IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JIMMY (BILLY) McCLENDON, et al.,

    *Plaintiffs,*

vs.             No. CV 95-24 MV/DJS

CITY OF ALBUQUERQUE, et al.,

    *Defendants*

vs.

E.M., R.L., W.A., D.J., P.S., and N.W., on behalf
of themselves and all others similarly situated,

    *Plaintiff Intervenors.*

### AMENDED COMPLAINT IN INTERVENTION
### FOR DECLARATORY AND INJUNCTIVE RELIEF
### (CLASS ACTION)

### PRELIMINARY STATEMENT

1.  Plaintiff Intervenors are people with mental and/or developmental disabilities who bring this complaint on behalf of themselves and all others similarly situated under 42 U.S.C. § 1983 to remedy the systematic failures by the Defendants to protect their federal statutory and constitutional rights when they are brought to the Bernalillo County Detention Center (BCDC). Frequently, people with disabilities are taken into police custody because of behaviors related to their disabilities, taken to the jail instead of the University of New Mexico Mental Health Center, booked, then denied pre-trial release because of their disabilities. Their trial, whether for a felony or misdemeanor, is routinely postponed because the issue of their competency to stand trial is raised, which initiates a process of competency evaluation that takes Defendants months to complete, even for petty misdemeanants. While awaiting their trial Plaintiff



Intervenors are denied by BCDC the therapeutic services they need and are often placed either in unnecessarily restrictive segregated settings or, without adequate care, in the jail's general population, where conflicts and injuries regularly take place. As a result their conditions often deteriorate. BCDC residents with disabilities are often disciplined as a result of conflicts with other residents or staff without due consideration of their disabling conditions. Plaintiff Intervenors are not kept safe from unreasonable threats to their safety in BCDC and are experiencing cruel and unusual punishment. Plaintiff Intervenors and the subclass they represent are discriminated against on the basis of their disabilities and kept in the jail far longer than similarly situated people without disabilities.

2.      The original plaintiffs in this action and their counsel are not in a position to adequately represent the interests of subclass members. Their complaint does not raise any of Plaintiff Intervenors' anti-discrimination claims based upon federal statutes and the U.S. Constitution, and the original Plaintiffs continue to assert interests actually adverse to the rights of subclass members seeking to be free of segregation and discrimination.

3.      The harms suffered by Plaintiff Intervenors are proximately caused by the acts and omissions of the Defendants as described below.

4.      Plaintiff Intervenors bring this suit under the United States Constitution and federal statutes. They seek a declaration that Defendants' practices of incarcerating people with mental and/or developmental disabilities far longer than people without disabilities and of failing to provide Plaintiff Intervenors with minimally adequate therapeutic services while in the jail violate Title II, Subtitle A of the Americans with Disabilities Act (42 U.S.C. §§ 12131-34); Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794); 42 U.S.C. § 1983; and the first, fourth, sixth, eighth and fourteenth amendments to the United States Constitution. Plaintiff

2

Intervenors also seek injunctive relief directing Defendants to immediately design and promptly implement a plan adequate to ensure that Plaintiff Intervenors will (1) receive all therapeutic services and supports to which they are entitled, and which, when provided, could prevent or end their incarceration by Defendants (2) obtain the education, treatment and other therapeutic services they require when they are incarcerated (3) receive prompt and professionally adequate evaluations, especially when the outcome of an evaluation could result in any classmember's release from the jail (4) have meaningful and effective access to the judicial system whenever they are incarcerated by Defendants and (5) be free of practices that subject them to unconstitutional conditions of confinement and unequal treatment.

## JURISDICTION

5.      This Court has jurisdiction over this controversy under 28 U.S.C. §§ 1331 and 1343.

6.      This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights, privileges and immunities secured by the Constitution and laws of the United States.   The rights sought to be redressed are guaranteed by the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq.*), § 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), and the first, fourth, sixth, eighth and fourteenth amendments to the United States Constitution.

## PLAINTIFF INTERVENORS

7.      Plaintiff Intervenor E.M. is a 22 year old man diagnosed with schizophrenia. E.M. has been housed at the jail since July 18, 1995.

8.      Plaintiff Intervenor R.L. is a 45 year old man diagnosed with chronic schizophrenia.  R.L. has been housed at the jail since January 8, 1995.

3

9.      Plaintiff Intervenor W.A. is a 44 year old man diagnosed with schizophrenia and affective disorders. W.A. was booked and released from the jail repeatedly during the months of February and March 1995, and has been housed at the jail continuously since March 3, 1995.

10.     Plaintiff Intervenor D.J. is a 22 year old woman diagnosed as having bipolar affective disorder. D.J. has been housed at the jail since November 10, 1994.

11.     Plaintiff Intervenor P.S. is a 31 year old man who has several diagnoses of chronic psychotic disorders. P.S. has been housed at the jail since December 19, 1994.

12.     Plaintiff Intervenor N.W. is a 41 year old man diagnosed with a psychotic disorder. N.W. has been housed at the jail since June 15, 1995.

13.     All named Plaintiff Intervenors are residing in Albuquerque, New Mexico.

## DEFENDANTS

14.     Defendant, the City of Albuquerque, is a Municipal Corporation, incorporated pursuant to the laws of the State of New Mexico. The City operates a police department.

15.     Defendant, Bernalillo County, is a county recognized pursuant to the laws of the State of New Mexico. The County operates a sheriff's office.

16.     The Defendants, City of Albuquerque, and the County of Bernalillo, have received and receive federal funds.

17.     The Defendants, City of Albuquerque, and Bernalillo County, jointly maintain and operate the Bernalillo County Detention Center for the purpose of enforcing, within their geographic limits, the City's ordinances and the laws of the State of New Mexico.

18.     Defendant, Martin Chavez, is the Mayor of the City of Albuquerque. He is responsible for the supervision, direction, and control of the conduct of the executive and administrative departments of the City, including the Albuquerque Police Department and

4

BCDC.   He establishes the policies and budget priorities of the executive branch of city government.   He is leading an effort to authorize the future expenditure of additional public safety tax revenue to improve police performance and to facilitate the operation of BCDC.   He supervises both the Chief of Police and the Director of BCDC.

19.   Defendants, County Commissioners Patrick Baca, Albert Valdez, Eugene Gilbert, Barbara Seward and Jacquelyn Schaefer, are the County Commissioners of Bernalillo County. They are responsible for the supervision, direction, and control of the conduct of the executive and administrative departments of the County of Bernalillo, including the Bernalillo County Sheriff's Office and the BCDC.   They have used their authority to establish and periodically change the amount of funding provided by the County for the operation of BCDC.

20.   The Mayor of the City of Albuquerque and the Bernalillo County Commissioners together appoint the director of the Bernalillo County Detention Center or formally authorize the appointment.

21.   Defendants Chavez and the Bernalillo County Commissioners must approve of any action by the BCDC Director to apply for and receive funds.

22.   Defendant John Dantis is the Director of the BCDC.   It is his duty to manage all operations of the BCDC, to establish its policies and procedures and to administer and enforce the laws with which he or the BCDC is charged.

23.   As the Director of the BCDC Defendant Dantis is responsible for the daily operation and management of the BCDC and is responsible for the operation of programs at the BCDC as well as other management duties set out by state statute and city ordinances.

