IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JIMMY (BILLY) MCCLENDON, et al.,

    Plaintiffs,

vs.   Civ. No. 95-24 MV/DJS

CITY OF ALBUQUERQUE, et al.,

    Defendants,

vs.

E.M., R.L., W.A., D.J., P.S., and N.W., on
behalf of themselves and all others similarly
situated,

    Plaintiff Intervenors.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiffs' and Plaintiff Intervenors' Joint Motion for a Temporary Restraining Order and Preliminary Injunction Enjoining the Defendants from Restricting Class and Sub Class Counsel from Having Access to the Metropolitan Detention Center ("Joint Motion") **[Doc. No. 409]**, filed June 27, 2003. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the Joint Motion is well-taken and will be **GRANTED.**

### BACKGROUND

In 1995, Plaintiffs commenced the instant action to address allegedly unlawful conditions of confinement at the Bernalillo County Detention Center ("BCDC"). In an Order dated November 5, 1996, the Court certified the class in this action as "a class of all persons presently confined in BCDC or who may/will be so confined in the future." The class was to be represented

by Plaintiffs and Plaintiff Intervenors. In an Order dated August 15, 1996, the Court certified the sub-class in this action as "a subclass of all persons with mental and/or developmental disabilities who are, or in the future may be, detained at BCDC." The sub-class was to be represented by Plaintiff Intervenors.

Plaintiffs and Plaintiff Intervenors entered into a settlement agreement with Defendants. This settlement agreement is set forth in the Court's Order Regarding the Prison Litigation Reform Act entered November 5, 1996 ("PLRA Order"). The PLRA Order also sets forth the parties' agreement that the Court's orders dated August 23 and September 7, 1995 will remain in effect as modified therein. Plaintiff Intervenors also entered into a separate settlement agreement with Defendants. This settlement agreement is set forth in the Court's Order, also entered November 5, 1996 ("Order Regarding Plaintiff Intervenors").

On or about June 17, 2003, the last members of the class and the sub-class were transferred from the BCDC facility to a newly constructed facility, the Metropolitan Detention Center ("MDC"). Plaintiffs and Plaintiff Intervenors allege that, since the class and the sub-class members were moved to MDC, Defendants have: (1) prohibited their counsel from monitoring MDC, interviewing members of the class and the sub-class at MDC, and interviewing staff at MDC; (2) changed their practices regarding residents' telephone access to their counsel; and (3) prohibited Protection & Advocacy System, Inc ("P&A"), co-counsel for Plaintiff Intervenors, from having access to MDC.

The parties held mediation sessions on June 13 and 19, 2003 regarding access to MDC by counsel for Plaintiffs and Plaintiff Intervenors. The mediation sessions failed to result in an agreement between the parties. By letter dated June 25, 2003, counsel for Defendants advised

counsel for Plaintiffs and Plaintiff Intervenors that they would not allow them access to the MDC facility unless they agreed not to be paid for their visits and not to report to this Court anything concerning the MDC facility.

Thereafter, on June 27, 2003, Plaintiffs and Plaintiff Intervenors filed the instant Joint Motion for a temporary restraining order and a preliminary injunction requiring that Defendants: (1) allow counsel to have reasonable and unaccompanied access to MDC and to the records of the residents of MDC; (2) allow P&A personnel to have access to MDC, its residents, records of the eligible residents and staff; (3) refrain from imposing limits on access that are more restrictive than the limits previously imposed at BCDC and the westside and satellite facilities; and (4) cease the imposition of time limits on telephone calls from MDC residents to their lawyers.  Defendants filed their response in opposition to the Joint Motion on July 1, 2003.  On July 8, 2003, the Court held a hearing on the Joint Motion.  At the conclusion of the hearing, the Court took the Joint Motion under advisement.

