# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JIMMY (BILLY) MCCLENDON, *et al*.,

      Plaintiffs,

vs.                                                                                      Civ. No. 95-24 MV/ACT

CITY OF ALBUQUERQUE, *et al*.,

      Defendants,

vs.

E.M., R.L., W.A., D.J., P.S., and N.W., on
behalf of themselves and all others similarly
situated,

      Plaintiff Intervenors.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Plaintiffs' Motion to Permit Counsel to visit

McClendon Class Members Housed at the Regional Correctional Center or Any other Facility, filed

June 28, 2007, **[Doc. Nos. 543 and 661],** Plaintiff Intervenors' Motion to Permit Counsel to Have

Access to RCC, Its Residents And Their Records, filed July 26, 2007, **[Doc. Nos. 548 and 660]**, the

Court's Order to Show Cause, filed December 11, 2007, **[Doc. No. 600]** and Plaintiffs' and Plaintiff

Intervenors' Joint Motion to Compel Deponents to Answer All Questions Regarding All Contracts

Involving the Regional Correctional Center and For Sanctions filed September 17, 2008, **[Doc. No.**

**683]**.  After considering the motion, response, and reply as well as the relevant law, the Court finds

that the motions **[Doc. Nos. 543 and 661** are well-taken and will be **GRANTED in part**. The

remaining motions **[Doc. Nos. 555, 562, and 683]** filed by Plaintiffs' and Plaintiff Intervenors' are **DENIED** as moot.

## BACKGROUND

On January 10, 1995, a class of individuals confined in the Bernalillo County Detention Center ("BCDC") filed this lawsuit to address allegedly unlawful conditions of confinement at BCDC. The Court subsequently certified "a class of all persons presently confined in BCDC or who may/will be so confined in the future" and "a subclass of all persons with mental and/or developmental disabilities who are, or in the future may be, detained at BCDC." The class is represented by Plaintiffs and Plaintiff Intervenors and the subclass is represented by Plaintiff Intervenors.

### A. 1996 PLRA Settlements

On November 5, 1996, Plaintiff and Plaintiff Intervenors entered into a settlement agreement pursuant to the Prison Litigation Reform Act ("PLRA") that was set forth in a Court Order ("PLRA Order"). At the same time, Plaintiff Intervenors also entered into a separate settlement agreement with Defendants that was set forth in a Court Order ("Order Regarding Plaintiff Intervenors").

For the next ten years, the parties engaged in litigation to ensure continuing compliance with the PLRA Order and the Order Regarding Plaintiff Intervenors. Numerous additional motions and orders were entered to address the conditions of confinement at BCDC.

### B. Application of PLRA Settlements to Metropolitan Detention Center

On or about June 18, 2003, Defendants opened a new 2100-bed facility known as the Metropolitan Detention Center ("MDC"). All class members and subclass members were

2

transferred from BCDC to MDC at this time.  A dispute subsequently arose regarding whether the settlement agreements continued to apply following the transfer of class members and subclass members to MDC.  On June 27, 2003, Plaintiffs and Plaintiff Intervenors filed a joint motion for a temporary restraining order and a preliminary injunction to prevent Defendants from limiting counsels' access to residents at MDC.  In an Opinion dated July 11, 2003, the Court granted the motion for a temporary restraining order and a preliminary injunction, finding that the PLRA Order remained in effect despite the transfer of the class and subclass members to MDC.[1]  In making this determination, the Court stated that "the parties did not intend to limit, for purposes of the class and the sub-class definitions or otherwise, the term "BCDC" to a particular facility, but rather intended that term to apply to the [Bernalillo County] jail system as a whole."

On October 10, 2003, Defendants filed a Motion to Vacate Settlement Agreement Between Plaintiff Intervenors and Defendants on the grounds that the settlement agreement did not apply to MDC.  Before this motion was heard, the parties negotiated new settlement agreements, collectively referred to as the 2005 Stipulated Settlement Agreements.

**C. 2005 Stipulated Settlement Agreements**

The 2005 Stipulated Settlement Agreements were explicitly limited to detainees housed at MDC. The stated purpose of the Stipulated Settlement Agreements was to "describe conditions both parties wish to see maintained or improved at the Bernalillo County Metropolitan Detention Center, 100 John Dantis Road SW, Albuquerque, New Mexico."  2005 Stipulated Settlement Agreements

---

[1]  The Court found that the Order Regarding Plaintiff Intervenors did not extend to MDC because the order explicitly stated that it did not extend to a new permanent facility.  However, because Plaintiff Intervenors were parties to the settlement agreement set forth in the PLRA Order, the Court found that Plaintiff Intervenors had standing to seek relief on behalf of the subclass members pursuant to the PLRA Order.

