# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

JIMMY (BILLY) MCCLENDON, *et al.*

        Plaintiffs,

vs.　　　　　　　　　　　　　　　　　　　　　　　　　　　Civ. No. 95-24 MV/ACT

CITY OF ALBUQUERQUE, *et al.*,

        Defendants,

vs.

E.M., R.L., W.A., D.J., P.S., and N.W.,
on behalf of themselves and all others
similarly situated,

        Plaintiff Intervenors.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Bernalillo County's ("County") Motion to Disqualify and Memorandum in Support Thereof (Doc. 702, filed April 21, 2009). For the reasons stated below, the Court will **GRANT** the Motion.

## BACKGROUND

On March 31, 2009, the Court issued a Memorandum Opinion and Order (Doc. 699) finding that the County had misrepresented material information to Plaintiffs, Plaintiff Intervenors and this Court. The Court found the County failed to disclose the following material facts: 1) the County has had operational and management authority over the Regional Correctional Center ("RCC") since at least June of 2004, when it entered into an Operating and Management Agreement with Cornell Companies, Inc. ("Cornell"); and 2) in March of 2005, the County entered into an Intergovernmental Service Agreement ("IGA") with the Office of the Federal Detention Trustee in which it agreed to

house federal detainees at RCC and to perform all the services required in the IGA. These facts are material because the class members and subclass members in this case are not confined to a particular facility, but rather to the Bernalillo County jail system as a whole. The settlement agreements entered into by the parties and adopted by the Court encompass those facilities that are operated or controlled, directly or indirectly, by Defendants as part of the Bernalillo County jail system. Other detention facilities not operated or controlled by the County are not part of the Bernalillo County jail system and are not subject to the requirements of this case even if Bernalillo County contracts to house detainees at those facilities.

Consequently, the County's misrepresentation that *Cornell* had sole operational authority over RCC and *Cornell* entered into the IGA to house federal detainees at RCC effectively shielded the County from responsibility in this case for the inmates and detainees it housed at RCC from approximately 2004 to 2009. Based upon these misrepresentations, Plaintiffs and Plaintiff Intervenors entered into Stipulated Settlement Agreements in 2005, limiting the applicability of this case to the Metropolitan Detention Center ("MDC") upon the belief that the County only operated MDC. Although the County entered into the IGA and the Operating and Management Agreement prior to the fairness hearing on June 30, 2005, it did not inform the Court or the other parties of its role in the housing of detainees at RCC. Consequently, the Court approved the Stipulated Settlement Agreements believing they covered all of the class members and subclass members subject to this lawsuit.

Almost two years later, in May of 2007, the Court began receiving numerous complaints about the availability of drugs, inadequate medical care and unsanitary conditions at RCC. While the Court often receives complaints from inmates about detention facilities where federal inmates are

2

housed, the number, type and frequency of the complaints concerning RCC at that time were greater than normal and prompted this Court to personally investigate the conditions at RCC on June 1, 2007. During its initial visit, the Court witnessed the most deplorable conditions it had ever encountered at a detention facility. Detainees detailed allegations of sexual assault, harassment, the trading of contraband for sex by the guards and the loss of personal property. The food failed to meet nutritional requirements, serious medical conditions were left untreated or ignored, pregnant women reported inadequate care including a lack of prenatal care allegedly resulting in some miscarriages, potentially toxic mold was left untouched in the showers, virtually no toiletries such as soap or toothpaste were provided and detainees were required to share undergarments. Part of the facility was unbearably hot and drugs, including cocaine, heroine and marijuana, were reputedly readily available. The facility where the ICE detainees were housed was seriously overcrowded. Over 1,000 individuals were subjected to these lamentable conditions at that time. Following its initial visit, the Court notified Cornell, the U.S. Department of Justice, the U.S. Marshal's Office and John P. Torres, the Director of the Office of Detention and Removal for U.S. Immigration and Customs Enforcement ("ICE") about its observations and the complaints from detainees at RCC.

