IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JIMMY McCLENDON, et al.

     Plaintiffs,

vs.                                                    CIV.- 95-0024 JP/ACT

CITY OF ALBUQUERQUE, et al.

     Defendants,

vs.

E.M., R.L., W.A., D.J., P.S., and N.W., on behalf
of themselves and others similarly situated,

     Plaintiff-Intervenors.

<u>MEMORANDUM OPINION AND ORDER ADOPTING
MAGISTRATE JUDGE'S INTERIM ORDER</u>

On September 17, 2009, Magistrate Judge Alan C. Torgerson entered the Interim Order

Regarding Access to the MDC (the "Interim Order") (Doc. No. 754).  On October 8, 2009,

Plaintiffs and Plaintiff-Intervenors filed their Joint Objections to the Interim Order Regarding

Access to the MDC (Doc. No. 754) (the "Joint Objections").  *See* Doc. No. 758.  On October 26,

2009, Defendant Bernalillo County filed its Response to Plaintiffs' and Plaintiff-Intervenors'

Joint Objections to the Interim Order Regarding Access to the MDC (Doc. No. 759) (the

"Response").  On November 12, 2009, Plaintiffs and Plaintiff-Intervenors filed their Reply In

Support of Their Joint Objections to the Interim Order Regarding Access to the MDC (Doc. No.

762). The Court has made a *de novo* review of those portions of the Interim Order at which the

Joint Objections were directed, and the Court finds the Joint Objections to be without merit.

Therefore, the Court will overrule the Joint Objections and in connection with this ruling finds

1

the following:

    I.  Background

        A.  Class and Sub-class Certification and Initial PLRA Orders

        In 1995, Plaintiffs filed this lawsuit alleging overcrowding and other unlawful conditions of confinement at the Bernalillo County Detention Center (the "BCDC") located in downtown Albuquerque, New Mexico. The Court certified the Plaintiff class as all persons who were then or in the future "confined in the Bernalillo County Detention center."  The Court later certified the Plaintiff-Intervenor sub-class as all persons with mental and/or developmental disabilities who were then or would be in the future detained at the BCDC. *See* Doc. Nos. 237 and 257.  On November 5, 1996, Plaintiff and Plaintiff-Intervenors entered into a settlement agreement with Defendants under the Prison Litigation Reform Act[1] (the PLRA), which the Court approved and memorialized in an order (Doc. No. 255).  Plaintiff Intervenors entered into a separate settlement agreement with Defendants, which was approved by the Court (*See* Order Doc. No. 256).  The Court will refer to both of these orders as the "PLRA Orders."

        Under the PLRA Orders, Plaintiff's and Plaintiff-Intervenors' counsels,  counsels' staff and counsels' agents regularly monitored the living conditions at the BCDC,[2] which included meeting with class and sub-class members, reviewing members' medical files, and discussing concerns regarding prison conditions with BCDC personnel.  From November 1996 to June

---

    [1] 42 U.S.C. §1997e (a) et seq.

    [2] Under the November 1996 Order approving the settlement with Plaintiff-Intervenors, counsel for Plaintiff-Intervenors were allowed to monitor conditions at the BCDC.  In an order entered on October 29, 1996, counsel for Plaintiffs and Plaintiff-Intervenors were allowed to review and copy any record maintained by agents of BCDC, including the medical services unit and the psychiatric services unit, concerning class and sub-class members.  *See* Protective Order (Doc. No. 254 ¶ 8.)

2003, Plaintiffs, Plaintiff-Intervenors and Defendants continued to litigate alleged constitutional violations concerning conditions of confinement at the BCDC and other facilities used to incarcerate class and sub-class members.

