IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JIMMY MCCLENDON, et al.

    Plaintiffs,

vs.                                                    CIV. 95-0024 JP/ACT

CITY OF ALBUQUERQUE, et al.

    Defendants,

vs.

E.M., R.L., W.A., D.J., P.S., and N.W., on behalf
of themselves and others similarly situated,

    Plaintiff-Intervenors.

**MEMORANDUM OPINION AND ORDER SETTING HOURLY RATES FOR PLAINTIFFS' ATTORNEYS ON WHICH PAYMENT OF FEES CAN BE BASED**

On April 15, 2010, Plaintiffs filed Plaintiffs' Motion For An Order Setting Hourly Rates For Plaintiffs' Attorneys And Their Staff On Which The Payment Of Fees Can Be Based (Doc. No. 775) ("Plaintiffs' Motion"). Plaintiffs' Motion asks the Court to set hourly attorneys' fee rates to compensate Plaintiffs' attorneys for work performed from April 9, 2009 to the present. Plaintiffs assert that they are entitled to payment of fees as prevailing parties under 42 U.S.C. § 1988 in this civil rights case brought under 42 U.S.C. § 1983.  On May 26, 2010, Defendant Bernalillo County filed Defendant's Response To Plaintiffs' Motion For Attorneys Fees (Doc. No. 786) ("Defendant's Response").  On June 22, 2010, Plaintiffs filed a Reply brief (Doc. No. 794). A status conference was held on June 21, 2010 at which the parties argued their positions on the Plaintiffs' Motion.

1

I. *Background*

On January 10, 1995, Plaintiffs filed this lawsuit alleging overcrowding and other unconstitutional conditions of confinement at the Bernalillo County Detention Center (the "BCDC") located in Albuquerque, New Mexico. The Court certified the Plaintiff class as all persons who were then or in the future "confined in the Bernalillo County Detention center." On February 16, 1995, Plaintiffs filed a Motion for Preliminary Injunction asking the Court to enjoin overcrowding at BCDC. On August 23, 1995, the Court granted a preliminary injunction and ordered Defendants to reduce the jail population according to a schedule of decreasing population caps. The Court retained jurisdiction to enforce, review and modify its August 1995 Order.  (Doc. No. 106.)

On September 7, 1995, Plaintiffs and Defendants entered into a settlement agreement approved by the Court. Defendants agreed to convert the preliminary injunction to a permanent injunction and also agreed that the Court would retain jurisdiction to enforce or modify the permanent injunction.

On October 26, 1995, Plaintiff-Intervenors, representing a sub-class of prisoners with developmental or mental disabilities or mental illness, joined this case. (Doc. No. 137.) The Court allowed Plaintiff-Intervenors' to assert claims regarding the following matters: 1) health care; 2) medical assessments (physical and mental); 3) classification; 4) psychiatric services unit (PSU); 5) mental health staffing; 6) overcrowding; and 7) basic accommodation and supplies. *Id.* On August 15, 1996, the Court granted class certification to Plaintiff-Intervenors. (Doc. No. 237.)

On April 26, 1996, the Prison Litigation Reform Act,  Pub. L. No. 104-134, 110 Stat. 1321 (codified as amended in several titles and sections of U.S.C. including, 18 U.S.C. § 3626;

2

42 U.S.C. § 1997e) (the "PLRA") became law.  By its terms, the PLRA applied to all claims for prospective relief including relief granted prior to its enactment. 18 U.S.C. § 3626.

In November 1996, the Court approved a settlement agreement among Plaintiffs, Plaintiff-Intervenors, and Defendants. *See* Doc. No. 255 (the "PLRA Order").[1] In the PLRA Order, the Court found that "violations of one or more federal rights of BCDC residents ha[d] occurred at BCDC." *Id.* at p. 1.  The Court also determined that Plaintiffs were entitled to attorneys' fees, expenses and costs reasonably and necessarily incurred with respect to the litigation in amounts to be determined by the Court. *Id.* at p. 6.

After a fairness hearing in January 1997, the Court in August 1997, entered the Corrected Order Approving Compromise & Settlement Agreement & Final Judgment Of Dismissal With Prejudice (Doc. No. 289) (the "1997 Order").  In the 1997 Order, the Court found that based on the Court's inspections of BCDC, the Court's findings in orders entered in March 1996, other information obtained in status conferences, Defendants' reports to the Court, the stipulations of the parties, and the entire record of the case, "the violations of one or more federal rights of class and subclass members have occurred at BCDC." *Id.* at p. 5.  The Court dismissed all claims on the merits, except claims regarding equal protection and access to the courts, in regard to which the Court retained jurisdiction for oversight purposes. *Id.* at pp. 8-10.

