## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**JIMMY MCCLENDON, et al.**

     **Plaintiffs,**

**vs.**                                                                    **CIV. 95-0024 JP/ACT**

**CITY OF ALBUQUERQUE,**
**MAYOR OF ALBUQUERQUE RICHARD J. BERRY,**
**in his official capacity,**
**DIRECTOR OF BERNALILLO COUNTY**
**DETENTION CENTER, in his official capacity,**
**BERNALILLO COUNTY BOARD OF COMMISSIONERS,**
**in their official capacities,**

     **Defendants,**

**vs.**

**E.M., R.L., W.A., D.J., P.S., and N.W., on behalf**
**of themselves and others similarly situated,**

     **Plaintiff-Intervenors.**

## MEMORANDUM OPINION AND ORDER
## SETTING HOURLY RATES FOR PLAINTIFF-INTERVENORS' ATTORNEYS
## ON WHICH PAYMENT OF FEES CAN BE BASED

On April 15, 2010, Plaintiff-Intervenors filed Plaintiff-Intervenors' Motion For An Order

Setting Hourly Rates For Plaintiff-Intervenors' Attorneys And Their Staff On Which The

Payment Of Fees Can Be Based (Doc. No. 773) (the "Motion"). In the Motion, Plaintiff-

Intervenors ask the Court to set hourly rates for their attorneys for work performed on or after

July 1, 2009.  Plaintiff-Intervenors contend that as prevailing parties under the Americans with

Disabilities Act ("ADA") (42 U.S.C. § 12101 et seq.), the Rehabilitation Act ("RA") (29 U.S.C.

§§ 701 et seq.), and Section 1983 of title 42, they are entitled to their reasonable attorney's fees

1

and expenses under 42 U.S.C. § 12205.[1]  On May 26, 2010, Defendant Bernalillo County Board

of Commissioners ("Defendant") filed Defendant's Response To Plaintiff-Intervenors' Motion

For Attorneys Fees (Doc. No. 787) (the "Response"). On June 22, 2010, Plaintiff-Intervenors

filed Plaintiff-Intervenors' Reply To Defendants' (sic) Response To Motion For An Order

Setting Hourly Rates For Plaintiff-Intervenors' Attorneys And Their Staff On Which The

Payment Of Attorneys' Fees Can Be Based ("Reply") (Doc. No. 795).

I. *Background*

On January 10, 1995, Plaintiffs filed this lawsuit alleging overcrowding and other

unconstitutional conditions of confinement at the Bernalillo County Detention Center (the

"BCDC") located in Albuquerque, New Mexico. The Court certified the Plaintiff class as all

persons who were then or in the future "confined in the Bernalillo County Detention Center." On

August 23, 1995, the Court granted to Plaintiffs a preliminary injunction, but the Court stayed

enforcement of the injunction until August 23, 1996 to "enable Defendants to immediately

implement their proposals for reducing the population at BCDC to its design capacity." Order

(Doc. No. 106 at 10-11)  The Court also enjoined Defendants from housing more than 95% of

the BCDC's design capacity after January 1, 1997.  *Id.* at 11.  The Court retained jurisdiction to

review and modify its August 1995 Order. *Id.* at 14.

On September 7, 1995, Plaintiffs and Defendants entered into a settlement agreement

approved by the Court in which Defendants agreed to convert the preliminary injunction into a

---

[1] In this Memorandum Opinion and Order, the Court will sometimes refer to the ADA and the RA collectively as the ADA because the standards for granting relief are essentially the same under both statutes. *Montez v. Romer*, 32 F. Supp. 2d 1235, 1239 (D. Colo. 1999) (citing *Patton v. TIC United Corp.*, 77 F.3d 1235, 1245 (10th Cir.), *cert. denied*, 518 U.S. 1005 (1996) ("As a general matter, courts have construed the [RA] and the [ADA] similarly.")). The RA served as the model for the ADA. *Id.*

permanent injunction and also agreed that the Court would retain jurisdiction to enforce or modify the permanent injunction.  Settlement Agreement (Doc. No. 114) and Order (Doc. No. 115).

On October 26, 1995, Plaintiff-Intervenors, representing a sub-class of prisoners with developmental or mental disabilities or mental illness, were allowed to join this case. Order (Doc. No. 137). The Court ruled that Plaintiff-Intervenors' intervention was limited "to the claims raised in the original Plaintiff's Complaint and the . . . issues addressed in the Court's prior orders . . . ." *Id*. at 2. The Court allowed Plaintiff-Intervenors to assert claims regarding the following matters: 1) health care; 2) medical assessments (physical and mental); 3) classification; 4) psychiatric services unit (PSU); 5) mental health staffing; 6) overcrowding; and 7) basic accommodation and supplies. *Id.* Plaintiff-Intervenors filed an Amended Complaint (Doc. No. 15) alleging discrimination by Defendants against prisoners with mental or developmental disabilities in violation of Title II of the ADA and the RA in addition to constitutional violations.  Plaintiff-Intervenors sought injunctive relief and a declaration that Defendants had violated the ADA, the RA, and the United States Constitution.

On April 26, 1996, Congress enacted the Prison Litigation Reform Act,  Pub. L. No. 104-134, 110 Stat. 1321 (codified as amended in several titles and sections of U.S.C. including 18 U.S.C. § 3626 and 42 U.S.C. § 19979e) (the "PLRA"). The PLRA applied to all claims for prospective relief including relief granted prior to its enactment; thus the PLRA applied to the claims brought and relief granted to the class and sub-class under 42 U.S.C. § 1983. 18 U.S.C. § 3626.

In November 1996, the Court approved two settlement agreements and determined that both settlement agreements complied with the requirements of the PLRA. The first settlement

agreement was executed by Plaintiffs, Plaintiff-Intervenors, and Defendants City of Albuquerque and Bernalillo County Board of Commissioners and was approved by the Court in the Order Regarding The Prison Litigation Reform Act (the "PLRA Order") (Doc. No. 255). In the PLRA Order, the Court found that "violations of one or more federal rights of BCDC residents ha[d] occurred at BCDC." *Id.* at 1.  The Court also determined that Plaintiffs and Plaintiff-Intervenors were entitled to attorney's fees, expenses and costs reasonably and necessarily incurred with respect to the litigation in amounts to be determined by the Court.  *Id.* at 6.

