IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


JIMMY MCCLENDON, et al.


       Plaintiffs,                  CIV No. 95-0024 JAP/ACT

v.

CITY OF ALBUQUERQUE, et al.

       Defendants,

v.

E.M., R.L., W.A., D.J., P.S., and N.W., on behalf
of themselves and others similarly situated,

       Plaintiff-Intervenors.


**MEMORANDUM OPINION AND ORDER**

      This matter is before the Court on Plaintiffs' and Plaintiff Intervenors' Motion for Enforcement of Interim Order Regarding Access to the MDC [Doc. 945], County Defendants' Response to Joint Motion for Enforcement of Interim Order Regarding Access to the MDC [Doc. 950], and Joint Reply to County Defendants' Response to Joint Motion for Enforcement of Interim Order Regarding Access to the MDC [Doc. 953].

      Plaintiffs and Plaintiff Intervenors seek to compel Defendants "and their medical and mental health care providers" to produce certain documents requested by Plaintiffs and Plaintiff Intervenors as required by the Court's September 17, 2009 Interim Order Regarding Access to the MDC [Doc. 754]. Plaintiffs and Plaintiff Intervenors state that the documents they seek were

"routinely provided in the past" and included the "continuous Quality Improvement ... and Quality Assurance... reports issued by CHC. . .[as well as the]...Mortality Review documents... and documents issued ... by Dr. Roberta Stellman, M.D." [Doc. 945 at p.2.]   Specifically, Plaintiffs and Plaintiff Intervenors state that in January of 2012, "counsel for Plaintiff Intervenors made their customary request for copies of all documents provided to Dr. Metzner prior to and during his January 30, 2012 to February 2, 2012 audit of mental health services and have sought to obtain these documents since that time." [*Id.*]  Plaintiffs and Plaintiff Intervenors claim that Defendants' "recent decision to withhold documents provided to both Dr. Greifinger and Dr. Metzner prevents [Plaintiffs and Plaintiff Intervenors ]from taking . . . actions to ensure a balanced report and fully informed findings." [*Id.* at p. 3.]

I.   Background.

On September 17, 2009 this Court issued its Interim Order Regarding Access to the MDC ("the Order") [Doc. 754] following Plaintiffs' and Plaintiff Intervenors' Joint Motion for Temporary Restraining Order and for Order to Show Cause [Doc. 731].  The Order directed that "the parties and Correctional Medical Service, Inc. (CMS)" [754 at p. 1] would follow certain protocols including the number of medical files that could be reviewed per visit [*Id.* at pp. 1-2], granting counsel for Plaintiffs and Plaintiff Intervenors permission to ask questions to decipher the content of files (providing that CMS staff was free to decline to respond to substantive questions) [*Id.* at pp. 2-3] and to have monthly meetings to discuss "problems or concerns regarding access to MDC and/or regarding substantive matters affecting class members." [*Id.* at p.4.] For non-client record requests, CMS was directed to produce the documents within thirty days or "explain their reasons for refusing to produce the documents." [*Id.* at p.5.]   In addition, each month CMS was directed to provide a copy of the following to counsel for Plaintiff-

Intervenors: "the Clinical Seclusion Log, Suicide Watch Log, Suicide Watch Follow Up Log, Involuntary Medication Log and Emergency Medication Log." [*Id.*] Other CMS documents, "including a reasonable sample of written Requests for Services, Requests for Services Tracking Log, Shift Report Forms, and a list of the people who are 'open to PSU'" would be provided to counsel for Plaintiff Intervenors upon request. [*Id.*]

On July 7, 2011, Plaintiff and Plaintiff Intervenors filed an opposed Motion for an Order Appointing Court Experts Pursuant to Federal Rule of Evidence 706. [Doc. 849.] Plaintiff Intervenor sought the appointment of the following experts "to evaluate services and conditions" at the MDC:  Dr. Jeffrey Metzner with respect to mental health care to members of the plaintiff class;  Dr. Robert Greifinger with respect to medical treatment to members of the plaintiff class; and Manuel Romero with respect to the conditions of confinement at MDC. [*Id.* at p. 1-2.] [1] Plaintiff and Plaintiff Intervenors argued that these experts would be "neutral," would "vastly reduce the amount of pre-hearing discovery needed to ascertain the current conditions at the MDC", would advance the interest of "judicial economy" and "preserve the resources of the parties." [*Id.* at p. 5.] Plaintiff and Plaintiff Intervenors also stated that the experts "would facilitate efficient fact-finding" and that "because of their familiarity with the MDC, and because of their considerable experience, they can quickly evaluate the conditions at the MDC against prevailing professional standards." [*Id.* at p. 6.]

