### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

**JIMMY (BILLY) McCLENDON, et al.,**

     **Plaintiffs,**

**vs.**                                                                 **Case No. 95 CV 024 JAP/ACT**

**CITY OF ALBUQUERQUE, et al.,**

     **Defendants.**

**vs.**

**E.M., R.L., W.A., D.J., P.S., and N.W.,**

**on behalf of themselves and all others similarly situated,**

     **Plaintiff-Intervenors.**

### MEMORANDUM OPINION AND ORDER
### DENYING MOTION FOR TRIAL ON THE MERITS

     Defendant Bernalillo County Board of Commissioners (the County) asks the Court to direct the parties to proceed to trial on the merits in this 19 year old case. *See* COUNTY DEFENDANT'S MOTION FOR TRIAL ON THE MERITS (Doc. No. 1099) (the Motion). Plaintiffs and Plaintiff Intervenors contend that early in the case the parties agreed to settlements that were adopted into remedial orders that remain enforceable. *See* PLAINTIFFS' AND PLAINTIFF-INTERVENORS' JOINT RESPONSE TO COUNTY DEFENDANT'S MOTION FOR TRIAL ON THE MERITS (Doc. No. 1108) and ERRATA AND CORRECTION TO DOC.

NO. 1108 (Doc. No. 1109) (together the Response). [1] The Court agrees with the Plaintiffs and

Plaintiff Intervenors and will deny the Motion.  Early in the case, the parties chose to settle most

of the claims and improve conditions at the County's jail facilities.  The Court adopted those

settlements as remedial orders, entered a judgment, and entered subsequent enforcement orders.

Therefore, a trial on the merits of the original Complaint is unnecessary.

## I.  BACKGROUND

A. <u>Complaint, Initial Settlements, and Final Judgment 1995 to 1997</u>

On January 10, 1995, Plaintiffs initiated this case alleging that Defendants, the City of

Albuquerque (City) and Bernalillo County, New Mexico (the County), operated the Bernalillo

County Detention Center (BCDC) in a manner that violated both the United States and New

Mexico Constitutions and federal and state statutory law. COMPLAINT (Doc. No. 1) at 3.  The

lengthy Complaint was divided into three parts: (1) overcrowding claims;[2] (2) constitutional

claims; and (3) individual claims. The City and the County (together, Defendants) operated the

BCDC under a Joint Powers Agreement.[3]

On August 23, 1995, the Court issued a Preliminary Injunction (Doc. No. 106) enjoining

Defendants from housing more inmates than the BCDC was designed to house (the design

capacity).  ORDER (Doc. No. 106).[4]  The Preliminary Injunction was based in part on the

stipulation by the City and the County that the average daily population at the BCDC exceeded

---

[1] In ruling on the Motion, the Court has also considered the County's REPLY IN SUPPORT OF COUNTY DEFENDANT'S MOTION FOR TRIAL ON THE MERITS (Doc. No. 1120) and the arguments presented at a hearing on the Motion held on April 4, 2014.
[2] The COMPLAINT alleged that over 1000 inmates were housed in the BCDC, which was designed to house 586 inmates.  Doc. No. 1 at 10 ¶ 3.18.
[3] Under the Joint Powers Agreement, the City and County were jointly responsible for funding the operation and maintenance of the BCDC. The City operated and maintained the BCDC, and the Mayor appointed the director of the BCDC, who submitted periodic budgets for the operation of the BCDC.
[4] Enforcement of the cap on BCDC's population at its design capacity was delayed for one year, until August 23, 1996. *Id.* at 12.

its design capacity. *Id.*  On September 7, 1995, Plaintiffs and Defendants entered into a settlement agreement in which Defendants agreed to convert the August 23, 1995 preliminary injunction into a permanent injunction with the Court retaining jurisdiction to enforce or modify the permanent injunction.  Doc. No. 115.  The September 7, 1995 settlement agreement was approved by the Court. Doc. No. 116.  The settlement agreement expressly resolved all claims in parts 1 and 2 of the Complaint. [5]

On October 26, 1995, Plaintiff-Intervenors, representing a subclass of prisoners with developmental or mental disabilities, intervened in the case. Doc. No. 137.  However, Plaintiff-Intervenors were allowed to intervene only on ". . . the claims raised in the original Plaintiff's Complaint and the . . . issues addressed in the Court's prior orders . . . ." *Id*. at 2.  Plaintiff-Intervenors alleged Defendants violated their rights under the Constitution, Title II of the Americans With Disabilities Act (42 U.S.C. § 12101 et seq.) (ADA), and the Rehabilitation Act (RA) (29 U.S.C. §§ 701 et seq.).[1] Doc. No. 150. On November 5, 1996, the Court entered an ORDER CERTIFYING A CLASS (Doc. No. 257) describing the class as "all persons presently confined in the [BCDC] . . . or who may/will be so confined in the future . . ."  *Id.* at 1.

On April 26, 1996, Congress enacted the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (codified as amended in several titles and sections of U.S.C. including 18 U.S.C. § 3626 and 42 U.S.C. § 19979e) (the PLRA). The PLRA imposed specific requirements regarding prospective relief in all prison conditions cases, whether the relief was ordered prior to

---

[5] "Plaintiffs dismiss with prejudice all allegations in 'Parts I and II'" SETTLEMENT AGREEMENT (Doc. No. 115) at 2.  "The Defendants acknowledge that the permanent injunction is a resolution of 'Parts I and II' of the Complaint . . ." *Id.*

[1] The Court will refer to the ADA and the RA collectively as the ADA because the standards for granting relief are essentially the same under both statutes. *Montez v. Romer*, 32 F. Supp. 2d 1235, 1239 (D. Colo. 1999) (citing *Patton v. TIC United Corp.*, 77 F.3d 1235, 1245 (10th Cir.), *cert. denied*, 518 U.S. 1005 (1996) ("As a general matter, courts have construed the [RA] and the [ADA] similarly.")).

or after its enactment, and the PLRA allowed termination of existing remedial orders in prison conditions cases. 18 U.S.C. § 3626.[6]  After the PLRA was enacted, the City and County moved to terminate the remedial orders entered in 1995 and 1996.  However, the termination motion was resolved in the next round of settlement agreements.

In November 1996, the Court approved two settlement agreements, which the Court adopted as consent decrees.  The first settlement agreement was executed by Plaintiffs, Plaintiff-Intervenors, the City, and the County and was adopted by the Court in the ORDER REGARDING THE PRISON LITIGATION REFORM ACT (Doc. No. 255) (the PLRA Order). In the PLRA Order, the Court found that "violations of one or more federal rights of BCDC residents ha[d] occurred at BCDC." *Id.* at 1.  The PLRA Order acknowledged that the Defendants agreed to file "no motion in the future asserting that this Settlement Agreement should be terminated based upon the provisions of the PLRA." *Id.* at 6 ¶13.

