UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

JIMMY (BILLY) McCLENDON, et al.,
    Plaintiffs,

vs.

Case No. 95 CV 024 JAP/ACT

CITY OF ALBUQUERQUE, et al.,
    Defendants.

vs.

E.M., R.L., W.A., D.J., P.S., and N.W.,
on behalf of themselves and all others similarly situated,
    Plaintiff-Intervenors.

**MEMORANDUM OPINION AND ORDER
GRANTING IN PART DENYING IN PART PLAINTIFF-INTERVENORS'
RENEWED OBJECTIONS TO MEMORANDUM OPINION AND ORDER
ON JOINT MOTION FOR ENFORCEMENT OF INTERIM ORDER
REGARDING ACCESS TO THE MDC (Doc. No. 1189)**

On August 4, 2015, Plaintiff Intervenors filed PLAINTIFF-INTERVENORS' RENEWED OBJECTIONS TO MEMORANDUM OPINION AND ORDER ON JOINT MOTION FOR ENFORCEMENT OF INTERIM ORDER REGARDING ACCESS TO THE MDC (Doc. No. 1189) (Renewed Objection) asking the Court to order County Defendants to produce documents related to quality improvement in the provision of mental health care at the Metropolitan Detention Center (MDC). On August 21, 2015, County Defendants filed RESPONSE TO PLAINTIFF-INTERVENORS' RENEWED OBJECTIONS TO MEMORANDUM OPINION AND ORDER ON JOINT MOTION FOR ENFORCEMENT OF INTERIM ORDER REGARDING ACCESS TO THE MDC (Doc. No. 1192) (Response to Renewed Objection) arguing that Plaintiff Intervenors' counsel are not entitled to these internal reports. After considering the arguments in these filings, as well as the arguments presented in

1

PLAINTIFF INTERVENORS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFF-INTERVENORS' RENEWED OBJECTIONS TO MEMORANDUM OPINION AND ORDER ON JOINT MOTION FOR ENFORCEMENT OF INTERIM ORDER REGARDING ACCESS TO THE MDC (Doc. No. 1198) (Reply to Renewed Objection), the Court will grant in part the Renewed Objection and will order County Defendants to produce the documents that the County provided to and that were used by Dr. Metzner in preparing his July 2015 Report. The Court will otherwise deny the Renewed Objection.

I. BACKGROUND

    A. MEMORANDUM OPINION AND ORDER (Doc. No. 962) (MOO)

On October 12, 2012, Magistrate Judge Torgerson, when he was the Magistrate Judge assigned to this case, entered this MOO (Doc. No. 962) denying Plaintiffs and Plaintiff-Intervenors' Joint Motion for Enforcement of Interim Order Regarding Access to the MDC [Doc. 945] (Joint Motion).[1] The Renewed Objection asks the Court to set aside the MOO because it is clearly erroneous or contrary to law and to order County Defendants to produce documents that the County provided to and that were used by Dr. Metzner in preparing his July 2015 Report. Fed. R. Civ. P. 72(a).

    B. RELEVANT EVENTS FROM 2009 TO THE PRESENT

In May and June of 2009, three motions were pending: (1) PLAINTIFFS' AND PLAINTIFF-INTERVENORS' JOINT MOTION TO ENFORCE THE COURT'S MARCH 31, 2009 ORDER AND SUPPORTING MEMORANDUM (Doc. No. 715);[2] (2) PLAINTIFF-

---

[1] Magistrate Judge Torgerson is now Special Master in this case.

[2] In the March 31, 2009 Order, the Court ruled that the orders entered in this case applied to the newly-constructed Metropolitan Detention Center (MDC) even though all inmates of the Bernalillo County Detention Center (BCDC), the original object of this lawsuit, had been relocated to the MDC. *See* MEMORANDUM OPINION AND ORDER (Doc. No. 699).The Court denied this Motion without prejudice because the Court's March 31, 2009 Order was on appeal to the Tenth Circuit. ORDER DENYING WITHOUT PREJUDICE PLAINTIFFS' AND PLAINTIFF INTERVENORS' JOINT MOTION TO ENFORCE THE COURT'S MARCH 31, 2009 ORDER (Doc. No. 769).

