## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**JIMMY (BILLY) McCLENDON, et al.,**

      **Plaintiffs,**


**vs.**                               **Case No. 95 CV 024 JAP/ACT**


**CITY OF ALBUQUERQUE, et al.,**

      **Defendants.**


**vs.**


**E.M., R.L., W.A., D.J., P.S., and N.W.,**
**on behalf of themselves and all others similarly situated,**

      **Plaintiff Intervenors.**


### MEMORANDUM OPINION AND ORDER
### GRANTING APPROVAL OF SETTLEMENT AGREEMENT

This class action lawsuit was brought in 1995 against the City of Albuquerque (City), Bernalillo County, New Mexico (the County), and other defendants to address conditions of confinement in the Bernalillo County jail system, namely the Bernalillo County Detention Center (BCDC) in downtown Albuquerque, New Mexico and later on, the Metropolitan Detention Center (MDC), operated by the County. Since 1996, the Court has approved numerous settlement agreements involving the BCDC and the MDC. On March 22, 2016, the Court granted preliminary approval of the SETTLEMENT AGREEMENT (Doc. No. 1222-1), which sets forth a process by which the County can achieve and solidify improvements in conditions at the MDC and eventually bring an end to this lawsuit that has been pending for over twenty years. *See*

1

STIPULATED ORDER PRELIMINARILY APPROVING SETTLEMENT, REQUIRING NOTICE TO CLASS AND SUBCLASS MEMBERS, AND SETTING FAIRNESS HEARING (Doc. No. 1213) (Order of Preliminary Approval). On May 25, 2016, the Court held a hearing on final approval of the Settlement Agreement. At the hearing, the Court asked counsel for the class, the subclass, and the County to submit briefs addressing the fairness of the Settlement Agreement and the objections submitted by current and former inmates at MDC.[1] *See* BRIEFING REGARDING SETTLEMENT AGREEMENT (Doc. No. 1223) and MEMORANDUM BY PLAINTIFFS AND PLAINTIFF INTERVENERS, REGARDING APPROVAL OF SETTLEMENT AGREEMENT (Doc. No. 1224). After considering the long history of this case, the improvements in conditions of confinement at the MDC, the objections to the Settlement Agreement, and the arguments of counsel for the class, subclass, and the County, the Court will overrule the objections and will approve the Settlement Agreement.[2]

I.    BACKGROUND

A.    1995–1997: Initial Settlement Agreements

On January 10, 1995, Plaintiffs brought this case alleging that the Defendants operated the Bernalillo County Detention Center (BCDC) in a manner that violated both the United States and New Mexico Constitutions and federal and state statutory law. COMPLAINT (Doc. No. 1).[3]

---

[1] On April 4, 2016, twenty class and subclass members filed a joint objection to the Settlement Agreement. (Doc. No. 1215.)  During monitoring visits on April 12 and 28, 2016, counsel for Plaintiffs and Plaintiff Intervenors met with most of the objectors who were still in custody to discuss their specific objections. On May 16, 2016, counsel for Plaintiff Intervenors met with subclass member, Lafayette Stone, who stated several objections to the Settlement Agreement. On May 23, 2016, counsel for Plaintiff Intervenors received a phone call from subclass member, Lewis Daniel Fernandez, who stated several objections to conditions at MDC. At the hearing, former MDC inmate Thomas Sheridan testified as to his proffered objections to the Settlement Agreement. Despite the objections, counsel for Plaintiffs and Plaintiff Intervenors maintain that the Settlement Agreement is in the best interests of all of their clients. The Court will address the objections below.
[2] The Court also considered the June 21, 2016 Seventh Report by Manuel D. Romero, the Court's expert on conditions of confinement.
[3] The City and the County operated the BCDC under a Joint Powers Agreement. Under the Joint Powers Agreement, the City and County were jointly responsible for funding the operation and maintenance of the BCDC.

The lengthy Complaint was divided into three parts: (1) overcrowding claims;[4] (2) constitutional claims; and (3) individual claims.

On August 23, 1995, the Court issued a Preliminary Injunction (Doc. No. 106) enjoining Defendants from housing more inmates than the BCDC was designed to house. ORDER (Doc. No. 106).[5] On September 7, 1995, Plaintiffs and Defendants entered into a settlement agreement in which Defendants agreed to convert the August 23, 1995 Preliminary Injunction into a permanent injunction. The Court approved the settlement agreement and retained jurisdiction to enforce or modify the permanent injunction. (Doc. Nos. 115; 116.)

On October 26, 1995, Plaintiff Intervenors, representing a subclass of prisoners with mental illness and/or mental disabilities, intervened in the case. (Doc. Nos. 137; 257.) However, Plaintiff Intervenors were allowed to intervene only on the claims "in the original Plaintiff's Complaint and the . . . issues addressed in the Court's prior orders . . . ." (*Id.* at 2.) Plaintiff Intervenors alleged violations of the United States Constitution, Title II of the Americans With Disabilities Act (42 U.S.C. § 12101 *et seq.*) (ADA), and the Rehabilitation Act (RA) (29 U.S.C. §§ 701 *et seq.*). (Doc. No. 150.)

