## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**JIMMY (BILLY) McCLENDON, et al.,**

      **Plaintiffs,**

**vs.**                                                        **Case No. 95 CV 24 JAP/KBM**

**CITY OF ALBUQUERQUE, et al.,**

      **Defendants,**

**vs.**

**E.M., R.L., W.A., D.J., P.S., and N.W.,**
**on behalf of themselves and all others similarly situated,**

      **Plaintiff Intervenors.**

### MEMORANDUM OPINION AND ORDER

In PLAINTIFF INTERVENORS' AMENDED MOTION FOR AN ORDER TO SHOW CAUSE AND FOR FURTHER REMEDIAL RELIEF REGARDING CITY DEFENDANTS (Doc. No. 1233) (Motion) Plaintiff Intervenors[1] ask the Court to issue an order to show cause why the City Defendants should not be held in contempt for failing to comply with these stipulated orders: (1) SUPPLEMENTAL ORDER TO ENFORCE PREVIOUSLY ORDERED POPULATION LIMITS AT THE BCDC MAIN FACILITY (Doc. No. 319) (2001 Supplemental Order); and (2) STIPULATED AGREEMENT (Doc. No. 361) (2002 Stipulated Order). The City of Albuquerque (City) and the Mayor of

---

[1] On August 3, 2016, Plaintiffs filed a notice of joinder in the Motion. *See* PLAINTIFFS' NOTICE OF JOINDER IN PLAINTIFF INTERVENORS' AMENDED MOTION FOR AN ORDER TO SHOW CAUSE AND FOR FURTHER REMEDIAL RELIEF REGARDING CITY DEFENDANTS (Doc. No. 1234). For simplicity, the Court will refer only to Plaintiff Intervenors as movants.

Albuquerque (together City Defendants) oppose the Motion. *See* CITY OF

ALBUQUERQUE'S RESPONSE TO PLAINTIFF INTERVENORS' AMENDED

MOTION FOR AN ORDER TO SHOW CAUSE AND FOR FURTHER REMEDIAL

RELIEF REGARDING CITY DEFENDANTS (Doc. No. 1237) (Response). Plaintiff

Intervenors and Plaintiffs jointly replied to the City Defendants' Response. *See*

PLAINTIFF INTERVENORS' AND PLAINTIFFS' JOINT REPLY TO CITY OF

ALBUQUERQUE'S RESPONSE TO PLAINTIFF INTERVENORS' AMENDED

MOTION FOR AN ORDER TO SHOW CAUSE AND FOR FURTHER REMEDIAL

RELIEF REGARDING CITY DEFENDANTS (Doc. No. 1239) (Reply).[2] The Court will

grant the Motion in part and deny the Motion in part.

    I.      BACKGROUND

        A.    The Original Settlement Agreements.

    This lawsuit began in 1995 as a class action alleging unconstitutional conditions

at the Bernalillo County Detention Center (BCDC) located in downtown Albuquerque,

New Mexico. At that time, both the City and Bernalillo County (County) jointly operated

the BCDC. On August 23, 1995, the Court certified "a class of persons presently

confined in BCDC or who may/will be so confined in the future," represented by

Plaintiffs. *See* ORDER (Doc. No. 106). On August 15, 1996, the Court certified "a sub-

class of all persons with mental and/or developmental disabilities who are, or in the

---

[2] The Amended Motion replaces Plaintiff Intervenors' previous Motion against the City. *See* PLAINTIFF INTERVENORS' MOTION FOR AN ORDER TO SHOW CAUSE AND FOR FURTHER REMEDIAL RELIEF REGARDING CITY DEFENDANTS (Doc. No. 1191) (Original Motion) filed August 17, 2015. CITY OF ALBUQUERQUE'S RESPONSE (Doc. No. 1195) (Original Response) filed August 31, 2015; and PLAINTIFF INTERVENORS' REPLY (Doc. No. 1203) (Original Reply) filed September 28, 2015. The Court did not rule on the original motion because soon after it was filed, Plaintiffs, Plaintiff Intervenors, and the County negotiated a settlement agreement and submitted it for Court approval. *See* STIPULATED ORDER PRELIMINARILY APPROVING SETTLEMENT, REQUIRING NOTICE TO CLASS AND SUBCLASS MEMBERS, AND SETTING FAIRNESS HEARING (Doc. No. 1213) (the 2016 County Settlement Agreement).

future may be, detained at the [BCDC]," represented by Plaintiff Intervenors. *See*

ORDER CERTIFYING SUB-CLASS (Doc. No. 237). In November 1996, Plaintiffs and

Plaintiff Intervenors entered into two settlement agreements with both the City

Defendants and Bernalillo County and its officials (County Defendants) (together,

Defendants). The Court adopted the settlement agreements in two orders: the ORDER

REGARDING THE PRISON LITIGATION REFORM ACT (Doc. No. 255) (the PLRA

Order) and the ORDER (Doc. No. 256) (the 1996 Order).

In the PLRA Order, the Court ordered Defendants to significantly reduce the

average daily population at BCDC.[3] To achieve population reduction, the Court required

Defendants to meet and "develop solutions to the continuing resident population

pressures at BCDC . . .," including the "possible development of additional drug

treatment and/or mental health treatment facilities." PLRA Order at 4. The Defendants

also agreed to "seek additional sources of funding for pre-trial services at BCDC." (*Id.*)

Representatives of Plaintiffs, Plaintiff Intervenors, and Defendants were required to meet

every month to discuss "defendants' efforts to reduce overcrowding . . . and defendants'

compliance with the court's orders[.]" (*Id.* at 5.)[4]

On August 12, 1997, the Court entered a CORRECTED ORDER APPROVING

COMPROMISE & SETTLEMENT AGREEMENT & FINAL JUDGMENT OF

DISMISSAL WITH PREJUDICE (Doc. No. 289) (Judgment). In the Judgment, the Court

---

[3] For seven months beginning November 1, 1996, the BCDC was required to have an average daily population of 700 residents. (*Id.* at 3.) Beginning June 1, 1997, the average daily population was to be no greater than 643, and beginning August 1, 1997, that population was to be no greater than 586. (*Id.* at 4.)
[4] The PLRA Order also required Defendants to (1) "open a 25 bed medical detox facility at BCDC;" (2) "contract with a licensed psychologist to provide written competency evaluations to BCDC residents charged with misdemeanors who are ordered . . . to undergo such evaluations;" (3) add staff to the "Alternatives to Secure Detention (ASDP);" and (4) "meet with officials of the Public Defender Department, the District Attorneys' Office, and the Metropolitan and District Courts to encourage them to use ASDP more often." (*Id.* at ¶¶ 6-8.)

reiterated its approval of the 1996 settlement agreements embodied in the PLRA Order

and the 1996 Order, and stated that this lawsuit "should henceforth be maintained as a

class action with respect to any claims for injunctive relief under 42 U.S.C. § 1983, § 504

of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities

Act, 42 U.S.C. § 12101 for deprivation of rights under the United States and New Mexico

Constitutions allegedly caused by overcrowding at BCDC[.]" (Judgment at 2.) The Court

ordered that:

> all claims which were brought in this class action in the Complaint or
> Amended Complaint-in-Intervention, except as to Plaintiff-Intervenors'
> claims of denial of equal protection for female subclass members and of
> access to the courts, are dismissed with prejudice . . . [and] all class and
> subclass members are barred from prosecuting against Defendants any
> action for declaratory or injunctive relief, whether it be a class action or
> otherwise, with respect to, based on, or arising from, or for any of the acts,
> omissions, facts, events, matters, transactions, or occurrences complained
> of, related to, arising from or referred to in Parts I and III of the Complaint
> and Plaintiff-Intervenors' Amended Complaint-in-Intervention in this
> action, including but not limited to the operation, policies or procedures of
> the Bernalillo County Detention Center, or arising out of the subject
> matter of this action, which might have been asserted in this action.

