# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**JIMMY (BILLY) McCLENDON, et al.,**
    **Plaintiffs,**

**vs.**

                                  **Case No. 95 CV 024 JAP/KBM**

**CITY OF ALBUQUERQUE, et al.,**
    **Defendants.**
**vs.**

**E.M., R.L., W.A., D.J., P.S., and N.W.,**
**on behalf of themselves and all others similarly situated,**
    **Plaintiff-Intervenors.**

## MEMORANDUM OPINION AND ORDER

In PLAINTIFFS' AND PLAINTIFF-INTERVENORS' JOINT MOTION FOR ORDER TO SHOW CAUSE AND FOR FURTHER REMEDIAL RELIEF PURSUANT TO COURT ORDER, Doc. Nos. 256 AND 1222-3, AND MEMORANDUM IN SUPPORT (Doc. No. 1247) (Joint Motion), Plaintiffs and Plaintiff Intervenors (Movants) ask the Court to order the County Defendants (the County or MDC)[1] to show cause why they are not in contempt of the Settlement Agreement approved by the Court on June 27, 2017[2] and other orders of the Court. Movants also ask the Court to order additional remedial relief. The County opposes the Joint Motion. *See* DEFENDANT BERNALILLO COUNTY BOARD OF COMMISSIONER'S RESPONSE TO PLAINTIFFS' AND PLAINTIFF INTERVENORS' JOINT MOTION FOR ORDER TO SHOW CAUSE AND FOR FURTHER REMEDIAL RELIEF PURSUANT TO COURT ORDER, Doc. Nos. 256 AND 1222-3, AND MEMORANDUM IN SUPPORT (Doc. No. 1256) (Response).

---

[1] Bernalillo County, the Bernalillo County Board of Commissioners, and the Metropolitan Detention Center (MDC) will be referred to collectively as the County or MDC.
[2] MEMORANDUM OPINION AND ORDER GRANTING APPROVAL OF SETTLEMENT AGREEMENT (Doc. No. 1225).

Movants filed a reply brief. *See* PLAINTIFFS' AND PLAINTIFF-INTERVENORS' REPLY TO RESPONSE TO MOTION FOR ORDER TO SHOW CAUSE, ETC., DOC. NO. 1247 (Doc. No. 1261) (Reply).

On March 2, 2017, the Court allowed the American Federation of State, County and Municipal Employees Council 18, Local 2499, AFL-CIO, CLC (the Union) to intervene for purposes of addressing the Joint Motion. *See* AFSCME COUNCIL 18, LOCAL 2499'S BRIEF OPPOSING JOINT MOTION FOR ORDER TO SHOW CAUSE [DOC NO. 1247] (Doc. No. 1278). The Union represents a large majority of MDC's security employees.

On June 13, 2017, the Court held an evidentiary hearing. At the end of the hearing, the Court asked Movants, the County, and the Union to file post-hearing briefs. *See* DEFENDANT BERNALILLO COUNTY BOARD OF COMMISSIONERS' CLOSING ARGUMENT IN RESPONSE TO PLAINTIFFS' AND PLAINTIFF INTERVENORS' JOINT MOTION FOR ORDER TO SHOW CAUSE AND FOR FURTHER REMEDIAL RELIEF PURSUANT TO COURT ORDER DOC. NOS. 256 AND 1222-3 (Doc. No. 1315); PLAINTIFFS' AND PLAINTIFF INTERVENERS' POST-HEARING BRIEF REGARDING Doc. No. 1247 (Doc. No. 1316); and AFSCME COUNCIL 18, LOCAL 2499'S POST-HEARING BRIEF (Doc. No. 1317). The transcript of the hearing was filed on July 6, 2017. (*See* Doc. No. 1311) (Tr.).

Movants argue that the County is violating certain provisions of the SETTLEMENT AGREEMENT (Doc. No. 1222-1) (SA) and CHECK-OUT AUDIT AGREEMENT No. 2: THE PROVISION OF MENTAL HEALTH SERVICES AT THE BERNALILLO COUNTY METROPOLITAN DETENTION CENTER (Doc. No. 1222-3) (COA2). Specifically, Movants claim that the County is failing to provide the requisite training to security employees[3] who work

---

[3] The Court refers to security employees, also known as correctional officers, because those employees are the focus of the Joint Motion. This ruling, therefore, is limited to the training and supervision of those employees.

in units where inmates with mental illness and mental disabilities (special management inmates) are housed (special management units). Movants argue that under the 2015 Collective Bargaining Agreement (CBA) with the Union, the County must allow MDC security employees, who do not have the necessary training or specialized skills, to bid according to seniority into positions in special management units. Movants further assert that when those security employees are accused of misconduct, MDC does not reassign them and timely investigate the allegations of misconduct. Movants contend that by failing to train, supervise, and reassign security employees, the County violates COA2 and the Court's orders. In addition, Movants assert these failures violate the Americans with Disabilities Act, 42 U.S.C. § 12132 and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (RA) (together, the ADA).

I.      STANDARD OF REVIEW

A.      Jurisdiction

The Court retains the authority and jurisdiction to enforce its own orders. *Spallone v. United States*, 493 U.S. 265, 276 (1990). In other words, a federal court is "not reduced to issuing injunctions against [public officials] and hoping for compliance. Once issued, an injunction may be enforced." *Hutto v. Finney*, 437 U.S. 678, 690 (1978). Moreover, the Court expressly retained jurisdiction to enforce the SA. (SA ¶ 20.)

