# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW MEXICO

JIMMY (BILLY) McCLENDON, et al.,
    Plaintiffs,

vs.

                                    Case No. 95 CV 024 JAP/KBM

CITY OF ALBUQUERQUE, et al.,
    Defendants.
vs.


E.M., R.L., W.A., D.J., P.S., and N.W.,
on behalf of themselves and all others similarly situated,
    Plaintiff-Intervenors.


## MEMORANDUM OPINION AND ORDER APPROVING SETTLEMENT AGREEMENT BETWEEN CLASS AND SUBCLASS AND THE CITY OF ALBUQUERQUE

The City of Albuquerque (City) and the Mayor of Albuquerque (together, City Defendants), Plaintiffs and Plaintiff Intervenors seek final approval of the SETTLEMENT AGREEMENT BETWEEN THE CITY DEFENDANTS, THE PLAINTIFF CLASS, AND THE PLAINTIFF INTERVENOR SUB CLASS (Doc. No. 1320) (the Settlement Agreement) that fully resolves a dispute over the treatment of class and subclass members by the Albuquerque Police Department (APD). On August 2, 2016, Plaintiff Intervenors, on behalf of the subclass of individuals with mental disabilities, asked the Court to issue an order requiring the City Defendants to show cause why they are not in violation of a 2001 consent decree entered in this case. *See* PLAINTIFF INTERVENORS' AMENDED MOTION FOR AN ORDER TO SHOW CAUSE AND FOR FURTHER REMEDIAL RELIEF REGARDING CITY DEFENDANTS (Doc. No. 1233) (Motion for Order to Show Cause). Plaintiff Intervenors also alleged that the City Defendants have allowed the APD to violate subclass members' rights under the Americans

with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*[1] On August 3, 2016, Plaintiffs, on behalf of the class of inmates housed at the Metropolitan Detention Center (MDC), filed a notice of joinder in the Motion for Order to Show Cause.

On November 9, 2016, after full briefing of the Motion for Order to Show Cause,[2] the Court entered a MEMORANDUM OPINION AND ORDER (Doc. No. 1245) requiring the City Defendants to appear and show cause as to whether they are in compliance with: (1) the SUPPLEMENTAL ORDER TO ENFORCE PREVIOUSLY ORDERED POPULATION LIMITS AT THE BCDC MAIN FACILITY (Doc. No. 319) (the 2001 Supplemental Order) requiring the City Defendants to "[p]rovide direction to law enforcement officials . . . to issue citations where appropriate and to use the 'walk through procedures,' rather than incarcerating individuals, where appropriate;" (2) the 2001 Supplemental Order requiring the City to "schedule a meeting or meetings concerning the provision of mental health services in Bernalillo County. . . . to plan how to implement an effective jail diversion program for persons with psychiatric and developmental disabilities;"[3] and (3) the ADA with regard to detaining and arresting individuals with mental illnesses or developmental disabilities to sweep them from the streets. The Court

---

[1] Plaintiff Intervenors also argued that the City Defendants were violating the Rehabilitation Act, 29 U.S.C. § 794(a). Section 504 of the Rehabilitation Act similarly prohibits disability-based discrimination. 29 U.S.C. § 794(a). Claims under the ADA and RA in this context are treated identically. The Court will discuss the claims together as an ADA claim. *See Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City,* 685 F.3d 917, 919 (10th Cir. 2012) (both ADA and RA address three categories of conduct: intentional discrimination, unlawful disparate impact, and failure to provide reasonable accommodation and apply the same standard).

[2] *See* CITY OF ALBUQUERQUE'S RESPONSE TO PLAINTIFF INTERVENORS' AMENDED MOTION FOR AN ORDER TO SHOW CAUSE AND FOR FURTHER REMEDIAL RELIEF REGARDING CITY DEFENDANTS (Doc. No. 1237) (Response); *and* PLAINTIFF INTERVENORS' AND PLAINTIFFS' JOINT REPLY TO CITY OF ALBUQUERQUE'S RESPONSE TO PLAINTIFF INTERVENORS' AMENDED MOTION FOR AN ORDER TO SHOW CAUSE AND FOR FURTHER REMEDIAL RELIEF REGARDING CITY DEFENDANTS (Doc. No. 1239) (Reply).

