# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO


**JIMMY (BILLY) McCLENDON, et al.,**

    **Plaintiffs,**

**v.**                                                      No. CV-95-24 JAP/KBM

**CITY OF ALBUQUERQUE, et al.,**

    **Defendants,**

**v.**

**E.M., R.L., W.A., D.J., P.S., and N.W., on behalf
of themselves and all others similarly situated,**

    **Plaintiff Interveners.**


## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## MOTION FOR PROTECTIVE ORDER

In DEFENDANT BERNALILLO COUNTY BOARD OF COMMISSIONERS'
MOTION FOR PROTECTIVE ORDER REGARDING THE DEPOSITIONS OF DR.
KENNETH RAY AND DR. RONALD SHANSKY (Doc. No. 1343) (Motion), the County asks
the Court to disallow the depositions of its consulting experts, Drs. Kenneth Ray and Ronald
Shansky.[1] The Motion has been fully briefed. PLAINTIFFS' AND PLAINTIFF-
INTERVENERS' RESPONSE TO COUNTY DEFENDANT'S MOTION FOR PROTECTIVE
ORDER (Doc. No. 1347) (Joint Response); and DEFENDANT BERNALILLO COUNTY
BOARD OF COMMISSIONERS' REPLY TO RESPONSE TO MOTION FOR PROTECTIVE
ORDER REGARDING THE DEPOSITIONS OF DR. KENNETH RAY AND DR. RONALD

---

[1] On April 25, 2018, the depositions were scheduled to be taken on May 14 and 15, 2018; but due to the
filing of the Motion, the depositions were postponed.

SHANSKY (Doc. No. 1350) (Reply).[2] On October 9, 2018, the Court heard arguments from counsel for Plaintiffs, Plaintiff Interveners, and the County. Based on the evidence and argument, the Court concludes that from July 28, 2016 through February 1, 2018, Drs. Ray and Shansky worked for the County as consulting experts and their opinions and reports, other than those provided to the Court's experts, are not discoverable under Fed. R. Civ. P. 26(b)(4)(D). Therefore, the Motion will be granted as to the Plaintiffs' and Plaintiff Interveners' attempts to depose Dr. Ray and Dr. Shansky, which will not be allowed. However, because Plaintiffs' and Plaintiff Interveners' pursuance of discovery through depositions was substantially justified under confusing circumstances, the Court will deny in part the County's request for sanctions.

## I.     STANDARD OF REVIEW

Rule 26(b)(4)(D) provides:

(D) *Expert Employed Only for Trial Preparation.* Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial. But a party may do so only:
…
(ii) on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.

Four commonly identified purposes for Rule 26(b)(4)(D) include:

(1) Allowing counsel to obtain the expert advice they need in order to properly evaluate and present their client's position, without fear that every consultation "may yield grist for the adversary's mill";
(2) Preventing unfairness that stems from allowing one party to benefit from the effort and expense incurred by its adversary in preparing its case;
(3) Guarding against the diminished willingness of experts to serve as consultants, and any potential unfairness to the expert; and
(4) Preventing the prejudice associated with one party calling an expert previously retained or consulted by the other side.

---

[2] The parties agreed to an extension of the deadline for the response. The Response was filed on June 18, 2018. The deadline for the reply was also extended, and the Reply was filed on July 13, 2018.

*Kurlander v. Kroenke Arena Co., LLC*, 16-CV-02754-WYD-NYW, 2017 WL 3084473, at *3 (D. Colo. July 20, 2017) (slip op.) (quoting *Rubel v. Eli Lilly & Co.*, 160 F.R.D. 458, 460 (S.D.N.Y. 1995)). *See also Brigham Young Univ. v. Pfizer, Inc.*, No. 2:12-MC-143 TS BCW, 2012 WL 1029304, at *4 (D. Utah Mar. 26, 2012) (unpublished) (noting that Rule 26(b)(4)(D) acts as a shield permitting parties to prepare for trial). "The rule is designed to promote fairness by precluding unreasonable access to an opposing party's trial preparation." *Durflinger v. Artiles*, 727 F.2d 888, 891 (10th Cir. 1984). The most important factor in deciding whether to allow discovery in this instance is whether an expert has been clearly designated as "testifying" or "non-testifying." *Delcastor, Inc. v. Vail Assoc., Inc.*, 108 F.R.D. 405, 407 (D. Colo. 1985) ("The threshold issue is whether, for the purpose for which Rephidim seeks to discover this report, Dr. Lampiris falls within the category of experts expected to testify at trial, (A), or that of experts not testifying, (B).").

However, the confidentiality of opinions of or facts known to a non-testifying expert may be waived if the "work product of non-testifying consultants is provided to testifying experts[.]" *Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 378 (5th Cir. 2010). *See Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-CV-00047 MSK-MEH, 2010 WL 3923092, at * 9 (D. Colo. Oct. 1, 2010) (unpublished) (recognizing ruling in *Ecuadorian Plaintiffs* and holding that when a non-testifying consulting expert provides information to a court-appointed testifying expert, protection of Rule 26 is waived as to that information); *Kurlander*, 2010 WL 3084473, at * 7 (noting that no Tenth Circuit case has directly held that Rule 26(b)(4)(D) protections can be waived and applying waiver standards from work product privilege).

## II. BACKGROUND RELEVANT TO THE MOTION

### A. Settlement Agreement

On June 27, 2016, the Court approved the Settlement Agreement (Doc. No. 1222-1), incorporating three Check-Out Audit Agreements. Under the Settlement Agreement, when the County believes it has sufficient evidence of compliance from the Court's experts,[3] the County can move the Court for an "initial finding of substantial compliance" as to one or more domains outlined in the corresponding Check-Out Audit Agreement. (Settlement Agreement (Doc. No. 1222-1) at 3.) The Court must then decide whether to find "initial substantial compliance" based on "the experts' reports and other evidence presented by the parties." (*Id.* at 4.) After the initial determination of substantial compliance for a domain, the Court must set a "period of self-monitoring for each domain which the Court determines is a sufficient period to reach sustained substantial compliance based upon the complexity of the domain[.]" (*Id.* at 5.) At that time, the Court's experts must develop "self-monitoring protocols" for the County. (*Id.*) During the period of self-monitoring, the County must submit quarterly reports to counsel for Plaintiffs and Plaintiff Interveners and to the appropriate expert. At that point, counsel for Plaintiffs and Plaintiff Interveners will be compensated for limited on-site monitoring of conditions at MDC.[4] (*Id.* at 7.)

