## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JIMMY (BILLY) McCLENDON, et. al.,**

    **Plaintiffs,**

**vs.**                                  **6:95-CV-00024-JB/KBM**

**CITY OF ALBUQUERQUE, et. al.,**

    **Defendants,**

**E.M., R.L., W.A., D.J., P.S., and**
**N.W. on behalf of themselves and**
**All other similarly situated,**

    **Plaintiff-Intervenors.**

## PLAINTIFF AND PLAINTIFF INTERVENERS'
## JOINT MOTION FOR ENFORCEMENT OF
## CHECK-OUT AUDIT AGREEMENT NO. 3 AND FOR FURTHER REMEDIAL RELIEF

COME NOW the Plaintiff class and the Plaintiff Intervener subclass ("Plaintiffs"), pursuant to the Court's inherent powers to enforce its orders, and hereby move this Court for an order:

(1)    Directing County Defendant to begin immediately to remedy its on-going violations of Paragraph 4 (safety and supervision) and Paragraph 6 (staffing) of Check-out Agreement Number 3 ("COA#3");

(2)    Directing County Defendant to provide monthly in-person reports to the Court, to the court-appointed corrections expert, and to the Parties regarding how County Defendant intends to cure deficiencies in complying with COA # 3;

(3)    Directing further remedial relief, as further detailed in Plaintiffs' Motion. County Defendant does not consent to this motion.[1]

---

[1] The Settlement Agreement ("SA") requires the parties to mediate their disputes prior to

## INTRODUCTION[2]

Since April 2019, more than two and a half years ago and well before the beginning of the pandemic, the Metropolitan Detention Center ("MDC") did not have sufficient corrections staff to supervise the inmates in its care.  Neither did MDC have a staffing plan that addressed its chronic deficiencies in corrections staff.  As a result, inmates in the general population pods were left locked in their two-person cells for hours at a time, with no corrections officer in the pod to supervise them. Inmates were often placed on "lockdown" status for the entirety of weekend hours, without sufficient time out of cell to call family or counsel, or even to shower.  Most egregiously, inmates had no effective way to call for help, for medical problems, the threat of physical violence, or any other matters that arose.

Despite multiple warnings that the call button system was not functioning, County Defendant continued to insist that either complaints by inmates and counsel for the inmates were exaggerated, or that the call button system would soon begin to function, as soon as a few flaws were worked out.  As a threshold matter, understanding MDC's "call button" system requires an understanding of the physical organization of MDC's housing structure.  MDC houses residents in different units.  Each unit is made up of individual pods.  With few exceptions, each unit has

---

presenting them to the Court.  At the parties' access meeting on November 5, 2021, Plaintiffs argued that waiting for the completion of mediation prior to filing the present motion would result in undue delay, in light of the urgency of the crisis at MDC.  Judge Torgerson suggested that Plaintiffs file their motion and that the parties also set a date for mediation, so that both could proceed contemporaneously.  Mediation is currently scheduled for December 14.

[2] Plaintiffs' Introduction is intended as a summary only.  Plaintiffs a more detailed "Factual Background," *infra.*

eight pods, with four pods on the "low side" (pods 1-4) and four on the "high side" (5-8). Each pod is self-contained, with its own secured doors and sally port. Different classifications of inmates are assigned to each pod. In the normal course, inmates in the general population pods spend much of their day out of their cells and are supervised by a corrections officer or officers assigned to the pod, who sit at an elevated desk in the pod and respond to issues that arise with or among the inmates. There should be at least one officer assigned to each pod, and some units require more than one officer, due to security concerns. When an inmate is locked in his cell, the "call button" that is mounted inside each cell by the door ostensibly allows the inmate to call to the desk for assistance.

When corrections staffing dropped to a dangerous level that left pods frequently unsupervised for lengthy periods of time, MDC changed its practice and required that corrections officers who were leaving the pod at any time would re-direct the call buttons to Master Control. From April 2019 to today's date, there is no evidence that this practice was ever implemented in a way that provided an effective and consistent way for inmates to call for help. In the meantime, MDC has promised repairs, work arounds, and additional training.

At the same time, MDC has failed to effectively recruit or retain sufficient staff or to design a staffing plan that will protect inmates despite staffing shortages. This has led to increased restrictions on the numbers of MDC corrections personnel assigned to a pod, which in turn decreases the supervision of each cell and each inmate.

Leon Casiquito was murdered on Monday, October 25, 2021. He was beaten to death by his cellmate, while he was trapped in his cell, over the course of at least half an hour. There was

no corrections officer on duty in the pod.  Other inmates in the pod tried multiple times to use the call buttons to summon help.  No one responded.  According to the criminal complaint, Mr. Casiquito's assailant had time to grow tired and take a drink of water, during the assault.

The threat to the security of the inmates is dire.  MDC has promised to hire a new company to design a staffing plan in January 2022.  There is no indication that MDC has an effective plan to timely ensure the effective functioning of the call button system.  There is no indication that MDC has a plan to timely bring out-of-cell time back to normal levels.  Indeed, the *Albuquerque Journal* reported last Sunday that "[d]ocuments obtained by the Journal suggest that since the slaying, staffing has remained just as sparse or even lower."  Elise Kaplan, *Dangerously Low staffing plagues Metropolitan Detention Center*, ALBUQUERQUE JOURNAL (last updated Nov. 14, 2021, 12:02 AM),  https://www.abqjournal.com/2445940/dangerously-low.html.   MDC Chief Greg Richardson and Joseph Trujeque, president of the union representing MDC, "say they worry every day about the possibility of a riot or the inmates taking over the jail. It's a common fear among staffers." *Id.*

Plaintiffs therefore seek emergency relief to ensure inmate safety, as well as long-term relief to ensure that MDC is properly staffed and regularly required to report its progress in alleviating this security crisis, to this Court, to the court-appointed expert, and to Plaintiffs.