24.   Deputy Director Ercell Griffith is the Deputy Director of the BCDC.

25.     Paul Sanchez, Frank Lovato, Lieutenant Michael Smith, Lieutenant John Van Sickler, Officer Will Bell, Lieutenant Albert Chavez, Lieutenant Fusco, George Fuentes, Lieutenant Baca, Victor Hernandez, Kevin D. Sevir, Dr. Mason, Barbara Cole, Maria Lucero, Medical Staff Nurse David, Captain Felimon Martinez, and Stanley Lents are or were employees of the BCDC.

26.     Each of the named natural person Defendants has acted, and is acting, pursuant to the laws, ordinances, regulations policies, customs and practices of the Bernalillo County Detention Center, the City of Albuquerque, the County of Bernalillo, and/or the State of New Mexico and is named herein in her or his official capacity.

27.     Each of the named natural person Defendants has initiated and/or continues to enforce the customs, policies, practices, and procedures which the Plaintiff Intervenors seek to enjoin.

28.     The Defendants have pursued and continue to pursue policies, practices and procedures which result in conditions of confinement at the BCDC which violate the constitutional and statutory rights of the Plaintiff Intervenors and has caused and is causing persons incarcerated therein irreparable harm.

29.     At all times and in all respects relevant to the claims raised herein, Defendants were acting in their official capacities and under color of state law.

### CLASS ACTION ALLEGATIONS

30.     Pursuant to Fed. R. Civ. P. 23(a) and (b)(2), Plaintiff Intervenors bring this action on behalf of themselves and the subclass of all people housed in the Bernalillo County Detention Center who have any form of mental and/or developmental disability.

31.     The Plaintiff Intervenors subclass is so numerous that joinder of all its members

is impracticable. Among the approximately nine hundred and ninety people housed in the Bernalillo County Detention Center there are at least one hundred forty six people who have been identified by Defendants as having a mental and/or developmental disability requiring some form of therapeutic service or support. Upon information and belief there are other people with mental and/or developmental disabilities also housed in the jail.

32.   The named Plaintiff Intervenors will fairly represent and adequately protect the interests of members of the subclass as a whole. The named Plaintiff Intervenors do not have interests antagonistic to those of other subclass members. All classmembers share an interest in assuring that all people with mental and/or developmental disabilities in the jail receive the services and supports to which they are entitled and that no person with a disability should be unnecessarily housed in the severely overcrowded jail. The named Plaintiff Intervenors and proposed subclass are represented by counsel who are experienced in federal class action and other civil rights litigation and can adequately represent the interests of the subclass.

33.   A community of interest exists between the named Plaintiff Intervenors and other members of the subclass in that there are questions of law and fact that are common to all because:

a.   All members of the class are in the custody of the Bernalillo County Detention Center and subject to the authority of Defendants;

b.   All members of the class are being denied adequate medical, psychiatric, psychological, and other therapeutic services and programs;

c.   It is in the interests of all residents of BCDC that residents with mental and/or developmental disabilities succeed in their efforts to vindicate the rights, privileges, and immunities that are secured by Title II, Subtitle A of the Americans with Disabilities Act (42

7

U.S.C. §§ 12131-34); Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794); and the first, fourth, sixth, eighth and fourteenth amendments to the United States Constitution; and

        d.     It is in the interest of the entire class if Plaintiff Intervenors can succeed in reducing the number of plaintiffs with disabilities housed in the jail.

    34.    The questions of law and fact common to all subclass members predominate over any question affecting individual members of the subclass.

    35.    The claims of the named Plaintiff Intervenors are typical of the claims of the subclass.

    36.    Defendants have acted or refused to act on grounds generally applicable to the subclass, thereby making appropriate final injunctive and declaratory relief with respect to the subclass as a whole.

## STATEMENT OF FACTS

### The Named Plaintiff Intervenors

    37.    E.M. is a 22 year old man with a diagnosis of schizophrenia.  He was placed in the jail on July 18, 1995.  He has also been housed at the jail in the past.  Since August 1995 E.M. has been requesting release from the Psychiatric Services Unit.  He has been taking Haldol and Cogentin to manage his psychiatric condition and feels ready to be placed in general population.

    38.    E.M. has found the conditions in the PSU to be harmful. The noise, overcrowding, lack of privacy and frequent physical confrontations in the PSU cause E.M. to experience emotional harm.

    39.    When E.M.'s requests for release were ignored he filed a grievance on August 27, 1995.  His grievance states that he wants to return to general population, stating that

remaining on 5 East makes it difficult to maintain his hygiene.  He requested "Please have someone help me return to G[eneral] P[opulation]."

40.    E.M.'s counselor, the PSU staff member responsible for providing the therapeutic services E.M. needs, only works on Monday and Tuesday evenings.

41.    E.M. has not received psychotherapy or other mental health services which might assist him in coping with the stresses resulting from placement in the PSU.  The counselor assigned to work with him has not been adequately trained to provide the necessary services and is not adequately supervised by a clinician.

42.    Although E.M. has repeatedly sought assistance in vindicating his right to be free of unnecessary segregation and to receive procedural due process, no legal assistance of any kind is provided to him at BCDC.

43.    R.L. is 45 years old.  He was admitted to BCDC on January 8, 1995, on charges of burglary and larceny.  Diagnosed with chronic schizophrenia, R.L. cut himself shortly after admission, threatening suicide.  He was moved to the dayroom on 5 East, the Psychiatric Services Unit (PSU) at the jail.  He has been requesting placement in an appropriate mental health treatment setting throughout his eight months in the jail.

44.    On January 13, 1995, a telephone order by Dr. Jack Ellis authorized R.L.'s transfer to 1 South "pending reclassification."  On January 14, 1995 R.L. was classified as needing maximum security and placement in the PSU, but his housing was nevertheless changed to 3 North.  Although his classification document stated that on January 14, 1995 he was "cleared by Dr. Hunter for general population," the first entry in R.L.'s mental health record made by Dr. Hunter, the facility psychiatrist, is dated January 23, 1995.

45.    Since his placement in general population R.L. has been repeatedly subjected to lock down in administrative segregation after receiving disciplinary reports.  He has been charged with disruptive conduct, threatening to inflict injury, and fighting.  He has been sanctioned with periods of disciplinary lock up as a result.

46.    He has received a number of misconduct reports, including a misconduct report for refusing to be moved to a segregated pod.  He received no legal assistance to defend himself against the charges.

47.    In the nearly eight months he has been housed at the jail R.L. has been medicated with Thorazine, although he has requested that he be allowed to receive Trilafon, the medication he took in the past and with which he has experienced good results.

48.    R.L.'s medications have not been reviewed on a timely basis and he has been threatened with the denial of any medication if he does not comply with the administration of Thorazine.  Medication was initially administered to him on January 11, 1995, although R.L. was not seen by a psychiatrist until January 23, 1995, fifteen days after his suicide attempt. These medication practices depart substantially from applicable professional standards.

49.    On August 9, 1995 R.L. was hit in the mouth and received lacerations to his mouth and lip.  He has been denied the placement and therapeutic services he needs and is not being kept safe from unreasonable threats to his safety.