## STANDARD

The district court may grant a preliminary injunction if the moving party shows:  "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm in the absence of the injunction; (3) proof that the threatened harm outweighs any damage the injunction may cause to the party opposing it; and (4) that the injunction, if issued, will not be adverse to the public interest." *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Social & Rehabilitation Servs.*, 31 F.3d 1536, 1542-43 (10th Cir. 1994) (*citing Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1487 (10th  Cir.), *cert. denied*, 510 U.S. 916 (1993); *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir.1992)).  "Because a preliminary injunction is an

'extraordinary remedy . . . the right to relief must be clear and unequivocal." *Kansas Health Care*, 31 F.3d at 1543 (citing *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991)).  The Tenth Circuit has modified this standard as follows:

> If the party seeking the temporary restraining order can establish the last three factors listed above, then the first factor becomes less strict – i.e., instead of showing a substantial likelihood of success, the party need only prove that there are 'questions going to the merits . . . so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.'

*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001) (citing *Federal Lands Legal Consortium v. United States*, 195 F.3d 1190, 1194 (10th Cir. 1999)).

## DISCUSSION

Jurisdiction

As a threshold matter, this Court must address the issue of its continuing jurisdiction to monitor the conditions of confinement of the class and the sub-class members since their transfer from the original BCDC facility to the new MDC facility.  Plaintiffs and Plaintiff Intervenors contend that constitutional violations are occurring at the MDC facility and that these violations are a continuation of the violations that were the original basis for the Complaint and Complaint in Intervention.  Plaintiffs and Plaintiff Intervenors argue that, because these violations are continuing, there has been no substantial compliance by Defendants with the orders previously entered by this Court and, accordingly, the Court continues to have jurisdiction to enforce its orders.

As set forth above, the class and the sub-class in this action were defined respectively as "all persons presently confined in BCDC or who may/will be so confined in the future," and "all

persons with mental and/or developmental disabilities who are, or in the future may be, detained at BCDC." Defendants argue that, because these definitions refer specifically to confinement at BCDC, membership in the class and the sub-class was extinguished upon the transfer of the BCDC residents to the MDC. Accordingly, Defendants argue, this Court's orders do not extend to protect the class and the sub-class members from violations at the MDC.

By contrast, Plaintiffs and Plaintiff Intervenors argue that it is immaterial whether the class and the sub-class members are physically present in a particular building (*i.e.*, the BCDC facility), as the Court's orders apply to the constitutional rights of individuals incarcerated by Defendants, not to the conditions of a building. Plaintiffs and Plaintiff Intervenors note that the individuals whose rights the Court's orders were entered to protect have been transferred from the BCDC facility to the MDC facility and remain incarcerated by Defendants. As these individuals are continuing to report to their counsel complaints of unconstitutional conditions of confinement, Plaintiffs and Plaintiff Intervenors reason that the Court's obligation to protect the rights of these individuals must continue regardless of their transfer from one location within Defendants' control to another.

The Court's orders themselves, in addition to the factual circumstances surrounding the settlement agreements set forth in those orders, persuade this Court that it has continuing jurisdiction in this matter. As set forth above, on November 5, 1996, the Court entered two orders: the PLRA Order, setting forth the settlement agreement entered into between Plaintiffs and Plaintiff Intervenors and Defendants; and the Order Regarding Plaintiff Intervenors, setting forth the settlement agreement entered into between Plaintiff Intervenors and Defendants.

The two settlement agreements set forth in the PLRA Order and the Order Regarding Plaintiff Intervenors both were drafted by Peter Cubra, attorney for Plaintiff Intervenors. Mr. Cubra has advised the Court that he drafted the agreements simultaneously on his computer and brought the drafts to Defendants' attorney's office, where the parties negotiated and finalized the final terms of both agreements and then executed the agreements. As the parties' attorneys drafted, negotiated and executed the two agreements simultaneously, the Court must read them together and interpret the inclusion and/or exclusion of language in one or the other of the agreements to be the parties' deliberate choice.

The settlement agreement set forth in the Order Regarding Plaintiff Intervenors includes the following provision:

> Defendants shall comply with the terms of this Settlement Agreement at all temporary and overflow facilities operated by Defendants. However, this Settlement Agreement shall not apply to any permanent facility opened after the opening of the interim facility on the Westside.