3

at p. 2.  The substantive provisions of the 2005 Stipulated Settlement Agreement require Defendants to "comply with the policies and procedures of the Metropolitan Detention Center" and to have two auditors evaluate and report on designated aspects of the Metropolitan Detention Center.  Similarly, Plaintiff Intervenors Stipulated Settlement Agreement specifically addresses provision of mental heath services by the Psychiatric Services Unit at MDC.  The parties also agreed that the 2005 Stipulated Settlement Agreements would supercede any previous orders, which presumably would include the Court's order finding that the previous settlement agreement applied to the entire Bernalillo County jail system.

The Plaintiffs' 2005 Stipulated Settlement Agreement provides that the case will be dismissed when Defendants obtain compliance with fourteen specified criteria as certified by an independent auditor.  Plaintiff Intervenors' agreement specifies that their claims will be dismissed when the auditor reports that "the mental health care provided at MDC complies with prevailing professional standards guaranteed by the requirements of the United States Constitution." Defendants have made substantial progress in satisfying the criteria in the settlement agreements but continue to struggle with issues related to overcrowding.

Following a hearing, the 2005 Stipulated Settlement Agreements were approved by the Court on June 30, 2005.

### D.  Regional Correctional Center

After Bernalillo County transferred all the residents of BCDC to MDC, the BCDC facility was renamed the Regional Corrections Center ("RCC").  At this time, Defendants represented that RCC had been leased to Cornell Companies, Inc. ("Cornell"), who planned to renovate the facility and use it to house federal detainees pursuant to a contract with the United States.  The October,

2003 lease between Bernalillo County and Cornell provided that Bernalillo County would attempt to secure Inter-Government Agreements ("IGA") to house federal inmates at RCC and that in the event an IGA was entered into between Bernalillo County and the Federal government, that Cornell and Bernalillo County would enter into a management agreement for those inmates covered by such IGA.   In June of 2004, apparently before an IGA was finalized, Bernalillo County and Cornell entered into an "Operating and Management Agreement," addressing Cornell's operation of RCC when housing inmates  "assigned and transferred to the Jail pursuant to an Intergovernmental Service Agreement (IGA) between Bernalillo County and the United States Government or Bernalillo County and the State of New Mexico."   The Operating and Management Agreement, which identifies RCC as a "Bernalillo County jail," specifies the operating standards for nearly every aspect of the jail's day-to-day operations, including staffing, training, record keeping, medical care, food service, laundry, telephone service, inmate work, discipline, grievance procedures, and the use of force.   The Operating and Management Agreement also requires Cornell to provide monthly summary reports to Bernalillo County on a number of matters, including inmate and staff disciplinary matters, inmate grievances, incident reports, inmate participation in programs provided at the facility and population statistics.   Under the Operating and Management Agreement, Bernalillo County retains full access to the facility and the facility's records and Cornell is required to surrender all records pertaining to the operation of RCC to Bernalillo County at the termination of the agreement.

In March of 2005, Bernalillo County entered into an IGA with the Office of the Federal Detention Trustee.  Pursuant to the IGA, Bernalillo County agreed to house federal detainees at RCC and to perform all the services required in the IGA by qualified personnel employed or contracted

by Bernalillo County.  Pursuant to the IGA and the Operating and Management Agreement, hundreds of federal detainees began being housed at RCC.[2]

### E.  Current Dispute

Although Bernalillo County entered into the IGA and the Operating and Management Agreement prior to the fairness hearing on the 2005 Stipulated Settlement Agreements, it did not inform the Court or the other parties of its role in the housing of detainees at RCC at this hearing. Nearly two years later, Plaintiffs and Plaintiff Intervenors discovered that Bernalillo County was the entity who had contracted to house federal detainees at RCC and filed the instant motions alleging that they were misled by Defendants' failure to disclose this information when limiting the 2005 Stipulated Settlement Agreements to MDC and seeking a ruling that the 2005 Stipulated Settlement Agreements applied everywhere Bernalillo County housed detainees, including RCC.

The Court, after reviewing Plaintiffs and Plaintiff Intervenors' filings, issued an Order directing Defendants to show cause why the Court's approval of the 2005 Stipulated Settlement Agreements should not be withdrawn because material information regarding whether the settlements were "fair, reasonable, and adequate" was not provided to the Court prior to the Court's approval of the settlements. *See* Fed. R. Civ. P. 23(e)(1)(A) (court may only approve a class settlement after a hearing and on finding that the settlement "is fair, reasonable, and adequate"). The parties' responses to this Order are considered by the Court in ruling on the instant motions.