On June 18, 2007 and June 22, 2007, the Court conducted follow-up visits at RCC. It noted several improvements had been made and some of the complaints had been addressed and remedied. However, significant improvements were still needed to ensure the district's federal detainees' fundamental needs and rights were being met. During this time, Cornell was responsive to the Court, thus supporting the impression that Cornell, not the County, had responsibility for the detainees housed at RCC. The County did not correct this false impression, but instead remained silent and avoided public scrutiny and judicial admonition.

On July 31, 2007, after conducting its own investigation, ICE began the removal of its entire population of detainees from RCC. Mr. Torres advised the Court that RCC was the worst detention facility he had seen. At or near the time the detainees were removed, Commissioner Deanna Archuleta initiated a meeting with the Court. Ms. Archuleta was accompanied by John Dantis to a meeting with the Court on August 6, 2007. Ms. Archuleta expressed her concerns about the conditions at RCC. The meeting concerned the same facts and concerns previously expressed by the Court to Cornell, ICE, the U.S. Marshal's Office and Mr. Dantis.

After ICE removed its detainees from RCC and Cornell took significant steps to improve the conditions there, including the removal of a number of employees it found to have engaged in misconduct, the complaints about RCC abated. Since the issue regarding the ICE detainees in 2007, the Court has received only a limited number of complaints about RCC, the most recent of which was made in April of 2009. An attorney visiting RCC reported to the Court at a monthly Department Head Meeting that he had witnessed what appeared to be a security breach. Pursuant to the Court's standard protocol, the Court forwarded this information to James Hyman, the CEO of Cornell requesting he look into the matter. (*See* Doc. 702, Ex. P.)

## LEGAL STANDARD

The County requests the Court disqualify itself in this case pursuant to 28 U.S.C. § 455(a), (b)(1) and (b)(5) (2009). Those provisions require, among other things, a judge to disqualify herself in any proceeding in which: 1) her impartiality might reasonably be questioned; 2) she has personal knowledge of disputed evidentiary facts concerning the proceeding; and 3) she or her spouse, or a person within the third degree of relationship to either of them, or the spouse of such person is a party to the proceeding.

For purposes of § 455(a), "[w]hat matters is not the reality of bias or prejudice but its appearance." *Nichols v. Alley*, 71 F.3d 347, 350 (10th Cir. 1995) (quoting *Liteky v. United States*, 510 U.S. 540, 547, 114 S.Ct. 1147, 1154, 127 L.Ed.2d 474, 486 (1994)). The Court must determine "'whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality.'" *Nichols*, 71 F.3d at 351 (quoting *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993)(further quotation omitted)). In applying this objective standard, the Court is limited to "outward manifestations and reasonable inferences drawn therefrom." *Id.* "[T]he judge's actual state of mind, purity of heart, incorruptibility, or lack of partiality are not the issue." *Id.*

For purposes of § 455(b)(1) and (5), the inquiry is subjective. Section 455(b)(1) calls for recusal when a judge has "personal knowledge of disputed evidentiary facts concerning the proceeding." This rule applies to knowledge which the judge obtained extrajudicially, e.g., through prior representation of a party, or by witnessing the events at issue in the proceeding." *United States v. Page*, 828 F.2d 1476, 1481 (10th Cir. 1987). Section 455(b)(5) is even more specific, requiring recusal when a family member within a third degree of relationship to the judge or her spouse is a party. Section 455(b) does not require a showing of actual impartiality. Circumstances falling within this subsection carry the appearance of impartiality which is sufficient for recusal.

## DISCUSSION

The County's Motion is a blatant attempt to malign and discredit the Court in an effort to achieve its objective of having this Court removed from the present case. The facts and circumstances relied upon by the County for disqualification lack the improper and meddling character attributed to them. The allegations made by the County's attorney, Marcus Rael, Jr., are reckless and violate the New Mexico Rules of Professional Conduct. The Court has a strong interest

5

in promoting public confidence in the integrity and independence of judges. The County's characterization of the circumstances leading to the Court's recusal require that the Court provide some clarification to avoid any misperceptions by members of the general public not familiar with the facts.