      B.  <u>The Metropolitan Detention Center</u>

On or about June 17, 2003, Defendants opened the Metropolitan Detention Center, a 2100-bed facility on the west side of Albuquerque.  Members of the class and the sub-class were transferred from the BCDC to the newly-constructed MDC. *See McClendon v. City of Albuquerque*, 272 F. Supp. 2d 1250, 1253 (D.N.M. 2003) (describing history of case).  After class and sub-class members were transferred to the MDC, counsel for Plaintiffs, Plaintiff-Intervenors and Defendants disagreed on whether the settlement agreements and PLRA Orders continued to apply to the MDC.  Defendants allegedly impeded access to the MDC by Plaintiffs' and Plaintiff-Intervenors' counsel and agents.  On June 27, 2003, Plaintiffs and Plaintiff-Intervenors filed their Joint Motion for a Temporary Restraining Order and Preliminary Injunction Enjoining the Defendants from Restricting Class and Sub Class Counsel from Having Access to the MDC (Doc. No. 409) (the "June 2003 Joint Motion").

      C.  <u>The July 2003 Order</u>

On July 11, 2003 in a published Memorandum Opinion and Order, the Court granted the June 2003 Joint Motion (the "July 2003 Order") (Doc. No. 416, *McClendon v. City of Albuquerque*, 272 F. Supp. 2d 1250 (D.N.M. 2003)).  After examining the  settlement agreements and the orders memorializing and approving the settlement agreements, the Court determined that the class and sub-class members did not loose their status as class or sub-class members after they had been transferred to the MDC.  *Id.* at 1255.  In other words, the settlement agreements approved and memorialized in the 1996 PLRA Orders, remained in effect and

applied to class and sub-class members wherever they were incarcerated. *Id.* Specifically, the Court found that in their settlement agreements, "the parties did not intend to limit, for purposes of the class and the sub-class definitions or otherwise, the term BCDC to a particular facility, but rather intended that term to apply to the jail system as a whole." *McClendon*, 272 F. Supp. 2d at 1255. Having determined that the previous orders remained in effect, including the PLRA Orders, the Court concluded that it retained continuing jurisdiction to review, modify and enforce the previous settlement agreements. *Id.* at 1257.

The July 2003 Order requires Defendants to immediately allow counsel for Plaintiffs and Plaintiff-Intervenors "reasonable and unimpeded access to MDC and to the records of residents of MDC. . . ." *McClendon*, 272 F. Supp. 2d at 1260. The July 2003 Order also requires Defendants to immediately refrain from imposing any limits on access to MDC and to the residents and staff therein "[w]hich [a]re [m]ore [r]estrictive" than those which were used when the class and the sub-class members were housed at the BCDC. *Id.* After the residents of the BCDC were transferred to the MDC, the BCDC facility was remodeled and renamed the Regional Correctional Center (the "RCC").

### D. Events Leading To the 2005 Settlement Agreements

On October 10, 2003, Defendants filed their Motion to Vacate Settlement Agreement Between Plaintiff-Intervenors and Defendant (Doc. No. 421) on the ground that the 1996 settlement agreements did not apply to the MDC and that the Court did not have jurisdiction to issue prospective injunctive relief for inmates at the MDC. Before the Court heard this motion, the parties negotiated new settlement agreements in 2004, which the Court approved in 2005 (the "2005 Settlement Agreements"). The 2005 Settlement Agreements were expressly limited to class and sub-class members detained or incarcerated at the MDC, and the 2005 Settlement

Agreements stated that they superceded any previous orders and settlement agreements.
Following a hearing, the Court approved the 2005 Settlement Agreements. (Doc. Nos. 513, 514
and 515.)  The stated purpose of the 2005 Settlement Agreements was to describe the conditions
that Plaintiffs and Plaintiff-Intervenors expected to be maintained or improved at the MDC.  The
2005 Settlement Agreements provided that this case would be dismissed when Defendants obtain
compliance with several specific criteria as certified by independent auditors. *See* Doc. No. 514
at p. 10; Doc. No. 515 at p. 6.  During the first half of 2007, several status conferences were held
before Magistrate Judge Torgerson concerning conditions and access to the MDC and to class
and sub-class members by Plaintiffs' and Plaintiff-Intervenors' counsel and their agents. (*See,
e.g.* Minutes of Proceedings, Doc. Nos. 528, 530, 532, 541, 545.)