In June 2003, Defendants opened the Metropolitan Detention Center (the "MDC"), a new 2100-bed facility on the west side of Albuquerque.  All inmates were transferred from the BCDC to the MDC. After the transfer, counsel for Plaintiffs, Plaintiff-Intervenors and Defendants disagreed on whether the settlement agreements and orders in this case applied to the MDC. On

---

[1] Plaintiff-Intervenors and Defendants also entered into a separate settlement agreement, which was approved by the Court. *See* Doc. No. 256 (the "1996 Order")

June 27, 2003, Plaintiffs and Plaintiff-Intervenors filed the Joint Motion for a Temporary Restraining Order and Preliminary Injunction Enjoining the Defendants from Restricting Class and Sub Class Counsel From Having Access to the MDC (Doc. No. 409).

Following a hearing, the Court issued a Memorandum Opinion and Order on July 11, 2003 (the "July 2003 Order") and ruled that the Court had continuing jurisdiction to monitor the conditions of confinement at the MDC as one of the facilities in the Bernalillo County jail system. *McClendon v. City of Albuquerque*, 272 F. Supp. 2d 1250, 1255 (D.N.M. 2003); Doc. No. 416 at pp. 11, 15. The Court concluded that the inmates who were transferred to the MDC did not lose their status as class or sub-class members and that all previous Orders remained in effect and applied to class and sub-class members wherever they were incarcerated. *Id.* Specifically, the Court found that in their settlement agreements the parties intended the term BCDC to apply to the "jail system as a whole." *Id.* The Court retained continuing jurisdiction to review, modify and enforce the previous settlement agreements and orders. *Id.* at 1257.

On October 10, 2003, Defendants filed their Motion to Vacate Settlement Agreement Between Plaintiff-Intervenors and Defendants (Doc. No. 421) asserting that the previous settlement agreements and orders did not apply to the MDC and that the Court did not have jurisdiction to issue prospective injunctive relief for inmates at the MDC. In 2004, the Plaintiffs and Defendants entered into a new stipulated settlement agreement governing conditions at the MDC, which the Court approved in June 2005 (the "2005 SSA") (Doc. No. 515). Also, in 2004, the Plaintiff-Intervenors and Defendants entered into a new stipulated settlement agreement governing conditions and services at the MDC, which the Court approved in June 2005 (the "Plaintiff-Intervenors' 2005 SSA") (Doc. No. 514).

In the 2005 SSA, the parties agreed to use independent auditors, who were experts in

corrections, instead of attorneys to determine Defendants' compliance with certain standards, which were outlined in 15 enumerated areas such as population management and inmate safety. The 2005 SSA expressly superceded "all previous Orders which pertain to Plaintiffs and Defendants." *Id.* at p. 7. The 2005 SSA contained provisions requiring Defendants to compensate Plaintiffs' counsel and their legal staff for monitoring activities provided that they did not exceed a certain number of hours per month.  Under the 2005 SSA, Plaintiffs' counsel agreed to be compensated at $135.00 per hour. *Id.* at p. 6.

In 2007, a dispute arose over conditions at the BCDC, which had been renovated and renamed the Regional Correction Center ("RCC").  In June 2007, Plaintiffs and Plaintiff-Intervenors filed motions for access to alleged class and sub-class members housed in the RCC. Plaintiffs and Plaintiff-Intervenors asserted that the County did not fully disclose its execution of an Intergovernmental Agreement ("IGA") with the federal government to house federal prisoners at the RCC.[2]  Plaintiffs and Plaintiff-Intervenors argued that inmates in the RCC were potential class and sub-class members by virtue of the County's contractual rights under the IGA; in other words, the RCC was part of the Bernalillo County jail system as a whole and subject to the orders in this case.

The Court issued an Order to Show Cause directing Defendants to show cause why the Court should not withdraw its approval of the 2005 SSA and the Plaintiff-Intervenors' 2005 SSA because material information had been withheld from the Court. (Doc. No. 600).  In March 2009, the Court issued an order (the "March 2009 Order") in which the Court withdrew its approval of

---

[2] At one time, the County housed overflow County inmates at the RCC, but does not currently house any of its inmates at the RCC. At this time, only federal detainees are housed at the RCC.

the 2005 SSA and the Plaintiff-Intervenors' 2005 SSA and allowed the Plaintiffs and the Plaintiff-Intervenors the option to rescind their respective 2005 SSAs. *See* Doc. Nos. 700, 701. On April 9, 2009, both Plaintiffs and Plaintiff-Intervenors rescinded their respective 2005 SSAs.