The second settlement agreement was executed by Plaintiff-Intervenors and Defendants City of Albuquerque and Bernalillo County Board of Commissioners.  In the Order approving the second settlement agreement (the "Plaintiff-Intervenors' 1996 Order") (Doc. No. 256), the Court found that "violations of one or more federal rights of subclass members have occurred at BCDC." *Id.* at 1.  Plaintiff-Intervenors' 1996 Order contained a stipulation by the parties that some of the BCDC residents were not afforded "reasonable accommodations for their disabilities," and that certain federal rights of sub-class members had been violated. *Id.* at 7. The Court ordered Defendants to implement several remedial measures designed to address the needs of inmates with mental and developmental disabilities or mental illness. *Id.* at 8-17. The Court ordered Defendants to do the following:

> 1. Hire a qualified manager for the psychiatric services unit (PSU);
> 2. Develop policies, procedures and standards of care for inmates with mental illness, mental disabilities and developmental disabilities;
> 3. Increase the number of mental health professionals working at the BCDC;
> 4. Provide an adequate number of hours during which inmates could receive psychiatric services;
> 5. Improve the assessment of inmates suspected of having mental illness or mental disabilities;
> 6. Provide adequate procedural due process for the segregation of inmates with mental illness or mental disabilities when necessary;
> 7. Implement adequate suicide prevention protocols;

8. Train staff to identify and appropriately deal with inmates with mental or developmental conditions;

9. Develop appropriate procedures for psychiatric hospitalization and civil commitment of inmates;

10. Provide procedural due process to determine when an inmate with mental or developmental disabilities is competent to participate in disciplinary proceedings;

12. Discontinue the punishment of groups of inmates for the actions of individual inmates;

13. Develop a system for investigating allegations of abuse;

14. Provide reasonable accommodation and assistance to ensure access to the courts and law library;

15. Provide adequate medical care to sub-class members; and

16. House inmates receiving psychiatric care outside the main BCDC facility only upon request by the inmate and upon concurrence of the psychiatrist.

*Id.*[2] In the 2000 Order, the Court described the sub-class represented by Plaintiff-Intervenors as "BCDC residents with mental and developmental disabilities." *Id.* at 2. The Court also stated that the ADA "defines and encompasses Plaintiff-Intervenors because they possess a qualifying disability." *Id.* at 9. However, the Court did not make specific findings as to which members of the sub-class represented by Plaintiff-Intervenors had conditions that would constitute qualifying disabilities under the ADA or the types of qualifying disabilities the sub-class members had.

After a fairness hearing in January 1997, the Court entered the Corrected Order Approving Compromise & Settlement Agreement & Final Judgment Of Dismissal With Prejudice (the "1997 Order") (Doc. No. 289). In the 1997 Order, the Court dismissed with prejudice all claims brought by Plaintiffs and Plaintiff-Intervenors except Plaintiff-Intervenors' claims that female sub-class members had been denied equal protection and Plaintiff-

---

[2] Also in the Plaintiff-Intervenors' 1996 Order, the Court recited that Plaintiff-Intervenors had agreed to file a motion to dismiss all Defendants in their Complaint in Intervention except Defendant City of Albuquerque, Defendant Bernalillo County Board of Commissioners, the Mayor of Albuquerque, Martin Chavez, in his official capacity, and the director of the Bernalillo County Detention Center. (Doc. No. 256 at 7.) The Mayor of Albuquerque is currently Richard J. Berry; therefore, his name has been substituted in the above caption.

Intervenors' claims for adequate access to the courts. *Id.* at 8.

On April 4, 1997, Mr. Baker, counsel for Defendant Bernalillo County and for Defendant City of Albuquerque, wrote a letter to Mr. Cubra, lead counsel for Plaintiff-Intervenors, with a copy to Mr. Robert White, Albuquerque City Attorney. Letter dated April 4, 1997 (Response Ex. 2.)  In his letter, Mr. Baker outlined an agreement in which the Claims Review Board of Defendant City of Albuquerque agreed to pay Plaintiff-Intervenors' attorneys at the following hourly rates: Mr. Cubra $145.00; Ms. Simpson $135.00; Ms. Koenigsberg $100.00.[3] (Response Ex. 2.)  On April 4, 1997 by a letter sent facsimile, Mr. Cubra responded to Mr. Baker agreeing to these hourly rates and clarifying that under the agreement, these rates were to be in effect until November 1, 1999. In April 1999, a dispute arose between Defendants City of Albuquerque and Bernalillo County Board of Commissioners and Plaintiff-Intervenors over the future hourly rates of Plaintiff-Intervenors' attorneys. After negotiations failed, Plaintiff-Intervenors filed Plaintiff-Intervenors' Application for Attorney's Fees (Doc. No. 307) in which they asserted that their attorneys were entitled to reasonable attorney's fees under the attorney's fee provision of the ADA and that their attorneys were not limited to the maximum PLRA rate. 42 U.S.C. § 12205.

On August 22, 2000, the  Court issued a Memorandum Opinion and Order (the "2000 Order") (Doc. No. 311) in which the Court awarded Plaintiff-Intervenors' attorneys their hourly market rates under the ADA. The Court based its decision in part on the stipulation that was recited in the Plaintiff-Intervenors' 1996 Order that some unidentified residents were not afforded "reasonable accommodations" for their disabilities. *Id.* at 7. The Court also pointed to the requirement in the Plaintiff-Intervenors' 1996 Order that Defendants implement "at least

---

[3] Ms. Schatz-Vance was substituted for Ms. Koenigsberg in March 1999.

eighteen measures designed to provide reasonable accommodations for the residents with disabilities." *Id.* at 6.  For example, the Court noted that Plaintiff-Intervenors' 1996 Order required Defendants to improve mental health evaluation and treatment procedures, to increase the staffing of mental health professionals, and to increase the number of beds available to residents in mental health crises. *Id.* The Court stated that the findings in Plaintiff-Intervenors' 1996 Order "were made plainly in the context of the ADA [and]. . . . Plaintiff-Intervenors' claims arose first and foremost under the [ADA] rather than under 42 U.S.C. § 1988." *Id.*  In conclusion, the Court ruled that the PLRA attorney's fees provision did not override the attorney's fee provision under the ADA. *Id.* at 10. The Court awarded attorneys for Plaintiff-Intervenors their hourly market rates as follows: Mr. Cubra $190.00; Ms. Simpson $180.00; and Ms. Schatz-Vance $125.00. *Id.*

Defendant appealed the 2000 Order but withdrew the appeal in 2001 after both sides met with a mediator from the Tenth Circuit Court of Appeals.  Defendant and Plaintiff-Intervenors agreed to certain hourly rates for Plaintiff-Intervenors' attorneys in exchange for dismissal of the appeal. The parties memorialized their settlement agreement regarding attorney's fees (the "2001 Agreement") in a letter dated February 7, 2001 from Jeffrey Baker, attorney for Defendants Bernalillo County and the City of Albuquerque, to Mr. Cubra, lead counsel for the sub-class. Response Ex. 3. The 2001 Agreement outlined the following hourly rates at which the Bernalillo County Claims Review Board agreed to pay attorneys for Plaintiff-Intervenors "until the end of the litigation:" Mr. Cubra $150.00; Ms. Simpson $140.00;[4] and Ms. Schatz-Vance $100.00.

---

[4]Although Ms. Simpson withdrew from the case in 2002, Ms. Simpson was allowed to replace Mr. Bach as co-counsel for Plaintiff-Intervenors in this case on August 9, 2010 (Doc No. 810).

Response Ex. 3.  Mr. Cubra's and Ms. Simpson's  hourly rates were considered enhanced PLRA rates.