At a subsequent hearing, the Honorable James Parker determined that an order appointing Mr. Romero, Dr. Greifinger, and Dr. Metzner "to evaluate the conditions of confinement, medical services, and mental health services at the MDC would be helpful to aid

---

[1] These experts had previously been jointly selected in 2005 to monitor compliance with the Stipulated Settlement Agreements. [Doc. 514 and Doc. 515.]

the Court and the parties in resolving this case." [Doc. 909.] On December 12, 2011, Judge Parker entered an Order appointing the experts requested by Plaintiffs and Plaintiff Intervenors. [*Id.*]

In 2010, CMS lost its contract with Bernalillo County to provide medical services to the MDC in a competitive bidding process. [Doc. 950 at pp. 4-5.] Correctional Healthcare Companies ("CHC"), a competitor to CMS, was awarded the contract and began its services in July, 2010. [*Id.*] CHC has worked with the Defendants, Plaintiff and Plaintiff Intervenors, as well as, the Court in connection with this litigation seeking to improve procedures and services to MDC inmates as evidenced by their oral reports given to the Court at the monthly and quarterly status conferences.

Defendants state that CHC spends approximately eight (8) hours per visit from class/subclass attorneys or staff preparing documents and an additional one to two hours during each visit. The number of visits per month is usually four. CHC staff routinely provides eight files per visit, and three more at the time of the visit. Each file can range from three to over 400 pages. In addition, at every visit CHC has supplied the PSU Case list, the PSU Shift Report Logs, the Suicide Watch and Clinical Seclusion logs, the Involuntary and Emergency Medication logs, and the PSU Request for Services. [Doc. 950 at p. 5.]   Furthermore, the Court has not heard from any party, or the Court-appointed experts, that CHC does anything but completely cooperate and comply with the requests of the Court-appointed experts. Defendants state the following:

> CHC's Rainbow Cross now compiles three different reports for internal evaluation and use by the experts, the Continuous Quality Improvement report ("CQI"), the Quality Assurance report ("QA"), and the Mortality Review. These reports are presented to clinical experts Dr. Stellman, Dr. Greifinger, and Dr. Metzner by CHC administrator Rainbow Cross and are thoroughly discussed and

> reviewed by them, but are otherwise not routinely available to MDC or CHC
> staff.   In fact, the County's understanding is that they are not even retained by
> Dr. Stellman or the other experts.  They are drafted specifically to be the basis for
> expert discussion. Their purpose is a full, frank, and candid discussion of possible
> issues to help the experts and Rainbow Cross develop action plans for
> improvement without the constraints imposed by employee relations or litigation
> problems.

[Doc. 950 at p. 6.][2]  The experts in turn "have engaged in broad review of corrections, medical health, and mental health and have proactively suggested improvements and corrections that would lead to self-sustaining quality and self-improvement." [*Id.* ]

II. Analysis

Defendants correctly point out that CHC is not a party to this lawsuit nor have Plaintiff and Plaintiff Intervenors subpoenaed CHC to seek discovery from a third party ; therefore this Court does not have jurisdiction over CHC.  *See, e.g., Walden's Lessee v. Craig's Heirs*, 39 U.S. 147, 151 (1840)("Service of process of notice is necessary to enable a Court to exercise jurisdiction in a case; and if jurisdiction be taken in a case in which there has been no process or notice, the proceeding is a nullity.")   However, Defendants state that they do not "wish to press these legal points." [Doc. 950 at p. 7.] Accordingly, the Court will resolve the discovery issue presented in the Plaintiffs and Plaintiff-Intervenors Motion [Doc. 945] without addressing the jurisdictional issues.