The second settlement agreement was executed by Plaintiff-Intervenors, the City, and the County and was adopted by the Court in the ORDER (Doc. No. 256) (the 1996 Order).  In the

---

[6] The PLRA provides

> [p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1).  The PLRA also allowed parties to move to terminate injunctive relief that had been ordered prior to its enactment:

> In any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener-- . . . in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act, 2 years after such date of enactment.

18 U.S.C. § 3626(b)(1)(iii).

1996 Order, the Court found that "violations of one or more federal rights of subclass members have occurred at BCDC." *Id.* at 1.  The 1996 Order contained a stipulation by the parties that some of the BCDC residents were not afforded "reasonable accommodations for their disabilities." *Id.* at 7. In the 1996 Order, the Court required Defendants to implement remedial measures designed to address the needs of inmates with mental and developmental disabilities or mental illness, particularly with regard to the diagnosis and treatment of those inmates. *Id.* at 8-17.

On January 10, 1997, the Court held a fairness hearing on the 1996 settlements under Fed. R. Civ. P. 23(e). On August 12, 1997, the Court entered the CORRECTED ORDER APPROVING COMPROMISE & SETTLEMENT AGREEMENT & FINAL JUDGMENT OF DISMISSAL WITH PREJUDICE (Doc. No. 289) (the 1997 Judgment) approving the two November 1996 settlements and dismissing with prejudice all claims except the Plaintiff Intervenors' claims regarding equal protection and access to the courts asserted on behalf of female subclass members. *Id.* at 5.  The 1997 Judgment contained the findings required by the PLRA, and the Court retained jurisdiction to enforce the 1996 settlement agreements. *Id.* at 8-10.

B.  Management of the Inmate Population and Conditions: 1997 to 2003

Between 1997 and 2003, despite efforts made by the County to reduce the inmate population, the BCDC continued to be overcrowded.  On September 25, 2000, the Court entered an Order (Doc. No. 315) finding that the Defendants had been in violation of the population cap imposed in the PLRA Order for eleven of the preceding twelve months and that the population at the BCDC at times approached the dangerously high population that existed at the time of the August 23, 1995 preliminary injunction.  The Court noted that the Defendants employed various

means to bring the population down including "building an interim westside facility, asking law enforcement agencies to issue citations rather than incarcerating people whenever appropriate . . . subsidizing the cost of Pre-Trial Services . . . paying for Saturday Metropolitan Court arraignments . . . and renting beds in out-of-county jails." *Id.* at 3.  The Court noted, "[t]here are approximately 1700 individuals incarcerated in BCDC's main facility, westside facility and satellite facility. . . . The new Metropolitan Detention Center, currently under construction, will not be ready to house inmates before October, 2001. " *Id.*  The Court ordered Defendants to comply with the PLRA Order, and to provide what was necessary for the appointment of one or more pro tem judges with the authority and responsibility to "a) utilize a 'judicial classification system' . . .; b) process probation and parole violators as expeditiously as possible; c) handle failure to appear warrants more expeditiously; d) issue orders to the Department of Corrections (DOC) to transport inmates to the local DOC facility for transport to court; and e) consider and implement other measures . . . to reduce the population of BCDC."  *Id.* at 4.

On June 27, 2001, the Court entered a SUPPLEMENTAL ORDER TO ENFORCE PREVIOUSLY ORDERED POPULATION LIMITS AT THE BCDC FACILITY (Doc. No. 319) requiring that Defendants direct law enforcement officials ". . . to issue citations . . . and to use 'walk through procedures,' rather than incarcerating individuals . . ." *Id.* at 5.  The Court also ordered the parties to hold meetings with counsel for both parties, court officials, probation and parole officials, representatives of the district attorney's office and the public defender's office.  In those meetings, the participants were to "plan how to reduce the number of incarcerated individuals at BCDC . . . plan how to include persons who do not have both a permanent address and a telephone in the Community Custody Program . . . plan how to implement an effective jail diversion program for persons with psychiatric or developmental

disabilities [and] . . . plan how to expand the program for early resolution of criminal cases." *Id.* at 5-7.

On January 31, 2002, the Court entered a STIPULATED AGREEMENT (Doc. No. 361) in which the Court continued to enforce a population cap on the number of inmates at the BCDC. *Id.* at 1.  The Court also ordered Defendants: 1) to make available a certain number of beds for female inmates at the BCDC annex; 2) to reopen BCDC section "3 Southwest" to house female residents; 3) to use BCDC section "5 Southwest" as a women's Psychiatric Services Unit; 4) to use BCDC "5 East" exclusively for alcohol and drug watches; 5) to clear all female inmates from the satellite facility; 6) to house men at the satellite facility; 7) to use all population management tools to achieve the population cap; and 8) to provide a full time benefits manager. *Id.* at 1-2.

C.   Metropolitan Detention Center Opens in 2003

In the summer of 2003, construction of the new 2100-bed Metropolitan Detention Center (MDC) was completed.  By June 17, 2003, all inmates housed at the BCDC had been transferred to the MDC.  Soon thereafter, class and subclass counsel, who had monitored the conditions at the BCDC, were restricted from monitoring conditions at the MDC.  On June 27, 2003, Plaintiffs and Plaintiff Intervenors moved for a temporary restraining order and a preliminary injunction to allow counsel to access the MDC and its inmates. Doc. No. 409.  The City and County opposed the motion arguing that the class and subclass were defined as inmates detained at the BCDC, and the remedial orders governed only the population and conditions at the BCDC. Doc. No. 411.  The City and County, through the affidavit of MDC Director Harry Tipton, represented that the BCDC "no longer houses inmates. The BCDC is being licensed to Cornell Corrections Corp. [sic], which intends to renovate the building and house federal prisoners pursuant to a contract

with the United States government."  Doc. No. 411 Ex. A.  On July 11, 2003, the Court granted

the motion and ruled that previous orders applied to the MDC and that the Court had continuing

jurisdiction to enforce those orders. Doc. No. 416.