INTERVENORS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM DEFENDANTS AND MEMORANDUM IN SUPPORT THEREOF (Doc. No. 730);[3] and (3) PLAINTIFFS' AND PLAINTIFF INTERVENORS' JOINT MOTION FOR A RESTRAINING ORDER ENJOINING THE DEFENDANTS FROM REDUCING ACCESS TO THE METROPOLITAN DETENTION CENTER AND FOR AN ORDER TO SHOW CAUSE AND FOR FURTHER REMEDIAL RELIEF (Doc. No. 731) (Joint Motion for a Restraining Order). At a hearing on July 20, 2009, the Court referred the Joint Motion for a Restraining Order to Magistrate Judge Torgerson to facilitate a settlement of that motion.

On September 17, 2009, after holding several settlement conferences that did not yield a complete settlement of access issues, Magistrate Judge Torgerson entered the INTERIM ORDER REGARDING ACCESS TO THE MDC (Doc. No. 754) (Interim Order). The Interim Order outlined procedures for the periodic monitoring activities by class and subclass counsel, including a procedure for requesting documents during their monitoring visits at the MDC. In the Interim Order, class and subclass counsel were allowed to request:

> (1) up to 15 medical files per visit (*Id.* ¶ 1);
> (2) the "Clinical Seclusion Log, Suicide Watch Log, Suicide Watch Follow-Up Log, Involuntary Medication Log, and Emergency Medication Log" (*Id.* ¶ 14); and (3) on request, [Correctional Medical Services] was to provide a "reasonable sample of written Requests for Services, Request for Services Tracking Log, Shift Form Reports, and a list of people who are 'open to [Psychiatric Services Unit].'"

(*Id.*)

---

[3] On July 15, 2010, Magistrate Judge Torgerson denied this motion and granted the Defendants' motion for protective order. Plaintiff Intervenors asked for all documents given by Defendants to Mr. Romero and Dr. Metzner, who were auditing conditions at the MDC, and documents related to the renovated BCDC, renamed the Regional Correctional Center (RCC) in downtown Albuquerque. Magistrate Judge Torgerson denied the motion because the case was on appeal to the Tenth Circuit. *See* MEMORANDUM OPINION AND ORDER (Doc. No. 802).

The Interim Order also required,

> [e]very quarter, on a date to be agreed on by the parties and CMS, defendants and CMS will produce documentation regarding mutually agreed subjects, including defendants' logs regarding use of force, use of mace, and other incidents." Within 30 days of receiving any request from counsel for plaintiffs or plaintiff-intervenors or their staff for documents other than client records . . . defendants and CMS will either produce the documents or explain their reasons for refusing to produce the documents.

(*Id.* ¶¶ 11, 13.)

On October 8, 2009, Plaintiffs and Plaintiff Intervenors filed JOINT OBJECTIONS TO THE INTERIM ORDER REGARDING ACCESS TO THE MDC (Doc. No. 758) (the Joint Objection to Interim Order). On February 1, 2010, the Court reviewed the Interim Order *de novo*, overruled the Joint Objection, and adopted the Interim Order.[4] *See* MEMORANDUM OPINION AND ORDER ADOPTING MAGISTRATE JUDGE'S INTERIM ORDER (Doc. No. 768).