On April 26, 1996, Congress enacted the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (codified as amended in several titles and sections of U.S.C. including 18 U.S.C. § 3626 and 42 U.S.C. § 1997e) (the PLRA). The PLRA imposed specific requirements regarding prospective relief in all prison conditions cases, whether the relief was ordered prior to or after its enactment, and the PLRA allowed termination of existing remedial orders in prison

---

[4] The COMPLAINT alleged that over 1000 inmates were housed in the BCDC, which was designed to house 586 inmates. (Doc. No. 1 at 10 ¶ 3.18.)
[5] Enforcement of the cap on BCDC's population at its design capacity was delayed for one year, until August 23, 1996. *Id.* at 12.

conditions cases. 18 U.S.C. § 3626.[6] After the PLRA was enacted, the City and County moved to terminate the remedial orders entered in 1995 and 1996. The termination motion was resolved in November 1996, when the Court approved two settlement agreements and adopted them as consent decrees. The first settlement agreement was executed by Plaintiffs, Plaintiff Intervenors, the City, and the County. *See* ORDER REGARDING THE PRISON LITIGATION REFORM ACT (Doc. No. 255) (the PLRA Order). In the PLRA Order, the Court found that "violations of one or more federal rights of BCDC residents ha[d] occurred at BCDC." (*Id.* at 1.) The second settlement agreement was executed by Plaintiff Intervenors, the City, and the County. *See* ORDER (Doc. No. 256) (the 1996 Order). In the 1996 Order, the Court found that "violations of one or more federal rights of subclass members have occurred at BCDC." (*Id.* at 1.) The 1996 Order contained a stipulation by the parties that some of the BCDC residents were not afforded "reasonable accommodations for their disabilities." (*Id.* at 7.) In the 1996 Order, the Court required Defendants to implement remedial measures designed to address the needs of inmates with mental illness and/or mental disabilities, particularly with regard to the diagnosis and medical treatment of those inmates. (*Id.* at 8–17.)

On January 10, 1997, the Court held a fairness hearing on the 1996 settlement agreements under Fed. R. Civ. P. 23(e). On August 12, 1997, the Court entered the CORRECTED ORDER APPROVING COMPROMISE & SETTLEMENT AGREEMENT & FINAL JUDGMENT OF DISMISSAL WITH PREJUDICE (Doc. No. 289) (the 1997 Judgment) approving the two November 1996 settlements and dismissing with prejudice all claims except the Plaintiff Intervenors' claims regarding equal protection and access to the courts, which were asserted on behalf of female subclass members. (*Id.* at 5.) The 1997 Judgment contained the findings

---

[6] In the PLRA, a prisoner is defined to include inmates and detainees in a local jail or detention center. 42 U.S.C. § 1997e(h).

required by the PLRA,[7] and the Court retained jurisdiction to enforce those agreements. (*Id.* at 8–10.)

  B. 1997 to 2003: Management of BCDC Population.

  Between 1997 and 2003, despite efforts made by the County to reduce the inmate population, the BCDC continued to be overcrowded. On September 25, 2000, the Court entered an Order (Doc. No. 315) finding that the Defendants had been in violation of the population cap imposed in the PLRA Order for eleven of the preceding twelve months and that the population at the BCDC at times approached the dangerously high population that existed at the time of the August 23, 1995 preliminary injunction. The Court noted that the Defendants employed various means to bring the population down including "building an interim westside facility, asking law enforcement agencies to issue citations rather than incarcerating people whenever appropriate . . . subsidizing the cost of Pre-Trial Services . . . paying for Saturday Metropolitan Court arraignments . . . and renting beds in out-of-county jails." (*Id.* at 3.) The Court ordered Defendants to comply with the PLRA Order, and to . . . consider and implement other measures . . . to reduce the population of BCDC." (*Id.* at 4.)

  C. 2003: Metropolitan Detention Center Opens.

  In the summer of 2003, construction of the new 2100-bed Metropolitan Detention Center (MDC) was completed. By June 17, 2003, all inmates housed at the BCDC had been transferred to the MDC. On July 11, 2003, the Court ruled that previous orders applied to the MDC and that the Court had continuing jurisdiction to enforce those orders. (Doc. No. 416.) The Court recognized that many of the provisions in the previous remedial orders addressed conditions that

---

[7] Under the PLRA, a court may not approve prospective injunctive relief in any civil action with respect to prison conditions unless the court finds that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation. 18 U.S.C. § 3626(a)(1)(A).

were not limited to BCDC, such as, medical care, access to the judicial system, transportation to court, staff training, and benefits for inmates. (*Id.* at 10.) In other words, the remedial orders concerned not just the physical conditions at the BCDC but also the treatment of inmates housed there, which implicated policies and procedures used by Defendants in all jail facilities. (*Id.*) Despite the passage of time and the opening of the new facility, the Court determined it had ". . . continuing jurisdiction to monitor conditions of confinement of the class and sub-class members at the MDC facility." (*Id.* at 15.)

> D.     2003 to 2009: The Stipulated Settlement Agreements.

On October 10, 2003, the City and County moved to vacate the PLRA Order and the 1997 Judgment under Fed. R. Civ. P. 60(b)(5) and (6). The City and County asked the Court to reconsider its decision to exercise its jurisdiction over the MDC reiterating that the 1996 PLRA Order and the 1997 Judgment could not be applied to the MDC. Doc. No. 421 at 1. In 2005, while the motion was pending, the parties entered into two settlement agreements, which the Court adopted as remedial orders: (1) STIPULATED SETTLEMENT AGREEMENT BETWEEN PLAINTIFFS AND DEFENDANTS (Doc. Nos. 480; 515) (Plaintiffs' SSA); and (2) STIPULATED SETTLEMENT AGREEMENT BETWEEN PLAINTIFF INTERVENORS AND DEFENDANTS (Doc. No. 514) (Plaintiff Intervenors' SSA) (together the 2005 SSAs). The stated purpose of the Plaintiffs' SSA was to "maintain and improve the conditions at the [MDC] for the benefit of the Defendants, their employees, agents and staff and for the benefit of the Plaintiff class." (Plfs' SSA at 2.) The stated purpose of the Plaintiffs Intervenors' SSA was to "describe conditions both parties wish to see maintained or improved at the [MDC] . . . ." (Plf Intervenors' SSA at 2.)