(*Id.* at 9.) The Court retained jurisdiction to enforce "the settlement." (*Id.* at 10.)

        B.    The 2000 Order, the 2001 Supplemental Order, and the 2002
               Stipulated Agreement.

On September 25, 2000, the Court entered an ORDER (Doc. No. 315) (the 2000

Order) resolving PLAINTIFF INTERVENORS' MOTION FOR FURTHER

REMEDIAL RELIEF. *See* Doc. No. 243 (arguing that the Defendants were not

complying with the PLRA Order and the 1996 Order on population reduction). In the

2000 Order, the Court found that for eleven of the previous twelve months the

Defendants had violated the requirement that the average population of BCDC not exceed

586 inmates.[5] The Court recognized that Defendants had used various means to bring the population down including, "building an interim westside facility, . . . asking law enforcement agencies to issue citations rather than incarcerating people whenever appropriate, . . . and renting beds in out-of-county jails." (*Id.* at 3.) The Court found that, despite those efforts, the average daily population at BCDC was 829 inmates at that time. (*Id.*) Recognizing that the processing of criminal cases within the state judicial system affected the BCDC population, the Court ordered Defendants to "provide what is necessary for the appointment of one or more pro tem state judges" to help reduce the jail population.[6] In October 2000, the Chief Judge of the Second Judicial District Court, Bernalillo County, New Mexico appointed Rebecca Sitterly as pro tem district judge and ordered Judge Sitterly to find ways to reduce the population of BCDC, so Defendants could meet the Court-imposed population cap of 586 inmates.[7]

Despite the efforts of Judge Sitterly, the parties, and several non-party stakeholders, the monthly average population levels at BCDC continued to exceed the Court-imposed cap. On June 27, 2001, the Court entered the 2001 Supplemental Order, which required Defendants to *inter alia* "[p]rovide direction to law enforcement officials under the control of the City and/or the County to issue citations where appropriate and to use the 'walk through procedures,' rather than incarcerating individuals, where

---

[5] The Court noted that the BCDC facility was designed to house 563 residents. (2000 Order at 2.)
[6] The Court required the pro tem judges to have authority to "a) utilize a 'judicial classification system' to evaluate the classification status of inmates in BCDC; b) process probation and parole violators as expeditiously as possible; c) handle failure to appear warrants more expeditiously; d) issue orders to the Department of Corrections (DOC) to transport inmates to the local DOC facility for transport to court; and e) consider and implement other measures consistent with the judgments and sentences to reduce the population of BCDC." (2000 Order at 4.)
[7] *See* Transcript of Proceedings held on April 11, 2002 (Doc. No. 1240) at 5:7-13.

appropriate." (2001 Supp. Ord. at 5 ¶1.) The 2001 Supplemental Order also required that

Defendants

> schedule a meeting or meetings concerning the provision of mental health
> services in Bernalillo County. . . . to plan how to implement an effective
> jail diversion program for persons with psychiatric or developmental
> disabilities. At the meeting the participants shall address at least those
> topics set forth in ¶ 8 above.[8]

(*Id.* at 6 ¶ 4.) At a hearing on April 11, 2002,[9] the Court heard testimony from Judge

Sitterly and accepted as an exhibit a June 29, 2001 report from Judge Sitterly (Doc. No.

319-1) (the Sitterly Report). The Sitterly Report was prepared to keep the Court "up to

date on the initiatives" that had been implemented "to varying degrees since November 1,

2000." (*Id.*) The Sitterly Report outlined several population management actions that had

been used to reduce the jail population:

> Per attachment 1,418 people were walked through rather than booked in
> the last 90 days. These people were brought to jail on warrants, and
> therefore have already failed to appear on more than one occasion. Of
> these, nearly 80% are showing up at court after walk-through without
> further problems, which pretrial services feels is an outstanding success.
>                                            . . .

---

[8] Paragraph 8 of the 2001 Supplemental Order states:
> Treatment programs and modalities which have proven effective in other communities
> for the safe, cost-effective and beneficial treatment of individuals with mental disabilities
> are not available in Bernalillo County in sufficient quantities to serve sub class members
> who could end or avoid incarceration by participating in such treatment programs.
> Effective jail diversion services for mentally disabled sub class members are needed in
> Bernalillo County to reduce jail overcrowding. Increased intensive mental health case
> management, crisis housing, and detox services, as well as a drop-in center for psycho-
> social rehabilitation, would reduce overcrowding at the jail.

(2001 Supp. Ord. ¶ 8.)
[9] This was an emergency hearing called at the request of Pro Tem Judge Rebecca Sitterly based on the
continued over-population of BCDC. The Court had Judge Sitterly testify as to the population measures
that had been effective in reducing the population at the BCDC. *See generally,* Transcript of Proceedings,
Status Conference, April 11, 2002 (Doc. No. 1240).

Several months ago, Pretrial Services started calling people to remind them of their Metro Court hearing date one day in advance. . . . Attendance rates have improved significantly, meaning that fewer bench warrants for failure to appear for court are necessary. . . . Both the jail population and police time and effort are reduced with each bench warrant saved.

. . .

APD has been convinced to direct its officers to cite and release offenders in the field for misdemeanor activity which is not violent and does not pose a threat to the safety of the community. This action has been seriously undertaken only as of June, but the beneficial effects were felt immediately in terms of jail population.

. . .

APD officers have been instructed to obtain every possible phone number from people they stop and arrest or cite and release, and to write the phone number(s) on the face of the arresting/citing document. This will immediately help the efforts of Pretrial Services to call and remind people of court dates, and the efforts of the BCDC clerk to notify people that there is a warrant for their arrest.

Sitterly Report (Doc. No. 319-1) at 1-2, 8-9.

In August 2001, Plaintiffs and Plaintiff Intervenors filed a JOINT MOTION FOR AN ORDER TO SHOW CAUSE AND FOR FURTHER REMEDIAL RELIEF (Doc. No. 320) alleging that BCDC "populations exceed[ed] the cap in eight out of the past nine months, and populations exceed[ed] 700 in recent days." (*Id.* at 2.)