B.      Civil Contempt

The SA and COA2 are consent decrees, "that [are] subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992). A party to a consent decree that is aggrieved by the other's noncompliance may apply for an order to show cause why the noncompliant party should not be held in contempt. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 381–82 (1994).

After a court issues an order to show cause, a party may be held in contempt only if the movant establishes, by clear and convincing evidence, "that a valid court order existed, that the [party] had knowledge of the order, and that the [party] disobeyed the order." *Reliance Ins. Co. v. Mast Const. Co.,* 159 F.3d 1311, 1315 (10th Cir. 1998) (citation omitted). A party may avoid a finding of contempt if it demonstrates that it attempted compliance in good faith based on a reasonable interpretation of the order. *See Braintree Labs., Inc. v. Nephro–Tech, Inc.,* 99 F. Supp. 2d 1300, 1303 (D. Kan. 2000). Also, if the court finds that the party has taken all "reasonable steps and substantially complies with the court order," the court may decline to find civil contempt. *Id.*

> Civil contempt . . . is a severe remedy which should be used only when necessary to sustain the authority of the court. *NLRB v. Shurtenda Steaks, Inc.,* 424 F.2d 192, 194 (10th Cir. 1970). . . . The movant must establish that the alleged contemnor has not diligently attempted to comply in a reasonable manner with a court order. *King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir. 1995). Technical or inadvertent violations of a court order do not support a finding of civil contempt. *Universal Motor Oils Co. v. Amoco Oil Co.,* 743 F. Supp. 1484, 1487 (D. Kan. 1990).

*T.Y. by Petty v. Bd. of Cty. Comm'rs of Cty. of Shawnee*, 912 F. Supp. 1424, 1427–28 (D. Kan. 1996).

C.     Further Remedial Relief under the ADA

Movants ask the Court to order additional remedial relief under the ADA. Specifically, Movants ask the Court to order MDC to allow only security employees with specialized training, skills, and temperament to work in special management units. *See McNeil v. Guthrie*, 945 F.2d 1163, 1165-66 (10th Cir. 1991) (finding that individuals who file suit complaining about unconstitutional prison conditions must seek relief through an ongoing prison-conditions class action).

The Tenth Circuit Court of Appeals explained,

> Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. This provision extends to discrimination against inmates detained in a county jail. *See Penn. Dep't of Corr. v. Yeskey,* 524 U.S. 206, 210 (1998).

*Robertson v. Las Animas Cty. Sheriff's Dep't,* 500 F.3d 1185, 1193 (10th Cir. 2007).

Discrimination under the ADA may include failure to make reasonable accommodations to the needs of a disabled person. *See Tennessee v. Lane,* 541 U.S. 509, 531 (2004) (stating that Congress recognized "that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion" or discrimination). The "ADA thus not only prohibits public entities from discriminating against the disabled, it also prohibits public entities from *excluding* the disabled from participating in *or* benefitting from a public program, activity, or service 'solely by reason of disability.'" *Romero v. Bd. of Cty. Commissioners for the Cty. of Curry*, 202 F. Supp. 3d 1223, 1265 (D.N.M. 2016) (emphasis in original) (citations omitted). Thus, if a detention facility provides programs for inmates, such as mental health treatment or educational programs, it must do so on non-discriminatory terms. *Robertson*, 500 F.3d at 1199.

In *Robertson*, the Tenth Circuit reversed the dismissal of an ADA claim brought by a hearing-impaired inmate who was not provided a hearing aid that would have allowed him to participate in his probable cause hearing. *Id.* at 1199. Even though the inmate's attorney represented him at the hearing and even though the charges against the inmate were dismissed, the Tenth Circuit determined that summary judgment dismissing the inmate's ADA claim was inappropriate:

> Because Mr. Robertson was detained at a facility that permits detainees to attend their probable cause hearings, Mr. Robertson was eligible to participate in this program. . . . Even though his presence was not required, because the facility makes the activity available to detainees in general, it must do so on nondiscriminatory terms. . . . Furthermore, . . . he was denied the ability to participate in his probable cause hearing to the same extent as non-disabled individuals.

*Id.* (citations omitted). The same is true for mentally disabled inmates. If a detention facility consistently denies mentally disabled inmates the benefits of therapeutic programs, by subjecting them to excessive force or excessive lockdowns for behavior that is a result of their disability, the detention facility may violate the ADA. *Cf. Jones v. Smith*, 109 F. App'x 304, 309 (10th Cir. 2004) (holding that while the inmate's work assignment may have been the product of incompetence or personal spite, the inmate's ADA claim failed because he did not allege that his assignment to medically inappropriate work was done because of his disability).