[3] Under the settlement agreement approved on June 27, 2016 (Doc. No. 1225), the County Defendants must develop an adequate plan to implement an effective jail diversion program for persons with psychiatric or developmental disabilities. (Doc. No. 1222-3 at 20.) The County Defendants also must direct their law enforcement officials to issue citations, where appropriate, and to use the "walk through procedures" rather than incarcerating individuals, where appropriate. (Doc. No. 1222-4 at 3.) Thus, the County is required to implement similar procedures as those being developed by the City under this Settlement Agreement.

ordered the parties to participate in limited discovery. After discovery was completed, the parties entered into settlement discussions with Special Master Alan C. Torgerson. The Settlement Agreement is the product of those discussions and the determined efforts of Special Master Torgerson.

On July 10, 2017, the Court granted preliminary approval of SETTLEMENT AGREEMENT BETWEEN THE CITY DEFENDANTS, THE PLAINTIFF CLASS, AND THE PLAINTIFF INTERVENOR SUB CLASS (Doc. No. 1312, Ex. A) (Settlement Agreement). *See* STIPULATED ORDER PRELIMINARILY APPROVING SETTLEMENT, REQUIRING NOTICE TO CLASS AND SUBCLASS MEMBERS, AND SETTING FAIRNESS HEARING (Doc. No. 1312).

On September 11, 2017, the Court held a hearing on final approval of the Settlement Agreement. Present at the hearing were counsel for the class, Mark Donatelli, Zach Ives, and Phil Davis, counsel for the subclass, Peter Cubra, Kelly Waterfall, and Ryan Villa, counsel for the City Defendants, Debra Moulton, and counsel for the County Defendants, Luis Robles, Taylor Rahn, and Kenneth Martinez.[4] At the hearing, the parties supported their contention that the Settlement Agreement was fair, reasonable, and adequate, informed the Court on the fulfillment of the notice requirements, and addressed two objections to the Settlement Agreement. At the end of the hearing, the Court signed the Settlement Agreement (Doc. No. 1320) and asked Ms. Moulton to notify the Court when the City Council had approved the Settlement Agreement so that the Court could find that the Motion for Order to Show Cause had been finally resolved. In a letter dated October 4, 2017, Ms. Moulton advised the Court that the

---

[4] Counsel for the County participated in the settlement discussions recognizing that the City's policies have an effect on the MDC population. At the final approval hearing, Ms. Rahn informed the Court that the County expects to negotiate with the City in good faith on the initiatives that require cooperation between the City and County governments.

parties agreed that the Court's execution and filing of the Settlement Agreement (Doc. No. 1320) was sufficient to fully resolve the Motion for Order to Show Cause. Ms. Moulton then informed the Court that the City ordinances do not require approval of the Settlement Agreement by the City Council and that Ms. Moulton received all necessary approval prior to executing the Settlement Agreement on behalf of the City.

After considering the long history of this case, the Settlement Agreement, the objections, and the arguments of counsel for the class, subclass, the City Defendants, and the County Defendants, the Court will grant final approval of the Settlement Agreement.

I. STANDARD OF REVIEW

Under Rule 23,

**(e) Settlement, Voluntary Dismissal, or Compromise.** The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

(2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
. . .
(5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

Fed. R. Civ. P. 23(e).

The notice requirements of Rule 23 are designed to satisfy due process by providing class members the right to notice of settlement and a right to be heard. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173–74 (1974). Notice, therefore, "must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 174 (internal quotation marks omitted).

4

Under Rule 23(e)(2), a court may approve a settlement agreement as fair, reasonable, and adequate if the settlement agreement meets four criteria: (1) the settlement was fairly and honestly negotiated; (2) serious legal and factual questions place the litigation's outcome in doubt; (3) the immediate recovery is more valuable than the mere possibility of a more favorable outcome after further litigation; and (4) the parties believe the settlement is fair and reasonable. *Tennille v. Western Union Co.*, 785 F.3d 422, 434 (10th Cir. 2015).