At the end of the period for self-monitoring, the Court's expert must conduct a Check-Out Audit and make findings of compliance, partial compliance, or non-compliance for each domain. (*Id.*) Based on the County's self-monitoring reports as well as the expert's proposed

---

[3] The Court appointed three experts under Fed. R. Evid. 706. Ms. Margo Frasier is the Court's expert on conditions of confinement. Dr. Jeffrey L. Metzner is the Court's expert on mental health care. Dr. Robert B. Greifinger is the Court's expert on medical care.

[4] Currently, the Interim Access Order (Doc. No. 754) allows counsel for Plaintiffs and Plaintiff Interveners to do monthly on-site monitoring of conditions at the MDC, and counsel may make a limited number of requests for documents, such as medical records.

findings from the Check-Out Audit, the Court must then determine whether the County has achieved "sustained substantial compliance" as to the domain. After that finding, "all provisions of extant orders related to that domain will be vacated." (*Id.* at 9–10.) When the Court finds "sustained substantial compliance" for every domain, the parties must "jointly request that the Court enter a permanent injunction pertaining to the Bernalillo County jail system."[5] (*Id.* at 11.) At that time, Plaintiffs and Plaintiff Interveners "agree to move the Court for dismissal of all claims with prejudice." (*Id.* at 10.)

Under the Settlement Agreement, contempt motions must be "filed on a timely basis, after mediation, and be based on the requirements of this Agreement and the substantive requirements set forth in the Check-Out Audit Agreements." (*Id.* at 12.) Before submission to the Court, the parties must mediate any requests for modification of the Settlement Agreement or alleged breaches of the Settlement Agreement. (*Id.* at 14.) Mediations are conducted by either a United States Magistrate Judge or Special Master Alan C. Torgerson. (*Id.*)

Other than the Motion, there are no pending motions in this case, and the County has not yet requested an initial finding from the Court of substantial compliance as to any domain.

## B. Events Relevant to the Motion

On June 28, 2016, one day after the Court approved the Settlement Agreement, the County entered into a two-year Professional Service Agreement (PSA) (Mot. Ex. A) with Dr. Ray's company Kenneth A. Ray Justice Services, LLC to provide "McClendon Litigation Compliance and Sustainability Monitor(s) Services which include six (6) bi-monthly visits for each provider (30 days on-site) and 30 off-site work days[.]" (*Id.*) Dr. Ray specializes in use of force and other security issues. Dr. Shansky, a subcontractor, specializes in medical and mental

---

[5] The terms of the permanent injunction are outlined in the Settlement Agreement.

health care. The PSA term was from July 1, 2016 through June 30, 2018 at a cost of $300,000. (Resp. Ex. 3.) The PSA governed three subjects of MDC compliance: (1) use of force; (2) mental health; and (3) medical services. (Mot. Ex. A.) The PSA contained a confidentiality provision stating: "Any confidential information provided to or developed by the Contractor in performance of this Agreement shall be kept confidential and shall not be made available to any individual or organization by the Contractor without the prior written approval of the County." (*Id.* at ¶16.)[6] Under the Request for Proposals (RFP) (Mot. Ex. B), incorporated into the PSA, Drs. Ray and Shansky were required to prepare reports including: audits of medical charts; review of MDC Medical Quality Management Data Matrix; review of all Clinical data; recommendations for policy changes; and meetings attended. In the RFP, Dr. Ray's title was the "McClendon Litigation Compliance and Sustainability Use of Force Monitor," and Dr. Shansky's title was the "McClendon Litigation Compliance and Sustainability Medical and Mental Health Monitor."

In the RFP, Dr. Ray's position was described as "Litigation Consultant to report to the MDC Director, County Legal, County Manager, or their designees." (Mot. Ex. B at 21.) Dr. Shansky's duties as the subcontractor for medical care included (1) monitoring "compliance in accordance with McClendon Settlement Agreement, … and report[ing] any deficiencies to MDC Director, County Legal, County Manager, or their designees[;]" and (2) serving "on the policy review committee, act[ing] as an independent reviewer for all morbidity and mortality reviews, [and] approv[ing] and recommend[ing] to the MDC Director, or their designee, any changes to current manuals or forms prior to their implementation." (*Id.*) Dr. Shansky could request that

---

[6] "Confidential information" is not specifically defined in the PSA.

"the Medical and Mental Health Services Administrator generate a corrective action plan in response to data gathered by the Mental Health Service Provider or monitor indicating an unusual trend or decline in performance by the Medical and Mental Health Serviced [sic] Provider." (*Id.*)

Under the RFP, Dr. Ray's duties as the Compliance Monitor for use of force included (1) reporting "to the MDC Director, County Legal, County Manager, or their designees[;]" (2) assisting "in the development and implementation and evaluation of strategic court-ordered reforms to the Use of Force policies and programs[;]" and (3) monitoring "use of force processes at MDC, perform[ing] audits, and meet[ing] with administrative and line staff of the MDC." (Mot. Ex. B at 22.) In the section describing basic qualifications and experience, the RFP asked candidates to "[d]escribe your experience in positive collaboration with plaintiffs, defendants, court monitors, internal and external stakeholders." (*Id.*)

In his affidavit, Plaintiff Interveners' counsel Mr. Peter Cubra testified that sometime in mid-2016, "Dr. Ray called me and told me that he and Dr. Shansky were working for the County to advise the County how to comply with the court orders in McClendon and he asked if he could interview me about my views with respect to compliance with the court orders in McClendon. I agreed." (Resp. Ex. 1, Cubra Aff. ¶ 6.) Mr. Cubra recounts several "routine" correspondences and meetings with Drs. Ray and Shansky from September 2016 through December 2017. (Resp. Ex. 1, Cubra Aff. ¶¶ 8–13.) During that time, Mr. Cubra "believed, with good reason, that Drs. Ray and Shansky had been hired as the County's internal monitoring experts, to assist with designing and implementing improvements in the operation of the jail system, not as opposing defense experts." (*Id.* ¶ 10.) Mr. Cubra also "assumed that counsel for County Defendant were aware of all of these meetings." (*Id.* ¶ 19.)