## APPLICABLE PROVISIONS OF COA # 3

COA # 3 governs what County Defendant is required to do vis-a-vis the current safety concerns.  Doc. 1222.  COA # 3 is broken down by "domain" and "paragraph." The paragraphs that apply to the present dispute are Domain 4, Paragraph F, regarding safety and supervision

("Paragraph F"), and Domain 4, Paragraph K regarding staffing ("Paragraph K").   Doc. 1222-4, pages 20-22 (safety and supervision) and pages 26-27 (staffing).   These deficiencies in care violate the parties' Settlement Agreement ("SA"), which is incorporated into a consent decree. Specifically, this Court approved a new SA between Plaintiffs and County Defendant, and adopted the SA as the Court's order.

In summary, Paragraph F, "Safety and Supervision," provides that MDC must adopt and implement security policies that ensure reasonable safety and security for inmates.  *See* Doc. 1222-4 at 20-22 (safety and supervision).  These actions must be in accordance with generally accepted correctional standards.  *Id*.  This includes conduct of monitoring rounds, "direct supervision of inmates by posting an adequate number correctional officers inside the day room area of a housing unit to conduct constant surveillance," documentation of rounds, daily documented rounds by security supervisors, and monitoring of the number and nature of assaults to ensure a reasonably safe environment.  *Id.*

Paragraph K, "Staffing," provides that correctional officer staff and supervision levels at the facility must be adequate to supervise inmates, protect inmates and staff, and allow for the safe operation of the facility.  Doc. 1222-4 at 26-27 (staffing).  MDC must have a written staffing plan, in consultation with the court-appointed expert, which requires correctional officer staffing and supervision levels at the facility that are adequate to supervise inmates, protect inmates and staff, and allow for the safe operation of the facility, consistent with generally accepted correctional standards and the Court's November 5, 1996 Order, Doc. No. 256.  *Id*.  MDC must implement the plan with oversight by the court-appointed expert.  *Id*. Finally, MDC must have sufficient

correctional officer staffing to provide inmates requiring treatment with adequate access to appropriate medical and mental health care.  *Id.*

## FACTUAL BACKGROUND FOR PLAINTIFFS' MOTION

### *Lack of Staffing*

Inmates and corrections officers report that there is insufficient staff at the facility.  *See* Declaration of Robert Mason, attached hereto as Exhibit 1; November Declarations, attached hereto as Exhibit 2; Declarations of Inmates in E8 at 4, attached hereto as Exhibit 3.  The SA requires that at least one officer be present in each pod where inmates are housed to "provide[] direct supervision of inmates...to conduct constant surveillance."  *See* Doc. 1222-4 at 21.  There are frequently not enough corrections officers for one officer to be present in each pod and when this happens, inmates are locked in their cells.  *See* Ex. 1 at ¶ 10. Over the last three years, this would happen routinely during the graveyard shift. *Id.* at ¶ 9.  Then approximately two years ago, it began happening nearly every weekend during the day shifts as well. *Id.* at ¶ 12-13. Inmates would more often than not be locked down for the entire weekend and one officer would be covering two to three pods. *Id.*  When this would happen, the officer assigned to multiple pods would check each pod to which he or she was assigned once every hour. *Id.* at ¶ 10. If one officer is assigned to two pods, he or she can sometimes let the inmates out for thirty minutes at some point during the day, but whether this happens is in the discretion of the officer.  *Id.* at ¶ 11. If an officer is assigned to more than two units, this typically does not occur.  *Id.*

Approximately two years ago, there were often not enough officers not only on the

weekends and the graveyard shifts, but also on Fridays through Mondays leaving inmates locked down Fridays and/or Mondays approximately four times a month. *Id.* at ¶ 14. In the past six months, the situation has worsened and there are not enough officers to cover all of the pods most Fridays or Mondays in addition to weekends and graveyard shifts. *Id.* at ¶ 14-15. There are also other days or shifts throughout the week beyond Friday through Monday when there are not enough corrections officers to cover all of the pods and the inmates must be locked down. *Id.* at 17. Officers are assigned to cover more than two pods at a time at least two to three times a week and often four to five times a week. *Id.* at 16 and 18. Inmates report that they are locked down all weekend, every weekend, and frequently during the day other days during the week as well. Ex. 2, November Declarations, Ex. 3, Declarations of Inmates in E8.

Furthermore, while there is supposed to be more than one officer assigned to the Restrictive Housing Unit ("RHU"), the unit that houses the most dangerous inmates and inmates with behavioral problems, now there is only one officer assigned to these pods. Ex. 1, at ¶ 20. And over the last six months, approximately once a week, only one officer will be assigned to multiple RHU pods leaving those inmates unsupervised in their cells. *Id.* There also is not enough staff to have two officers in the intake pods as there should be, so there is only one officer assigned. *Id.* at ¶ 21.

Not only are there not enough corrections officers, but there are also not enough supervisors. There should be at least one supervisor assigned to each housing unit. *Id.* at ¶ 4. However, beginning approximately four years ago, only supervisors would be assigned to the entire facility during graveyard shift. *Id.* at ¶ 9. Over the last six months, one supervisor will frequently be assigned to multiple housing units. *Id.* at ¶ 19.

When there is no corrections officer in the pod and inmates are locked down, there is no staff able to detect when an inmate assaults his or her cellmate. *Id.* at ¶ 23.  These assaults are only discovered later if a corrections officer checks the pod and an inmate reports the assault or the officer notices that someone is injured and asks about it. *Id*. If there is a medical emergency when no officer is in the pod, no staff will know about it unless they get the officer's attention when they check the pod.  *Id.* at ¶ 24.  Inmates have had seizures that have gone unnoticed and untreated. *See* Ex. 3, E8 Declarations at 11-12, 7/22/19 Memorandum at 6, attached hereto as Exhibit 4 (pointing out that an inmate reported to Plaintiff's counsel that he had a grand mal seizure when his pod was locked down and no officer was present). One inmate tried to hang herself recently when no officer was in the pod, but an officer found her before she died. *See* Ex. 2, November Declarations at 1, 3. There are no cameras in individual cells, cameras do not typically pick up what is happening in the cells. *Id.* at ¶ 27.