50.    W.A. is a 44 year old man with a history of psychiatric hospitalizations and diagnoses of schizophrenia and affective disorder who was initially arrested and booked into the jail on February 6, 1995 on a charge of arson.  He was released on February 27, 1995, then rearrested on March 3, 1995, for violating his conditions of release.  In the six months he has

10

been housed at BCDC, W.A. has been deemed "psychotic" by medical staff and has been administered Prolixin Deconate, Lithium, Cogentin, and Benadryl. His medications have not been reviewed in a timely fashion, as required by prevailing professional standards. He is experiencing untoward size effects from the drugs and is not being properly screened to detect and prevent such side effects.

51.   During August of 1995 he has been experiencing difficulty breathing, passing out on at least one occasion. Adequate medical care is not being provided.

52.   During his incarceration W.A. has been: denied minimally adequate medical and mental health care; segregated, denied legal assistance regarding the length and conditions of his confinement; subjected to unnecessary threats to his safety; and discriminated against on the basis of his disability in the provision of programs, activities and services at the jail.

53.   D.J. is a 22 year old woman with a lengthy history of psychiatric treatment, including repeated hospitalizations and has been held in BCDC since November 10, 1994, on charges of issuing worthless checks. She has not had a trial.

54.   Housed in the women's unit on 6 East, D.J. first saw a psychiatrist on December 14, 1994, over a month after her admission. She was then diagnosed as having a bipolar affective disorder and Lithium was prescribed. Since that time she has also been prescribed Zoloft, Vistaril and Cogentin. The last time her medications were evaluated was June 25, 1995, although they have been due for review since July 26, 1995. During her confinement her medications have not been managed in a fashion consistent with community standards and she has not received the mental health services she needs.

55.   D.J. was kept in a cage with other subclass members for some time.  On June 9, 1995 she was reclassified from 6 East to 6 West after a psychiatric services worker told the classification committee that D.J. was "malingering."  She had difficulty with residents in 6 West and was returned to 6 East, now classified as needing protective custody; she has not been kept safe from unreasonable risks to her safety.

56.   D.J. has been disciplined without due process of law.  She received a misconduct report in June for refusing to obey an order to return to her cell.  At that time she stated that she had been denied any opportunity to be out of her cell during the previous shift and that she needed an opportunity to be in the open for a longer time.  Her disability was not accommodated in the disciplinary process and she was sentenced to four days in lockup in violation of her due process rights.

57.   No legal assistance has been provided to D.J. with respect to the cruel and unusual punishment she has suffered or the length and conditions of her confinement.

58.   D.J. has been subjected to invasive body cavity searches without due process of law.  Such searches without due process present the elements of criminal sexual penetration.

59.   D.J. has also been subjected to a denial of her rights to equal protection of the law.  She, like all women with mental disabilities, does not have access to a PSU or to a level of care that even roughly approximates psychiatric hospitalization.  Further, she has been denied adequate programs and services and irrationally subjected to a greater degree of overcrowding than are men.  Due to overcrowding, women in 6 East must take turns using the dayroom, rotating in groups.

60.   P.S. is a 31 year old man diagnosed with chronic schizophrenia who was booked

12

into the jail on December 19, 1994 on a charge of residential burglary.  He was assigned to the PSU on December 21, 1994, where his condition deteriorated and he was not kept safe from unreasonable threats to his safety.  As a result of his deteriorating condition, he was the subject of a civil commitment proceeding at which he was committed for up to 30 days to the University of New Mexico Mental Health Center.  However, after only a few days at the Mental Health Center, he was returned to the jail by Defendants.

61.   P.S. has not received the mental health care he needs and has been subjected to discrimination in the provision of recreation, disciplinary proceedings, medical and mental health care and other programs and services.

62.   With a diagnosis of chronic schizophrenia and a history of psychiatric hospitalizations, and long-term placement in the mental health facilities operated by the state Department of Corrections, P.S. has been seeking placement in a psychiatric hospital or other treatment facility since his discharge from the Mental Health Center.  Defendants have kept him in BCDC despite his apparent need for hospital level care.

63.   P.S.'s medical care has also been inadequate.  In fact, when a representative of Plaintiff Intervenors' counsel attempted to review his medical file at the jail, the file could not be located by medical staff, even after a search of several hours' duration.

64.   P.S. has been subjected to disciplinary proceedings which he does not understand and punished without due process of law.

65.   Due to the severity and nature of his disabilities, P.S. cannot use a law library or assert his legal rights on his own behalf.  His requests to be placed in a psychiatric hospital during the past two months have evidently been ignored by Defendants.

13

66.     While in the PSU he has made suicidal gestures and been engaged in frequent altercations with other residents.  His face and leg were seriously bruised on or about August 29, 1995 and he was then locked down in his cell for an indeterminate period without due process of law.

67.     N.W. is a 41 year old man with a diagnosis of an unspecified psychotic disorder. He was admitted to the jail on June 15, 1995 based on a charge of aggravated assault on a peace officer.  Although jail medical staff placed him on an "alcohol watch" upon his admission, he was immediately "medically cleared" for and placed in the general population.  He did not receive detoxification.

68.     While in general population, N.W. did not receive adequate mental health care and he swallowed a razor blade on July 1, 1995.  No adequate medical precautions or treatment were provided thereafter.  Although he was later transferred to the University Hospital for evaluation, his medical record indicates neither that the transfer to the hospital occurred, nor what treatment or precautions were prescribed by the doctor at the hospital.

69.     In late August 1995, N.W. began experiencing blurred vision.  The nursing assessment stated "blurred vision due to psychotropic medications."  The nurse wrote "encouraged resident to discuss with PSU."  No follow up is indicated in his records.  Although his diagnosis has not been established properly, he has been given at least four medications. Adequate medical and psychiatric care has not been provided.

70.     While housed at the jail, N.W. has not been provided with materials necessary to perform legal work nor access to a lawyer or other trained legal worker to contest the conditions of his confinement.

14

*The Plaintiff Intervenor Subclass*

71.    The Defendants' treatment of the named Plaintiff Intervenors is typical of its treatment of the members of the Plaintiff Inervenor subclass.

72.    Subclass members are qualified individuals with disabilities most of whom have been assessed by the Defendants' own agents and determined to have mental and/or developmental disabilities and to be in need of supportive, therapeutic services.   Instead, subclass members have been unnecessarily confined in segregation units and strip cells without toilet facilities or running water, tied into restraint devices, kept in cages with numerous other people, many with serious psychiatric disorders, crowded into small cells designed for one person, required to sleep on floors, or housed in living units that do not provide reasonably safe conditions or requisite treatment and services.

73.    The PSU on 5 East houses many subclass members who need and are seeking psychiatric hospitalization; the unit is unable to provide the acute mental health care required. Psychological, psychiatric and related services are inadequate for those subclass members who need treatment or habilitation.  Not a single psychologist is employed to supervise the counselors or to clinically evaluate residents.   Men deemed suicidal are all housed in one cage that sometimes is so crowded that they must lie shoulder to shoulder on mattresses on the floor as they attempt to sleep.  People with no serious psychiatric disorder who express a suicidal idea in response to the stress of being jailed are sometimes caged together with individuals with psychoses who are hallucinating.  In addition to being incapable of providing needed hospital level services, the PSU is the most restrictive and segregated placement for subclass members. Within the PSU subclass members are often physically injured.   Years ago two pods were

15

designated to serve as the PSU.  The severe overcrowding at the jail led Defendants to convert one of the PSU pods to other housing, reducing PSU capacity by half. The remaining pod for PSU is designed to hold twenty-two (22) people, but at times has held many more.  Mattresses are routinely scattered on the floor in the dayroom.