(Order Regarding Plaintiff Intervenors at 17). The Order Regarding Plaintiff Intervenors thus explicitly provides that it does not extend to a new permanent facility. The parties agree that MDC is a permanent facility and that, based on the plain language of this Order, Plaintiff Intervenors are foreclosed from asking for relief under this Order.

The settlement agreement set forth in the PLRA Order does not include this or a similar provision. By contrast, the settlement agreement in the PLRA Order contains the following provision:

> In recognition of the limited financial resources of the Defendants, the unpredictability of the population at the detention facilities operated by Defendants, the unpredictability of the numbers of residents with mental and/or developmental disabilities and the uncertainty of the impact of reduction in

-6-

> population at the BCDC main facility and the opening and expansion of additional facilities, the parties are adopting a flexible approach to addressing the concerns raised by the [Motion for Immediate Termination of Prospective Relief Regarding Overpopulation Granted or Approved by the Court's Orders Dated August 23, 1995, September 7, 1995, March 22, 1996 and March 25, 1996 and the Motion for Further Remedial Relief]. All parties recognize that this agreement may require tailoring in the future to address unanticipated circumstances.

(PLRA Order at 3).

The Court interprets the absence of a provision stating that the agreement set forth in the PLRA Order does not apply to a new permanent facility to be a deliberate choice. Similarly, the Court interprets as a deliberate choice the inclusion in this agreement of a provision regarding the need for future flexibility and tailoring as necessary due in part to the opening and expansion of facilities additional to the BCDC facility. The Court draws the logical inference that the parties did not intend for the settlement agreement set forth in the PLRA Order to be limited to the BCDC facility or to terminate upon the opening of a new permanent facility, but rather intended that the agreement remain in effect and apply wherever individuals incarcerated by Defendants are housed.

Moreover, the language of the parties' settlement agreements and the Court's orders suggests that the parties did not intend to limit, for purposes of the class and the sub-class definitions or otherwise, the term "BCDC" to a particular facility, but rather intended that term to apply to the jail system as a whole. For example, the August 23, 1995 Order, which was incorporated into the PLRA Order, specifically defines the "existing facility of BCDC" as comprised of "two (2) buildings, the main facility, including the annex, and the satellite." (August 23, 1995 Order at 3). The use of the word "existing" to define the BCDC facility suggests that these buildings were merely the physical structures used by the Bernalillo County Detention

Center system as of that date to house individuals incarcerated by Defendants.  The Order further states that "[d]iscussions are taking place between the City and the County concerning the expansion of BCDC into additional permanent facilities."  *Id.* at 8.  This language suggests that the parties intended the new permanent facility, then under discussion and now in existence as the MDC, to be an expansion of the BCDC jail system.

The settlement agreement set forth in the PLRA Order refers to "the population at the detention facilities operated by Defendants," "the population *at the BCDC main facility*," and "the opening and expansion of additional facilities."  (PLRA Order at 3) (emphasis added).  Similarly, the Court's June 27, 2001 Supplemental Order, which was entered in order to ensure compliance with the PLRA Order, repeatedly refers to population limits *at the BCDC main facility*.  If the parties intended the term BCDC to be limited to the main facility at BCDC, the term "BCDC main facility" would have no meaning.  The parties' reference to the population at "detention facilities" suggests that the agreement applies to individuals incarcerated at any and all of Defendant's facilities, rather than the BCDC facility alone.  Likewise, the reference to the opening and expansion of "additional facilities" suggests that the agreement would apply equally to such additional facilities.

The Court's September 25, 2000 Order, entered as a result of Defendants' violation of the PLRA Order, concludes that "BCDC is dangerously overcrowded." (September 25, 2000 Order at 3).  This conclusion is based not on the number of individuals incarcerated at the BCDC main facility alone, but rather on the total number of "individuals incarcerated in BCDC's main facility, westside facility, and satellite facility," in addition to the fact that the "[t]he new Metropolitan Detention Center, currently under construction, will not be ready to house inmates before

-8-

October, 2001." *Id.* The plain language of this Order strongly suggests that the parties intended the term BCDC to encompass all facilities -- including the MDC – where Defendants house individuals incarcerated by the City and the County.