---

[2] In addition to federal detainees, overflow inmates from MDC were also housed at RCC pursuant to a separate contract between Bernalillo County and Cornell. At the request of Cornell, the County removed all its detainees from RCC in July of 2007.

**LEGAL STANDARD**

A settlement agreement, including a settlement agreement encompassed in a judicial order, is a contract. *See Republic Res. Corp. v. ISI Petroleum West Caddo Drilling Program 1981*, 836 F.2d 462, 465 (10th Cir. 1987)( "We construe a settlement stipulation in the same manner as a contract to determine how it should be enforced.") (citation omitted); *In re Columbia Gas System, Inc.*, 146 B.R. 106, 113 (D. Del. 1992). Thus, when determining whether a court will enforce a settlement agreement or in interpreting the terms of a settlement agreement, a court applies state contract law. *See United States v. McCall*, 235 F.3d 1211, 1215 (10th Cir. 2000)("Issues involving the formation, construction and enforceability of a settlement agreement are resolved by applying state contract law.")(citing *Carr v. Runyan*, 89 F.3d 327, 331 (7th Cir. 1996)).

New Mexico public policy favors settlement agreements. *See Navajo Tribe of Indians v. Hanosh Chevrolet-Buick, Inc.*, 106 N.M. 705, 707, 749 P.2d 90, 92 (1988). New Mexico courts presume that, when parties have settled a dispute, they "intended a complete accord and satisfaction of their respective claims...." *Bennett v. Kisluk*, 112 N.M. 221, 223-24, 814 P.2d 89, 91-92 (1991). In applying this policy, courts are bound by unambiguous language in settlement agreements. *See Burden v. Colonial Homes, Inc.*, 79 N.M. 170, 173, 441 P.2d 210, 213 (1968) (citation omitted).

Generally, in order to set aside or avoid a written settlement, there must be evidence of misrepresentation, fraud, undue influence, coercion or mutual mistake, and such evidence must be clear and convincing. *Woods v. City of Hobbs*, 75 N.M. 588, 408 P.2d 508 (1965); *Durham v. Gulf Interstate Engineering Company,* 74 N.M. 277, 393 P.2d 15 (1964); *Mendenhall v. Vandeventer*, 61 N.M. 277, 299 P.2d 457 (1956). The terms of a settlement agreement are controlling, unless the terms produce a result that is unfair to the class or contrary to the policies underlying class actions.

7

**DISCUSSION**

Plaintiffs' motion seeks an order requiring Defendant Bernalillo County to instruct all contractors who operate a facility where *McClendon* class members are housed, including RCC, to permit Plaintiffs' counsel to visit with the *McClendon* class members housed at these facilities in their living quarters.  Plaintiffs assert they are entitled to this access because 1) the class is defined as "[a]ll persons presently confined in the Bernalillo County Detention Center, Albuquerque, new Mexico ("BCDC") or who may/will be so confined in the future;" and 2) the Court, interpreting the previous settlement agreement, ruled that "the parties did not intend to limit, for purposes of the class and the sub-class definitions or otherwise, the term "BCDC" to a particular facility, but rather intended that term to apply to the jail system as a whole."

Plaintiff Intervenors' motion similarly seeks an order requiring Defendant Bernalillo County to provide counsel for Plaintiff Intervenors access to RCC, its residents, and their records.  Plaintiff Intervenors claim that inmates housed at RCC are part of the *McClendon* subclass because they are in the custody of Bernalillo County.  Plaintiff Intervenors assert that the language in its 2005 Settlement Agreements limiting its applicability to MDC should be disregarded because the language was adopted based on Defendants' misrepresentation that it would not operate RCC as a Bernalillo County jail.

In essence, Plaintiffs and Plaintiff Intervenors' motions are asking the Court to reform the 2005 Settlement Agreements to cover facilities other than MDC on the grounds that Defendants' misrepresentations regarding Bernalillo County's role in housing detainees at RCC induced the parties to limit the settlement agreements to MDC.  Prior to determining if any misrepresentations were made, the Court must consider the two premises underlying the motions: 1) that the definition

8

of the class and subclass include persons housed at other facilities and 2) that Bernalillo County is operating RCC as part of the Bernalillo County jail system.