### A.     The Court Did Not Engage in Extrajudicial Conduct

A chief district judge has an obligation to perform a great number of administrative duties and judicial functions in overseeing the integrity of the judicial system in her district. *See* 28 U.S.C. §§ 136 & 137; *see also* FEDERAL JUDICIAL CENTER, DESKBOOK FOR CHIEF JUDGES OF U.S. DISTRICT COURTS §§ 1 & 2 (3rd ed. 2003). Federal detainees and inmates fall within the Court's purvey while housed in this district. It is incumbent upon the Court to respond to complaints and to ensure that the conditions of the facilities in which these individuals are housed are adequate and meet their basic needs. The Court is kept apprised by the United States Marshal's Office, the United States Probation Department, members of the federal bar and inmates themselves regarding conditions at detention facilities. When problems associated with overcrowding, unsanitary conditions and inadequate medical treatment arise, the Court addresses those concerns by directing the complaints to the proper authority, and, if necessary, by physically inspecting the facility itself. Each complaint is taken seriously and treated appropriately. This Court has visited numerous detention facilities housing federal inmates and detainees during its tenure, including facilities in Texas and South Dakota before deciding to send any of our juveniles there. The administrative actions of the Court are not extrajudicial. *See Duckworth v. Department of Navy*, 974 F.2d 1140, 1142 (9th Cir. 1992); *see also Cheeves v. Southern Clays, Inc.,* 797 F.Supp. 1570, 1581 (M. D. Ga. 1992) (circumstances giving rise to actual or perceived prejudice arising out of communications or events known to the judge by

virtue of his or her judicial capacity are not a basis for disqualification).

In June of 2007, the Court visited RCC three times based on the complaints it received regarding drugs in the facility, unsanitary conditions and poor medical care. Visits by federal judges to inspect jail conditions are not extraordinary. *See* Kevin Cullen, *Locked-in Perspective*, The Boston Globe, (October 1, 2007), http://www.boston.com/news/local/articles/2007/10/01/locked_in-perspective/ (federal judge paid unannounced visit in 1973 after lawyers for inmates sued on the grounds that the conditions violated their civil rights); *Alberti v. Sheriff of Harris County*, 937 F.2d 984, 987 (5th Cir. 1991) (in about 1975, district judge, after visiting facilities, concluded that conditions in the jails were "inhumane"); *Campbell v. McGruder*, 580 F.2d 521, 538 (D.C. Cir. 1978) (district court made unannounced visit to District of Columbia jail and found that more than 200 persons were held in violation of the court's order regarding space requirements); David Firestone, *Crowded Jails Create Crisis for Prisons in Alabama,* (May 21, 2001), http://www.tgorski.com/criminal_justice/ Crowded%20Jails%20Create%20Crisis%20For%20Prisons%20in%20Alabama_010530.htm (2001, federal judge visited jail and found it uncivilized and hazardous, resembling the holding units of slave ships); *Rutherford v. Baca*, No. CV 75-04111, (C.D. Cal. 2006) (court made two visits to Los Angeles jail and observed overcrowding to such a degree that a finding of a constitutional violation would be warranted); The MacArthur Justice Center, Northwestern School of Law, *Judge Decides to Visit Cook County Jail to See Overcrowded Conditions* (Media Advisory, February 1, 2008) (calls people sleeping on floor "unconstitutional," wants overcrowding addressed). The Court's activities with respect to RCC were public and well-known by the County.

It is disingenuous for the County to characterize the Court's inspection of RCC as an

"extrajudicial factfinding and evidence gathering" mission related to the present lawsuit. (Doc. 702, pp. 2 & 3.) In June of 2007, due to the misrepresentations made by the County, the Court believed that Cornell had contracted to house federal detainees at RCC. As a private company and non-party to this lawsuit, Cornell's operation of RCC and alleged contractual obligations fell outside the parameters of the present lawsuit. The full extent of the County's involvement with RCC was not discovered until many months later after it was revealed that the County, not Cornell, had entered into contracts with the federal government to provide housing for federal detainees at RCC.