    E. Issues Regarding the RCC

   On June 28, 2007, Plaintiffs and Plaintiff-Intervenors alleged that Defendants were
housing class and sub-class members at the RCC and asked the Court to allow counsel for class
and sub-class members access their clients at the RCC. *See* Plaintiffs' Motion to Permit Counsel
to Visit McClendon Class Members Housed at the Regional Correctional Center or Any Other
Facility (Doc. No. 543 at pp. 6-7) (the "Plaintiffs' Motion For Access to the RCC").  On July 25,
2007, Plaintiff-Intervenors filed their Motion to Permit Counsel to Have Access to RCC, Its
Residents and Their Records (Doc. Nos. 548) (the "Plaintiff-Intervenors' Motion For Access to
the RCC").[3]  In July 2007, Magistrate Judge Torgerson assisted Plaintiffs, Plaintiff-Intervenors

---

[3] Other motions were filed alleging overcrowding and other violations at both the MDC
and the RCC. *See* Plaintiff's Motion for an Order to Show Cause, filed September 12, 2007,
(Doc. No. 555)**.** *See also* Plaintiff-Intervenors' Motion for an Order to Show Cause, filed
September 24, 2007, (Doc. No. 562) (alleging inadequate services for sub-class members at the
MDC).

and Defendants on issues of access to the MDC and on the discovery issues related to the Plaintiffs' Motion For Access to the RCC and the Plaintiff-Intervenors' Motion For Access to the RCC.  In the settlement conferences held by Judge Torgerson, the parties negotiated detailed protocols to follow when Plaintiffs' counsel, Plaintiff-Intervenors' counsel and their agents visited the MDC. *See* Minutes of Proceedings, Doc. Nos. 550, 565, 582, 592, and 605). In March 2008, the Court denied *sua sponte* the Plaintiffs' Motion For Access to the RCC and the Plaintiff-Intervenors' Motion For Access to the RCC without prejudice on procedural grounds (Order Doc. No. 652).[4]  In April 2008, however, Plaintiffs renewed Plaintiffs' Motion For Access to the RCC and Plaintiff-Intervenors renewed Plaintiff-Intervenors' Motion For Access to the RCC.  *See* Notice (Doc. No. 660); Notice (Doc. No. 661).

On December 11, 2007, the Court issued an Order directing Defendants to show cause why the Court's approval of the 2005 Settlement Agreements, which governed only inmates housed in the MDC, should not be withdrawn because material information regarding whether the 2005 Settlement Agreements were "fair, reasonable, and adequate" was not provided to the Court prior to its approval of the 2005 Settlement Agreements.  *See* Doc. No. 600 at p. 4.

F. The March 2009 Order

In a Memorandum Opinion and Order entered on March 31, 2009 (Doc. No. 699) (the "March 2009 Order"), the Court granted the Plaintiffs' Motion Regarding Access to the RCC and granted in part the Plaintiff-Intervenors' Motion Regarding Access to the RCC.   The Court concluded that the class and sub-class includes those individuals that are incarcerated or detained in facilities that are "operated or controlled, directly or indirectly, by Defendants as part of the

---

[4] The Court's Order stated that the Motions were not ripe for adjudication due to ongoing discovery disputes. Doc. No. 652 at p. 1.

Bernalillo County jail system."  March 2009 Order at p. 10.  The Court specifically excluded from the class and sub-class detainees who are incarcerated in facilities owned, but not controlled, by Bernalillo County.  *Id.* at p. 10 n. 3 ("Mere ownership of a facility, without additional indices of control, would not be sufficient to support a finding that detainees housed in that facility were part of the *McClendon* class or sub-class.").  The Court also specifically excluded from this case all facilities not operated or controlled by Bernalillo County "even if Bernalillo Country [sic] contracts to house detainees at these facilities."  *Id.* at p. 10.