Defendants appealed the March 2009 Order allowing Plaintiffs and Plaintiff-Intervenors to rescind their 2005 SSAs, and the appeal is pending before the Tenth Circuit Court of Appeals. *McClendon v. City of Albuquerque et al.*, Tenth Cir. Case No. 09-2095.

II. *Plaintiffs' Motion Partially Settled*

The parties have been negotiating the number of reasonable and necessary hours for which Defendant will compensate Plaintiffs' attorneys for services rendered from April 9, 2009, the date upon which Plaintiffs' rescinded the 2005 SSA, to the present. In the Response, the Defendant offered to pay paralegals at the hourly rate of $75.00; and in the Reply, Plaintiffs accepted Defendant's offer. Response at 22; Reply at 11. The Defendant has also agreed to compensate Plaintiffs' attorneys and their employees for travel time at the hourly rate set by the Court. Reply at 11. In addition, Defendant has agreed to pay Mr. Donatelli, lead counsel for Plaintiffs, and Mr. Davis, Plaintiffs' fee counsel, the maximum hourly rate allowable under the Prison Litigation Reform Act (PLRA). Response at 23.[3] The Court interprets Defendant's statement in Defendant's Response to mean that Defendant has agreed to compensate Mr. Donatelli and Mr. Davis at the maximum PLRA rate of 167.50 per hour for work performed before January 1, 2010 and $187.50 per hour for work performed after January 1, 2010, regardless of how the Tenth Circuit rules on the pending appeal.

---

[3] **"Defendant is willing to compensate Mr. Donatelli and fee counsel [Mr. Davis] at the maximum rate permitted under the PLRA."** Response at 23 (emphasis added).

III. *Plaintiffs' Current Compensation*

In their Reply brief and in a Letter to Judge Parker from Mr. Davis dated June 22, 2010, Plaintiffs state that Defendant Bernalillo County ("Defendant") has paid Plaintiffs' attorneys, except Mr. Davis, for all undisputed work from April 9, 2009 to the present at a rate of $135.00 per hour. Plaintiffs have agreed that the 2005 SSA established a rate of $135.00 per hour for all attorneys engaged in monitoring activities. *See* 2005 SSA (Doc. No. 480) at 6. Nowhere in Plaintiffs' briefing do they suggest that their attorneys should be compensated at more than $135.00 per hour from the date of the 2005 SSA to April 9, 2009, the date of the rescission. Implicit in this is Plaintiffs' agreement that if the Tenth Circuit Court of Appeals reverses the March 2009 Order, 1) Plaintiffs' rescission of the 2005 SSA will be unenforceable, 2) the 2005 SSA will be revived, 3) Plaintiffs' attorneys' rate of compensation will be governed by the 2005 SSA, and 4) the hourly rate of $135.00 will apply.

The Motion asks the Court to set hourly rates for all of Plaintiffs' attorneys, other than Mr. Donatelli and Mr. Davis, for services rendered from April 9, 2009 to the present. However, the Motion does not expressly ask the Court to order payment of the fees based on those rates at this time. The Motion also fails to address the effect of the appeal and the possibility that the 2005 SSA will be revived. As explained below, in this Memorandum Opinion and Order, the Court will only establish the hourly rates at which all of Plaintiffs' attorneys are to be compensated if Plaintiffs prevail on appeal. If the Tenth Circuit affirms the March 2009 Order, Plaintiffs may then file a motion for payment at the higher rates set in this Memorandum Opinion and Order. On the other hand, if the Tenth Circuit Court of Appeals reverses the March 2009 Order and the 2005 SSA becomes enforceable, Plaintiffs' attorneys will be bound by the 2005 SSA, which prescribes a rate of $135.00 per hour for all counsel, other than Mr. Donatelli,

who engage in monitoring activities.[4] As discussed above, Defendant has agreed in its Response to compensate Mr. Donatelli and Mr. Davis at the maximum PLRA rates regardless of the ruling by the Tenth Circuit.