In June 2003, Defendants opened the Metropolitan Detention Center (the "MDC"), a new 2100-bed facility on the west side of Albuquerque.  The BCDC inmates were transferred to the MDC. After the transfer, the parties disputed whether the settlement agreements and orders in this case applied to the MDC. On June 27, 2003, Plaintiffs and Plaintiff-Intervenors filed a Joint Motion For A Temporary Restraining Order And Preliminary Injunction Enjoining The Defendants From Restricting Class And Sub Class Counsel From Having Access To The MDC (Doc. No. 409).  Following a hearing, the Court issued a Memorandum Opinion and Order on July 11, 2003 (the "July 2003 Order") in which the Court concluded that all previous orders remained in effect and applied to class and sub-class members while they were incarcerated in any Bernalillo County facility. *McClendon v. City of Albuquerque*, 272 F. Supp. 2d 1250, 1255 (D.N.M. 2003). The Court determined that it had continuing jurisdiction to monitor the conditions of confinement at the MDC as a facility in the Bernalillo County jail system. *Id.* Specifically, the Court found that in their settlement agreements the parties intended the term BCDC to apply to the "jail system as a whole."  *Id.*

On October 10, 2003, Defendants filed Defendants' Motion To Vacate Settlement Agreement Between Plaintiff-Intervenors And Defendants And To Dismiss Claims For Equal Protection And Access To Courts (Doc. No. 421) asserting that Plaintiff-Intervenors' 1996 Order and other settlement agreements and orders did not apply to the MDC and that the Court did not have jurisdiction to issue prospective injunctive relief for inmates at the MDC.[5]

---

[5] Both Plaintiff-Intervenors and Plaintiffs filed responses to this motion.  *See* Doc. Nos. 435, 436.

In November 2004, after a settlement conference with Magistrate Judge Alan C. Torgerson, Defendant City of Albuquerque, Defendant Bernalillo County Board of Commissioners, and Plaintiff-Intervenors entered into a new stipulated settlement agreement that was approved by the Court in 2005 (the "Plaintiff-Intervenors' 2005 SSA") (Doc. No. 514).  The Plaintiff-Intervenors' 2005 SSA expressly provided that it replaced the Plaintiff-Intervenors' 1996 Order in its entirety. Although the Plaintiff-Intervenors' 2005 SSA did not specify hourly rates at which attorneys for Plaintiff-Intervenors would be compensated, it stipulated that Defendants would pay those attorneys for no more than 180 hours of monitoring work per quarter. *Id.* at 10. Also in November 2004, the Plaintiffs, Defendant City of Albuquerque, and Defendant Bernalillo County Board of Commissioners entered into a new stipulated settlement agreement governing conditions at the MDC that the Court approved in 2005 ("Plaintiffs' 2005 SSA") (Doc. No. 515).  In the Plaintiffs' 2005 SSA, Plaintiffs agreed that attorneys for Plaintiffs would be compensated at the hourly rate of $135.00. The Plaintiffs' 2005 SSA also included a limit on the number of compensable hours for attorneys who performed monitoring services. *Id.* at 6.

In 2006, Defendant Bernalillo County took over operation of the MDC from Defendant City of Albuquerque.[6]

In 2007, attorneys for Plaintiffs and Plaintiff-Intervenors claimed that the conditions at the BCDC, which had been renovated and renamed the Regional Correction Center ("RCC"),

---

[6] Until Defendant Bernalillo County became the sole operator of the MDC in 2006, it appears that both Defendant City of Albuquerque and Defendant Bernalillo County Board of Commissioners were responsible for paying Plaintiffs' and Plaintiff-Intervenors' attorneys' fees. Hence, the Court has referred to Defendants in the plural when discussing agreements with Plaintiff-Intervenors prior to 2006.

violated the civil and constitutional rights of the inmates incarcerated there. In June 2007, Plaintiffs and Plaintiff-Intervenors filed motions for access to alleged class and sub-class members housed in the RCC.  Plaintiffs and Plaintiff-Intervenors asserted that the County did not fully disclose its execution of an Intergovernmental Agreement ("IGA") with the federal government to house prisoners at the RCC.[7]  Plaintiffs and Plaintiff Intervenors argued that inmates in the RCC were potential class and sub-class members by virtue of the County's contractual rights under the IGA.  In other words, Plaintiffs and Plaintiff-Intervenors claimed that the RCC was part of the Bernalillo County jail system and was subject to the orders in this case.

On December 11, 2007, the Court issued an Order to Show Cause (Doc. No. 600) directing Defendants to show cause why the Court should not withdraw its approval of the Plaintiffs' 2005 SSA and the Plaintiff-Intervenors' 2005 SSA because material information was withheld from the Court. In March 2009, the Court entered an order (the "March 2009 Order") in which the Court withdrew its approval of the Plaintiffs' 2005 SSA and the Plaintiff-Intervenors' 2005 SSA and gave the Plaintiffs and the Plaintiff-Intervenors the option to rescind their respective 2005 SSAs. (*See* Doc. Nos. 700, 701.)

On April 9, 2009, both Plaintiffs and Plaintiff-Intervenors rescinded their respective 2005 SSAs.  Defendants have appealed the March 2009 Order to the Tenth Circuit Court of Appeals, and that appeal is pending.  *McClendon v. City of Albuquerque et al.*, Tenth Cir. Case No. 09-2095.

---

[7] At one time, the County housed overflow County inmates at the RCC. At this time, no County inmates are housed at the RCC.

10

II. *Current Compensation of Plaintiff-Intervenors' Counsel*

Under an agreement with Defendant Bernalillo County ("Defendant"),[8] Plaintiff-Intervenors' counsel have been paid for fees and expenses through June 30, 2009, except for fees and expenses applicable to Ms. Simmons.[9]  According to a letter dated June 22, 2010 to Judge Parker from Mr. Davis, Plaintiff-Intervenors' fee counsel, Defendant has been paying Plaintiff-Intervenors' attorneys for work performed on or after July 1, 2009 at the following hourly rates: Mr. Cubra $150.00; Ms. Dickson $135.00;[10] Mr. Tuck $60.00;[11] Ms. Simmons $135.00; Mr. Meilleur $135.00; Mr. Bach $135.00;[12] and Mr. Davis $169.50.

III. *Plaintiff-Intervenors' Motion Partially Settled*

In the Response, Defendant offered to pay paralegals working for Plaintiff-Intervenors' attorneys at the hourly rate of $75.00; and in the Reply, Plaintiff-Intervenors accepted Defendant's offer.  Response at 25; Reply at 17.  In addition, Plaintiff-Intervenors state in the

---

[8] Because Defendant Bernalillo County Board of Commissioners was the only Defendant who responded to the Motion, presumably because the County now is the sole operator of the MDC, the Court will refer to Defendant Bernalillo County Board of Commissioners in the singular, as "Defendant," and this Memorandum Opinion and Order will be enforceable against Defendant Bernalillo County Board of Commissioners only.

[9] In the Motion, Plaintiff-Intervenors claim that Defendant has refused payment for Ms. Simmons' work performed prior to July 1, 2009.  However, Plaintiff-Intervenors also state that they are hoping to resolve this issue with Defendant without requesting judicial intervention. The hourly rate set in this Memorandum Opinion and Order for Ms. Simmons' work will only govern her work on or after July 1, 2009.

[10] Ms. Dickson was not specifically named in Plaintiff-Intervenors' Motion.

[11] Mr. Tuck is no longer involved in this case; however, Plaintiff-Intervenors have requested that he be compensated for his work at the hourly rate of $145.00.