Defendants attach a letter from counsel for CHC which explains CHC's reason for not disclosing the documents listed on the CHC privilege log. [Doc. 950-1, Ex. A.]  Counsel for

---

[2] Plaintiffs and Plaintiff Intervenors state that there are "a number of unsupported assertions [] made in the Background and Facts sections of the Response, which Plaintiffs and Plaintiff Intervenors dispute." [Doc. 953 at p. 2, n.2.] Plaintiffs and Plaintiff Intervenors have deemed "those assertions" as not relevant to their Motion and cite generally to the Defendants' Response at pp. 2-6. [*Id.*]

CHC explains in the letter that it is not disclosing the requested materials based on the self-critical analysis privilege. The letter analyzes the privilege and applies it to their situation in the litigation. [*Id.*] In their Reply, Plaintiffs and Plaintiff Intervenors strenuously argue the existence and applicability of the self critical analysis privilege to CHC's situation, and whether it has been waived. [Doc. 953.][3]

The Court does not see any necessity to evaluate the self critical analysis privilege, nor any privilege, in this situation. As discussed above, Plaintiff and Plaintiff Intervenors had originally asked the Court to appoint neutral experts to evaluate the medical and mental health services at MDC on the grounds that expert evaluations are more efficient and probative. The Court was persuaded by Plaintiffs and Plaintiff Intervenors to appoint the very three experts requested by the Plaintiffs and Plaintiff Intervenors. Under the circumstances, the Plaintiffs and Plaintiff Intervenors can not now argue that the experts are not qualified or neutral.

Plaintiffs and Plaintiff Intervenors are judicially estopped from asserting this position after previously arguing to the Court that the appointment and reliance on these experts would be an efficient and helpful in this litigation in that both parties could rely on the experts' opinions and expertise. *See Johnson v. Lindon City Corp.,* 405 F.3d 1065, 1069 (10th Cir. 2005)("[W]here a party assumes a certain position in a legal proceeding, and succeeds in

---

[3] Plaintiffs and Plaintiff Intervenors also charge that CHC's letter marked as Exhibit A "contains several incorrect citations, erroneously states that a number of cases stand for propositions that the cases do not not actually support, and also contains misstatements of fact [but] [b]ecause it is not a pleading, those statements are evidently not subject to Rule 11 Sanctions." [Doc. 953 at p.4, n.4.] The Court finds this unsupported accusation against CHC troubling, especially in light of the fact that Plaintiffs and Plaintiff Intervenors argue the inapplicability of possible privileges in their Motion and nothing but the merits of the self critical analysis privilege claimed by CHC in their Reply, and never mention the alleged misrepresentations made by counsel for CHC.

maintaining that position, he may not thereafter, simply because his interest have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.")(quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)).

Plaintiffs and Plaintiff Intervenors' only response to Defendants' argument of judicial estoppel is that they owe a duty to their clients to monitor the Defendants' compliance efforts and this duty did not stop with the appointment of the experts. [Doc. 953 at p. 10.] They argue that they must ensure that "relevant and accurate information is provided to the experts." [*Id.* ]

The Court finds Plaintiffs and Plaintiff Intervenors argument that they should monitor the flow of information to the experts disingenuous.  They are suggesting that the experts they recommended and requested are not, or cannot, adequately perform their Court appointed functions.  The experts were appointed with the specific directions to evaluate MDC, the provisions of medical services to class and sub-class members, and mental health care services at MDC. [Doc. 909.]  There is nothing before the Court to suggest that they are not doing their jobs.  Furthermore, Plaintiffs and Plaintiff Intervenors have access to all the primary documents that are available to the experts.  They can meet with the experts if they believe there are systemic problems or lack of access to reports and documents of which the experts are not aware so that the experts can take action if they deem it necessary.

Finally, Plaintiffs and Plaintiff Intervenors present no concrete evidence to suggest that CHC is withholding information from or not cooperating fully with the Court appointed experts. As Defendants state, "the biggest problem with Plaintiffs and Plaintiff Intervenors [arguments] is in its inherent assertion that the experts are not competent to conduct evaluations without Plaintiffs and Plaintiff Intervenors." [Doc. 950 at p. 9.]

**IT IS THEREFORE ORDERED** that Plaintiff and Plaintiff Intervenors' Joint Motion

for Enforcement of Interim Order Regarding Access to the MDC [Doc. 945], is hereby by

**DENIED**.

_____
**ALAN C. TORGERSON**
**United States Magistrate Judge**