     D.  <u>Metropolitan Detention Center Governed by the PLRA Order</u>

     In a July 11, 2003 MEMORANDUM OPINION AND ORDER (Doc. No. 416), the Court

held that the settlement agreements adopted in the PLRA Order, the 1997 Judgment and

subsequent remedial orders, in addition to the factual circumstances, "persuade this Court that it

has continuing jurisdiction in this matter." *Id.* at 5.  The Court began with an analysis of the

language used by the parties in the settlement agreements adopted by the Court in the PLRA

Order (Doc. No. 255).  The Court determined that the parties "did not intend for the settlement

agreement set forth in the PLRA Order to be limited to the BCDC facility or to terminate upon

the opening of a new permanent facility, but rather intended that the agreement remain in effect

and apply wherever individuals incarcerated by Defendants are housed."  *Id.* at 7.  Moreover, the

Court concluded that in the PLRA Order, "the parties did not intend to limit, for purposes of the

class and the sub-class definitions or otherwise, the term 'BCDC' to a particular facility, but

rather intended that term to apply to the jail system as a whole." *Id.*  However, the Court found

that the 1996 Order (Doc. No. 256), memorializing the settlement agreement between

Defendants and Plaintiff Intervenors, did not apply to the MDC under its express language.  *Id* [7]

In addition to the PLRA Order, the Court examined the language used by the parties in

subsequent stipulated orders as evidence that the parties intended the remedial relief to extend to

all jail facilities operated by Defendants.  For example, in the Order (Doc. No. 315) entered on

September 25, 2000, the Court concluded that Defendants had violated the PLRA Order based on

---

[7] The Order stated, "this Settlement Agreement shall not apply to any permanent facility opened after the opening of
the interim facility on the Westside."  The parties agreed that the MDC was the permanent facility to which the
Order referred.  *Id.* at 17.

the total number of individuals "incarcerated in BCDC's main facility, westside facility, and satellite facility" and based on the Court's recognition that the "new Metropolitan Detention Center, currently under construction, w[ould] not be ready to house inmates before October, 2001." *Id.*at 3.  The Court reasoned that this provision, along with other provisions of the PLRA Order and subsequent remedial orders, involved actions by Defendants that affected more than conditions inside the physical BCDC facility. For example, the Court noted that the total inmate population was affected by certain law enforcement policies, under which individuals were incarcerated for petty offenses when a citation without incarceration could have been issued. Moreover, the Court required Defendants to control the population of BCDC by using the Community Custody Program as an alternative to incarceration.  The Court properly recognized that the previous remedial orders addressed conditions that were not site-specific, such as, medical care, access to the judicial system, transportation to court, staff training, and benefits for inmates.  *Id.* at 10.  The remedial orders concerned not just the physical conditions at the BCDC but also the treatment of inmates housed there, which implicated policies and procedures used by Defendants in all jail facilities.

The Court's conclusion was similar to the conclusion in *Camden County Inmates v. Parker*, 123 F.R.D. 490 (D. N.J. 1988).  *Parker* involved a decade-long case in which the court had entered consent decrees to govern inmate population and jail conditions in Camden County, New Jersey.  After the county built and began operating a new jail facility, the court *sua sponte* issued an order to show cause to determine whether its subject matter jurisdiction to enforce previous consent decrees had lapsed. *Id.* at 494.  The court recognized that, in the original complaint, the plaintiff class challenged not only the physical conditions at the jail but also the "practices and procedures of the defendants." *Id.* at 498.  The court also noted that the consent

decrees were not solely "directed at the physical stones of the old jail, . . . but at the policies through which these defendants operated the jail facilities." *Id.* at 499 (quoting *Campbell v. McGruder*, 580 F.2d 521, 544 (D.C. Cir. 1978)).  The court ruled that the scope of the pleadings and the terms of the consent decree with respect to jail operations meant that the court's power was not limited to the original jail facility.  *Id.* "Although construction of a new jail is relevant in fashioning an appropriate remedy for constitutional violations that may exist . . . and although the new facility may temporarily eliminate problems such as overcrowding; the new structure itself may merely provide new housing for problems that were present at the old jail."  *Id.* at 500. The court concluded that it was within "the broad equitable power of this Court to enforce the [consent decree] as it applies to the policies, procedures, and practices of the county defendants at the new jail." *Id.*

In *Cooper v. Noble*, 33 F.3d 540 (5th Cir. 1994), a case involving a jail in Madison County, Mississippi, county officials moved for relief under Rule 60(b) a decade after a final judgment was entered. The officials argued that the construction of a new jail rendered the judgment obsolete and inapplicable to the new facility. *Id.* at 542.  The District Court denied the Rule 60(b) motion.  *Id.* at 541.  The Fifth Circuit upheld the lower court's determination that the county failed to show that changed factual conditions made compliance with the judgment substantially more onerous, that the judgment became unworkable because of unforeseen obstacles, or that enforcement of the judgment would be detrimental to the public interest.  *Id.* at 544.

In 2003, this Court recognized its equitable power to enforce the PLRA Order and subsequent remedial orders beyond the BCDC facility. Despite the passage of time and the

opening of the new facility, the Court determined it had ". . . continuing jurisdiction to monitor conditions of confinement of the class and sub-class members at the MDC facility." *Id.* at 15.

### E. MDC Stipulated Settlement Agreements: 2005 to 2009

On October 10, 2003, the City and County moved to vacate the PLRA Order and the 1997 Judgment under Fed. R. Civ. P. 60(b)(5) and (6). The City and County asked the Court to reconsider its decision to extend its jurisdiction over the MDC reiterating their argument that the 1996 PLRA Order, and the 1997 Judgment were site-specific and could not be applied to the MDC. Doc. No. 421 at 1. However, while the motion was pending, the parties entered into two settlement agreements, which the Court adopted as remedial orders. The Plaintiffs, the City and the County entered into a STIPULATED SETTLEMENT AGREEMENT BETWEEN PLAINTIFFS AND DEFENDANTS (Doc. Nos. 480; 515) (Plaintiffs' SSA).[8] The Plaintiff Intervenors, the City and the County entered into a STIPULATED SETTLEMENT AGREEMENT BETWEEN PLAINTIFF INTERVENORS AND DEFENDANTS (Doc. No. 514) (Plaintiff Intervenors' SSA). Both the Plaintiffs' SSA and the Plaintiff Intervenors' SSA (together the 2005 SSAs) were expressly limited to conditions at the MDC. The stated purpose of the Plaintiffs' SSA was to "maintain and improve the conditions at the [MDC] for the benefit of the Defendants, their employees, agents and staff and for the benefit of the Plaintiff class." Plaintiffs' SSA at 2. The stated purpose of the Plaintiffs Intervenors' SSA was to "describe conditions both parties wish to see maintained or improved at the [MDC] . . . ." Plaintiffs Intervenors' SSA at 2.

---

[8] The same settlement agreement between Plaintiffs and Defendants is docketed as Doc. No. 480 and also as Doc. No. 515. The latter docket entry occurred after a fairness hearing on June 30, 2005.