    C.    MEDICAL CONTRACTOR; THE DOCUMENTS; AND THE MOO

Prior to 2010, the medical contractor at the MDC was Correctional Medical Services (CMS). In 2010, MDC contracted with a new company, Correctional Healthcare Companies (CHC). Recently, CHC was acquired by Correct Care Solutions (CCS). In the Renewed Objection, Plaintiff Intervenors allege that from 2005 to the time CHC became the medical contractor, CMS provided the three types of documents that counsel now seek. Beginning in 2010, the new medical contractor, CHC, withheld these documents, and its successor CCS has continued to deny access to these documents. Those documents are described as follows:

---

[4] Although the Plaintiffs and Plaintiff Intervenors argued that the Interim Order should be reviewed under Rule 72(a)'s clearly erroneous standard, the Court reviewed the Interim Order and the objections thereto *de novo* under Rule 72(b) because the original motion for access was a request for injunctive relief and as such, the Interim Order was treated as Proposed Findings and Recommended Disposition (PFRD) on a dispositive matter.

      1. Continuous Quality Improvement (CQI) and Quality Assurance (QA) reports (Quality Reports);

      2. Reports on deaths of class and sub class members (Mortality Review Documents); and

      3. Spreadsheets called the "MDC PSU Quality Management Data Matrix" (Stellman Matrix) created by Dr. Roberta Stellman, MD, the County's contract compliance officer.

On December 7, 2011, the Court, under Fed. R. Evid. 706, appointed three experts to evaluate conditions of confinement at the MDC and to determine whether the Defendants were in compliance with all extant orders in this case. *See* ORDER APPOINTING MANUAL ROMERO, ROBERT GREIFINGER, M.D., AND JEFFREY METZNER, M.D. TO EVALUATE THE BERNALILLO COUNTY METROPOLITAN DETENTION CENTER (Doc. No. 909) (Expert Order).

On June 26, 2012, Plaintiffs and Plaintiff Intervenors filed PLAINTIFFS' AND PLAINTIFF INTERVENORS' JOINT MOTION FOR ENFORCEMENT OF INTERIM ORDER REGARDING ACCESS TO THE MDC (Doc. No. 945) seeking *inter alia* access to the above-described documents. On October 12, 2012, Magistrate Judge Torgerson issued the MOO denying Plaintiffs and Plaintiff-Intervenors' Joint Motion for Enforcement of Interim Order. On October 26, 2012, Plaintiffs and Plaintiff Intervenors filed Joint Objections to Judge Torgerson's MOO. *See* PLAINTIFF AND PLAINTIFF-INTERVENORS' JOINT OBJECTIONS TO MEMORANDUM OPINION AND ORDER ON JOINT MOTION FOR ENFORCEMENT OF INTERIM ORDER REGARDING ACCESS TO THE MDC (Doc. No. 965) (Joint Objections to MOO on Interim Access).

During the latter part of 2012 through the middle of 2013, the parties diligently worked on settling the outstanding issues in this case. Recognizing these efforts, the Court denied the

Joint Objections to MOO on Interim Access without prejudice. *See* MEMORANDUM OPINION AND ORDER OVERRULING OBJECTION TO MAGISTRATE JUDGE'S ORDER (Doc. No. 1009). "Since the [Joint] Objection [was] filed[,] this case has moved in a substantially different direction and may be nearing settlement. Due to the current posture of the case, the Court will overrule the [Joint] Objection without prejudice at this time. If the direction of the case changes, Plaintiffs and Plaintiff-Intervenors may renew the Objection, and it will be considered on the merits." (*Id.* at 1–2.)

On September 23, 2014, the Court entered three stipulated orders submitted by the parties, which compiled the relevant requirements from previous consent decrees into an outline of specific terms for the compliance review by each Rule 706 expert. Doc. Nos. 1167 (Manuel Romero), 1168 (Dr. Greifinger), and 1169 (Dr. Metzner) (together, September 2014 Orders).[5] Since September 23, 2014, the experts have regularly visited the MDC and have evaluated whether conditions at MDC comply with the terms of the September 2014 Orders. Dr. Metzner visited the MDC in late July 2015, and he produced a report outlining for each matter he evaluated whether the MDC and its officials were in compliance, non-compliance, or partial compliance.