On March 31, 2009, the Court issued a MEMORANDUM OPINION AND ORDER (Doc. No. 699) in which the Court determined that inmates at the renovated BCDC, renamed the Regional Corrections Center (RCC), were potential class and subclass members because the County had maintained operational control over the RCC. Instead of allowing the parties to modify the 2005 SSAs, as requested by Plaintiffs and Plaintiff Intervenors, the Court gave the Plaintiffs and Plaintiff Intervenors the option to rescind the 2005 SSAs. In April 2009, the Plaintiffs and Plaintiff Intervenors rescinded the 2005 SSAs.[8] On May 18, 2009, United States District Judge Martha Vazquez recused from the case. On May 19, 2009, Senior United States District Judge James A. Parker was assigned to the case.

E.      2009 to 2014: Experts Appointed and Population Controlled.

On July 13, 2009, Plaintiffs and Plaintiff Intervenors, citing continued limitations on counsels' access to class and subclass members at the MDC, filed a motion to allow counsel access to the MDC for monitoring purposes. District Judge Parker and Magistrate Judge Alan C. Torgerson held a hearing on July 20, 2009 and instructed the parties to meet with Magistrate Judge Torgerson and produce an agreed order regarding access to the MDC. (Doc. No. 739.) On September 17, 2009, Magistrate Judge Torgerson entered the INTERIM ORDER REGARDING ACCESS TO THE MDC (Doc. No. 754) (Interim Order). On February 1, 2010, the Court adopted the Interim Order over objections. (Doc. No. 768.)

On July 7, 2011, Plaintiffs and Plaintiff Intervenors filed a joint motion to appoint the three experts who had monitored the MDC under the 2005 SSAs. (Doc. No. 849.) The three experts were Dr. Timothy Greifinger, an expert on inmate medical care, Dr. Jeffrey Metzner, an expert on inmate mental health care, and Manuel Romero, an expert on conditions of

---

[8] On April 24, 2009, the County appealed the March 31, 2009 ruling, but the appeal was dismissed. *McClendon v. City of Albuquerque*, 630 F.3d 1288 (10th Cir. 2011).

confinement. On December 7, 2011, the Court appointed the three experts under Fed. R. Evid. 706 and asked the experts to evaluate conditions at the MDC in the areas listed in the 2005 SSAs. (Doc. No. 909.)

On February 26, 2013, after receiving reports from the three experts on conditions at the MDC, which had become dangerously overcrowded, the Court issued an ORDER TO SHOW CAUSE (Doc. No. 981). The Court ordered the City and the County to appear on March 28, 2013 and show cause why the MDC should not cease ". . . housing female residents, who have not been classified or who have different classifications, in the same Segregation housing unit." *Id.* at 2. On the date of the hearing, the parties agreed to alter the conditions for female inmates at MDC, and the Court adopted the agreement in the ORDER VACATING ORDER TO SHOW CAUSE (Doc. No. 989).

On April 19, 2013, the Court issued another ORDER TO SHOW CAUSE (Doc. No. 995) based on the experts' reports, information from Magistrate Judge Torgerson regarding ongoing issues at the MDC, and information from the Court's tours of the MDC. On May 22, 2013, the parties presented a stipulated ORDER RESOLVING ORDER TO SHOW CAUSE (Doc. No. 1004), requiring the County to draft a plan addressing the matters described in the ORDER TO SHOW CAUSE (Doc. No. 995) and to implement the plan by certain dates. The ORDER VACATING ORDER TO SHOW CAUSE (Doc. No. 989) and the ORDER RESOLVING ORDER TO SHOW CAUSE (Doc. No. 1004) will be referred to as the 2013 Stipulated Orders.

On July 24, 2013 the Court issued yet another ORDER TO SHOW CAUSE (Doc. No. 1015) requiring the County to show how it had complied with the 2013 Stipulated Orders. On August 8, 2013, the Court held a hearing and heard from the County's counsel, Mr. Jeffrey Baker, about the County's inability to implement the changes required in the 2013 Stipulated

Orders. Those difficulties were primarily driven by the County's inability to arrange for the housing of inmates in facilities outside of Bernalillo County. It became clear at this hearing that the County did not timely comply with the 2013 Stipulated Orders in several areas.

On November 19, 2013 at the Court's request, Mr. Romero submitted a report assessing whether the County was in compliance with each item in the 2013 Stipulated Orders. On November 20, 2013, the Court held a hearing and heard arguments on Mr. Romero's itemized report. At the hearing, the Court also heard a report from Ms. Elizabeth Simpson, the County's population coordinator.[9] Ms. Simpson informed the Court about the high incarceration rate in Bernalillo County as compared with other communities of its size. She outlined the County's plan to invest in and expand the pre-trial supervision department and the community custody program as well as the County's plans to confront problems in the criminal justice system in Bernalillo County that affected the length of incarceration for pre-trial detainees.

On May 12, 2014, the Court entered the ORDER RESOLVING TWO MOTIONS AND ORDER TO SHOW CAUSE (Doc. No. 1147).[10] In that order, many of the provisions of prior orders were specifically incorporated. In addition, the May 12, 2014 order provided that the County would create "an Emergency Population Management Plan in cooperation with the Criminal Justice Review Commission (CJRC) to ensure that the population at MDC remains at

---

[9] In the ORDER RESOLVING ORDER TO SHOW CAUSE (Doc. No. 1004), the County was required to hire by September 1, 2013, an employee or contractor to monitor "measures for the reduction of the inmate population at the MDC[.]" (Id.) The County hired as a contractor, Ms. Elizabeth Simpson, to act as MDC population coordinator, to address the significant changes needed in the criminal justice system to ease overcrowding at MDC, and to develop alternatives to incarceration of inmates who do not pose a threat to the community. (See Doc. No. 1095, Clerk's Minutes of Hearing on November 20, 2013.)