Plaintiffs, Plaintiff Intervenors, and Defendants resolved the joint motion and the Court entered the 2002 Stipulated Order, which required Defendants to "continue to employ all existing population management tools[.]" (*Id.* at 2.) Plaintiff Intervenors urge the Court to find that the Sitterly Report, filed as an attachment to the 2001 Supplemental Order as Doc. No. 319-1, was incorporated into the 2001 Supplemental Order and became part of the injunctive relief ordered by the 2001 Supplemental Order. Plaintiff Intervenors also urge the Court to conclude that the 30 population control measures

described in the Sitterly Report define the "population management tools" that the 2002 Stipulated Order originally required and continues to require the City Defendants to use.[10]

However, under Rule 65(d) orders of injunctive relief cannot rely on other documents to provide the "act or acts restrained or required." Fed. R. Civ. P. 65(d).[11] Rule 65(d) "expressly proscribes the issuance of an injunction which describes the enjoined conduct by referring to another document." *Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*, 84 F.3d 367, 371 (10th Cir. 1996) (citing *Thomas v. Brock*, 810 F.2d 448, 450 (4th Cir. 1987)). Under this rule, the terms of the 2001 Supplemental Order and the 2002 Stipulated Order cannot be defined by the Sitterly Report. The Court cannot enforce by contempt any failure by the City Defendants to continue to implement the measures described in the Sitterly Report. *Id.* Consequently, the "population management tools" referred to in the 2002 Stipulated Order can only be defined by specific requirements of this Court's previous orders such as those outlined in the body of the 2001 Supplemental Order.

## C.     The Metropolitan Detention Center

In June 2003, the City and County completed the transfer of inmates from the BCDC to the newly-constructed Metropolitan Detention Center (MDC) located in western Bernalillo County. Soon thereafter, Defendants restricted counsel for class and

---

[10] Notably, neither the 2001 Supplemental Order nor the 2002 Stipulated Order actually refers to the Sitterly Report. The 2001 Supplemental Order was filed on June 27, 2001, two days before the date of the Sitterly Report, which was June 29, 2001. Because the Sitterly Report was not mentioned in either order it is impossible to know when the Sitterly Report was actually filed as Doc. No. 319-1. There is no file stamp on the Sitterly Report and it is labeled "Defendant's Exhibit A." Yet, at the April 11, 2002 status conference, the Report was entered as Court's Exhibit 1. (Transcr. (Doc. No. 1240) at 9:14.)

[11] Rule 65(d) provides: "Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail--and not by referring to the complaint or other document--the act or acts restrained or required." Fed. R. Civ. P. 65(d).

subclass members from access to the MDC facility because they believed the case no longer applied to inmates in the MDC. On July 11, 2003, the Court granted a joint motion for access to the MDC[12] and ruled that the Court had jurisdiction over conditions at the MDC: "the language of the parties' settlement agreements and the Court's orders suggests that the parties did not intend to limit, for purposes of the class and the subclass definitions or otherwise, the term 'BCDC' to a particular facility, but rather intended that term to apply to the jail system as a whole." (*Id.* at 7.) In addition, reference to BCDC and additional facilities in settlement agreements meant that the settlement agreements "would apply equally to such additional facilities." (*Id.* at 8.) The Court further stated, "[w]hile the central purpose of the Court's orders was to ameliorate overcrowding, an additional and equally compelling purpose was to eliminate the unnecessary incarceration of individuals, including people with disabilities and probation violators." (*Id.* at 9.) One of the cited provisions required Defendants to "implement an effective jail diversion program for persons with psychiatric or developmental disabilities[.]" (*Id.*)

In the ensuing months, the parties negotiated and the Court approved two new settlement agreements concerning the MDC. *See* STIPULATED SETTLEMENT AGREEMENT BETWEEN PLAINTIFF INTERVENORS AND DEFENDANTS (Doc. No. 514); and STIPULATED SETTLEMENT AGREEMENT BETWEEN PLAINTIFFS AND DEFENDANTS (Doc. No. 515) (together the 2005 Stipulated Settlement Agreements). However, the Court later withdrew its approval of the 2005 Settlement Agreements, and the Plaintiffs and Plaintiff Intervenors were allowed to rescind those

---

[12] PLAINTIFFS' AND PLAINTIFF INTERVENORS' JOINT MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ENJOINING THE DEFENDANTS FROM RESTRICTING CLASS AND SUBCLASS COUNSEL FROM HAVING ACCESS TO THE METROPOLITAN DETENTION CENTER (Doc. No. 409).

agreements. In July 2006, the City transferred full operational control of the MDC to the County. Since that time, the County has managed the MDC, but the City Defendants have remained parties to this lawsuit.

Although the MDC does not currently suffer from overcrowding, Plaintiff Intervenors assert that the City Defendants have not consistently complied with the terms in the 2001 Supplemental Order and the 2002 Stipulated Order requiring the City to use walk through procedures, issue citations, and develop jail diversion programs for mentally ill and disabled individuals.[13]

II.     STANDARD OF REVIEW

A.     Jurisdiction

The Court has subject matter jurisdiction because it retains the authority and jurisdiction to enforce its own orders. *Spallone v. United States*, 493 U.S. 265, 276 (1990). When a federal court "invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution," the court has the continuing duty and responsibility to "assess the efficacy and consequences of its order." *Brown v. Plata*, 563 U.S. 493, 542 (2011). In other words, a federal court is "not reduced to issuing injunctions against [public officials] and hoping for compliance. Once issued, an injunction may be enforced." *Hutto v. Finney*, 437 U.S. 678, 690 (1978). Moreover, in the Judgment, the Court expressly retained jurisdiction to enforce the original settlement.

---

[13] The Court notes that under the most recent settlement agreement approved on June 27, 2016 (Doc. No. 1225), the County Defendants must develop an adequate plan to implement an effective jail diversion program for persons with psychiatric or developmental disabilities. (Doc. No. 1222-3 at 20.) The County Defendants also must direct their law enforcement officials to issue citations, where appropriate, and to use the "walk through procedures" rather than incarcerating individuals, where appropriate. (Doc. No. 1222-4 at 3.)

B.      Civil Contempt

A consent decree "is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992). A party to a consent decree that is aggrieved by the other's noncompliance may apply for an order to show cause why the noncompliant party should not be held in contempt. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 381–82 (1994). Civil contempt sanctions are the primary means of compelling a party's compliance with the provisions of such a decree. *Id.*

Once an order to show cause is issued, a court may hold a party in contempt only if the movant establishes, by clear and convincing evidence, "that a valid court order existed, that the [non-movant] had knowledge of the order, and that the [non-movant] disobeyed the order." *Reliance Ins. Co. v. Mast Const. Co.,* 159 F.3d 1311, 1315 (10th Cir. 1998) (citation omitted). A party may avoid a finding of contempt if it demonstrates that it attempted compliance in good faith based on a reasonable interpretation of the order. *See Braintree Labs., Inc. v. Nephro–Tech, Inc.,* 99 F. Supp. 2d 1300, 1303 (D. Kan. 2000). However, "if the defendant takes all reasonable steps and substantially complies with the court order," a finding of civil contempt may be avoided. *Id.*

> Civil contempt . . . is a severe remedy which should be used only when necessary to sustain the authority of the court. *NLRB v. Shurtenda Steaks, Inc.,* 424 F.2d 192, 194 (10th Cir. 1970). . . . The movant must establish that the alleged contemnor has not diligently attempted to comply in a reasonable manner with a court order. *King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir. 1995). Technical or inadvertent violations of a court order do not support a finding of civil contempt. *Universal Motor Oils Co. v. Amoco Oil Co.,* 743 F. Supp. 1484, 1487 (D. Kan. 1990).