II.     BACKGROUND

A.      Settlement Agreement and the Check-Out Audit Agreements

The SA incorporates three Check-Out Audit Agreements (Doc. Nos. 1222-2, 1222-3, and 1222-4). The Check-Out Audit Agreements outline "definitive, specific, and measurable tasks to be accomplished in order to achieve substantial compliance" in each area covered. Check-Out Audit Agreement No. 1 (COA1) governs medical services. As stated, COA2 governs mental health services. Check-Out Audit Agreement No. 3 (COA3) governs general conditions of confinement. Each Check-Out Audit Agreement provides: "the parties understand and agree that this Agreement incorporates (but does not supersede) all extant orders and agreements." (COA 1,

2, and 3 at p. 1.)[4]

Movants complain that the County is violating ¶ G of COA2, which requires the Court's mental health expert Dr. Jeffrey Metzner to determine whether MDC sufficiently trains its security employees to work with special management inmates:

> G. Basic Mental Health Training
> 1) Whether MDC provides adequate pre-service and annual in-service basic training to Qualified Medical and Mental Health Staff and security staff that addresses mental health needs. MDC will provide no less than forty (40) hours of specialized training.
> 2) Whether MDC provides adequate specialized training for all security staff on specialized mental health units.

(COA 2 at p. 15.) COA2 also requires Dr. Metzner to determine (1) whether MDC provides "adequate care for inmates' serious mental health needs"; (2) whether MDC mental health care staff and security staff communicate sufficiently about special management inmates; and (3) whether MDC follows a proactive program of care for special management inmates. (COA2 at 16–22.) COA2 incorporates an ORDER (Doc. No. 256) (the 1996 ORDER), that states in relevant part,

---

[4] Under the SA, the County may move for a finding of initial substantial compliance with the requirements in one of eight domains outlined in the SA. (For example, one domain set forth in COA2, governs the provision of Mental Health Services.) The Court will then determine whether the record supports a finding of initial substantial compliance with respect to that domain based on experts' reports and other evidence presented. After the Court determines that MDC is in initial substantial compliance with the requirements of a domain, the Court will set a specific period for the MDC to self-monitor. During that period, the MDC will gather data and issue a preliminary analysis of compliance with each requirement of the domain. The expert will review the data, gather any additional facts, if necessary, and submit a written analysis. The expert determines whether the MDC is in substantial compliance with each requirement of that domain and reports to the Court. If MDC is not in substantial compliance, the expert will recommend corrective action. Over the period of self-monitoring, MDC must submit quarterly reports to the expert, and to counsel for Plaintiffs and Plaintiff Intervenors, that contain information sufficient to determine ongoing compliance with each requirement of a domain. At the end of the self-monitoring period, the expert will determine whether MDC is in compliance, partial compliance, or non-compliance with the substantive requirements of the domain. For any finding of non-compliance, MDC has 90 days to correct the non-compliance. If the Court determines that a domain has remained in sustained substantial compliance, the orders covering that domain will be vacated.

> security staff shall receive training regarding the identification of symptoms of mental or developmental disabilities and regarding appropriate methods for dealing with residents with mental or developmental disabilities. Correctional officers who work in . . . units in which people with mental or developmental disabilities are congregated shall receive specialized training to adequately prepare them for working with people with mental or developmental disabilities. The specialized training shall be no less than 40 hours.

(*Id.* at 12.)

In 2011, the MDC established a 40-hour mental health training program in its cadet academy; therefore, as to security employees hired after 2011, the MDC has complied with the "pre-service" training requirement of COA2 ¶ G. (County Post-Hrg Brief Ex. A (Doc. No. 1315-1)). However, about half of the security employees eligible to work in special management units have not received the 40 hours of basic mental health training. (Tr. 72:25–74:5; County Post-Hrg Brief Ex. A at 2.) MDC offers 8 hours of "in-service" mental health training to security employees who are permanently assigned to work in special management units. (Tr. 73:15–23.)

B.      2015 Collective Bargaining Agreement.

In August 2015, the County entered into a CBA with the American Federation of State, County, and Municipal Employees (AFSCME) (the Union). Under the 2015 CBA § 10.2, security employees may "bid semi-annually for shift, days off and Unit (post) assignments in seniority order." (Union Resp. to Jt. Mot. (Doc. No. 1278-2) CBA at § 10.2.) Prior to 2015, security employees were allowed to bid only for shift and days off. Section 10.5 of the 2015 CBA provides:

> Any permanent change of work schedule (shift/days off/post assignment) requires a two week notice in writing to the employee by the Chief of Corrections. Reassignments due to disciplinary issues can be immediate (post final action), but the two-week notice before the permanent change is still required. An employee may not be moved from their bid position without "just cause."

(CBA § 10.5.) [5] "Just cause" is not defined in the CBA. The 2015 CBA expired on June 30, 2017, and the Union and the County are negotiating a replacement CBA. The 2015 CBA, however, remains in effect until a new CBA is executed. (Tr. 9:16-10:6.)

C.    General Complaints about the Treatment of Special Management Inmates

In 2015, the County created a segregation mental health unit to house seriously mentally ill male inmates. The unit was located in the Seg. 6 building and was named Health Services Unit 6 (HSU 6). Beginning in the summer of 2015, counsel for Plaintiff-Intervenors, who regularly monitor conditions at the MDC, complained about the treatment of special management inmates, particularly in HSU 6. Counsel for Plaintiff Intervenors alleged that certain security officers verbally abused and berated these inmates; locked down the inmates frequently for minor infractions; failed to allow inmates their requisite time out of their cells; and threatened inmates who complained. (Jt. Mot. at 7–10.) Counsel noted that the security staff were "treating [HSU 6] like a regular segregation unit, not a mental health unit." (Tr. 12:21-22.)