II. BACKGROUND

    A. CONSENT DECREES

This class action lawsuit was brought in 1995 against the City Defendants and the County Defendants to address issues related to the overcrowding of the Bernalillo County jail system, consisting originally of the Bernalillo County Detention Center (BCDC) in downtown Albuquerque, New Mexico and later on, the newer Metropolitan Detention Center (MDC), now operated by the County. In addition to addressing the needs of the Plaintiff class, the Court certified a "sub-class of 'all persons with mental and/or developmental disabilities who are now, or in the future may be, detained at BCDC'. . ." ORDER CERTIFYING A CLASS (Doc. No. 257) at 2.

In the AMENDED COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF (CLASS ACTION) (Doc. No. 150) (Complaint in Intervention), the Plaintiff Intervenors' alleged *inter alia* that Defendants, in the administration of the APD, Bernalillo County Sheriffs' Office and the Bernalillo County Detention Center, violated Plaintiff Intervenors' rights under the Americans with Disabilities Act (ADA) by: 1) failing to establish a system for determining the mental health needs of arrestees; 2) failing to provide effective pre-trial release services for individuals with psychiatric illness or developmental disabilities

5

(subclass members); 3) denying programs for subclass members in an integrated setting; and 4) failing to modify existing programs to avoid discrimination against subclass members. (Compl. in Interv. ¶¶ 79, 80, and 103.) The Plaintiff Intervenors also alleged that the APD was "more likely to bring persons with psychiatric, developmental or other mental health disorders to the BCDC for booking than they are similarly situated persons with [physical] medical conditions that are not psychiatric disorders or mental health disorders. Non-disabled citizens receive citations for the same alleged offenses. Police and deputies rarely use the option of transporting subclass members to the University of New Mexico Health Center, rather than to the jail." (*Id.* ¶ 125.) Plaintiff Intervenors alleged that "[p]ersons with psychiatric, developmental or other mental health disorders are more likely to be booked into the BCDC by BCDC staff than are similarly situated persons without such disorders. . . . [P]ersons with psychiatric disabilities that warrant psychiatric hospitalization do not [get it]." (*Id.* ¶ 126.) In the Prayer for Relief, the Plaintiff Intervenors asked the Court to "[d]eclare unlawful Defendants' policy and practice of denying Plaintiff Intervenors . . . needed therapeutic services[]" and to issue injunctive relief "directing Defendants to immediately propose and promptly implement a plan to: . . . 2. Divert all people needing and wanting in-patient treatment to an appropriate treatment facility. . . . 4. ensure that whenever possible, classmembers receive services in the setting that most integrates them into their communities . . . " (*Id.* p. 42.)

  Since 1996, the Court has approved numerous settlement agreements involving the treatment of detainees at the BCDC and at the MDC. The settlements have addressed both the overcrowding of the Bernalillo County jail system and the causes of overcrowding, which included the arrest, pre-trial detention, and release procedures used by City and County law enforcement. On November 5, 1996, the Court entered a consent decree which, in relevant part,

required the City Defendants to develop and implement "adequate formal procedures for seeking psychiatric hospitalization or other appropriate residential mental health care" for subclass members that were arrested. ORDER (Doc. No. 256) (1996 Order). In June 2001, to resolve a motion for contempt, the parties entered into a consent decree requiring them to "plan how to implement an effective jail diversion program for persons with psychiatric or developmental disabilities[.]" (2001 Supplemental Order at 6.) In addition, the Court ordered the City and County Defendants to "[p]rovide direction to law enforcement officials under the control of the City and/or the County to issue citations where appropriate and to use the 'walk through procedures,' rather than incarcerating individuals, where appropriate." (*Id.* at 5.) The purpose of those provisions was to "achieve compliance with the Court's prior population reduction orders. (*Id.*) On January 31, 2002, the Court entered a STIPULATED AGREEMENT (Doc. No. 361) (2002 Stipulated Agreement), that required the City and County Defendants to "continue to employ all existing population management tools[.]" (*Id.* ¶ 8.)