After Dr. Greifinger's November 2016 site visit to MDC, Plaintiff Interveners' counsel sent an email to counsel for the County asking for copies of every document that either Dr. Ray or Dr. Shansky had provided to any County employee "that contains any assessment of or comments about the MDC. That includes, but is not limited to, the documents that they provide to Dr. Greifinger." (Mot. Ex. C.)

On November 23, 2016, the County's counsel, Ms. Taylor Rahn, responded that reports generated by Ray and Shansky were protected from disclosure because Drs. Ray and Shansky were "experts employed only for trial preparation." (Mot. Ex D.) However, Ms. Rahn also stated in the letter, "[i]t has not been determined whether Dr. Ray or Dr. Shansky will testify in this matter…. At this point, Drs. Ray and Shansky are not required to produce an expert report." (*Id.*) Ms. Rahn quoted provisions in Rule 26 governing testifying and non-testifying experts. (*Id.*) Although Ms. Rahn concluded that this Court's ruling required that only internal reports given to the Court's experts must be disclosed, she informed opposing counsel that the County would not produce reports that were not given to the Court's experts. (*Id.* at 3.) Ms. Rahn sent a copy of her November 23, 2016 letter to Drs. Ray and Shansky.

On November 28, 2016, Mr. Cubra sent an email to Ms. Rahn stating he believed that the County hired these experts under a County Ordinance[7] allowing experts to work with the MDC Facility Management Oversight Board (Oversight Board). (Mot. Ex. D.) On November 29,

---

[7] The Ordinance, Ord. No. 2015-19, § 3, 6-9-15 provides:

> The county manager shall contract with independent experts in the operation of jails and detention facilities. The independent experts shall work with the advisory board to provide regular independent oversight of Bernalillo County adult detention facilities to ensure that the county is following or exceeding nationally recognized best practices. During the period that the federal court orders the county to hire experts[,] those three experts shall fulfill this requirement.

2016, Ms. Rahn replied to Mr. Cubra's email and attached a copy of the PSA. (Mot. Ex. E.) In the reply email, Ms. Rahn stated that Drs. Ray and Shansky were retained "as litigation experts in the McClendon litigation. They were not hired to be the experts for the oversight board. … [F]or now, the oversight board will rely upon the reports of the Court's experts." (Ex. E.) Ms. Rahn ended her email message by stating: "Because the contract confirms that the doctors are litigation experts, the County stands by its original response to your request for all reports prepared by Drs. Ray and Shansky." (*Id.*)

On January 27, 2017, Plaintiffs and Plaintiff Interveners filed a Joint Motion to Enforce the Interim Order Regarding Access to the MDC (Doc. No. 1265) asking for production of documents given to Dr. Greifinger during his visits to MDC in April 2016 and November 2016. In the Joint Motion (Doc. No. 1265), Plaintiffs and Plaintiff Interveners requested copies of Dr. Ray's and Dr. Shansky's internal reports. The County argued *inter alia* that the reports on quality assurance, including those prepared by Dr. Ray and Dr. Shansky, were protected by the "self-critical analysis privilege." (Resp. (Doc. No. 1268) at 2.) In a March 20, 2017 Memorandum Opinion and Order (Doc. No. 1275), the Court ordered the County to produce only those documents or reports that had been given to Dr. Greifinger.[8] On April 4, 2017, the parties entered into a Stipulated Confidentiality Agreement (Doc. No. 1276) limiting access to those reports and noting that the County was not waiving its privilege associated with the documents produced. *See* Stipulated Confidentiality Order (Doc. No. 1276).

In early December 2017, Dr. Ray visited the MDC, and unbeknownst to County counsel, Dr. Ray scheduled a meeting with counsel for Plaintiff Interveners and MDC management personnel. On December 11, 2017, after learning about the meeting from an MDC employee, the

---

[8] The Court held that the self-critical analysis privilege was not applicable in this case, and the Court distinguished cases, such as medical malpractice cases, where the privilege had been enforced.

County's counsel, Mr. Luis Robles, sent a letter to Plaintiffs' and Plaintiff Interveners' counsel accusing them of violating Rule of Professional Conduct 16-402 (prohibiting lawyers from contacting parties represented by counsel) and the Interim Access Order. (*See* Mot. Ex. F.)

On February 1, 2018, the County terminated the PSA.

In a February 7, 2018 letter sent in response to Mr. Robles' December 2017 letter, Plaintiff's counsel Mr. Zachary Ives denied any misconduct on the part of Plaintiffs' and Plaintiff Interveners' counsel claiming that counsel had complied with the Interim Access Order and with the "established customs and practices in this litigation." (Mot. Ex. G.) Mr. Ives asserted that it was in the parties' best interest to clarify their agreement as to future communications. Mr. Ives, on behalf of Plaintiffs and Plaintiff Interveners, proposed the following: (1) counsel for Plaintiffs and Plaintiff Interveners would agree not to communicate with Drs. Ray and Shansky without County counsel's presence or permission; (2) following monitoring visits, counsel for Plaintiffs and Plaintiff Intervenors would, after informing County's counsel, "continue to have exit conferences" with the MDC Chief or the Chief's designee to discuss urgent issues; (3) the County would agree to allow counsel for Plaintiffs and Plaintiff Interveners to communicate orally with MDC personnel bearing the rank of captain and above without imputing any statements to the County; (4) counsel for Plaintiffs and Plaintiff Interveners would send a copy of all written communications with MDC staff holding the rank of captain or above to the County's counsel; and (5) the County would provide a current organizational chart of personnel holding the rank of captain or above. (*Id.*)