### *Call Buttons Do Not Function*

Not only is there frequently not enough staff to directly supervise inmates, but when they are left without an officer in the pod, there is no means for inmates to call for help in emergencies. There are intercom call buttons in each cell and when an officer is in the pod, when an inmate presses the call button, it alerts the officer at the desk.  *Id.* at ¶ 25.  However, when an officer leaves the pod, these call buttons have a long history of failing to notify anyone of emergencies.  *Id.* Plaintiffs expressed these specific concerns as a problematic *pattern*, beginning at the latest *over two years ago.* On July 23, 2019, Plaintiffs reported concerns that the call buttons were not being forwarded to master control:

>On the July 5, 2019 visit, while Plaintiffs were touring the facility, a CO assisted
>Plaintiffs' counsel in testing the call panel in a pod to check whether the call button
>from a cell worked during a lockdown. The CO locked out the call panel as if a
>CO were not present on the pod during lockdown at which point the call button was
>supposed to go to master control. Upon testing the call button, nothing happened,
>and the call did not go to master control. During this most recent visit, residents of
>E5 reported that during lockdowns with no CO present, there was no response upon
>pushing their call button. We are concerned that inmates are unable to seek
>assistance in an emergency while a CO is not on the pod due to malfunctioning call
>panels. *Any number of serious emergencies could occur in the time between
>security checks without any means to call for help*. . . . Please provide any and all
>documentation of system checks or audits of the call panel system within the last
>six months.

09/06/19 Letter, Rahn to Smith at 1-2, attached hereto as Exhibit 5 (emphasis added). In response,

counsel for County Defendant objected to Plaintiffs' counsel testing the call buttons. *Id*., at 2.[6]

County Defendant agreed at the August 2019 access meeting to inspect all call buttons. *Id.*

On August 17, 2019, Plaintiffs reported that an inmate had a seizure and fell on his head on the

weekend of July 20-21, and that the call button "only went to the empty officer desk." *See* Ex. 4,

7/22/19 Memorandum at 6. After counsel's memorandum, MDC issued a memorandum to all

MDC security staff:

>Effective immediately, officers in E unit and F unit must **lock** the Control Panel at
>any time an officer is not in the pod for any reason. When the control panel is
>locked, all inmate calls from the intercom system located inside the inmate's cell
>will be diverted to Master Control. In the event Master Control receives a call from
>an inmate in one of the vacant pods, Master control will screen the call and if
>deemed a priority request or emergency notification, Master Control will
>immediately notify either the Pod Officer of the unit supervisor. After notification
>of the Pod Officer or unit supervisor, Master Control will log the name of the inmate
>making the report or request and the action taken by Master Control.
>
>Also, if a pod does not have a dedicated officer *due to shared staff*, all inmates must
>be secured within their cells. Corrections officers should physically confirm that

---

[6] Plaintiffs' counsel had previously stated, however, that the CO performed the test. *Id.*

9

doors are secured and check the control panel lights to ensure that the locking mechanisms are operational.

09/19/19, Memorandum from Alvarado to Security Staff, attached hereto as Exhibit 6.

On September 23, 2019, Plaintiffs reported that during its August 27, 2019 site visit, they received multiple reports of lengthy lockdowns, including a lockdown from Friday, August 23 through Monday, August 25, 2019 on E2 and E 3 Pods, during which inmates reported no response to call buttons.   10/21/19 Letter, Rahn to Smith at 1, attached hereto as Exhibit 7.   County Defendant responded

> As noted in the intercom list, every call button was examined.  The majority were working, however, *those that were not* have since been repaired.  As discussed at the monthly access meetings, *MDC is currently working to address the call buttons to ensure Master Control responds when the officer is out of the pod*.

*Id.* at 2 (emphasis added).

On March 25, 2021, a building maintenance worker examined the call buttons to determine whether they alerted to master control.  MDC Maintenance Workorder Form, 03/25/21, attached hereto as Exhibit 8.  Restricted housing unit call buttons did not forward to Master Control, but would be programmed to do so whenever the panel in the pod was disabled.  *Id.*  "Echo, Fox, & Pac units do forward to Master Control."  *Id.*

On April 21, 2021, at the civilian oversight board meeting, Chief Richardson reported that there was "a long standing problem at MDC" with "call buttons for inmate emergencies." 4/21/21 Detention Oversight Meeting at 18:40, attached as Exhibit 9.  "[A] contractor was finally selected, and the project has started again to make those repairs."  *Id*.  In response to a question from Larry Kronen, local attorney and former *McClendon* counsel, Chief Richardson added that the call

buttons had been a problem since he began working at MDC as chief. *Id.*, 23:35.[7]  On May 3,

2021, Plaintiffs asked about Chief Richardson's statement regarding current problems with call

buttons. *See* 06/17/21 Letter, Rahn to Smith at 1, attached as Exhibit 10.  Counsel for County

Defendant responded that Chief Richardson had misspoken at the oversight meeting, and "[t]he

call buttons have functioned as previously reported." *Id.*  Specifically,

> MDC planned to re-route call buttons to allow them to connect a supervisor instead of master control. . . . [I]nstallation was delayed by the pandemic.  Recently, the fiber optics project resumed, as discussed at the June 2021 mediation.  *MDC does not have any documentation demonstrating when the fiber optics project will be completed and/or when call buttons may be re-routed.*  Please close out this request.

*Id.* at 2 (emphasis added).