74.    The PSU only serves men.  Women with mental and/or developmental disabilities are required to live in 6 East, which is so overcrowded that different segments of the women's population take turns getting out of their overcrowded cells to have access to the dayroom for a maximum of two hours at a time.  Women needing acute mental health care do not get hospital level services and do not even have a PSU available to them.  They are typically required to live in a cage like the men's suicide watch cage, where they are denied any semblance of privacy.

75.    Subclass members are routinely restrained in cells or cages for the protection of others.  When subclass members (and others) do not comply with instructions from security staff they are routinely restrained in a hard plastic chair, bound hand and foot and kept there, sometimes for several hours.  Their arms are shackled at a low level behind their backs and become numb in a short time.  This cruel practice is not overseen by any qualified mental health professional.

76.    Due to the enormously overcrowded conditions in the jail, subclass members are either locked away in segregated settings or subject to harm in general population.

77.    Subclass members do not receive appropriate and necessary training or therapeutic intervention and BCDC does not have facilities or personnel sufficiently trained to work with or educate mentally and/or developmentally disabled or multiply diagnosed children or adults.

78.    Plaintiff Intervenors are also denied meaningful and effective access to court.

16

Defendants do not provide subclass members with understandable information about their legal rights, BCDC policies and procedures, or the available remedies for violations of their rights. No policy manuals are distributed.  Nor does BCDC provide Plaintiff Intervenors with a lawyer or other legal worker to assist them in asserting their civil rights, whether with respect to the length or the conditions of their confinement.  The legal services available to plaintiffs at BCDC are inferior to those provided to convicted felons (without the additional impediment of a mental disability) housed in the state Department of Corrections.  People with disabilities are held at the jail far longer than people without disabilities charged with the same offenses.  Some are held even beyond the terms of their sentences, due to Defendants' failure to arrange an appropriate alternative placement.  Meaningful legal advice and assistance are not available to subclass members held at BCDC.

79.     Many subclass members have been unnecessarily segregated from the community and incarcerated in the jail because of the unavailability of services for people who (a) need residential mental health care or other supervised living arrangements, (b) have both a psychiatric and a developmental disability, or (c) have organic or other neurological disorders.

80.     Defendants discriminate against some subclass members on the basis of their disability by:  (a) booking them into BCDC even when it is apparent they need hospitalization, and  (b) then denying them pre-trial release because they have a mental disability.

81.     Defendants have followed a custom and practice of keeping BCDC severely overcrowded.  Subclass members housed in the PSU and elsewhere are routinely required to sleep on the floor, sometimes without a mattress.

17

82.     Defendants require subclass members in the PSU and elsewhere to live in conditions which are unsanitary and which present unreasonable threats to their safety from fire and other hazards, due, in part, to overcrowded conditions.

83.     Defendants permit excessive violence among residents and between residents and staff.   Defendants' customs and practices discourage effective investigations when subclass members allege brutality by staff.

84.     Inadequate lighting throughout the living areas is physically and emotionally harmful to subclass members.   The lack of minimally adequate ventilation is also harmful. There is often an odor of feces or urine in the PSU, particularly when people are housed in one of the strip cells which have only an open grate in the floor for a toilet.   Temperatures in the PSU are too hot in the summer and too cold in the winter.

85.     The Defendants have established policies and practices by which some subclass members are confined to a cell twenty four hours a day except for three hours per week allowed for exercise and showers.

86.     Defendants have established the custom and practice of understaffing the facility, especially with respect to psychologists, psychiatrists, counselors, teachers, nurses and other professional and administrative staff.   This understaffing contributes to the inability of existing BCDC staff to comply with minimal professional standards.   The Defendants have also established the custom and practice of providing staff with inadequate training.   Security staff working with mentally disabled residents receive only eight hours of training in working with that special population.   Staff without any special training are assigned to work with residents with mental disabilities in the PSU.

18

87.     Defendants do not now employ even a single psychologist, and have not done so for many months.  Counselors receive inadequate supervision.

88.     Defendants have established a custom and practice of imposing idleness on subclass members.   There is little meaningful employment, training, education or other constructive activity provided.

89.     Defendants do not provide adequate recreational or exercise opportunities for subclass members.  Recreation facilities, equipment, programs and staff are insufficient.

90.     Defendants have established a custom and practice whereby they do not provide minimally adequate medical and dental services to subclass members.   Drug and alcohol treatment is not available.

91.     Defendants have established a custom and practice of maintaining a disciplinary process which denies subclass members due process of law.

92.     Defendants have established customs and practices which result in physical and other abuse of residents by staff.

93.     Defendants' staff physically and emotionally abuse subclass members, especially those who are accused of assaulting or resisting BCDC staff, physically abuse subclass members who are hand-cuffed or otherwise restrained, and verbally abuse subclass members.

94.     Defendants detain subclass members in segregated and secluded areas without proper cause and/or for excessive periods and deny them access to counsel, medical services, mental health services, and other necessities while secluded.

95.     Defendants maintain an inadequate system for investigating complaints of abuse.

96.     Defendants have established a custom and practice of failing or refusing to provide sufficient training to staff regarding the use of force, including failing to adequately instruct them to not use unnecessary force against residents with mental and/or developmental disabilities.

### FIRST CLAIM FOR RELIEF
### (Americans with Disabilities Act)

97.     Plaintiff Intervenors reallege the allegations of paragraphs 1 through 96.

98.     Because Defendants are governmental entities and their agents and employees, they are subject to the requirements of Subtitle A, Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-34, and the regulations promulgated thereunder, 28 C.F.R. Part 35 (July 26, 1991).

99.     The ADA prohibits governmental entities from, inter alia, subjecting any qualified individual with a disability to discrimination in their programs on the basis of disability.

100.    Plaintiff Intervenors are "disabled" within the meaning of the ADA and protected from discrimination by the Act because they have mental and/or developmental impairments which substantially limit one or more major life activities, have a record of such an impairment, or are regarded as having such an impairment.

101.    Actions which are prohibited by the ADA and its implementing regulations include:

        a.      denying qualified individuals with disabilities the opportunity to participate in or benefit from the programs or services of government;

b.    denying qualified handicapped individuals aid, benefits or services that are as effective as those provided to non-disabled persons;

c.    denying qualified individuals with disabilities any aid, benefit or service that would afford disabled individuals an equal opportunity to obtain the same result, gain the same benefit or reach the same level of achievement as that provided to non-disabled persons;

d.    using criteria or methods of administration that have the purpose or effect of defeating or substantially impairing accomplishment of the objective of the program with respect to individuals with disabilities.

e.    requiring qualified individuals with disabilities to participate in different or separate services or programs when these separate programs are not necessary to ensure that individuals with disabilities receive aid, benefits or services that are as effective as those provided to non-disabled individuals;

f.    failing to provide programs, activities and services in the most integrated setting appropriate to the needs of qualified individuals with disabilities;

g.    imposing or applying eligibility criteria for government services that tend to deny individuals with disabilities the full and equal enjoyment of government services or programs;

h.    failing to make reasonable modifications in government programs, policies and procedures when necessary to avoid discrimination on the basis of disability; and

i.    otherwise limiting qualified individuals with disabilities in the enjoyment of rights, privileges, advantages, or opportunities enjoyed by others receiving government aid, benefits, or services.