Additionally, the Court's orders grant relief which extends beyond the physical boundaries of the BCDC structure itself. First, with regard to the issue of overcrowding, the Court's orders set population limits not only at the BCDC main facility but also at the satellite facility (*See* August 23, 1995 Order; January 31, 2002 Stipulated Agreement).[1] While a central purpose of the Court's orders was to ameliorate overcrowding, an additional and equally compelling purpose was to eliminate the unnecessary incarceration of individuals, including people with disabilities and probation violators. The PLRA Order provides that "Alternatives to Secure Detention Program ('ASDP') staff will be added in response to increases in ASDP referrals." (PLRA Order at 5). Similarly, the June 27, 2001 Order requires that plans be made to reduce the number of incarcerated individuals waiting resolution of probation or parole violation proceedings, to include persons who do not have both a permanent address and a telephone in the Community Custody Program, to implement an effective jail diversion program for persons with psychiatric or developmental disabilities and to expand the program for early resolution of criminal cases. Thereafter, in a Stipulated Agreement dated January 31, 2002, the Court ordered Defendants to provide sufficient assistance to the pro tem Judge.

The Court's orders also address additional issues regarding general conditions of

---

[1] As noted by Mr. Cubra during the hearing, during the Court's tour of the Montessa Park facility, Defendants agreed to a population cap at that facility. Thus, while there is no Court order regarding this facility, it was a matter which was discussed and addressed within the context of the instant action.

confinement which are applicable to the jail system as a whole. For example, the settlement agreement in the PLRA directs the parties, through counsel, to meet at least once a month to discuss medical care, access to the judicial system, transportation to court, staff training and other matters of mutual concern. Similarly, the August 23, 1995 Order directs that immediate action be taken regarding physical examinations, medical requests, basic accommodations and feminine hygiene items. The January 31, 2002 Stipulated Agreement directs Defendants to provide a full-time benefits manager to assist in securing public benefits for inmates.

The Court's review of the relevant case law suggests that consent decrees and contested orders issued in jail class actions apply to facilities where individuals are incarcerated, regardless of whether those facilities are named in the original complaint or decree. *See Glover v. Johnson*, 934 F.2d 703 (6th Cir. 1991) (despite naming of particular facility in class definition, class encompassed female inmates wherever they were housed); *Inmates of Allegheny County Jail v. Wecht*, 612 F. Supp. 874 (W.D. Pa. 1985) (members of class defined as inmates at Allegheny county jail who were not physically present at Allegheny county jail were still entitled to the minimum conditions of confinement set for the class); *Doty v. County of Lassen*, 37 F.3d 540, 544 (9th Cir. 1994) ("in fashioning a remedy, the district court must focus on the specific constitutional violations found."). In *Glover,* the plaintiffs originally sought to represent "all female penal inmates who are now, or may be in the future, incarcerated at the Huron Valley Women's Facility and at the Kalamazoo County Jail," a temporary placement facility used to relieve overcrowding at Huron Valley. 934 F.2d at 709. At the time the action was filed, these were the only female prison facilities in the state. The Sixth Circuit found that "the specification by name of the only institutions then housing female inmates as comprising the class of 'all female inmates' was

redundant and certainly was not intended to exclude those female inmates who, ten years later, would be housed at a new location." *Id.* The Sixth Circuit further found that the class certification was intended to encompass all female inmates in Michigan, including "all future inmates who would come within the jurisdiction of the Department of Corrections." *Id.* Accordingly, the Sixth Circuit concluded that the defendants "had reasonable notice that the conditions of confinement they were obligated to provide for female prisoners at Huron Valley were to be provided to all female prisoners wherever they were housed." *Id.* This reasoning is especially applicable here, where the BCDC facility has been replaced by the MDC facility, and every resident who was housed at the BCDC facility is now housed at the MDC facility.