### A.  Definition of the Class

Plaintiffs and Plaintiff Intervenors assert that the class includes any individual detained by Bernalillo County or the City of Albuquerque whereever they are housed.  In support of this assertion, the parties rely upon a sentence in the Court's 2003 Opinion stating that the parties intended the PLRA Order to apply "wherever individuals incarcerated by Defendants are housed."  *See* 2003 Opinion at p. 7.  The analysis in the 2003 Opinion makes it clear that the Court's finding was that the PLRA Order applied to the entire Bernalillo County jail system and was not that the PRLA Order applied anywhere an individual incarcerated by Defendants was housed.  In fact, the very next sentence states that the parties intended the term "BCDC" to apply "to the jail system as a whole." *id.;  see also id.* at 8 (noting that "the parties' reference to the population at "detention facilities" suggest that the agreement applies to individuals incarcerated at any and all of Defendant's facilities");  *id* at 9-10 (noting that the PRLA address conditions of confinement that "are applicable to the jail system as a whole").

The language in the PLRA Order itself confirms that the parties interpreted the agreements to apply only to facilities operated by Bernalillo County.  *See* PLRA Order at 3 (recognizing the "unpredictability of the population at the detention facilities operated by Defendants."); *id*. at 8 (referring to "the population at the detention facilities operated by Defendants").

While Plaintiffs and Plaintiff Intervenors now rely upon this one sentence, the history of this case belies the fact that anyone believed the class and subclass was defined this broadly.  Throughout the pendency of this litigation, including at the time the current settlement agreements

were negotiated, Defendants housed detainees in detention facilities owned and operated by other entities. Prior to the instant motions, no party has contended that detainees housed at non-County facilities are part of the class or subclass, these detainees have not been included in any prior settlement agreements, and counsel for Plaintiffs and Plaintiff Intervenors have never sought access to non-County detention facilities on the grounds that detainees housed there by contract with the County were class or subclass members. The Court finds it significant that at the time the 2005 Stipulated Settlement Agreements were signed, the population of MDC was above its rated capacity, raising the possibility that detainees would be housed at other non-County facilities (a practice Plaintiffs and Plaintiff Intervenors have advocated in the past to reduce overcrowding at County facilities), yet the parties included no provisions covering detainees housed at non-County facilities in the settlement agreements.

The record in this case firmly supports the Court's finding that the settlement agreements apply to the "jail system as a whole" was intended to encompass only those facilities that are operated or controlled, directly or indirectly, by Defendants as part of the Bernalillo County jail system.[3] Other detention facilities not operated or controlled by Defendant Bernalillo County are not part of the Bernalillo County jail system and are not subject to the requirements of this case even if Bernalillo Country contracts to house detainees at these facilities.

---

[3]In the December 11, 2007 Order to Show Cause, the Court stated that the Court's 2003 Order "interpreting the term "BCDC" to apply to the "jail system as a whole" was intended to encompass only those facilities that are owned, controlled, or operated by Defendant Bernalillo County as part of the Bernalillo County jail system." As clarified above, the keystone to the Court's inquiry is whether a detainee is housed in a facility controlled or operated, directly or indirectly, by Bernalillo County. Mere ownership of a facility, without additional indices of control, would not be sufficient to support a finding that detainees housed in that facility were part of the *McClendon* class or subclass.

10

**B.  Is RCC being operated as part of the Bernalillo County jail system?**

The evidence is irrefutable that RCC is being operated, at least in part, as part of the Bernalillo County jail system.[4]  Bernalillo County entered into an IGA to house federal detainees at RCC.  The IGA requires Bernalillo County to perform the services under the contract and holds Bernalillo County, not Cornell, liable for the failure to perform on any service related to the IGA, including ensuring that units housing Federal detainees are operated in accordance with federal operating guidelines.  Pursuant to the IGA, Bernalillo County submits invoices and receives payment by the federal government.

Pursuant to an Operating and Management Agreement, Bernalillo County subcontracted the care of these inmates to Cornell.  The Operating and Management Agreement, which identifies RCC as a "Bernalillo County jail," specifies the operating standards for nearly every aspect of the jail's day-to-day operations, including staffing, training, record keeping, medical care, food service, laundry, telephone service, inmate work, discipline, grievance procedures, and the use of force.  The Operating and Management Agreement also requires Cornell to provide monthly summary reports to Bernalillo County on a number of matters, including inmate and staff disciplinary matters, inmate grievances, incident reports, inmate participation in programs provided at the facility and population statistics.  Under the Operating and Management Agreement, Bernalillo County retains full access

---

[4]  Defendants contend Plaintiffs and Plaintiff Intervenors' motions are moot because no MDC inmates are being housed at RCC now and there are no plans to house MDC inmates at RCC in the future.  Defendants misapprehend Plaintiffs and Plaintiff Intervenors' arguments. Plaintiffs' and Plaintiff Intervenors' arguments are not limited to the overflow inmates from MDC who were housed for a period of time at RCC.  Plaintiffs contend that the federal detainees at RCC are part of the *McClendon* class because for purposes of housing these federal detainees, RCC is being operated by Bernalillo County.  Federal detainees are still housed at RCC so this issue is not moot.