Based upon false impressions fostered and left uncorrected by the County, the Court directed all of its requests for improvement at RCC to Cornell. Cornell was responsive to the Court, while the County remained silent or denied responsibility. At no time during the Court's investigation into RCC did the County ever admit responsibility for the detainees housed at RCC. On the contrary, the County stated "[t]here are no Bernalillo County inmates housed at RCC." (Doc. 546, filed July 12, 2007). If the Court had known that RCC was a County-run facility at the time, it would have taken a different course of action with respect to the complaints it received about RCC. Nevertheless, at that time, pursuant to the parties' Stipulated Settlement Agreements, MDC was the only facility subject to the terms of the present lawsuit. Therefore, none of the actions taken by the Court in 2007 with respect to RCC relate to the present lawsuit. The Court's investigation of RCC occurred almost two years before RCC was brought into this lawsuit. It is hypocritical for the County now to purport to hold the Court accountable for knowing the very facts it improperly withheld.

Finally, in April of 2009, a complaint concerning security at RCC was made to the Court by an attorney unrelated to the present case in a monthly Department Head Meeting during which a variety of matters concerning the Court are discussed. The Court relayed the complaint to

Cornell, as is its standard procedure. The Court's action is a basic judicial function. Addressing complaints and concerns regarding detention facilities serves an important judicial function and helps ensure the quality and integrity of the judicial system. The transmittal of this information to RCC is not alone sufficient to require recusal under 28 U.S.C. §§ 455(a) or (b).

### B.     The Court Did Not Engage in *Ex Parte* Communications

The County makes 16 separate references to alleged *ex parte* "correspondence," "evidence gathering" and "communications" by the Court with RCC inmates, detainees and guards, John Dantis, Commissioner Deanna Archuleta, Cornell and an unidentified attorney. (Doc. 702, pp. 2-5, 7, 16, 19, 22-23.) Counsel for the County either lacks a basic understanding of this common legal principal, or knowingly misuses the phrase to incite distrust in this Court's impartiality. Either explanation is unacceptable for a licensed attorney obligated to uphold the New Mexico Rules of Professional Conduct.[1] The pejorative connotation of the phrase *ex parte* implies, directly or indirectly, that the Court engaged in improper behavior, which is simply not the case. Despite littering its motion with the derogatory phrase, the County has failed to identify a single instance in which the Court actually engaged in an *ex parte* communication concerning this case.

*Ex parte* is defined as "[o]n one side only; by or for one party; done for, in behalf of, or on the application of, one party only." BLACK'S LAW DICTIONARY 576 (6th ed. 1990); *see also United States v. Forbes*, 150 F.Supp.2d 672, 677 (D.N.J. 2001) ("An *ex parte* communication is a communication which takes place between one party in a matter, without the presence of opposing party or parties, with or without notice to such other party or parties."). The inmates and detainees

---

[1] The New Mexico Rules of Professional Conduct, Rule 16-802(A) states: "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer. . .".

9

at RCC were not class and subclass members in this lawsuit in 2007.[2] The RCC guards, John Dantis and Commissioner Archuleta were not defendants in this lawsuit in 2007, with respect to RCC.[3] Cornell has never been a party to this lawsuit. The attorney that reported an alleged breach of security at RCC in 2009 is neither counsel in this lawsuit nor a party. Consequently, the Court's communications with these individuals were not *ex parte* as none of these individuals were parties with respect to RCC at the time of the communication. *Forbes*, 150 F.Supp.2d at 677 ("[T]his term contemplates that one actually be a party to a matter before the communication of another party is considered '*ex parte*'"). Finally, the fact that RCC is now at issue in the present lawsuit does not change the character of the Court's past communications with individuals who may now be considered class members, subclass members or defendants. *Id.* (communications with an individual in 1999, before the individual became a criminal defendant in 2001, were not *ex parte*).

### C.   The County's Motion is an Improper Litigation Tactic

The County seeks to disqualify the Court for two reasons: 1) the Court's investigation of the conditions at RCC in 2007; and 2) the fact that the Court's sister-in-law has been incarcerated at MDC on four occasions since 2007, the most recent of which occurred from March 17, 2009 through March 27, 2009.