The Court found that Bernalillo County owned the RCC; contracted with the federal government to house its detainees under an Inter Governmental Agreement ("IGA"); and subcontracted with Cornell Companies, Inc. to care for the detainees. *Id.* at p. 11. The Court concluded that the RCC was under Bernalillo County's control and was being operated as part of the Bernalillo County jail system; therefore, the conditions at the RCC were subject to the Court's orders in this case. *Id.* at p. 12.  The Court further found that when Plaintiffs and Plaintiff-Intervenors entered into the 2005 Settlement Agreements, which were specifically limited to the conditions at the MDC, they were not informed that the RCC was "being operated as a Bernalillo County jail such that detainees housed there were members of the class and sub-class[.]" *Id.* at p. 12.  The Court found that if Plaintiffs and Plaintiff-Intervenors had known this fact, "they would not have limited the settlement agreement to MDC." *Id.* at pp. 12-13.  The Court determined that Bernalillo County misrepresented a material fact on which Plaintiffs and Plaintiff-Intervenors justifiably relied in entering into the 2005 Settlement Agreements because they believed that all class and sub-class members were being housed only at the MDC.  The Court also concluded that Bernalillo County misrepresented that fact to the Court and that the Court approved the 2005 Settlement Agreements based on the same belief, that all class and sub-

7

class members were being housed at the MDC. *Id.* at p. 18. The Court gave Plaintiffs and

Plaintiff-Intervenors the option to rescind their respective 2005 Settlement Agreements, and

although the Court did not find that Defendant Bernalillo County committed fraud on the Court,

the Court exercised its equitable power and withdrew its approval of the 2005 Settlement

Agreements. *Id.* at p. 20. In early April 2009, Plaintiffs and Plaintiff-Intervenors rescinded the

2005 Settlement Agreements (*See* Doc. Nos. 700 and 701), and on April 24, 2009, Defendant

Bernalillo County appealed the March 2009 Order to the Tenth Circuit Court of Appeals.

    II. <u>Discussion</u>

        A. <u>Access Issues at the MDC</u>

Beginning in June 2009, Defendant Bernalillo County proposed revised protocols, called

"rules of engagement," to govern the monitoring activities at the MDC by Plaintiffs' and

Plaintiff Intervenors' counsel and their agents. The rules of engagement, now called "MDC

Monitoring Protocols," were more restrictive than the previous protocols. For example,

*McClendon* counsel and their agents were required to give the MDC at least 48 hours' advance

notice, instead of 24 hours' notice previously required, before counsel could review medical

records. And under the MDC Monitoring Protocols, counsel and their agents were not allowed

access to the PSU offices or clinical services area as they had previously been allowed. The new

protocols required counsel to be escorted by MDC staff when they visited their clients' living

areas and required all non-lawyer personnel to be escorted by counsel when they monitored

secure areas of the MDC.

On July 13, 2009, Plaintiffs and the Plaintiff Intervenors filed Plaintiffs' and Plaintiff-

Intervenors' Joint Motion for a Restraining Order Enjoining the Defendants From Reducing

Access to the Metropolitan Detention Center and For An Order to Show Cause and for Further

Remedial Relief (the "2009 Joint Motion") (Doc. No. 731). In the 2009 Joint Motion, Plaintiffs

and Plaintiff-Intervenors asked the Court *inter alia* to hold Defendants in contempt of three

orders, the two PLRA Orders from 1996 and the July 2003 Order, because with the new

protocols Defendants were restricting the type of access previously enjoyed by class and sub-

class counsel and their agents.  Plaintiffs and Plaintiff-Intervenors also asked the Court to issue

an injunction under Fed. R. Civ. P. 65 prohibiting Defendant from imposing any limits on access

to members of the class and sub-class and to the facilities housing them that were not in place

before May 2007.   In their Response to the 2009 Joint Motion (Doc. No. 738), Defendants

argued that access to the MDC remains essentially unaffected and that the changes were minor

and were necessary.