Specifically, Plaintiffs ask for an order setting the maximum PLRA rate of $169.50 per hour for work performed by Mr. Ives, by Ms. Schmidt-Nowara, and by Mr. Urias from April 9, 2009 to December 31, 2009 and $187.50 per hour for work performed by these attorneys from January 1, 2010 to the present. Because Ms. Freedman-Smith represented Plaintiffs only in 2009, Plaintiffs ask the Court to set the maximum PLRA rate of $169.50 per hour for her work. Plaintiffs ask the Court to set an hourly rate for Mr. Coberly at his standard hourly rate of $160.00 per hour for all work performed from April 9, 2009 to the present.

IV. *Discussion*

The PLRA provides for the award of attorneys' fees:

> (d) Attorney's fees
> > (1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under section 1988 of this title, such fees shall not be awarded, except to the extent that--
> > > (A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 1988 of this title; and
> > > (B)(I) the amount of the fee is proportionately related to the court ordered relief for the violation; or
> > > (ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.
> > . . .

---

[4] The 2005 SSA states,
. . . if any items listed above have not met the requirements of this Stipulated Settlement Agreement, Plaintiffs' lawyers and paralegals will continue to be limited to the hourly rates and number of hours described above for monitoring activities, unless modified in writing between Plaintiffs and Defendants.

2005 SSA at 6. The rates at which Plaintiffs' attorneys and paralegals agreed to be paid were $135.00 per hour (attorneys) and $65.00 per hour (paralegals). *Id.*

> (3) No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 3006A of Title 18 for payment of court-appointed counsel.

42 U.S.C. § 1997e(d)(1) and (3).

Section 1988 provides,

> In any action or proceeding to enforce a provision of sections . . . 1983 of this title, . . . the court, in its discretion, may allow the prevailing party, . . . a reasonable attorney's fee as part of the costs[.]

42 U.S.C. § 1988.

Under the PLRA, a prevailing party must show that his attorneys' fees were directly and reasonably incurred in proving a constitutional violation or in enforcing the granted relief. 42 U.S.C. § 1997e(d)(1). A plaintiff is a prevailing party if the court grants relief on the merits of the plaintiff's claim or if the court-ordered consent decree "materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992). When a lawsuit serves as a catalyst for favorable action by defendant, such as taking remedial action because of the suit, plaintiff is a prevailing party. *Tyler v. City of Manhattan, KS*, 866 F. Supp. 500, 501 (D. Kan. 1994).

In determining the proper fees to award "[t]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1249-50 (10th Cir. 1998). In cases subject to the PLRA, the hourly rate is capped at an amount that is 150% of the hourly rate paid to court appointed counsel in criminal cases (the "CJA rate"). In 2009, 150% of the CJA rate was $169.50 per hour, which was the maximum PLRA rate. On January 1, 2010, the CJA rate was increased; therefore, the maximum PLRA rate was increased to $187.50 per hour. 42

U.S.C. § 1997e(d)(3) (PLRA); 18 U.S.C. § 3006A(d)(1) (CJA).

In its Response, Defendant argues that because Plaintiffs rescinded the 2005 SSA, Plaintiffs should no longer be considered prevailing parties. Defendant asks the Court to defer ruling on Plaintiffs' Motion until the Tenth Circuit Court of Appeals decides whether to affirm the March 2009 Order, which allowed the Plaintiffs to rescind the 2005 SSA.  Alternatively, Defendant asks the Court to set the hourly rates for Plaintiffs' attorneys, except Mr. Donatelli and Mr. Davis, at a rate below the PLRA cap rate because the attorneys have less experience in prison litigation than Mr. Donatelli.

### A. *Plaintiffs' Status As Prevailing Parties*

Defendant argues that when the Plaintiffs rescinded the 2005 SSA, they either lost their status as prevailing parties or Plaintiffs' status became ambiguous. Defendant reasons that since the 2005 SSA expressly superceded all previous orders and agreements, it was the only enforcement tool in the case and the only basis for Plaintiffs' prevailing party status.   Defendant asserts that once the 2005 SSA was rescinded, the parties were placed back at the beginning of the case. Defendant, however, misunderstands the effect of Plaintiffs' rescission of the 2005 SSA.