[12] Mr. Bach has been replaced by Ms. Simpson; however, Plaintiff-Intervenors have requested that he be compensated for his work at the hourly rate of $225.00. The June 22, 2010 letter does not indicate at what rate Defendant is compensating Ms. Simpson.

Reply that Defendant has agreed to compensate Plaintiff-Intervenors' attorneys and their employees for travel time at the hourly rate set by the Court. Reply at 17.

    IV. *Discussion*

        A. *Plaintiff-Intervenors' Motion For Attorney's Fees*

    In the Motion, Plaintiff-Intervenors argue that they are prevailing parties under the ADA; therefore, Plaintiff-Intervenors' attorneys argue that they are entitled to compensation at their market rates and they are not limited to the maximum hourly rates provided in the PLRA as the Court determined in its 2000 Order.  Plaintiff-Intervenors further assert that their attorneys are not bound by the hourly rates established in the 2001 Agreement because changed circumstances have rendered the hourly rates in the 2001 Agreement inequitable. Plaintiff-Intervenors contend that their attorneys are entitled to be compensated from July 1, 2009 to the present at the following hourly rates for all hours worked: Mr. Cubra $300.00; Ms. Schatz-Vance $225.00; Mr. Tuck $145.00; Ms. Simmons $285.00; Mr. Meilleur $150.00; Mr. Bach $225.00; and Mr. Davis (fee counsel) $350.00.[13]

    Alternatively, Plaintiff-Intervenors argue that if the Court does not allow their attorneys compensation at their market rates under the ADA, the Court should order Defendant to compensate all of their attorneys, except Mr. Tuck and Mr. Meilleur, at the maximum PLRA hourly rate of $169.50 for pre-January 1, 2010 time and $187.50 for post-January 1, 2010 time.[14] Plaintiff-Intervenors acknowledge that if the Court finds that Plaintiff-Intervenors' counsel are

---

    [13] Ms. Simpson and Ms. Dickson are not mentioned in the Motion; however, Ms. Simpson's rate was one of the rates set in the 2001 Agreement.

    [14] In their alternative proposal, Plaintiff-Intervenors seek the maximum PLRA rate for all attorneys whose market rates are in excess of the PLRA rates. (Mot. at 6.) Mr. Tuck and Mr. Meilleur charge hourly market rates that are lower than the maximum PLRA rate.

not entitled to market rates under the ADA but instead are entitled to the PLRA maximum rate,

Defendant has agreed to pay Mr. Cubra and Mr. Davis the maximum PLRA hourly rate of

$169.50 for work performed prior to January 1, 2010 and $187.50 for work performed after

January 1, 2010.[15]

    B.  *Attorney's Fees Under The PLRA and ADA*

Section 1988 of Title 42 of the United States Code states that:

> In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983,
> 1985, and 1986 of this title, . . . the court, in its discretion, may allow the prevailing
> party, . . . a reasonable attorney's fee as part of the costs[.]

42 U.S.C. § 1988.

The PLRA provides for the award of attorney's fees:

> (d) Attorney's fees
> > (1) In any action brought by a prisoner who is confined to any jail, prison, or
> > other correctional facility, in which attorney's fees are authorized under section
> > 1988 of this title, such fees shall not be awarded, except to the extent that--
> > > (A) the fee was directly and reasonably incurred in proving an actual
> > > violation of the plaintiff's rights protected by a statute pursuant to which a
> > > fee may be awarded under section 1988 of this title; and
> > > (B)(I) the amount of the fee is proportionately related to the court ordered
> > > relief for the violation; or
> > > (ii) the fee was directly and reasonably incurred in enforcing the relief
> > > ordered for the violation.
> > . . .
> > (3) No award of attorney's fees in an action described in paragraph (1) shall be
> > based on an hourly rate greater than 150 percent of the hourly rate established
> > under section 3006A of Title 18 for payment of court-appointed counsel.

---

[15] The Court notes that in their Motion, Plaintiff-Intervenors state that Defendant has not
agreed to compensate Mr. Davis at the increased PLRA maximum rate of $187.50 for work
performed after January 1, 2010 if ADA rates are not awarded.  However, in its Memorandum
Opinion and Order Setting Hourly Rates For Plaintiffs' Attorneys Upon Which Payment Of Fees
Can Be Based (Doc. No. 813) the Court found that Defendant had agreed to pay fee counsel Mr.
Davis at the maximum PLRA hourly rate of $169.50 for work performed before January 1, 2010
and $187.50 for work performed after January 1, 2010. (Doc. No. 813 at 6.) That finding will
also apply to Mr. Davis's hourly rate for work performed on behalf of Plaintiff-Intervenors.

42 U.S.C. § 1997e(d)(1) and (3).

A plaintiff is a prevailing party if the court grants relief on the merits of the plaintiff's claim or if the court-ordered consent decree "materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992). When a lawsuit serves as a catalyst for favorable action by a defendant, such as taking remedial action because of the suit, plaintiff is a prevailing party. *Tyler v. City of Manhattan, KS*, 866 F. Supp. 500, 501 (D. Kan. 1994).

Attorneys for prison inmates who prevail on claims brought under 42 U.S.C. § 1983 are limited by the attorney's fees provision of the PLRA, which caps all compensation to attorneys for prevailing parties at an amount that is 150% of the hourly rate paid to court appointed counsel in criminal cases (the "CJA rate"). In 2009, 150% of the CJA rate was $169.50 per hour, which was the maximum PLRA rate.  On January 1, 2010, the CJA rate was increased; therefore, the maximum PLRA rate was increased to $187.50 per hour. 42 U.S.C. § 1997e(d)(3) (PLRA); 18 U.S.C. § 3006A(d)(1) (CJA).

In cases brought under the ADA, courts may award reasonable attorney's fees to the prevailing party. 42 U.S.C. § 12205 (2006) (fee provision of the ADA).[16] Hourly attorney's fee rates in ADA cases should be calculated by using the prevailing market rates of attorneys in the community. *Blum v. Stenson*, 465 U.S. 886, 895 (1984).  The courts that have ruled on this issue have held that inmates who prevail on claims brought under the ADA are entitled to attorney's

---

[16] The fee provision of the ADA states:
   In any action or administrative proceeding commenced pursuant to this chapter,
   the court or agency, in its discretion, may allow the prevailing party, . . . a reasonable
   attorney's fee, including litigation expenses, and costs, . . .
42 U.S.C. § 12205.

fees under the ADA attorney's fee provision and are not limited to the maximum hourly rate provided in the PLRA. *Armstrong v. Davis*, 318 F.3d 965, 974 (9th Cir. 2003); *Beckford v. Irvin*, 60 F. Supp. 2d 85, 88 (W.D.N.Y. 1999).

Plaintiff-Intervenors argue that they are prevailing parties under the ADA because, in Plaintiff-Intervenors 1996 Order, the Court recited the stipulation that some residents did not have reasonable accommodations for their disabilities. Plaintiff-Intervenors also ask the Court to enforce the 2000 Order in which the Court awarded attorney's fees under the ADA and held that Plaintiff-Intervenors' attorneys should not be limited to the maximum hourly rate applicable to prevailing parties under the PLRA.