In the Plaintiffs' SSA, the parties agreed that it "supersede[d] all previous Orders which pertain to Plaintiffs and Defendants." Plaintiffs' SSA at 7.  In the Plaintiff Intervenors' SSA, the parties stipulated that the "Stipulated Settlement Agreement replaces in its entirety the November 5, 1996 Order entered between the Defendants and Plaintiff Intervenors (doc # 256)." Plaintiff Intervenors' SSA at 2.  Both the Plaintiffs' SSA and the Plaintiff Intervenors' SSA contained the promise that Defendants would not file a motion to terminate the agreement under the PLRA. Plaintiffs' SSA at 7; Plaintiff Intervenors' SSA at 2.  On June 30, 2005, after a hearing, the Court approved and adopted both 2005 SSAs. Doc. No. 513 (minutes of hearing).

In October 2003, after all inmates were moved out of the BCDC, the County leased the facility to Cornell Companies, Inc. (Cornell).  The lease agreement required Cornell to remodel and operate the facility under the name the Regional Corrections Center (RCC).[9]  The lease provided that the County would secure an Inter-Governmental Agreement (IGA) with the federal government for the housing of federal inmates at the RCC.  The lease agreement stated that Cornell and the County would enter into a management agreement governing the operation of the RCC.  In June of 2004, the County and Cornell entered into an Operating and Management Agreement[10] regarding conditions of confinement and Cornell's operation of the RCC as a detention center. The Operating and Management Agreement specified operational standards that covered many aspects of the RCC's daily operations, including staffing, training, record keeping, medical care, food service, laundry, telephone service, inmate work, discipline, grievance procedures, and the use of force. Doc. No. 543-2 at 7-19. According to the Plaintiffs and Plaintiff Intervenors, prior to the Court's approval of the 2005 SSAs, the County misrepresented the fact

---

[9]  The Lease Agreement is part of the Court's record as an exhibit to PLAINTIFFS' MOTION TO PERMIT COUNSEL TO VISIT MCCLENDON CLASS MEMBERS HOUSED AT THE REGIONAL CORRECTIONAL CENTER OR ANY OTHER FACILITY (Doc. No. 543-4).
[10]  The Operating and Management Agreement is part of the Court's record. *Id.* Ex. A (Doc. No. 543-2).

that it had an IGA with the federal government and that the County essentially had operational control of the RCC under the Operating and Management Agreement.

In June, July, and August 2007, the Plaintiffs and Plaintiff Intervenors filed motions to permit counsel to visit class and subclass members housed at the RCC. Plaintiffs and Plaintiff Intervenors filed a joint motion asking the Court to order the County[11] to show cause why it should not be held in contempt of Court for violating all previous orders (Doc. Nos. 555 and 562) and for misrepresenting the County's arrangement with Cornell regarding the operation of the RCC. Doc. Nos. 543 and 548.[12]

In December 2007, the Court *sua sponte* issued an order requiring the County to show cause why the Court should not withdraw its approval of the 2005 SSAs. Doc. No. 600. The Court noted that prior to its approval of the 2005 SSAs, the Defendants led the Court to believe that Cornell, and not the County, had the agreement with the federal government to house detainees at the RCC. Specifically, the County represented that the "RCC had been leased to Cornell Companies, Inc., who planned to renovate the facility and use it to house federal detainees pursuant to a contract with the United States." *Id.* at 2. The Plaintiffs and Plaintiff Intervenors alleged that they agreed to restrict the coverage of the 2005 SSAs to the MDC based on the representation that the BCDC facility would not be operated as part of the County's jail system. The Court also noted that in addition to federal detainees, the County housed overflow inmates from MDC at the RCC until July of 2007, when Cornell asked the County to remove the inmates. *Id.* n. 3. More importantly to the Court, the County had entered into the contracts with the federal government and Cornell prior to the hearing on the approval of the 2005 SSAs, "but

---

[11] In 2003, the MDC was operated by both the City and the County. In July 2006, the City turned over control of the MDC to the County. The County alone was involved in the operation of the RCC as owner of the property.
[12] The July 2007 and the August 2007 motions were denied without prejudice on March, 28, 2008. Doc. No. 652.

did not inform the Court or the other parties of its role in housing detainees at RCC at th[e] hearing." *Id.* at 4.  The Court averred that if it had known the nature of the arrangement among the County, Cornell and the federal government, the Court would not have approved the 2005 SSAs because "the settlement agreements did not cover a significant portion of the defined class and subclass—those detainees being housed by Bernalillo County at RCC." *Id.* at 4.  Plaintiffs and Plaintiff Intervenors asked the Court to equitably modify the 2005 SSAs to apply to "every facility in which subclass members are detained by Defendants, including the old BCDC facility." Doc. Nos. 620 at 2-3; 622.  Defendants opposed any change to or cancellation of the 2005 SSAs and denied making any misrepresentation. Doc. Nos. 639 and 640.

On March 31, 2009, the Court issued a MEMORANDUM OPINION AND ORDER (Doc. No. 699) in which the Court determined that inmates at the RCC were potential class and subclass members because the County had maintained operational control over the RCC.  The Court opted not to allow modification of the 2005 SSAs, as requested by Plaintiffs and Plaintiff Intervenors, but instead allowed the Plaintiffs and Plaintiff Intervenors to rescind the 2005 SSAs.

In April 2009, the Plaintiffs and Plaintiff Intervenors rescinded the 2005 SSAs.  On April 24, 2009, the County appealed the March 31, 2009 ruling, but the appeal was dismissed. *McClendon v. City of Albuquerque*, 630 F.3d 1288 (10th Cir. 2011).

On May 18, 2009, United States District Judge Martha Vazquez recused from the case. On May 19, 2009, Senior United States District Judge James A. Parker was assigned to the case.

F.  <u>Post-Rescission: May 2009 to the present</u>

On July 13, 2009, Plaintiffs and Plaintiff Intervenors, citing continued limitations on counsels' access to class and subclass members at the MDC, filed a motion to allow counsel

access to the MDC for monitoring purposes.  District Judge Parker and Magistrate Judge Alan C. Torgerson held a hearing on July 20, 2009 and instructed the parties to meet with Magistrate Judge Torgerson and produce an agreed order regarding access to the MDC. Doc. No. 739 (minutes).  On September 17, 2009, Magistrate Judge Torgerson entered the INTERIM ORDER REGARDING ACCESS TO THE MDC (Doc. No. 754) (Interim Order).  On February 1, 2010, the Court adopted the Interim Order over objections. Doc. No. 768.

On January 27, 2011, asserting that the RCC was being operated as part of the County's jail system, Plaintiffs and Plaintiff Intervenors filed a Joint Motion to Enforce the March 31, 2009 Order and allow counsel access to the RCC, asserting that the Court had jurisdiction to enforce the order despite the County's appeal. *See* Doc. No. 822.  The parties restarted settlement discussions over the next several months.  In April 2011, all inmates were moved out of the RCC, and the RCC was closed. The Court denied the Joint Motion to Enforce the March 31, 2009 Order without prejudice as moot. Doc. No. 844.