Plaintiff Intervenors assert that they need the requested documents provided to Dr. Metzner: (1) to ensure that the County Defendants provide truthful and accurate information to Dr. Metzner; (2) to acquire the same information that is provided to the County Defendants' counsel; and (3) to ensure that the due process rights of the subclass members are recognized through equal access to information.

---

[5] Since 1996, Plaintiff Intervenors and Defendants have entered into several settlement agreements that were approved by the Court and entered as consent decrees. *See, e.g.,* Doc. Nos. 106, 255, 256, 319, 361, 514, 515, and 1004.

In the MOO, Magistrate Judge Torgerson ruled that Plaintiff Intervenors were not entitled to these documents for the following reasons:

(1) By seeking the documents underlying the experts' reports, Plaintiffs and Plaintiff Intervenors are either asserting the experts are not neutral or the experts are unqualified to evaluate compliance. Since Plaintiffs and Plaintiff Intervenors originally argued in favor of appointing the experts, they are judicially estopped from making this argument. *Id.* at 6.

(2) Plaintiffs and Plaintiff Intervenors have access to all of the primary documents on which the reports are based. *Id.* at 7.

(3) Plaintiffs and Plaintiff Intervenors presented no evidence that MDC was providing incorrect or untruthful information to the experts. *Id.*

Plaintiff Intervenors contend that the Court should set aside the MOO because Magistrate Judge Torgerson incorrectly applied the doctrine of judicial estoppel. They assert that Magistrate Judge Torgerson considered Plaintiff Intervenors' document request as an inappropriate reversal of their previous position that the experts were qualified to evaluate the MDC and that the experts would streamline the discovery process. As they originally argued, Plaintiff Intervenors also ask this Court to rule that the documents are not protected under the self-critical analysis privilege, an argument not addressed in the MOO. *See id.* at 6 ("CHC explains . . . that it is not disclosing the requested materials based on the self-critical analysis privilege. . . . The Court does not see any necessity to evaluate the self-critical analysis privilege . . .").

D.   COUNTY DEFENDANTS' RESPONSE

County Defendants point to this Court's denial of Plaintiff Intervenors' Joint Objections to MOO on Interim Access without prejudice and the Court's unwillingness to disrupt settlement

discussions and argue that Plaintiff Intervenors have failed to demonstrate that the direction of this case has changed.[6] In other words, since the parties are working with Special Master Torgerson on a global settlement of this case, the case is still "nearing settlement;" and therefore, Plaintiff Intervenors' Renewed Objection should again be denied without prejudice. Alternatively, the County Defendants contend that Magistrate Judge Torgerson correctly applied the doctrine of judicial estoppel, Judge Torgerson appropriately limited counsel's monitoring role, and Judge Torgerson rightly denied Plaintiff Intervenors access to the requested documents.

The Court recognizes that it could deny the Renewed Objection without prejudice because there are ongoing settlement discussions facilitated by Special Master Torgerson. However, given the long history and the complex nature of this case, the Court finds it more appropriate to rule on the specific request for documents in the Renewed Objection even though the Court will decline to set aside Judge Torgerson's MOO. Moreover, to facilitate a final settlement of this lawsuit, to correct a misconception of the role of the Rule 706 experts, and to clarify the appropriate limits of the self-critical analysis privilege, the Court will address important aspects of the Renewed Objection.

II.     ANALYSIS

        A.     ROLE OF RULE 706 EXPERTS

Under Rule 706, a court may appoint an expert on its own motion or on motion of a party. Fed. R. Evid. 706(a). The Rule 706 expert must 1) advise the parties of any findings the expert makes; 2) submit to a deposition if requested; 3) testify if called by the court or any party; and 4) submit to cross examination by any party. Fed. R. Evid. 706 (b)(1)-(4). The rule does not preclude a party from calling its own experts. Fed. R. Evid. 706 (e). Logically, if a party may

---

[6] *See* MEMORANDUM OPINION AND ORDER OVERRULING OBJECTION TO MAGISTRATE JUDGE'S ORDER (Doc. No. 1009).

depose or cross examine a Rule 706 expert, that party would be entitled to any non-privileged documents supporting the expert's opinions.