[10] The order resolved: (1) PLAINTIFFS' AND PLAINTIFF INTERVENORS' JOINT MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR INJUNCTIVE RELIEF (Doc. No. 1133); (2) COUNTY DEFENDANTS' MOTION TO TERMINATE CERTAIN PRIOR ORDERS GRANTING PROSPECTIVE RELIEF BASED ON THE PRISON LITIGATION REFORM ACT (Doc. No. 1135) and (3) ORDER TO SHOW CAUSE (Doc. No. 1015). On August 19, 2014, the order was amended as to certain deadlines. See AMENDED ORDER RESOLVING TWO MOTIONS AND ORDER TO SHOW CAUSE (Doc. No. 1161).

or under 1950." (*Id.* at 7.)[11] That order also contained provisions for the Court's experts to resolve disputes over the implementation of the order's requirements. The order stated that if the experts were unable to resolve disputes, the parties were required to mediate their disputes with Magistrate Judge Torgerson. (*Id.* at 8–9.)

On May 27, 2014, the Court appointed as Special Master, Alan C. Torgerson, who had retired from his position as Magistrate Judge. (Doc. No. 1128.) Chief Magistrate Judge Karen Molzen was assigned as Magistrate Judge in the case.

On June 13, 2014, the Court held a status conference. Ms. Simpson reported that she, on behalf of the County, had worked with the CJRC, the City, the District Attorney's Office, the Public Defender's Office, Judges of the State Second Judicial District Court, and Judges of the Albuquerque Metropolitan Court to achieve the population reductions necessary to maintain MDC population under 1950 inmates. Ms. Simpson reported significant changes that were designed to lower the MDC population: (1) the creation of a new Assistant District Attorney (ADA) position, funded by the City and County, to appear at Metropolitan Court Arraignments and negotiate early plea agreements; (2) the appointment of a pro tempore judge to preside over

---

[11] The CJRC was created by the New Mexico legislature in early 2013. The CJRC is composed of stakeholders in all levels of the criminal justice system in Albuquerque. The legislation charged the CJRC with "reviewing the criminal justice system in Bernalillo county, including judicial process, sentencing, community corrections alternatives and jail overcrowding," to make written recommendations to revise or replace local and state laws, and to "improve the delivery of criminal justice in Bernalillo county." NMSA 1978 § 34-9-17.1. The CJRC's term has been extended to June 30, 2016. Membership in the CJRC consists of the Chief Judges of the Second Judicial District Court and the Metropolitan Court, the County Sheriff, the District Attorney, the Chief of the Albuquerque Police Department, the Chair of the Bernalillo County Commission, the District Public Defender, the Region 2 Manager of NMCD Adult Probation and Parole,  the Executive Director of the New Mexico Association of Counties, and the Director of the Second Judicial District Court's Administrative Office, who serves as Chair of the CJRC.

In February 2015, the CJRC was featured in a report by the National Center for State Courts (NCSC). The NCSC report stated that the changes implemented by the stakeholders in the CJRC "provides a grand lesson in addressing common and seemingly intractable criminal justice challenges. The [CJRC] has been able to breakdown silos and build bridges between local and state government organizations in Greater Albuquerque to successfully confront system wide issues and turn them into opportunities for public good." Gordon Griller, *Integrative Leadership Reducing Felony Case Delay and Jail Overcrowding A Lesson in Collective Action in Bernalillo County, New Mexico,* National Center for State Courts, February 2015, http://www.nmcourts.gov/BernalilloCountyCriminalJusticeReviewCommission.

preliminary hearings;  (3) the adoption of a risk assessment tool for judges to use in determining

whether inmates were eligible for pre-trial release; (4) the expansion of nolle prosequi

dismissals; and (5) the development, with the New Mexico Supreme Court, of a new criminal

case management system to move criminal cases through the courts at a faster pace and to

address the backlog of cases.[12] Mr. Romero worked with both sides to develop comprehensive

new MDC policies. Through the efforts of the parties, their counsel, and Mr. Romero, MDC

adopted a new use of force policy. Mr. Romero also reported on plans to prepare an MDC

staffing plan, to work on a more accurate tracking system for "out of cell" time, and to develop a

new "behavior management program" for disciplining inmates.

On September 23, 2014, the Court entered three orders: (1) ORDER INSTRUCTING

COURT-APPOINTED JAIL OPERATIONS EXPERT MANUEL ROMERO TO EVAULATE

CONDITIONS OF CONFINEMENT AT THE BERNALILLO COUNTY METROPOLITAN

DETENTION CENTER (Doc. No. 1167); (2) ORDER INSTRUCTING COURT-APPOINTED

MEDICAL EXPERT ROBERT GREIFINGER, M.D. TO EVAULATE CONDITIONS OF

CONFINEMENT AT THE BERNALILLO COUNTY METROPOLITAN DETENTION

CENTER (Doc. No. 1168)[13] and (3) ORDER INSTRUCTING COURT-APPOINTED MENTAL

HEALTH EXPERT JEFFREY METZNER, M.D. TO EVAULATE CONDITIONS OF

CONFINEMENT AT THE BERNALILLO COUNTY METROPOLITAN DETENTION

CENTER (Doc. No. 1169) (together the 2014 Evaluation Orders). In the 2014 Evaluation

Orders, the Court ordered each expert to determine whether the County was in compliance with

---

[12] Effective February 2, 2015, a new Case Management Order (CMO), issued by the New Mexico Supreme Court, took effect. The CMO placed tight deadlines for case management in the Bernalillo County court system and for clearing the backlog of old cases.
[13] This order was amended on March 30, 2015. *See* AMENDED ORDER INSTRUCTING COURT-APPOINTED MEDICAL EXPERT ROBERT GREIFINGER, M.D. TO EVAULATE CONDITIONS OF CONFINEMENT AT THE BERNALILLO COUNTY METROPOLITAN DETENTION CENTER (Doc. No. 1187).

specific enumerated provisions from its previous orders.[14] On November 18, 2014, the Court

entered a stipulated order extending the deadline for the County to submit an emergency

population plan. (Doc. No. 1178.)