11

*T.Y. by Petty v. Bd. of Cty. Comm'rs of Cty. of Shawnee*, 912 F. Supp. 1424, 1427–28 (D. Kan. 1996). If a movant fails to show that an order of contempt is justified or necessary, the court can decline to enter an order of contempt. *Id.* at 1428.

C.      Further Remedial Relief

Plaintiff Intervenors ask the Court to order additional compensatory and coercive remedial relief against the City Defendants for violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (ADA) and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (RA). The Court has jurisdiction over this request, and Plaintiff Intervenors may seek further remedial relief in this action in addition to the relief granted in previous consent decrees. *McNeil v. Guthrie*, 945 F.2d 1163, 1165-66 (10th Cir. 1991) (finding that individuals who file suit complaining about unconstitutional prison conditions must seek relief through ongoing prison-conditions class action). In addition, as stated in the Judgment, requests for injunctive relief under the ADA and RA on behalf of the subclass should be dealt with in this class action. *See Ginest v. Board of County Comm'rs of Carbon County*, 333 F. Supp. 2d 1190, 1204 (D. Wyo. 2004) (finding that consent decree was enforceable through contempt and did not prohibit court from granting remedial relief for ongoing Eighth Amendment violations).

III.    DISCUSSION

A.      Motion for Order to Show Cause.

1.      This lawsuit governs conditions of confinement, overcrowding, and the causes of overcrowding.

The City Defendants contend that the issues litigated in this lawsuit have focused on conditions of confinement inside of Bernalillo County jail facilities and that Plaintiff Intervenors are attempting to inappropriately broaden the scope of this litigation to

12

include "pre-jail intervention." Since the relevant provisions of the 2001 Supplemental

Order and the 2002 Stipulated Order involve keeping individuals out of custody, the City

Defendants imply that this Court lacked jurisdiction to enter those orders. The Court

disagrees. From its inception this case has addressed not only unconstitutional jail

overcrowding but also the causes of overcrowding. The Amended Complaint in

Intervention alleged:

> Defendants, in the administration of the Albuquerque Police Department, Bernalillo County Sheriffs' Office and the Bernalillo County Detention Center, have violated Plaintiff Intervenors' rights under the ADA by: a. failing to establish an adequate system for identifying mental, behavioral and developmental problems of people arrested and/or brought to the jail; b. failing to develop for and provide to Plaintiff Intervenors necessary therapeutic placements and services; . . . d. failing to provide pre-trial release services . . . that are as effective as those provided to their non-disabled peers; . . . f. denying Plaintiff Intervenors programs, activities and services in the most integrated setting; . . . [and] j. failing to make reasonable modifications in programs, policies and procedures when necessary to avoid discrimination against Plaintiff Intervenors on the basis of disability[.]

(Am. Compl. in Interv. (Doc. No. 150) ¶ 103.)

. . .

> The Albuquerque Police Department and Bernalillo County Sheriffs' Office [are] more likely to bring persons with psychiatric, developmental or other mental health disorders to the BCDC for booking than they are similarly situated persons with medical conditions that are not psychiatric disorders or mental health disorders. Non-disabled citizens receive citations for the same alleged offenses. Police and deputies rarely use the option of transporting subclass members to the University of New Mexico Health Center, rather than the jail.

(*Id.* ¶ 125.)

> Persons with psychiatric, developmental or other mental health disorders are more likely to be booked into the BCDC by BCDC staff than are similarly situated persons without such disorders . . . persons with psychiatric disabilities that warrant psychiatric hospitalization do not [get it].

(*Id.* ¶ 126.) In the Prayer for Relief, Plaintiff Intervenors asked the Court to "declare unlawful Defendants' policy and practice of denying Plaintiff Intervenors . . . needed therapeutic services[,]" and Plaintiff Intervenors asked the Court to issue injunctive relief "directing Defendants to immediately propose and promptly implement a plan to: . . . Divert all people needing and wanting in-patient treatment to an appropriate treatment facility." (*Id.* p. 42.)

This lawsuit has not been limited to conditions inside of Defendants' jail facilities. In crafting remedial relief, the parties and the Court appropriately addressed causes of jail overcrowding including the unnecessary incarceration of certain individuals. The City Defendants maintain that no previous orders addressed pre-jail intervention. However, the PLRA Order set certain population limits on a specific time-table and recognized that jail alternatives were necessary to achieve those limits. If the City Defendants did not want to address jail alternatives as a solution to overcrowding, they should not have agreed to the original settlement embodied in the PLRA Order. And, in 2000, because the population of the jail had not been sufficiently reduced, Plaintiffs and Plaintiff Intervenors moved to enforce the PLRA Order. The resulting 2001 Supplemental Order required Defendants to use additional alternatives to incarceration, such as the use of citations and walk through procedures, "where appropriate." (2001 Supp. Ord. at 5 ¶1.) Defendants were also ordered to meet, plan, and implement an effective jail diversion program for subclass members. (*Id.* at 6 ¶ 4.) Thus, the City's argument that this lawsuit is limited to conditions inside of jail facilities is simply untenable.

2.      This class action proceeding is the proper avenue for additional relief.

The City Defendants maintain that the Judgment resolved and dismissed all claims; therefore, Plaintiff Intervenors may not seek additional remedial relief for violations of federal law. However, this argument ignores the body of case law that requires individuals to bring within the class action all requests to rectify constitutional or federal law violations similar to those alleged in the class action. *See supra* Part II. C.

3.      The City Defendants must comply with the Court's orders.

The City Defendants argue that when the County took over full operational control of the MDC in July 2006, the County Defendants assumed responsibility to fulfill the requirements of all remedial orders. The City Defendants contend that it is the County Defendants' duty to create an effective jail diversion program for individuals with mental disabilities, to develop walk through procedures, and to cite and release non-violent misdemeanants.

The City Defendants ignore the fact that they remain parties in this suit and that they have never moved to vacate or modify the remedial orders to reflect the City Defendants' perceived complete transfer of responsibility to the County Defendants. "Rule 60(b)(5) provides that a party may obtain relief from a court order when 'it is no longer equitable that the judgment should have prospective application[.]'" *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. at 383. Recently, courts have been encouraged to allow parties flexibility in modifying consent decrees. *See Horne v. Flores*, 557 U.S. 433, 447 (2009) (stating that public reform decrees demand a flexible approach to injunctions that remain in force for many years and that a court abuses its discretion when it refuses to modify a consent decree in light of meritorious changes in circumstances). However,

15

even with the flexibility allowed by *Horne*, the Court would not have granted a motion by the City Defendants to vacate or modify the applicable remedial orders as they relate to the City's police department practices, which affect jail population.