At a status hearing on October 7, 2015, the Court instructed Manuel Romero, the Court's conditions of confinement expert, to evaluate the CBA and its impact on compliance with this Court's orders. In a December 23, 2015 report, Mr. Romero stated,

---

[5] In 2012, a Memorandum of Understanding (MOU) between the Union and the County allowed only Sergeants and Lieutenants to bid for post assignments. Beginning in 2013, a new MOU expanded the bid for post program to include corrections officers. Under those MOUs, however, MDC management reserved the right to reassign employees from a bid post "when deemed necessary." (AFSCME Resp. to Jt. Mot (Doc. No. 1278-1) Aff. Joseph Trujeque ¶¶ 8–9.) In the 2015 CBA, § 10.5 was added regarding the removal of security employees from bid posts. Instead of having the right to remove security employees "when deemed necessary," the 2015 CBA required "just cause" for removal. (*Id.*)  The Union insisted on the "just cause" provision because it believed some MDC managers had arbitrarily moved security employees from their posts, not due to performance or disciplinary issues, but because of personal animosity or favoritism. (*Id.* ¶ 11.)

The most problematic provision of the new CBA is that the bidding process for custody staff has expanded from shift and days off to include unit post assignments. . . . Furthermore, once an employee is occupying a "bid position", the employee may not be moved from their bid position without "just cause." Managements' prerogative to assign custody staff to a unit (post) is taken away[.] . . . For example, there are custody staff that may not be suitable to work with special management inmates, mentally ill inmates or special inmate populations, but under the current CBA any officer can bid for any post by seniority order. . . . Moreover, if a particular officer has or has had a conflict with a particular inmate; he or she cannot be removed from that security post without meeting the standard of "just cause" which is operationally problematic.

(Jt. Mot. Ex. 4.)

In a February 2016 report, Dr. Metzner expressed concerns about the "serious breakdown" in communication between MDC mental health staff and officers.[6] (Jt. Mot. Ex. 2.) Dr. Metzner noted that "the working relationship between security staff and mental health staff has been strained since the latest bid process." (*Id.*) Dr. Metzner concluded that the communication issues "have negatively impacted the treatment program within Seg. 6." (*Id.*) Thus, Dr. Metzner and Mr. Romero attributed the negative treatment of special management inmates to the CBA's bid for post provision in § 10.2 and restrictions in CBA § 10.5 on the MDC's power to reassign security employees in bid positions. The County maintains that these CBA provisions have hampered MDC's ability to reassign security employees because it must give a two-week notice to employees and show "just cause" before employees can be moved from bid positions, even temporarily.

In mid-2016, counsel for Plaintiff Intervenors, the County, and the Union attempted to negotiate a "Memorandum of Understanding" (MOU) to address concerns about security employees who were not performing well in bid positions. They tried to add specific

---

[6] COA2 requires that "sufficient communication occur[] between MDC administration and treating mental health care professionals. . . . [and that] MDC security staff is adequately advised of inmates' special mental health needs that may affect . . . disciplinary measures . . . [and that] mental health care and security staff communicate sufficiently about inmates with special needs conditions." (COA2 at 21-22.)

requirements for security employees who bid into special management units, and they attempted

to define "just cause" in CBA § 10.5. The MOU was never finalized. (Tr. 9:16–10:22.)

In Dr. Metzner's July 2016 Report (Jt. Mot. Ex. 3), he stated emphatically,

[T]he conduct of some of the MDC correctional staff has effectively denied a
significant number of inmates access to adequate mental health care and has
caused harm to inmates with a serious mental illness. This harm has been both
physical, due to unnecessary and/or excessive use of force, and mental related to
abusive and/or inappropriate verbal interactions and excessive and unnecessary
lockdowns. . . . [A] small number of correctional officers during the past seven
months created a toxic environment for many inmates with a serious mental
illness. The response by correctional management staff, in my opinion, has been
problematic and ineffective, which appears to be related, in part, to union contract
issues and permanent administrative leadership positions being vacant or changed.
As a result, problematic correctional officers/supervisors working within the
HSUs have been allowed to continue to work within those units despite their very
problematic interactions with inmates with a serious mental illness.

(*Id.* at 17) (emphasis added). Dr. Metzner downgraded his finding of "compliance" to "partial

compliance."

In response to the complaints of inmate mistreatment, MDC administrators disbanded

HSU 6 and moved the special management inmates into other housing units known as PAC

units. Recently, Dr. Metzner has recommended that MDC reinstate HSU 6 because housing

segregated special management inmates in the same unit better facilitates treatment and access to

programming. However, Movants maintain that whether or not the HSU 6 is reinstated, MDC

must ensure that security employees in all special management units are properly trained and

have the specialized skills and temperament to accommodate the needs of special management

inmates and to comply with COA2 and the Court's orders.

D.    Specific Examples of Complaints of Mistreatment

In late January 2016, Sergeant Kevin Romero was assigned to work an overtime shift in a

special management unit. (*See* Plf. Hrg. Ex. 4 memoranda.) After his shift, Sergeant Romero was

notified that MDC was investigating a complaint by Dr. Hamilton, an MDC mental health professional, about Sergeant Romero's inappropriate communication with an inmate that led the inmate to believe Dr. Hamilton was afraid of the inmates in that unit. (*Id.*) Sergeant Romero was removed from that special management unit pending an investigation. (*Id.*) The Union grieved MDC's temporary reassignment of Sergeant Romero as not supported by the "just cause" requirement of CBA § 10.5.