In his July 2015 report, Dr. Jeffrey L. Metzner, the Court's Rule 706 expert, concluded: "There currently does not exist an adequate plan to implement an effective jail diversion program for persons with psychiatric or developmental disabilities." (Metzner Report dated July 17, 2015 at 14.)[5] In the Motion for Order to Show Cause, Plaintiff Intervenors alleged that the City Defendants are in violation of the 2001 Supplemental Order and federal law by (1) unnecessarily arresting and incarcerating individuals with mental disabilities; (2) failing to accommodate those individuals by arresting for citable offenses; (3) incarcerating individuals who need psychiatric hospitalization; (4) failing to train City police officers on the appropriate use of force on

---

[5] Although the July 2015 report from Dr. Metzner was the latest one available when the Motion for Order to Show Cause was filed, Dr. Metzner has submitted a December 16, 2016 report indicating that "a draft plan has been developed re: a jail diversion program for persons with psychiatric or developmental disabilities." (Metzner Report dated December 16 2016 at 17.) Dr. Metzner found partial compliance with this requirement. (*Id.*)

7

individuals with mental disabilities;[6] and (5) failing to modify City police policies and procedures to avoid targeting mentally disabled homeless individuals.

        B.        THE SETTLEMENT AGREEMENT

                1.        Revisions of APD's Standard Operating Procedures

                      a.        Citations instead of arrest.

Within 45 days of the signing of the Settlement Agreement, the City must (a) issue a Special Order and a member of the command staff must issue a corresponding video and (b) initiate revision to APD's Standard Operating Procedure (SOP) 2-80, entitled Arrests, Arrest Warrants and Booking Procedure. (Settlement Agreement at 1.) Both the Special Order and the revised SOP 2-80 must contain a clear written directive informing police officers that this Court has ordered the City to require its APD officers to issue citations whenever appropriate, and explain "that persons alleged to have committed non-violent misdemeanor offenses (not to include DWIs) will not be arrested when there are no circumstances necessitating arrest." (*Id.* at 2.) The written directive must also instruct officers how to use the window at the Albuquerque Metropolitan Court to allow individuals to post a bond or pay a fine to resolve or quash a warrant, to avoid being booked into the MDC. In addition, the written directive must specify that "whether a person has a permanent address may not be the sole factor in determining whether to arrest rather than issue a citation." (*Id.*)

The parties note that the State of New Mexico will soon be issuing a revised Uniform Traffic Citation form that includes fields for telephone number and email address. In the

---

[6] The Court will not address allegations regarding use of force on sub class members because no excessive force claim was asserted in the Complaint in Intervention. Moreover, the excessive force issue is being dealt with in the a case before United States District Judge Robert C. Brack, *United States v. City of Albuquerque*, Case No. 14 CV 1025 RB/KK. In that case, Judge Brack denied intervention by a class of persons who have mental disabilities. *See* MEMORANDUM OPINION AND ORDER (Doc. No. 135). And the consent decree in that case has detailed requirements for the improvement of "use of force" with regard to all arrestees.

Settlement Agreement, the parties agreed that the Chief of APD will, "within 30 days after the State issues the revised Uniform Traffic Citation form that includes fields for telephone number and email address," issue an SOP requiring all APD officers to, "whenever possible, obtain and record both telephone numbers and email addresses when they issue a citation." (*Id.*)

The City must also initiate further revisions to: (1) SOP 1-14 entitled "Biased Based Policing/Profiling;" (2) SOP 2-80; (3) SOP 2-71 entitled "Search and Seizure without a Warrant;" and (4) SOP 3-12 entitled "Domestic Violence." The revised SOPs must include, to the extent that the existing provisions are not already sufficiently clear, provisions that: (1) require officers to have reasonable suspicion before stopping, searching, asking for identification from, frisking, or searching people who appear to have a mental disability or who appear to be homeless; and (2) state that officers may seize or dispose of personal property or personal identification only when authorized by law to do so. The City must issue the new SOPs within 10 days after the Settlement Agreement is signed, and counsel for the class and subclass have 30 days thereafter to suggest revisions. Thereafter, counsel for the class and subclass must be given an opportunity to present their suggestions to the Office of Policy Analysis (OPA), and the City must schedule an OPA meeting within 30 days of receiving their suggestions. The City must then complete the review process for the new SOPs within 90 days. After the review process, counsel for the class and subclass must receive the final version of the SOPs, and they will have 14 days to provide written objection with respect to any of their original suggestions not fully incorporated into the revisions.