On February 26, 2018, Plaintiff Interveners' counsel, Ms. Nancy Simmons, sent a letter to County counsel citing concerns about "the most recent reports by Drs. Greifinger and Metzner." (Mot. Ex. H.) She noted Dr. Greifinger's recent report had stated that "MDC does not

have a viable quality control plan to ensure constitutionally adequate medical services at MDC[.]" (*Id.* at 1.) She was also concerned with "Dr. Metzner's report that MDC's quality control with regard to mental health care relies on faulty and deficient data." (*Id.*) "To ensure that counsel for Plaintiffs and Plaintiff Interveners are able to monitor compliance with the Settlement Agreement moving forward, we request the following…. copies of all public records provided by MDC, … to either Dr. Shansky or Dr. Ray … as well as reports issued by Dr. Shansky or Dr. Ray, or by any other experts functioning either pursuant to municipal ordinance, Ord. No. 2015-19 or as a litigation expret [sic] in *McClendon*. Please consider this second request as arising pursuant to Fed. R. Civ. Pro. 26 as well as pursuant to the New Mexico Inspection of Public Records Act." (*Id.* at 7.)

On March 2, 2018, Ms. Rahn sent a letter in response to Mr. Ives' February 7, 2018 proposal. Ms. Rahn stated the following about contact with Drs. Ray and Shansky:

> County Defendants recognize that counsel for the inmates have agreed not to have contact with County Defendants' experts without counsel's express permission and to copy counsel on all written correspondence. County Defendants further recognize that inmates' counsel makes this offer notwithstanding inmates' counsel's position that Dr. Ray and Dr. Shansky are not necessarily litigation experts.

(Mot. Ex. I.) Ms. Rahn said that the County did not agree to allow oral communications with MDC administration or personnel at the rank of captain and above without the presence of County's counsel. Ms. Rahn agreed to allow written communication with MDC administration personnel if the County's counsel was copied on the correspondence, and she agreed to provide an organizational chart of MDC's upper management and personnel with the rank of captain and above. (*Id.*)

On March 21, 2018, counsel for Plaintiff Interveners, Kate Loewe, sent an email to Dr. Greifinger and Catherine Knox that stated: "Please find attached Plaintiff-Intervenors' second

letter in preparation for your April 2018 site visit, as well as a companion document that provides additional context. Please be in touch with any questions and let me know how I can be of further assistance." (Mot. Ex. J (email chain).) Ms. Loewe copied Ms. Rahn, Mr. Robles, County Attorney Ken Martinez, Dr. Ray, Dr. Shansky, and others on the email. (*Id.*) Dr. Ray responded to Ms. Loewe's email addressing his response to Ms. Loewe, Dr. Greifinger, and Catherine Knox and copying counsel for Plaintiffs, Plaintiff-Interveners, including Ms. Kelley Waterfall, the County, and others. Dr. Ray advised that he and Dr. Shansky were no longer involved with McClendon compliance. (*Id.*) Plaintiff Interveners' counsel Ms. Waterfall, without copying others, replied to Dr. Ray by email and asked to speak to Dr. Ray.[9] Ms. Waterfall did not copy the County's counsel on her reply email, presumably because she thought it was no longer necessary. (*Id.*) Dr. Ray responded by email that he would be "happy to talk" with Ms. Waterfall "with consent" of the County's counsel. (*Id.*) Dr. Ray copied County Attorney Ken Martinez on his response email. Apparently, Ms. Waterfall then emailed Dr. Ray and Mr. Martinez thanking Dr. Ray and asking Mr. Martinez if he had any objections to her speaking with Dr. Ray. (*Id.*) Mr. Martinez responded by email that the County did object. (*Id.*) Then, late on March 21, 2018, Ms. Waterfall asked via email to Mr. Martinez for the legal basis of the objection. Ms. Rahn responded by email the next day that, as stated in her November 23, 2016 letter, the County objected to all communication between counsel for Plaintiffs and Plaintiff

---

[9] Ms. Waterfall wrote:

> We do not agree with the county that our past communications with you were improper, but we had agreed to the county's request that they be copied on all future communications with you or Dr. Shansky and that they be notified of any future meetings. I am assuming that is now a moot point, as I understand your email to mean you are no longer in their employ. If I have gotten that wrong, please let me know. Assuming I am correct that you are no longer working for the county, I would appreciate an opportunity to speak with you.

(Resp. Ex. J.)

Interveners and Drs. Ray and Shansky under Rule 26(b)(4)(D) and under the confidentiality clause of the PSA. (*Id.*)

In a March 30, 2018 letter, Ms. Rahn responded to Ms. Simmons' February 26, 2018 request for materials generated by Drs. Ray and Shansky. In the letter, Ms. Rahn stated that "'discovery' in this matter is controlled by the Interim Access Order (Doc. No. 754) absent an order regarding formal discovery." (Mot. Ex. K.) Ms. Rahn observed that "County Defendants through CCS have provided periodic updates regarding quality assurance for both medical and mental health at the same time it is provided to the Court experts. County Defendants will not prepare a separate summary for counsel." (*Id.*) Ms. Rahn noted that the County rejected "Plaintiff-Intervenors' attempt to conflate a discovery request under the Federal Rules of Civil Procedure 26 and the Inspection of Public Records Act ('IPRA'). … IPRA requests are not an appropriate vehicle to escape procedural safeguard imposed by pending litigation." (*Id.* at 2.) Ms. Rahn then quoted Rule 26(b)(4)(D) and represented that Drs. Ray and Shansky "are not expected to testify at trial. Thus, Plaintiff-Intervenors' counsel has no right to discover any facts known or opinions held by these experts." (*Id.*)