> On May 14, 2021, Plaintiffs reported as follows, on events occurring May 1-2, 2021:

>  In F5, . . . inmates complained that [from 7:00 am to 11:00 a.m.], they were unable to get any help when they pressed their call buttons.  Inmates were concerned because there were some who had seizure disorders and an inmate who was 8 months pregnant in the pod. . . . In other pods, we heard similar stories – inmates were locked down all weekend long and checks by COs were sporadic. . . .

06/30/21 Letter, Rahn to Smith at 1, attached hereto as Exhibit 11.

> Lastly, numerous inmates brought to our attention issues with the call buttons.  In F 5, we received reports that while the women were completely locked down and no COs were in the pod, women were unable to raise anyone on the call buttons, [and] that several women were screaming about "killing themselves."

*Id.* at 2.

On October 21, 2021, counsel for Plaintiffs made the following report to MDC, concerning

---

[7] Chief Richardson began working at MDC as a deputy chief in an administrative capacity in 2017 and as chief of MDC on May 10, 2020.

staffing, call buttons, and out of cell time:

> Residents continue to report being locked down for lack of staff, especially on the weekends.  Residents report frequently being locked down Friday through Sunday with no time out of cell.  They report that often they are left without supervision for more than an hour at a time and that call buttons are ignored.

10/21/21 Memorandum at 1, attached hereto as Exhibit 12.

Despite Plaintiffs' repeated notifications, the call buttons were not functioning on October 25, 2021, when Mr. Casiquito was murdered.  *See below.* Following this murder, Defendant sent out a directive stating, once again, that calls from the call buttons would be routed to master control for screening.  Ex. 1, ¶ 26.

### *Margo Frasier's April 2021 Report*

Pursuant to COA # 3, the court-appointed corrections expert, Margo Frasier, conducts six check-out audits regarding all domains, including Domain Number 4.  Doc. 1222-4.  Ms. Frasier's report, from April 16, 2021, states as follows, with regard to safety and supervision:

a.   As to effective implementation of security and control-related policies, "[a]dherence to the policies is still lacking in the area of supervision of inmates." 04/16/21 Frasier Report, page 28, attached hereto as Exhibit 13.

b.   As to "monitor[ing] inmates to ensure that they are reasonably safe and secure," with special attention to security rounds, Ms. Frasier warns that "MDC's self-audits demonstrate that adherence to the policy is dreadfully lacking."  *Id.,* pages 29-30.

c.   As to "[w]hether MDC ensures that security supervisors conduct daily rounds in the inmate housing units and document the results of their inspections," Ms. Frasier criticizes both the policy, as not being in compliance with the Settlement Agreement, and adherence to the policy that does exist.  *Id.,* pages 30-31.

With regard to staffing, Ms. Frasier's April 16, 2021 report states as follows:

d.   As to whether staffing is adequate to supervise and protect inmates and staff, and allow for the safe operation of the facility, "MDC has a significant number of

vacancies that makes adherence to the staffing plan difficult.  MDC was making progress on reducing vacancies before Covid-19 exasperated the problem due to difficulty in recruiting and training.  Also, there are resignations which are related to concerns about working in an institutional environment during a pandemic.  This has resulted in an increased of lockdown of units when officers are required to staff two units.  There have been several recent deaths in which supervision of inmates may have been a contributing factor."  *Id.* at 35-36.

e.      With regard to whether MDC is following its own staffing plan, developed with prior corrections expert Manuel Romero, "MDC utilizes significant amounts of overtime to staff the jail in accordance with the plan.  Even with the use of overtime, lockdowns of units are being utilized when officers are required to staff two units at a time.  Lack of documentation does not allow Monitor Frasier to assess how often the staffing plan is not follows, but given the level of staff, it is almost impossible to fully follow the staffing plan.  MDC increased its efforts to recruit new staff and to retain current staff, but COVID-19 has hampered those efforts.  Some of the efforts have met resistance from the union and being discussed in current collective bargaining proceeding."  *Id.* at 37.  Ms. Frasier's recommendation including "making necessary changes to the collective bargaining agreement."  *Id.*

f.      Finally, with regard to adequate staffing to ensure access to appropriate medical and mental health care, Ms. Frasier found that it appeared that corrections officers were sometimes unable to escort or transport inmates for medical care, but "[l]ack of documentation does not allow Monitor Frasier to assess the extent to how often the staffing plan is not followed as far as provision of correctional officers for escort."  *Id.* at 38-39.

### *Lack of Action to Remedy Staffing Problems*

In September, the staff vacancy rate at MDC was 24.74%.  It has since dropped to 31.7%.  "Dangerously  Low,"   https://www.abqjournal.com/2445940/dangerously-low.html.   At   the November 5, 2021 access meeting[1], MDC reported that an average of 13% of CO's call in on leave every weekend, which further decreases the number of corrections officers available to supervise

---

[1] The parties attend a monthly "access meeting" to address particular issues regarding Plaintiffs' monitoring of compliance with the Settlement Agreement.

each pod.[2]

MDC also has not done a recent staffing analysis. MDC conducted a staffing analysis in 2013, which was updated in 2016.  In March, 2021, MDC had received two bids for a complete staffing analysis, yet at the access meeting on November 5, 2021, MDC explained that it has retained a different contractor, and that the staffing analysis will not begin until January 2022. This staffing analysis will take months to complete.

To remedy staffing problems, Plaintiffs have suggested and asked County Defendant if it would consider incentive pay for officers to work on weekends, and MDC indicated at the November 5, 2021 access meeting that incentive pay could be considered as one way to increase the number of corrections officers on weekends, but incentive pay for weekends could implicate the collective bargaining agreement.  MDC stated it must work within the confines of the CBA and balance these requirements with *McClendon*.  County Defendant also does not pay wages that are competitive. "[A]t $ 18.90 an hour and $ 19.85 an hour for those who graduate from the [corrections] academy and complete their first year respectively, corrections officers are still making less than the $20 an hour those at state-run prisons make after graduation."  "Dangerously Low," https://www.abqjournal.com/2445940/dangerously-low.html.