102.   Plaintiff Intervenors are "qualified individuals with disabilities" within the meaning of the ADA and thus protected against discrimination by the Act because they can, with or without reasonable accommodations, meet the essential eligibility requirements for the receipt of governmental services.

103.   Defendants, in the administration of the Albuquerque Police Department, Bernalillo County Sheriffs' Office and the Bernalillo County Detention Center, have violated Plaintiff Intervenors' rights under the ADA by:

a.      failing to establish an adequate system for identifying mental, behavioral and developmental problems of people arrested and/or brought to the jail;

b.      failing to develop for and provide to Plaintiff Intervenors necessary therapeutic placements and services;

c.      failing to provide Plaintiff Intervenors with services that are as effective as those provided to non-handicapped people;

d.      failing to provide pre-trial release services, access to the judicial system, recreational and other services for Plaintiff Intervenors that are as effective as those provided to their non-disabled peers;

e.      unnecessarily requiring Plaintiff Intervenors to participate in different or separate services or programs and denying them the opportunity to participate in programs or activities with their non-disabled peers;

22

f.      denying Plaintiff Intervenors programs, activities and services in the most integrated setting appropriate to their needs;

g.      imposing or applying eligibility criteria for the receipt of some services and programs, including pre-trial release, that tend to prevent Plaintiff Intervenors from fully and equally enjoying these services or programs;

h.      categorically denying needed services to Plaintiff Intervenors with particular disabilities (e.g., developmental disabilities, organic and neurological impairments and multiple disabilities);

i.      denying access to all available and appropriate services for those Plaintiff Intervenors with the most severe disabilities;

j.      failing to make reasonable modifications in programs, policies and procedures when necessary to avoid discrimination against Plaintiff Intervenors on the basis of disability;

k.      using methods of administration that have the effect of defeating or substantially impairing accomplishment of the objectives of New Mexico's statutory schemes regarding the care of people with disabilities in the corrections system; and

l.      using methods of administration that have the effect of defeating or substantially impairing accomplishment of the disability integration objectives of the ADA.

### SECOND CLAIM FOR RELIEF
#### (Section 504 of the Rehabilitation Act)

104.    Plaintiff Intervenors reallege the allegations of paragraphs 1 through 103.

105.    Because Defendants are governmental entities who receive federal funds and their agents and employees, they are subject to the requirements of § 504 of the Rehabilitation Act,

29 U.S.C. § 794, and the regulations promulgated thereunder, 45 C.F.R. Part 84.

106.    Section 504 prohibits governmental entities from, inter alia, subjecting any qualified individual with a disability to discrimination in their programs solely on the basis of disability.

107.    Among Defendants' discriminatory actions which are prohibited by § 504 and its implementing regulations are:

a.    denying qualified individuals with disabilities the opportunity to participate in or benefit from the programs or services of government;

b.    denying qualified handicapped individuals aid, benefits or services that are as effective as those provided to non-disabled persons;

c.    denying qualified individuals with disabilities any aid, benefit or service that would afford disabled individuals an equal opportunity to obtain the same result, gain the same benefit or reach the same level of achievement as that provided to non-disabled persons;

d.    using criteria or methods of administration that have the purpose or effect of defeating or substantially impairing accomplishment of the objective of the program with respect to individuals with disabilities.

e.    requiring qualified individuals with disabilities to participate in different or separate services or programs when these separate programs are not necessary to ensure that individuals with disabilities receive aid, benefits or services that are as effective as those provided to non-disabled individuals;

f.    failing to provide programs, activities and services in the most integrated setting appropriate to the needs of qualified individuals with disabilities;

g.     imposing or applying eligibility criteria for government services that tend to deny individuals with disabilities the full and equal enjoyment of government services or programs;

h.     failing to make reasonable modifications in government programs, policies and procedures when necessary to avoid discrimination on the basis of disability; and

i.     otherwise limiting qualified individuals with disabilities in the enjoyment of rights, privileges, advantages, or opportunities enjoyed by others receiving government aid, benefits, or services.

108.   Plaintiff Intervenors are "disabled" within the meaning of § 504 and protected from discrimination by the Act because they have mental and/or developmental impairments which substantially limit one or more major life activities, have a record of such an impairment, or are regarded as having such an impairment.

109.   Plaintiff Intervenors are "qualified individuals with disabilities" within the meaning of § 504 and thus protected against discrimination by the Act because they can, with or without reasonable accommodations, meet the essential eligibility requirements for the receipt of governmental services.

110.   Defendants, in the administration of the Albuquerque Police Department, the Bernalillo County Sheriffs' Office and the Bernalillo County Detention Center, have violated Plaintiff Intervenors' rights under § 504 by:

a.     failing to establish an adequate system for identifying mental, behavioral and developmental problems of people arrested and/or brought to the jail;

b.      failing to develop for and provide to Plaintiff Intervenors necessary therapeutic placements and services;

c.      failing to provide Plaintiff Intervenors with services that are as effective as those provided to non-handicapped people;

d.      failing to provide pre-trial release services, access to the judicial system, recreational and employment opportunities and other services for Plaintiff Intervenors that are as effective as those provided to their non-disabled peers, including but not limited to the failure to ensure that the educational needs of children who are handicapped within the meaning of federal special education law are adequately addressed;

e.      unnecessarily requiring Plaintiff Intervenors to participate in different or separate services or programs and denying them the opportunity to participate in programs or activities with their non-disabled peers;

f.      denying Plaintiff Intervenors programs, activities and services in the most integrated setting appropriate to their needs;

g.      imposing or applying eligibility criteria for the receipt of some services and programs, including pre-trial release, that tend to prevent Plaintiff Intervenors from fully and equally enjoying these services or programs;

h.      categorically denying needed services to Plaintiff Intervenors with particular disabilities (e.g., developmental disabilities, organic and neurological impairments and multiple disabilities);

i.      denying access to all available and appropriate services for those Plaintiff Intervenors with the most severe disabilities;

26

j.      failing to make reasonable modifications in programs, policies and procedures when necessary to avoid discrimination against Plaintiff Intervenors on the basis of disability;

k.      using methods of administration that have the effect of defeating or substantially impairing accomplishment of the objectives of New Mexico's statutory schemes regarding the care of people with disabilities in the corrections system; and

l.      using methods of administration that have the effect of defeating or substantially impairing accomplishment of the disability integration objectives of § 504.

## THIRD CLAIM FOR RELIEF
### (Substantive Due Process Right to Minimally Adequate Treatment)

111.    Plaintiff Intervenors reallege the allegations of paragraphs 1 through 110 above.

112.    Plaintiff Intervenors have substantive rights to due process of law, guaranteed by the fourteenth amendment to the United States Constitution, to safety, freedom from undue restraint and to minimally adequate living conditions and treatment.