Based on the Court's orders, the factual circumstances surrounding the parties' settlement agreements and the relevant case law, the Court thus concludes that the PLRA Order remains in effect despite the transfer of the class and the sub-class members to the MDC. So long as the PLRA Order remains in effect, the Court retains "continuing jurisdiction to review, modify and enforce the Settlement Agreement[s]" set forth and incorporated therein (PLRA Order at 6). Accordingly, this Court has jurisdiction to grant injunctive relief as necessary to enforce the settlement agreements set forth and incorporated in the PLRA Order.[2]

---

[2] As set forth above, Plaintiff Intervenors, in addition to Plaintiffs, are parties to the settlement agreement set forth in the PLRA Order. As Plaintiff Intervenors represent the sub-class members, who have rights identical to the class members who are not disabled, the PLRA Order applies to the sub-class members. Plaintiff Intervenors thus have standing to seek relief on behalf of the sub-class members pursuant to the PLRA Order.

Preliminary Injunction[3]

### Likelihood of Success on the Merits

Plaintiffs and Plaintiff Intervenors have presented evidence in the form of an affidavit sworn to by Plaintiff's attorney, Brian Pori, that class and sub-class members have reported to their counsel unconstitutional conditions of confinement at MDC. Mr. Pori's affidavit also contains allegations that Defendants are refusing to permit counsel for Plaintiffs and Plaintiff Intervenors access to monitor the conditions at MDC and to interview class and sub-class members so that they can verify the accuracy of their clients' reports and, if appropriate, address their unconstitutional conditions of confinement. Accordingly, Plaintiffs and Plaintiff Intervenors ask the Court to permit their counsel access to the MDC facility, the MDC records and the MDC residents. They further ask the Court to permit P&A personnel similar access.

Based upon the previous orders in this case and the constitutional right of the class and the sub-class members of access to the courts, the Court finds that Plaintiffs and Plaintiff Intervenors are likely to succeed on the merits of their claim. The Court has entered at least two orders requiring that counsel for Plaintiffs and Plaintiff Intervenors be allowed access to records concerning any person who is or was a member of the class or the sub-class in this action. *See* Protective Order Regarding Confidentiality entered October 29, 1996 at ¶8; Protective Order Regarding Confidentiality of Medical and Mental Health Records Obtained by Plaintiff Intervenors entered April 23, 1998 at ¶7.

---

[3] As the Court has held a hearing at which both parties were afforded the opportunity to present legal arguments and evidence with regard to the Joint Motion, the Court shall consider Plaintiffs' and Plaintiff Intervenors' request for a preliminary injunction rather than their request for a temporary restraining order.

With regard to the constitutional right of access to the courts, "[i]t is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977).  Access of inmates to the courts must be "adequate, effective, and meaningful." *Id.* at 822.  "Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974).

Plaintiffs and Plaintiff Intervenors allege that Defendants have imposed restrictions on counsel's access to the MDC facility, MDC records and MDC inmates, including a complete ban on visitation with clients and a five-minute limit on telephone calls with counsel.  Such restrictions would "unjustifiably obstruct the availability of professional representation," thereby violating the class members' and the sub-class members' constitutional right of access to the courts.  *Id.* Similarly, unreasonable limitations on P&A's access to the MDC facility, MDC records and MDC inmates would constitute a violation of the sub-class members' right of access to the courts.[4]  *See Robbins v. Budke*, 739 F. Supp. 1479 (D.N.M. 1990) (constitutional right of access to the courts of patients at Las Vegas Medical Center was violated by limitations on P&A's access to patients); *The Advocacy Center v. Stalder*, 128 F. Supp.2d 358 (M.D. La. 1999) (questions regarding violations of inmates' right to access to the courts raised where state prison denied advocacy center timely access to inmates' records; timely access just as essential for effective communications between center and its clients as it is for attorneys).  Accordingly, Plaintiffs and

---

[4]P&A is not a party to this action.  It is involved in this action only to the extent that it is co-counsel for Plaintiff Intervenors.  Accordingly, P&A has no standing in this action to assert its own constitutional and/or statutory rights.  The Court's decision to grant the injunctive relief as it relates to P&A is based only on the sub-class members' right of access to the courts.

Plaintiff Intervenors have established a substantial likelihood of success on the merits of their claim.