11

to the facility and the facility's records and Cornell is required to surrender all records pertaining to the operation of RCC to Bernalillo County at the termination of the agreement.

The fact that Bernalillo County entered into the contract to house federal detainees and has significant oversight and control over, not to mention responsibility for, the conditions and services provided to these inmates convinces the Court that RCC, at least to the extent it is used to house detainees by Bernalillo County pursuant to the IGA, is part of the Bernalillo County jail system.[5] This determination is unaffected by the fact that Bernalillo County has subcontracted some of its duties under the IGA to Cornell.

C.     **Was there a misrepresentation or omission by Defendants at the time the 2005 Stipulated Settlement Agreements were negotiated and approved?**

There is no question that the parties explicitly limited the 2005 Stipulated Settlement Agreements to MDC. Plaintiffs and Plaintiff Intervenors assert that Defendants' failure to inform them that it was actually Bernalillo County, not Cornell, who had contracted to house federal detainees at RCC was a material omission that induced Plaintiffs and Plaintiff Intervenors to enter into settlement agreements limited to MDC. According to Plaintiffs and Plaintiff Intervenors, had they known that RCC was being operated as a Bernalillo County jail such that detainees housed there were members of the class and subclass, they would not have limited the settlement agreement

_____

[5] The fact that Bernalillo County entered into the IGA, in part, to raise money for the mental health unit at MDC does not affect the Court's determination that RCC is being operated as a Bernalillo County jail. Defendants' motivations in entering the IGA and agreeing to be responsible for the housing of federal detainees at RCC are irrelevant to the determination of whether class members have been excluded from the protections due under this lawsuit. Similarly, Defendants' assertion that a finding that RCC is part of the Bernalillo County jail system and subject to the strictures of *McClendon* may affect its ability to attract clients to RCC, which in turn will affect their ability to pay the bonds used to build HSU at MDC, is not relevant to the Court's analysis. All members of the class and subclass are entitled to the same protections and oversight.

to MDC.

Misrepresentations by one party to a contract can make the contract voidable by the other party. Under New Mexico law, "rescission is allowed where there has been a misrepresentation of a material fact, the misrepresentation was made to be relied on, and has in fact been relied on." *Hendren v. Allstate Ins. Co*., 100 N.M. 506, 672 P.2d 1137, 1140 (1983). "A representation or concealment of a fact is material if it operates as an inducement to the [party] to enter into the contract, where, except for such inducement, it would not have done so . . ." *Id*. "If misrepresentations be made, or information withheld, and such be material to the contract, then it makes no difference whether the party acted fraudulently, negligently, or innocently." *Modisette v. Foundation Reserve Insurance Co*., 77 N.M. 661, 667 (1967) (citations omitted); *Robison*, 94 N.M. at 319 (a misrepresentation can result in the voiding or rescission of a contract "irrespective of the good or bad faith of the party making the misrepresentation."); *Hendren*, 100 N.M. at  ( "If a material misrepresentation is made or material information withheld, it does not matter whether the culpable party acted fraudulently, negligently, or innocently; rescission may follow.").

The Supreme Court in *Modisette* quoted with approval the following from *Metropolitan Life Ins. Co. v. Becraft*, 213 Ind. 378, 12 N.E.2d 952 (1938):

> Whether there was fraudulent intent or actual fraud is immaterial. An unqualified statement that a fact exists or does not exist, made for the purpose of inducing another to act, implies that the person who makes it is acquainted with the facts; and, if action is induced by the representation and false statement, the law will impute to him who made the false representation a fraudulent purpose. * * * It is the injury caused by the misrepresentation of fact that the law protects against. If the misrepresentation was brought about by forgetfullness [sic] or mistake it is just as injurious as an intentional fraud. It accomplishes a fraud upon the other contracting party by inducing him to act upon a false premise, where he would not have acted had he known the truth. Whether it be caused by negligence, or actual fraudulent purpose, good intention or bad, the result is the same. There is no meeting of the minds * * *.