A motion to disqualify under § 455(a) and (b) "must be timely filed." *Willner v. Univ. of*

---

[2] It is doubtful that any of these individuals are class and subclass members today, as the requirement for membership is that the individual presently be housed in a Bernalillo County facility. As the majority of the detainees were removed from RCC in 2007, and the others have likely proceeded through the system and out of RCC during the past two years, it is questionable whether any of the individuals housed in RCC in 2007 remain there today and can be considered class members.

[3] While John Dantis and Commissioner Archuleta are Defendants in the present lawsuit, the Court is not forbidden from communicating with them about matters unrelated to the lawsuit. In 2007, RCC was unrelated to the present lawsuit, and therefore the Court's meeting with them about RCC was not improper.

*Kansas*, 848 F.2d 1023, 1028 (10th Cir. 1988). Although the Tenth Circuit "has not attempted to define the precise moment at which a § 455(a) motion to recuse becomes untimely, our precedent requires a party to act promptly once it knows of the facts on which it relies in its motion." *United States v. Pearson*, 203 F.3d 1243, 1276 (10th Cir. 2000) (citing *Willner*, 848 F.2d at 1028-29); *see also Summers v. Singletary*, 119 F.3d 917, 921 (11th Cir. 1997) ("[W]here the facts are known before a legal proceeding is held, waiting to file such a motion until the court has ruled against a party is untimely."). Furthermore, "[a]n issue involving recusal cannot be used as an insurance policy to be cashed in if a party's assessment of his litigation risks turns out to be off and a loss occurs." *Bivens Gardens Office Building v. Barnett Banks of Florida, Inc.*, 140 F.3d 898, 913 (11th Cir. 1998). The statute is not "intended to bestow veto power over judges or to be used as a judge shopping device." *Nichols*, 71 F.3d at 351; *see also United States v. Greenspan*, 26 F.3d 1001, 1006 (10th Cir. 1994) (§ 455 "is not intended to be used as a forum shopping statute").

Concerning the Court's investigation of RCC in 2007, all of the facts upon which the County relies for recusal under § 455(a) and (b)(1) were known to it in 2007. The County was fully aware of the actions taken by the Court and participated to a substantial degree in the investigation. Mr. Dantis accompanied the Court to RCC on June 1, 2008; received correspondence written by the Court to the CEO of Cornell, James Hyman, on June 7, 2007, which detailed the Court's findings at RCC; attended a meeting with the Court, Mr. Hyman and counsel for Cornell on June 22, 2007; and attended another meeting with the Court and Commissioner Archuleta regarding RCC on August 6, 2007. (Doc. 702, Ex. Q.) Consequently, the County was fully aware of the Court's involvement with RCC in 2007.

The County claims its motion is not untimely because prior to March 31, 2009, the Court "had

11

not explicitly ruled that RCC was part of the Bernalillo County jail system or that the RCC was part of this litigation." (Doc. 702, p. 23.) The County stated it "had always been of the position that the RCC was not part of Bernalillo County's jail system and thus not part of the litigation," therefore "filing a recusal motion based upon the Court's 2007 *ex parte* [sic] communications prior to this Court's March 31, 2009 Memorandum Opinion and Order would have been premature." (Doc. 702, p. 23.)

The County's explanation for its almost two-year delay in filing the present motion is unpersuasive. The law is clear that a § 455 motion must be filed when the facts on which it relies are known to the moving party, which in this case was in the summer of 2007. *See Pearson*, 203 F.3d at 1276. The County's explanation that it did not know the Court would rule adversely to it by including RCC in the Bernalillo County jail system is the precise explanation prohibited from consideration. *See Summers*, 119 F.3d at 921 (party's motion to disqualify is untimely when it waited to file motion until after it received an adverse ruling). The County's delay in filing the present motion based upon facts it knew in 2007 supports a finding that the motion is an improper litigation tactic. *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1296 (9th Cir. 1992) ("unexplained delay suggests that the recusal statute is being misused for strategic purposes").