On July 20, 2009 a hearing on the 2009 Joint Motion was held before Senior District

Court Judge James A. Parker and Magistrate Judge Alan C. Torgerson. (*See* Transcript of

Proceedings, Doc. No. 748.)  At the hearing, the Court ruled that the 2009 Joint Motion would be

treated as a "motion regularly filed" because Plaintiffs and Plaintiff-Intervenors had not

demonstrated to the Court the need for extraordinary relief.  (*See* Tr. 38:21-25.)  Plaintiffs and

Plaintiff-Intervenors argued that since the rescission of the 2005 Settlement Agreements, the July

2003 Order became the latest ruling that described the type of access required in this case; and

thus, the terms outlined in the July 2003 Order should govern access to the MDC.  As described

*supra*, the 2003 Order stated that counsel for Plaintiffs and Plaintiff-Intervenors were to have

"reasonable and unimpeded access to MDC and to the records of residents of MDC" and that

Defendants were to immediately refrain from imposing any limits on access to MDC and to the

residents and staff therein "[w]hich [a]re [m]ore [r]estrictive" than those which were used when

the class and the sub-class members were housed at the BCDC.  *McClendon*, 272 F. Supp. at

9

1260.

###### B. Referral to Magistrate Judge Torgerson and Interim Order

At the July 20, 2009 hearing, the Court asked all counsel present at the hearing to "meet with Judge Torgerson . . . and see if you can work out a resolution of the issues of greatest concern to the plaintiffs." (Tr. 39:1-3.)  Immediately after the hearing, Magistrate Judge Torgerson held a settlement conference with counsel for Plaintiffs, Plaintiff-Intervenors and Defendants.  Judge Torgerson met with counsel for Plaintiffs, Plaintiff-Intervenors and Defendants on July 29, 2009, August 14, 2009, and September 11, 2009 in an ongoing effort to resolve the issues regarding access to the MDC raised in the 2009 Joint Motion.

On September 17, 2009, Judge Torgerson entered the Interim Order. The Interim Order contains a list of fifteen protocols that counsel for Plaintiffs, counsel for Plaintiff-Intervenors, and non-lawyers who work with counsel for both Plaintiffs and Plaintiff-Intervenors must follow when monitoring conditions at the MDC and when meeting with their clients and with the staff of the MDC. It is this Interim Order that is the subject of the Joint Objections.  In the Joint Objections, Plaintiffs and Plaintiff-Intervenors assert that Magistrate Judge Torgerson did not have authority to enter the Interim Order because this Court referred the matter to him not as a decision maker, but as a mediator to settle the issues raised in the 2009 Joint Motion.  Plaintiffs and Plaintiff-Intervenors argue that the Interim Order is a decision, not a settlement.

II.  Powers of Magistrate Judges

The relevant statutory provision states in relevant part:

(b)(1) Notwithstanding any provision of law to the contrary–

> (A) a judge may designate a magistrate judge to hear and determine **any pretrial matter pending before the court, except a motion for injunctive relief,** . . . .A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's order is **clearly erroneous or contrary to law**.

> (B) **a judge may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A)**, . . . and of prisoner petitions challenging conditions of confinement.

> (C) **the magistrate judge shall file his proposed findings and recommendations under subparagraph (B)** with the court and a copy shall forthwith be mailed to all parties.

Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. **A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made**. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636 (b) (1) (emphasis added).

Rule of Civil Procedure 72  provides in relevant part:

(a) Nondispositive Matters. When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, **issue a written order** stating the decision. A party may serve and file objections to the order within 14 days after being served with a copy. A party may not assign as error a defect in the order not timely objected to. The district judge in the case must consider timely objections and modify or set aside any part of the order that is **clearly erroneous or is contrary to law**.

11

(b) Dispositive Motions and Prisoner Petitions.

> (1) Findings and Recommendations. A magistrate judge must promptly conduct the required proceedings when assigned, without the parties' consent, to hear a pretrial matter dispositive of a claim or defense or a prisoner petition challenging the conditions of confinement. A record must be made of all evidentiary proceedings and may, at the magistrate judge's discretion, be made of any other proceedings. **The magistrate judge must enter a recommended disposition, including, if appropriate, proposed findings of fact.** The clerk must promptly mail a copy to each party.

> (2) Objections. Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy. Unless the district judge orders otherwise, the objecting party must promptly arrange for transcribing the record, or whatever portions of it the parties agree to or the magistrate judge considers sufficient.