Settlement agreements are contracts governed by basic contract law.  *Heuser v. Kephart,* 215 F.3d 1186, 1190 (10th Cir. 2000) (noting that courts disagree on whether federal common law or state law governs settlement agreements in Title VII cases, but noting also that New Mexico contract law and federal common contract law do not differ). The rescission of a contract returns the parties to their positions before the contract. *Baker v. Penn Mut. Life Ins. Co.*, 788 F.2d 650, 663 (10th Cir. 1986).  While the 2005 SSA expressly stated that it superceded all previous orders, the rescission of the 2005 SSA returned the parties to their positions prior to

the 2005 SSA. Consequently, the previous orders that existed as of the time the parties entered into the 2005 SSA are no longer superceded. Prior to the 2005 SSA, the Court had ruled that constitutional violations existed in the BCDC. *See* 1997 Order at p. 5.  More importantly, in the July 2003 Order, the Court held that all of its previous orders were applicable to the MDC. Therefore, even without the 2005 SSA, Plaintiffs remain prevailing parties in this litigation because the previous orders materially altered the legal relationship between Plaintiffs and Defendant by modifying Defendant's behavior in a way that directly benefitted the Plaintiffs. *Farrar*, 506 U.S. at 111-12.

     Alternatively, Defendant asks the Court to defer ruling on Plaintiffs' request for an order setting hourly rates for Plaintiffs' attorneys until after the Tenth Circuit Court of Appeals has determined whether the Court erred in allowing the rescission of the 2005 SSA. Defendant correctly notes that the 2005 SSA established an hourly rate of $135.00 for attorneys, which is below the current maximum PLRA rate.  With the exception of Mr. Davis, Defendant has continued to compensate Plaintiffs' attorneys, including Mr. Donatelli, at the rate of $135.00 per hour despite Plaintiffs' rescission of the 2005 SSA and the Defendant's consequent appeal. *See* Letter dated June 22, 2010 from Mr. Davis to Judge Parker submitted to the Court after the June 21, 2010 hearing.  If the Tenth Circuit affirms the March 2009 Order that allowed the rescission of the 2005 SSA, the 2005 SSA along with its prescribed rate of $135.00 per hour will not be enforceable. On the other hand, if the Tenth Circuit Court of Appeals reverses the March 2009 Order that allowed rescission, it would appear that the attorneys' fees rate of $135.00 per hour established in the 2005 SSA would continue to apply to all counsel except Mr. Davis and Mr. Donatelli, who Defendant, in its Response, has agreed to pay at the maximum PLRA rates. Nevertheless, in either situation, Plaintiffs would remain the prevailing parties, and the amounts

Plaintiffs' attorneys are to be compensated based on this Memorandum Opinion and Order may be subject to later adjustments.

### B. *Conduct of Plaintiffs' Legal Team*

Defendant next argues that the attorneys for Plaintiffs violated the policies encompassed within the PLRA and § 1988. Defendant argues that the legislative intent of the PLRA cap on fees was to curb frivolous litigation and prevent undue strain on taxpayers. *Skinner v. Uphoff*, 324 F. Supp. 2d 1278, 1282 (D. Wyo. 2004). Defendant contends that it was close to achieving compliance with the 2005 SSA and that the Plaintiffs' attorneys unnecessarily prolonged this litigation by attempting to draw into the case inmates housed at the RCC, thereby shifting the focus away from the MDC. According to Defendant, attorneys for Plaintiffs attempted to gain a windfall by dismantling the 2005 SSA and its lower attorneys' fee rates and limitations on compensable hours.  Defendant argues that the Court should not reward Plaintiffs' attorneys for this behavior with an increased hourly rate.

The record in this case does not support Defendant's position that Plaintiffs intentionally prolonged this litigation in order to generate more fees. This type of challenge is better addressed when determining the reasonable number of hours expended and whether certain work done by Plaintiffs' counsel benefitted the class or was useful in obtaining the desired results. Defendant's argument is not applicable to the issue of hourly rates.

### C. *Fee Rates For Attorneys Other Than Mr. Donatelli and Mr. Davis*

Defendant argues that with the exception of Mr. Donatelli and Mr. Davis, the attorneys on Plaintiffs' legal team should not receive the maximum PLRA rate because they do not have as much experience as Mr. Donatelli in civil rights prison litigation. Defendant contends that those attorneys should be compensated at an hourly rate below the maximum PLRA rate.

However, Defendant did not present any evidence to support Defendant's proposed rate for each attorney. Nor does Defendant explain how it arrived at its proposed hourly rate for each of the attorneys on Plaintiffs' legal team.