C. *The Effect of Plaintiff-Intervenors' Rescission of The 2005 SSA on Plaintiff-Intervenors' Prevailing Party Status*

Defendant asserts that when Plaintiff-Intervenors rescinded the Plaintiff-Intervenors' 2005 SSA, they lost their prevailing party status and thereby lost their right to attorney's fees. Plaintiff-Intervenors contend that the rescission of Plaintiff-Intervenors' 2005 SSA did not affect their prevailing party status.

Settlement agreements are contracts governed by basic contract law. *Heuser v. Kephart*, 215 F.3d 1186, 1190 (10th Cir. 2000) (noting that courts disagree on whether federal common law or state law governs settlement agreements in Title VII cases, but stating that New Mexico contract law and federal common contract law do not differ). The rescission of a contract returns the parties to their positions before the contract. *Baker v. Penn Mut. Life Ins. Co.*, 788 F.2d 650, 663 (10th Cir. 1986). Prior to the Plaintiff-Intervenors' 2005 SSA, the Court had ruled in Plaintiff-Intervenors' 1996 Order that constitutional violations existed in the BCDC and that some of the sub-class members were not provided reasonable accommodation for their

15

disabilities. And, in the July 2003 Order, the Court held that all of its previous orders were applicable to the MDC.

While Defendant is correct that settlement agreements replace all of the settled claims, Plaintiff-Intervenors' 2005 SSA expressly superceded only Plaintiff-Intervenors' 1996 Order. More importantly, under contract law, the rescission of  Plaintiff-Intervenors' 2005 SSA returned the parties to their status prior to the Plaintiff-Intervenors' 2005 SSA, and Plaintiff-Intervenors' 2005 SSA no longer replaced the settled claims. *Baker*, 788 F.2d at 663. Consequently, the rescission reinstated all prior orders and actionable claims, including Plaintiff-Intervenors' 1996 Order, and Plaintiff-Intervenors remain prevailing parties in this case.  *Farrar*, 506 U.S. at  111-12.

D.  *Should the Court Defer Ruling Until The Appeal Is Decided?*

Alternatively, Defendant asks the Court to defer ruling on the Motion until the Tenth Circuit Court of Appeals has determined whether the Court erred in allowing the rescission of Plaintiff-Intervenors' 2005 SSA.  However, as discussed above, the rescission does not affect Plaintiff-Intervenors' prevailing party status.  In addition, unlike Plaintiffs' 2005 SSA, the Plaintiff-Intervenors' 2005 SSA did not address hourly attorney's fees rates. Thus, if the Tenth Circuit Court of Appeals reverses the order allowing rescission, the hourly rates payable to Plaintiff-Intervenors' attorneys would not be affected by the reinstatement of the Plaintiff-Intervenors' 2005 SSA. *See* Plaintiff-Intervenors' Reply at 2 n.2 (stating that the Plaintiff-Intervenors' 2005 SSA "did not address the issue of hourly rates.").  Accordingly, the Court will not defer ruling on the Plaintiff-Intervenors' Motion.

16

E. *The 2001 Agreement*

Plaintiff-Intervenors do not dispute that the 2001 Agreement was a valid compromise agreement in which Plaintiff-Intervenors agreed that their attorneys would be compensated at specific hourly rates in exchange for Defendant's agreement to dismiss its appeal of the 2000 Order.  Plaintiff-Intervenors argue that they are not bound by the 2001 Agreement because its terms have become inequitable. Plaintiff-Intervenors argue that they are now entitled to disavow the rates set in the 2001 Agreement and that their attorneys are entitled to compensation at reasonable market rates under the ADA for all work performed on or after July 1, 2009. Plaintiff-Intervenors assert that three circumstances render the rates in the 2001 Agreement inequitable.  First, the rates in the 2001 Agreement were negotiated in accordance with lower market rates in 2001.  Second, Plaintiff-Intervenors' attorneys could not have anticipated that this litigation would continue for several more years and that the agreed upon rates would become obsolete. Third, at the time the 2001 Agreement was negotiated, there was no dispositive case law on the appropriate rate for attorney's fees in combined ADA and PLRA litigation; but since then, courts have held that attorneys are entitled to their market rates when they prevail on ADA claims in prison cases.  *See, e.g., Armstrong v. Davis*, 318 F.3d 965 (9th Cir. 2003).

Plaintiff-Intervenors cite *Rufo v. Inmates of Suffolk County Jail* to support the contention that they are entitled to disavow the 2001 Agreement because it has become inequitable. 502 U.S. 367, 384 (1992). The *Rufo* case was brought on behalf of pretrial detainees who alleged that the crowded conditions at the Suffolk County Massachusetts Jail were unconstitutional. *Id.* at 376.  The parties settled their claims, and the court entered a consent decree that required the construction of a new jail large enough to allow single occupancy of cells by pretrial detainees. *Id.* During construction of the new jail, the Suffolk County Sheriff moved under Fed. R. Civ. P.

17

60(b)[17] to modify the decree and allow double bunking in some of the cells.  The district court

applied the *United States v. Swift & Co.* "grievous wrong" standard. *Rufo*, 502 U.S. at 377 (citing

*United States v. Swift & Co.* 286 U.S. 106, 119 (1932) ("Nothing less than a clear showing of

grievous wrong evoked by new and unforeseen conditions should lead us to change what was

decreed after years of litigation with the consent of all concerned.")).  The district court found

that the movant failed to meet the *Swift* standard, and the First Circuit Court of Appeals affirmed

the holding. *Id.* (citing *Inmates of Suffolk County Jail v. Kearney*, 915 F.2d 1557 (1st Cir. 1990)).

The Supreme Court, however, reversed and ruled that the *Swift* standard should not apply to

consent decrees in institutional reform cases that often remain in place for extended periods of

time and become unworkable due to significant changes during the life of the decree. *Rufo*, 502

U.S. at 380. To that end, the Supreme Court adopted the following standard: one who seeks

modification of an institutional reform consent decree bears the burden of establishing that a

significant change in facts or law warrants revision of the decree and that the proposed

modification is suitably tailored to the changed circumstance.  *Id.* at 383. According to the

Supreme Court, a court may modify a consent decree in an institutional reform case if the

movant shows that compliance with the decree has become "substantially more onerous[;]" or

the decree has become "unworkable because of unforeseen obstacles." *Id.* at 384.

 Plaintiff-Intervenors compare the 2001 Agreement to the consent decree in *Rufo* and

---

[17] The wording of Rule 60(b) at that time provided in relevant part the following:
On motion and upon such terms as are just, the court may relieve a party or a party's
legal representative from a final judgment, order, or proceeding for the following
reasons: . . . (5) the judgment has been satisfied, released, or discharged, or a prior
judgment upon which it is based has been reversed or otherwise vacated, or it is no
longer equitable that the judgment should have prospective application. . . .
Fed. R. Civ. P. 60(b).

argue that changes in attorney's fees market rates, the unforeseeable length of this litigation, and changes in the law on attorney's fees in ADA cases brought on behalf of prisoners warrant an increase in hourly rates to market rates recoverable under the ADA.