On July 7, 2011, Plaintiffs and Plaintiff Intervenors filed a Joint motion to appoint the three experts who had monitored the MDC under the 2005 SSAs.  Doc. No. 849.  The three experts were Dr. Timothy Greifinger, an expert on inmate medical care, Dr. Jeffrey Metzner, an expert on inmate mental health care, and Manuel Romero, an expert on prison conditions.  On July 11, 2011, the County moved to reinstate the 2005 SSAs.  Doc. No. 851.  On December 7, 2011, the Court appointed the three experts under Fed. R. Evid. 706 and asked the experts to evaluate conditions at the MDC based on the standards imposed by the 2005 SSAs.[13] Doc. No.

---

[13] The Court specifically stated that it was not ratifying or reinstating the 2005 SSAs and that the experts' use of the 2005 SSAs, under which the experts had previously evaluated the MDC, was for the initial evaluation only. *See* Doc. No. 909 at 2.

909.  On May 3, 2012, the Court denied without prejudice the County's motion to reinstate the 2005 SSAs.  Doc. No. 938.

On February 26, 2013, after receiving reports from the three experts on conditions at the MDC, which had become dangerously overcrowded, the Court issued an ORDER TO SHOW CAUSE (Doc. No. 981).  In the February 26, 2013 Order to Show Cause, the Court ordered the City and the County to appear in court on March 28, 2013 and show cause why the MDC should not cease ". . . housing female residents, who have not been classified or who have different classifications, in the same Segregation housing unit."  *Id.* at 2.  On the date of the hearing, the parties agreed to alter the conditions for female inmates at MDC and the agreement was adopted by the Court in the ORDER VACATING ORDER TO SHOW CAUSE (Doc. No. 989).  The County agreed 1) to continue housing female inmates assigned to administrative segregation in at least two separate housing units; 2) to cease triple celling all female segregation inmates; 3) to allow all female inmates at least one hour out of cell per day; 4) to cease double celling female inmates who are classified as high risk, security threats, seriously mentally ill, disciplinary, or reclassification unless found compatible using a reliable classification tool; 5) to implement a pre-classification triage system to separate violent from non-violent female inmates; 6) to cease housing unclassified female inmates with female inmates who are in segregation; and 7) to consult with Mr. Romero in operating the female segregation units so as not to expose those inmates to an unreasonable risk of harm. *Id.* at 1-2.

On April 19, 2013, the Court issued another ORDER TO SHOW CAUSE (Doc. No. 995) based on the experts' reports and on information gained from Magistrate Judge Torgerson regarding ongoing issues at the MDC, as well as on information gained from tours of the MDC. In this Order to Show Cause the Court specifically found: 1) that problems at MDC have

persisted for a long time, 2) that the health and safety of inmates can be significantly improved by better management practices, 3) that improved management practices would reduce the cost of litigating emergency motions for reductions in inmate population and for other remedial relief, and 4) that the interests of all parties are served by improving the health and safety of MDC inmates.  *Id.* at 2.  The Court ordered the County to appear on May 22, 2013 and show cause why it should not present a written plan on or before July 1, 2013: 1) to cease triple celling of inmates at MDC no later than August 1, 2013; 2) to cease by September 1, 2013, the double celling of inmates requiring segregation with other inmates in protective custody, unless those inmates are deemed compatible using a reliable classification tool; 3) to present a plan, in collaboration with Mr. Romero, for the reduction of the inmate population at MDC; 4) to cease, no later than August 1, 2013, housing female inmates with different classifications in the same segregation unit; 5) to implement a pre-classification triage system, as recommended by the National Institute of Corrections (NIC), to separate inmates who have committed acts of violence from inmates who have not; 6) to cease, no later than August 1, 2013, housing unclassified inmates with inmates who require segregation; 7) to provide appropriate specialized mental health treatment for both female and male inmates who are segregated; 8) to hire the appropriate number of staff to ensure adequate numbers of corrections officers and case managers for each housing pod; and 9) to hire a full time employee who has substantial and appropriate experience in establishing community-based alternatives to incarceration. *Id.* at 3-4.  On May 22, 2013, the parties presented a settlement agreement to the Court in the form of an ORDER RESOLVING ORDER TO SHOW CAUSE (Doc. No. 1004) in which the County represented that by July 1, 2013, it would draft a plan addressing the nine matters described above and that it would timely implement the plan by the certain dates. The ORDER VACATING ORDER TO SHOW CAUSE

(Doc. No. 989) and the ORDER RESOLVING ORDER TO SHOW CAUSE (Doc. No. 1004) will be referred to as the 2013 Stipulated Orders.

On August 8, 2013, the Court held a hearing on another ORDER TO SHOW CAUSE (Doc. No. 1015) issued on July 24, 2013.  The order to show cause required the County to show cause with respect to three matters.  First, the County was required to show how a letter dated July 1, 2013 and written by the County's counsel, Jeffrey Baker, fulfilled the requirement of a plan required by the Order Resolving the Order to Show Cause (Doc. No. 1004).  Second, the Court required the County to show cause why it should not be held to have violated the Order Vacating Order to Show Cause (Doc. No. 989).  Third, the Court ordered the County to show cause why it should not be fined a substantial amount of money for every day that it is in violation of the April 19, 2013 Order to Show Cause (Doc. No. 995).  At the hearing, the Court heard from Mr. Baker about the difficulties the County was having implementing the 2013 Stipulated Orders.  Those difficulties were driven by the County's inability to meet the deadline for population reduction by housing some inmates in facilities outside of Bernalillo County.  Mr. Baker also indicated that, although the County allocated money to house inmates out of county temporarily, the County would not be able to allocate funds indefinitely to house inmates in outside facilities.  Mr. Baker expressed hope that during the time inmates would be housed out of county, the County could implement other population reduction measures, such as the expansion of the Community Custody Program and the pre-trial supervision of detainees without incarceration.  It became clear at this hearing that the County did not timely comply with the 2013 Stipulated Orders in several areas.  The Court specifically found that the County failed to present an adequate plan as required in the Order Resolving the Order to Show Cause (Doc. No. 1004).  Moreover, the Court noted that it needed proof of the amount required to compensate

class and subclass members for the County's failure to meet the deadlines imposed in the 2013 Stipulated Orders.  In the alternative, the Court needed evidence of an amount of monetary sanctions necessary to coerce the County to fully comply with the 2013 Stipulated Orders.