More importantly, the purpose of Rule 706 is to assist **the court** in evaluating contradictory or complex evidence or issues. It is not designed to aid a party's prosecution of his own case. *Griffin v. Perry*, No. 04 CV 654 MCA/WDS, 2008 WL 8097279, * 2 (D.N.M. Mar. 10, 2004) (unreported decision) (emphasis added) (citing 4 Weinstein's Federal Evidence § 706.02[3] (2d Ed. 2007) (stating that a court has discretion to appoint an expert of its choosing "in exceptional cases that present unwieldy, complex, or technical issues" or when "there is a need for an impartial, independent assessment of a disputed issue.")). The policy goal of Rule 706 is to promote accurate fact finding. 29 Charles Alan Wright & Victor James Gold, Fed. Prac. & Proc. Evid. § 6304 (1st ed. 1997). In sum, Rule 706 experts help courts with complex and unwieldy fact finding; Rule 706 experts do not displace the role of counsel as advocates. Hence, the Court finds that the existence of the highly qualified Rule 706 experts in this case does not preclude Plaintiff Intervenors from acquiring information relevant to their case and from continuing to monitor conditions at MDC.

## B. EVALUATING THE EXPERTS' REPORTS

Throughout the pendency of this case, Plaintiffs and Plaintiff Intervenors have sought to discover internal quality assurance and mortality review reports generated within the Bernalillo County jail system. The Quality Reports, the Mortality Review Documents, and the Stellman Matrix contain information vital to the determination of whether the County Defendants are in compliance with the myriad orders in this case, among them the September 2014 Orders. Most recently, Dr. Metzner evaluated the conditions at MDC and submitted the July 2015 report. It is

undisputed that Dr. Metzner reviewed the Quality Reports, the Mortality Review Documents, and the Stellman Matrix to aid in preparing his July 2015 Report.

The September 2014 Order applicable to Dr. Metzner's evaluation of the MDC, the ORDER INSTRUCTING COURT-APPOINTED MENTAL HEALTH EXPERT JEFFREY METZNER, M.D. TO EVALUATE MENTAL HEALTH SERVICES AT THE BERNALILLO COUNTY METROPOLITAN DETENTION CENTER (Doc. No. 1169) (Metzner Order), requires Dr. Metzner to evaluate the quality of care given to inmates who have mental health illness or disabilities. Specifically, Dr. Metzner must evaluate: (1) whether MDC personnel properly screen and assess inmates for mental health needs (*Id.* pp. 2–7); (2) whether MDC provides appropriate treatment plans for those inmates who require mental health treatment (*Id.* pp. 7–11); (3) whether MDC properly treats, houses, and monitors suicidal inmates (*Id.* pp. 12–13); (4) whether MDC trains its personnel to appropriately handle inmates with mental health illness, including training its personnel in suicide prevention (*Id.* pp. 13–14); (5) whether MDC appropriately uses restraints on inmates with mental illness (*Id.* pp. 14–15); (6) whether MDC maintains sufficient staff to treat subclass members (*Id.* pp. 16–17); and (7) whether MDC has developed and implemented "policies and procedures that create an adequate quality management system to review suicide and self-injurious behaviors, morbidity and mortality and implementation of its mental health policies and procedures and implemented appropriate corrective action to prevent or minimize future harm to inmates." (*Id.* pp. 17–20).