F.      The 2015 Settlement Agreement: A Means to the End.

At a status conference on March 10, 2015, the Court asked the parties to develop a plan

for disengagement of Court oversight and for eventual dismissal of this lawsuit. As Ms. Simpson

reported at the status conference, several initiatives designed to reduce the MDC population were

working. Ms. Simpson reported the positive effect of the new ADA position on MDC's

population. She stated that the ADA's appearance at Metropolitan Court arraignments had

allowed 472 people to resolve their cases. (Clerk's Minutes Doc. No. 1186.) Ms. Simpson also

reported that MDC's population was positively impacted by the use of preliminary hearings

instead of grand jury proceedings. (*Id.*) The Court concluded that population reductions at the

MDC were resulting in improvements in overall conditions of confinement.

According to the April 8, 2016 report from the CJRC, the MDC has been at or below the

1950 inmate population goal for 506 consecutive days. Monthly Report (April 8, 2016),

http://www.nmcourts.gov/BernalilloCountyCriminalJusticeReviewCommission.

In late 2015 and early 2016, the MDC population has consistently averaged about 1400 inmates.

*Id.*

After the March 10, 2015 status conference, the parties, worked with Special

Master Torgerson to develop a settlement agreement with a view toward finishing what

was started in 1995, while ensuring that the positive changes in the conditions at MDC

---

[14] The 2014 Evaluation Orders resolved the COUNTY DEFENDANT'S MOTION THAT THE COURT-APPOINTED EXPERTS EVALUATE WHETHER CONDITIONS AT THE MDC ARE CURRENT AND ONGOING VIOLATIONS OF FEDERAL CONSTITUTIONAL RIGHTS (Doc. No. 1102) filed on December 19, 2013).

would become permanent. After several months of negotiations, the parties produced the Settlement Agreement that the Court is now considering for final approval. The Settlement Agreement requires the County to first demonstrate initial compliance with numerous standards outlined in three Check-Out Audit Agreements. (Doc. Nos. 1222-2, 1222-3, and 1222-4.) The Check-Out Audit Agreements correspond with each expert's area of evaluation and contain virtually every substantive requirement from previous orders.

Check-Out Audit Agreement No. 1 (Doc. No. 1222-2) (COA 1) governs "the provision of all medical services" other than mental health services. For example, COA 1 requires the Court's medical expert, Dr. Greifinger, to evaluate whether MDC "is conducting and completing a history and physical exam of each inmate in a timely manner, i.e., within 72 hours for inmates with serious medical needs identified at booking and no later than 14 days otherwise." (COA 1 at 2.) Dr. Greifinger will also assess "whether MDC inmates who complain orally or in writing of serious acute illness or serious injury are given immediate medical attention[.]" (*Id.*) Dr. Greifinger must also determine "[w]hether there are systemic and gross deficiencies in staffing, facilities, equipment, or procedures[]" in MDC's medical care. COA 1 outlines in great detail the requirements for treatment of inmates with special physical needs. (COA 1 at 4–6.)

Check-Out Audit 2 (Doc. No. 1222-3) (COA 2) governs the "provision of all mental health services" at the MDC. For example, COA 2 requires the Court's mental health expert, Dr. Metzner, to evaluate whether MDC "screens all inmates with qualified Medical Staff upon booking at MDC, but no later than four (4) hours after booking, to identify the inmate's risk for suicide or self-injurious behavior." (COA 2 at 2.) Dr.

13

Metzner must also analyze "[w]hether MDC Qualified Medical Staff . . . develop and implement an acuity or triage scheme . . . to ensure that inmates with immediate mental health needs are prioritized for services." (*Id.* at 3.) Dr. Metzner must also decide "[w]hether a psychiatrist assesses (no later than the business day after an inmate's admission) any inmate who: (1) reports being on any psychiatric medication when taken into custody; (2) requests any psychiatric medication or other psychiatric service; or (3) has been identified by any mental health or health professional at the jail as appropriate for a psychiatric assessment." (COA 2 at 4.)

Check-Out Audit Agreement 3 (Doc. No. 1222-4) (COA 3) governs the general conditions of confinement at MDC. COA 3 requires the Court's operations expert, Mr. Romero, to evaluate numerous areas of operation within the MDC. For instance, Mr. Romero must determine whether MDC has created an Emergency Population Management Plan in cooperation with the CJRC to ensure that the population at MDC remains at or under 1950. Mr. Romero must determine whether the County is "continuing to use all appropriate population management tools[;]" "has developed and effectively implements comprehensive and contemporary policies regarding the appropriate use of force[;]" and "maintains and effectively implements policies and procedures for a formal disciplinary process[.]" (COA 3 at 2–17.) Mr. Romero will also analyze whether MDC maintains an "objective classification system that separates inmates in housing units by classification levels in order to protect inmates from an unreasonable risk of harm." (COA 3 at 17.) Mr. Romero must determine whether MDC has adopted and implemented an effective inmate grievance system to ensure that grievances are available in English and Spanish, that grievances may be accessed and filed confidentially, and that

grievances receive an appropriate response. (COA 3 at 19.) In sum, Mr. Romero will evaluate the management and operation at MDC to ensure that conditions at MDC are in accordance with generally accepted correctional standards. (COA 3 at 2–39.)