Hence, even though the City Defendants relinquished operation and control of the MDC to the County, the City Defendants cannot avoid their duty to obey the Court's orders related to the City Defendants' law enforcement activities. It is still the responsibility of the City Defendants to direct Albuquerque police officers to cite and release and to use walk through procedures "where appropriate." As counsel for Plaintiff Intervenors asserted at the hearing on July 19, 2016, the City maintains a Prisoner Transport Unit in downtown Albuquerque where arrestees are held pending transport to the MDC. Plaintiff Intervenors' counsel suggested that the City Defendants could implement walk through procedures at that site to allow some detainees to avoid transport to and custody in the MDC. Finally, it is still the City Defendants' responsibility to work with the County Defendants to implement effective jail diversion programs for mentally ill and disabled individuals.

        4.      Laches does not bar Plaintiff Intervenors' Motion.

The City asks the Court to deny Plaintiff Intervenors' Motion under the doctrine of laches because Plaintiff Intervenors waited over a decade to enforce the 2001 Supplemental Order and the 2002 Stipulated Order. In general, a claim may be barred under the doctrine of laches when a party, having knowledge of the relevant facts, delays for an unreasonable length of time in the assertion of that right. *Alexander v. Phillips Petroleum Co.*, 130 F.2d 593, 605 (10th Cir. 1942) ("The doctrine of courts of equity to withhold relief from those who have delayed the assertion of their claims for an

16

unreasonable length of time is thoroughly settled."). Whether laches bars an action depends on the facts and circumstances of each case. *Id.* More importantly, "[i]t is not a mere matter of lapse of time, but of change of situation during neglectful repose, rendering it inequitable to afford relief." *Id.* In sum, laches will not bar a claim unless two things are demonstrated: (1) unreasonable delay in asserting the claim, and (2) material prejudice as a result of that delay. *Id.*

Plaintiff Intervenors have demonstrated that they have not been in "neglectful repose" during the last decade and a half. In the months following the PLRA Order, serious efforts at population reduction yielded some decrease in BCDC population levels. As described in the Background section, however, the Court recognized in its 2000 Order that for the previous 11 out of 12 months, the average daily BCDC population was far above the target set by the Court. That year, one of the methods of lowering the BCDC population was by "asking law enforcement agencies to issue citations rather than incarcerating people whenever appropriate." (2000 Order at 3.) To aid in further reform, the Court ordered Defendants to provide for the appointment of a pro tem state judge. (*Id.*) However, Plaintiff Intervenors continued to assert that law enforcement arrest and booking practices also contributed to the jail overpopulation. This focus led to the 2001 Supplemental Order and the 2002 Stipulated Order. Even after the MDC was opened, additional motions in 2004 led to the 2005 settlement agreements, which addressed alternatives to jailing subclass members in a section entitled "Community-based services for sub class members." *See* STIPULATED SETTLEMENT AGREEMENT BETWEEN PLAINTIFF INTERVENORS AND DEFENDANTS (Doc. No. 514) at 7–8. In 2009, the Court withdrew its approval of the 2005 settlement agreements and those agreements

were rescinded. The County appealed the Court's order withdrawing its approval, but that appeal was dismissed as interlocutory.

In July 2011, Plaintiff Intervenors again sought to obtain remedial relief, and the County Defendants sought to reinstate the 2005 settlement agreements. *See* MOTION BY PLAINTIFFS AND PLAINTIFF INTERVENORS FOR AN ORDER APPOINTING COURT EXPERTS PURSUANT TO FEDERAL RULE OF EVIDENCE 706 (Doc. No. 849) and COUNTY DEFENDANTS' MOTION TO REINSTATE THE 2005 STIPULATED SETTLEMENT AGREEMENTS (Doc. No. 853). The City Defendants did not oppose the County Defendants' motion to reinstate the 2005 settlement agreements, which, technically speaking, would have revived the requirement to develop community-based services for subclass members. The Court appointed the requested Rule 706 experts and had those experts initially evaluate the conditions within MDC using certain provisions of the 2005 settlement agreements as the standards of measurement.[14]

The Court concludes that the City Defendants have failed to show that Plaintiff Intervenors unreasonably delayed in asserting their rights and that the City Defendants were prejudiced by the passage of time. Therefore, the Plaintiff Intervenors are not barred under the doctrine of laches from seeking enforcement of the relevant provisions of the 2001 Supplemental Order and the 2002 Stipulated Order.

---

[14] The Court notes that it initially limited Dr. Jeffrey Metzner's evaluation of the mental health services at MDC to only those services provided to inmates, and the Court did not address the provision of community-based services.

5.      Compliance with the 2001 Supplemental Order and the 2002
Stipulated Order will not interfere with *United States v. City of
Albuquerque*.

The City Defendants contend that Plaintiff Intervenors have asked the Court to

expand this lawsuit to allow the Court to monitor the Albuquerque Police Department

(APD); and if that occurs, this Court will interfere with monitoring under a settlement

agreement entered in *United States v. City of Albuquerque*, No. 14 CV 01025 RB/SMV

(the DOJ case). In that case, United States District Judge Robert C. Brack approved a

SETTLEMENT AGREEMENT (Doc. No. 134) (DOJ Settlement Agreement) designed to

ensure that the APD complies with the Constitution and federal law in its use of force.

The DOJ Settlement Agreement was presented to Judge Brack based on findings made by

the United States Department of Justice (DOJ) that APD had a pattern and practice of

using excessive force. Compliance with the DOJ Settlement Agreement will be

determined by a monitor appointed by Judge Brack. According to the City Defendants,

the DOJ Settlement Agreement governs "virtually all interactions with sub class

members;" thus, it would be duplicative and burdensome for this Court to monitor

compliance with the 2001 Supplemental Agreement and the 2002 Stipulated Order.

Notably, in the DOJ case, the Plaintiff Intervenors submitted an *Amicus* brief

opposing the approval of the DOJ Settlement Agreement. Plaintiff Intervenors argued

that certain provisions "(1) will likely cause harm to people with mental disabilities or

developmental disabilities and (2) could also impair the protections afforded *McClendon*

subclass members by the federal court's order in that case." No. 14 CV 01025 RB/SMV,

*AMICUS CURIAE* BRIEF ON BEHALF OF PEOPLE WHO HAVE MENTAL OR

DEVELOPMENTAL DISABILITIES WHO ARE DETAINED BY THE

19

ALBUQUERQUE POLICE DEPARTMENT (Doc. No. 55) (Amicus Brief) at 2. Plaintiff Intervenors now assert that the orders in this case do not overlap with the relief awarded in the DOJ Settlement Agreement. Plaintiff Intervenors assert that the DOJ case does not address biased policing or wrongful incarceration of subclass members. However, this Court must be careful not to interfere with the monitoring of compliance with the DOJ Settlement Agreement. Hence, the Court must examine relevant provisions of the DOJ Settlement Agreement, particularly Section VI of that agreement entitled CRISIS INTERVENTION aimed at reducing "the use of force against individuals in crisis due to mental illness." (DOJ Settlement Agreement at 42-49.).