In mid-2016, a mental health professional complained about an employee, Officer Files, who had bid into a position in a female special management unit. (*See* Plf. Hrg. Ex. 1 email and correspondence.) The mental health professional asked for a transfer from the unit while Officer Files held the bid position. The mental health professional said she did not feel safe in the special management unit because Officer Files failed to follow instructions and protocols for protecting mental health workers from inmate hostility and threats. (*Id.*) The captain in that special management unit determined that the problems stemmed primarily from the fact that Officer Files had not received the training required for officers who are assigned to that unit. (*Id.*) As a result of the mental health professional's complaints, group therapy in that special management unit was suspended. (*Id.*) On June 15, 2016, Officer Files was reassigned to another unit pending an investigation. (*Id.*)

On February 12, 2016, Plaintiff Intervenors' counsel initiated a formal complaint, via email to the MDC message center, to all counsel for the County, and to several MDC administrators, about Correction Officer (CO) Sisneros who was in a bid position in HSU 6. (Plf. Hrg. Ex. 5 emails.) Counsel complained that CO Sisneros violated MDC policy 3.35, which prohibits abusive language and behavior directed at an inmate. (*Id.*) Counsel relayed complaints from subclass members that CO Sisneros locked down HSU 6 excessively, used severely rude

and degrading language when addressing inmates, and threatened inmates who filed grievances about his behavior. (*Id.*)[7]

In a May 23, 2016 email, the County's counsel summarized information from a series of memoranda and letters between the County's counsel and Plaintiff Intervenors' counsel about CO Sisneros. (Plf. Hrg. Ex. 2 (Doc. No. 1256-2)). The email summary included the following specifics: In a February 18, 2016 memorandum, Plaintiff Intervenors' counsel requested documentation regarding the investigation of CO Sisneros. (*Id.*) The County responded by letter dated March 17, 2016 that Captain Alvarado had investigated Inmate Cook's grievance and that CO Sisneros had received a verbal reprimand. (*Id.*) Plaintiff Intervenors' counsel sent another memorandum dated March 22, 2016 stating that they observed CO Sisneros was still working in HSU 6. (*Id.*) Counsel relayed other complaints from inmates that CO Sisneros was verbally abusive and "does not seem to understand that the residents on that pod have significant mental health needs. . . . CO Sisneros routinely threatens to lock residents down for minor things [for example, an inmate's] shirt was not properly tucked in" (*Id.*) On April 14, 2016, Plaintiff Intervenors' counsel received a call from an HSU 6 inmate who reported excessive lockdowns and that staff, especially CO Sisneros, continued to be verbally abusive. (*Id.*)

In the same May 23, 2016 email, counsel for the County stated that MDC "considers the request for an investigation into CO Sisneros closed and fulfilled." (*Id.*) In that email, counsel for the County also recounted a meeting between Plaintiff Intervenors' counsel and the County's counsel held on April 29, 2016. (*Id.*) At the meeting, the County's counsel explained to Plaintiff Intervenors' counsel that "while MDC does allow the average citizen to request an investigation into a matter at MDC, the intent is not to allow counsel in this case to order additional

---

[7] A record of the grievance against CO Sisneros initiated by Inmate Joshua Cook was attached to the Ex. 5 emails. (*Id.*) There was evidence at the hearing that inmate Cook's grievance about CO Sisneros was flagged as a duplicate of the Plaintiff-Intervenors' counsel's complaint via email. (*Id.*)

investigation into matters that MDC considers resolved." (*Id.*) "MDC continues to take counsel's concerns seriously and look [sic] into those concerns, but MDC will not conduct a different or additional investigation into something because counsel is dissatisfied and submits a request through a means intended for citizens to raise their own separate concerns." (*Id.*) The letter reported that CO Sisneros was investigated by Universal Investigation Services concerning two separate incidents in HSU 6. "MDC has provided everything that it plans to provide in response to Mr. Cubra's February 12, 2016 e-mail and has explained that there are no further documents." (*Id.*) Finally, the County's counsel reported that "[b]ased on the pod logs, it does not appear staff has been locking the pod down for inappropriate reasons or too frequently." (*Id.*) CO Sisneros was not reassigned from the bid position in HSU 6 while the investigation was pending. At the next two bidding opportunities, however, CO Sisneros did not bid back into that position.

III.     DISCUSSION

Movants argue that the County is violating COA2 and the 1996 ORDER by allowing untrained employees to work in special management units and that the County is violating the ADA by not removing abusive or negligent employees from those units. Movants allege specifically that MDC violates COA2, the Court's orders, and the ADA in three ways: (1) MDC fails to adequately train security employees who work with special management inmates; (2) MDC allows security employees to bid into special management units despite their lack of training and special skills necessary for appropriate treatment of special management inmates; and (3) MDC inadequately supervises and disciplines security employees who violate MDC policies or mistreat special management inmates. Movants further contend that to the extent the CBA causes the County to violate this Court's orders or the ADA, it is unenforceable.

The County claims the provisions in the CBA regarding bid for post and moving security employees from bid positions severely limit its ability to assign and to remove security employees from those positions. The County also asserts that to the extent the CBA hinders its compliance with this Court's orders or the ADA, the Court has the power to modify the CBA.