After final approval of the revised SOPs, the City will "ensure that all officers are adequately trained on the revised SOPs." (*Id.* at 4.) APD must develop a training plan on the revisions within 60 days of the final approval of those SOPs by the Chief of APD. Counsel for

the class and subclass will be given an opportunity to review the training materials and give comments and recommendations within two weeks of receipt. (*Id.* at 4.) The Chief of APD, however, will make the final determination on training materials and methods.

           b.  Response to mentally disabled individuals.

The City must also revise SOP 2-19 entitled "Response to Behavioral Health Issues." (*Id.*) First, the City must, within 10 days of the signing of the Settlement Agreement, provide copies of the current SOP 2-19 to counsel for the class and subclass. Counsel for the class and subclass will have 30 days to suggest revisions to the current policy, and they may participate in the review of this policy with the Mental Health Response Advisory Committee (MHRAC) or the OPA if they choose. The City must schedule an OPA meeting within 30 days of receiving counsels' suggestions. Within 90 days, the review process must be completed. Counsel for the class and subclass will receive the final revised version of SOP 2-19 and will have 14 days to provide written objection to any failure to incorporate the suggestions. After the APD's internal review process is complete, the City will send the final version of this SOP to the parties and the Monitor appointed in *United States v. City of Albuquerque,* Case No. 14 CV 1025 RB/SMV (the DOJ case), where the final version will be subject to the parties' objection and to the Monitor's approval. Within 30 days of this approval, the City will implement the new SOP. The City must then develop a training program for the new SOP and train all personnel who are allowed to respond to calls involving mentally disabled persons. Mental health professionals employed by APD are also subject to training on the new SOP 2-19.

         2.  Recordkeeping Requirements

The City must create a system of business records documenting the following: (1) the notation of phone numbers and email addresses on the new Uniform Traffic Citation form; (2)

bookings into MDC on citable non-violent misdemeanor offenses other than driving while intoxicated (DWI) offenses; (3) disposition data for individuals involved in incidents to which the CIT responded; and (4) arrests involving domestic violence calls. (*Id.* at 5.) Beginning 30 days after the Settlement Agreement is signed, the City Defendants must compile these records for one year. Within three months thereafter, the City Defendants must publically issue a written report summarizing the findings from these statistical records and any follow-up measures taken. (*Id.*) Issuance of the report constitutes compliance with this section.

### 3. Jail Diversion Programs and Response Teams

The City Defendants must continue to collaborate in good faith with the County Defendants to develop and allocate resources to jail diversion programs. The City Defendants may continue to use third-party behavioral health programs for individuals in behavioral health crisis, and the City Defendants must utilize other appropriate third-party providers as they become available in the community. (*Id.* at 6.) To the extent appropriations of funds are required to use these third-party programs, compliance with this provision is contingent on the City Council making the necessary appropriations.

During the period between July 1, 2017 and June 30, 2018, City officials must meet with County officials through the Albuquerque Bernalillo County Government Commission or one of its subcommittees at least one time per quarter to determine whether to use teams comprised of mental health professionals who are not employees of APD to provide mental health follow-up and case management services similar to the activities of the COAST[7] team. The City Defendants must continue to collaborate in good faith with County officials in the development of and funding for mobile crisis teams to respond to mental health crisis calls, including alleged

---

[7] COAST stands for Crisis Outreach and Support Team, which was developed by APD under its settlement in the DOJ case.

suicide threats and welfare checks, where appropriate. (*Id.*) However, the details and timing of the implementation of these mobile crisis teams are within the discretion of the City and County. The funding for the mobile crisis teams is contingent on the City Council making the necessary appropriations. (*Id.* at 7.)

The City must continue to provide approximately 700 supportive housing slots for people, including the mentally disabled, who have been booked into the MDC. (*Id.*) The provision of housing slots must be coupled with "wrap-around case management and other behavioral health services." (*Id.*) The City and County must collaborate in good faith on providing additional supportive housing units. (*Id.*) "Where obligations in the Settlement Agreement are subject to appropriations, the failure to appropriate sufficient amounts in whole or in part shall not constitute a default of the [Settlement] Agreement." (*Id.*)

                4.        Compliance and Disputes

If a dispute arises over compliance with the Settlement Agreement, before filing a motion with this Court, the parties must first attempt to mediate the dispute before Special Master Alan C. Torgerson or another agreed-upon mediator. The City Defendants may file a motion with the Court for a finding of substantial compliance with the Settlement Agreement and upon a showing of substantial compliance, the City Defendants may ask the Court to dismiss them from the case. (*Id.* at 8.)