On April 11, 2018, Ms. Simmons sent a letter to the Board Members of the Oversight Board informing them that the County had refused to allow discovery of the opinions of Drs. Ray and Shansky. (Mot. Ex. M.) Ms. Simmons asked the Board Members to invite Drs. Ray and Shansky to speak before the Board; and she asked the Board Members to delay completing the Board's annual report until the Board Members heard from these experts. (*Id.*) Ms. Simmons' legal assistant, Rachel C. Lujan, sent the letter by email to all counsel for Plaintiffs and Plaintiff Interveners and to Dr. Greifinger and Dr. Metzner; but, she inadvertently failed to send the letter

to the County's counsel. (Mot. Ex. N.)[10] Also on April 11, 2018, Ms. Simmons emailed the County's counsel stating that Plaintiffs and Plaintiff Interveners would like to take depositions of Drs. Ray and Shansky. (Mot. Ex. L.)

On April 25, 2018, Ms. Simmons filed notices to take the depositions duces tecum of Drs. Ray and Shansky. (Mot. Exs. O & P.) In the notices, counsel asked for copies of (1) all written communications, including emails and attachments, between Drs. Ray and Shansky and any employee of or independent contractor for the MDC, any employee or independent contractor for Correct Care Solutions (CCS), any member of Oversight Board, any Bernalillo County Commissioner, and any court-appointed expert; (2) all documentation, including personal notes, between Drs. Ray and Shansky and those persons; (3) all written reports, including drafts, provided to any person concerning the MDC or the *McClendon* litigation; and (4) all documentation related to the termination or non-renewal of the PSA.[11]

III.  DISCUSSION

A.      Drs. Ray and Shansky were retained in anticipation of litigation
        over substantial compliance under the Settlement Agreement.

In the Joint Response, Plaintiffs and Plaintiff Interveners argue that neither the PSA nor the County's counsel's statements clearly delineated Drs. Ray and Shansky as non-testifying consulting experts; therefore, the protections of Rule 26(b)(4)(D) do not apply. In his affidavit, Mr. Cubra states that in 2014, two years prior to the Settlement Agreement and the PSA, Dr. Ray provided technical assistance to the County at Manuel Romero's[12] suggestion. (Jt. Resp. Ex. 1)

---

[10] Ms. Simmons states that this was a mistake, and County counsel should have been included in the email bearing the letter as an attachment.
[11] The notice stated that all communications between Drs. Ray and Shansky and counsel for the County were excluded from the requested documents.
[12] At that time, Mr. Romero was the Court's expert on conditions of confinement.

According to a February 3, 2016 email (Jt. Resp. Ex. 2), the County described its 2014 arrangement with Dr. Ray:

> Kenneth A. Ray Justice Services (RJS) was contracted in 2014 to provide professional services to MDC to assist in the development and implementation of court-ordered reforms to its Use of Force (UOF) policies and program. These services involved on and offsite work that included Solution-Focused and highly collaborative activities involving MDC leadership and operations staff.

(*Id.* at 1) (footnote omitted).

> Professional services will be provided in a highly collaborative manner that leverages MDC leadership and staff strengths, competencies, and dedication. Stakeholder engagement in the process is considered important and vital to project success. It is critical to the success of this project that primary stakeholders (i.e. court monitor, counsel for the parties, MDC project leaders and team members) continue to contribute meaningfully during the term of the project.

(*Id.* at 1–2.)

Plaintiffs and Plaintiff Interveners claim that in 2016 Dr. Ray acted as if the same collaborative relationship existed. Plaintiffs and Plaintiff Interveners further argue that the amount paid to Drs. Ray and Shansky, $300,000, is not in keeping with the limited role of litigation expert and that "litigation consultant" was only one item in a long list of tasks in the 2016 PSA/RFP. Plaintiffs and Plaintiff Interveners rely on a February 3, 2016 document entitled MDC "Use of Force Program Reform Development, Implementation, Evaluation Project[,]" in which Dr. Ray clarified the work performed under the 2014 contract and offered to complete the use of force training program in 2016 at a cost of $10,960.00. (Jt. Resp. Ex. 2.) Dr. Ray proposed that he continue to provide professional services in a

> highly collaborative manner that leverages MDC leadership and staff strengths, competencies, and dedication. Stakeholder engagement in the process is considered important and vital to project success. It is critical to the success of this project that primary stakeholders (i.e. court monitor, counsel for the parties, MDC project leaders and team members) continue to contribute meaningfully during the term of the project.

(*Id.* at 1-2.) Plaintiffs and Plaintiff Interveners also point to a January 11, 2015 email request from the County's counsel Luis Robles asking Mr. Romero to resolve a dispute on use of force training, with copies of the email sent to Dr. Ray and all counsel. (Jt. Resp. Ex. 5.) In another January 11, 2015 email, Mr. Robles provided to Plaintiffs' and Plaintiff Interveners' counsel a "use of force program prepared by MDC use of force training consultants Kenneth Ray and Brad Hompe." (*Id.* Ex. 5A.)