### *Beating Death of Leon Casiquito*

Leon Casiquito was murdered on Monday, October 25, 2021. The *Albuquerque Journal*

---

[2] Plaintiffs' counsel requested records showing the number of staff assigned to each pod during each shift.  MDC stated they would let Plaintiffs know if they would provide these documents, but expressed that this would be voluminous and they may not be willing to provide these documents.

reported that Telea Lui, 25, was charged with murder after having "allegedly beat a cellmate to death Monday evening, [October 25, 2021], during a lockdown." The inmate who died was Leon Casiquito, 41 years old. Matthew Reisen, *Fellow inmate charged in fatal beating at MDC*, ALBUQUERQUE JOURNAL (last updated Oct. 26, 2021, 11:02 PM), https://www.abqjournal.com/2440760/man-charged-in-beating-death-of-mdc-cellmate.html.

"According to a criminal complaint filed in Metropolitan Court: MDC staff responded around 5:45 p.m. to the fight inside the men's cell and found Casiquito not breathing, with 'severe trauma' to his head. He was pronounced dead shortly afterward, and the Bernalillo County Sheriff's Office was called to investigate. Deputies said MDC was on lockdown at the time, and the two men were the only inmates in the cell. Blood was spattered on the walls and pools of blood were on the floor." *Id.*

"Lui, . . . had been behind bars for months, accused of beating his mother with a 20-pound dumbbell after hearing voices." *Id*. "Lui was arrested in July after allegedly attacking his mother at their Northwest Albuquerque home. The mother told police, according to court records, that he was schizophrenic, had hallucinations and did not take medications." *Id*.

"Lui told deputies Casiquito had been 'nagging' him by hitting him in the legs over the past few days. He said when Casiquito went to hit him again, he punched him and went into a rage." *Id.* "Lui told deputies he punched, kicked and used his elbows on Casiquito 'over and over' as Casiquito apologized and asked him to stop. [Lui] said he grew tired and had to catch his breath and got a drink of water at one point." *Id.* "Lui admitted to mounting Casiquito and smashing his face into the ground. Lui stated that any time that Casiquito would move he would hit him again.

Lui continued battering Casiquito until staff at MDC came to the cell and removed him." *Id.*

Despite screaming by Mr. Casiquito and several attempts by inmates to use the call buttons, no one returned to the pod and "became aware of a physical fight" until approximately 5:41. *Id.* Inmates who were forced to listen to the sounds accompanying the beating have been severely traumatized.

Plaintiffs obtained declarations from twelve inmates who were present in the same pod as Mr. Casiquito and Mr. Liu. *See* Ex. 3, Declarations of Inmates in E8. The Declarations agree that no corrections officer was on the pod for at least an hour, during which time Mr. Casiquito was murdered. *See*, e.g., Declaration of Richard Clemente; Declaration of Jacob Steven Chavez, Jr., Ex. 3. Review of the pod camera confirmed that the corrections officer left the pod, Echo 8 ("E8"), at 4:41pm and no officer returned until 5:39pm. *See* 10/27/21 MDC Inter-Office Correspondence, attached hereto as Exhibit 14, at 1-2. The inmates also reported that it was typical for COs to leave the pod unsupervised for two to three hours at a time. Declaration of Jose Rivera, Ex. 3 at 6.

Within 15 minutes of the CO leaving the pod, inmates in E8 heard Mr. Casiquito calling for help over and over again. *See* Declarations, Ex. 3; Inmate Statement of M.T., attached hereto Exhibit 15; Inmate Statement of B.C., attached hereto as Exhibit 16; Inmate Statement of J.V., Exhibit 17. "He was crying for help. Then all I would here [sic] is a thumping sound. Then him crying for help. Someone, 'HELP' 'HELP' Please help me. Then I would here [sic] thumping sound agen [sic]. Then the inmate crying out for help, please someone help me. Please. Then after about 45 mins we heard nothing." Ex. 3 at 7, Declaration of Jacob Steven Chavez Jr.

Inmates reported hearing calls for help stated that it was very loud or described it as

16

screaming. According to those inmates, everyone in the pod would have heard. Inmates in E8 repeatedly pressed their call buttons and kicked their doors trying to get the attention of security. *See* Ex. 3, at 2, 7-10, Declarations of George Tribe, Christopher Lucero, and Jacob Steven Chavez Jr.

The inmates in E8 heard Mr. Casiquito being beaten and calling for help for around 30 minutes. Some inmates estimated the beating was 30-45 minutes, others said an hour to an hour and a half. *See* Declarations, Ex. 3 at 9-10, 13-16, Declarations of James McKee, Christopher Lucero, Raymond Roberts III; Ex. 15, Inmate Statement of M.T.; Ex. 16, Inmate Statement of B.C; Ex. 17, Inmate Statement of J.V.   The pod was unsupervised for an hour. *See* Ex. 14, at 1-2, 10/27/21 MDC Inter-Office Correspondence. The assault began as early as 5:07pm when the camera review notes Mr. Casiquito was visibly slammed against the cell door and window. *Id*. at 1. Eventually, Mr. Casiquito's cries ceased. "[A]ll I could do was listen to one inmate yelled for help until he couldn't talk anymore. I pressed a call button that would alert master control or the desk that is in the pod. The Inmate yelled out help me for about 30 min to 45 mins until their [sic] was no sound[.]" Ex. 3 at  15-16, Declaration of Raymond Roberts III.

A porter brought the food cart to the sally port more than an hour after the CO had left the pod, and everyone was yelling at the porter to get help; the porter left.   Sometime later, a corrections officer came into the pod with the food cart and everyone was yelling at him. *See* Ex. 3, E8 Declarations.  The officer let out the bay orderlies to serve the food and one of them told the officer to check on cell 22.   *See id*. at 5, 15-16, Declarations of Arsenio Mascarenas, Raymond Roberts III; Ex. 14, at 2 10/27/21 MDC Inter-Office Correspondence.