113.    Defendants have violated Plaintiff Intervenors' substantive due process rights by, among other things:

a.      failing to protect them from serious emotional, physical and mental injury and other unreasonable risks to their safety while in custody;

b.      failing to provide them with minimally adequate food, clothing, living conditions and shelter;

c.      failing to provide them with minimally adequate medical care;

d.      failing to provide them with minimally adequate treatment for their mental and developmental disabilities, including the failure to provide the medications, treatment and

27

other therapeutic services prescribed by qualified professionals;

      e.     failing to provide them with adequate training and habilitation;

      f.     unreasonably restraining their liberty by placing them in more restrictive environments than is required for their care and treatment, including the unnecessary use of mechanical and chemical restraints;

      g.     causing their conditions to deteriorate by failing to provide them with appropriate treatment and adequate services and unreasonably restraining their liberty;

      h.     making and implementing decisions about Plaintiff Intervenors treatment based on administrative and fiscal convenience, rather than professional judgment and accepted professional norms;

      i.     failing to maintain an adequate formulary of medications in the pharmacy and denying Plaintiff Intervenors the medications that have proven effective in managing their psychiatric and other disorders;

      j.     failing to make available adequate psychiatric and psychological resources; and

      k.     failing to provide adequate detoxification and other drug and alcohol treatment.

### FOURTH CLAIM FOR RELIEF
### (Right to Equal Protection of the Law)
### (Sexual Discrimination)

114.    Plaintiff Intervenors reallege the allegations of paragraphs 1 through 113 above.

115.    Defendants have deprived Plaintiff Intervenors of their constitutional right to equal protection of the laws as is guaranteed to them by the Fourteenth Amendment to the United States Constitution.

116.    BCDC maintains and operates a Psychological Services Unit for men.   No Psychological Services Unit exists at BCDC for women.

117.    Separate pods exist for male Plaintiffs (1) in Protective Custody, (2) in the Psychological Services Unit, and (3) in Administrative Segregation, while most females incarcerated at BCDC are housed in only two pods.  Due to the limited space used to house females at the BCDC, the women's housing units are more overcrowded than are mens' housing units.

118.    One pod, 6 East, houses female Plaintiffs (1) in Protective Custody, (2) those in need of Mental Health services, (3) in Administrative Segregation and (4) in general population.

119.    Access to the 6 East dayroom is provided on a rotating basis.  Due to the mixed population being housed in the 6 East, female Plaintiffs are provided less opportunities to be out of their cells than are male Plaintiffs housed in the Psychological Services Unit.

120.    BCDC provides female Plaintiffs less recreation time and activities than BCDC provides to males.

121.    BCDC provides female Plaintiffs less access to programs and services, especially mental health services, than BCDC provides to males.

122.    Female Plaintiffs have been, and are currently being, deprived of their constitutional right to equal protection of the laws as is guaranteed them by the Fourteenth Amendment to the United States Constitution as a direct and proximate result of being their being treated differently by the Defendants and less favorably than are similarly situated men.

29

### FIFTH CLAIM FOR RELIEF
### (Right to Equal Protection of the Law)
### (Disability Discrimination)

123.   Plaintiff Intervenors reallege the allegations of paragraphs 1 through 122 above.

124.   Defendants have deprived Plaintiff Intervenors of their constitutional right to equal protection of the laws as is guaranteed to them by the Fourteenth Amendment to the United States Constitution.

125.   The Albuquerque Police Department and Bernalillo County Sheriffs' Office is more likely to bring persons with psychiatric, developmental or other mental health disorders to the BCDC for booking than they are similarly situated persons with medical conditions that are not psychiatric disorders or mental health disorders.  Non-disabled citizens receive citations for the same alleged offenses.  Police and deputies rarely use the option of transporting subclass members to the University of New Mexico Mental Health Center, rather than the jail.

126.   Persons with psychiatric, developmental or other mental health disorders are more likely to be booked into the BCDC by BCDC staff than are similarly situated persons without such disorders.  Persons with medical conditions that warrant hospitalization frequently get it; persons with psychiatric disabilities that warrant psychiatric hospitalization do not.

127.   Persons with psychiatric, developmental or other mental health disorders are less likely to be released from BCDC under the Pre-Prosecution Diversion Program than are similarly situated persons without such disorders.

128.   Persons with psychiatric, development or other mental health disorders are less likely to be granted pre-trial release from BCDC than are similarly situated persons without such disorders.

129.   Persons with psychiatric, developmental or other mental health disorders are more likely to be segregated in Administrative Segregation or Protective Custody by BCDC staff than are similarly situated persons without such disorders.

130.   Persons with psychiatric, developmental or other mental health disorders are incarcerated for a much longer period of time in the BCDC than are similarly situated persons without such disorders.

131.   Persons with psychiatric, developmental or other mental health disorders are provided less opportunity to participate in education, recreation, and work programs while incarcerated at BCDC than are similarly situated persons without such disorders.

132.   Persons with psychiatric, developmental or other mental health disorders are provided less out-of-cell  time while incarcerated at BCDC than are similarly situated persons without such disorders.

133.   Plaintiff Intervenors with psychiatric, developmental or other mental health disorders are being, deprived of their constitutional right to equal protection of the laws as is guaranteed them by the Fourteenth Amendment to the United States Constitution as a direct and proximate result of being their being treated differently, and less favorably, by Defendants than are similarly situated nondisabled persons.

## SIXTH CLAIM FOR RELIEF
### (Right to Procedural Due Process)

134.   Plaintiff Intervenors reallege the allegations of paragraphs 1 through 133 above.

135.   Defendants do not afford Plaintiff Intervenors procedural due process.  Plaintiff Intervenors are routinely compelled to be placed into the PSU and the cages on 5 East and 6 East against their will without due process of law.   No administrative hearing or civil

31

commitment proceeding is initiated when Plaintiff Intervenors are involuntarily placed into the PSU or other area designated as housing for residents with mental disorders.

136.   Defendants deprive Plaintiff Intervenors of their liberty without procedural due process of law, contrary to the provisions of the Fourteenth Amendment to the United States Constitution.

137.   Plaintiff Intervenors have a liberty interest in not being confined in the BCDC Psychological Services Unit or otherwise identified and stigmatized as a person needing mental health services.

138.   Currently BCDC employs inadequately trained and supervised counselors who determine which Plaintiff Intervenors will be confined in the PSU or in the cages on 5 East and 6 East.  If subclass members oppose the recommendation of the BCDC counselor, correctional officers use physical force to move them to the place designated by the counselor.

139.   Plaintiff Intervenors are provided no notice of the counselor's intent to transfer them to PSU or to other housing designated to provide mental health services prior to their transfer.

140.   Subclass members are not provided any administrative hearing before an objective decision maker for the purpose of opposing a counselor's decision prior to their transfer to PSU or being identified as a person in need of mental health services.

141.   Plaintiff Intervenors are also not provided an administrative hearing before an objective decision maker for the purpose of opposing their continued placement after they are transferred to PSU or other housing designated to provide mental health services.

142.   Plaintiff Intervenors are not provided a meaningful opportunity to prepare a defense or opposition to their involuntary confinement for mental health services.

143.   Plaintiff Intervenors are not provided an opportunity to call witnesses, present documentary or other evidence or otherwise present relevant information in opposition to involuntary confinement for mental health reasons.