<u>Irreparable Harm</u>

"Irreparable harm" means that "the injury 'must be both certain and great' and that it must not be 'merely serious or substantial.' . . . [I]rreparable harm is often suffered when 'the injury can[not] be adequately atoned for in money,' or when 'the district court cannot remedy [the injury] following a final determination on the merits.'" *Prairie Band of Potawatomi Indians*, 253 F.3d at 1250 (citations omitted). A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain. *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (citing *Tri-State Generation & Transmission Assoc., Inc., v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1354 (10th Cir. 1989)).

"When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Id.* (citing 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed.1995)). As set forth above, Plaintiffs and Plaintiff Intervenors allege that Defendants' limitations on access to MDC by counsel for Plaintiffs and Plaintiff Intervenors and by P&A constitute a violation of the class and the sub-class members' constitutional right to access to courts. As the claims herein thus have constitutional underpinnings, Plaintiffs and Plaintiff Intervenors need not make any further showing of irreparable injury.

Balance of Harms

Counsel for Plaintiffs and Plaintiff Intervenors have had routine access to all of the other correctional facilities run by Defendants. There can be little harm to Defendants if these same attorneys are granted similar access to the MDC facility. Indeed, the only potential harm to Defendants is that inmate allegations of constitutional violations will be brought to the attention of this Court. This is not a legitimate concern. By contrast, the lives of class and sub-members may be at risk if their attorneys are prevented from investigating their reports of unconstitutional conditions of confinement. The Court thus finds that, if a preliminary injunction is granted, the benefit to the class and the sub-class members will outweigh any potential harm to Defendants.

Public Interest

The public has an interest in the City's and the County's maintenance of prison facilities that provide the minimal conditions of confinement required by the Constitution and federal law. Indeed, any citizen could find himself or herself detained at MDC and would have the right to constitutional conditions of confinement while so detained. This public interest can be served most effectively by allowing the attorneys for Plaintiffs and Plaintiff Intervenors access to the MDC so that they can gather accurate facts regarding the operation of that facility. Accordingly, the Court finds that a preliminary injunction would not be adverse to the public interest.

## CONCLUSION

This Court has continuing jurisdiction to monitor the conditions of confinement of the class and the sub-class members at the MDC facility. Plaintiffs and Plaintiff Intervenors contend that Defendants have unreasonably restricted their counsel's access to the MDC facility and request injunctive relief requiring Defendants to allow their counsel such access. Plaintiffs and

Plaintiff Intervenors have shown a substantial likelihood of prevailing on the merits of their claim, irreparable harm in the absence of the injunction, proof that the threatened harm outweighs any damage the injunction may cause to the party opposing it, and that the injunction, if issued, will not be adverse to the public interest.  Accordingly, this Court may grant the request for a preliminary injunction.

**IT IS THEREFORE ORDERED** that Plaintiffs' and Plaintiff Intervenors' Joint Motion for a Temporary Restraining Order and Preliminary Injunction Enjoining the Defendants from Restricting Class and Sub Class Counsel from Having Access to the Metropolitan Detention Center **[Doc. No. 409]** is **GRANTED.**

**IT IS THEREFORE FURTHER ORDERED** that Defendants shall:

1. Immediately allow counsel for Plaintiffs and Plaintiff Intervenors and P&A personnel, as co-counsel to Plaintiff Intervenors, to have reasonable and unimpeded access to MDC and to the records of residents of MDC;

2. Immediately refrain from imposing any limits upon access to MDC and to the residents and staff therein which are more restrictive than those which were used when the class and the sub-class were housed at the BCDC, westside and satellite facilities; and

3. Immediately cease their practice of limiting the length of telephone calls from the MDC residents to their lawyers, including counsel for the class and/or the sub-class.

**DATED** this 11th day of July, 2003.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

<u>Attorneys for Plaintiff</u>:
Brian Pori
Peter Schoenburg

<u>Attorneys for Plaintiff Intervenors</u>:
Peter Cubra
Claire Dickson

<u>Attorney for Defendant</u>:
Jeffrey L. Baker