13

In order to obtain recission, Plaintiffs and Plaintiff Intervenors must show that (1) there was a misrepresentation that was (2) material or fraudulent and which (3) induced them to enter into the settlement agreements, and that (4) their reliance on the misrepresentation was justified.

### 1. Was there a misrepresentation?

Bernalillo County entered its lease agreement with Cornell in October of 2003.   In June of 2004, Bernalillo County and Cornell entered into the Operating and Management Agreement addressing Cornell's operation of RCC when housing inmates pursuant to an IGA between Bernalillo County and the federal government.   The IGA between the Office of the Federal Detention Trustee and Bernalillo County to house federal detainees at RCC was signed in March of 2005.  The settlement agreements at issue in this case were signed by the parties in November of 2004, a motion for preliminary approval of the agreements was filed in March of 2005, a hearing on the proposed settlement agreements was held on June 30, 2005, and the settlement agreements were approved by the Court immediately following that hearing.   Thus, it is apparent that while Defendants may not have been aware of Bernalillo County's role in the housing of federal detainees at RCC when the settlement was negotiated, they were certainly aware that Bernalillo County, not Cornell, had contracted to house federal detainees at RCC when the hearing on the settlement agreements was held in June of 2005.

On October 10, 2003, Bernalillo County submitted an affidavit to the Court stating that "BCDC is currently leased to Cornell Corrections Corp., which intends to renovate the building and house federal prisoners pursuant to a contract with the United States government." *See* Docket No. 422, Exhibit A.  While Defendants argue that this statement is accurate because the building was leased to Cornell and Cornell did begin to house federal pursuant to a contract with the federal

government, the statement implies that Cornell had the contract to house federal prisoners--an impression Defendants never corrected.

Defendants assert that the process by which the IGA was procured, and Bernalillo County's role in the process, was open and transparent and "the fact that the Plaintiffs and Plaintiff Intervenors failed to read a newspaper or attend any of the public hearings should not now serve as a basis to discount all of the work successfully undertaken pursuant to the goals and directive of the June, 2005 settlement agreements." In support of this assertion, Defendants have provided a number of newspaper articles as well as copies of the minutes from several Bernalillo County Board of County Commissioners meetings.  While these documents discuss the County's efforts to secure an IGA and certain aspects of the County's lease with Cornell, none of the documents states that Bernalillo County is the party that assumed responsibility under the contract to house federal prisoners or gives any indication of the extent to which Bernaillo County would retain oversight for these detainees under the Operation and Management Agreement  There are occasional references to Cornell and the County "working together" to obtain a contract to house federal prisoners but the closest any of the submitted documents came to disclosing the extent of the County's role is a newspaper article stating that the lease with Cornell "[r]equires the county to try to work out agreements with the federal government to house inmates at the Downtown jail." 6/10/2003 ABQ Journal.

Based on the evidence provided, the Court cannot find that the information available to the public was such that Plaintiffs and Plaintiff Intervenors should have been aware that it was Bernalillo County that entered a contract to house federal detainees at RCC at the time the 2005 Stipulated Settlement Agreements were approved.  In fact, the overwhelming evidence in the record

supports Plaintiffs and Plaintiff Intervenors' assertion that Defendants, intentionally or unintentionally, perpetuated the misimpression that Cornell was the party to the contract with the federal government to house federal detainees at RCC:

* In 2005 Defendants submitted a sworn statement to the Court that "BCDC is currently leased to Cornell Corrections Corp., which intends to renovate the building and house federal prisoners pursuant to a contract with the United States Government."

* A May 20, 2007 newspaper article attributes to John Dantis the statement that "Cornell Corrections . . . has an intergovernmental agreement to detain inmates [at RCC]."

* In an August 11, 2007 newspaper article Cornell CEO James Hyman is quoted as stating that "The contract between Cornell and ICE is still in place."

* An October 11, 2007 Albuquerque Journal article states that "Cornell leases and runs the downtown jail . . . the company contracts with federal authorities to house federal prisoners in the region.").

* Defendants' representatives repeatedly "referred to Cornell's contract with the federal government" in conversations with counsel for Plaintiffs and Plaintiff Intervenors and not once did Defendants  disclose that it was the County that held the contract.

* Defendants' representatives repeatedly informed Magistrate Judge Torgerson during status conferences on this case that Cornell held the contract with the federal government to house federal detainees at RCC.