Concerning the detention of the Court's sister-in-law, Carla Maestas, at MDC, Ronald Torres, the Chief of Corrections for MDC, had knowledge that Ms. Maestas was incarcerated at MDC as early as February of 2007. (Doc. 702, Ex. R, ¶ 7.) Contrary to Mr. Torres's Affidavit, my husband and I visited Ms. Maestas on Easter Sunday, April 8, 2007, during regular visiting hours. When we arrived my husband was advised that Ms. Maestas was in the infirmary and unable to attend a visitation in the regular visiting area due to her illness. Mr. Torres's Affidavit again requires

12

correction when he states he received a call from a "staff member" on a weekend "informing [him] that the Honorable Judge Martha Vazquez and her husband Joseph Maestas were asking to visit with Ms. Maestas." *Id.* at ¶ 12. Mr. Torres incorrectly stated "visitors are not allowed direct contact visits with inmates unless there are extraordinary circumstances and then only with the approval of the Chief of Corrections." *Id.* at ¶ 13. Mr. Torres said he considered the "fact that a sitting United States District Court Judge wanting to visit an inmate as extraordinary." *Id.* at ¶ 14. Contrary to Mr. Torres's description of the events that day, after learning his sister was in the infirmary, my husband called Mr. Torres's wife, Ana Lisa Torres, who is a long-time friend of his. He asked her if she knew how he could visit his sister in the infirmary, and she confirmed shortly thereafter that Mr. Torres had authorized the visit. *See* Bernalillo County Metropolitan Detention Center, *Policy and Procedure Manual* §§ 1511(A) (allowing personal visits), 1512(A)(1)(b) (authorizing visits to hospitalized inmates), 1513(C)(a) (allowing contact visits in the infirmary). According to § 1513(C)(a) of the Bernalillo County Metropolitan Detention Center Policy and Procedure Manual, Mr. Torres's authorization is not required for a visit in the infirmary. The Shift Commander on duty that day also could have authorized the visit. *See* § 1513(C)(a).

Mr. Torres's statements give the false impression that the Court contacted MDC and, using its position as a federal judge, requested special treatment other members of the community do not receive. The insinuation is erroneous and challenges the integrity of the Court. The Court had nothing to do with scheduling the visit with Ms. Maestas. To the Court's knowledge, the standard protocol was followed and nothing regarding the visit was "extraordinary." Personal visits to inmates housed in the infirmary are not extraordinary and are allowed according to the Policy and Procedure Manual. *See* §§ 1512(A)(1)(b) & 1513(C)(a).

13

In addition to the County's knowledge of Ms. Maestas's incarceration in 2007, and this Court's visit to her at that time, the County or its attorneys clearly took special notice of Ms. Maestas's detention approximately a year before filing the present motion as demonstrated by the fact that it pulled her Offender Booking Sheets on May 1, 2008, the printed dated on the County's Exhibits S and U. (Doc. 702 Exs. S & U.)  These facts demonstrate that the County knew of this possible basis for disqualification but deliberately waited until after receiving an unfavorable decision from this Court on March 31, 2009.  Although Ms. Maestas was again recently incarcerated from March 17, 2009 to March 27, 2009, this period of incarceration does not obviate the need for the County to act promptly upon learning facts that support a § 455(b) motion.  *See Pearson*, 203 F.3d at 1276.  Plaintiffs and Plaintiff Intervenors correctly state that "[s]tarting the clock from the most recent in a series of interrelated events, as the County suggests, would allow a party to ignore allegedly disqualifying facts while litigation proceeds and then take advantage of them in a recusal motion only after the party decides that it does not like the judge's rule." (Doc. 711, p. 6.)  A motion is untimely when the vast majority of the disqualifying events occurred several years earlier.  *City of Cleveland v. Cleveland Electric Illuminating Co.*, 503 F.Supp. 368, 379-80 (N.D. Ohio 1980); *see also United States v. Sanford*, 157 F.3d 987, 988-89 (5th Cir. 1998) ("The most egregious delay– the closest thing to per se untimeliness– occurs when a party already knows facts purportedly showing an appearance of impropriety but waits until after an adverse decision has been made by the judge before raising the issue of recusal.").