> (3) Resolving Objections. **The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.** The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72 (emphasis added).

In this district, all non-dispositive pre-trial matters in civil cases are automatically assigned to Magistrate Judges. *See* D.N.M.LR-Civ. 73.1 (regarding direct assignment of civil cases to Magistrate Judges).

Non-dispositive matters subject to the deferential review of Rule 72(a) are matters referred to magistrate judges under 28 U.S.C. § 636(b)(1)(A), and non-dispositive matters do not include the grant or denial of injunctive relief. Dispositive matters, such as motions for injunctive relief, may be referred to magistrate judges under 28 U.S.C. § 636(b)(1)(B). Magistrate judges who receive referrals of dispositive matters must issue proposed findings and recommended dispositions ("PFRD") to the district court, and if an objection to the PFRD is filed, the district court must conduct a *de novo* review as provided in 28 U.S.C. § 636(b)(1)©

12

and Fed. R. Civ. P. 72(b)(3).

### A. Dispositive or Non-dispositive?

Plaintiffs and Plaintiff-Intervenors argue that under Fed. R. Civ. P. 72(a) Judge

Torgerson's Interim Order should be vacated because it is clearly erroneous or contrary to law.

This standard of review, however, governs non-dispositive matters.  Fed. R. Civ. P. 72(a).

Defendants argue that when the access issues raised by the 2009 Joint Motion were referred to

Judge Torgerson, the Court had already ruled that the 2009 Joint Motion was a "motion regularly

filed;" and therefore, the 2009 Joint Motion was no longer a dispositive motion, and Judge

Torgerson could rule on it as a non-dispositive pretrial matter referred to him under Local Rule

73.1(a).  *See* 28 U.S.C. § 636(b)(1)(A).

The 2009 Joint Motion sought injunctive relief, and the Court's finding that no

extraordinary relief was required did not change the nature of the relief sought.  Because the

2009 Joint Motion seeks injunctive relief, it is a dispositive matter that may be referred under 28

U.S.C. § 636(b)(1)(B). Thus, the referral of the 2009 Joint Motion to Magistrate Judge

Torgerson was a referral of a dispositive matter and requires the submission of a PFRD. *See* 28

U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b)(3).

### B. Magistrate Judge as Mediator or Arbitrator?

At the hearing on the 2009 Joint Motion, the Court directed the parties to meet with

Magistrate Judge Torgerson, who would assist the parties in working out a settlement of issues

regarding access to the MDC.  Plaintiffs and Plaintiff-Intervenors argue that at some point the

settlement failed, and Judge Torgerson acted as an arbitrator.  Plaintiffs and Plaintiff-Intervenors

argue that without their consent, Magistrate Judge Torgerson could not enter a decision as he did

in the Interim Order.[5]  According to the Plaintiffs and Plaintiff-Intervenors, once the parties

came to an impasse, they should have come to this Court to resolve the impasse, and the Court

could have then referred the matter for decision by the Magistrate Judge with the parties'

consent, or the Court could have decided the disputed issues. The Court notes, however, that the

Plaintiffs and Plaintiff-Intervenors did not complain about the process until after the Interim

Order was entered.  Defendants argue that Judge Torgerson remained a mediator and never acted

as an arbitrator, and that the parties came to resolution on all but one of the terms outlined in the

Interim Order.  Plaintiffs and Plaintiff-Intervenors, however, dispute this assertion giving several

examples of specific areas on which the parties disagreed.[6]

        Although the Court originally referred the matter to Judge Torgerson as a mediator to

assist the parties in settling their differences regarding access to the MDC, when Judge

Torgerson ruled on issues about which the parties disagreed and then memorialized those rulings

in the Interim Order, he stepped out of his role as mediator.  However, the referral was not

nullified by the change in Magistrate Judge Torgerson's role, and the Court does not need to

---

        [5] All parties must consent to allow a specific designation to the magistrate judge to
conduct "any or all proceedings in a . . . civil matter and order the entry of judgment in the case.
. . ."  28 U.S.C. § 636(c)(1).