The PLRA does not provide a scheme for differentiating between the hourly rate charged by attorneys of varying experience levels. *Searles v. Van Bebber*, 64 F. Supp. 2d 1033, 1036 (D. Kan. 1999), *vacated on other grounds*, 251 F.3d 869 (10th Cir. 2001). Courts have granted the PLRA maximum rate with little or no consideration of experience. *See, e.g., Jackson v. Austin*, 267 F. Supp. 2d 1059, 1065 (D. Kan. 2003) (noting that the PLRA rate cap is low relative to market rates of even the most inexperienced counsel); *Rodriguez v. Zavaras*, 22 F. Supp. 2d 1196, 1202 (D. Colo. 1998) (awarding maximum PLRA rate for all counsel because market rates were higher than the maximum PLRA rates). As stated by the court in *Searles*, ". . . the maximum allowable rate under the PLRA is so low relative to market rates that counsel would be hard pressed to be so inexperienced as to not deserve the maximum rate." *Searles*, 64 F. Supp. 2d at 1036.

Mr. Ives' standard hourly rate is $275.00, and Ms. Freedman-Smith's standard hourly rate is $225.00. The other attorneys on Plaintiffs' legal team, Ms. Schmidt-Nowara and Mr. Urias, charge standard hourly rates in excess of the maximum PLRA rate. Mr. Davis, Plaintiffs' fee counsel, charges in excess of the PLRA maximum rate. The only exception is Mr. Coberly, whose hourly rate of $160.00 is below the maximum PLRA rate. Thus, with one exception, Plaintiffs' attorneys charge a standard hourly rate that is considerably higher than the PLRA maximum hourly rate.

The Court finds that each attorney on Plaintiffs' legal team, with the exception of Mr. Coberly, should be compensated at the maximum PLRA hourly rate. Thus, Mr. Ives, Ms.

Freedman-Smith, Ms. Schmidt-Nowara, and Mr. Urias should be compensated at the maximum PLRA hourly rate applicable at the time their work was performed, which was $167.50 during 2009 and which was increased to $187.50 on January 1, 2010. Mr. Coberly should be compensated at the requested rate of $160.00 per hour.[5] As discussed above, Defendant has agreed that Mr. Davis and Mr. Donatelli should be compensated at the maximum PLRA hourly rate of $167.50 for work performed before January 1, 2010 and $187.50 for work performed after January 1, 2010.

IT IS ORDERED that Plaintiffs' Motion For An Order Setting Hourly Rates For Plaintiffs' Attorneys And Their Staff On Which The Payment Of Fees Can Be Based (Doc. No. 775) is granted as follows:

1. If the Tenth Circuit Court of Appeals affirms the March 2009 Order, the hourly rates at which Plaintiffs' attorneys are to be compensated are:

> A) Mr. Ives: $169.50 for work performed before January 1, 2010, and $187.50 for work performed after January 1, 2010.
>
> B) Ms. Freedman-Smith: $169.50 for work performed before January 1, 2010.
>
> C) Ms. Schmidt-Nowara: $169.50 for work performed before January 1, 2010, and $187.50 for work performed after January 1, 2010.
>
> D) Mr. Urias: $169.50 for work performed before January 1, 2010, and $187.50 for work performed after January 1, 2010.
>
> E) Mr. Coberly: $160.00 for all work.

2. If the Tenth Circuit Court of Appeals reverses the March 2009 Order, the hourly rate

---

[5] Defendant's request that the Court set limits on the number of Plaintiffs' attorneys who may work on this case and the number of hours that they may devote to the case is not properly before the Court because the issue was not raised in the Plaintiffs' Motion. However, if the Tenth Circuit Court of Appeals reverses the March 2009 Order, the 2005 SSA and its limitations on the number of attorney and paralegal hours will be enforceable.

at which Plaintiffs' attorneys are to be compensated is $135.00 in accordance with the 2005 SSA, except for Mr. Donatelli and Mr. Davis who Defendant has agreed to pay PLRA rates.

3. By agreement set forth in Defendant's Response, Mr. Donatelli and Mr. Davis are to be compensated at the hourly rate of $169.50 for work performed before January 1, 2010 and $187.50 for work performed after January 1, 2010.

4. By agreement of the parties, the hourly rate at which paralegals working for Plaintiffs' attorneys are to be compensated is $75.00.

5. All attorneys and paralegals are to be compensated for their travel time at the applicable hourly rates.

*/s/ James A. Parker*
UNITED STATES SENIOR DISTRICT JUDGE