Defendant contends that the circumstances in this case have not made compliance with the 2001 Agreement significantly more onerous even if the 2001 Agreement may have become financially unappealing to Plaintiff-Intervenors' attorneys. Defendant argues that the 2001 Agreement was implemented in the sixth year of this lawsuit; thus, attorneys for Plaintiff-Intervenors knew the case had a long history and could have foreseen that the lawsuit would continue for several more years.  Moreover, attorneys for Plaintiff-Intervenors could easily have foreseen that their rates would increase over time. Defendant further asserts that Bernalillo County is suffering financially and that an award of the higher ADA market rates would be an inappropriate burden on the taxpayers. Finally, Defendant argues that proposed ADA market rates would be unreasonable in this case because Plaintiff-Intervenors have achieved success, and their attorneys do not bear the risk of losing the case at this stage.

The 2001 Agreement is a contract that is somewhat similar to a consent decree.  The consent decree in *Rufo* corrected the violations of constitutional rights and involved an injunction regarding conditions of confinement that the court was to monitor on an ongoing basis.  In contrast, the 2001 Agreement only resolved the attorney's fees issue between the parties and did not "relate[] to the vindication of a constitutional right."  *See Rufo*, 502 U.S. at 382 n.7 (explaining that the standard set forth "applies when a party seeks modification of a term of a consent decree that arguably relates to the vindication of a constitutional right").  Hence, modification of the 2001 Agreement is not governed by the standard outlined in *Rufo* for consent decrees.

Under well-settled law, courts generally enforce settlement agreements according to their terms. *See Envtl. Control, Inc. v. City of Santa Fe*, 2002-NMCA-003, ¶ 19, 131 N.M. 450, 38 P.3d 891; *Bd. of Educ. for the Carlsbad Mun. Sch. v. State Dep't of Pub. Educ.*, 1999-NMCA-156, ¶ 14, 128 N.M. 398, 993 P.2d 112. A settlement agreement will not be set aside just because its terms later prove to have been unwise or unfortunate for one party. *Envtl. Control, Inc.*, 2002-NMCA-003, ¶ 19, 131 N.M. 450, 38 P.3d 891. Instead, courts in New Mexico have consistently held that parties are bound by their valid settlement agreements, and they must accept both the burdens and benefits of the contract. *Cortez v. Cortez*, 2007-NMCA-154, ¶ 14, 143 N.M. 66, 172 P.3d 615, *rev'd on other grounds,* 2009-NMSC-008, 145 N.M. 642, 203 P.3d 857. According to the New Mexico Court of Appeals in *Cortez*:

> Because of their favored status, there must be a compelling basis to set aside a settlement agreement. [A court] will allow equity to interfere with enforcing clear contractual obligations only when well-defined equitable exceptions, such as unconscionability, mistake, fraud, or illegality justify deviation from the parties' contract.

*Id.* ¶ 14 (internal quotations marks and citations omitted). *See also In re Tocci*, 45 N.M. 133, 112 P.2d 515 (1941); *Montano v. NM Real Estate Appraiser's Bd.*, 2009-NMCA-009, ¶ 12, 145 N.M. 494, 200 P.3d 544; *Beaver Creek Coal Co. v. Nevada Power Co.*, 968 F.2d 19 (table), 1992 WL 113747, at *4 (D. Utah May 27, 1992) (unpublished) (denying buyer's claim that long-term contract for purchase of coal was inequitable due to change in market rate of coal).

The 2001 Agreement is a settlement agreement that replaced the 2000 Order, and the 2001 Agreement expressly established that the agreed-upon rates would be effective "until the end of the litigation." Response Ex. 3.  Plaintiff-Intervenors have not shown that the 2001 Agreement is unenforceable due to unconscionability, mistake, fraud or illegality and Plaintiff-Intervenors have not convinced the Court that there is a compelling reason to alter or set aside

the 2001 Agreement. *Cortez*, 2007-NMCA-154 ¶ 14. The 2001 Agreement sets an hourly rate for Mr. Cubra at $150.00; for Ms. Simpson at $140.00;[18] and for Ms. Schatz-Vance at $100.00 per hour.[19] Thus, the 2001 Agreement applies to the rates at which these attorneys are to be compensated. Since Mr. Cubra is currently being compensated at the rate of $150.00 per hour, no adjustment of his hourly rate is required. However, while Ms. Simpson is currently being compensated at the rate of $135.00 per hour, she should have been compensated at the rate of $140.00 per hour under the 2001 Agreement. In addition, according to Mr. Davis' letter dated June 22, 2010, "[a]ny other lawyers not listed who, *e.g.*, had time in 2009 have been paid at $135.00 per hour." Ms. Schatz-Vance is not listed in the June 22, 2010 letter. If Defendant has compensated Ms. Schatz-Vance for work performed in 2009 at $135.00 per hour, Defendant paid more than the rate established by the 2001 Agreement. According to the 2001 Agreement, Ms. Schatz-Vance should be paid at the rate of $100.00 per hour. To the extent Defendant overpaid Plaintiff-Intervenors' for Ms. Schatz-Vance's services, Defendant should receive a credit..

F.   *Attorneys Not Bound By The 2001 Agreement*

Ms. Simmons, Mr. Meilleur, Mr. Tuck, Mr. Bach, and Mr. Davis are not named in the 2001 Agreement; therefore, they are not bound by it. According to the June 22, 2010 letter from Mr. Davis to Judge Parker, these attorneys are currently being compensated at $135.00 per hour,

---

[18]  Ms. Simpson left the case in 2002 but re-entered her appearance on August 9, 2010.

[19]  According to Mr. Baker's February 7, 2001 letter to Mr. Cubra, which was presented as evidence of the 2001 Agreement, the Bernalillo County Claims Review Board did not address Ms. Schatz-Vance's hourly rate. In the letter, Mr. Baker proposed that Ms. Schatz-Vance receive compensation at the rate of $100.00 per hour, which was a rate previously paid to Ms. Schatz-Vance. The Court assumes that this rate for Ms. Schatz-Vance was part of the 2001 Agreement because Plaintiff-Intervenors have not argued to the contrary. However, if either party believes that $100.00 per hour was not the rate for Ms. Schatz-Vance that the parties agreed to as part of the 2001 Agreement, that should be pointed out in a motion to reconsider.

except Mr. Tuck, who was being compensated at the hourly rate of $60.00 while he was involved in the case, and Mr. Davis, who is being compensated at the hourly rate of $169.50.