On August 19, 2013, Plaintiffs and Plaintiff Intervenors filed a Joint Motion for Contempt arguing that the County failed to comply with the 2013 Stipulated Orders. Doc. No. 1022.  On November 19, 2013 at the Court's request, Manuel Romero submitted a report outlining each item in the 2013 Stipulated Orders along with his assessment as to whether the County was or was not in compliance with each requirement.  A hearing was held on November 20, 2013 at which the Court heard arguments on Mr. Romero's itemized report.  Mr. Romero reported that, although the County had complied with various items, the County did not timely comply with several items.  As to some items, the County was technically compliant, but the County could not sustain the compliance long term because the population reduction was dependent on continued funding to lease space in out of county facilities. The Court ordered the parties to meet and confer and submit stipulations on the status of the County's compliance with each item and the dates on which that compliance was reached.  Another hearing on the Joint Motion for Contempt is scheduled on April 29, 2014.

## II. STANDARD FOR REVIEW

Although styled as a motion asking the Court to set a trial on the merits, the Motion actually seeks a ruling on whether previous orders are enforceable after the rescission of the 2005 SSAs.  To determine the enforceability of previous final orders, the Court is guided by Rule 60(b).  *Compare Stewart v. Beach*, 701 F.3d 1322, 1329 (10th Cir. 2012) (noting that district courts generally remain free to reconsider earlier interlocutory orders) *and Rufo v. Inmates of*

*Suffolk County Jail*, 502 U.S. 367 (1992) (applying Rule 60(b) as standard for altering or setting

aside final remedial orders).  Rule 60(b) allows a court to relieve a party from a final judgment,

order, or proceeding if "(5) . . .applying [the judgment] prospectively is no longer equitable[.]

Fed. R. Civ. P. 60(b)(5).

## III. DISCUSSION

### A. Effect of 2009 Rescission of the 2005 SSAs

#### 1. 1996 and 1997 Order and Judgment Are Enforceable

At the heart of this controversy is the County's contention that after the rescission of the 2005

SSAs there was no enforceable final order or judgment governing this case. The Plaintiffs and

Plaintiff Intervenors contend that this case has been in a post-judgment phase since the parties

entered into settlement agreements that were adopted by the Court in 1996 and 1997 in remedial

orders and a judgment, despite the rescission of the 2005 SSAs.  Their dispute requires the Court

to determine whether, after the 2005 SSAs were rescinded, the PLRA Order, the 1996 Order, and

the 1997 Judgment, along with the subsequent remedial orders, including the 2013 Stipulated

Orders, remain enforceable.  If those orders and judgment are enforceable, the Court may

disregard those final orders only if the County carries its burden under Rule 60(b).   Thus, the

Court may grant the County's request for a trial only if the Court determines that, when the 2005

SSAs were rescinded, the previous orders entered from 1996 to 2005, and orders entered

subsequent to the 2009 rescission, are no longer enforceable against the County.

The County contends that the orders in effect prior to the 2005 SSAs, particularly the

PLRA Order, the 1996 Order, and the 1997 Judgment, cannot be enforced at the MDC because

those orders and judgment were tailored to conditions at the BCDC.  The County lists numerous

site-specific provisions in the orders and judgment, particularly the provisions imposing numerical population caps which clearly cannot be applied to the MDC as written.  The County further contends that none of the orders specifically declare that the MDC is in violation of the Constitution or any other federal law, which is required for remedial relief under the PLRA.[14] The Plaintiffs and Plaintiff Intervenors assert that several provisions of the orders and judgment can be applied to the MDC with minor revisions and that the County has not met its burden under Rule 60(b) to set those orders aside.[15]

Plaintiffs and Plaintiff Intervenors point out that the Court has already determined that the MDC can be governed by the provisions of the PLRA Order, the 1997 Judgment, and subsequent remedial orders.  Under the Court's 2003 MEMORANDUM OPINION AND ORDER (Doc. No. 416), the Court specifically ruled that the PLRA Order, the 1997 Judgment, and subsequent remedial orders were enforceable against the City and the County and the operation of all jail facilities in the Bernalillo County jail system.[16]  Prior to the Court's 2003 decision, the County argued, as it argues here, that the 1996 PLRA Order, the 1997 Judgment and subsequent remedial orders could not be applied to the MDC because they were intended only to govern conditions at the BCDC.  The Court concluded that the PLRA Order remained "in effect despite the transfer of the class and the sub-class members to the MDC."  *Id.* at 11.  The Court rejected the County's argument in 2003, and the Court sees no reason to revisit that ruling. *Stewart v. Beach*, 701 F.3d 1322, 1329 (10th Cir. 2012) (noting that district courts generally

---

[14] *See* 18 U.S.C. § 3626(a)(1). Orders entered without the PLRA findings are enforceable until a motion to terminate is filed.  *See Baker v. Haun*, 333 F. Supp. 2d 1162, 1165-66 (D. Utah 2004) (adopting magistrate judge's decision concluding that 1992 injunction should be terminated as to the Wasatch Unit within the Utah State Prison). *Cf. Skinner v. Lampert*, 457 F. Supp. 2d 1269, 1276 (D. Wyo. 2006) (denying motion to terminate remedial injunction governing Wyoming state prison).

[15] Plaintiff Intervenors list several provisions in the 1996 Order that could be applied to the MDC; however, the 1996 Order expressly states that it will not apply to the MDC.

[16] The County did not appeal this ruling.

remain free to reconsider their earlier interlocutory orders).  Therefore, as the Court concluded in

2003, this Court "retains continuing jurisdiction to review, modify, and enforce" the PLRA

Order, the 1997 Judgment and the subsequent remedial orders.

By arguing that there are no orders governing the MDC, the County also ignores the

Court's recent 2013 Stipulated Orders directed to conditions at the MDC.  Those orders relieved

the County from the burden of two Orders to Show Cause and required the County to implement

specific improvements at the MDC, particularly in the area of population management, by

prohibiting "triple celling" and by limiting the double celling of certain inmates.  Although the

2013 Stipulated Orders do not contain the required PLRA findings, they are nevertheless

enforceable court orders.  The Court recognizes that the 2013 Stipulated Orders are terminable

under the PLRA, but only if the County moves to terminate them, and no motion to terminate has

been filed.[17]  However, even if the 2013 Stipulated Orders are terminable, the 1996 PLRA Order

and the 1997 Judgment remain enforceable against the County.  The 1996 PLRA Order contains

the finding that the County violated "one or more federal rights of BCDC residents." PLRA

Order at 1.  The 1997 Judgment contains the finding that "violations of one or more federal

rights of class and subclass members have occurred at BCDC."  1997 Judgment at 5.  The PLRA

Order and the 1997 Judgment are enforceable against the County in the operation of its jail

facilities, including the MDC.  *See supra Parker*, 122 F.R.D. at 499 (applying a remedial order to

new jail facility).