Dr. Metzner's findings of compliance, partial compliance, or non-compliance, are extremely valuable to both the parties and the Court especially with regard to reaching a conclusion to this twenty-year long litigation. Plaintiff Intervenors argue convincingly that the Quality Reports, the Mortality Review Documents, and the Stellman Matrix contain information

relevant to their evaluation of Dr. Metzner's conclusions. To agree on a timetable for ending this lawsuit, both sides must have confidence that Dr. Metzner's findings are based on valid and accurate information.

County Defendants argue that Plaintiff Intervenors do not need these internally generated documents because they have access to the "source documents," i.e. medical files, provided at each monitoring visit as outlined in the Interim Order Regarding Access to the MDC. The Quality Reports, the Mortality Review Documents, and the Stellman Matrix cannot be engineered from the "source" documents given to counsel during monitoring visits because they are based on compiled information about medical care given to all inmates. In contrast, monitoring attorneys are given only a limited number of documents at each monitoring visit.

County Defendants also maintain that Plaintiff Intervenors have not shown that the experts are being given inaccurate or invalid information from MDC personnel. However, County Defendants fail to explain how Plaintiff Intervenors can show whether or not officials at MDC are providing a complete picture to Dr. Metzner unless the information given to Dr. Metzner s reviewable by subclass counsel in the first place. Moreover, Plaintiff Intervenors must be able to question the Rule 706 experts' findings, just as they would an expert proffered by Defendants. In sum, County Defendants fail to convince the Court that Plaintiff Intervenors do not need the requested documents.

      G.      SELF-CRITICAL ANALYSIS PRIVILEGE

County Defendants argue that the Court should deny Plaintiff Intervenors' request for the documents because the self-critical analysis privilege protects these documents from disclosure. Rule of Evidence 501 allows federal courts to recognize privileges: "The common law—as interpreted by United States courts in light of reason and experience—governs a claim of

privilege . . ." Fed. R. Evid. 501. The privilege has been applied almost exclusively in medical malpractice cases involving reports prepared by peer review committees in hospitals and medical clinics. *See e.g. Balk v. Dunlap,* 163 F.R.D. 360, 363 (D. Kan. 1995) (finding minutes of OB/GYN meeting called to discuss the quality of patient care protected under Kansas medical peer review statutes in diversity medical malpractice case). "Because of this unique role in preserving the public health, medical morbidity and mortality reviews must be distinguished from other peer review cases." *Weekoty*, 30 F. Supp. 2d 1343, 1345 (D.N.M. 1999) (recognizing privilege in malpractice suit against Indian Health Services Clinic). Under Rule 501, an evidentiary privilege should not be recognized or applied unless it "promotes sufficiently important interests that outweigh the need for probative evidence." *See id.* at 1347 (finding that because 46 states had self-critical analysis privilege in medical review context, application of the privilege made sense in federal court in same types of cases).[7] In general, the self-critical analysis privilege is not available unless the information sought is "intended to help the medical staff improve patient care and avoid errors in medical treatment." *Aragon v. National Home Healthcare, Inc.*, 99 CV 628 JP/LFG, ORDER GRANTING PLAINTIFF'S MOTION TO COMPEL DISCOVERY (Doc. No. 61) (D.N.M. Mar. 14, 2000) (Garcia, M.J.) (unpublished) (diversity case against health care company). For example, the privilege has not been applied to internal affairs records in civil rights cases against police officers. *Bauer v. City of Albuquerque*, No. 00 CV 110 JEC/KBM, ORDER AS TO MATERIALS SUBMITTED *IN CAMERA* (Doc. No. 44) (D.N.M. Oct. 31, 2000) (Molzen, M.J.) (unpublished) (§ 1983 case involving internal investigation files of police officer). And, like any other privilege, this privilege can be waived if the information is produced to third parties. *Id.*

---

[7] New Mexico, like a majority of states, has recognized a self-critical analysis privilege in the medical context. *See* NMSA 1978 § 41-9-5 (precluding any party from using the confidential records of medical peer review proceedings in civil litigation).