After the Court finds that the County is in initial compliance with a set of requirements outlined in one area described in the relevant Check-Out Audit Agreement, known as a domain,[15] the County must continue to meet the domain's requirements for a Court-imposed period of time. (Settlement Agreement at 5.) During that period of time, the County will "self-monitor" the particular conditions at issue. (*Id.* at 6.) In that regard, the experts and the County will develop self-monitoring protocols to collect and review data and "provide a written analysis of whether the County is substantially complying with each of the substantive requirements set forth in the applicable Check-Out Audit Agreement." (*Id.*) During the self-monitoring period, the County must submit quarterly reports to the appropriate expert and to counsel for Plaintiffs and Plaintiff Intervenors to allow a determination as to whether the County remains in compliance with the particular requirements of the domain at issue. (*Id.*)

At the completion of the self-monitoring period, the experts must conduct "Check-Out Audits" as to each domain and make a finding of compliance, partial compliance, or non-compliance using the standards set out in each Check-Out Audit Agreement. (*Id.* at 7–8.) After each expert completes a Check-Out Audit, the expert is

---

[15] There are a total of eight domains: 1) medical services; 2) mental health services; 3) operations Group A; 4) operations Group B; 5) population management; 6) housing and segregation; 7) sexual misconduct; and 8) use of force and internal investigations. Operations Group A consists of 1) fire and life safety; 2) sanitation; 3) laundry; 4) food service; 5) mail service; 6) access to telephones; 7) access to commissary; 8) access to community services; and 9) competency evaluations. Operations Group B consists of 1) inmate discipline; 2) classification; 3) grievance procedure; 4) safety and supervision; 5) contraband control; 6) staffing; 7) access to counsel and legal materials; 8) law library; 9) programming; 10) access to information; and 11) supplemental categories set forth in ¶¶ 6(Y) and 6(Z) concerning patterns of dangerous conduct by security staff or deficiencies in security staff and communication between health care staff and correctional staff.

required to submit to the Court proposed findings of fact with respect to each subcategory of the applicable Check-Out Audit Agreement. (*Id.* at 8.) Based on the County's self-monitoring reports as well as the experts' proposed findings at the Check-Out Audits, the Court will determine "whether the record supports a finding of sustained substantial compliance as to each domain." (*Id.* at 8.) After a finding of sustained substantial compliance, the extant orders governing that particular domain will be vacated and thus removed from the specific reporting and other requirements imposed by the applicable Check-Out Audit Agreement. (*Id.* at 9–10.)

Once the County has demonstrated sustained substantial compliance in each of the eight domains, the Court will enter a Permanent Injunction with the following provisions: 1) the population of the MDC will be limited to the operational capacity of the MDC, which as of this date is 1950; 2) no inmates will be triple-celled; 3) no inmates will sleep in day rooms, except for detoxification units; 4) high risk or security threat inmates or inmates requiring segregation will not be double-celled with other inmates unless determined to be compatible; 5) segregated inmates who are in protective custody or new intakes may be double celled if they have been determined to be low risk and compatible; and 6) unclassified inmates will not be housed with segregated inmates. The permanent injunction will contain the findings required by the PLRA. After entry of the Permanent Injunction, the Court may dismiss all claims and vacate all extant orders.

II.      LEGAL STANDARD

Rule 23(e) governs the settlement of class actions:

The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
>
> (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
>
> (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
> . . .
> (5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

 Fed. R. Civ. P. 23(e).

Rule 23(e)(1) requires the district court to give class members notice of a proposed class settlement "in a reasonable manner." The notice requirements of Rule 23 are designed to satisfy due process by providing class members the right to notice of settlement and a right to be heard. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173–74 (1974). Notice, therefore, "must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 174 (internal quotation marks omitted).

Under Rule 23(e)(2), a court may approve a settlement agreement as fair and reasonable if the settlement agreement meets four criteria: (1) the settlement was fairly and honestly negotiated; (2) serious legal and factual questions place the litigation's outcome in doubt; (3) the immediate recovery is more valuable than the mere possibility of a more favorable outcome after

further litigation; and (4) the parties believe the settlement is fair and reasonable. *Tennille v. Western Union Co.*, 785 F.3d 422, 434 (10th Cir. 2015).

III.     DISCUSSION

        A.     In Accordance With Rule 23(e)(1), Class and Subclass Members Received Adequate Notice.

In the Order of Preliminary Approval, the Court outlined procedures for the County to follow in notifying the class and subclass members of the terms of the settlement. Attached to the Order of Preliminary Approval were the templates for the Summary Notice (Ex. E) and the Full Notice (Ex. F) to be provided to the class and subclass members at the MDC. At the hearing on May 25, 2016, the County presented the testimony of MDC Assistant Chief for Ethics and Compliance Matt Rivera, who is responsible for MDC's compliance with the Settlement Agreement and the Order of Preliminary Approval. Assistant Chief Rivera testified that he personally directed MDC staff to (1) obtain a certified Spanish language translation of the Summary Notice, the Full Notice, and the Settlement Agreement; (2) post a copy of the Full Notice in English and Spanish in all housing units, the medical services unit, the reception area, the discharge area, the transfer unit and the law library within two days of entry of the Order of Preliminary Approval; (3) post the Summary Notice in the common areas of the segregation units; (4) post a sign stating that each inmate is entitled to a copy of the Full Notice in English or Spanish;[16] (5) provide a complete copy of the Settlement Agreement and copies of the Check-Out Audit Agreements in each housing unit, the law library, and electronically in the Kiosk system; (6) post the Settlement Agreement and the Check-Out Audit Agreements on the County's public website; and (7) publish notice of the Settlement Agreement in the Albuquerque

---

[16] A copy of the sign was admitted as Exhibit C.

Journal newspaper for six weeks. The County provided documentary evidence that each notice requirement was carried out at the MDC. (*See* Hearing Exhibits A-G.)

The Court finds that members of the class and subclass were provided reasonable notice of the Settlement Agreement.