In Section VI, the City agreed that APD would "assist in facilitating access to community-based treatment, supports, and services to improve outcomes for individuals." (*Id.* at 42-43.) The City agreed to establish a "Mental Health Response Advisory Committee" (MHRAC) to "assist in identifying and developing solutions and interventions that are designed to lead to improved outcomes for individuals perceived to be or actually suffering from mental illness or experiencing a mental health crisis."[15] (*Id.* at 43.) The MHRAC must "analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with individuals with mental illness." (*Id.*) The DOJ Settlement Agreement requires the City to train its field officers in basic crisis intervention in addition to the state-mandated behavioral health training. (*Id.*

---

[15] The MHRAC consists of representatives from APD command staff, crisis intervention certified responders, Crisis Intervention Unit, Crisis Outreach and Support Team, City-contracted mental health professionals, the Department of Family and Community Services, the University of New Mexico Psychiatric Department, community mental health professionals, advocacy groups for consumers of mental health services, mental health service providers, homeless service providers, interested community members and other similar groups. DOJ Settlement Agreement ¶ 112.

at 45.) APD must also maintain a sufficient number of officers who are certified in crisis intervention. (*Id.* at 46.)

In the DOJ case, Plaintiff Intervenors as *Amici* were opposed to a provision requiring APD to use its crisis intervention teams to "follow up with chronically homeless individuals and individuals with known mental illness who have a history of law enforcement encounters and to proactively work to connect these individuals with mental health service providers." (*Id.* at 48.) Plaintiff Intervenors argued that if APD crisis intervention teams, made up of specially-trained police officers, follow-up on these individuals it will likely lead to confrontations with mentally ill individuals and to more, not fewer, incidents of excessive force. (Amicus Brief at 11.) Plaintiff Intervenors proposed that a better solution would be to have mental health professionals perform the follow-up without police involvement. (*Id.*) Plaintiff Intervenors also argued that the DOJ Settlement Agreement did not address the primary cause of violent encounters with the mentally ill homeless, "the City's choice not to provide basic and essential mental health services to City residents with mental disabilities." (*Id.* at 13-14.) Plaintiff Intervenors contended that the MHRAC is mostly populated by APD personnel; thus, the MHRAC would act from a law enforcement perspective instead of a therapeutic perspective. In their *Amicus* brief, Plaintiff Intervenors asserted that the DOJ Settlement Agreement did not address the "root cause" of many incidents of unnecessary force against them: the City's *de facto* policy of "sweeping the streets" of homeless and/or mentally disabled individuals. (*Id.* at 7.) According to Plaintiff Intervenors, APD routinely initiates interactions with the mentally ill without reasonable suspicion of a crime and often arrests these individuals instead of citing them for petty offenses. (*Id.*) The Plaintiff

Intervenors' complaints about APD's treatment of mentally disabled individuals in this case mirror many of the arguments they presented in their *Amicus* brief.

This case, however, involves alternatives to arrest as a means to control jail population and using treatment alternatives instead of incarcerating subclass members rather than minimizing the use of force in police interactions with mentally disabled individuals. After examining the DOJ Settlement Agreement, the Court finds that enforcement of the cite and release, walk through procedures, and jail diversion provisions of the 2001 Supplemental Order and the 2002 Stipulated Order will not directly interfere with the City's compliance with the DOJ Settlement Agreement. In the future, however, the City Defendants, Plaintiffs, and Plaintiff Intervenors should keep the Court apprised of conflicts that may arise.

6. Contempt proceedings are justified.

The City Defendants contend that the Sitterly Report demonstrates the City Defendants initially complied with two of the relevant provisions. Judge Sitterly described the effectiveness of walk through procedures that were being implemented at the BCDC. Judge Sitterly also stated that the City had directed APD officers to issue citations and release individuals who commit non-violent petty offenses. As further evidence of compliance, the City Defendants attached to their original Response an Albuquerque Police Department Special Order 01-41 issued by then-Chief of APD Galvin on June 7, 2001, which informed all APD officers that the City had been "under a Federal court order for over four years to reduce the number of inmates that are housed at the [BCDC]. . . . the Federal court has directed that whenever possible individuals arrested for misdemeanor offenses be cited and released rather than booked." *See supra*

note 1. The directive also described the walk through procedure by stating that APD officers can transport arrestees to BCDC, but "process and release the offender without the offender being booked[.]" (Original Resp. Ex. B.) Even though Chief Galvin's directive was dated prior to the entry of the 2001 Supplemental Order, the directive is evidence that the City Defendants initially complied with the specific wording of the 2001 Supplemental Order, which required the City Defendants to *"[p]rovide direction* to law enforcement officials . . . to issue citations where appropriate and to use the 'walk through procedures,' rather than incarcerating individuals, where appropriate." (2001 Suppl. Ord. at p. 5) (emphasis added).

Plaintiff Intervenors submit that the City Defendants are currently not in full compliance with these provisions alleging that APD officers continue to inappropriately arrest subclass members for citable offenses and that the City Defendants have not continued to use walk through procedures to avoid incarceration at MDC. Therefore, the Court will order the City Defendants to show cause why they should not be held in contempt of the Court's 2001 Supplemental Order and the 2002 Stipulated Order for (1) failing to consistently direct APD officers to cite and release non-violent misdemeanants and (2) failing to implement walk through procedures where appropriate. In addition, the City Defendants have not demonstrated that they have complied with the requirement that they and the County Defendants meet, plan, and implement an effective jail diversion program for individuals with mental illness or disabilities. Therefore, the Court will also order the City Defendants to show cause why they should not be held in contempt for failing to comply with these provisions of the Court's 2001 Supplemental Order and the 2002 Stipulated Order.

B.      Motion for Additional Remedial Relief.

Plaintiff Intervenors allege that in addition to violating this Court's orders, the City Defendants discriminate against subclass members in violation of the ADA. Specifically, Plaintiff Intervenors allege that APD: (1) targets subclass members for stops, searches, and seizures without reasonable suspicion and probable cause; (2) subjects subclass members to disparate treatment when officers are trained to consider subclass members as dangerous, which leads APD officers to use of excessive force;[16] (3) segregates subclass members from the community and institutionalizes subclass members in jail instead of funding and providing access to community treatment centers; (4) uses crisis intervention units made up of police officers rather than mental health professionals; and (5) maintains policies and procedures that lead to arresting subclass members for behaviors that are not criminal or for offenses that should result in a citation.