The Union counters that the CBA does not hinder the County's compliance with COA2, the Court's orders, or the ADA. According to the Union, the CBA does not "speak to the mechanics of training or dictate how the County will train its personnel. . . . [T]raining, qualifications and job duties are all determined by the County and [are] not constrained by the CBA." (Union Post-Hrg Brief at 3.) The Union asserts that the CBA's bid for post provision (§ 10.2) does not hinder the County's compliance with its obligations under this Court's orders or the ADA, and CBA § 10.5 does not preclude the County from removing a security employee for misconduct by temporarily reassigning the employee pending an investigation of misconduct. Moreover, the Union maintains that the Court does not have the authority to modify the CBA without the Union's consent.

Based on the arguments and evidence, the meaning of the CBA's bid provisions has become clear to the Court. The Court concludes that the CBA's bid provisions do not hinder the County from adequately training and managing its employees in accordance with COA2, the Court's orders, and the ADA.

A.  Training

The County and Movants initially disagreed about what constitutes the "adequate pre-service and annual in-service basic training" required by COA2 ¶ G and the 1996 ORDER. Movants assert that all MDC security employees must receive at least 40 hours of pre-service mental health training. (County Post-Hrg. Brief Ex. A at 2.) At first, the County took the position

that its 40-hour cadet training program and its 8-hour refresher training for all employees who bid into special management units fully complied with this Court's orders. (County Resp. (Doc. No. 1256) at 2–3.) At the hearing, the County reported that it now realizes it must require all security employees to take the 40-hour training and that it has developed a plan to provide that training.[8] (Tr. 7:11–9:11.) Thus, the County properly recognizes that under COA2 ¶ G and the 1996 ORDER; all security employees who are eligible, through bidding or otherwise, for assignment into positions in special management units must have completed 40 hours of pre-service mental health training.

The current lack of adequate training is illustrated by Union President Perkins' testimony:

> Q. . . . do you ever work in the psych services unit, the PAC unit?
> A. Yes, sir.
> . . .
> Q. And in the last year or so, have you been working in the psych services unit?
> A. Sporadically, yes, sir.
> Q. Now, is that a post into which you bid, or does that come to you as an overtime shift?
> A. Currently, it comes to me as an overtime shift.
> Q. And so have you undertaken the eight hours of specialized training that some people call refresher training before your current bid cycle?
> A. I have taken the eight-hour training, but not before this bid cycle. I've taken it previously. . . it's been a few years.
> Q. Okay. So who decides to require you to work in that housing unit . . . even though you have not had in recent times the eight-hour refresher training . . .?
> A. Well, the training for the psych unit staff currently is after the bid, any new people, they are pulled aside and scheduled for an eight-hour training. That's just the permanently assigned people. . . . [I]f I take an overtime shift or get ordered there, I'm required to work there.
> Q. Right. But who makes the decision to say, you, Mr. Perkins, go work in the psych unit even though you haven't had the eight-hour training?
> A. It's based on seniority and/or voluntary overtime. I can volunteer for it if that's open, I can take it, or if I'm just low man and it's open, I can get ordered to it.
> . . .
> Q. Okay. So why don't you take the eight hours of refresher training if you are choosing to go work in the mental health unit?

---

[8] The County's counsel, Taylor Rahn, stated that the County submitted a proposal to Dr. Metzner that was approved by Movants and by Dr. Metzner. (Tr. 7:20–23.)

A.  It is not something that's offered. They schedule new biddees into the unit, and that's who gets to go to training. It is not offered a la carte, so to speak, here is the training, sign up as you will. It is not offered that way.

. . .

Q.  . . . Now, you have been working at the jail since before 2011, so have you ever been offered the 40-hour block of training?

A.  I have not.

(Tr. 72:19–75:5.)

In view of this testimony regarding MDC's need to temporarily fill vacant and overtime positions and the CBA's bidding process for permanent assignments, it appears that any security employee could be assigned to work in a special management unit at any given time. Therefore, as the County now agrees, to comply with COA2 ¶ G and the 1996 ORDER, MDC must require all security employees to complete the 40-hour pre-service training.[9]

As Mr. Perkins testified, the County currently provides an eight-hour "refresher" mental health training program only to security employees who are permanently assigned to work in special management units. Security employees, who like Mr. Perkins received the 8-hour training in the past, are not required to retake the training even though they are eligible for placement into those positions temporarily. Under the plain language of COA2 ¶ G, however, the County must provide annual in-service training to all security personnel who handle mental health needs. Movants request an order mandating MDC to provide eight-hour annual "refresher" training. (Jt. Post-Hrg Brief (Doc. No. 1316) at 21.) However, the eight-hour length is not specifically required by COA2 or the 1996 ORDER. Hence, the Court will ask the parties to confer in an effort to determine the proper length of an annual in-service training program.

---

[9] The CBA bid provision has not caused, but has merely magnified the effect of the County's failure to require all security employees to receive the 40-hour pre-service training. The Court also recognizes that the CBA bid for post provision adds a layer of complexity to the assignment of security employees at MDC. As Movants point out, since security employees are allowed to bid for posts every six months, it is impossible to anticipate which security employees will bid into special management units. But, the problem did not begin with the 2015 CBA.

The Court recommends that the parties consult Dr. Metzner on both the appropriate content and length of that program.