    III.    DISCUSSION

        A.    Notice Was Reasonable

The proposed notice of the Settlement Agreement was incorporated into the Order of Preliminary Approval. The notice sufficiently summarized the provisions of the Settlement Agreement and explained how class and subclass members could object to the terms of the

Settlement Agreement. The City presented the affidavits of Daniel Lucero and Miranda Trujillo, who are Police Service Aides with the APD. (Ex. A, Lucero Aff. ¶ 2; Ex. B, Trujillo Aff. ¶ 2.) Mr. Lucero and Ms. Trujillo posted copies of the notice in both English and Spanish in certain areas where notices to the public are generally maintained– "the APD Main by the Records Department and the main Library." (Lucero Aff. ¶ 3; Trujillo Aff. ¶ 3.) The City presented the affidavit of Celina Espinoza, the Communications and Community Outreach Director for the APD. (Ex. D, Espinosa Aff. ¶ 2.) Ms. Espinoza posted both the notice and the Settlement Agreement, in both Spanish and English, on the City's website under the APD section, which is available for public viewing. (*Id.* ¶ 3.) The City presented the affidavit testimony of Jennifer Stepp, a Lieutenant who serves as the MDC Quality Assurance Team Leader, Accreditation Team Leader, and the Records Disposition Team Leader. (Stepp Aff. ¶ 2.) Lt. Stepp received copies of the notice in both Spanish and English and posted them in all housing units at the MDC, in the reception area, the discharge and transfer unit, the PAC units, and in the law enforcement area at the MDC. (*Id.* ¶ 3.) The City submitted the affidavit of Natalie Howard, the City Clerk. (Ex. E, Howard Aff. ¶ 2.) Ms. Howard testified she received copies of the Settlement Agreement in English and Spanish and has continuously displayed them in the City Clerk's office for public viewing. (*Id.* ¶¶ 3–4.)

The City provided an AFFIDAVIT OF PUBLICATION from Anita Montoya, a representative of the Albuquerque Journal. (Ex. F, Montoya Aff.) Ms. Montoya published notice of the Settlement Agreement on three consecutive weeks. (*Id.*) The City submitted an AFFIDAVIT OF PUBLICATION from David Rivord, a representative of the Health City Sun, a weekly newspaper published in the State of New Mexico. (Ex. G, Rivord Aff.) Mr. Rivord testified that he published notice of the Settlement Agreement on three consecutive weeks. (*Id.*)

13

Based on these affidavits, the Court concludes that notice of the Settlement Agreement was provided to the class and subclass members "in a reasonable manner."

    B.  Settlement Agreement Is Fair and Reasonable.

      1.  Settlement Agreement Was Fairly and Honestly Negotiated.

The Court is satisfied that the settlement was fairly and honestly negotiated. Negotiations commenced after the parties engaged in discovery. *Campbell v. C.R. England, Inc.*, 2:13-CV-00262, 2015 WL 5773709, at *5 (D. Utah Sept. 30, 2015) (noting that parties engaged in "extensive discovery and damages calculations" prior to settlement, which supporting finding that settlement was fairly and honestly negotiated). The parties, through experienced counsel, engaged in arms-length negotiations to arrive at a proposed settlement of this litigation. *Casados v. Safeco Ins. Co. of Am.*, No. 10 CV 751 JAP/SMV, 2015 WL 11089527, at *9 (D.N.M. Nov. 6, 2015) (unpublished). The Settlement Agreement negotiations were facilitated by Special Master Torgerson, who has an intimate knowledge of this case, having conducted settlement negotiations over several years and who was the assigned Magistrate Judge in this case for several years.

      2.  Serious Legal and Factual Questions Place Outcome in Doubt and the Value of Immediate Recovery.

With regard to the second and third factors, the Court is convinced that sufficient legal and factual issues place the outcome of this dispute in doubt. *Casados*, 2015 WL 11089527, at *9. Litigation of the Motion for Order to Show Cause, would be an arduous process. And, the resolution through settlement is more valuable given the additional relief granted in the Settlement Agreement. For example, the provision of 700 units to house homeless and mentally disabled individuals is a valuable alternative to repeated incarceration, and was not specifically sought as a remedy in the Motion for Order to Show Cause. Nevertheless, this remedy

recognizes that repeated arrest and incarceration of certain homeless and/or mentally disabled individuals is not the optimum solution.