In contrast to the February 3, 2016 document and the emails about use of force training, the July 2016 RFP (Mot. Ex. B) clearly states that the "Compliance Monitor" was a "Litigation Consultant to report to the MDC Director, County Legal, County Manager, or their designees." (Mot. Ex. B at 19.) The "Compliance Monitor deliverables include[d] … Monthly activity report [concerning] … accomplishments, recommendations on policy and procedure changes, issues resolved, critical findings, meetings attended for MAC, CQI, *McClendon*, NCCHC and ACA audits, etc." (*Id.*) This language distinguishes the type of arrangement in July 2016 from the "highly collaborative" approach of the previous arrangements. Although the February 3, 2016 document recognizes that Dr. Ray would continue the collaborative approach as to that project, the evidence shows that the County entered into a different type of relationship with Dr. Ray in the July 2016 PSA. This is illustrated by the language that allows only internal reporting to MDC

management and legal team and the existence of a confidentiality clause.[13] Thus, the 2016

PSA/RFP did not call for, as the Joint Response seems to imply, collaboration between Drs. Ray

and Shansky and opposing counsel.[14]

In her November 23, 2016 letter, Ms. Rahn clearly communicated the changed status of

Drs. Ray and Shansky by describing them as "litigation experts." Moreover, she explicitly

invoked the protections of Rule 26(b)(4)(D). She clearly designated them as "non-testifying"

experts in her March 30, 2018 letter to Ms. Simmons. Between November 2016 and March 2018,

the County opposed all of Plaintiffs' and Plaintiff Interveners' requests for production of their

written reports. The County has met its initial burden to show that in July 2016, the County

intended to retain these experts in anticipation of litigation involving substantial compliance

under the Settlement Agreement. Therefore, Dr. Ray's and Dr. Shansky's opinions are protected

as facts known or opinions held by experts retained or specially employed in anticipation of

litigation or to prepare for trial and who are not expected to be called as witnesses at trial. Fed. R.

Civ. P. 26(b)(4)(D).

---

[13] Plaintiffs and Plaintiff Interveners also point to a June 28, 2016 document entitled "Section D (All Services) Minimum Requirements, Basic Qualifications and Experience Medical, Mental Health, and Use of Force Compliance and Sustainability Responses." (Jt. Resp. Ex. 3) (Minimum Requirements). These Minimum Requirements were submitted to "Offerors" of services who would respond to the RFP and contained a description of the Offeror's abilities in response to specific statements of services required by the County's RFP. The Minimum Requirements state in relevant part that: the UOF Compliance Monitor (1) "will oversee technical aspects of medical, mental health, and use of force delivery and operations required by the *McClendon* Settlement Agreement[;]" (2) "will assist in problem solving and serve when appropriate as a liaison to County management[;]" (3) "will be a Litigation Consultant to report to the MDC Director, County Legal, County Manager, or their designees[;]" (3) "will … perform audits, and meet with administrative and line staff of the Health Services Unit (HSU)[;]" [and] (4) "will serve on the annual policy review committee, act as an independent reviewer for all morbidity and mortality reviews, approve and recommend … any changes to current manuals or forms prior to their implementation." (Jt. Resp. Ex. 3.) However, this language mirrors the PSA's limitations by allowing only internal collaboration.

[14] Plaintiffs and Plaintiff Interveners further argue that on July 20, 2016, Dr. Ray made a public presentation on use of force issues at MDC to the Oversight Board, which illustrates that his role was not as a behind-the-scenes "litigation consultant." (Resp. Ex. 4A.) Plaintiffs and Plaintiff Interveners claim that this evidence shows the County waived any protection afforded in Rule 26(b)(4)(D). The presentation was made seven days prior to the execution of the PSA on June 28, 2016; therefore, the Court cannot find waiver based on that presentation.

B.     The County did not waive the protections of Rule 26(b)(4)(D).

Plaintiffs and Plaintiff Interveners contend that, based on the previous collaborations in 2014 and the open communications between their counsel and Drs. Ray and Shansky during 2016 and 2017, the County waived the protections of Rule 26(b)(4)(D). The evidence implies that these experts were not clearly instructed about their new status. Hence, counsel for Plaintiffs and Plaintiff Interveners reasonably concluded that they could meet with and "collaborate" with Drs. Shansky and Ray as they had done in the past. Nevertheless, "the failure by a non-testifying expert to maintain confidentiality in the initial instance does not necessarily allow for the adverse party to then benefit from its opponent's effort and expense through one-stop discovery of those facts gathered and held by the non-testifying expert." *Kurlander*, 2010 WL 3084473, at *8. The Court concludes that neither the County nor its counsel waived the protections of Rule 26(b)(4)(D) because there is no evidence that the County's management or counsel knew about all of the meetings held in late 2016 and 2017. Without knowing the extent of the contact between opposing counsel and the experts, the County and its counsel cannot be held to have waived the protections of Rule 24(b)(4)(D), and the Plaintiffs and Plaintiff Interveners may not obtain, through deposition or otherwise, the reports and opinions of these experts.

C.     Plaintiffs and Plaintiff Interveners have not shown exceptional circumstances.

Plaintiffs and Plaintiff Interveners argue that even if the County may avail itself of the protections under Rule 26(b)(4)(D), Plaintiff and Plaintiff Interveners have shown the required "exceptional circumstances" under Fed. R. Civ. P. 26(b)(4)(D)(ii) to allow the depositions. A party may obtain information from consulting non-testifying experts when the party "can demonstrate a 'substantial need for the materials to prepare its case' and an inability to obtain 'their substantial equivalent by other means' without undue hardship." *Martens v. Koch*, 301

F.R.D. 562, 580 (D. Colo. 2014). "A substantial need exists where 'the information sought is essential to the party's defense, is crucial to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issues.'" *Nevada v. J-M Mfg., Inc.*, 555 F. App'x 782, 785 (10th Cir. 2014) (citation omitted) (upholding denial of access to a consulting expert's test results). The party seeking discovery from the expert "carries a heavy burden in demonstrating the existence of exceptional circumstances." *Disidore v. Mail Contractors of Am., Inc.*, 196 F.R.D. 410, 415 (D. Kan. 2000) (quoting *Ager v. Jane C. Stormont Hospital & Training School for Nurses,* 622 F.2d 496, 503 (10th Cir.1980)).