17

The inmates of E8 reported that tension in the pod is coming from the lockdowns and that something like this was bound to happen. *See* Ex. 3, at 1-2, Declaration of Richard Clemente, George Tribe. A couple of men reported that Mr. Casiquito requested to be moved to a different cell the night before but the request was refused by the CO. *See id.* at 2-3, Declarations of George Tribe, Leo Sandoval.

The men who were on the pod at the time of Mr. Casiquito's death reported anxiety, PTSD triggers, being unable to sleep, hearing the screams, seeing the blood filling the body bag, seeing Mr. Lui covered in blood. *See id.*, E8 Declarations. They are afraid for their safety. Most reported that the lockdowns are negatively impacting their mental health.

The facility was short-staffed during the incident. *See* 10/29/21 MDC Inter-Office Correspondence from Captain Pierce, attached hereto as Exhibit 18. Corrections Officer Torres was covering two housing units and was in a different housing unit during the incident. *Id*, *see also* Statement of Officer G. Magdaleno, attached hereto at Exhibit 19.

## COUNTY DEFENDANT IS VIOLATING
## PLAINTIFFS' EIGHTH AND FOURTEENTH AMENDMENT RIGHTS [8]

### County Defendant Is Deliberately Indifferent to Plaintiffs' Need for Reasonable Safety, Resulting In a Pattern of Conditions that Threaten Plaintiffs' Life, Health, and Welfare

"Prisoners retain the essence of human dignity inherent in all persons. Respect for that

---

[8] The plaintiff class in *McClendon* includes both persons convicted of a crime and pre-trial detainees. Therefore, the Eighth Amendment would apply to some inmates; the Fourteenth to others. Moreover, the Tenth Circuit "appl[ies] the same deliberate indifference standard no matter which amendment provides the constitutional basis for the claim." *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020)(citation omitted).

dignity animates the Eighth Amendment prohibition against cruel and unusual punishment." *Brown v. Plata*, 563 U.S. 493, 510 (2011). When a person is incarcerated, whether pretrial or after conviction, they are stripped of the means to provide for their own needs and must depend upon prison and jail officials to take reasonable measures to ensure their health and safety. The Eighth Amendment "imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832  (1994)(internal quotation and citation omitted)).

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs – *e.g.*, food, clothing, shelter, medical care, and reasonable safety – it transgresses the substantive limits on state action set by the *Eighth Amendment* and the Due Process Clause.

*DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (emphasis in original). "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer*, 511 U.S. at 832 (internal quotation marks and citation omitted).  Pretrial detainees' Due Process rights parallel that of an inmate's Eighth Amendment rights. *Glover v. Gartman*, 899 F. Supp. 2d 1115, 1133 (D. N.M. 2012) (citing *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999)).

Prison officials have a constitutional duty to take reasonable measures to protect inmates from violence at the hands of other prisoners. *Farmer*, 511 at 833. Indeed, "allowing the beating [] of one prisoner by another serves no legitimate penological objective." *Id*. (internal quotations and citations omitted). "Suffering physical assaults while in prison is not part of the penalty that criminal offenders pay for their offenses against society." *Benefield v. McDowall*, 241 F.3d 1267,

1271 (10th Cir. 2001) (internal citation and quotation omitted). Jails and prisons place together "incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct" and "strip[s] them of virtually every means of self-protection and foreclosed their access to outside aid[.]" *Farmer v. Brennan*, 511 at 833 (internal quotation marks and citation omitted). The Eighth Amendment prohibits officials from letting "the state of nature take its course." *Id*. Rather, where an individual is incarcerated under conditions posing a substantial risk of serious harm, a prison official violates the Eighth Amendment where he knows of and disregards the risk. *See Benefield*, 241 F.3d at 1271 ("[I]n order to establish a cognizable Eighth Amendment claim for failure to protect, a plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm, the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component." (internal citation and quotation marks omitted)). The Eighth Amendment provides the standard for analyzing pretrial detainees' failure to protect claims arising under the Fourteenth Amendment. *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999) (citations omitted).

Because Plaintiffs are seeking equitable relief against the County, not damages on behalf of a particular inmate or inmates, they are not required to show that County Defendant *itself* knew of a particular serious security threat and was deliberately indifferent to the particular danger faced by a particular inmate.

> Unlike in the individual liability context, a municipality's deliberate indifference *is defined objectively*, in part because of the "considerable conceptual difficulty [that] would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a government official." *Farmer*, 511 U.S. at 841; *see also Barney v. Pulsipher*, 143 F.3d 1299, 1307 n. 5 (10th Cir. 1998)(discussing the deliberate indifference distinction).

20

*Paugh v. Uintah Cty*., 2020 WL 4597062, at *41 (D. Utah Aug. 11, 2020)(emphasis added).

For example, institutional practices may create or contribute to unreasonable risk to inmate safety. Thus, staffing that is insufficient to provide adequate security for inmates poses a substantial risk of serious harm. *See e.g. Coleman v. Schwarzenegger*, 922 F.Supp.2d 882, 930–31 (E.D. Cal. 2009) (describing scenario where two officers supervise 200 prisoners in a gym or dorm as "extremely dangerous for both the prisoners and the staff because line of sight supervision is impossible under these circumstances and it does not permit the staff the time to recognize that prisoners are in trouble from any number of causes, including medical or mental illnesses.") (internal quotation omitted); *Ramos v. Lamm*, 485 F.Supp. 122, 141 (D. Colo. 1979) (three prison employees cannot maintain security over 91 inmates housed in various locations), *aff'd in relevant part Ramo*s, 639 F.2d 559.

Likewise, a substantial risk of harm arises from the inability of inmates to communicate their needs to correctional officers or medical staff. As inmates depend on correctional officers and medical staff for their health and safety needs, it necessarily follows that inmates must be able to communicate their needs. The Eighth Amendment requires inmates be able to communicate with corrections officers to summon assistance if necessary. "Prison officials show deliberate indifference to serious medical needs if prisoners are unable to make their medical problems known to the medical staff." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir.1982); see also *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.").