144.   Plaintiff Intervenors are not provided a written statement by any fact finder of the evidence relied on and the reasons for the decision to identify them as needing involuntary mental health services or placement.

145.   Indigent Plaintiff Intervenors are not provided appointed counsel or other advocate and are not provided access to other adequate, meaningful and effective legal assistance and/or resources prior to being transferred to PSU or other area designated to provide mental health services.

146.   Plaintiff Intervenors are disciplined for behaviors which are symptomatic of their mental disorders.   No advocate is provided to residents with mental disabilities facing disciplinary proceedings.   No opportunity is permitted to present expert testimony by a mental health professional regarding the exculpatory effect of a resident's mental disorder.

### SEVENTH CLAIM FOR RELIEF
### (Right of Access to the Judicial Process)

147.   Plaintiff Intervenors reallege the allegations of paragraphs 1 through 146 above.

148.   Plaintiff Intervenors have a right to adequate, effective and meaningful access to the judicial system guaranteed by the first, fifth, sixth and fourteenth amendments and the Privileges and Immunities Clause of Article IV of the United States Constitution.  This right of access encompasses at least their right of access to legal representation and to meaningful

33

information regarding their legal rights and remedies, including the right to challenge the legality

of their incarceration and their continued confinement.   This also includes the right to challenge

the conditions of confinement and the practices of the facility in which they are confined.   Their

right of access to the judicial system imposes affirmative obligations upon Defendants to ensure

that classmembers may effectively exercise this right.   Defendants' obligations are greater to

people who have mental and/or developmental disabilities, which impair their ability to know

their rights, recognize a violation of their rights, or to effectively pursue the vindication of their

rights.

149.    Defendants systematically deny effective access to the judicial system to Plaintiff

Intervenors.  Plaintiff subclass members often are not provided with any legal representation for

a significant period of time after they are taken into custody; people with psychiatric disabilities

are sometimes given no timely arraignment, ostensibly because they are "too disturbed" to be

walked to Metropolitan Court.   Subclass members are not provided with an adequate law library

or other effective means of sufficiently informing themselves of their legal rights and remedies

and are not provided access to any effective mechanism by which they can challenge the legality

or conditions of their confinement.  No legal assistance is provided to people with mental and/or

developmental disabilities by Defendants.

150.    Once adjudicated and sentenced to serve a term in the jail, people with mental

and/or developmental disabilities have no meaningful access to the legal system.   Public

defenders do not represent any claim regarding conditions of confinement or other civil rights

claims.  Adequate law libraries are not provided and there are no lawyers or other trained legal

professionals available to assist Plaintiff Intervenors in the evaluation, preparation, filing and

34

presentation of their legal claims.  This general inaccessibility of the legal system is exacerbated by subclass members' disabilities, often resulting in their unlawful confinement.

151.    While most subclass members have not been adjudicated incompetent, their cognitive and other impairments impede their ability to be effective self-advocates.  Some are unable to read and most do not have any legal training.  Many are isolated from families and friends.  Many subclass members are unable to effectively: a) understand fully the various federal and state rights to which they might be legally and constitutionally entitled, b) evaluate, negotiate, draft, and file pleadings, memoranda and other legal papers that are necessary to assert these rights, and c) to represent themselves effectively in legal proceedings that are necessary to pursue their rights.

152.    There are a number of subclass members held within the Psychological Services Unit or otherwise segregated in the jail who are illegally and/or inappropriately placed there.  These include persons whose problems can be treated more effectively in less restrictive settings.  Said subclass members remain illegally confined, in considerable part, because of the absence of civil legal assistance.

153.    Plaintiff Intervenors and their subclass are not provided adequate, meaningful or effective access to the courts for the purposes of:

        a.    Evaluating potential civil rights actions; assessing the reasons for either asserting or not asserting such actions; negotiating such actions; and, where negotiations are unsuccessful, drafting, preparing and filing pleadings necessary to bring such actions in appropriate courts.

        b.    Evaluating potential actions seeking release from confinement at BCDC;

35

assessing the reasons for either asserting or not asserting such actions; negotiating such actions; and, where negotiations are unsuccessful, drafting, preparing and filing pleadings necessary to bring such actions in appropriate courts.

        c.     Evaluating potential claims to government benefits and entitlements, e.g., public assistance, social security and veterans administration benefits, that can be essential to obtaining the housing, counseling, sustenance, transportation and other necessary services which could enable them to qualify for release from the jail; assessing the reasons for either asserting or not asserting such claims; negotiating their claims; and, where negotiations are unsuccessful, drafting, preparing and filing pleadings necessary to seek such entitlements in appropriate courts or administrative agencies.

        d.     Evaluating potential claims challenging involuntary confinement in the PSU in the absence of a civil commitment; assessing the reasons for either asserting or not asserting such claims; negotiating such claims; and, where negotiations are unsuccessful, drafting, preparing and filing pleadings necessary to bring such actions in appropriate courts.

        e.     Attempting to resolve other legal problems that interfere with the effective provision of psychiatric and psychological treatment.

154.    The New Mexico Office of the Public Defender does not provide legal assistance or representation to class members in civil matters.

155.    BCDC has no meaningful, adequate or effective system for providing paralegals or BCDC residents specially trained in the law to assist subclass members in identifying, researching or evaluating the merits of potential legal claims or to assist Plaintiffs in preparing legal documents to file with the courts.

36

156.    Defendants have established no meaningful, adequate or effective system for providing attorneys to assist Plaintiff Intervenors in identifying, researching or evaluating the merits of potential legal claims or to assist them in preparing legal documents to file with the courts.

157.    Those Plaintiff Intervenors who could pursue access to the courts through the use of an adequate law library are not being provided sufficient access to an adequate law library by Defendants.

158.    A law library exists on the BCDC premises.  In the absence of a court order, the custom and practice at BCDC is that only one resident is allowed to use the law library at a time.  The BCDC law library is understaffed in light of the number of inmates who request or need access to the law library and its hours of operation are inadequate.

159.    Some residents gain access to the existing BCDC law library by obtaining a court order.  Others can attempt to gain access to the existing BCDC law library by depositing a request to use the law library in a metal box in the dayroom of living units.  BCDC staff retrieve requests to use the law library, then determine which resident requests to use the law library will be granted.  In the absence of a court order regarding use of the BCDC law library, BCDC staff determine the dates and times selected residents will be granted access to the law library.  After the court ordered access to the law library is scheduled, the remaining time during which the law library is open is available to schedule access to the law library for residents who have requested to use it.  Most residents without court ordered access to the BCDC law library are unable to obtain access to the law library by depositing a request for access to the law library. Many residents do not even request use of the BCDC law library in light of the wide-spread

knowledge that in the absence of a court order the likelihood of an inmate obtaining timely access to the law library is poor.

160.   BCDC does not provide indigent residents with paper, pens, stamps and envelopes necessary to prepare legal documents or mail legal documents to appropriate courts and administrative agencies.

161.   BCDC does not provide adequate, meaningful or effective access to the courts through its law library in light of (1) the length of time the library is open or accessible for use by residents, (2) the general rule of allowing only one inmate at a time access to the law library, (3) the law library being understaffed, (4) the inadequate legal materials available in the law library, and (5) the failure to provide any accommodations or special assistance to residents impaired by a mental and/or developmental disability.