* On June 14, 2006, Magistrate Judge Torgerson convened a conference call with counsel for the parties to discuss the downtown jail.  During the call, counsel for the Defendants explicitly stated that it was Cornell who held the contract with ICE.  When counsel for Plaintiff Intervenors informed Judge Torgerson that he had recently heard that the contract was with the County, not Cornell, Defendants' counsel insisted that, to his knowledge, the contract was between Cornell and ICE. Judge Torgerson directed Defendants' counsel to provide copies of the  contract to the parties, which Defendants' counsel did on June 26, 2007. These  documents confirmed that the contract was between Bernalillo County and the federal government.

* Plaintiffs' counsel made numerous requests for a copy of the Management and Operating Agreement with Cornell.  These requests were ignored by Defendants

16

for nearly a year, until Plaintiffs threatened to subpoena the documents in the
summer of 2007.

As stated by Plaintiffs, if Bernalillo County's relationship with the federal government was
so transparent, "how did the newspapers get it wrong, the County's defense attorney get it wrong,
the Plaintiffs' attorneys get it wrong, the Plaintiff Intervenors' attorneys get it wrong, the Magistrate
Judge get it wrong, and the District Judge presiding over the case get it wrong?"  Whether
fraudulently, negligently, or innocently, Defendants' statements and omissions led the Plaintiffs,
Plaintiff Intervenors, and the Court to believe that Cornell, not Bernalillo County, had entered into
a contract to house federal detainees at RCC.

The Court is perplexed by Defendants' argument that they were justified in not disclosing
that Bernalillo County had contracted to house detainees to RCC because Defendants believed that
the *McClendon* class and subclass were limited to detainees housed in facilities directly *operated*
by the County.  The Court finds the suggestion that Defendants believed that hiring a contractor to
operate a facility for them would somehow relieve them of their obligations under this case
completely incredulous.

Defendants argue that if Plaintiffs and Plaintiff Intervenors truly believed that detainees
housed at RCC were part of the class and subclass, they should have sought access to RCC when
the County began housing MDC inmates there in 2006.  If the facts had been as Plaintiffs and
Plaintiff Intervenors thought they were--*i.e.* that RCC was being operated as a private facility by
Cornell and MDC inmates were being housed there pursuant to a contract between the County and
Cornell--these detainees were not members of the class or subclass.  In addition, the County assured
Plaintiff Intervenors that no subclass members would be housed at RCC.

Finally, Defendant asserts that even if the Court finds that a misrepresentation was made, any

17

representation was neither reckless nor intentional.  Defendants also submitted testimony from County officials stating that they did not know that "such information would have any bearing on the approval of the settlement agreement."  John Dantis at  ¶ 15.  The Court need not find that Defendants acted recklessly or intentionally or even knew that the information was relevant because even an inadvertent failure to disclose a material fact is grounds for recission.[6]

### 2.  Was the misrepresentation material?

The fact that RCC would continue to be operated as part of the Bernalillo County jail system such that detainees in that facility were members of the class and subclass whose claims were being settled was a material fact.  There can be no question that the fact that there were hundreds of class members excluded from the class settlement was a material fact.

### 3.  Did the misrepresentation induce the parties to enter the agreement?

Defendants' misrepresentations or omissions led Plaintiff and Plaintiff Intervenors' counsel to approve a settlement agreement limited to MDC rather than applying to all facilities in the Bernalillo County jail system.  Defendants' misrepresentations or omissions also led the Court to approve the 2005 Settlement Agreements based upon its belief that all class members were being housed at MDC.  Counsel for Plaintiffs and Plaintiff Intervenors both testified that they would not have entered the 2005 Stipulated Settlement Agreements had they known that Bernalillo County had contracted to house federal detainees at RCC.

### 4.  Was the parties' reliance on the misrepresentation justified?

Defendants argue that any reliance upon the alleged misrepresentation was misplaced since

---

[6]  Whether County officials were aware of the import of this information, Defendants' counsel should have known that the fact that Bernalillo County was contracting to house federal detainees in RCC was a material fact that should have been disclosed to Plaintiffs and the Court.

information regarding the County's role in the IGA was readily available in the public arena.  As discussed above, the information available in the public arena supported the view that Cornell had a contract to house federal detainees.  In addition, Plaintiffs and Plaintiff Intervenors reasonably relied upon Defendants' representatives' statements to the Court and to them that Cornell had the contract with the federal government.

Plaintiffs and Plaintiff Intervenors have come forward with convincing evidence that Defendants made a material misrepresentation that the parties reasonably relied upon in entering the 2005 Stipulated Settlement Agreements.