The County's extremely late filing of the present motion is a transparent effort to remove a judge from whom the County recently received an unfavorable decision in hopes of having this matter reassigned to a judge who may be more amenable to the County's position.  *See  Nichols*, 71 F.3d at

351; *Greenspan*, 26 F.3d at 1006; *E. & J. Gallo Winery*, 967 F.2d at 1296. "Counsel, knowing the facts claimed to support a § 455(a) recusal for appearance of partiality may not lie in wait, raising the recusal issue only after learning the court's ruling on the merits." *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1472 (11th Cir. 1986). The County's tactics are unethical.

### D.    Recusal is Appropriate Because a Person Might Reasonably Question the Court's Impartiality

While it is disappointing that the County's tactics are ultimately successful, the Court's foremost obligation is to promote public confidence in the integrity and independence of judges. This obligation outweighs the Court's obligation to quell inappropriate litigation tactics in this case. *See Jackson v. Fort Stanton,* 757 F.Supp. 1231, 1240 (D.N.M. 1990) ("In deciding whether to recuse himself, the trial judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over the case." (quotation omitted)).

Section 455(a) requires the Court to recuse if her "impartiality might reasonably be questioned." After considering all of the facts at issue, the Court finds a person may reasonably question whether this Court can set aside the negative opinion it had about the conditions at RCC in the summer of 2007. While admittedly the conditions in 2007 are not currently a disputed issue of fact in this case, and thus recusal is not appropriate under § 455(b)(1), the conditions at RCC will undoubtedly be an issue going forward. Although the Court has no knowledge or opinion regarding the present conditions at RCC, the standard for recusal does not rest upon whether a Court has an actual bias. *See Liteky*, 510 U.S. at 547. The Court's expression of its opinion regarding RCC in the past is sufficient for a reasonable person to infer that the Court may not be impartial in this case now

that RCC has been identified as a facility subject to this lawsuit. *See Nichols*, 71 F.3d at 351. Avoiding even the appearance of impartiality is important and necessary to uphold public confidence in the integrity of the Court and its ability to make fair and impartial decisions. This is the utmost concern of the Court and the reason recusal is appropriate.

Additionally, with respect to the Court's sister-in-law, as she is no longer incarcerated at MDC, she is not currently considered a class member and thus recusal is not appropriate under § 455(b)(5). (*See* Doc. 116 (defining the class as "a class of all persons presently confined in BCDC [now MDC] or who may/will be so confined in the future")). However, she has been a class member in the past.[4] While the Court is confident the fact of Ms. Maestas's brief membership in the present class has had no bearing on its ability to fairly and impartially consider the issues before it in this case, a reasonable person may infer from this relationship that the Court may be impartial. *See Nichols*, 71 F.3d at 351. Therefore, the Court must also recuse for this reason pursuant to § 455(a).

**IT IS THEREFORE ORDERED** that Defendant Bernalillo County's Motion to Disqualify and Memorandum in Support Thereof (Doc. 702) is **GRANTED**.

**DATED** this 15th day of May, 2009.

_____
**MARTHA VAZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE**

---

[4] Plaintiffs and Plaintiff Intervenors argue Ms. Maestas is "not a 'party' for purposes of the recusal statute because of the breadth of the class and the nature of the relief sought." (Doc. 711, p. 20.) While the class and subclass in this case is very large, the Court finds it does not represent a "substantial segment of the general public" as courts have defined the phrase. *See, e.g., In re City of Houston*, 745 F.2d 925, 929-30 (5th Cir. 1984) (recusal not necessary in a voting rights class action in which all voting members of Houston had an equal interest in the lawsuit; *In re New Mexico Natural Gas Antitrust Litig.*, 620 F.2d 794, 796 (10th Cir. 1980) (judge's status as a natural gas consumer too insubstantial to require recusal).