        [6] One of the points of contention involved the amount of notice that counsel for Plaintiffs
or Plaintiff-Intervenors or their agents must give the MDC before they could visit the MDC and
meet with their clients.  Before July 2009, Plaintiffs and Plaintiff-Intervenors were required to
give the MDC 24 hours' notice, but the Interim Order requires them to give 48 hours' notice.
Another point of contention was access to the PSU office.  Prior to July 2009, counsel for
Plaintiff-Intervenors were allegedly allowed to enter the PSU and observe the activities of that
office. The Interim Order, however, limits access to the PSU office to 15 minutes per visit.  In
another provision, Plaintiffs and Plaintiff-Intervenors sought to include language in the Interim
Order that reserved their rights to litigate the continued validity of the July 2003 Order and the
nature of access that Plaintiffs and Plaintiff-Intervenors had at the time the Court entered the July
2003 Order.  However, Judge Torgerson properly excluded the requested provision from the
Interim Order.

obtain the parties' consent to refer the 2009 Joint Motion under 28 U.S.C. § 636(c)(1) and start

over.  Under these circumstances, the Court will treat the referral to Magistrate Judge Torgerson

as a referral of a dispositive pre-trial motion under 28 U.S.C. § 636(b)(1)(B), and the Court will

treat the Interim Order as a PFRD submitted by Judge Torgerson and objected to by Plaintiffs

and Plaintiff-Intervenors. *See Mook v. Gertsema*, No. 07-2152-CM, 2009 WL 2176001, at *1 (D.

Kan. July 21, 2009) (stating that even if a magistrate judge enters an order purporting to

determine a matter reserved for district court judges, the district court may disregard the form of

the order and consider it as a Report and Recommendation); *Wright v. TJX Companies, Inc.*, No.

08-2282-CM, 2009 WL 2176009, at *1 (D. Kan. July 21, 2009) (same).  Thus, the Court will

treat the Interim Order as a Report and Recommendation and will review *de novo* those

provisions of the Interim Order to which objections are lodged.

C. *De Novo* Review

When reviewing a PFRD *de novo*, a court "should make an independent determination of

the issues ...; [it] 'is not to give any special weight to the [prior] determination'. . . ." *Ocelot Oil

Corp. v. Sparrow Industries*, 847 F.2d 1458, 1464 (10th Cir. 1988) (citing *United States v. First

City Nat. Bank*, 386 U.S. 361, 368 (1967)). The Court ". . . is free to follow [a magistrate judge's

recommendation] or wholly to ignore it, or, if [it] is not satisfied, [it] may conduct the review in

whole or in part anew." *Id.* (citing *Mathews v. Weber*, 423 U.S. 261, 271 (1976)). With these

standards in mind and upon *de novo* review of the Interim Order and the Joint Objections, the

Court finds that the Interim Order is a valid and enforceable and reasonable disposition of the

issues raised in the 2009 Joint Motion.

Plaintiffs and Plaintiff-Intervenors assert that since the 2005 Settlement Agreements were

rescinded, the parties were required under the finality doctrine to abide by the terms of the July

2003 Order regarding access to the MDC. Plaintiffs and Plaintiff-Intervenors argue that the Interim Order impermissibly alters the July 2003 Order, which requires "reasonable and unimpeded access to MDC and to the records of residents of MDC. . . ."[7]  However, instead of substantively altering the July 2003 Order, the Interim Order simply clarifies the reasonable and unimpeded access required by the July 2003 Order; and therefore, does not impermissibly change the July 2003 Order.

IT IS ORDERED that the Joint Objections to the Interim Order Regarding Access to the MDC (Doc. No. 758) are overruled.

IT IS FURTHER ORDERED that the Interim Order (Doc. No. 754) is adopted in its entirety.

_____
UNITED STATES SENIOR DISTRICT JUDGE

---

[7] The Court acknowledges that the word "unimpeded" could be interpreted to mean without any restriction whatsoever, whether the restriction is reasonable or unreasonable. However, the Court interprets the language "reasonable and unimpeded" in the July 2003 Order to allow reasonable restrictions on access.