     E.  *Should The Attorneys Not Bound By The 2001 Agreement Be Compensated At The ADA Rate?*

     Attorneys for Plaintiff-Intervenors argue that they are prevailing parties under the ADA because the Court in the Plaintiff-Intervenors' 1996 Order found that some residents did not have reasonable accommodations for their disabilities, and the Court also instructed Defendants to implement several measures designed to ameliorate unlawful conditions for inmates with disabilities. The Plaintiff-Intervenors' 1996 Order formed the basis of the Court's 2000 Order which awarded Plaintiff-Intervenors' attorneys the ADA fee rates. Plaintiff-Intervenors rely on both of these orders as support for their argument that they are prevailing parties under the ADA and that their attorneys are entitled to compensation for all of their work at ADA hourly rates unlimited by the PLRA cap. However, the 2001 Agreement has subsumed the 2000 Order. Consequently, the 2000 Order cannot support a ruling that Plaintiff-Intervenors' attorneys are entitled to ADA rates for all work performed on behalf of the sub-class members. *See supra* Part IV, C. To be eligible for ADA rates, Plaintiff Intervenors' attorneys must show that they performed work to enforce sub-class members's rights under the ADA by ensuring that Defendant does not discriminate in the provision of services at the MDC to sub-class members because of their disabilities. Plaintiff-Intervenors attorneys must also show that the particular sub-class member on whose behalf they were working had a qualifying disability under the ADA. On the other hand, if an attorney's work was performed enforcing sub-class members' constitutional rights under § 1983, such as the provision of adequate medical care, the attorney should recover fees at the maximum PLRA rate. *See Fitzgerald v. Corrections Corp. Of*

*America*, 403 F.3d 1134, 1144 (10th Cir. 2005) (stating that a claimant must show under the ADA that he was qualified for the benefits sought and that he was denied the benefits "solely by reason of disability."). *See also Hughes v. Colorado Dept. Of Corrections*, 594 F. Supp. 2d 1226, 1240-41 (D. Colo. 2009) (differentiating between ADA claims of discriminatory denial of mental health services and non-ADA claims of inferior treatment of mental health conditions); *Rashad v. Doughty*, 4 Fed. Appx. 558, 560 (10th Cir. Jan. 29, 2001) (unpublished) (noting that allegations that a disabled prisoner has been denied medical services that had been provided to other prisoners stated an ADA claim); *Moore v. Prison Health Servs., Inc.*, 1999 WL 1079848, at *1 (10th Cir. Dec. 1, 1999) (unpublished table opinion) (holding that the ADA affords "disabled persons legal rights regarding access to programs and activities enjoyed by all, not a general federal cause of action for challenging the medical treatment of their underlying disabilities").

Title II of the Disability Act prohibits public entities, like Defendant, from discriminating against persons with disabilities in the provision of programs, activities, and services. 42 U.S.C. §§ 12131 to 12134. Title II of the ADA has been held to pertain to disabled state prisoners. *See Roberston v. Las Animas County Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007). To prevail on their claims, Plaintiff-Intervenors must demonstrate, (1) that sub-class members are qualified individuals with disabilities; (2) that sub-class members were . . . denied the benefits of services, programs, or activities provided by the Bernalillo County jail system, or that sub-class members were otherwise discriminated against; and (3) that the denial of benefits or discrimination was by reason of their disabilities. *See Tyler v. City of Manhattan*, 849 F. Supp. 1429, 1439 (D. Kan. 1994). *See also Meyers v. Colo. Dep't of Human Servs.*, 62 Fed. Appx. 831, 832 (10th Cir. Jan. 6, 2003) (unpublished decision). The ADA also requires public entities to

make particular accommodations for the disabled in order to ensure their access to government programs. *Tyler*, 849 F. Supp at 1439.

Defendant argues that despite the Court's previous rulings, Plaintiff-Intervenors have not proven that Defendant violated the ADA, which was necessary to support an award of attorney's fees under the ADA. However, after a careful review of the Plaintiff-Intervenors' Amended Complaint and the Plaintiff-Intervenors' 1996 Order, the Court finds that Plaintiff-Intervenors should be considered prevailing parties under both the ADA and the PLRA. Two cases cited by Plaintiff-Intervenors, *Armstrong* and *Beckford*, are instructive.

In *Armstrong*, a class of disabled inmates of the California state prison system originally brought claims only under the ADA and the RA. 318 F.3d at 968-69.[20] Just before trial, the plaintiff class was allowed to add a claim for violation of their due process rights under 42 U.S.C. § 1983. *Id.* at 969. After a ten-day bench trial, the district court found the defendant liable for violations of the ADA, the RA, and the Due Process Clause of the Constitution. *Id.* However, the district court awarded all attorney's fees based on market rates under the ADA and the RA and did not limit any of the fees to the PLRA maximum rate. *Id.* at 975. On appeal, defendants unsuccessfully argued that the PLRA limit applied to all of the claims. Alternatively, defendants argued on appeal that the PLRA limit on fees should be applied to work related to the due process claim, which they argued constituted one-third of the fee request. The Ninth Circuit Court of Appeals affirmed and stated,

---

[20] Two years after the *Armstrong* case was filed, all of the defendants in *Armstrong*, except one group, stipulated that the prison facilities lacked adequate emergency evacuation plans for disabled prisoners, that a smaller range of vocational programs was available to disabled prisoners, and that sentence reduction credits were improperly denied to some disabled prisoners.

24

No doubt, the district court could have . . . applied PLRA limits to some of the requested fees. We cannot say, however, that its decision not to do so was an abuse of discretion. The due process claim was added late in the litigation . . . and the post-judgment work involved the ADA and RA claims exclusively. The tertiary § 1983 claim required no additional discovery or witnesses at trial, and the arguments supporting it so overlapped with the ADA and RA claims as to make discrete time allocation and billing challenging. In light of these circumstances, the district court reasonably concluded that it was not appropriate to apply the PLRA limits. This determination was well within its discretion.

*Id.* at 975 (citations omitted).

In *Beckford*, 60 F. Supp. 2d 85 (W.D.N.Y. 1999), plaintiff, an inmate in the custody of the New York State Department of Correctional Services who was confined to a wheel chair, successfully brought an action under § 1983 alleging violations of his Eighth Amendment right against cruel and unusual punishment and for violations of the ADA. Plaintiff's attorneys moved for an award of attorney's fees. *Id.* at 86. The district court noted that plaintiff's attorneys stipulated that the claims were inextricably intertwined and that half of their time was spent on each type of claim. The district court found that one-half of the attorneys time was attributable to the ADA claim, and the other half of the attorneys time was attributable to the § 1983 claims. *Id.* at 88. Consequently, the district court apportioned one half of the amount of attorney's fees to the ADA claim for which the attorneys were awarded their market rates, and the other half to the § 1983 claim for which the attorneys were awarded the maximum PLRA rate. *Id.*

In their affidavits, attorneys for Plaintiff-Intervenors state that all of their work performed on or after July 1, 2009 can be attributed to Plaintiff-Intervenors' ADA claims. Alternatively, attorneys for Plaintiff-Intervenors state that their work was inextricably linked to or had a common core of facts with both the ADA and the § 1983 claims and that their work is incapable of being divided between the different types of claims. According to Plaintiff-Intervenors, the Court should award all of their attorneys fees based on their market hourly rates

25

for all of their work on or after July 1, 2009.  However, the Court finds that it is more equitable to award Plaintiff-Intervenors' attorneys fees for work done in furtherance of the § 1983 claims at the maximum PLRA rates and for work done in furtherance of the ADA claims at their market rates, as the Court did in *Beckford*.  *See Beckford*, 60 F. Supp. 2d at 88.  In support of this finding, the Court necessarily concludes that an attorney's work is capable of being apportioned between the two types of claims. Just as courts have apportioned work between claims that are successful and claims that are unsuccessful, the Court can apportion the work that attorneys for Plaintiff-Intervenors have performed on behalf of sub-class members according to the type of enforcement action on which the attorney worked.  *See Hensley v. City of Eckerhart*, 461 U.S. 424, 434-35 (1983). If it is not possible to determine the type of claim on which an attorney worked, the attorney's work should be compensated at the maximum PLRA hourly rate.