---

[17] *See* 18 U.S.C. § 3626(b)(2) (stating that prospective relief in a prison conditions case may be terminated if the relief was granted without the finding that the relief was narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right).  However, prospective relief is not terminable if the Court makes the written findings based on the record "that the prospective relief remains necessary to correct a current and ongoing violation of the Federal right, and that that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3). *See also Berwanger v. Cottey*, 178 F.3d 834, 838 (7th Cir. 1999) (Easterbrook, J.) (holding that statutory PLRA language in § 3626 (b)(1) that "relief shall be terminable" does not mean that a court must terminate an injunction and that a motion to terminate is required when subsection (b)(1) is read with subsection (e)).

## 2. The 2005 SSAs were not novations

In a related argument, the County contends that the 2005 SSAs were "novations" because the settlement agreements expressly extinguished all preexisting settlement agreements. According to the County, if the 2005 SSAs were novations, the rescission of the 2005 SSAs did not revive previous settlement agreements embodied in the pre-2005 remedial orders. The requirements for a novation are: 1) an existing, valid contract; 2) an agreement to a new contract; 3) a new valid contract; and 4) an extinguishment of the old contract by the new one. *Summit Properties, Inc. v. Pub. Serv. Co. of New Mexico*, 138 N.M. 208, 218, 118 P.3d 716, 726 (2005). "There must be a clear and definite intention on the part of all concerned that such is the purpose of the agreement, for it is a well-settled principle that novation is never to be presumed." *Id.* The County maintains that the 2005 SSAs meet all of the "novation" requirements and that the explicit language of the 2005 SSAs shows the parties' intent to replace all previous settlement agreements. The Plaintiff Intervenors' 2005 SSA (Doc. No. 515) stated, "[t]his Stipulated Settlement Agreement replaces in its entirety the November 5, 1996 Order entered between the Defendants and Plaintiff Intervenors (# 256)." Id. at 2. Plaintiffs' 2005 SSA stated, "[t]his Stipulated Settlement Agreement supersedes all previous Orders which pertain to Plaintiffs and Defendants." Doc. No. 516 at 7.

Plaintiff and Plaintiff Intervenors assert that the County's novation argument disregards an earlier finding by this Court in 2010 that, despite the rescission of the 2005 SSAs, Plaintiffs' and Plaintiff Intervenors' status as prevailing parties was unchanged, and they were entitled to an award of attorney's fees. *See* MEMORANDUM OPINION AND ORDER SETTING HOURLY RATES FOR PLAINTIFFS' ATTORNEYS ON WHICH PAYMENT OF FEES CAN BE

BASED (Doc. No. 813) at 10-11 (stating that despite rescission, Plaintiffs and Plaintiff

Intervenors were entitled to attorney's fees as prevailing parties).

Plaintiffs and Plaintiff Intervenors further contend that the pre-2005 settlement

agreements adopted by the Court as remedial orders are not governed solely by contract law.

Although contract law governs the enforcement of settlement agreements and the meaning of

their terms, it is Rule 60(b) that governs whether an order adopting a settlement agreement

should be set aside or modified.  Settlement agreements incorporated into court orders require a

parallel analysis: one which applies contract principles and one which applies doctrines for

vacating court orders adopting settlement agreements, i.e. consent decrees.  In *EEOC v. Safeway*

*Stores, Inc.*, 611 F.2d 795 (10th Cir. 1979) the Tenth Circuit explained:

> There are two channels through which a consent decree may later be modified.  Rule
> 60(b) allows for relief from a final judgment, order or proceeding upon a showing that
> "the judgment is void," that "it is no longer equitable that the judgment should have
> prospective application," or for "any other reason justifying relief." Fed. R. Civ. P.
> 60(b)(4), (5), (6).  In addition, a court of equity has continuing jurisdiction to modify a
> decree upon changed circumstances, even if the decree was entered by consent. *United*
> *States v. Swift & Co.*, 286 U.S. 106 (1932).  However, a court's power to modify is not to
> be lightly exercised to change the settled terms of a consent decree.

*Id.* at 798-99.  A consent decree "has the same force and effect for 60(b) purposes as a judgment

on the merits following trial." *Zimmerman v. Quinn*, 744 F.2d 81, 82 (10th Cir. 1984).

In *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), the United States

Supreme Court explained,

> A consent decree no doubt embodies an agreement of the parties and thus in some
> respects is contractual in nature. But it is an agreement that the parties desire and expect
> will be reflected in and be enforceable as a judicial decree that is subject to the rules
> generally applicable to other judgments and decrees.

*Id.* at 378.  The Plaintiffs and Plaintiff Intervenors convincingly argue that the County cannot

disregard the orders entered prior to the 2005 SSAs unless the County meets the burden imposed

under Rule 60(b).  The County contends that under Rule 60(b)(5) a consent decree can be set

aside "when it is no longer equitable that the judgment should have prospective application." *Id.*

at 383.  However, this rule requires the County to show "a significant change in circumstances

warrants a revision of the decree."  *Id. See also Zimmerman*, 744 F.2d at 82 (stating that the

Tenth Circuit requires a strong showing of changed circumstances before a stipulated judgment

may be modified under Rule 60(b)).  The County has failed to show that it is no longer equitable

to apply the pre-2005 remedial orders to the MDC, an argument that failed in 2003 as well.

Given the existence of remedial orders, the County has failed to convince the Court that a

trial is necessary to conclude this litigation.  The 2005 SSAs were not novations, but were

settlement agreements incorporated into Court orders containing specific findings and

conclusions that are enforceable as to the County's operation of the MDC.  The 1996 PLRA

Order, the 1997 Judgment, and the 2013 Stipulated Orders cannot be ignored or cast aside

without a showing under Rule 60(b) that it is no longer equitable to apply those orders to the

County's operation of the MDC. *Rufo*, 502 U.S. at 383.  The County has not made that showing.

### 3.   The Tenth Circuit's statements in its 2011 ruling are not binding

Next, the County points to a 2011 opinion issued by the Tenth Circuit Court of Appeals

that the County contends supports its argument that a trial should be held.  In that ruling, the

Tenth Circuit dismissed the County's appeal of the March 31, 2009 Order, which allowed

rescission of the 2005 SSAs, because the March 31, 2009 Order was not a final appealable order.