*Bravo v. Board of Commissioners for the County of Dona Ana* is instructive. In *Bravo*, Chief Magistrate Judge Molzen held that the privilege was not designed to protect internal review documents prepared by a prison's medical provider. Case No. 08 CV 0010 WJ/KBM, MEMORANDUM OPINION AND ORDER (Doc. No. 214) (D.N.M. Nov. 24, 2009) at 6 (unpublished). Magistrate Judge Molzen also found that by providing and discussing the findings of a peer review committee with staff at the prison, the medical provider had waived any privilege. *Id.* at 5. "[T]he majority of federal courts recognizing the self-critical analysis privilege do so in limited contexts. For instance, the cases cited by . . . the *Weekoty* court . . . only apply the self-critical analysis privilege in the hospital setting, and not in jails, prisons, detention facilities, or the like." *Id.*

Chief Magistrate Judge Molzen agreed with the reasoning of the Ninth Circuit Court of Appeals in *Agster v. Maricopa County*, 422 F.3d 836 (9th Cir. 2005). In *Agster*, the parents of a prison inmate who died while in custody sought mortality review documents prepared by CHS, but CHS asserted the self-critical analysis privilege. *Id.* at 838. In upholding the denial of the privilege, the Ninth Circuit reasoned:

> Whereas in the ordinary hospital setting it may be that the first object of all involved in patient care is the welfare of the patient, in the prison context the safety and efficiency of the prison may operate as goals affecting the care offered. . . . [I]t is particularly important that the public have access to the assessment by peers of the care provided. Given the demands for public accountability . . ., we are not convinced by the County's argument that such reviews will cease unless kept confidential by a federal peer review privilege. Accordingly, we are unwilling to create the privilege in this case.

*Id*. at 839. *See also Grabow v. County of Macomb*, Case No. 12-10105, 2013 WL 3354505, *6 (E.D. Mich. July 3, 2013) (holding that self-critical analysis privilege may not be asserted in § 1983 cases because federal law does not recognize this privilege and requiring CMS to produce mortality review of plaintiff's decedent's suicide).

In addition, courts in prison and jail conditions cases have not been persuaded by the argument that without the privilege, review committees would not be as effective. "Given the demands for public accountability [in cases involving the death of an inmate], which seem likely to guarantee that such reviews take place whether they are privileged or not, we are not convinced by the County's argument that such reviews will cease unless kept confidential by a federal peer review privilege." *Johnson v. Cook County*, No. 15 C 741, 2015 WL 5144365, *4 (N.D. Ill. Aug. 31, 2015) (slip op.) (citing *Agster,* 422 F.3d at 839).

As these cases illustrate, the documents sought by Plaintiff Intervenors are not protected by the self-critical analysis privilege. But, even if this type of privilege were applicable, the documents are discoverable because MDC waived its privilege when it provided the documents to MDC personnel and to the Court's experts.

IT IS THEREFORE ORDERED that the PLAINTIFF-INTERVENORS' RENEWED OBJECTIONS TO MEMORANDUM OPINION AND ORDER ON JOINT MOTION FOR ENFORCEMENT OF INTERIM ORDER REGARDING ACCESS TO THE MDC (Doc. No. 1189) is granted in part:

1. By October 20, 2015, County Defendants must provide to Plaintiff Intervenors copies of all documents given to Dr. Metzner prior to and in connection with the preparation of his July 2015 Report including the Quality Reports, the Mortality Review Documents, and the Stellman Matrix.

2. County Defendants must provide to Plaintiff Intervenors copies of all future Quality Reports, Mortality Review Documents, and Stellman Matrixes at the same time they are given to Dr. Metzner.

3. Before the County Defendants produce the documents, County Defendants and Plaintiff Intervenors must execute a Stipulated Confidentiality Order in a form similar to the STIPULATED CONFIDENTIALITY ORDER (Doc. No. 1093).

_____
SENIOR UNITED STATES DISTRICT JUDGE