B.     Settlement Agreement Is Fair and Reasonable Under Rule 23(e)(2).

1.     Settlement Agreement Was Fairly and Honestly Negotiated.

The Settlement Agreement negotiations were facilitated by Special Master Torgerson, who has an intimate knowledge of this case and conditions at the MDC, having conducted settlement negotiations over several years as the assigned Magistrate Judge in this case. Special Master Torgerson, counsel for the parties, and representatives of the MDC, negotiated each detail of each provision during numerous meetings, most lasting several hours. Plaintiffs and Plaintiff Intervenors were represented by very experienced civil rights attorneys. Mark Donatelli, Zachary Ives, and Mark Baker represented the Plaintiff class. Peter Cubra, Kelly Waterfall, and Nancy Simmons represented the Plaintiff Intervenors. Collectively, these six attorneys have decades of experience in civil rights cases and prison reform litigation. The County was represented by very capable attorneys with decades of experience, Luis Robles, Taylor Rahn, and Jeff Baker. In addition, numerous MDC staff members participated in the settlement negotiations ensuring that the County had the resources and ability to comply with the terms of the Settlement Agreement. The Settlement Agreement was approved by the Bernalillo County Commission. The Court finds that the Settlement Agreement was fairly and honestly negotiated.

2.      Serious Legal and Factual Questions Place the Outcome in Doubt.

a.      Extant Orders.

Since its inception, this lawsuit has been in a settlement posture. After the rescission of

the 2005 Settlement Agreements, however, the parties have disagreed as to which orders entered

prior to the 2005 Settlement Agreements, if any, govern conditions at MDC. The Court ruled that

the previous settlement agreements from 1996 were revived after the rescission, but many

provisions in those agreements were site-specific to the BCDC. The Settlement Agreement

avoids further conflicts concerning which orders, entered in this case during the last two decades,

apply to the MDC. The Settlement Agreement encapsulates all relevant provisions from previous

orders and removes any doubt as to what provisions apply to the MDC.

b.      The PLRA's Effect on Extant Orders.

The PLRA sets forth the requirements for prospective relief in prison conditions lawsuits.

**(a) Requirements for relief.--**
**(1) Prospective relief.--(A)** Prospective relief in any civil action with respect to
prison conditions shall extend no further than necessary to correct the violation of
the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or
approve any prospective relief unless the court finds that such relief is narrowly
drawn, extends no further than necessary to correct the violation of the Federal
right, and is the least intrusive means necessary to correct the violation of the
Federal right. The court shall give substantial weight to any adverse impact on
public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A) and (B).

Clearly, the numerous orders entered in this case and the Settlement Agreement grant

prospective relief regarding the conditions of confinement at a detention facility; and therefore,

the orders are subject to the provisions of the PLRA. After the rescission of the 2005 Settlement

Agreements, the Court entered numerous orders governing specific conditions at the MDC,

appointing experts to evaluate conditions at the MDC, and resolving orders to show cause. In

some, but not all, of the orders, the findings required under the PLRA were included. As the County recognizes, if any order that omitted the PLRA findings were attacked, the Court must immediately terminate that order. 18 U.S.C. § 3626(b)(2).[17] *See, e.g.,* ORDER RESOLVING ORDER TO SHOW CAUSE (Doc. No. 1004). The Settlement Agreement avoids this risk of termination.

The PLRA also provides for termination of a prospective relief order, upon the motion of a party or intervener—

(i) 2 years after the date the court granted or approved the prospective relief; [or]
(ii) 1 year after the date the court has entered an order denying termination of prospective relief[.]

18 U.S.C. § 3626(b)(1)(A) (i) and (ii). If the County brought a motion to terminate, the Court could deny termination, but only after the Court makes written findings based on the record "that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3). One year later, the County could again move to terminate. 18 U.S.C. § 3626(b)(1)(A)(ii).

The Settlement Agreement recognizes and defines for the parties their rights under the PLRA. The Settlement Agreement provides that the County "will reacquire the right to file motions under the [PLRA]." (Settlement Agreement at 14.) As mentioned, the permanent

---

[17] That provision provides,

In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C.A. § 3626(b)(2).

injunction will be terminable two years after it is entered. (*Id.* at 12.) Thus, the parties are given ample time to implement the provisions of the Settlement Agreement.

### c.     Experts Remain Involved.

Most importantly, the Settlement Agreement provides for review of conditions at MDC by the Court's three experts, counsel, the County itself, and the Court to ensure that Plaintiffs' and Plaintiff Intervenors' claims remain pending until the County demonstrates it has achieved lasting remedies as to all domains in the Settlement Agreement and the Check-Out Audit Agreements. The self-monitoring requirements are critical because they ensure that the County has the personnel and systems in place to monitor and maintain compliant conditions at the MDC.

### d.     Avoiding Rule 60(b) Motion to Modify.

Fed. R. Civ. P. 60(b)(5) provides that a party may be relieved from an order if "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable."[18] In a landmark institutional reform case, the Supreme Court addressed a defendant's motion to modify a consent decree. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992). The *Rufo* case involved a longstanding suit over the conditions of confinement in the Suffolk County, Massachusetts Jail. *Id.* at 372. The parties' settlement was accepted by the district court and entered as a consent decree. *Id.* at 375. Several years later, the Suffolk County Sheriff moved to modify the consent decree arguing that the factual circumstances and legal standards had changed. *Id.* at 376. Both the district court and the court of appeals denied the motion under the "grievous wrong" standard set forth in *United States v. Swift*, 286 U.S. 106, 119 (1932). *Id.* The Supreme Court rejected the use of the "grievous wrong" standard in favor of a flexible standard for courts to apply in

---

[18] This right is recognized in the PLRA. *See* 18 U.S.C. § 3626(b)(4).

considering the modification of consent decrees in institutional reform cases. *Id.* at 380. The Supreme Court outlined a two-part test: "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree," then the court should "consider whether the proposed modification is suitably tailored to the changed circumstances." *Id.* at 383.