The City Defendants contend that the Court lacks jurisdiction to grant Plaintiff Intervenors the relief they seek because the additional relief is beyond the scope of this lawsuit, and that Plaintiff Intervenors are asking the Court to monitor the APD in areas already addressed in the DOJ Settlement Agreement. Again the City Defendants argue that the DOJ Settlement Agreement governs "virtually all interactions with sub class members;" thus, it would be duplicative and burdensome for this Court to grant additional remedial relief. Although the DOJ case is directed at excessive force claims, the changes required under the DOJ Settlement Agreement may have the residual effect of correcting violations of the ADA. Thus, the Court will examine whether granting

---

[16] The Court will not address this allegation since it stems from a claim of excessive force, which is not at issue in this case.

24

additional remedial relief in this case will interfere with or duplicate the relief awarded in

the DOJ Settlement Agreement.

>    The CRISIS INTERVENTION section of the DOJ Settlement Agreement states:
>
>    To maintain high-level, quality service; to ensure officer safety and
>    accountability; and to promote constitutional, effective policing, APD
>    agrees to minimize the necessity for the use of force against individuals in
>    crisis due to mental illness or a diagnosed behavioral disorder and, where
>    appropriate, assist in facilitating access to community-based treatment,
>    supports, and services to improve outcomes for the individuals. APD
>    agrees to develop, implement, and support more integrated, specialized
>    responses to individuals in mental health crisis through collaborative
>    partnerships with community stakeholders, specialized training, and
>    improved communication and coordination with mental health
>    professionals.

(*Id.* at 42-43.) Specifically, APD agreed to train its officers in behavioral health and crisis

intervention in order to provide "clear guidance" as to when an officer may detain an

individual who is experiencing a mental health crisis and refer the person for further

services. (*Id.* at 45.) Because the DOJ case involved allegations that APD violated the

Fourth Amendment in its use of excessive force, it is not clear whether required training

will correct all of APD's alleged violations of the ADA. The goal of the DOJ Settlement

Agreement, however, will not only minimize the use of excessive force against

individuals in mental health crisis, but it also will provide the APD with incentive to

assist persons with mental disabilities with access to community-based services. APD

agreed to form the MHRAC, which will issue a public report to APD containing

recommendations for improvement, training priorities, changes in policies and

procedures, and identifying available mental health resources.

>    Plaintiff Intervenors' allegations focus on three specific ADA violations: (1) APD

officers' targeting of subclass members and unlawfully detaining, searching, and seizing

them in the absence of reasonable suspicion of criminal activity; (2) APD officers' failure

to reasonably accommodate subclass members in the course of lawful stops, searches, or

seizure; and (3) APD officers' pattern of discriminatory arrests and incarceration of

subclass members, which segregate subclass members from the community due to their

mental disabilities.

1.    Targeting and detaining subclass members

Title II of the ADA[17] states:

> No qualified individual with a disability shall, by reason of such disability,
> be excluded from participation in or be denied the benefits of the services,
> programs, or activities of a public entity, or be subject to discrimination by
> any such entity.

42 U.S.C. § 12132. For purposes of the ADA, an individual is disabled if she: (1) has "a

physical or mental impairment that substantially limits one or more major life activities

of such individual;" (2) has "a record of such an impairment;" or (3) is "regarded as

having such an impairment." 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g).

Courts have recognized two types of Title II ADA claims directly related to

arrests: a "wrongful-arrest theory" and "a reasonable-accommodation-during-arrest

theory." *J.H. ex rel. J.P. v. Bernalillo Cty.,* CIV 12-0128 JB/LAM, 2014 WL 3421037, at

*24 (D. N.M. July 8, 2014), *aff'd,* 806 F.3d 1255 (10th Cir. 2015) (citing *Gohier v.

Enright,* 186 F.3d 1216 (10th Cir.1999)). A wrongful arrest claim arises when a police

officer misperceives the effects of a person's mental disability as criminal activity or

when a police officer arrests a person because of the person's mental disability. *Gohier,*

---

[17] Section 504 of the Rehabilitation Act ("Section 504") similarly prohibits disability-based discrimination:
"No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be
excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any
program or activity receiving Federal financial assistance ...." 29 U.S.C. § 794(a). Claims under the ADA
and RA in this context are treated identically.

186 F.3d at 1220 (citing *Lewis v. Truitt*, 960 F. Supp. 175, 178 (S.D. Ind. 1997) and

*Jackson v. Town of Sanford*, Civ. No. 94–12–P–H, 1994 WL 589617, at *6 (D. Me. Sept.

23, 1994)). For example, in *Lewis v. Truitt*, officers beat and arrested a deaf man for

resisting law enforcement even though he could not understand their verbal commands.

*Lewis*, 960 F. Supp. at 176–77. In *Jackson v. Town of Sanford*, officers arrested for drunk

driving a man who was sober and whose unsteadiness and slurred speech resulted from a

past stroke. *Jackson*, 1994 WL 589617, at *1. Hence, APD officers violate the ADA if

they target subclass members and unlawfully detain them in the absence of reasonable

suspicion of criminal activity or seize subclass members without probable cause of

criminal activity unrelated to their disabilities. As alleged by Plaintiff Intervenors, if APD

officers are instructed to sweep mentally ill homeless individuals from the streets of

Albuquerque for behavior that is not criminal, the City Defendants violate the ADA.

However, after reviewing the latest APD standard operating procedures (SOP),

the Court believes that the City Defendants appear to be making strides toward

complying with the ADA through the implementation of the DOJ Settlement Agreement.

APD Standard Operating Procedure (SOP) § 2-13-2, effective June 7, 2016, states that

APD officers are required to treat individuals in behavioral health crisis "with dignity"

and that APD officers are required to provide those individuals with "access to the same

law enforcement, government, and community services provided to all community

members." SOP § 2-13-2 *See* https://www.cabq.gov/police/our-department/standard-

operating-procedures (last visited October 25, 2016). This SOP provides for training of

all APD field officers "to equip them with information and techniques to help them better

respond to individuals with behavioral health disorders." *Id.* at 2. Officers "will be trained

in intervention and de-escalation techniques and behavioral health resources to enhance both officer and public safety. This training does not restrict an officer's discretion to make an arrest when probable cause exists, however, officers are encouraged to jail divert individuals affected by a behavioral health disorder or in a behavioral health crisis." *Id.* Jail diversion includes issuing a verbal warning; issuing a citation; giving a summons for misdemeanors or submitting a non-violent felony case to the District Attorney; transporting the person to a mental health provider; or disengagement. *Id.* § 2-13-8.

APD has formed a Crisis Intervention Unit (CIU) made up of specially trained detectives who are located in the Family Advocacy Center and whose primary responsibilities are to respond to mental health crisis calls. APD maintains a Crisis Outreach and Support Team (COAST) to follow up with individuals with a known mental illness or disability, who have a history of law enforcement encounters. COAST officers will work to proactively connect those individuals with mental health service providers. In addition to providing the state-mandated basic behavioral health training to all cadets in the APD Academy, APD requires an additional 40 hours of specialized training in crisis intervention for field officers and new Academy graduates. After this additional training, an officer is considered to be a crisis intervention certified responder and capable of responding to calls involving individuals in mental health crisis. In the DOJ Settlement Agreement, the City Defendants agreed to train 40% of APD officers who volunteer to take on specialized crisis intervention duties in the field. All crisis intervention officers are required to take an additional 8 hours of in-service crisis intervention training biannually.