In sum, COA2 ¶ G outlines a bifurcated mental health training scheme. First, all security employees must complete 40 hours of pre-service mental health training. Second, all security employees must complete annual in-service mental health training in order to be eligible to work with special management inmates.

B.      Qualifications and the ADA

Movants argue that in order to comply with the ADA, the County, in addition to training security employees, must ensure that each security employee assigned to a special management unit has the specialized skills and temperament to properly "accommodate inmates with mental disabilities." (Joint Post-hrg Brief. At 1.) Movants urge the Court to mandate (1) that MDC determine whether an employee possesses the specialized skills and temperament essential for working in a special management unit under "an interdisciplinary process in which security personnel and medical and/or mental health professionals jointly determine whether the employee demonstrates such specialized skills"; and (2) that if a mental health professional determines "an employee is not demonstrating the necessary specialized skills, the employee will be transferred out of the post and replaced by a qualified employee." (*Id.* at 2.) Movants say that they are not required to take a position on whether the CBA § 10.5 prevents the County, as it has argued, from fulfilling its duty to require security employees to have specialized skills and temperament.

The Union, on the other hand, notes that the CBA says nothing about the qualifications required for assignments at MDC. The Union points to the County as being in charge of setting up the qualifications for each position. The County retorts that under the bid for post provision, it

has to allow security employees to bid for positions on the basis of seniority, not on the basis of specialized skills and temperament. The Union counters that the County could separately classify all positions in special management units and only allow certain "qualified" employees to bid on those positions. (Tr. 26:1–20.)

Specialized skills and temperaments are reflected in certain behaviors. For example, a security employee must have the skill and temperament to follow the instructions of mental health professionals (Tr. 33:7–24; Plf Hrg. Ex. 1); to appropriately respond to inmates with psychotic behaviors (Plf Hrg. Ex. 1); to avoid interfering with group therapy (*Id.*); to appropriately communicate with mental health professionals during inmate crisis incidents (*Id.*); and to refrain from discussing certain matters in front of inmates. (*Id.*) The SA and the COA2 with its incorporated orders, however, do not explicitly require that the MDC use only security employees who have particular specialized skills and temperament for working with special management inmates. COA2 and the Court's orders leave it up to the MDC administration to train, supervise, and discipline security employees to make sure they behave in an appropriate manner with special management inmates. And the Court is convinced that if the County substantially complies with the requirements of COA2 and the Court's orders, as clarified in this ruling, MDC's special management inmates will be reasonably accommodated under the ADA.

Nonetheless, Movants want the Court to add a requirement that gives MDC mental health professionals a prominent role in deciding whether an MDC security employee has specialized skills and temperament to work with special management inmates. The Court agrees with the Union that Movants' request is unworkable. MDC mental health professionals are not County employees but instead are employees of the County's contract health care provider—Correct Care Solutions (CCS). Giving mental health professionals, who are not County employees, this

type of decisive role would essentially place those professionals in a supervisory position that undermines the MDC management structure and the CBA protections for Union employees. In short, it is inappropriate to give non-County personnel the power to decide which security employees are qualified to work in special management units. However, it would be appropriate for the County to give significant weight to the opinions of mental health professionals in the MDC's supervision and discipline of security employees who work in those posts.

Although it is advisable to have employees with special skills and temperaments assigned to special management units, the Court finds that a new order imposing that requirement, in addition to the other requirements of COA2 and the Court's extant orders, is unnecessary. A security employee can adequately accommodate the needs of special management inmates if the security employee is sufficiently trained, supervised, coached, and disciplined by MDC supervisors and administrators with advice from mental health professionals.

In his testimony, Mr. Romero suggested that MDC establish a separate classification for security employees who are assigned to special management units. He noted that some jails and prisons have created stand-alone mental health units staffed with employees who are specially trained and separately classified. (*See* Tr. 145:12–146:7.) Although this is a thoughtful suggestion worthy of the County's consideration, the global settlement represented by the SA, COA2 and the incorporated orders does not require the County to create stand-alone special management units at the MDC with separately classified employees. Although these types of units have been successful in other facilities, the Court will not impose this requirement on the MDC at this time. The County should be allowed flexibility in deciding whether it can comply with COA2, the Court's orders, and the ADA by implementing stand-alone mental health units

staffed by separately classified security employees while adhering to the CBA and its protections of employee rights.[10]

### C.   Supervision and CBA § 10.5

Movants contend that MDC supervisors and administrators are not proactively moving security employees from their bid posts during investigations of misconduct. The County maintains that under CBA § 10.5, it has very limited recourse against employees in bid positions who are accused of improprieties. The last sentence of § 10.5 states that an employee "may not be moved from their bid position without 'just cause.'" The County interprets this sentence to mean that it must give notice to a security employee, perform an investigation of the employee's performance, and find a disciplinary infraction, before removing or reassigning the employee from a bid position, even temporarily.

The Union reads this provision differently. The Union says that under CBA § 10.5, the County may immediately reassign a security employee who presents a "disciplinary issue." Under this interpretation, allegations of misconduct would be sufficient for the immediate reassignment of a security employee. However, the Union has not taken such a flexible position in the past. Although the Union maintains that it has never grieved the temporary reassignment of an employee pending an investigation, the Union did grieve Kevin Romero's reassignment pending an investigation of misconduct as alleged by Dr. Hamilton. (*See* County Hrg. Ex. A pp. 1-2.)