In addition, as reflected in the Settlement Agreement, the City will take part in solving issues related to overcrowding of the Bernalillo County jail system by reforming the City's policing that contributes to overcrowding. Since 2001, the City Defendants were required to direct APD officers to issue citations where appropriate to avoid over-incarceration of members of the mentally disabled and homeless population. The City also agreed to develop and use "walk-through" procedures to avoid incarceration of individuals who commit petty nonviolent offenses. Under the Settlement Agreement those requirements will be encapsulated into new SOPs. The Court is persuaded that, after APD officers are trained on the new SOPs, those procedures will aid in controlling the MDC population and will improve the outcomes for mentally disabled and homeless individuals. Since 2001, the City has been instructed to plan and implement, along with the County, an effective "jail diversion program" for persons with psychiatric and developmental disabilities. With the Settlement Agreement, the City solidifies its commitment to that provision of the 2001 Supplemental Order. Both the City and County recognize that appropriately channeling some individuals with mental illness into treatment programs instead of incarcerating them in jail is an effective way to control the MDC population.

Therefore, despite the existence of the 2001 Supplemental Order, the parties have identified serious legal and factual issues that have contributed to this ongoing dispute. And, the litigation of these issues could produce an outcome that is not as effective as the relief provided in the Settlement Agreement particularly the housing program and the changes to APD SOPs. In short, the parties have chosen the Settlement Agreement as an appropriate and effective way to

solidify the improvements in APD's policing procedures while avoiding disputes over the details associated with enforcement of the 2001 Supplemental Order.

### 3. Parties Believe Settlement Agreement is Fair and Reasonable.

Finally, the Court is persuaded that the parties and the class and subclass they represent believe that the Settlement Agreement is fair and reasonable. Because only two individuals objected to the Settlement Agreement, the Court can assume that other members of the class and subclass reacted favorably to the Settlement Agreement. (Doc. No. 1319); *see Ramah Navajo Chapter v. Jewel*, 167 F. Supp. 3d 1217, 1239 (D.N.M. 2016) (noting that the absence of objections signals approval of a settlement agreement). On July 26, 2017, Troy Shaw, a disabled veteran who suffers from PTSD, objected to the Settlement Agreement and described negative encounters he has had with APD officers. (*Id.*) Mr. Shaw stated that he did not believe that amended SOPs would correct the perceived problems, particularly the excessive force used by APD officers against the homeless mentally disabled population. (*Id.*) However, counsel for the Plaintiff Intervenors assured the Court that Mr. Shaw's concerns are addressed in the Settlement Agreement and that the City is following through on its commitment. At the hearing, Plaintiff's counsel, Ms. Waterfall, informed the Court she held a meeting with MDC inmate Caley Volante, who also indicated an objection to the Settlement Agreement. Mr. Volante stated that he thinks the City should have agreed to provide twice the number of housing units based on his opinion of what the City needs. However, after careful consideration of each objection, the Court will approve the Settlement Agreement because the concerns behind the objections are appropriately addressed in the Settlement Agreement. Moreover, the small number of objections supports a finding that the Settlement Agreement is fair and reasonable. *Casados*, 2015 WL 11089527, at *10; *Williams v. Sprint/United Mgmt. Co.,* No. 03–2200–JWL, 2007 WL 2694029, at *4, (D.

16

Kan. Sept. 11, 2007) (while not controlling, "a relatively small number of objectors can be taken as 'some indication that the class members as a group did not think the settlement was unfair' ") (unpublished) (citation omitted). *See also,Make a Difference Foundation, Inc. v. Hopkins*, No. 10–cv–00408–WJM–MJW, 2012 WL 917283, at *3, (D. Colo. Mar. 19, 2012) (unpublished) (collecting cases for the same proposition). The Court concludes that the parties have sufficiently supported their belief that the Settlement Agreement is fair and reasonable.

IT IS ORDERED that the Settlement Agreement (Doc. No. 1320) is approved.

                                             _____
                                             SENIOR UNITED STATES DISTRICT JUDGE