   1. Unequal access to information is not an exceptional circumstance.

   Plaintiffs and Plaintiff Interveners argue that since Drs. Ray and Shansky continued to meet with their counsel after July 2016, it is unfair for the County to have the benefit of information that Plaintiffs and Plaintiff Interveners' counsel provided to these experts during those meetings. At the hearing, Ms. Simmons asserted that Drs. Ray and Shansky were privy to Mr. Cubra's "mental impressions" about MDC's systemic non-compliance. Ms. Simmons contended that the inequality of information should be remedied by allowing counsel for Plaintiffs and Plaintiff Interveners to depose Drs. Ray and Shansky and get the benefit of their analyses. In response, Ms. Rahn, as an officer of the Court, assured the Court that Drs. Ray and Shansky never shared opposing counsels' mental impressions with the County or its counsel. Furthermore, the County argues that it now does not intend to use any of the reports or opinions prepared by Drs. Ray and Shansky to establish substantial compliance under the Settlement Agreement. Thus, the fact that only the County knew the opinions of its consulting experts from July 2016 to February 2018 about whether MDC was in substantial compliance with the Settlement Agreement provisions, does not constitute an exceptional circumstance. *See*

*Kurlander*, 2017 WL 3084473, at *3. By its nature, the arrangement with a consulting expert is a one-sided arrangement. *Id.*

>2.    Critical nature of Drs. Ray and Shansky's opinions is not an exceptional circumstance.

Plaintiffs and Plaintiff Interveners also contend that Drs. Ray and Shansky were more critical of conditions at MDC than the Court's experts; therefore, Plaintiffs and Plaintiff Interveners must access their opinions to rebut the County's future claim of substantial compliance. Plaintiffs and Plaintiff Interveners note that after this Court ruled that Plaintiffs and Plaintiff Interveners could receive all reports that Drs. Ray and Shansky provided to the Court's experts, the County instructed Drs. Ray and Shansky to stop communicating with the Court's experts and prevented Plaintiffs and Plaintiff Interveners from thereafter accessing the critical opinions of these experts.[15]

Under the Settlement Agreement, the County may move for an "initial finding of substantial compliance," and the Court must then decide whether to make that finding based on the Rule 706 "experts' reports and other evidence presented by the parties." Plaintiffs and Plaintiff Interveners argue that the information gleaned from Drs. Ray and Shansky about conditions at MDC in 2016 through February 1, 2018 is the very type of "other evidence" that they need to rebut a finding of substantial compliance. At the hearing, Mr. Cubra asserted that Drs. Ray and Shansky generally performed more in-depth analyses of conditions at MDC; therefore, the opinions of these experts are critical to allow Plaintiffs and Plaintiff Interveners to adequately evaluate or counter the Court's experts' opinions. And, Ms. Simmons contended that during their tenure, Drs. Ray and Shansky may have disagreed with the Court's experts'

---

[15] Plaintiffs and Plaintiff Interveners contend that from October 2016 forward, they have not been able to access the reports from Drs. Ray and Shansky because those reports were not shared with the Court's experts.

findings; and Plaintiffs and Plaintiff Interveners should be allowed to depose these experts about those possible disagreements.

Importantly, the County has not yet moved for a finding of substantial compliance. Given the Court's experts' recent reports, it seems unlikely that the issue will be raised in 2018 or even next year. Whenever the County may eventually request an "initial finding of substantial compliance," the Court will consider more current conditions, not the conditions in 2016, 2017 and early 2018.[16] And, after any future initial finding of substantial compliance, the Court will have to find sustained compliance from that point forward based on the County's self-monitoring reports. Hence, the opinions of Drs. Ray and Shansky about conditions at MDC from mid-2016 to early 2018 would have minimal evidentiary value in determining sustained substantial compliance going forward. In sum, the opinions of Drs. Ray and Shansky about conditions at the MDC from mid-2016 to February 2018, is not information that has "great probative value on contested issues." *Nevada*, 555 F. App'x at 785. And, Plaintiffs and Plaintiff Interveners have failed to show that they have no substantially equivalent source of rebuttal evidence given their counsels' continued monitoring of conditions at the MDC under the Interim Access Order.

Another reason also prompts the Court to grant the Motion. Under the Settlement Agreement, the parties agreed to allow the Court's experts to be the primary source of evidence for findings of initial substantial compliance and sustained substantial compliance. The experts referred to throughout the Settlement Agreement are assumed to be the Court's experts. *See, e.g.,* Sett. Agmt. at p. 4 (referring to "the appropriate expert"); at p. 5 (referring to the "Court-

---

[16] And, to the extent Plaintiffs and Plaintiff Interveners argue that they must have the benefit of these experts' opinions to determine whether there is a durable remedy for the past constitutional violations, no Rule 60(b) motion is before the Court nor is one anticipated considering the recent entry of the Settlement Agreement and Check-Out Audit Agreements. *See Jackson v. Los Lunas Community Program*, 880 F.3d 1176, 1197 (10th Cir. 2018) (stating, "a critical question in [the] Rule 60(b)(5) inquiry is whether the objective of the [challenged decree] has been achieved…. If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper.") (quoting *Horne v. Flores*, 557 U.S. 433, 450 (2009))).

appointed experts in each area"); at p. 7 (stating, "The parties agree that at end of the period established for self-monitoring, the Court's experts will conduct Check-Out Audits as to each domain…"); and at p. 8 (stating, "In the performance of their check-out audits, the Court's experts will submit proposed findings of fact with respect to each subcategory of the applicable Check-Out Audit Agreements."). As to each stage of the process of disengagement under the Settlement Agreement, the parties have essentially agreed not to engage in a drawn-out discovery process using interrogatories, requests for admission, and depositions prior to each determination of substantial compliance. The parties bargained for a process giving weight to the Court's experts' opinions and the MDC's internal monitoring reports. Eventually this will provide a path for the Court to disengage from decades of federal court oversight of the MDC.

In sum, the County hired Drs. Ray and Shansky in 2016 as internal consulting experts and not collaborating experts as they had been in the past. These experts' opinions are not discoverable under Rule 26(b)(4)(D) and that protection has been waived only for reports and opinions given to the Court's experts. Plaintiffs' and Plaintiff Interveners' arguments fail to persuade the Court that exceptional circumstances exist to allow full discovery of Dr. Ray's and Dr. Shansky's reports and opinions about conditions at MDC during the time-period from July 2016 to February 2018.  Therefore, the Court will grant the Motion in part and will disallow the depositions of Drs. Ray and Shansky.