The inmates at MDC depend on supervision by corrections officers for their survival. They

depend on corrections officers for food, for clothing, for access to hygiene and showers and phones. And most urgently, inmates depend on corrections officers to respond to medical, mental health, and security emergencies. In this regard, MDC has failed these inmates. The staffing crisis at MDC has created a substantial risk of serious harm to inmates, in particular to those who are locked down in cells for many hours, if not days, at a time. Locking down inmates for an extended period without supervision, without the ability to communicate with any MDC staff, creates a situation in which inmate assaults or medical emergencies may arise without intervention by jail officials or the ability of inmates to seek assistance. The Eighth Amendment requires MDC to fulfill their obligation to take reasonable measures for the physical and mental health and safety of their inmates. MDC's failure to do so violates their constitutional responsibilities and is incompatible with the concept of human dignity, in violation of the Eighth and Fourteenth Amendments, *see Brown v. Plata*, 563 U.S. at 511, as well as this Court's order incorporating the Parties' Settlement Agreement.

**PLAINTIFFS NEED AND ARE ENTITLED TO**
**REMEDIAL RELIEF FOR VIOLATIONS OF THE COURT'S ORDERS,**
**AS WELL AS FOR VIOLATIONS**
**OF THE EIGHTH AND FOURTEENTH AMENDMENT**

<u>The Court Has the Inherent Authority to Enforce its Remedial Orders</u>

Plaintiffs are entitled to substantial compliance with court orders designed to remediate a violation of federal law. The entry of the stipulations as judicial orders provides the precondition for the exercise of the Court's equitable authority to enforce them. *See*, *e.g.*, *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 385 (1992); *United States v. Board of Educ. of City of Chicago*, 567 F. Supp. 272, 281 (N.D. Ill. 1983), *aff'd in part and rev'd in part on other grounds*, 717 F.2d

378 (7th Cir. 1983), *Brewster v. Dukakis*, 675 F.2d 1, 3-4 (1st Cir. 1982); *Inmates of Boys' Training School v. Southworth*, 76 F.R.D. 115, 123 (D.R.I. 1977).

Court orders, by their very nature, are enforceable and invest the Court with equitable authority to ensure compliance with their terms. *Swann v. Charolette-Meckenberg Bd. of Ed.*, 402 U.S. 1, 15 (1971); *Green v. County School Bd.*, 391 U.S. 430, 439 (1968). These powers extend to the enforcement of consent decrees, albeit with some limitation. *See* Anderson, *Implementation of Consent Decrees in Structural Reform Litigation*, 3 Univ. of Ill. L.Rev. 725, 738 (1987). A court's enforcement mechanisms include: interpreting the agreement or order; issuing further injunctions to implement an agreement or order; granting supplemental relief, consistent with the purpose of the agreement or order; holding a party in contempt; imposing sanctions such as fines or other coercive actions; appointing a special master; and appointing a receiver. *See id.*

The nature of the interest at stake should determine how high the bar should be set for County Defendant. *Fortin v. Comm'r of Ma. Dep't of Public Welfare,* 692 F.2d 790, 795 (1st Cir. 1982); *Morales-Feliciano v. Parole Board of the Commonwealth of Puerto Rico*, 887 F.2d 1, 4 (1st Cir. 1989); *Devine v. State of Rhode Island*, 827 F. Supp. 852, 863 (D.R.I. 1993). The more fundamental the interest at stake, the higher the degree of compliance required. *Morales-Feliciano,* 887 F.2d at 4-5 (holding that a high degree of compliance is required where noncompliance puts a prisoner's fundamental Eighth Amendment interest at risk). Courts have regularly expected exceedingly high compliance standards when the interest of class members is great, when the harm of noncompliance is significant, and when the delays have been protracted. All three of these factors are present here, to an overwhelming degree.

<u>The Court Has Broad Equitable Authority</u>
<u>to Provide Meaningful Remedies to Enforce Its Orders</u>

The Court has the authority, based upon a finding of ongoing noncompliance, to order County Defendant to take additional or more specific actions necessary to achieve the purposes of COA # 3 and to satisfy its constitutional obligations thereunder.  The Court may compel County Defendant to do what is reasonably necessary to provide the relief agreed to by the parties and ordered by the Court.

In order to safeguard its authority and to vindicate the rights of the litigants, a court has the authority to prevent violations of its orders.  *See Aspira of New York, Inc. v. Board of Education*, 423 F. Supp. 647 (S.D.N.Y. 1979).  "[T]he court is obliged . . . to require substantial performance [of its orders] and due diligence [on the part of defendants]."  *Id*. at 651.  Where the court determines that "defendants violated their obligation under the decree by failures of diligence, effective control, and steadfast purpose to effectuate the prescribed goals," the court can find the defendants in contempt.  *Id.*  The court's equitable powers are quite broad and the court may impose further injunctive relief to remedy noncompliance with its prior orders.  *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 450 (1911).

"A district court may exercise broad discretion in using its contempt power to assure compliance with its orders." *Rodriguez v. IBP* Inc., 243 F.3d 1221, 1231 (10th Cir 2001)(citation and internal punctuation omitted).  Among its inherent powers, the Court can order additional injunctive and other relief distinct from that specified or even implied in the SA.  "On the periphery of a court's power to interpret is also a limited power to issue injunctive relief which may be used to protect rights and enforce duties once they have been clarified."  *Brewster,* 675 F.2d at 3, *citing*

24

*Delaware Valley Citizen's Council for Clean Air v. Pennsylvania*, 674 F.2d 970, 974 (3rd Cir. 1982). The relief must be narrowly tailored to achieve the goals and purposes of the order. *See, e.g., Brewster v. Dukakis*, 687 F.2d 495, 500 (1st Cir. 1982).