162.   Plaintiff Intervenors are deprived of their constitutional rights as a direct and proximate result of Defendants' failure to provide Plaintiffs (1) meaningful legal assistance from persons trained in the law, (2) meaningful access to an adequate law library, and (3) access to adequate library materials and legal supplies, such as papers, pens, and postage, necessary to prepare and file legal pleadings.

### EIGHTH CLAIM FOR RELIEF
### (Eighth Amendment Cruel and Unusual Punishment)
### (Totality of the Conditions of Confinement)

163.   Plaintiff Intervenors reallege the allegation of Paragraphs 1 through 162 above.

164.   Defendants deprive Plaintiff Intervenors of their constitutional right to be free from cruel and unusual punishment guaranteed to them by the Eighth and Fourteenth Amendments to the United States Constitution.

165.   The totality of the conditions of confinement at the BCDC amounts to cruel and unusual punishment in violation of the prohibition of the Eighth Amendment to the United States Constitution.

166.   Most subclass members are housed in cells throughout the BCDC.  The cells have concrete walls and a door with a clear solid window in it.  A concrete slab designed to serve as a single bunk exists in most cells.  As many as five residents are housed in a single cell at the same time.  Rarely, is a single occupant cell occupied by a single inmate.  When more than one resident is confined in a cell, which is almost always the case, all but one of them must sleep on a stack-a-bunk or, more frequently,  on a mattress on the concrete floor; sometimes mattresses are not provided.  When stack-a-bunks and mattresses are not available, Plaintiffs are required to sleep directly on the concrete floor.  The toilet and sink in many cells do not work properly.

167.   Some subclass members are housed in "cages."  Cages have three concrete walls, one metal mesh type wall, and a door.  Cages have no bunks, bed fixtures, showers or toilets within them.  At least one cage has no sink within it.  Subclass members confined in cages sleep on mattresses on a concrete floor.  Other residents and staff continuously view them through the metal mesh wall.  Plaintiff Intervenors confined in a cage must request to be taken to a cell with a toilet to urinate or defecate.  Male Plaintiff Intervenors, confined in a cage without a sink, must request access to a cell with a sink to wash themselves.  No secure storage spaces are provided.

168.   Some subclass members are housed in unit dayrooms.  Unit dayrooms have no bunks, bed fixtures or toilets within them.  Five or more residents have been housed in a unit

39

dayroom at the same time.  Plaintiff Intervenors confined in unit dayrooms sleep on stack-a-bunks or mattresses laid on a concrete floor when mattresses are available.  Other residents and staff may view Plaintiffs while they sleep.  Plaintiffs confined in a unit dayroom must have permission to use a cell with a toilet to urinate or defecate.  No secure storage spaces are provided.

169.    Some Plaintiffs are housed in pod dayrooms.  Pod dayrooms are smaller than unit dayrooms and have no bunks, bed fixtures or toilets.  Three or more Plaintiffs have been housed in a single pod dayroom at the same time.  Plaintiffs confined in pod dayrooms sleep on stack-a-bunks or mattresses laid on the concrete floor when mattresses are available.  When stack-a-bunks and mattresses are not available, Plaintiffs sleep directly on the concrete floor.  Inmates and staff may view Plaintiffs while they sleep.  Plaintiffs confined in a pod dayroom must have permission to use a cell with a toilet to urinate or defecate.  No secure storage spaces are provided.

170.    Cells, cages and dayrooms are inadequately ventilated and lighted.  The plumbing in many cells does not work properly.

171.    Many of the mattresses upon which Plaintiffs are required to sleep are torn, stained and/or dirty. Some of the mattresses smell of urine and other foul odors.

172.    Plaintiffs are not provided with sheets, blankets, pillows and/or pillowcases on a consistent basis.  The sheets, blankets, pillows and/or pillowcases provided Plaintiffs are not laundered on an adequate basis.

173.    Plaintiff Intervenors spend most of their time in their assigned cell, cage, unit dayroom, or pod dayroom.   Recreation is often not provided and subclass members are sometimes required to go weeks without a breath of fresh air.

174.   Plaintiff Intervenors are not provided access to meaningful education programs, work opportunities or rehabilitation programs.

175.   Indigent Plaintiffs are not provided with proper toiletries and an opportunity to properly wash or to obtain sufficient changes of socks or underwear.

176.   Indigent Plaintiffs are not provided soap, shampoo, toothpaste and other needed personal hygiene items on a regular basis.

177.   Some subclass members are not given an opportunity to take a shower on a regular basis.

178.   Some Plaintiffs are not provided towels on a regular basis.

179.   Many Plaintiffs are provided no designated space in which to store personal hygiene items and personal belongings.

180.   Defendants have been deliberately indifferent to the rights of subclass members to be free from cruel and unusual punishment as guaranteed under the provisions of the Eighth and Fourteenth Amendments to the United States Constitution.

181.   Plaintiff Intervenors are being deprived of their constitutional right to be free from cruel and unusual punishment as a direct and proximate result of Defendants' confinement of them in the BCDC where the totality of the conditions of confinement amount to cruel and unusual punishment.

## IRREPARABLE HARM

182.   Defendants, through their acts and omissions, have irreparably harmed and will continue to irreparably harm Plaintiff Intervenors and the subclass they represent.  Plaintiff Intervenors have no adequate remedy at law to secure redress of their rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.    Grant intervention in this action.

B.    Order that Plaintiff Intervenors may maintain this action as a class action pursuant to Fed. R. Civ. P. 23.

C.    Declare unlawful Defendants' policy and practice of denying Plaintiff Intervenors and the Intervenor subclass needed therapeutic services.

D.    Issue injunctive relief directing Defendants to immediately propose and promptly implement a plan to:

1.    appropriately screen and evaluate for mental and/or developmental disabilities all people brought to the jail;

2.    Divert all people needing and wanting in-patient treatment to an appropriate treatment facility;

3.    ensure that all people with mental and/or developmental disabilities housed in the jail receive appropriate treatment and services, including adequate discharge planning, while there;

4.    ensure that whenever possible, classmembers receive services in the setting that most integrates them into their communities or into the jail's general population and is the least restrictive setting appropriate to their needs; and

5.    ensure that classmembers are assured meaningful and effective access to the judicial system and to due process of law whenever Defendants act upon their liberty or property interests.

E.   Award Plaintiff Intervenors their costs and expenses and reasonable attorneys' fees.

F.   Grant such other and further relief as the Court deems appropriate.

Respectfully submitted,

PETER CUBRA
3500 Indian School NE, Suite A
Albuquerque, New Mexico 87106
(505)256-7690

NANCY KOENIGSBERG
Protection & Advocacy System
1720 Louisiana NE, Suite 204
Albuquerque, New Mexico 87110
(505) 256-3100

TOMITA & SIMPSON, P.C.

By:  ELIZABETH E. SIMPSON
4253 Montgomery NE, #205
Albuquerque, NM  87109-1103
(505)883-4993

*Attorneys for Plaintiff Intervenors*

This is to certify that a true copy of the
foregoing Amended Complaint in Intervention
was mailed to counsel of record this
21st day of November, 1995.

PETER CUBRA

43