### D.  Remedy

Plaintiffs and Plaintiff Intervenors' motions essentially request that the 2005 Settlement Agreements be reformed to extend to RCC and other facilities where Bernalillo County and the City of Albuquerque house detainees.  In response to the Court's Order to Show Cause, Plaintiffs requested that the their settlement agreement be withdrawn while Plaintiff Intervenors reiterated their request that the Court exercise its inherent equitable powers to modify the terms of the 2005 Stipulated Settlement Agreement to apply to subclass members housed at RCC.  Defendants strenuously object to any proposal that results in the withdrawal of the 2005 Stipulated Settlement Agreements or the extension of the 2005 Stipulated Settlement Agreements to RCC.

While the Court may have the equitable power to modify the terms of consent decrees, the Court will decline to exercise this power.  Under New Mexico law, recission is the specified remedy for a misrepresentation in the negotiation of a contract.  Furthermore, simply extending the current agreements to include RCC does not seem practical as many of the provisions, such as those related to the Mental Health Unit, are site specific.  Consequently, the Court will grant Plaintiffs and

Plaintiff Intervenors the option to rescind their respective 2005 Stipulated Settlement Agreements.

### E.  Court's Approval of the 2005 Stipulated Settlement Agreements

Pursuant to Rule 23(e)(1)(A), the Court must approve "any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class." Fed. R. Civ. P. 23(e)(1)(A). The Court may only approve a settlement after a hearing and on a finding that the settlement "is fair, reasonable, and adequate."  *Id* at (e)(1)(C).  A class suit may not be settled or compromised unless such a disposition is in the interest of the whole class. *Euresti v. Stenner*, 458 F.2d 1115 (10th Cir. 1972).

Defendants had an obligation to the Court to relay material information in their possession at the settlement hearing.  The Court approved the settlements with the understanding that all class members were being housed at MDC.  If the Court had known that Defendant Bernalillo County had contracted to house detainees at RCC, the Court would not have approved the 2005 Stipulated Settlement Agreements because the settlement agreements did not cover a significant portion of the defined class and subclass.  Pursuant to Rule 23(e)(1)(A), the Court has an obligation to ensure that the settlement agreement is of benefit to the whole class.   The approval of the 2005 Settlement Agreements was unfair to the class as a whole and contrary to the policies underlying class actions. *In Re N.M. Indirect Purchasers Microsoft Corp.*,140 N.M. 879, 889 (N.M. App. 2006).

While the Court does not find that Defendants' failure to disclose this information constitutes a fraud on the Court, the Court will exercise its equitable power to withdraw its approval of the 2005 Stipulated Settlement Agreements because material information regarding whether the settlements were "fair, reasonable, and adequate" was not provided to the Court prior to the Court's approval of the settlements.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion to Permit Counsel to visit McClendon Class Members Housed at the Regional Correctional Center or Any Other Facility, filed June 28, 2007, **[Doc. Nos. 543 and 661]**, Plaintiff-Intervenors' Motion to Permit Counsel to Have Access to RCC, Its Residents And Their Records, filed July 26, 2007, **[Doc. Nos. 548 and 660]**, are **GRANTED in part**. The Court hereby grants the parties the option to rescind their respective 2005 Stipulated Settlement Agreements. The parties must notify the Court in writing within 10 days of the date of this Order if they would like to exercise their option to rescind.

**IT IS FURTHER ORDERED** that the Court's approval of the 2005 Settlement Agreements is hereby withdrawn.

**IT IS FINALLY ORDERED** that because the Court's approval of the 2005 Stipulated Settlement Agreements has been withdrawn, Plaintiff's Motion for an Order to Show Cause, filed September 12, 2007, **[Doc. No. 555],** Plaintiff-Intervenors' Motion for an Order to Show Cause, filed September 24, 2007, **[Doc. No. 562]**, and Plaintiffs' and Plaintiff Intervenors' Joint Motion to Compel filed September 17, 2008, **[Doc. No. 682]** are hereby **DENIED as moot**.

Dated this 31st day of March, 2009.

MARTHA VAZQUEZ
CHIEF U.S. DISTRICT COURT JUDGE

21

Attorneys for Plaintiffs:

Marc M. Lowry
Peter Schoenburg
Alexandra Freedman Smith
Mark H. Donatelli
Zachary A. Ives
Andrew Vallejos

Attorneys for Intervenors:
Claire Dickson
Flynn Evelyn Sylvest
Peter Cubra
Lisa Y. Schatz-Vance

Attorneys for Defendants:
Jeffrey L. Baker
Kathryn Levy
Daniel J. Macke
Marcus J. Rael, Jr.