Since the rescission of Plaintiff-Intervenors' 2005 SSA, the Plaintiff-Intervenors' attorneys must enforce the relief granted by the Court in earlier orders, especially the Plaintiff-Intervenors' 1996 Order.  These earlier orders were in some ways "site specific" to the BCDC even though the Court held in the July 2003 Order that they apply to the MDC.  On the other hand, the relief granted in the prior orders and agreements was also "sub-class specific" because the relief can be enforced on behalf of sub-class members incarcerated at the MDC or other County facilities. Plaintiff-Intervenors' 1996 Order set forth measures that were appropriate to remedy violations of both the ADA and the PLRA. For example, the Court ordered Defendant to improve its provision of mental health services at the BCDC, and that relief may be enforced as to the MDC. To the extent that this relief is aimed at services that are provided in a discriminatory fashion against sub-class members with qualifying disabilities, the relief is based on the ADA.  Conversely, to the extent that this relief is aimed at improving general care of sub-

26

class members with qualifying disabilities or to improve the care of sub-class members who have mental illnesses that do not qualify as a disability under the ADA, the relief should be viewed as correction of violations of constitutional rights under § 1983. Therefore, each attorney not subject to the 2001 Agreement must show what type of work the attorney performed on behalf of sub-class members, explaining whether the work was designed to enforce sub-class members' rights under the ADA or under § 1983.

If an attorney demonstrates that the attorney performed work on behalf of a sub-class member with a qualifying disability and the work was designed to ameliorate discrimination on the basis of that disability, then that attorney should receive the attorney's hourly market rate under the ADA for the time spent on that work.  By contrast, if an attorney shows that the attorney performed work on behalf of a sub-class member who does not have a qualifying disability under the ADA, then the attorney should receive the maximum PLRA hourly rate for that work. Or if an attorney shows that the attorney performed worked on behalf of a sub-class member who has a qualifying disability, but the relief sought by the attorney was not of the type that ameliorated discrimination on the basis of that disability, that attorney should not receive the ADA rate but instead should receive the maximum PLRA hourly rate for that work.

Plaintiff-Intervenors were allowed to join this case under limited circumstances that were tied to the Plaintiffs' claims already before the Court.  The existing claims that Plaintiff-Intervenors joined were the types of claims for which attorney's fees under § 1988 are awarded. Although the Plaintiff-Intervenors asserted claims under the ADA, the litigation focused primarily on the constitutional claims of overcrowding. In other words, this is a prison conditions case brought primarily to correct the unconstitutional conditions of confinement in Bernalillo County's jail system.

To the extent that Ms. Simmons, Mr. Meilleur, Mr. Tuck, and Mr. Bach show that their work was performed in furtherance of the Court's mandates to provide qualifying members of the sub-class reasonable accommodations for their disabilities or to correct discriminatory conditions, that work will be compensated at the following hourly market rates: Ms. Simmons $285.00; Mr. Meilleur $150.00; Mr. Tuck $145.00; and Mr. Bach $225.00.[21] To the extent that Ms. Simmons and Mr. Bach show that their work was performed in furtherance of the sub-class members' constitutional claims, that work should be compensated at the maximum rate allowed under the PLRA, which is $169.50 per hour for work performed prior to January 1, 2010 and $187.50 for work performed after January 1, 2010.  For work performed in furtherance of the sub-class members' constitutional claims, Mr. Meilleur and Mr. Tuck, who both have rates below the maximum PLRA rate, should be compensated at their hourly market rates of $150.00 and $145.00 respectively.

Mr. Davis represents both Plaintiffs and Plaintiff-Intervenors as fee counsel.  As fee counsel, Mr. Davis's fees are recoverable under the PLRA and the ADA. *Jackson v. Los Lunas Center*, 489 F. Supp. 2d 1267, 1276 (D.N.M. 2007); *Batchelder v. Geary*, 2007 WL 2427989, at *10 (N.D. Cal. Aug. 22, 2007) (unpublished). Mr. Davis was awarded the maximum PLRA hourly rate by the Court in the Memorandum Opinion and Order (Doc. No. 813) for all of his work on behalf of Plaintiffs' attorneys. The Court finds that it is equitable that for work performed on this Motion and work performed advocating for fees on behalf of Plaintiff-Intervenors, Mr. Davis should be compensated for all of his time at the maximum PLRA hourly

---

[21] Even though she is receiving $135.00 per hour according to Mr. Davis' June 22, 2010 letter, Ms. Dickson's market rate is was not listed among the rates requested in the Plaintiff-Intervenors' Motion. Thus, Ms. Dickson's market rate cannot be established here.

rate, which is $169.50 for work performed prior to January 1, 2010 and $187.50 for work

performed after January 1, 2010.

IT IS ORDERED that the Plaintiff-Intervenors' Motion For An Order Setting Hourly

Rates For Plaintiff-Intervenors' Attorneys And Their Staff On Which The Payment Of Fees Can

Be Based is granted as follows:

1. Mr. Cubra will be compensated for all work performed on or after July 1, 2009 at the hourly rate of $150.00.

2. Ms. Simpson will be compensated for all work performed on or after July 1, 2009 at the hourly rate of $145.00.

3. Ms. Schatz-Vance will be compensated for all work performed on or after July 1, 2009 at the hourly rate of $100.00.

4. Mr. Tuck will be compensated for work performed on constitutional claims on or after July 1, 2009 and for work performed on ADA claims on or after July 1, 2009 at the hourly rate of $145.00.

5. Ms. Simmons will be compensated for work performed on constitutional claims on or after July 1, 2009 at the maximum PLRA hourly rate of $169.50 for work performed before January 1, 2010 and $187.50 for work performed after January 1, 2010. Ms. Simmons will be compensated for work performed on ADA claims on or after July 1, 2009 at the hourly rate of $285.00.

6. Mr. Meilleur will be compensated for all work performed on or after July 1, 2009 at the hourly rate of $150.00.

7. Mr. Bach will be compensated for work performed on or after July 1, 2009 on constitutional claims at the maximum PLRA hourly rate of $169.50 for work performed before January 1, 2010 and $187.50 for work performed after January 1, 2010. Mr. Bach will be compensated for work performed on ADA claims on or after July 1, 2009 at the hourly rate of $225.00.

8. Mr. Davis will be compensated for all of his time preparing this Motion and for work advocating on behalf of attorneys for Plaintiff-Intervenors at the maximum PLRA hourly rate of $169.50 for work performed before January 1, 2010 and $187.50 for work performed after January 1, 2010.

9. By agreement of the parties, the hourly rate at which paralegals working for Plaintiff-Intervenors' attorneys are to be compensated is $75.00.

10.  All attorneys and paralegals are to be compensated for their travel time at the applicable hourly rates.

_____

UNITED STATES SENIOR DISTRICT JUDGE