*See McClendon v. City of Albuquerque*, 630 F.3d 1288, 1293 n. 1 (10th Cir. 2011) (ruling that

order withdrawing approval of a class action settlement agreement did not qualify as a "final decision" and the court lacked jurisdiction to review the order).  The County argues that, although the Tenth Circuit dismissed the appeal for lack of a reviewable final order, the Tenth Circuit also expressed an opinion that the March 31, 2009 Order ". . . simply presses the reset button, *vacates any prior final decision*, and marks the case for renewed litigation."  *Id.* at 1290 (emphasis added).  According to the County, the Tenth Circuit essentially ruled that the March 31, 2009 Order vacated any prior final decision, including the 1996 PLRA Order and the 1997 Judgment.  In the Tenth Circuit, contrary to the County's current position, the County argued that the March 31, 2009 Order was final because prior orders in the case, particularly the 2005 SSAs and the 1997 Judgment, were final decisions. The Tenth Circuit rejected that argument: ". . . every post-judgment decision must be assessed on its *own terms* to determine whether it is a final decision amenable to appeal. . . . [and] while it is surely true that many post-judgment orders qualify as final decisions on their own terms, not every post-judgment order does." *Id.* at 1293. In this statement, the Tenth Circuit correctly characterized the case as "post-judgment."  More importantly, the Tenth Circuit's statement that the case was reset by the March 31, 2009 Order is not a binding determination that the case is back at the pre-trial stage. The only issue addressed by the Tenth Circuit in its 2011 opinion was whether it had jurisdiction to review the March 31, 2009 Order:

> The defendants' arguments before us thus aren't aimed at attacking any final judgment. Just the opposite, in fact: the defendants seek the *benefit* of those putative final judgments, challenging only the March 31, 2009 order that effectively *undid* them. So it is that, when assessing our authority to hear this appeal, our focus naturally turns, as it must, to the district court order that the defendants' appeal seeks to *attack,* not other orders the appeal doesn't seek to upset.

*Id.* (emphasis in original).  In this statement, the Tenth Circuit properly limited its focus to the March 31, 2009 Order and refused to analyze the nature of the 2005 SSAs and the previous

remedial orders and judgment.  Consequently, any statements by the Tenth Circuit about the
nature of those orders and judgment were for the purpose of contrasting them with the March 31,
2009 Order.  Hence, the statements made by the Tenth Circuit related to resetting the case were
merely dicta.  Dicta are "statements and comments in an opinion concerning some rule of law or
legal proposition not necessarily involved nor essential to determination of the case in hand." *See
Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1184 (10th Cir. 1995) (quoting *Black's Law
Dictionary* 454 (6th ed. 1990)).  Lower courts are not bound by dicta from appellate decisions.
*Bates v. Dep't of Corr. State of Kan.*, 81 F.3d 1008, 1011 (10th Cir. 1996).  Once the Tenth
Circuit concluded that it had no jurisdiction to consider the March 31, 2009 Order because it was
not a final appealable order, the court's statements about previous orders carried no weight of
authority.  *Cf. In re Dep't of Energy Stripper Well Litigation*, 206 F.3d 1345, 1353 (10th Cir.
2000) (noting that once the district court decided that it lacked jurisdiction over the matter, its
discussion of other grounds for dismissal was dicta). The Tenth Circuit's holding was limited to
its decision not to review the March 31, 2009 Order because it was not a final appealable order.
The Tenth Circuit's comments regarding the effect of the rescission of the 2005 SSAs on the
future of this litigation are not binding on this Court.

### B.  Application of the PLRA Order and 1997 Judgment to the MDC

The County maintains that even if the 1996 PLRA Order, the 1997 Judgment, and the
subsequent orders survived the rescission of the 2005 SSAs, the specific provisions of those
orders and the judgment cannot be equitably and practically applied to the MDC.  The County
outlines each provision that is incompatible to the conditions at MDC, such as specific
population caps and the prohibition against housing inmates in holding cells inside the old
district courthouse, which is no longer used as a courthouse.  It is obvious to the Court that

certain provisions in the previous orders cannot be directly applied to the MDC.  But the County

fails to convince the Court that this incompatibility means that the case is rewound to the time

prior to the parties' 1995 decision to settle instead of litigate.  Early in the case, the parties chose

to "save themselves the time, expense, and inevitable risk of litigation," and the later rescission

of the 2005 SSAs cannot erase the consequences of that early choice. *See Cooper v. Noble*, 33

F.3d at 545 (affirming a ruling that, even after a new jail was constructed, government officials

failed to show significant changes in fact or law so as to set aside a consent decree governing old

jail facilities).

The County maintains that it is inequitable to allow the Plaintiffs and Plaintiff Intervenors

to have the benefit of previous remedial orders when they did not strictly follow those orders

after the 2009 rescission of the 2005 SSAs.  The County points out that under the 1996 Order,

the parties were required to mediate all disputes prior to taking them to the Court for resolution,

yet Plaintiffs and Plaintiff Intervenors have not asked for mediation of the many disputes since

2009.  The County also contends that Plaintiffs and Plaintiff Intervenors have not mentioned the

PLRA Order and the 1997 Judgment in filings since April 2009.  In addition, the Plaintiffs and

Plaintiff Intervenors moved for the appointment of the same three experts appointed under the

2005 SSAs, they asked the Court to have the experts evaluate and monitor the MDC under the

standards of the 2005 SSAs, and they asked for improvements in conditions not mentioned in the

PLRA Order and the 1996 Order, such as out-of-cell time, inmate violence, use of force, and

improvement of grievance procedures.

First, the 1996 Order under its express terms does not apply to the MDC; therefore, the

Plaintiff Intervenors' failure to seek enforcement of its provisions is irrelevant.  More

importantly, since the 2009 rescission of the 2005 SSAs, Plaintiffs and Plaintiff Intervenors have

maintained that this case is in its post-judgment stage, and they have specifically argued in written pleadings and orally in court that there are "extant" orders governing this case despite the rescission of the 2005 SSAs.  More significant, after the rescission the parties have focused on settlement and improving and monitoring conditions at the MDC, and the Court will not sweep away those efforts.

C.  Reformation of the PLRA Order

The County contends that to make the outmoded 1996 PLRA Order and the 1997 Judgment apply to the MDC, they would have to be wholly rewritten.  The Plaintiffs and Plaintiff Intervenors contend that these orders can be applied to the MDC with minor revisions. However, neither side has moved to reform those orders.  The County argues that since significant changes to the PLRA Order and the 1997 Judgment are necessary, the Court should wipe the settlement slate clean and hold a trial on the original allegations that the County is operating an unconstitutional jail.  However, the County has failed to show that the orders are unenforceable or that the orders must be set aside under Rule 60(b).  Even though the long history of settlement and remedial orders has failed to lead to a definitive conclusion of this case, unquestionably conditions at the MDC have been improving and are on a path of continued improvement.  The answer is not to erase the agreements and orders that brought about the improvements, especially the 2013 Stipulated Orders, which led to reductions in the MDC population with consequent improved conditions and better practices at the MDC.

IT IS ORDERED that the COUNTY DEFENDANT'S MOTION FOR TRIAL ON THE

MERITS (Doc. No. 1099) is denied.

_____
SENIOR UNITED STATES DISTRICT JUDGE