The County maintains that in the over two decades of litigation, circumstances certainly have changed. The County believes it could prove that changed factual circumstances warrant modification of the numerous consent decrees in this case under *Rufo* and its progeny. The Settlement Agreement avoids a time-consuming and contentious motion under Rule 60(b)(5) because it enforces and incorporates the existing consent decrees. In addition, the Settlement Agreement provides that any request for a modification of the Settlement Agreement will be mediated by Special Master Torgerson or by a United States Magistrate Judge before such a request is submitted to this Court. (*See* Settlement Agreement at 14.)

In sum, even though the case has been in settlement mode for two decades, the Court finds there remain serious legal and factual issues that place the eventual outcome in doubt for both sides. The parties have chosen the Settlement Agreement as an appropriate and effective way to solidify the improvements in conditions at the MDC while avoiding disputes over what orders apply to conditions at MDC and what standards the experts must use to evaluate the conditions at MDC.

3.      Immediate Recovery is More Valuable than Mere Possibility of a More Favorable Outcome after Further Litigation.

The Settlement Agreement incorporates definable standards from previous orders and provides more certainty to the class and subclass that the relief won in this case will be sustained and made permanent. Unlike previous orders, the Settlement Agreement adds a new dimension

to the relief by requiring the MDC to self-monitor over a period of time and report on the sustainability of improved conditions. The parties agree that the defined exit strategy laid out in the Settlement Agreement is more valuable than the mere possibility of a more favorable decision through litigation. In sum, the process laid out in the Settlement Agreement provides a means to make the improvements at MDC permanent. Absent settlement, there is the real possibility that the parties will continue to litigate over what extant orders govern MDC, whether MDC is in compliance with those orders, and whether the orders are subject to Rule 60(b) alteration or PLRA termination. It is hard to see how continued litigation could produce a more favorable outcome.

>4.      The Parties Believe the Settlement Agreement is Fair and
>        Reasonable and Objections Are Overruled.

The County maintains that the Settlement Agreement is fair and reasonable. Staff at the MDC participated directly in settlement negotiations. Further, the Board of County Commissioners approved the Settlement Agreement after being briefed by legal counsel. Counsel for the class and subclass maintain that the Settlement Agreement is in the best interest of their clients. Counsel for the class and subclass have satisfied the Court that the objections lodged by certain class and subclass members are not sustainable.

The objections submitted by current and former MDC inmates fall into three basic categories. First, some inmates objected to the absence of an award of monetary damages for the class and subclass. However, neither the Complaint (Doc. No. 1) nor the Complaint in Intervention (Doc. No. 150) requested monetary damages. More importantly, the Settlement Agreement does not bar inmates with individual claims from pursuing damages in separate lawsuits.

Second, the objectors complained that the conditions at MDC are substandard and that their rights are being violated. However, these objections miss the point of the Settlement Agreement, which is carefully designed to resolve the problems in the conditions at MDC over a relatively short time frame, and then more importantly, to demonstrate sustained resolution of the problems over time.[19]

Third, Mr. Thomas Sheridan, a former inmate at the MDC, testified at the fairness hearing about his concerns with the Settlement Agreement. Mr. Sheridan identified conditions that admittedly need improvement.[20] Nevertheless, Mr. Sheridan testified that despite his concerns, he did not wish to prevent the approval of the Settlement Agreement and he deferred to counsel for the class and subclass on whether the Settlement Agreement was fair.

Specifically, Mr. Sheridan testified that he did not think that pre-trial detainees should be housed along with convicted inmates; that after booking, inmates should have access to the contact numbers stored in their cellular telephones; and that the telephone system at the MDC is cumbersome. Mr. Sheridan has a valid legal point. Pre-trial detainees may not be punished per se and must be subject to restrictions only as necessary for proper jail administration. *See generally, Bell v. Wolfish*, 441 U.S. 520, 530 (1979). Counsel for the class and subclass assured the Court that they will continue to monitor whether pre-trial detainees' rights are violated. Mr. Sheridan expressed concern that he did not receive a timely response to a grievance submitted through the Kiosk system and that he was not given access to the law library. The Settlement Agreement addresses those issues and counsel for the class and subclass will continue to monitor those

---

[19] Mr. Lafayette Stone telephoned counsel for the class and subclass and also handed a handwritten objection to counsel during an in-person visit.  Mr. Stone's objections were based on the current state of conditions at the MDC rather than the Settlement Agreement itself. Subclass member Mr. Lewis Daniel Fernandez also raised objections in a telephone call to subclass counsel. His objections also concern current conditions at the MDC and are not relevant to the Court's approval of the Settlement Agreement.

[20] Even though other objectors expressed the desire to testify at the fairness hearing, the parties agreed that while any class or subclass member could testify, neither the Settlement Agreement nor due process require that current inmates be transported to the hearing.

items. Finally, Mr. Sheridan testified that he could not afford basic necessities because the prices at the MDC commissary were too high. These are all reasonable complaints about conditions at MDC, but they are not sufficient to deny approval of the Settlement Agreement. The Settlement Agreement contemplates steady improvement in conditions, not immediate resolution of all issues.

An objection filed on April 4, 2016 also contends that MDC is not in substantial compliance with the terms of the Settlement Agreement. This objection reflects a misunderstanding of the Settlement Agreement, which provides that the Court will determine incrementally whether the MDC is in substantial compliance with the standards set out for each domain.

In conclusion, the parties have persuaded the Court that the Settlement Agreement is fair, reasonable, and adequate under the four factors outlined in the *Tennille* case, and the Court will approve the Settlement Agreement. The Settlement Agreement provides a way to solidify improvements at the MDC and eventually end this decades old lawsuit. It is this Court's sincerest hope that the parties will achieve these goals.

IT IS ORDERED that the SETTLEMENT AGREEMENT (Doc. No. 1222-1) is approved.

_____
SENIOR UNITED STATES DISTRICT JUDGE

26