Although it is implied in the DOJ Settlement Agreement that APD officers will comply with the ADA and only arrest mentally disabled individuals when they have engaged in unlawful conduct, the DOJ Settlement Agreement does not expressly address the Plaintiff Intervenors' allegation that APD targets individuals who are mentally ill or disabled without reasonable suspicion of criminal activity in an effort to sweep them from the streets. If those allegations are true, then this Court has the jurisdiction to grant additional remedial relief in the form of an injunction prohibiting such targeting.

2. Failure to accommodate by using only police officers to address mental health crisis situations

The second ADA violation occurs when police fail to reasonably accommodate a person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other persons. *Gohier v. Enright,* 186 F.3d at 1220. To determine if reasonable accommodations were made during an investigation and arrest, courts engage in a "highly fact-specific inquiry." *J.H. ex rel. J.P. v. Bernalillo Cty.* 2014 WL 3421037, at *24. In other words, what is reasonable must be decided case-by-case based on numerous factors. *See id.* (finding that school resource officer did not violate the ADA in the manner he arrested mentally disturbed child for criminal battery when officer used properly positioned handcuffs and transported child to juvenile detention center). *See also Gorman v. Bartch,* 152 F.3d 907, 913 (8th Cir. 1998) (finding that paraplegic arrestee properly alleged an ADA violation after suffering injuries while being transported to jail in a van not equipped for wheelchair transport).

Plaintiff Intervenors argue that the City Defendants' maintain policies that have a negative impact on mentally ill or disabled detainees because the City Defendants rely solely on APD officers for responding to mental health crises. They argue that the APD's

CIU and COAST groups, who are responsible for responding, take a law enforcement oriented approach. For example, the COAST groups are made up of armed police officers and civilian mental health professionals, who are dressed as police officers and who are under the authority of police officers. Plaintiff Intervenors allege that when a person calls "911" for help with a mental health crisis, even when no criminal activity is alleged, the City Defendants use APD officers to respond. In contrast, medical professionals respond to "911" calls involving a person having a heart attack. The crisis response, case management, and outreach functions performed by APD are not police functions, according to Plaintiff Intervenors. Plaintiff Intervenors assert that under the ADA the City Defendants must redeploy funding away from law enforcement and incarceration and toward the provision of basic mental health services, such as a mobile crisis team that consists of trained mental health professionals and a crisis response facility.

Although Plaintiff Intervenors' ideas for dealing with individuals in mental health crisis are commendable, they provide no case law to support their argument that a city must comply with the ADA in this particular fashion. Moreover, the Court cannot find applicable case law in which courts have enforced the ADA to require the use of civilian mental health professionals instead of specially trained police officers. The ADA requires reasonable accommodation, not optimal accommodation. *See, e.g., Vila v. Miami-Dade Cty.*, 65 F. Supp. 3d 1371, 1383–84 (S.D. Fla. 2014) (dismissing claim under the ADA and holding that city police officers did not deny reasonable accommodation when they arrested an erratic mentally ill person who would not respond to orders and transported him to jail because under the circumstances, ADA does not require officers to wait for assistance from crisis intervention unit and transport arrestee to a treatment facility

instead of jail) *and Scozzari v. City of Clare*, 723 F. Supp. 2d  974, 981 (E.D. Mich. 2010) (stating, "the ADA does not require that police officers contact a mental health professional any time they interact with an individual with mental health problems and there are not exigent circumstances."). *See also Winters v. Arkansas Dept. of Health and Human Services*, 491 F.3d 933, 937 (8th Cir. 2007) (approving of district court's statement that "jails should not become our mental hospitals by default" and that the solution to inadequate mental health facilities "requires decisions of how to best allocate available resources, and those decisions belong to the legislative branch.").

In addition, granting this relief has the potential of interfering with the DOJ Settlement Agreement, which provides for the continuation of the APD's crisis intervention teams with additional training for more positive interactions with mentally ill or disabled individuals. In short, the Court cannot define how APD should comply with the DOJ Settlement Agreement's broad mandate "to develop, implement, and support more integrated, specialized responses to individuals in mental health crisis." (DOJ Settlement Agreement at 42-43.) Thus, the Court will not order the City Defendants to show cause why they are not violating the ADA by using APD's CIU and COAST groups to respond to mental health crisis situations.

### 3.  Unlawful Segregation

The "integration mandate"—arising out of Congress' explicit findings in the ADA, the regulations implementing Title II, and the Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999)—requires that a governmental entity providing services to individuals with disabilities must do so "in the most integrated setting appropriate to their needs." 28 C.F.R. § 35.130(d); 28 C.F.R. § 41.51(d); *Olmstead*, 527

U.S. at 607. Plaintiff Intervenors allege that the City Defendants are violating the ADA's integration mandate by failing to provide sufficient community-based treatment facilities as alternatives to jail. Allegedly this leads APD officers to arrest subclass members and institutionalize them in jail where subclass members can receive some type of treatment.

The Court recognizes that the ADA requires integrated localized services for subclass members. However, Plaintiff Intervenors and the City Defendants, along with the County Defendants, have already agreed to develop and implement effective jail diversion programs for persons with psychiatric or developmental disabilities. *See* 2016 County Settlement Agreement and 2001 Supplemental Order. Therefore, the Court finds that the City Defendants and County Defendants may comply with the ADA by developing community-based programs for subclass members who would benefit from them. In other words, to be "effective," those programs must comply with the ADA's integration mandate. Consequently, the Court will not order additional remedial relief addressing the integration mandate at this time.

4.     The Court has allowed limited discovery

At a hearing on July 19, 2016 the Court granted Plaintiff Intervenors' request to conduct limited discovery on (1) whether APD issues citations instead of arresting individuals for petty non-violent offenses where appropriate and (2) whether the City Defendants have developed walk through procedures for persons arrested for non-violent petty offenses where appropriate. Discovery on these issues is progressing. *See* CERTIFICATE OF SERVICE (Doc. No. 1242). The Court has not yet allowed discovery on whether the City Defendants, along with the County Defendants as required by the

2016 County Settlement Agreement, are developing jail diversion programs for the benefit of subclass members.

IT IS ORDERED that, after the all of the authorized discovery is completed, the Court will schedule a hearing at which the City Defendants may appear and show cause whether they are in compliance with the following:

1. The provision in the 2001 Supplemental Order requiring the City Defendants to "[p]rovide direction to law enforcement officials under the control of the City . . . to issue citations where appropriate and to use the 'walk through procedures,' rather than incarcerating individuals, where appropriate."

2. The provision in the 2001 Supplemental Order requiring the City Defendants to "schedule a meeting or meetings concerning the provision of mental health services in Bernalillo County. . . . to plan how to implement an effective jail diversion program for persons with psychiatric or developmental disabilities."

3. The ADA and the RA with regard to detaining and arresting individuals with mental illnesses or developmental disabilities to sweep them from the streets.

_____
SENIOR UNITED STATES DISTRICT JUDGE