Interestingly, Union President Perkins' testimony supports yet another interpretation of this sentence based on whether a transfer is temporary or permanent. Mr. Perkins testified that CBA § 10.5 allows a temporary transfer of a security employee from a bid position pending an

---

[10] Mr. Perkins, the Union President, described other positions at MDC that only certain qualified employees may bid into. For example, employees stationed in releasing, master control, community custody, and transport must meet some additional qualifications before being assigned to those positions. (Tr. 82:4–83:16.)

investigation of misconduct. (Tr. 79:1-11.) Mr. Perkins, on behalf of the Union, opined that prior to a permanent transfer, the CBA "requires a notice of intent to discipline, that describes the security employee's actions, the policies violated, and the proposed discipline. This is followed by a pre-determination hearing, which affords the employee the opportunity to address the charges. The CBA . . . requires two weeks' notice prior to a permanent change." (Union Ans. to Interrog. (Doc. No. 1305-1) at p. 3.) On the meaning of "just cause" Mr. Perkins stated, "[w]e understand just cause to include the 'seven tests of just cause.'" (*Id.* at p. 2.) Those seven tests include determining (1) whether prior notice was given to the employee; (2) whether the rule violated was reasonable; (3) whether there was an investigation of the infraction; (4) whether the investigation was done fairly, (5) whether there was substantial evidence of guilt; (6) whether the employer applied its rules evenhandedly; and (7) whether the degree of discipline was reasonably related to the seriousness of the offense and the employee's record. (*Id.* at pp. 1–2.) (*See also* Tr. 78:6–13.) Mr. Perkins explained that the grievances filed by the Union under § 10.5 were for instances where MDC reassigned employees to fill vacant positions in order to allow other employees to accrue overtime. In those grievances, the Union claimed that removal of an employee from a bid position to allow another to accrue overtime, even if temporary, was not "just cause" for a transfer under § 10.5.

In a written decision dated December 29, 2016, UNM Law Professor Scott Hughes, acting as arbitrator, decided that the "just cause" requirement of CBA § 10.5 governed only permanent reassignments from bid positions. (County Hrg. Ex. B at p. 5.) In a dispute over temporary reassignment of two MDC employees to fill vacant positions, Professor Hughes concluded "that the language of the just cause requirement is limited to permanent moves, but that single or one-off moves do not require such a showing." (*Id.*)

In that arbitration, an MDC security employee, Lieutenant Contreras, was moved on several occasions from a bid position to a shift commander position. In the situation in which the MDC lacks an employee to fill a position, MDC administrators are required first to assign employees from a voluntary overtime list and next from an involuntary overtime list in reverse order of seniority. Instead of assigning an employee to the vacant post according to that process, MDC administrators repeatedly assigned Lt. Contreras from his bid position to a shift commander position. Professor Hughes determined that the "seniority call list was violated in the process of frequently moving Lt. Contreras to shift commander." (*Id.* at 6.) Professor Hughes found that even though Lt. Contreras was not permanently moved from his bid position, "[w]here the management needs impact a single individual, as with Lt. Contreras, they violate his vital interests in the bidding process found in Article 10 and constitute a constructive permanent move[.] . . . If employees can be moved in this way just short of permanent moves, then there is no meaning to the bidding system." (*Id.*) Thus, Professor Hughes concluded that MDC violated § 10.5 when it frequently moved Lt. Contreras from his bid position to another position to accommodate a staffing shortage in violation of MDC's policy. (*Id.*)

The Court agrees with Professor Hughes' general finding that temporary removals do not per se require "just cause." The Court concludes that under CBA § 10.5, MDC has authority to immediately transfer, pending an investigation, any security employee in a bid position in a special management unit who acts abusively toward special management inmates. Under COA2, the Court's extant orders, and the ADA, the MDC must temporarily reassign a security employee who abusively interacts with a special management inmate. In sum, CBA § 10.5 does not require MDC to prove "just cause" before temporarily reassigning a security employee while conducting an investigation of the security employee's alleged mistreatment of a special management

inmate. Moreover, CBA § 10.5 allows MDC to permanently reassign that same security employee if the allegations are confirmed because misconduct constitutes "just cause" under § 10.5.

IV.     CONCLUSION

Despite MDC's training deficiencies and hesitance when faced with allegations of abuse, the Court believes that, at this time, there is insufficient evidence to hold the County in contempt of the SA or COA2 and its incorporated orders. However, the County must improve in the MDC's mental health services before the Court will be able to find substantial compliance with COA2. First and foremost, the County must require all MDC security employees (1) to successfully complete the 40-hour training to prepare them for working with special management inmates, and (2) to undergo annual in-service mental health training. The County should direct MDC to closely supervise security employees and to promptly investigate of allegations of abuse of special management inmates by security employees. This will go a long way toward improving MDC's mental health services and ensuring an eventual finding of substantial compliance for this domain.

IT IS ORDERED that PLAINTIFFS' AND PLAINTIFF-INTERVENORS' JOINT MOTION FOR ORDER TO SHOW CAUSE AND FOR FURTHER REMEDIAL RELIEF PURSUANT TO COURT ORDER, Doc. Nos. 256 AND 1222-3, AND MEMORANDUM IN SUPPORT (Doc. No. 1247) is denied.

_James A. Parker_
SENIOR UNITED STATES DISTRICT JUDGE