IV.     Reasonable Fees and Expenses

Rule 37(a) provides in relevant part:

(5) *Payment of Expenses; Protective Orders*

> *If the Motion Is Granted (or Disclosure or Discovery Is Provided After Filing).* If the motion is granted—or the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:
> …
>> (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or
>> (iii) other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(5).

The County invokes Rule 37(a)(5) and asks the Court to require Plaintiffs' and Plaintiff Interveners' counsel to pay the County's reasonable attorneys' fees and expenses in making the Motion. In addition, since the County must pay all of Plaintiffs' and Plaintiff Interveners' fees and expenses in this case, the County asks the Court to order that the County need not pay the fees and expenses that Plaintiffs and Plaintiff Interveners incurred in litigating the Motion. An award of fees and expenses is mandatory under Rule 37(a)(5) unless the Count finds that the Plaintiffs' and Plaintiff Interveners' actions were substantially justified or "other circumstances make an award of expenses unjust." The County maintains that the actions of Plaintiffs' and Plaintiff Interveners' counsel in continuing to communicate with Drs. Ray and Shansky in late 2016 through early 2018 support the County's request under Rule 37(a)(5). The County points out that after being informed on November 23, 2016 that Drs. Ray and Shansky were hired as litigation experts, Plaintiff Interveners' counsel continued to meet with these experts during 2017 without the County's knowledge or consent. And on February 7, 2018, after agreeing (through Mr. Ives' proposal) not to contact Drs. Ray and Shansky without County counsels' consent, Plaintiff Interveners' counsel asked to speak to Dr. Ray upon learning that the County had

terminated the PSA. Moreover, after learning that the County claimed protection under Rule 26(b)(4)(D) in March 2018, Plaintiff Interveners' counsel sent a letter to the Oversight Board asking the Board members to request the reports of these experts despite the language in the County Ordinance recognizing that the Court's experts would perform that task.

Plaintiffs and Plaintiff Interveners contend that they were never clearly notified of the change in these experts' status from consulting compliance monitors to non-testifying litigation experts. Plaintiffs and Plaintiff Interveners point out that Dr. Ray contacted Mr. Cubra soon after being hired in July 2016 to set up a meeting to hear Mr. Cubra's concerns about conditions at MDC. According to Plaintiffs and Plaintiff Interveners, the experts themselves acted as if they were hired in 2016 to continue collaborating with external stakeholders as they had since 2014. Mr. Cubra represented that he and his co-counsel assumed the County's counsel were aware of the meetings even though the County opposed discovery of Dr. Ray's and Dr. Shansky's written reports. There is some support to Mr. Cubra's belief as illustrated by the letter presented to the Court on October 5, 2018 by Ms. Simmons, which had Plaintiff Interveners' counsel's time sheets attached. These time sheets, provided to the County for payment of fees, clearly recorded counsels' preparation for and attendance at meetings with Drs. Ray and Shansky.[17]

The Court concludes that under Rule 37(a)(5) it must require that Plaintiffs and Plaintiff Interveners bear their own fees and expenses in litigating the Motion. The Court cannot find that Plaintiffs and Plaintiff Interveners were substantially justified in pursuing the depositions of Drs. Ray and Shansky. Ms. Rahn's November 23, 2016 letter explicitly invoked Rule 26 and stated

---

[17] On October 5, 2018, Ms. Simmons delivered a letter to the Court and to all counsel with two attachments. The first attachment is a copy of Dr. Ray's email to Mr. Cubra on June 28, 2018 informing Mr. Cubra that Dr. Ray would be at MDC and "then every other month for compliance & sustainability monitoring. We can chat anytime until then; just give me a call." (Ltr. 10/5/18 Ex. 1.) The second attachment is a copy of billing records from Plaintiff Interveners' attorneys reflecting hours billed to the County for meetings with Drs. Ray and Shansky. (Ltr. 10/5/18 Ex. 2.) Plaintiff Interveners submitted these exhibits to support their position that they did not secretly meet with these experts as the County suggests. The Court agrees.

that these experts were retained "specifically in regards to the instant litigation." (Mot. Ex. D.) Even though Ms. Rahn stated that the County had not yet decided whether the experts would testify, Plaintiffs' and Plaintiff Interveners' counsel were clearly informed that the opinions and reports generated by these experts were protected until that decision was made. Ms. Rahn also provided a copy of the PSA with its confidentiality clause to all counsel. And even though Dr. Ray continued to meet with opposing counsel and MDC personnel in late 2016 and in 2017, the County's counsel did not know about the meetings other than a meeting that County counsel attended. The Court does not approve of Plaintiffs' and Plaintiff Interveners' counsel's actions in attending meetings with expert witnesses after learning about their designation as litigation experts and after receiving a copy of the PSA. Moreover, the most recent request for depositions, which precipitated the Motion, crosses that fine line between zealous representation and overreach under the rules of procedure. Hence, a partial award under Rule 37(a)(5) is justified in this instance. Therefore, the Court, in its discretion, will order that although the County must bear its own fees and expenses, the County will not be required to pay the Plaintiffs' and Plaintiff Interveners' attorneys' fees and expenses incurred in litigating the Motion.

IT IS ORDERED that

DEFENDANT BERNALILLO COUNTY BOARD OF COMMISSIONERS' MOTION FOR PROTECTIVE ORDER REGARDING THE DEPOSITIONS OF DR. KENNETH RAY AND DR. RONALD SHANSKY (Doc. No. 1343) is granted in part and denied in part:

1. The depositions of Dr. Kenneth Ray and Dr. Ronald Shansky are disallowed; and

2. The County is not required to pay Plaintiffs' and Plaintiff Interveners' attorneys' fees and expenses incurred in litigating the Motion.

_____
SENIOR UNITED STATES DISTRICT JUDGE