In the instant case, the Court can order County Defendant to take additional actions necessary to ensure that class members receive the services and supports guaranteed to them by the Court's orders and federal law.

> When prison officials disregard the Eighth Amendment, *"judicial intervention is indispensable." Rhodes v. Chapman*, 452 U.S. 337, 354 (1981) (emphasis in original). This is particularly true in cases where, as here, inmates have demonstrated gross and systemic inadequacies in policies and practices that place the health and safety of all inmates at substantial risk. *See Hutto v. Finney*, 437 U.S. 678, 687 n. 9 (holding that federal courts must "bring an ongoing violation [of the Eighth Amendment] to an immediate halt."). Accordingly, the plaintiffs are entitled to declaratory and injunctive relief that will effectively protect their constitutional rights.

*Ginest v. Bd. of Cty. Comm'rs.*, 333 F. Supp. 2d 1190, 1209 (D. Wyo. 2004)(citations omitted).

**WHEREFORE**, for all of the foregoing reasons, Plaintiffs respectfully request that this Court order as follows:

### EMERGENCY RELIEF

I.   Enter an Order directing County Defendant to appropriately staff MDC by maintaining at least one correctional officer on each pod during every shift in accordance with the facility's original design plan and *Check-Out Audit Agreement No. 3,* Domain 4, Paragraphs F (safety and supervision) and K (staffing);

II.  Enter an Order directing County Defendant, within five days of this Court's order, to submit a plan, in coordination with the court-appointed corrections expert, to ensure,

monitor, and document that corrections personnel respond to call button requests for urgent assistance within a reasonable time from the time the requests are made;

III.     Enter an Order, within the discretion of the Court, mandating the imposition of fines within fifteen days of this Court's order, if County Defendant fails to implement an effective plan to ensure, monitor, and document that corrections personnel are posted on each pod during each shift and respond to requests for urgent assistance within a reasonable time from the time the requests are made;

IV.     Order at least 20 hours of mental health counseling for every inmate who was present on the pod where the murder took place, by private counselor, unless an inmate declines assistance;

V.      Enter an order directing County Defendant to effectively implement security and control-related policies, procedures and practices, including but not limited to effective training, that will result in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards which includes adequate time out of cell for inmates in both segregation and general population and requiring County Defendant to track out-of-cell time in all pods and provide tracking documentation to the court-appointed corrections expert and the parties on a weekly basis.

VI.     Order the County Defendant, in consultation with the court-appointed corrections expert, to consider options previously advised by the court-appointed corrections expert or suggested by Plaintiffs to comply with the settlement agreement including, but not limited to, incentive pay for all corrections officers, additional incentive pay for all

corrections officers working overtime hours on weekends, additional pay for corrections officers, closing some pods that are not in use, request for assistance by the New Mexico National Guard or other available emergency assistance, or any other potential remedies to either recruit additional corrections officers or comply with COA # 3 relying on corrections officers currently employed.

**LONG-TERM RELIEF**

I.     Enter an order setting a discovery schedule, and schedule an evidentiary hearing on Plaintiffs' Motion no later than three months from the date of the filing of this Motion;

II.     Enter an Order directing County Defendant to provide, beginning the first day of the month following the Court's order, monthly in-person reports to the Court, the court-appointed corrections expert, and the Parties regarding whether current performance measures by the Metropolitan Detention Center ("MDC") demonstrate sufficient progress on *Check-Out Audit Agreement No. 3,* Domain 4, Paragraphs F (safety and supervision) and K (staffing);

III.     Should County Defendant be unable to adequately place a correctional officer on each pod during each shift, consider convening a three-judge panel to entertain a release order to bring MDC's population down to a level that allows to constitutionally adequate supervision;

IV.     Issue those further Orders which this Court deems just and proper.

Respectfully submitted,

LAW OFFICE OF ALEXANDRA
FREEDMAN SMITH, LLC

*/s/ Alexandra Freedman Smith*
Alexandra Freedman Smith
Doreen McKnight
925 Luna Cir. NW
Albuquerque, NM 87102
P: (505) 314-8884
F: (505) 407-2922
Email: asmith@smith-law-nm.com
Email:  doreen@smith-law-nm.com
*Attorneys for Plaintiffs*


IVES & FLORES PA
Adam C. Flores
925 LUNA CIRCLE NW
ALBUQUERQUE, NM 87102
O: 505-364-3858
Email:  adam@nmcivilrights.com
*Attorney for Plaintiffs*


DAVIS LAW NEW MEXICO
Philip B. Davis
Nicholas T. Davis
1000 Lomas Blvd. NW
Albuquerque, NM 87102
(505) 242-1864
phil@davislawnm.com
nick@davislawnm.com
*Attorneys for Plaintiff*


ROTHSTEIN DONATELLI LLP
Marc M. Lowry
Kate Thompson
500 Fourth Street NW, Suite 400
Albuquerque, NM  87102
(505) 243-1443
28

mlowry@rothsteinlaw.com
kthompson@rothsteinlaw.com
*Attorneys for Plaintiffs*

LAW OFFICES OF NANCY L. SIMMONS, PC
Nancy L. Simmons
120 Girard SE
Albuquerque, NM 87106
(505) 232-2575
nlslaw@swcp.com
*Attorneys for Plaintiff Intervenors*

LAW OFFICE OF RYAN J. VILLA
Ryan J. Villa
Kelly K. Waterfall
Katherine M. Loewe
5501 Eagle Rock Ave.,Suite C2
Albuquerque, New Mexico 87113
(505) 256-7690
ryan@rjvlawfirm.com
kelly@rjvlawfirm.com
kate@rjvlawfirm.com
*Attorneys for Plaintiff Intervenors*

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2021, I filed the forgoing document electronically through the CM/ECF system, which caused all counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

/s/ *Alexandra Freedman Smith*
Alexandra Freedman Smith