# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JIMMY (BILLY) MCCLENDON; HAROLD
LUND; PETER SUMATKAKU; DAVID
MICHAEL BAUER; CARL RAY LOPEZ;
BRUCE DAVID MORAWE; THOMAS
YOUNG; RUTHIE DURAN; DEBORAH
LAVERA; JANELLE ROYBAL; DANETTE
DIFIORI; MARIA SISNEROS; LARRY
GREEN; BARTEL HALEY; MICHAEL
COTE; JOE RAY HERRERA; JOSIE
KRIENA; DEBBIE LUCERO; DAVID
SHAWKIN; MARC A. GILLETTE; GEORGE
CHAVEZ; ELISEO BACA; CLINT BARRAS;
FRANCISCO MELENDEZ; SAMUAL
HERROD; VINCENT PADILLA; CARL
DUCKWORTH; JOSEPH W. ANDERSON;
PAUL JOHNSON; FRED MALL; HECTOR
LOPEZ; RICKY ROSE; HERBERT KING,
SR.; JAMES PARKS; MICHAEL A.
JOHNSON; JOHNNY VALLEJOS; JOE
NEWBERRY; DARRYL CRAFT; ALBERT
WILLY; WILLIAM P. JIMMY; AUGUSTINE
TAPIA; RICHARD A. SMITH; ROBERT
LOVATO; ROY WHATLEY; MARTY
BEGAY; MARTIN VALDIVIA; TALLIE
THOMAS; AUGUSTINE JACKSON;
DONALD HALL; CARL SUR; STEVE
ESQUIBEL; LONNIE WHATLEY; JAMES
SAIZ; BRYON ZAMORA; ALLEN M.
SAWYER; PATRICK BENNY ROMERO;
RICHARD C. KOPECKY; PHILLIP
SHUMATE; NELSON ROMERO; STEVE
JOHNSON; BENNIE F. GARCIA; LOUIE
CHAVEZ; BRIAN SALAZAR; RICHARD
GALLEGOS; LARRY STROUD; JAMES
BURKS; BRAD FISCHER; AMIHON BACA;
JEFF DILLOW; PETE MCQUEEN; MANUEL
MARTINEZ; ARNOLD ANTHONY
MAESTAS, and JOHN HEWATT,

     Plaintiffs,

vs.                                                                      No. CIV 95-0024 JB/KBM

E.M.; R.L.; W.A.; D.J, P.S.; and N.W., on behalf
of themselves and all others similarly situated,
and SHAWNA TANNER,

        Plaintiff-Intervenors,

vs.

CITY OF ALBUQUERQUE; MARTIN
CHAVEZ; COUNTY OF BERNALILLO;
PATRICK BACA; ALBERT VALDEZ;
EUGENE GILBERT; BARBARA SEWARD;
JACQUELINE SCHAEFER; BILL DANTIS;
BERNALILLO COUNTY DETENTION
CENTER; PAUL SANCHEZ; FRANK
LOVATO; ERCELL GRIFFIN; MICHAEL
SMITH; JOHN VAN SICKLER; WILL
BELL; ALFRED CHAVEZ; RICHARD
FUSCO; GEORGE FUENTES; DAVID
BACA; VICTOR HERNANDEZ; KEVIN D.
SEVIR; DR. JIM MASON; BARBARA
COLE; MARIA LUCERO; DAVID
ROYSTON; FELIMON MARTINEZ;
STANLEY LENTS; DOUGLAS
ROBINSON; SEAL BARLEY; LYNN KING;
DAVID SHERMAN; BRIAN MASER;
JOHN DOES, employees of Bernalillo County
Detention Center; MICHAEL SISNEROS,
Director of Bernalillo County Detention
Center, in his official capacity, and
BERNALILLO COUNTY BOARD OF
COMMISSIONERS,

        Defendants,

vs.

LAWRENCE A. JOHNSON; WILLIE
JAMES WASHINGTON; MANUEL R.
BOSWELL, and AFSCME LOCAL 2499,

        Intervenors.

- 2 -

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Bernalillo County Board of Commissioners' Motion for Finding of Sustained Compliance and for Disengagement of Domain #3, filed November 12, 2021 (Doc. 1480)("Motion").  The Court held a hearing on February 11, 2022.  <u>See</u> Clerk's Minutes at 1, filed February 11, 2022 (Doc. 1550).  The primary issues are: (i) whether the Settlement Agreement, filed May 26, 2016 (Doc. 1222-1), requires Defendant Bernalillo County Board of Commissioners ("Bernalillo County") to provide six quarterly reports for an eighteen-month self-monitoring period before seeking disengagement from Domain #3, where Bernalillo County asserts that it submitted sufficient data for the Court-appointed jail operations expert Margo Frasier to make an informed finding of sustained compliance regarding certain conditions at Bernalillo County Metropolitan Detention Center ("MDC"); (ii) whether the record supports a finding that Bernalillo Country has reached sustained substantial compliance with Domain #3 of the Settlement Agreement, where the Plaintiffs object to the Motion and argue that Bernalillo County does not demonstrate sustained compliance with certain provisions in Check-Out Audit Agreement No. 3: the Conditions of Confinement at the Bernalillo County Metropolitan Detention Center, filed May 26, 2016 (Doc. 1222-4)("Check Out Audit #3"), namely: (a) Checkout Audit #3 ¶¶ 6(L)(3)-(4), at 28, governing fire and life safety, (b) Checkout Audit #3 ¶ 6(M)(1), at 29, governing maintenance staffing, (c) Checkout Audit #3 ¶¶ 6(O)(3)-(4), at 32, governing food service, and (d) Checkout Audit #3 ¶¶ 6(S)(1)-(3), at 34-35, governing inmates' access to telephones; and (iii) whether Class and Subclass members are entitled to notice and an opportunity to be heard before the Court finds that Bernalillo County has achieved sustained compliance with Domain #3, where rule 23 of the Federal Rules of Civil Procedure and the Due Process Clause of the Fifth Amendment to the Constitution of the United States of America, U.S.

Const. Amend. V, require notice and an opportunity to be heard. The Court concludes that: (i) the Settlement Agreement as written requires Bernalillo County to provide six quarterly reports during an eighteen-month self-monitoring period; (ii) the record does not support a finding that Bernalillo County demonstrates sustained substantial compliance as to: Checkout Audit #3 ¶¶ 6(L)(3)-(4), at 28, governing fire and life safety, and Checkout Audit #3 ¶ 6(M)(1), at 29, governing maintenance staffing, and Checkout Audit #3 ¶¶ 6(S)(1)-(3), at 34-35, governing inmates' access to telephones, but the records supports a finding of sustained compliance as to Checkout Audit #3 ¶¶ 6(O)(3)-(4), at 32, governing food service; and (iii) rule 23 of the Federal Rules of Civil Procedure and the Fifth Amendment to the United States Constitution do not require Bernalillo County to provide notice and an opportunity to be heard, because these procedural safeguards were met when the Settlement Agreement was reached, and the parties do not argue that Class and Subclass representatives are inadequate for this stage of the proceedings. The Court, therefore, will deny the Motion.

## **FACTUAL BACKGROUND**

On January 10, 1995, Plaintiff Jimmy (Billy) McClendon, along with "all prisoners who are presently, or will be confined in the Bernalillo County Detention Center"[1] ("the Plaintiffs") filed a class action against Defendants City of Albuquerque, the Mayor of Albuquerque, the County Commissioners of Bernalillo County, the County of Bernalillo, MDC, the MDC Director, the MDC Deputy Director, and various MDC employees, alleging that MDC operates under inhumane and unconstitutional conditions. See Complaint Class Action at 1-2, filed January 10,

---

[1]The Bernalillo County Detention Center is now known as the Bernalillo County Metropolitan Detention Center ("MDC").

1995 (Doc. 1)("Initial Complaint"); Complaint Class Action Part 2 at 1-34, filed January 10, 1995

(Doc. 1-1)("Initial Complaint Part 2"); Complaint Class Action Part 3 at 1-40, filed January 10,

1995 (Doc.1-2)("Initial Complaint Part 3"). After years of negotiation, the parties agreed to the

most recent Settlement Agreement, which sets forth requirements that aim to improve conditions

at MDC and carve a pathway to the end of litigation. See Settlement Agreement at 1-14, filed May

26, 2016 (Doc. 1222-1).[2]

### 1.      The Initial Complaint.

In the Initial Complaint, the Plaintiffs seek to enjoin the Defendants from operating MDC

until MDC meets State and federal constitutional standards. See Initial Complaint ¶ 1, at 1-5. The

Plaintiffs allege that Bernalillo County is violating Articles I, II, and VI of the Constitution of the

United States; specifically, the Plaintiffs allege that Bernalillo County is violating:

> The freedom of persons within the United States to travel and transact
> business in channels of interstate commerce as established by Article I, Section 8;
> to see that federal law is faithfully executed as provided by Article II, Section 3;
> and to protect the rights of persons with the United States to receive the benefits of
> the supreme law of the land as provided by Article VI.

Initial Complaint ¶ 3, at 4. The Plaintiffs bring their claims under 42 U.S.C. § 1983, 18 U.S.C.

§ 242, and 18 U.S.C. § 245. See Initial Complaint ¶ 3, at 4.

The Initial Complaint alleges:

> The totality of the overcrowding and other conditions at MDC fall beneath
> standards of human decency, inflict needless suffering on prisoners and create an
> environment which threatens prisoners' mental and physical wellbeing, and results

---

[2]The Honorable James Parker, Senior United States Judge for the United States District for
the District of New Mexico, summarizes extensively the factual background to this case in his
Memorandum Opinion and Order Granting Approval of Settlement Agreement at 2-16, filed June
27, 2016 (Doc. 1225)("MOO Approving Settlement").

in the physical and mental deterioration and debilitation of the persons confined therein which is both unnecessary and penologically unjustifiable.

Initial Complaint ¶ 1, at 2-3.  The Plaintiffs contend that MDC employees deprive inmates of basic federal and State rights with "the intent, and/or effect, of inflicting disproportionate abuse upon persons of Hispanic origin, Indian origin and Black persons."  Initial Complaint ¶ 1, at 4.  The Plaintiffs allege that MDC was designed to house 700 inmates, but was housing over 1000 inmates at the time the Initial Complaint was filed.  Initial Complaint ¶ 1, at 10.  The Plaintiffs allege that this overcrowding makes it nearly impossible to clean the cells, maintain personal hygiene, and provide safety for the inmates.  See Initial Complaint ¶ 4, at 10.  The Plaintiffs also contend that Bernalillo County does not provide sufficient medical care, dental care, or psychological and rehabilitative services to their inmates.  See Initial Complaint ¶ 4, at 13.

The Plaintiffs describe their personal experiences with lack of basic resources, frequent violence, lack of effective security, and lack of effective health care.  See Initial Complaint ¶¶ 1-8.35, at 2-39; Initial Complaint Part 2 ¶¶ 8.36-23.3, at 1-24; and Initial Complaint Part 3 ¶¶ 23.4-36.6, at 1-40.  Each named Plaintiff seeks damages in an amount greater than $50,000.00, with the exact award to be proven at trial.  See Initial Complaint ¶ 2, at 25-36; Initial Complaint Part 2 ¶ 1, at 1-24; and Initial Complaint Part 3 ¶ 1, at 1-40.  For the next several years of litigation, there were various changes in the parties[3] and their legal representation, multiple settlement agreements, and multiple intervening Plaintiffs.  On August 23, 1995, the Honorable Martha Vázquez, United States District Judge for the United States District Court for the District of New Mexico, enjoined the Defendants "from housing more than 563 inmates (design capacity) in BCDC's existing main

---

[3]Several of the original Plaintiffs, including McClendon, have passed away since the start of the litigation.  See Order of Dismissal with Prejudice at 1-2, filed May 29, 1996 (Doc. 231)("Order of Dismissal").

facility . . . and from housing more than 120 (design capacity) in BCDC's existing satellite facility
. . . after August 23, 1996," and further enjoined the Defendants "from housing more than 535
inmates (95% of design capacity) in BCDC's main facility . . . and from housing more than 112 .
. . in BCDC's existing satellite facility . . . after January 1, 1997.  Order at 12, filed August 23,
1995 (Doc. 106)("PI Order").  Judge Vázquez also ordered that: (i) the Defendants must separate
violent from non-violent offenders, develop a classification system for housing assignments, house
residents assigned to the Psychiatric Services Unit with the general population only if there is a
written evaluation, see PI Order at 15; (ii) BCDC staff must conduct a medical exam of each
resident who is incarcerated over 14 days, see PI Order at 15-16; (iii) immediate medical attention
be given to any resident who complains of a "serious acute illness or serious injury," PI Order at
16; and (iv) the Defendants must provide a sufficient number of mattresses, bunks, linens, storage
for personal necessities, and feminine hygiene items for the inmate population, see PI Order at 17-
18.

> ### 2.      The Intervening Plaintiffs and Early Settlement Agreements.

On September 6, 1995, a group of persons with mental and/or developmental disabilities
who were or were going to be detained at MDC, and all others similarly situated, moved to
intervene in the lawsuit.  See Motion to Intervene, filed September 06, 1995 (Doc. 113)("MTI
#1"); Plaintiff Intervenors' Memorandum of Law in Support of Motion to Intervene, filed
September 6, 1995 (Doc. 114)("Memo. for Motion to Intervene").  The Plaintiffs moved to
intervene, because "each named Plaintiff has one or more mental or developmental disabilities
which require medical, mental health, habitation and/or educational service.  As a result of their
detention, proposed plaintiffs in intervention have interests directly affected by this litigation."
Memo. for Motion to Intervene at 1.  Judge Vázquez granted the MTI #1 on October 26, 1995.

See Order Granting Motion to Intervene, filed October 26, 1995 (Doc. 137).[4] An initial Settlement Agreement was reached and filed on September 7, 1995 (Doc. 115)("Initial Settlement Agreement").  The Initial Settlement Agreement converted the PI Order into a permanent injunction.  See Initial Settlement Agreement ¶ 1, at 1.

### 3.      The Prison Litigation Reform Act.

The Honorable James Parker, Senior United States District Judge for the United States District Court for the District of New Mexico, summarizes the impact of the Prison Litigation Reform Act, including 18 U.S.C. § 3626 and 42 U.S.C. § 1997e ("PLRA") on the litigation:

> On April 26, 1996, Congress enacted the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (codified as amended in several titles and sections of U.S.C. including 18 U.S.C. § 3626 and 42 U.S.C. § 1997e)(the PLRA).  The PLRA imposed specific requirements regarding prospective relief in all prison conditions cases, whether the relief was ordered prior to or after its enactment, and the PLRA allowed termination of existing remedial orders in prison conditions cases. 18 U.S.C. § 3626.[] After the PLRA was enacted, the City and County moved to terminate the remedial orders entered in 1995 and 1996. The termination motion was resolved in November 1996, when the Court approved two settlement agreements and adopted them as consent decrees.  The first settlement agreement was executed by Plaintiffs, Plaintiff Intervenors, the City, and the County. See ORDER REGARDING THE PRISON LITIGATION REFORM ACT (Doc. No. 255)(the PLRA Order).  In the PLRA Order, the Court found that "violations of one or more federal rights of BCDC residents ha[d] occurred at BCDC." (Id. at 1.) The second settlement agreement was executed by Plaintiff Intervenors, the City, and the County. See ORDER (Doc. No. 256) (the 1996 Order). In the 1996 Order, the Court found that "violations of one or more federal rights of subclass members have

---

[4] The next four individuals who attempted to intervene were Lawrence A. Johnson, Willie James Washington, Manuel R. Boswell, and Larry Green, whose requests to intervene were denied.  See Motion by Intervenor Lawrence A. Johnson, Pro Se to Intervene, filed February 28, 1996 (Doc. 173); Order Denying Motion to Intervene, filed August 26, 1996 (Doc. 238); Motion to Intervene and/or to Challenge Adequacy of Representation of Counsel, filed October 5, 2001 (Doc. 324); Order Denying Willie Washington's Motion to Intervene, filed September 03, 2002 (Doc. 388); Motion to Intervene, filed on November 16, 2001 (Doc. 338); Order Denying Manuel Boswell's Motion to Intervene, filed September 03, 2002 (Doc. 389); Motion to Intervene and/or Challenge Adequacy of representation of Counsel, filed October 03, 2002 (Doc. 390); Order Denying Larry Green's Motion to Intervene and/or Challenge Adequacy of Representation of Counsel, filed April 14, 2003 (Doc. 407).

occurred at BCDC." (*Id.* at 1.) The 1996 Order contained a stipulation by the parties that some of the BCDC residents were not afforded "reasonable accommodations for their disabilities." (*Id.* at 7.) In the 1996 Order, the Court required Defendants to implement remedial measures designed to address the needs of inmates with mental illness and/or mental disabilities, particularly with regard to the diagnosis and medical treatment of those inmates. (*Id.* at 8–17.)  On January 10, 1997, the Court held a fairness hearing on the 1996 settlement agreements under Fed. R. Civ. P. 23(e). On August 12, 1997, the Court entered the CORRECTED ORDER APPROVING COMPROMISE & SETTLEMENT AGREEMENT & FINAL JUDGMENT OF DISMISSAL WITH PREJUDICE (Doc. No. 289) (the 1997 Judgment) approving the two November 1996 settlements and dismissing with prejudice all claims except the Plaintiff Intervenors' claims regarding equal protection and access to the courts, which were asserted on behalf of female subclass members. (*Id.* at 5.) The 1997 Judgment contained the findings required by the PLRA,[] and the Court retained jurisdiction to enforce those agreements.

Memorandum Opinion and Order Granting Approval of Settlement Agreement at 3-5, filed June 27, 2016 (Doc. 1225)("MOO Approving Settlement").  On January 31, 2002, the parties reached another agreement addressing facilities for women inmates and retaining the population cap of 586 residents.  See Stipulated Agreement at 1-2, filed January 31, 2002 (Doc. 361).  The parties signed two more stipulated agreements in the following years.  See Stipulated Agreement Between Plaintiffs and Defendants, filed June 30, 2005 (Doc. 515); Stipulated Settlement Agreement between Plaintiff Intervenors and Defendants at 1, filed June 30, 2005 (Doc. 514).  On May 19, 2009, the case was reassigned to Senior Judge Parker.  See Minute Order at 1, filed May 19, 2009 (Doc. 719).

### 4.    **The Settlement Agreement.**

On March 22, 2016, Senior Judge Parker approved preliminarily the Settlement Agreement.  See Stipulated Order Preliminarily Approving Settlement, Requiring Notice to Class and Subclass Members, and Setting Fairness Hearing at 1, filed March 22, 2016 (Doc. 1213)("Order Approving Settlement").  On June 27, 2016, Senior Judge Parker approved the Settlement Agreement after a fairness hearing.  See MOO Approving Settlement.  The Settlement

Agreement categorizes over 250 grievances about the detention facility's conditions into eight "Domains."  Settlement Agreement ¶ 9, at 9.  To comply with the Settlement Agreement and to conclude the litigation, the Defendants must demonstrate sustained substantial compliance in each Domain.  See Settlement Agreement ¶¶ 1- 5, at 1-7.  Three different Check-Out Audits provide the standards the Defendants must meet to demonstrate sustained compliance for each Domain. See Settlement Agreement ¶ 2, at 3.

The Settlement Agreement categorizes its requirements into eight Domains: (i) Domain 1: Mental Health Services, whose requirements are set forth in Check-Out Audit Agreement No. 2, The Provision of Mental Health Services at the Bernalillo County Metropolitan Detention Center, filed May 26, 2016 (Doc. 1222-3)("Check Out Audit #2"); (ii) Domain 2: Medical Services, whose requirements are set forth in Check-Out Audit Agreement No.1., The Provision of Medical Services at the Bernalillo County Metropolitan Detention Center, filed May 26, 2016 (Doc. 1222-2)("Check Out Audit #1"); (iii) Domain 3: Group A of Jail Operations, set forth in Check-Out Audit Agreement No. 3, The Conditions of Confinement at the Bernalillo County Metropolitan Detention Center, filed May 26, 2016 (Doc. 1222-4)("Check Out Audit #3); (iv) Domain 4: Group B of Jail Operations, set forth in Check-Out Audit #3; (v) Domain 5: Population Management, set forth in Check-Out Audit #3; (vi) Domain 6: Housing and Segregation, set forth in Check-Out Audit Agreement # 3; (vii) Domain 7: Sexual Misconduct, set forth in Check-Out Audit #3; and (viii) Domain 8: Use of Force by Security Staff, set forth in Check-Out Audit #3.  See Settlement Agreement ¶ 6, at 7; id. at ¶ 9, at 9.

Check Out Audit #1 provides the standards for Domain 2, Medical Services.  See Settlement Agreement  ¶ 6, at 7; id. at ¶ 9, at 9; Check Out Audit #1 at 1.  Check Out Audit #1 describes standards for whether MDC's provision of medical services complies with MDC's

policies and procedures, as well as various "advisory standards in the American Correctional Association's Standards for Adult Detention Centers" and in the National Commission on Correctional Health Care.  <u>See</u> Check Out Audit #1 ¶¶ 6(A)-(C), at 2.  Check Out Audit #1 also examines the timeliness of completing history and physical exams as well as providing immediate medical attention when requested.  <u>See</u> Check Out Audit #1 ¶ 6(D)-(F), at 2-3.  Check Out Audit #1 also ensures that MDC is making consistent revisions to their medical policies and practices when deficiencies are identified.  <u>See</u> Check Out Audit #1 ¶ 6(G) at 3.

Check Out Audit #2 provides the standards for Domain 1, Mental Health Services.  <u>See</u> Settlement Agreement  ¶ 6, at 7; <u>id.</u> at ¶ 9, at 9; Check Out Audit #2 at 1-24.  Check Out Audit #2 analyzes whether MDC has developed a comprehensive screening and assessment process of inmates with serious mental health needs, whether MDC has the ability to provide professional treatment plans to inmates whose conditions requires one, whether MDC has suicide prevention precautions in place for inmates who may be deemed as suicidal, whether MDC follows regulations on the use of both Clinical Restraints and Four Point Restraints, and whether MDC provides basic mental health training and sufficient mental health professionals.  <u>See</u> Check Out Audit #2 ¶ 6(A)-(L), at 2-22.

Check Out Audit #3 provides the standards for Domains 3-8, all of which fall under the category of Jail Operations.  <u>See</u> Settlement Agreement ¶ 6, at 7; <u>id.</u> ¶ 9, at 9.  Domain #3 provides standards for MDC's fire and life safety procedures, sanitation and environmental conditions, food service, mail service, telephones, commissary, inmate access to community services, and for whether inmates have access to sanitary laundry.  <u>See</u> Check Out Audit #3 ¶ 7(A), at 39.  Domain #4 provides the standards that MDC must maintain for inmate discipline, inmate classification, whether MDC has a comprehensive inmate grievance procedure, whether MDC provides safety

and supervision to inmates and employees, and whether MDC has contraband control, adequate staffing, inmate access to counsel and legal materials, an extensive law library, inmate programming, and inmate access to information.  See Check Out Audit #3 ¶¶ 7(B), at 39-40.

Domain #5 examines whether MDC successfully manages the inmate population size.  See Check Out Audit #3 ¶6(A), at 2-3; id. ¶ 7(C), at 40.  Domain #6 requires MDC to follow housing and segregation protocols.  See Check Out Audit #3 ¶ 7(D), at 40.  This includes ensuring that the cells do not hold more inmates than they were designed to hold and making sure that inmates get at least one hour out of their cell each day.  See Check Out Audit #3 ¶ 4, at 23.  Domain #7 addresses sexual misconduct.  See Check Out Audit #3 ¶ 7(E), at 40.  This includes MDC's compliance with the Prison Rape Elimination Act of 2003, 34 U.S.C. §§ 30301-30309, prevention of sexual misconduct, a well-structured reporting system, and the collection of data regarding sexual misconduct at the facility.  See Check Out Audit #3 ¶ 6(I), at 24-25.  Domain #8 covers the security staff's use of force and internal investigations.  See Check Out Audit #3 ¶ 6(B), at 3-14; id. ¶ 7(F), at 40.  This Domain includes whether MDC has comprehensive policies regarding the appropriate use of force with respect to restraint devices, defensive tactics, inflammatory and chemical agents, taser conducted electrical weapon (CEW), less-lethal munitions and distraction devices, restraint chair, and firearms.  See Check Out Audit #3 ¶¶ 6(B), at 3-14.

Bernalillo County is not required to reach compliance with all Domains at once, but may reach compliance with one Domain at a time.  See Settlement Agreement ¶ 1, at 3.  To demonstrate sustained compliance for each Domain, the Settlement Agreement prescribes four steps for the Defendants to follow: (i) the Defendants must demonstrate initial substantial compliance; (ii) the Defendants must undergo a period of self-monitoring; (iii) the Defendants must demonstrate

sustained compliance; and (iv) the Defendants must undergo a check-out audit.  See Settlement

Agreement ¶¶ 4-14, at 3-10.  See Analysis, infra at 57-63.

### 5.      The Court-Appointed Experts.

There are three Court-appointed experts who assess the MDC's compliance with the

Check-Out Audit Agreements.  Senior Judge Parker first appointed Manuel Romero as Jail

Operations expert, in charge of evaluating the conditions of confinement at MDC.  See Order

Instructing Court-Appointed Jail Operations Expert Manuel Romero to Evaluate Conditions of

Confinement at the Bernalillo County Metropolitan Detention Center at 1-42, filed September 23,

2014 (Doc. 1167)("Appointment of Manuel Romero").  Next, Senior Judge Parker appointed Dr.

Robert Greifinger as the Medical Expert in the Order Instructing Court-Appointed Medical Expert

Robert Greifinger, M.D. to Evaluate Medical Services at the Bernalillo County Metropolitan

Detention Center at 1-9, filed September 23, 2014 (Doc. 1168)("Appointment of Dr. Greifinger").

Senior Judge Parker appointed Dr. Jeffrey Metzner as the Mental Health Expert in the Order

Instructing Court-Appointed Mental Health Expert Jeffrey Metzner, M.D. to Evaluate Mental

Health Services at the Bernalillo County Metropolitan Detention Center at 1-25, filed September

23, 2014 (Doc. 1169)("Appointment of Dr. Metzner").  Four years later, Senior Judge Parker

appointed Margo Frasier to replace Manuel Romero as the Jail Operations Expert. See Stipulated

Order Appointing Margo Frasier as Court's Jail Operations Expert at 1-2, filed February 05, 2018

(Doc. 1336)("Appointment of Margo Frasier").  Frasier has more than forty years of experience in

the criminal justice field.  See Margo Frasier, filed November 12, 2021 at 1-6 (Doc. 1480-

2)("Frasier CV").  In 1974, she graduated with Honors from Sam Houston State University with a

Bachelor of Science in Criminology and Corrections.  See Frasier CV at 2.  In 1984, Frasier

graduated with High Honors from the Florida State University College of Law Tallahassee,

- 13 -

Florida, with a Juris Doctor.  See Frasier CV at 2.  Frasier served as the Sheriff of Travis County, Texas, for seven years, taught as an assistant professor in the College of Criminal Justice at Sam Houston State University in Huntsville, Texas, and acted as a Police Monitor for the City of Austin. See Frasier CV at 1.  Frasier serves on the board of the National Association of Civilian Oversight of Law Enforcement, and also has served on the board of the National Sheriff's Association, National Center for Women and Policing, Texas Institute for Public Problem Solving, the Children's Advocacy Center of Central Texas.  See Frasier CV at 1.  Frasier has served as treasurer, vice-president, and president of the Major County Sheriffs' Association, and she received a Lifetime Achievement Award from the National Center on Women in Policing.  See Frasier CV ¶ 3, at 1.  Senior Judge Parker appointed Dr. M. Anandkumar to replace Dr. Greifinger as the Medical Expert by a Stipulated Order Appointing M. Anandkumar, M.D., M.BA., C.H.C.Q.M., C.C.H.P as the Court's Medical Expert at 1, filed August 13, 2021 (Doc. 1450)("Appointment of Dr. Anandkumar").  The Settlement Agreement requires that, "at the end of the period established for self-monitoring, the Court's experts will conduct Check-Out Audits as to each domain and make a finding of compliance, partial compliance, or non-compliance with the substantive requirements of the Check-Out Audit Agreements."  Settlement Agreement ¶ 6, at 7.  The court-appointed experts must "submit proposed findings of fact with respect to each subcategory of the applicable Check-Out Audit Agreements."  Settlement Agreement ¶ 6(D), at 8.

### 6.     **The Union's Motion to Intervene**.

AFSCME Local 2499, the exclusive bargaining representative for a certified bargaining unit of employees who work for MDC, moved to intervene on February 3, 2017.  See Motion to Intervene and For Leave to File brief Opposing Plaintiffs' and Plaintiff-Interveners' Joint Motion for Order to Show Cause and for Further Remedial Relief Pursuant to Court Order, Doc. Nos. 256

and 1222-3, and Memorandum in Support at 1-4, filed February 03, 2017 (Doc. 1266)("AFSCME MTI").  Senior Judge Parker, granted the AFSCME MTI on March 2, 2017. See Order Granting AFSCME Council 18, Local 2499's Motion to Intervene for Limited purpose, filed March 15, 2017 (Doc. 1272).

      **7.**      **The Defendants' Motion for Sustained Compliance as to Domain 6.**

On April 7, 2021, Bernalillo County moved for a finding of sustained compliance as to Domain 6, requesting that they be disengaged from Domain 6, and arguing that they reached initial compliance, developed and complied with a self-monitoring plan, and adhered to any additional requests from the Court-appointed expert.  See Defendant Bernalillo County Board of Commissioners' Motion for Finding of Sustained Compliance as to Domain #6 at 4, filed April 7, 2021 (Doc. 1406)("Domain #6 Motion").  The Court denied the Domain #6 Motion in the Order Denying the Defendant Bernalillo County Board of Commissioners' Motion for Finding of Sustained Compliance as to Domain #6, filed March 29, 2022 (Doc. 1557)("March 29, 2022 Order").  The Court concluded that Bernalillo County did not reach sustained compliance as to Check Out Audit #3 ¶ 6(H)3's requirement that segregated prisoners have on hour per day of outside cell time.  See March 29, 2022, Order at 4.

      **8.**      **The Defendants' Motion for Sustained Compliance as to Domain #5.**

On April 12, 2021, Bernalillo County moved the Court for a finding of sustained compliance as to Domain #5, and arguing that that it has achieved a finding of initial compliance, developed and complied with a self-monitoring plan, and adhered to any additional requests from the Court-appointed expert.  See Defendant Bernalillo County Board of Commissioners' Motion for Finding of Sustained Compliance as to Domain #5, filed April 12, 2021 (Doc. 1407)("Domain #5 Motion").  On March 29, 2022, the Court granted the Domain #5 Motion, because the Plaintiffs

do not object to finding sustained compliance as to Domain #5.  See March 29, 2022, Order at 16-19.

**PROCEDURAL HISTORY**

On February 5, 2018, Senior Judge Parker appointed Margo Frasier as the expert for jail operations.  See Appointment of Margo Frasier at 1-2.  Frasier completed an initial evaluation of the Defendants' compliance with the Domain #3 requirements.  See Report No. 11 of the Court Appointed Jail Operations Expert Regarding Conditions of Confinement at the Bernalillo County Metropolitan Detention Center, filed February 19, 2020 (Doc. 1396-1)("Report No. 11").  On February 14, 2020, the Defendants filed an Unopposed Motion for Finding of Initial Compliance and to Set Self-Monitoring Period Regarding Domain #3 at 1-6, filed February 14, 2020 (Doc. 1396)("Domain #3 Motion for Initial Compliance").  On February 19, 2020, Senior Judge Parker granted the Domain #3 Motion for Initial Compliance.  See Stipulated Order Granting Defendant Bernalillo County Board of Commissioners' Unopposed Motion for Finding of Initial Compliance and to Set Self-Monitoring Period Regarding Domain #3, filed February 19, 2020 (Doc. 1397)("Domain #3 Initial Compliance Order").

On November 12, 2021, Bernalillo County filed their Motion.  Frasier conducted the Check-Out Audit for Domain #3 and recorded her findings in the Check Out Audit Report for Domain #3 by Court Appointed Jail Operations Expert Margo Frasier, filed November 12, 2021 (Doc. 1480-1)("Domain #3 Report").  On December 10, 2021, the Plaintiffs filed the Plaintiff and Plaintiff Intervenors' Joint Response Opposing Defendant Bernalillo County Board of Commissioners' Motion for Finding of Sustained Compliance and for Disengagement of Domain #3 at 1-9, filed December 10, 2021 (Doc. 1497)("Response").  Finally, on January 21, 2022, the Defendants filed the Defendant Bernalillo County Board of Commissioners' Reply in Support of

Motion for Finding of Sustained Compliance and for Disengagement of Domain #3 at 1-11, filed January 21, 2022 (Doc. 1529)("Reply").  On February 11, 2022, the Court held a hearing to discuss the Defendants' motions to disengage from Domains #3, #5, and #6.  See Draft Transcript of Hearing at 34:18-53:2 (taken February 11, 2022)(Court)("Tr.").[5]

       1.    **<u>Finding of Initial Compliance</u>**.

On October 18, 2019, Frasier completed an evaluation of the Defendants' initial compliance with the Domain #3 requirements.  See Report No. 11 at 1-4.  The only two requirements with which Bernalillo County did not achieve compliance were the two provisions about competency evaluations, because Frasier determined that "Court guidance to the counsel for the parties and Monitor Frasier is necessary to delineate the measures of compliance."  Report No. 11 at 3.  In early February, 2020, Frasier approved the Defendants' plan for self-monitoring for Domain #3.  See Report No. 11 at 4; Domain #3: Group A of Jail Operations -- Self-Monitoring, filed November 22, 2021 (Doc. 1489-2)("Domain #3 Self-Monitoring").  On February 14, 2020, the Defendants filed a motion for a finding of initial compliance and to set self-monitoring.  See Domain #3 Motion for Initial Compliance at 1-6.  On February 19, 2020, Senior Judge Parker found that Bernalillo County was in initial compliance, and set an eighteen-month period of self-monitoring.  See Domain #3 Initial Compliance Order ¶ 1, at 1-2.  The Domain #3 Order for Initial Compliance states that Bernalillo County was in substantial compliance as of July 1, 2019, and places Domain #3 in self-monitoring until August 19, 2021.  See Domain #3 Order for Initial Compliance at 2.  At the beginning of the self-monitoring period, Senior Judge Parker directed

---

[5]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Frasier to complete Check Out Audit #3 to determine if Bernalillo County has reached sustained compliance with Domain #3's requirements.  See Settlement Agreement ¶ 6, at 7.

>    2.    **Frasier's Domain #3 Report**.

Frasier recommends a finding sustained compliance for each requirement listed under Check Out Audit #3.  See Domain #3 Report at 12.  Frasier writes:  "Substantial compliance does not require perfection. The purpose of self-monitoring is for the Defendants to assess compliance independent of the Monitor and counsel for Plaintiffs/Plaintiff-Intervenors and make any necessary corrections."   Domain #3 Report at 2.   In conformity with the Settlement Agreement, Frasier outlines the reported findings in the Check Out Audit Report for Domain #3.   See Domain #3 Report at 1-12. The first set of requirements pertains to fire and life safety.  See Domain #3 Report ¶ 4, at 2.  In the Domain #3 Report, Frasier considers: (i) "[w]hether MDC has a comprehensive fire safety program, which is approved by the fire prevention authority having jurisdiction," Domain #3 Report ¶ L(1), at 2; (ii) "[w]hether MCD has developed and implements an adequate evacuation plan for inmates and staff and ensures that comprehensive fire drills are conducted every three months on each shift," Domain #3 Report ¶ L(2), at 2; (iii) "[w]hether MDC has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas according to applicable fire codes," Domain #3 Report ¶ L(3), at 3; (iv) "[w]hether MDC properly maintains and routinely inspects all fire and life safety equipment," Domain #3 Report ¶ L(4), at 3; (v) "[w]hether MDC staff are able to manually unlock all doors (without use of the manual override in the event of emergency in which the manual override is broken), including in the event of a power outage or smoke buildup where visual examination of keys is generally impossible," Domain #3 Report ¶ L(5), at 3; and (vi)

> "[w]hether MDC ensures that combustibles are adequately controlled and eliminates highly flammable materials throughout the facility and inmate living areas (e.g., inmates' use of paper bags as trash receptacles, ripped fire-retardant mattress covers, improvised cell light covers, blankets on cell floors, and improperly stored and labeled flammable liquids and other chemicals)[,]"

Domain #3 Report ¶ L(6), at 3.  The Domain #3 Report indicates that there were violations in the January, 2021, fire inspection, and Frasier explains that they were minor issues that have since been corrected.  See Domain #3 Report ¶ L(4), at 3.  Frasier recommends a finding of sustained compliance for each requirement listed above.  See Domain #3 Report ¶¶ L(1)-(6), at 2-3.

The next set of requirements Frasier considers in Domain #3 pertain to sanitation and environmental conditions.  Domain #3 Report ¶ M(1), at 3: (i) "[w]hether MDC maintains an adequate written staffing plan and sufficient staffing levels to provide for adequate maintenance of the facility," Domain #3 Report ¶ M(1), at 3; (ii) "[w]hether MDC maintains and adequately implements written housekeeping and sanitation plans to ensure the proper routine cleaning of housing, shower, and medical areas, in accordance with generally accepted correctional standards," Domain #3 Report ¶ M2, at 4; (iii) "[w]hether MDC provides adequate ventilation throughout the facility to ensure that inmates receive an adequate supply of air flow and reasonable levels of heating and cooling," Domain #3 Report ¶ M3, at 4; (iv) "[w]hether MDC ensures adequate lighting in all inmate housing and work areas," Domain #3 Report ¶ M4, at 4; (v) "[w]hether MDC ensures adequate pest control throughout the housing units, medical units, RDT, and food storage areas," Domain #3 Report ¶ M5, at 4; (vi) "[w]hether MDC has developed and adequately implements policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials, in accordance with generally accepted correctional standards," Domain #3 Report ¶ M6, at 5; (vii) "[w]hether MDC has developed and adequately implements a policy on hazardous materials storage, in accordance with generally accepted correctional standards, and

ensures that all MDC staff is properly trained on the procedure," Domain #3 Report ¶ M7, at 5; (viii) "[w]hether MDC ensures the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills," Domain #3 Report ¶ M8, at 5; (ix) "[w]hether MDC has a sufficient amount of stack-a-bunks so that no inmate will have to sleep on the floor," Domain #3 Report ¶ M9, at 5; (x) "[w]hether MDC has a sufficient supply of towels, blankets, and pillows in stock and in reasonable condition, to provide every inmate with linen, a towel, and a blanket," Domain #3 Report ¶ M10, at 5; (x) "[w]hether MDC ensures that all inmates have access to needed hygiene supplies," Domain #3 Report ¶ M11, at 6; (xi) "[w]hether MDC has an adequate system for storing inmates' personal necessities such as hygiene products," Domain #3 Report ¶ M12, at 6; (xii) "[w]hether MDC ensures adequate control and observation of all housing units, including distribution and collection of razors and cleaning supplies," Domain #3 Report ¶ M13, at 6; (xiii) "[w]hether MDC at all times stores in the female housing units sufficient supplies of tampons and/or sanitary pads for female inmates and whether MDC issues the same on request by any inmate," Domain #3 Report ¶ M14, at 6; (xiv) "[w]hether MDC implements adequate procedures and processes for the cleaning and sanitizing of inmate mattresses that are in use in all living areas," Domain #3 Report ¶ M15, at 6; and (xv) "[w]hether MDC has developed and adequately implements an inmate indigent policy," Domain #3 Report ¶ M16, at 7.

The report indicates that there is a shortage of security staff, but that MDC has enough to provide for adequate maintenance of the facility and to meet substantial compliance with Domain #3. See Domain #3 Report ¶ M1, at 3-4. Frasier also notes that security staff is covered in another Domain and should not be analyzed under this Domain. See Domain #3 Report ¶ M1, at 4. Frasier recommends a finding of sustained compliance for each of the staffing requirements under Domain #3. See Domain #3 Report ¶¶ M1-M16, at 3-7.

The third set of requirements for Domain #3 pertain to laundry services.  Domain #3 Report ¶ N1, at 7.  Frasier considers: (i) "[w]hether MDC has developed and adequately implements policies and procedures for laundry procedures to protect inmates from risk of exposure to communicable disease, in accordance with generally accepted correctional standards," Domain #3 Report ¶ N1, at 7; (ii) "[w]hether MDC ensures that inmates are provided adequate clean clothing, underclothing, and bedding, consistent with generally accepted correctional standards, and that the laundry exchange schedule provides consistent distribution and pickup service to all housing areas," Domain #3 Report ¶ N2, at 7; (iii) "[w]hether MDC trains staff and educates inmates regarding laundry sanitation policies," Domain #3 Report ¶ N3, at 7; (iv) "[w]hether MDC ensures that laundry delivery procedures protect inmates from exposure to communicable diseases by preventing clean laundry from coming into contact with dirty laundry or contaminated surfaces," Domain #3 Report ¶ N4, at 8; and (v) "[w]hether MDC requires inmates to provide all clothing and linens for laundering and prohibit inmates from washing and drying laundry outside the formal procedures," Domain #3 Report ¶ N5, at 8.  Frasier identifies no areas of improvement and recommends a finding of sustained compliance as to all the laundry services requirements in Domain #3.  See Domain #3 Report ¶¶ N1-N5, at 7-8.

The next set of requirements in Domain #3 focus on food safety.  See Domain #3 Report ¶ O1, at 8.  Frasier must consider the following: (i) "[w]hether MDC ensures that food service at the facility is operated in a safe and hygienic manner and that foods are served and maintained at safe temperatures," Domain #3 Report ¶ O1, at 8; (ii) "[w]hether MDC ensures that all types of meals (including meals served to inmates requiring medical diets, inmates with food allergies, and inmates with religious diets) provide adequate nutrition," Domain #3 Report ¶ O2, at 8; (iii) "[w]hether MDC ensures that all food service staff, including inmate staff, are adequately

trained in food service operations, safe food-handling procedures, and appropriate sanitation," Domain #3 Report ¶ O3, at 8; (iv) "[w]hether MDC ensures that the kitchen is staffed with a sufficient number of appropriately supervised and trained personnel," Domain #3 Report ¶ O4, at 8; and (v) "[w]hether MDC checks and records, on a regular basis, the temperatures in the refrigerators, coolers, walk-in-refrigerators, the dishwasher water, and all other kitchen equipment with temperature monitors to ensure proper maintenance of food service equipment," Domain #3 Report ¶ O5, at 9.

The report indicates that Frasier requested ten food temperature audits throughout the month of August. See Domain #3 Report ¶ O1, at 8. The Plaintiffs have reported incidents of cold food, but the food temperature audits demonstrated that MDC successfully met standards of food temperature. See Domain #3 Report ¶ O1, at 8. In addition, the report addresses some grievances about the Defendants' failure to provide specialty diet meals. See Domain #3 Report ¶ O1, at 8. Frasier recommends that despite this, the Defendants' have generally met all requirements for providing adequate meals to inmates. See Domain #3 Report ¶ O1, at 8. Frasier recommends that the Defendants create a process for keeping track of the delivery of specialty diet meals. See Domain #3 Report ¶ O2, at 8. Frasier recommends a finding of sustained compliance for all food services requirements listed under Domain #3. See Domain #3 Report ¶¶ O1-O6, at 8-9.

Next, Domain #3 addresses mail services. See Domain #3 Report ¶ R1, at 9. Frasier must consider the following: (i) "[w]hether MDC's U.S. mail service policies and practices meet the applicable standards stated in the American Correctional Association's Standards for Adult Detention Centers," Domain #3 Report ¶ R1, at 9; (ii) "[w]hether MDC provides adequate resources to allow indigent inmates to correspond with their family, friends, and his/her attorney," Domain #3 Report ¶ R2, at 9; (iii) "[w]hether MDC properly delivers U.S. mail to inmates,"

Domain #3 Report ¶ R3, at 9; and (iv) "[w]hether MDC ensures that staff do not read attorney-client correspondence and do not open incoming attorney- correspondence outside of the presence of the addressee." Domain #3 Report ¶ R4, at 9.   Frasier indicates that, aside from sporadic complaints, Bernalillo County has reached sustained compliance with Domain #3's mail service requirements.   See Domain #3 Report ¶ R3, at 9.  Frasier notes that the Plaintiffs complain about some instances where attorney-client correspondence was opened prior to delivery to inmates.  See Domain #3 Report ¶ R3, at 9.  Frasier recommends that these are isolated incidents, and Bernalillo County is meeting their general requirements.   See Domain #3 Report ¶ R3, at 9.   Frasier recommends a finding of sustained compliance as to the mail services requirements listed in Domain #3.  See Domain #3 Report ¶¶ R1-R4, at 9-10.

Next, Domain #3 addresses telephone use.   See Domain #3 Report ¶ S1, at 10. Frasier considers the following: (i) "[w]hether MDC provides its inmates access to telephones which meets the applicable standards stated in the American Correctional Association's Standards for Adult Detention Centers," Domain #3 Report ¶ S1, at 10; (ii) "[w]hether MDC has adequate policies and procedures governing inmate access to telephones and whether it adequately implements those policies," Domain #3 Report ¶ S2, at 10; and (iii) "[w]hether MDC has inmate telephones in the booking area and all housing units and whether it provides inmates with adequate access to those telephones," Domain #3 Report ¶ S3, at 10.   Frasier acknowledges that physical access to telephones was reduced because of social distancing, and lock-downs because of staffing shortages reduced inmate access to telephones.   See Domain #3 Report ¶ S1, at 10.  Frasier reports that the use of tablets helped the inmates have access to telephone calls while they were in their cells.  See Domain #3 Report ¶ S1, at 10.  Overall, Frasier recommends a finding of sustained

compliance with the telephone services requirements listed in Domain #3.  See Domain #3 Report ¶¶ S1-S3, at 10-11.

Next, Frasier addresses Domain #3's access to commissary requirements.  See Domain #3 Report ¶ U1, at 11.  Frasier must consider the following: (i) "[w]hether MDC provides its inmates access to commissary which meets the applicable standards stated in the American Correctional Association's Standards for Adult Detention Centers," Domain #3 Report ¶ U1, at 11; (ii) "[w]hether MDC has adequate policies and procedures that addressed the commissary service and whether it adequately implements that policy and procedure," Domain #3 Report ¶ U2, at 11; and (iii) "[w]hether MDC inmates are provided the opportunity to purchase from the commissary store approved items not furnished by the jail," Domain #3 Report ¶ U3, at 11.  The Domain #3 Report indicates that the Plaintiffs raised concerns in September, 2021, about unfair prices at the commissary and how money was spent at the commissary.  See Domain #3 Report ¶ U1, at 11. Frasier monitored this issue, although the terms for self-monitoring did not require it.  See Domain #3 Report ¶ U1, at 11.  Frasier suggests that despite the complaint, the commissary meets the requirements set forth in Domain #3 and the self-monitoring plan.  See Domain #3 Report ¶ U1, at 11.  Frasier states that inmates had reduced access to kiosks at the commissary store because of pandemic-related safety precautions; nevertheless, Frasier determines that this reduction did not impair the inmates' ability to purchase items.  See Domain #3 Report ¶ U3, at 11.  Frasier recommends a finding of sustained compliance for each of the commissary requirements set forth in Domain #3.  See Domain #3 Report ¶¶ U1-U3, at 11.  Finally, Domain #3 asks "[w]hether MDC has a full-time benefits manager to assist in securing public benefits for inmates."  Domain #3 Report ¶¶ V1, at 11.  Frasier indicates in the report that there is a full-time benefits manager that meets the requirement under Domain #3 and recommends a finding of sustained compliance.  See

Domain #3 Report ¶¶ V1, at 11.  After examining each requirement listed under Domain #3, Frasier concludes the report by stating that Bernalillo County successfully maintained sustained compliance with Domain #3 throughout the self-monitoring period that Senior Judge Parker set. See Domain #3 Report ¶ L1, at 2.  Frasier does not discuss the last two requirements in Domain #3 about competency evaluations, as an agreement was reached by the parties on those provisions. See Domain #3 Report ¶ 5, at 11.

    **3.**    <u>**The Motion**</u>.

In the Motion, Bernalillo County requests that the Court make a finding of sustained substantial compliance with Domain #3.  <u>See</u> Motion at 1-10.  On February 20, 2020, Senior Judge Parker made an initial finding of compliance, and that Domain #3 had been in substantial compliance as of July 1, 2019; Senior Judge Parker ordered Bernalillo County to move into the self-monitoring phase until August 19, 2021.  <u>See</u> Domain #3 Initial Compliance Order ¶ 2, at 2. Check Out Audit #3 provides the standards for Domains 3-8, all of which fall under the category of Jail Operations.  <u>See</u> Settlement Agreement ¶ 9, at 9.  Bernalillo County seeks to disengage from Domain #3, asking that the Court find sustained compliance with the requirements set forth in Check Out Audit #3.  Motion at 9.

In the Motion, Bernalillo County first discusses the Settlement Agreement's general terms. See Motion at 2.  The Defendants note that the Settlement Agreement describes:

> "Defendants' consideration for entering into this Settlement Agreement is knowing exactly what must be done to achieve substantial compliance, understanding what element of their obligations will be audited and how those audits will be conducted, and having their obligations described specifically and clearly enough to have their compliance accurately and objectively measured."

Motion (quoting Settlement Agreement ¶ 1B, at 2).  Bernalillo County then summarizes the process to reach disengagement from each Domain.  <u>See</u> Motion at 4-5.  Next, Bernalillo County

argues that it is entitled to disengagement of Domain #3, because Frasier determines that it has reached sustained compliance with each requirement listed under Check Out Audit #3.  <u>See</u> Motion at 6.  Bernalillo County contends that the Court should give special weight to Frasier's opinions, because of her expertise in jail operations.  <u>See</u> Motion ¶ 3, at 6.  Bernalillo County also addresses the Plaintiffs' attempt to "elevate the recommendations" of Dr. Robert Greifinger.  <u>See</u> Motion at 6; Plaintiff and Plaintiff Interveners' Joint Motion for Enforcement of Check-Out Audit Agreement No. 1 and for Further Remedial Relief, filed September 27, 2021 (Doc. 1468). Bernalillo County asserts that the Plaintiffs tried to get it to adopt the recommendations of Dr. Greifinger, even though Dr. Greifinger is no longer the Court-appointed medical expert, and the current expert, Dr. Adandkumar, has neither adopted nor approved Dr. Greifinger's recommendations.  <u>See</u> Motion at 7.  Bernalillo County argues that if the Plaintiffs make this argument, Dr. Greifinger's recommendations should be found to be irrelevant and should not influence the Court's decision.  <u>See</u> Motion at 6.

Bernalillo County also anticipates that the Plaintiffs will make the same argument that they did in their arguments against the disengagement of Domains #5 and #6.  <u>See</u> Plaintiff and Plaintiff Intervenors' Joint Response to Defendant Bernalillo County Board of Commissioners' Motion for Finding of Sustained Compliance as to Domain #5 at 1-5, filed April 26, 2021 (Doc. 1410)("Domain #5 Response"); Plaintiff and Plaintiff Intervenors' Joint Response Opposing Defendant Bernalillo County Board of Commissioners' Motion for Finding of Sustained Compliance as to Domain #6 at 1-12, filed January 3, 2020 (Doc. 1411)("Domain #6 Response"). Bernalillo County states that the Plaintiffs argued in these joint responses that Bernalillo County tried to disengage both Domains without a notice and comment period.  <u>See</u> Domain #5 Response at 2; Domain #6 Response at 10.  Bernalillo County asserts that the Settlement Agreement does

not require it to provide notice before moving to disengage from a Domain, and thus, their lack of notice should not be taken into consideration. See Motion at 7. Bernalillo County next addresses the Plaintiffs' request for more information and guidelines on Bernalillo County's self-monitoring period and anticipates that the Plaintiffs will argue that more information must be provided before disengagement. See Motion at 8. Bernalillo County asserts that when it and Frasier wrote the self-monitoring guidelines, Bernalillo County tried to obtain input from the Plaintiffs but did not receive any. See Motion at 8; Domain #3 Self-Monitoring at 1. Bernalillo County argues that the Plaintiffs interfered only once the self-monitoring plan had been approved, asking if there could be stricter standards on what amounted to substantial compliance. See Motion at 8. Bernalillo County argues that this interference is not in accordance with the Settlement Agreement and asks that the Court not to take into consideration the anticipated argument that Bernalillo County did not provide sufficient information. See Motion at 8. Bernalillo County concludes by asking the Court to look towards the findings of substantial compliance in Frasier's report and disengage Bernalillo County from Domain #3. See Motion at 9.

### 4.    **The Response.**

On December 10, 2021, the Plaintiffs and the Plaintiff Intervenors filed a joint response. See Response at 1-9. In the Response, the Plaintiffs argue that Bernalillo County has not reached a satisfactory level of sustained compliance to merit disengagement from Domain #3. See Response at 1. The Plaintiffs first discuss the Settlement Agreement's requirement that Bernalillo County submit quarterly reports to the Court throughout their self-monitoring period. See Response at 1-2 (citing Settlement Agreement ¶ 5, at 6). The first report for the year was submitted on time, but the Plaintiffs allege that the second quarterly report for April through June, 2021, was never submitted. See Response at 2. Instead of submitting the second quarterly report, the

Plaintiffs allege that Bernalillo County submitted only a document requesting that Frasier complete their check out audit.  See Response at 2 (citing Letter from Taylor Rahn to Margo Frasier (dated August 24, 2021), filed December 10, 2021 (Doc. 1497-2)("Check Out Request Letter")).  The Plaintiffs assert that "[th]is correspondence gives no indication that it is intended as a report regarding Q2 2021," and argue that, although Frasier "indicates that Q2 2021 documentation was provided on August 24, 2021 with the request for a Check-Out Audit," "Defendant failed to provide any Q2 2021 documentation for a number of provisions."  Response at 2.  The Plaintiffs note that they objected in writing to the request for a check out audit, "because no Q2 2021 report had been issued nor findings made by the expert."  Response at 2 (citing Response to Defendant's Request for a Check Out Audit at 1-7, filed December 10, 2021 (Doc. 1497-3)).

Next, the Plaintiffs discuss various provisions in Check Out Audit #3 with which, they assert, Bernalillo County does not comply.  See Response at 2-6.  First, the Plaintiffs address the requirement to have adequate fire and life safety infrastructure and procedures in place.  See Response at 2-3 (citing Check Out Audit #3 ¶ 6(L), at 27-28).  Specifically, the Plaintiffs contend that Bernalillo County does not comply with Check-Out Audit #3 ¶6(L)(3)-(4), at 28.  See Response at 2-3 (citing Check Out Audit #3 ¶ 6(L)(3)-(4), at 28).  These provisions analyze "'[w]hether MDC has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas according to applicable fire codes,'" Response at 2 (quoting Check Out Audit #3 ¶ 6(L)(3), at 28), and "'[w]hether MDC properly maintains and routinely inspects all fire and life safety equipment.'"  Response at 2 (quoting Check Out Audit #3 ¶ 6(L)(4), at 28).  The Plaintiffs allege that "the Fire Alarm Inspection List and the Fire Sprinkler Test had shown failures of various smoke alarms, horns, strobes and modules, as well as various deficiencies in certain housing and other areas regarding the fire

sprinkler system in previous reports." Response at 3. The Plaintiffs also note that information about test failures is provided in some quarterly reports, but not provided for 2021's second quarter. See Response at 3.

Next, the Plaintiffs address Check Out Audit #3 ¶ 6(M)(1), at 28-29, which considers "'[w]hether MDC maintains an adequate written staffing plan and sufficient staffing levels to provide for adequate maintenance of the facility.'" Response at 3 (quoting Check Out Audit #3 ¶ 6(M)(1), at 28-29). The Plaintiffs allege that there is "[n]either a staffing plan nor documentation showing sufficient staffing levels were provided for Q2 2021." Response at 3. The Plaintiffs contend that the "Defendant provided only three daily staffing rosters for this time period and a letter dated June 30, 2021 indicating that Defendant had received two bids for a complete staffing analysis and was in the selection and funding process." Response at 3. The Plaintiffs note that an updated staffing analysis is set to begin in January 2022. See Response at 3. The Plaintiffs state that Frasier, in Report No. 14 of the Court Appointed Jail Operations Expert Regarding Conditions of Confinement at the Bernalillo County Metropolitan Detention Center at 2-83, filed November 22, 2021 (Doc. 1495)("Report No. 14"), "found all five provisions related to staffing to be in only partial compliance as of July 2, 2021," and note that Frasier recommends that Bernalillo County update its staffing plan. Response at 3. The Plaintiffs contrast Report No. 14 with the Domain #3 Report, "which covers roughly the same review period as Report No. 14 and relied upon the same documentation," but "indicates that the staffing plan requirement is in compliance." Response at 3-4 (citing Domain #3 Report at 3-4). The Plaintiffs assert that the Domain #3 Report "distinguishes other staffing requirements, stating: 'While MDC has a shortage of security staff, it has sufficient maintenance staff to provide for adequate maintenance of the facility.'" Response at 4 (quoting Domain #3 Report at 4). The Plaintiffs argue that they have received information

- 29 -

that contradicts this, "indicat[ing] that the lack of security staff is preventing proper maintenance of the facility."  Response at 4 (citing Declaration of Louie J. Cadena, (dated December 8, 2021), filed December 8, 2021 (Doc. 1496)("Cadena Decl.").  The Plaintiffs note that the Cadena Decl. states that "the frequent lockdowns at MDC include the bay orderlies, who are the very persons who clean the pods," and that, "[d]ue to the shortage of corrections officers to supervise each pod, Mr. Cadena is routinely locked down in his cell."  Response at 4 (citing Cadena Decl. at 2-4).  The Plaintiffs assert that, according to the Cadena Decl., because of the shortage of corrections officers, trash is left for days in the pods, causing a bad smell.  See Domain ## Response at 4.  The Plaintiffs argue that "the lack of meaningful documentation for the review period . . . makes it impossible to determine for how long facility maintenance has been impacted by security staffing shortages," and urge the Court not to find sustained compliance for this provision.  Response at 4.

The Plaintiffs also allege that Bernalillo County failed to meet food service requirements in Check Out Audit #3 ¶¶ 6(O)(3) and (4).  See Response at 4 (citing Check Out Audit #3 ¶ 6(O), at 31).  The Plaintiffs state that these provisions evaluate "[w]hether MDC ensures that all food service staff, including inmate staff, are adequately trained in food service operations, safe food-handling procedures, and appropriate sanitation" and "[w]hether MDC ensures that the kitchen is staffed with a sufficient number of appropriately supervised and trained personnel."  Response at 4 (quoting Check Out Audit #3 ¶ 6(O), at 31).  The Plaintiffs assert that, although Bernalillo County provided documentation about the staff training for 2021's first quarter, "[n]o documentation was provided for the Q2 2021 compliance period and so [the Defendants] fail to demonstrate sustained compliance with this provision."  Response at 4.

The Plaintiffs next address Check Out Audit #3 ¶¶ 6(S)(1) and S(2).  See Response at 4. Check Out Audit #3 ¶¶ 6(S)(1) and S(2) evaluate "'[w]hether MDC provides its inmates access to

telephones which meets the applicable standards stated in the American Correctional Association's Standards for Adult Detention Centers'" and "'[w]hether MDC has adequate policies and procedures governing inmate access to telephones and whether it adequately implements those policies,' respectively."  Response at 4-5 (quoting Check Out Audit #3 ¶ 6(S), at 34).  The Plaintiffs note that Frasier acknowledges in the Domain #3 Report that "'physical access to telephones in the housing units was necessarily reduced due to the safety precautions related to the pandemic' and that 'lock-downs due to staffing shortages reduced the number of hours inmates have access to telephones.'"  Response at 5 (quoting Domain #3 Report at 10).  The Plaintiffs note that Frasier recommends finding substantial compliance anyway, because Bernalillo County provided tablets to inmates to offset their lack of out-of-cell time and limited access to telephones.  See Response at 5.  The Plaintiffs argue that Bernalillo County provided no documentation showing how many "functional tablets" were available or how accessible the tablets were to inmates.  Response at 5. The Plaintiffs contend that Bernalillo County has "acknowledged in multiple public meetings that the video visit system on the tables has been problematic from the beginning, with approximately 50% of video calls being missed or failing."  Response at 5.

The Plaintiffs turn next to Check Out Audit #3 ¶ 6(S)(3), which evaluates "'[w]hether MDC has inmate telephones in the booking area and all housing units and whether it provides inmates with adequate access to those telephones.'"  Response at 5 (quoting Check Out Audit #3 ¶ 6(S), at 3).  The Plaintiffs allege that "the serious reduction in out of cell time, particularly in intake and quarantine units, allows for very little telephone access," and that, Bernalillo County has "refused to document out of cell time except in segregation, but even on general population units inmates consistently report that they are locked down every weekend, all weekend, and often on weekdays as well due to staffing shortages."  Response at 5-6.  The Plaintiffs explain that,

"[d]ue to the number of provisions for which no documentation for the Q2 2021 review period was provided and the other provisions for which documentation of compliance was otherwise lacking," Bernalillo County has not met Check Out Audit #3's provisions; consequently, the Plaintiffs oppose a finding of sustained compliance as to Domain #3.  See Response at 6.

The Plaintiffs next request that, if the Court finds sustained compliance for Domain #3, Bernalillo County provide notice both to the class and subclass members, so that they can "provide objections to the Court" before the disengagement.  Response at 6.  The Plaintiffs adopt by reference their arguments about notice in the Domain #5 Response.  See Response at 6.  The Plaintiffs cite Irvin v. Harris, 944 F.3d 63 (2d Cir. 2019), in support of their argument, and summarize its holding as "terminating a consent decree concerning jail conditions without input from class members via current class representative violates individual class members' Due process rights and Rule 23."  Response at 7 (citing Irvin v. Harris, 944 F.3 at 72).  The Plaintiffs contend that "moving forward without notice or an opportunity to be heard for the class members would violate Fed. R. Civ. P. 23 and the Due Process clause of the federal constitution."  Domain #3 at 7.

   **5.    The Reply.**

Bernalillo County filed their Reply on January 21, 2021.  See Reply at 1-11.  Bernalillo County disagrees with the Plaintiffs' assertion that Bernalillo County did not provide the required documentation.  See Reply at 2.  Bernalillo County argues that it is not clear that they had to submit a second quarterly report, and that the Settlement Agreement does not require a certain number of reports.  See Reply at 2-3.  Bernalillo County asserts that they "provided a quarterly report in June 2021 which addressed data from Quarter 1 of 2021" and that "[t]he next quarterly report would have been due in September 2021, however the monitoring period ended before the next report

was due." Reply at 2. Bernalillo County argues that the Settlement Agreement only requires Bernalillo County to provide sufficient information for the expert to be able to come to a conclusion. See Reply at 3. Bernalillo County asserts that they "did produce data for Q2 2021," and state that they provided information Frasier requested in her July 21, 2021 letter on August 24, 2021. Reply at 3 (citing Check Out Request Letter). Bernalillo County adds that the Check Out Request Letter "provides the documents dictated by Ms. Frasier's self-monitoring protocol for Q2 of 2021," and asserts that the Check Out Request Letter should "qualify as a quarterly report." Reply at 3. Bernalillo County asserts that Frasier "found this report sufficient," because "she noted '[w]ith the request for the Check-Out Audit, documentation regarding Q2 2021 was submitted to Monitor Frasier and the parties by MDC on August 24, 2021.'" Reply at 3 (quoting Domain #3 Report at 2). Bernalillo County asserts that the Settlement Agreement "specifically gives the Court expert the prerogative to request additional information if it is required for his/her determination," and provides that "'[t]he quarterly reports will contain sufficient data for the expert for that domain to determine whether County Defendants remain in compliance with each of the subcategories listed under the domain.'" Reply at 3 (citing Settlement Agreement ¶ 5(B)(3), at 5, and quoting Settlement Agreement ¶ 5(C), at 6). Bernalillo County characterizes Frasier's "finding that the August 24, 2021 data was a sufficient report for Q2" as "definitive." Reply at 3.

Next, Bernalillo County rebuts the Plaintiffs' allegations that Bernalillo County does not meet sustained compliance with Domain #3. See Reply at 4-10. First, Bernalillo County asserts that they have maintained substantial compliance with Check Out Audit #3 ¶¶ 6(L)(3) and (4), which address fire safety. See Reply at 4 (citing Check Out Audit #3 ¶ 6(L), at 27). The Plaintiffs explain that the Fire Inspection Report Violations January 31, 2021, filed January 21, 2022 (Doc. 1529-2)("Fire Inspection Report"), documents 18 areas of fire safety compliance, of which 14

areas are in compliance; the Fire Inspection Report lists four violations in "individual locations, not across the entire facility."  Reply at 4.  Bernalillo County add that the inspectors "noted the facility was aware of the issues and were in the process of fixing them," and BCMDC's Safety and Health Compliance Officer "submitted a memorandum regarding corrective action take to address the findings in the January report."  Reply at 4.  Bernalillo County asserts that Frasier finds sustained compliance with these Check Out Audit #3 ¶¶ 6(L)(3), because:

> "MDC has the necessary fire and life safety equipment to demonstrate that it has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas according to applicable fire codes.  MDC's audits demonstrate that there was alignment between policy/procedures and operational practices throughout the self-monitoring period. The issues found to be violations in the January 2021 annual fire inspection were minor and have been corrected."

Reply (quoting Domain #3 Report at 3).  Bernalillo County asserts that Frasier finds sustained compliance with these Check Out Audit #3 ¶¶ 6(L)(4), because:

> "MDC's documentation demonstrates proper maintenance and routine inspection of all fire and life safety equipment by MDC and a fire and life safety equipment contractor.  MDC's audits demonstrate that there was alignment between policy/procedures and operational practices throughout the self-monitoring period. The issues found to be violations in the January 2021 annual fire inspection were minor and have been corrected."

Reply (quoting Domain #3 Report at 3).

Next, Bernalillo County discusses the Plaintiffs' allegations that Bernalillo County did not substantially comply with Check Out Audit #3 ¶ 6(M)(1), which evaluates maintenance staffing. See Reply at 5.  Check Out Audit #3 ¶ 6(M)(1) evaluates whether "'MDC maintain[s] an adequate written staffing plan and sufficient staffing levels to provide for adequate maintenance of the facility . . . .'"  Reply at 5 (quoting Domain #3 Report at 4).  Bernalillo County argues that, even though Check Out Audit #3 ¶ 6(M)(1) is specifically about maintenance staffing, the Plaintiffs

continue to discuss security staffing issues, which Bernalillo County argues is irrelevant and "outside the scope of Paragraph M(1)." Reply at 5.  Bernalillo County references Frasier's analysis of the staffing issue:

> "MDC's documentation and performance demonstrates that MDC maintained an adequate written staffing plan and sufficient staffing levels to provide for adequate maintenance of the facility throughout the self-monitoring period.  While MDC has a shortage of security staff, it has sufficient maintenance staff to provide for adequate maintenance of the facility.  Adequacy of security staff is covered in another Domain."

Reply at 5-6 (quoting Domain #3 Report at 4).  Bernalillo County counters that the Plaintiffs' allegations that "a lack of staff is contributing to an inability to maintain the facility" by stating that this allegation is based on the Cadena Decl., and that the Plaintiffs "admit [that] Mr. Cadena's testimony is outside the self-monitoring period, which ended on August 31, 2021."  Reply at 6.  Bernalillo County also argues that Cadena's testimony is the declaration only of "a single inmate" and "does not demonstrate a lack of substantial compliance," citing the Settlement Agreement in support of their position: "'Incidents of non-compliance do not necessarily prevent a finding of substantial compliance.  The determination of substantial compliance will take into account the extent to which exceptions to compliance are sporadic or isolated in nature.'"  Reply at 6 (quoting Settlement Agreement ¶ 2 (C), at 2).  Bernalillo County asserts that the Cadena Decl. "does not specifically address facility maintenance (such as periodic repairs to fixtures), but rather housekeeping duties performed by bay orderlies" and note that the "Plaintiffs do not challenge a finding of sustained compliance with Paragraph (M)(2), which specifically refers to implementation of a housekeeping and sanitation plan, even though this provision is far more relevant to Mr. Cadena's claims."  Reply at 6-7.

Next, Bernalillo County addresses the Plaintiffs' allegation that Bernalillo County has not reached sustained compliance as to Check Out Audit #3 ¶¶ 6(O)(3)-(4), at 31-32, which evaluate food service.  See Reply at 7.  These provisions consider: "[w]hether MDC ensures that all food service staff, including inmate staff, are adequately trained in food service operations, safe foodhandling procedures, and appropriate sanitation" and "[w]hether MDC ensures that the kitchen is staffed with a sufficient number of appropriately supervised and trained personnel."  Check Out Audit #3 ¶ 6(O) at 31-32.  Bernalillo County states that the Plaintiffs "complain" not about food safety issues, but that Bernalillo County did not provide training schedules for inmate kitchen staff from April through June 2021.  Reply at 7.  Bernalillo County states that it provided the documentation to Frasier, who found it sufficient.  See Reply at 7-8.  Bernalillo County provided Frasier with the kitchen staff schedule, the staff certifications, as well as the staff training curriculum.  See Reply at 7.  Bernalillo County argues that they provided proper and sufficient documentation about their food safety procedures -- enough for Frasier to be able to recommend sustained substantial satisfaction for this provision.  Domain #3 Report ¶ 3, at 8.

Bernalillo County addresses the Plaintiffs' allegations that it does not comply with Check Out Audit ¶¶ 6(S)(1)-(3), regarding inmates' access to telephones.  See Reply at 8.  Bernalillo County contends that the Plaintiffs "largely ignore relevant evidence submitted to Ms. Frasier" about the "out of cell time for [the] general population."  Reply at 8.  Bernalillo County counters the Plaintiffs' argument by stating that it submitted its current American Correctional Association ("ACA") certification, demonstrating compliance with Check Out Audit ¶¶ 6(S)(1).  See Reply at 8-9.  In addition, Bernalillo County has call logs that they argue demonstrate adequate call time for the inmates, as well as access to tablets for video calls, or to use when the landlines are being used by others.  See Reply at 9 (citing Call Statistics, filed January 21, 2022 (Doc. 1529-6);

Criminal Justice Reforms and the Jail Population, filed January 21, 2022 (Doc. 1529-7); Metropolitan Detention Center Tablet Usage April 2021 Report, filed January 21, 2022 (Doc. 1529-8); and Call Standard Summary, filed January 21, 2022 (Doc. 1529-9)).  Bernalillo County argues that, "[b]ased upon this irrefutable data, Plaintiffs' criticism of a lack of documentation of out of cell time in general population is of no importance because inmates were demonstrably able to access and use  telephones and tablets to communicate with individuals outside MDC."  Reply at 9.  Bernalillo County asks the Court to adopt Frasier's finding of sustained compliance as to inmates' access to telephones in Check Out Audit #3 ¶¶ 6(S)(1)-(3). See Reply at 9 (citing Domain #3 Report ¶¶ S(1)-(3), at 10-11).

Finally, Bernalillo County argues that providing notice and an opportunity to be heard are not required prior to disengagement of Domain #3.  See Reply at 10.  Bernalillo County contends that the disengagement procedure set forth in the Settlement Agreement underwent Rule 23 approval, and so "the Court need not allow notice and opportunity to comment."  Reply at 10.  The Defendants note that one of the Settlement Agreement's key purposes is to provide a clear path towards dismissal of each Domain, and asking for notice puts an unnecessary burden on the Defendants.  See Reply at 10.  Bernalillo County argues that the cases cited in the Response are "not binding and are distinguishable."  Reply at 10.  The Defendants ask the Court to conclude that they are entitled to disengagement from Domain #3.  See Reply at 10.

**6.      February 11, 2021 Hearing.**

The Court held a hearing on February 11, 2022.  See Clerk's Minutes at 1.  The Court heard arguments for the Domain #5 Motion, the Domain #6 Motion, and the Plaintiff and Plaintiff Intervenors' Joint Motion and Memorandum in Support Thereof, for Enforcement of Paragraphs 14 and 15 ("Force Majeure") of Settlement Agreement, Doc. No. 1222-1, and for Further Remedial

Relief, filed July 23, 2021 (Doc. 1434)("Force Majeure Motion").  See Tr. at 1:1-147:6 (Court, Rahn, Haverman, Rigdon, Lowry, Waterfall, Smith, Simmons).  Bernalillo County next argued in support of its Motion.  See Tr. at 147:7-186:13 (Rahn).  Bernalillo County asked the Court to adopt Frasier's findings of compliance, noting that "this court recognized . . . that the parties had bargained for a process that gave reverence and weight to the Courts experts' findings."  Tr. at 149:4-7 (Rahn).  Bernalillo County noted that the Plaintiffs dispute their compliance with Check Out Audit #3 ¶¶ 6(L)(3) and (L)(4), because there was a 2021 fire inspection report that found several violations.  See Tr. at 150:7-9 (Rahn).  Bernalillo County argued that the same report gives MDC a passing score, and, regardless of the passing score, Bernalillo County remedied the violations that the fire inspection report outlines.  See Tr. at 150:10-19 (Rahn).  Bernalillo County asserted that there are no claims related to fire and life safety in this litigation, so it is required only to ensure that Bernalillo County is prepared adequately for such an incident in the future.  See Tr. at 150:21-26 (Rahn).

Next, Bernalillo County discussed the issue of staffing, listed in Check Out Audit #3 ¶ 6(M)(1).  See Tr. at 151:2-4 (Rahn).  Bernalillo County responded to the Plaintiffs' contention that Bernalillo County has not shown an adequate staffing plan for BCMDC and typically has a shortage of security staffing, by arguing that security staffing is clearly addressed in a different Domain, so the facility's lack of security staffing is irrelevant to the Motion.  See Tr. at 151:11-16 (Rahn); id. at 152:6-10 (Rahn).  In response to the Plaintiffs' argument that Bernalillo County failed to provide Frasier with the exact number of maintenance individuals, Bernalillo County asserted that Frasier conducted her own facility tour to determine whether it is being maintained adequately, and ultimately determined that it is being maintained adequately.  See Tr. at 153:8-16 (Rahn).  Bernalillo County concluded its arguments on staffing by noting that the only time frame

that is relevant for the Court's review is the self-monitoring period.  <u>See</u> Tr. at 154:6-8 (Rahn).

Bernalillo County argued: "What plaintiffs allege may or may not have happened after self-

monitoring ended, would not bar an initial finding of sustained compliance, because we were not

required to submit to self-monitoring beyond August 2021."  Tr. at 153:8-13 (Rahn).

Bernalillo County next discussed Check Out Audit #3 ¶¶ 6(O)(3)-(4) concerning food

service requirements.  <u>See</u> Tr. at 153:14-154:4 (Rahn).  Bernalillo County addressed the Plaintiffs'

challenge to whether Bernalillo County complies with Check Out Audit #3 ¶¶ 6(O)(3) and O(4).

<u>See</u> Tr. at 153:17-19 (Rahn).   Bernalillo County explained that it provided Frasier with the

curriculum that is given to the kitchen staff -- which contains both inmate workers and civilian

workers, <u>see</u> Tr. at 153:23-25 (Rahn) -- and stated that Frasier found the curriculum complies with

Domain #3, <u>see</u> Tr. at 154:2-4 (Rahn).  Bernalillo County argued that the Plaintiffs' only grievance

in this area is that Bernalillo County did not provide a copy of the kitchen staffing schedule to the

Plaintiffs.  <u>See</u> Tr. at 154:14-15 (Rahn).  Bernalillo County countered that it provided a copy to

Frasier, and its failure to provide a copy to the Plaintiffs is irrelevant to the determination of its

actual compliance.  <u>See</u> Tr. at 154:14-17 (Rahn).

Next, Bernalillo County addressed the "preliminary issue" whether Bernalillo County

submitted a sufficient number of quarterly reports -- specifically, whether Bernalillo County is

required to submit a report for 2021's second quarter, April through June.  Tr. at 155:6-10 (Rahn).

Bernalillo County explained that the self-monitoring period ended in August 2021, and, although

it did not submit a self-monitoring report for 2021's second quarter, Bernalillo County provided

Frasier with sufficient information from that quarter to successfully conduct the check out audit.

<u>See</u> Tr. at 155:11-19 (Rahn).  Bernalillo County stated that, although it "do[esn]'t know that full

information was provided in July of 2021, . . . that doesn't appear to be plaintiffs' objection."  Tr.

at 155:25-156:2 (Rahn).  Bernalillo County noted that the Plaintiffs attempted to get the Court to establish a minimum number of quarterly reports, but the Court stated that the Settlement Agreement does not establish a specific number of quarterly reports to demonstrate compliance. See Tr. at 156:2-16 (Rahn).  Bernalillo County argued that, because the purpose of quarterly reports is to demonstrate to Frasier that they have reached sustained compliance during the self-monitoring period, Bernalillo County has fulfilled the self-monitoring reports' purpose by providing the requested information to Frasier.  See Tr. at 156:17-20 (Rahn).

Finally, Bernalillo County discussed the Plaintiffs' argument that Bernalillo County has not reached substantial compliance with Check Out Audit #3 ¶¶ 6(S)(1)-(3), at 34-35, which address inmates' access to telephones.  See Tr. at 156:23-162:11 (Rahn).  Bernalillo County argued that Check Out Audit #3 ¶ 6(S)(1), at 34, "simply refers to the American Correctional Association provision about . . . access to telephones," and that these provisions do not "set a specific timeframe or a specific number of calls."  Tr. at 157:6-10 (Rahn).  Bernalillo County asserted that data it provided to Frasier shows that "inmate[s] have adequate access to telephones in spite of less [out-of-cell] time than they enjoyed prior to the pandemic," and that it provided Frasier with call logs.  Tr. at 157:14-17 (Rahn).  Bernalillo County explained that, while inmates must leave their cells to access landline telephones, MDC also provides tablets with which inmates are able to conduct video calls, exchange messages, and make telephone calls inside their cells.  See Tr. at 157:20-158:4 (Rahn).   Bernalillo County  informed the Court that the company with which it contracts for the telephones, tablets, and GTL,[6] produces automated reports showing the devices'

---

[6]"GTL GettingOut" provides communication services "between inmates, friends and family."  GTL GettingOut, What GettingOut is all About!, https://www.gettingout.com/about/ (last visited August 17, 2022).

usage.   See Tr. at 158:10-13 (Rahn).   Bernalillo County asserted that these call statistics demonstrate that, in May, 2021, there were 65,000[7] calls completed from the facility, which equates to about two completed calls per inmate per day, because there are 1,100 inmates at the facility on any given day.  See Tr. at 158:16-23 (Rahn); id. at 183:12-13 (Rahn).  Bernalillo County stated that it also receives statistics of incomplete calls, which may be attributed to declined calls, invalid pin numbers, a busy recipient, or a recipient with insufficient funds.  See Tr. at 160:1-12 (Rahn).  Bernalillo County argued that, although 1200[8] recipients of the 65,000 calls were busy, these calls still indicate that the inmate had access to the telephone.  See Tr. at 160:12-22 (Rahn). Bernalillo County explained that the Plaintiffs keep track of calls with their clients at MDC and have found that there is a call completion rate as low as twenty-five percent, see Tr. at 160:3-5 (Rahn), but argued that the low rate of completed calls "does not take into account the reason why the call was . . . not completed," Tr. at 160:5-8 (Rahn).   Bernalillo County asserted that this argument is irrelevant to Domain #3, because a different Domain specifically deals with inmates' access to their attorneys.  See Tr. at 161:8-9 (Rahn).  In terms of tablet usage, Bernalillo County reported that, in April 2021, inmates spent 900,000 minutes on video calls, 400,000 minutes on messaging, and about 12,000 minutes exchanging photos on the tablets.  See Tr. at 161:1-5 (Rahn).

---

[7]Bernalillo County first stated incorrectly that the number of calls was 6,500, but later clarified that the number of calls made was 65,000.  See Tr. at 159:16-23 (Rahn); id. at 183:12-13 (Rahn).  The exact number of completed calls during May, 2021, was 65,816.  See Call Statistics at 1, filed January 21, 2022 (Doc. 1529-6).  In June, 2021, 62,413 calls were completed, see Call Statistics at 2, and in July, 2021, 59,324 calls were completed, see Call Statistics at 3.

[8]The Call Statistics show separate rows and numbers for busy calls and incomplete calls: in May, 2021, there were 189,407 "[i]ncomplete" calls, and 1203 "[b]usy" calls.  See Call Statistics at 2.  The Call Statistics document does not explain whether the numbers for "[b]usy" or "[i]nvalid Pin" are included in the number of "Complete" calls or the number of "Incomplete" calls.  Call Statistics at 2.

Bernalillo County argued that the Plaintiffs' anecdotal evidence cannot undermine statistical data demonstrating Bernalillo County's compliance with Check Out Audit #3 ¶ 6(S)'s requirement that inmates have adequate access to telephones.  See Tr. at 162:2-9 (Rahn).

The Court next invited the Plaintiffs to speak in support of their Response.  See Tr. at 162:12-14 (Court).  The Plaintiffs responded by arguing that Bernalillo County's failure to submit a quarterly report is a "basic problem," Tr. at 162:20 (Smith), because the Settlement Agreement requires Bernalillo County to submit quarterly self-monitoring reports "to the expert for that domain and to plaintiffs and plaintiff intervenors," Tr. at 163:3-4 (Smith)(citing Settlement Agreement ¶ 5(C), at 6).  The Plaintiffs also quoted the Settlement Agreement's provision that "the quarterly reports will contain sufficient data for the expert for . . . that domain to determine whether County Defendants remain in compliance with each of the subcategories listed [under] the domain."  Tr. at 163:6-10 (Smith)(citing Settlement Agreement ¶ 5(C), at 6).  The Plaintiffs emphasized that the Settlement Agreement lists two requirements for Bernalillo County to demonstrate sustained compliance: first, that Bernalillo County must submit quarterly reports, and second, that those reports must contain sufficient data to demonstrate that Bernalillo County has remained in compliance.  See Tr. at 163:11-17 (Smith).   The Plaintiffs argued that, in accordance with the eighteen-month self-monitoring period the Court set -- from February, 2020, until August, 2021 -- Bernalillo County is required to submit six quarterly reports, but only submitted five.  See Tr. at 164:1-5 (Smith).  The Plaintiffs emphasized that Bernalillo County did not "provide data from March until August," "a five-month period in an 18-month compliance period."  Tr. at 164:12-15 (Smith).

The Plaintiffs acknowledged that Bernalillo County provided some of the data to Frasier when it asked her to complete the Check Out Audit for Domain #3, see Tr. at 164:15-17, but

countered that providing partial data is not the same as submitting quarterly reports in accordance with the Settlement Agreement, see Tr. at 164:23-165:1 (Smith).  The Plaintiffs next addressed the argument that, because Bernalillo County was set to complete their self-monitoring period in August, 2021, and the final quarterly report would have begun in June, 2021, the quarterly report would not have been due until September.  See Tr. at 165:13-15 (Smith).  The Plaintiffs argued that "there is nothing in the Settlement Agreement that says they only have to provide a quarterly report three months after the previous quarter has ended."  Tr. at 165:16-19 (Smith).  The Plaintiffs asserted that Bernalillo County must submit quarterly reports throughout the self-monitoring process, but have failed to submit the report for 2021's second quarter.  See Tr. at 165:20-22 (Smith).  The Plaintiffs acknowledged that Bernalillo County's argument that there is no fixed number of quarterly reports that are required to reach compliance, see Tr. at 165:23-25 (Smith), but argued that this comment in the Domain #3 Initial Compliance Order setting the self-monitoring period for Domain #6 was taken out of context, see Tr. at 166:22-167:2 (Smith)(citing Domain #3 Initial Compliance Order at 1-2).  The Plaintiffs explained that, because the Settlement Agreement does not provide for a fixed time period for the self-monitoring period, the number of required quarterly reports could vary.  See Tr. at 166:22-25 (Smith).  Finally, the Plaintiffs argued that, because Bernalillo County failed to provide all the required quarterly reports, Bernalillo County failed to provide Frasier with enough information to show that Bernalillo County is in sustained compliance.  See Tr. at 167:13-16 (Smith).

Next, the Plaintiffs argued that Bernalillo County has not reached sustained compliance with Check Out Audit #3 ¶¶ 6(L)(3) and (4), at 28, which address fire and life safety requirements. See Tr. at 167:17-25 (Smith).  The Plaintiffs did not dispute that Bernalillo County made the necessary corrections after a fire inspection demonstrated several violations, but asserted that

Bernalillo County has not reached sustained compliance with these provisions, because MDC failed a fire alarm inspection test and a fire sprinkler test at the beginning of the self-monitoring period.  See Tr. at 168:7-10 (Smith).  The Plaintiffs alleged that they brought these facts to Bernalillo County's attention during the self-monitoring period, but Bernalillo County has not provided documentation showing that those issues are fixed.  See Tr. at 168:14-17 (Smith).

The Plaintiffs next argued that Bernalillo County has not reached sustained compliance as to Check Out Audit #3 ¶ 6(M)(1), at 28, which evaluates whether "MDC [maintains] an adequate written staffing plan, and sufficient staffing levels to provide for adequate [maintenance] of the facility." Tr. at 168:18-22 (Smith).  The Plaintiffs asserted that Bernalillo County does not have an up-to-date staffing plan, because it was written in 2013 and updated in 2016.  See Tr. at 168:25-169:3 (Smith).  The Plaintiffs explained that, instead of an updated staffing plan, Bernalillo County provided a letter explaining that it had received two bids for staffing analysis and that the analysis would not begin until January, 2022.  See Tr. at 169:7-12 (Smith).  The Plaintiffs argued that this letter is "not a substitution for an actual adequate staffing plan" and therefore, that Bernalillo County is not in compliance.  Tr. at 169:13-17 (Smith).  The Plaintiffs also note that Bernalillo County does not show that it has adequate staff for the facility's maintenance.  See Tr. at 169:18-20 (Smith).  The Plaintiffs countered that Bernalillo County's assertion that Check Out Audit #3 ¶ 6(M)(1), at 28-29, relates only to maintenance staffing, by arguing that "the provision actually says [that] MDC must provide sufficient staffing levels to provide for adequate maintenance of the facility," and that "security staff is a part of that." Tr. at 169:22-25 (Smith).  The Plaintiffs emphasized that Frasier acknowledges that there is "a shortage of security staff." Tr. at 170:4-5 (Smith).  The Plaintiffs explained that "at MDC . . . bay orderlies who are inmates . . . do a lot of the cleaning of the facility," Tr. at 170:6-8 (Smith), and so, because of the lack of security staff,

many of the inmates who have cleaning duties are "locked down . . . days on end" and "[a]ll weekend almost every weekend," Tr. at 170:10-16 (Smith).  The Plaintiffs also noted that, according to the Cadena Decl., toilets will overflow, because "there is no corrections officer in the pod, those toilet will just keep . . . flooding until an officer finally comes back and notices it," demonstrating that there is not enough security staff to allow adequate maintenance.  Tr. at 170:17-24 (Smith). The Plaintiffs argued that, although Bernalillo County states that this information is "just one particular declaration," Tr. at 171:5 (Smith), "Frasier pointed out that there was a staffing shortage of security officers, and that affects the way that maintenance of the entire facility is run, because without sufficient security officers to let the inmates out to clean the pod they can't maintain that facility." Tr. at 171:6-11 (Smith).  The Plaintiffs contended that three days of staffing data from April, May and June, 2021, is "not enough [data] to show that staffing levels are adequate." Tr. at 171:12-17 (Smith).  The Plaintiffs argued that, although Frasier conducted an in-person inspection and found that MDC's staffing levels are adequate, the Settlement Agreement states clearly that Bernalillo County must provide sufficient data to the expert demonstrating that it is in compliance, and that this supply of information did not happen.  See Tr. at 171:18-23 (Smith).

The Plaintiffs next turned to Check Out Audit #3 ¶¶ 6(O)(3)-(4), which outline kitchen safety requirements, ensuring that "[all] food service staff including inmate staff are adequately training in food service operations, safe food handling procedures and appropriate sanitation," and that the "kitchen is staffed with . . . a sufficient number of adequately trained personnel."  Tr. at 172:2-8 (Smith).  See id. at 172:1-2 (Smith).  The Plaintiffs asserted that Bernalillo County does not provide any data showing compliance with these provisions for 2021's second quarter, in contravention of the Settlement Agreement's requirement that Bernalillo County provide

"adequate data to show compliance and quarterly reports."  Tr. at 172:21-23 (Smith).  See id. at 172:11-17 (Smith).

Next, the Plaintiffs addressed Check Out Audit #3 ¶¶ 6(S)(1)-(2), at 34-35, which evaluate inmates' access to telephones.  See Tr. at 173:9-10 (Smith).  The Plaintiffs explained that Check Out Audit #3 ¶¶ 6(S)(1), at 34, evaluates "whether MDC provides its inmates with access to telephones[,] which  meets applicable standards stated in the ACA standards for adult detention centers."  Tr. at 173:9-12 (Smith).  The Plaintiffs noted that Check Out Audit #3 ¶¶ 6(S)(2) evaluates "whether MDC has adequate policies and procedures governing inmate access to telephones and whether it adequately implements [those] policies."  Tr. at 173:12-15 (Smith).  The Plaintiffs argued that COVID-19 lockdowns and security staffing shortages have led to inmates having insufficient out-of-cell time, and are not able to make as many calls as before the pandemic. See Tr. at 173:16-25 (Smith).  The Plaintiffs countered Bernalillo County's argument that the Call Statistics show thousands of calls made per month by arguing that the Call Statistics do not demonstrate what the call rates were before the COVID-19 pandemic.  See Tr. at 174:6-8 (Smith). The Plaintiffs emphasize that Frasier acknowledges that the Call Statistic do not demonstrate what the call rates were before the pandemic, and quotes her report, in which she writes: "'The monitor recognizes that physical access to telephones in the housing units was necessarily reduced due to the safety precautions related to the pandemic.  The monitor also recognizes that lockdowns due to staffing shortages reduce the number of hours inmates have access to telephone.'"  Tr. at 174:13-19 (Smith)(quoting Domain #3 Report at 10).  The Plaintiffs contested Frasier's decision to find sustained compliance as to this provision, "because . . . the provision of tablets and the easing of restrictions on inmates being able to access the tablets when they're in their cells helped to offset the reduction of access to telephones in the housing unit."  Tr. at 174:25-175:5 (Smith).  The

Plaintiffs asserted that the tablets "only work about 50 percent of the time," that Bernalillo County acknowledged this fact in meetings, and that this statistic comports with the experience of the Plaintiffs' counsel trying to contact their clients on the tablets.  Tr. at 175:6-7 (Smith).  See id. at 175:8-16 (Smith).  The Plaintiffs argued that using a tablet inside a cell is very different from leaving the cell to make a telephone call.  See Tr. at 175:17-20 (Smith).  The Plaintiffs added that there is no consistent plan in place to ensure that each inmate has equal or consistent access to working tablets, and gave an example of tablet hoarding, where "one inmate would keep the tablet in his room the whole day and nobody wanted to bother him because he was the meanest guy in the pod." Tr. at 176:9-12 (Smith).  The Plaintiffs also stated that Bernalillo County did not provide "any records showing how many tablets [were] functional and how [many] were in each pod." Tr. at 176:14-16 (Smith).

After a recess, the Court invited the Plaintiff-Intervenors to present their arguments.  See Tr. at 177:21-25 (Court, Smith).   The Plaintiff-Intervenors stated their agreement with the Plaintiffs' arguments, see Tr. at 178:3-4 (Waterfall), and reiterated that the Settlement Agreement requires the Defendants to have an adequate written staffing plan, and that the most recent staffing plan, which was written in 2013 and updated in 2016, is too outdated to demonstrate compliance. See Tr. at 178:7-12 (Waterfall).  The Plaintiff-Intervenors noted that Frasier stated in the Domain #3 Report that, because of the level of staffing vacancies, it is difficult for MDC to comply with the outdated staffing plan, and Frasier recommended creating an updated staffing plan.  See Tr. at 178:12-17 (Waterfall).  The Plaintiff-Intervenors asserted that Frasier does not explain her decision to find sustained compliance despite the outdated staffing plan and low staffing levels.  See Tr. at 178:17-20 (Waterfall).  Next, the Plaintiff-Intervenors noted Rahn's statement that MDC reports 6,500 calls in one month, averaging two calls a day per inmate, and asserted that 6,500 calls divided

by the 1,100 inmates in MDC equals 5.9 calls per month per inmate.  See Tr. at 179:1-6 (Waterfall).

The Plaintiff-Intervenors mentioned that those 5.9 calls per month include attorney calls and

family calls, and argued that such a number is not sufficient, especially because those calls are not

equally distributed amongst inmates.  See Tr. at 179:7-16 (Waterfall).

The Court gave Bernalillo County the last word on its Motion.  See Tr. at 179:21-22

(Court).  Bernalillo County disputed the Plaintiffs' preliminary allegation that Bernalillo County

failed to submit its final quarterly report.  See Tr. at 180:11-14 (Rahn).  Bernalillo County directed

the Court's attention to the Domain #3 Report, in which Frasier indicates that Bernalillo County

provided self-monitoring data for April through June, 2021.  See Tr. at 180:14-20 (Rahn).

Bernalillo County also noted that the Plaintiffs were discussing data from April through June,

2021, that is in the record.  See Tr. at 181:22-25 (Rahn).  Bernalillo County disagreed with the

Plaintiffs' contention that the quarterly reports are a requirement for self-monitoring, see Tr. at

181:10-13 (Rahn), and argued that the quarterly report itself is not the end goal; rather, "[t]he point

of those quarterly reports is to give sufficient data for the expert," Tr. at 181:13-15 (Rahn).  The

Plaintiffs noted that "Frasier repeatedly found in her report that she had sufficient data and she

actually goes through []and details the data that she received," which Frasier discusses on the

second page of her report.  Tr. at 181:15-17 (Rahn).

Bernalillo County next discussed the Plaintiffs' arguments about staffing.  See Tr. at 182:7-

10 (Rahn).  Bernalillo County argued that, although MDC has a security staffing shortage, it has

sufficient staff to maintain the facility.  See Tr. at 182:17-19 (Rahn).  Bernalillo County asserted

that Frasier acknowledges that there is a staffing plan and distinguishes that maintenance staffing

plan from the security staffing plan.  See Tr. at 183:22-184:2 (Rahn).  Bernalillo County next

discussed inmate access to telephones and corrected its earlier statement that inmates only make

6,500 calls per month.  See Tr. at 183:9-14 (Rahn).  Bernalillo County corrected the record by

stating that 65,000 -- not 6,500 -- telephone calls were completed in one month.  See Tr. at 183:12-

13 (Rahn).  Bernalillo County emphasized that the Settlement Agreement does not require that

inmates make a certain number of telephone calls, but, rather, requires Bernalillo County to "prove

that there was adequate telephone contact."  Tr. at 183:25-184:1 (Rahn).  See id. at 184:22-25

(Rahn).  Bernalillo County reiterated that Frasier "found that there was adequate access to

telephones" based upon "her decades of experience, as well as her familiarity with American

Correctional Association standards."  Tr. at 184:10-12 (Rahn).  Bernalillo County argued that the

Plaintiffs "submitted no evidence in the record that the number of calls were inadequate," but have

"simply offered anecdotes" and "anecdotal information" that "does not prove that we did not meet

the minimum adequate level of access to telephones."  Tr. at 18417-23 (Rahn).  Bernalillo County

concluded by arguing that it has submitted enough evidence to demonstrate its substantial

compliance with Domain #3 and that, although it is "not perfect compliance," substantial

compliance "is not defeated by showing sporadic incidents of noncompliance."  Tr. at 185:10-13

(Rahn).

    7.    **The Order.**

    In the Court's March 29, 2022, Order, the Court denied the Domain #6 Motion, because

the record does not support a finding of sustained compliance as to Check-Out Audit #3 ¶ 6(H)(3),

at 23.  See Order at 4-16, 25.  The Court granted the Domain #5 Motion, because the Plaintiffs do

not object to a finding of sustained compliance.  See Order at 16-19, 25.  The Court denied the

Plaintiffs' request that Bernalillo County give notice and an opportunity to be heard to Class

members before finding Domain #5 to be in sustained compliance.  See Order at 16-19, 25-26.

The Court also denied the Force Majeure Motion, because only Bernalillo County may invoke the

Force Majeure provision.  See Order at 19-26.  Most relevant to the Motion, the Court concluded that Frasier must recommend substantial compliance with Check Out Audit #3 ¶¶ 6(S)(1)-(3), at 34-35, without reference to the COVID-19 pandemic before the Court finds sustained compliance as to Domain #3.  See Order at 21.  In the Order, the Court notes about the Domain #3 Report: "It is not clear whether Frasier would have made the recommendation that Bernalillo County is in substantial compliance with these provisions were it not for allowances Frasier made for the COVID-19 pandemic."  Order at 23.

### 8.   Frasier's Supplemental Report.

On August 26, 2022, Frasier filed a supplemental report on Check Out Audit #3 ¶¶ 6(S)(1)-(3), at 34-35, regarding inmates' access to telephones.  See Supplemental Check-Out Audit Report for Domain #3 by Court Appointed Jail Operations Expert Margo Frasier, filed August 26, 2022 (Doc. 1579)("Supplemental Report").  Referring to the Court's March 29, 2022 Order, Frasier writes:  "It was the intent of Monitor Frasier to provide insight on how the COVID-19 pandemic and/or staff shortage had influenced the manner in which the Metropolitan Detention Center (MDC) complied with the provisions of the Settlement Agreement, not to change the standard to which Monitor Frasier held MDC."  Supplemental Report at 2.  Frasier explains that the Domain #3 Supplemental Report reflects "not only compliance during the self-monitoring period, but also the current status."  Supplemental Report at 2.  Frasier details that she "asked for additional data on telephone usage for the periods of quarters three and four in 2021 and quarters one and two in 2022," and, during an on-site inspection in June, 2022, spoke "directly to inmates on various housing units about telephone usage," including to long-term inmates.  Supplemental Report at 2.  Frasier presents a qualitative and quantitative analysis of inmates' telephone and tablet usage for those periods, and concludes that "MDC provides not only reasonable access to inmates to make

telephone calls but meets or exceeds the access provided by most correctional agencies." Supplemental Report at 2-4.

Frasier addresses the Plaintiffs' argument that tablets are not equally available to all inmates, because some inmates hoard the tablets, by stating that "[a]dditional steps were taken to lessen the likelihood of hoarding occurring including the introduction of additional tables." Supplemental Report at 4.  Frasier also addresses the Plaintiffs' argument that tablets are not a sufficient substitute for telephone access, by stating that "[i]nmates interviewed indicated that tablets are readily available to inmates," and that "they preferred the tablets to the wall mounted telephones as they provided more privacy and were more widely available."   Supplemental Report at 4.  Frasier summarizes the ACA standards against which the Settlement Agreement evaluates compliance:

> There are five provisions in the ACA's Standards for Adult Detention Centers (ACA Standards) which apply to telephone access for inmates. Three deal with inmates in general and address having a written policy, procedure, and practice for inmates to have access to public telephones, reasonably priced services, and access for inmates with hearing or speech disabilities. (5-7D-4497, 5-7D-4497-1, and 5-7D-4497-2).  The other two provisions require that inmates in administrative status or protective custody be allowed telephone privileges and that inmates on disciplinary status be allowed limited telephone access unless restricted as a result of discipline and provides that restriction do not apply to access to their attorney of record.  (5-4A-4271 and 5-4A-4272).

Supplemental Report at 4.   Frasier emphasizes that the ACA standards do "not require a set number of telephones in a housing unit or a set number of calls by a particular inmate." Supplemental Report at 4.  Frasier recommends a finding of sustained substantial compliance as to Check-Out Audit #3 ¶¶ 6(S)(1)-(3), at 34-35, and assures the Court that Bernalillo County has maintained this level of compliance since the end of Domain #3's self-monitoring period.

## LAW REGARDING THE APPROVAL OF SETTLEMENT AGREEMENTS

A "court must approve a settlement if it is fair, reasonable and adequate." Jones v. Nuclear Pharmacy, Inc., 741 F.2d 322, 324 (10th Cir.1984).  See DV ex rel. EM v. Bd. of Regents of the N.M. Sch. for the Deaf, No. CIV 09-0420 JB/GBW, 2010 U.S. Dist. LEXIS 52286, 2010 WL 2486002 (D.N.M. April 29, 2010)(Browning, J.)(approving a settlement where it was "fair and reasonable, and in [the plaintiff's] best interests").  Voluntary agreements are favored as a matter of public policy.  See Trujillo v. State of Colo., 649 F.2d. 823, 826 (10th Cir. 1981).  When an administrative agency has entered into a settlement agreement, a Court should exercise deference to the agency's decision and refrain from second-guessing the Executive Branch. See Sam Fox Pub. Co. v. United States, 366 U.S. 683, 689 (1961)("Sound policy would strongly lead us to decline . . . to assess the wisdom of the Government's judgment in negotiating and accepting the . . . Consent Decree, at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting.").  "[T]o the extent that the consent decree is not otherwise shown to be unlawful, the Court is not barred from entering a consent decree merely because it might lack authority under [the governing statute] to do so after a trial."  Local No. 93, Int'l Ass'n of Firefighters v. Cleveland, 478 U.S. 501, 526 (1986).  See Wildearth Guardians v. United States Forest Serv., 778 F. Supp. 2d 1143, 1148 (D.N.M. 2011)(Browning, J.)(holding that intervenors may not veto a settlement agreement in multi-party litigation where the settlement agreement imposes no additional legal obligations on the intervenors).

## LAW REGARDING THE CONSTRUCTION AND MODIFICATION OF CONSENT DECREES

"Since consent decrees and orders have many of the attributes of ordinary contracts, they should be construed basically as contracts . . . ."  United States v. ITT Cont'l Baking Co., 420 U.S.

223, 236 (1975). Furthermore, because "a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract." United States v. ITT Cont'l Baking Co., 420 U.S. at 238. "Such aids include the circumstances surrounding the formation of the consent order" when terms are ambiguous, "any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree," United States v. ITT Cont'l Baking Co., 420 U.S. at 238. See id. at 238 n.11. Although "a district court should exercise flexibility in considering requests for modification of an institutional reform consent decree, it does not follow that a modification will be warranted in all circumstances." Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. 367, 383 (1992).

> Rule 60(b)(5) provides that a party may obtain relief from a court order when 'it is no longer equitable that the judgment should have prospective application,' not when it is no longer convenient to live with the terms of a consent decree. Accordingly, a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance.

Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. at 383 (quoting Fed. R. Civ. P. 60(b)(5)).

"While it may be true that a court charged with *interpreting* a consent decree is bound by an unambiguous termination provision contained in the decree, a court exercising its broad equitable power to *modify* the consent decree is not similarly constrained." David C. v. Leavitt, 242 F.3d 1206, 1210 (10th Cir. 2001)(emphasis in original). "[A] court's equitable power to modify its own order in the face of changed circumstances is an inherent judicial power that cannot be limited simply because an agreement by the parties purports to do so." David C. v. Leavitt, 242 F.3d at 1210. Furthermore, "[a] court's broad, equitable power to modify its own orders is not limited to modification of ambiguous provisions," because "[t]o hold otherwise would allow the

parties, by the terms of their agreement, to divest a court of its equitable power or significantly constrain that power by dictating its parameters." David C. v. Leavitt, 242 F.3d at 1211.  The Supreme Court's standard that modification is possible when "a significant change in circumstances warrants revisions of the decree" "applies when a party seeks modification of a term of a consent decree that arguably relates to the vindication of a constitutional right."  Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. at 383 & n.7.  While, "[o]rdinarily, the parties should consent to modifying a decree to allow such changes," "[i]f a party refuses to consent and the moving party has a reasonable basis for its request, the court should modify the decree."  Inmates of Suffolk Cnty. Jail, 502 U.S. at 383 n.7.

### LAW REGARDING INTERVENORS IN CONSENT DECREES

A "consent decree," which is "'also termed a consent order,'" is "'[a] Court decree that all parties agree to.'"  Macias v. N.M. Dep't of Labor, 300 F.R.D. 529, 563 n.29 (D.N.M. 2014)(Browning, J.)(quoting Black's Law Dictionary at 471 (9th ed. 2009)).  Consent decrees are a way for parties to settle the issues 'without having to bear the financial and other costs of litigating.  It has never been supposed that one party -- whether an original party, a party that was joined later, or an intervenor -- could preclude other parties from settling their own disputes and thereby withdrawing from litigation.'"  Local No. 93 v. Cleveland, 478 U.S. at 528-29.  See United States v. City of Albuquerque, 2021 U.S. Dist. LEXIS 241107, *53-55; United States v. City of Albuquerque, No. CIV 14-1025 JB\SMV, 2020 U.S. Dist. LEXIS 103158 (D.N.M. June 12, 2020)(Browning, J.).   An intervenor, therefore, "is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree," but "it does not have power to block the decree merely by withholding its consent."  Local No. 93 v. Cleveland, 478 U.S. at 529. "Allowing [a party] to intervene does not mean that it can veto the settlement . . . The

district court can still approve the consent decree if it finds that the settlement is reasonable, fair and consistent with [federal law]." WildEarth Guardians v. United States Forest Serv., 778 F. Supp. 2d at 1149 (quoting United States v. Albert Inv. Co., 585 F.3d at 1398 (internal citations omitted)). Nonetheless, "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without that party's agreement.  A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor." Local No. 93 v. Cleveland, 478 U.S. at 529.  See United States v. City of Albuquerque, No. CIV 14-1025 JB/SMV, 2021 U.S. Dist. LEXIS 241107, at *55 (D.N.M. Dec. 16, 2021)(Browning, J.).

## LAW REGARDING FEDERAL COURT JURISDICTION TO ENFORCE SETTLEMENT AGREEMENTS

"Once a lawsuit is settled and dismissed, the district Court does not generally have 'ancillary jurisdiction to enforce the parties' settlement agreement.  A district Court can, however, retain jurisdiction over a settlement agreement if the order of dismissal shows an intent to retain jurisdiction or incorporates the settlement agreement.'" McKay v. United States, 207 F. App'x 892, 894 (10th Cir. 2006)(unpublished)(quoting Morris v. City of Hobart, 39 F.3d 1105, 1110 (10th Cir. 1994), and citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 380-81)). Accordingly, a federal Court does not, ipso facto, have jurisdiction over a settlement agreement by virtue of the settlement agreement resolving claims which the federal Court previously entertained.  See Marcotte v. Burlington N. Santa Fe Rail Corp., No. CIV 04-0836 JB/RLP, 2007 U.S. Dist. LEXIS 97732, 2007 WL 5685129, at *12 n.5 (D.N.M. October 11, 2007)(Browning, J.)("The Court has, however, no ancillary jurisdiction over the settlement agreement of the parties,

because the Court did not explicitly retain such jurisdiction in its order dismissing this case with prejudice pursuant to joint motion.").

Reference to the settlement agreement in the order dismissing a case is necessary for a Court to retain jurisdiction over the agreement after dismissing the parties' claims which the settlement resolved, unless the Court has an independent basis for jurisdiction over the agreement. "Unless incorporated into a judgment of the Court, a settlement agreement is 'a contract, part of the consideration for which [i]s dismissal of a[] suit.'" Beetle Plastics Inc. v. United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus., 97 F.3d 1464 (10th Cir. Sept. 19, 1996)(unpublished table decision)(quoting Kokkonen v. Guardian Life Ins. Co., 511 U.S. at 381). [w]ithout reservation by the Court . . . there must be an independent basis for federal jurisdiction." Morris v. City of Hobart, 39 F.3d at 1110-11 (citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 382).

If the parties' "obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal -- either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order," the situation is different. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 381. "In that event, a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 381. On the other hand, "[t]he judge's mere awareness and approval of the terms of the settlement agreement do not suffice to make them part of his order." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 381. See Macias v. N.M. Dep't of Labor, 300 F.R.D. 529, 547-48 (D.N.M. 2014)(Browning, J.); United States v. City of Albuquerque, 2020 U.S. Dist. LEXIS 103158, *154-156.

## ANALYSIS

The Court will deny the Motion, because Bernalillo County does not comply with the Settlement Agreement's requirement that Bernalillo County provide quarterly reports during the self-monitoring period, and because the record does not demonstrate that MDC is in sustained substantial compliance with all of Domain #3's requirements, as Check Out Audit #3 and the Settlement Agreement require. The parties refer to their agreement as a Settlement Agreement; however, because the Settlement Agreement is subject to judicial enforcement, it is more properly termed a consent decree. See 18 U.S.C. § 3626(g)(1)("The term 'consent decree' means any relief entered by the Court that is based in whole or in part upon the consent or acquiescence of the parties but does not include private settlements."). The Court construes the Settlement Agreement as a contract. See United States v. ITT Cont'l Baking Co., 420 U.S. at 236 ("Since consent decrees and orders have many of the attributes of ordinary contracts, they should be construed basically as contracts . . . ."). Accordingly, the Court may consider "the circumstances surrounding the formation of the consent order," if any terms are ambiguous, and "any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree," United States v. ITT Cont'l Baking Co., 420 U.S. at 238. See id. at 238 n.11. Because the Settlement Agreement expressly incorporates the Check Out Audit Agreements, the Court considers the Check Out Audit Agreements to be part of the Settlement Agreement.

The Prison Litigation Reform Act, 18 U.S.C. § 3626 ("PLRA"), governs the Settlement Agreement. See MOO Approving Settlement at 3. After Congress passed the PLRA in 1996, "the City and County moved to terminate the remedial orders entered in 1995 and 1996." MOO Approving Settlement at 4. Judge Vázquez entered an order finding that "violations of one or more federal rights of BCDC residents have occurred at BCDC." Order Regarding the Prison

Litigation Reform Act at 1, filed November 5 (Doc. 255)("PLRA Order").  Referring to the

PLRA's standards for consent decrees governing prison conditions, Judge Vázquez found that:

> the settlement agreement regarding the Prison Litigation Reform Act is proper
> and that the relief set forth in the settlement agreement:
>
> (1)    is narrowly drawn;
>
> (2)    extends no further than necessary to correct the violations
>        of the federal rights of subclass members;
>
> (4)    is the least intrusive means necessary to correct the
>        violations of the federal rights of subclass members;  and
>
> (5)    will have no adverse impact on the public safety or the
>        operation of the criminal justice system.

PLRA Order at 2 (citing 18 U.S.C. § 3626(a)(1)).

On June 27, 2016, Senior Judge Parker approved the parties' current Settlement

Agreement.  See MOO Approving Settlement at 26.  In the MOO Approving Settlement, Senior

Judge Parker determines that the Settlement Agreement is "fair and reasonable."  MOO Approving

Settlement at 24.  The Settlement Agreement notes the parties' consideration for entering into the

agreement:

> Plaintiffs' and the Plaintiff Intervenors' (the Plaintiffs) consideration for
> entering into this Settlement Agreement are improvements in the operation of the
> County jail system, a fair and reasonable check-out audit for each of the Domains
> listed in the Check-Out Audit Agreements described below, assurance that a finding
> of substantial compliance is meaningful, the establishment of a durable remedy and,
> during the pendency of the lawsuit, identification of any domains, if any, in which
> backsliding has occurred so that appropriate corrective action can be taken.

Settlement Agreement ¶ 1(A), at 1-2.  Bernalillo County's consideration is "knowing exactly what

must be done to achieve substantial compliance, understanding what elements of their obligations

will be audited and how those audits will be conducted, and having their obligations described

specifically and clearly enough to have their compliance accurately and objectively measured."

Settlement Agreement ¶ 1(B), at 2.   The Settlement Agreement sets out the process by which Bernalillo County can demonstrate compliance with the parties' agreed-upon standards for the operation of Bernalillo County's detention facilities and by which this litigation may be terminated.   See Settlement Agreement at 1-14.

The Settlement Agreement terms each category of requirements a "domain," and the parties agree that, after "the Court makes a finding of sustained substantial compliance as to a particular domain . . . , all provisions of extant orders related to that domain will be vacated."   Settlement Agreement ¶ 10, at 9.   Bernalillo County must demonstrate sustained compliance for each domain by: (i) demonstrating initial substantial compliance; (ii) undergoing a period of self-monitoring; (iii) demonstrating sustained compliance; and (iv) undergoing a Check-Out Audit.   See Settlement Agreement ¶¶ 4-7, at 4-8.   According to the Settlement Agreement, "'substantial compliance' means that Defendants generally are in compliance with the terms of the substantive requirements listed in the Check-Out Audit Agreements," and "[i]ncidents of non-compliance do not necessarily prevent a finding of substantial compliance."   Settlement Agreement ¶ 2(C), at 3.   "[O]nce the Defendants believe that they have sufficient evidence to demonstrate substantial compliance in a particular domain the Defendants may move the Court for a finding of initial substantial compliance."   Settlement Agreement ¶ 4(A), at 4.   Once Bernalillo County moves for a finding of initial compliance, "the Court will determine whether the record supports a finding of initial substantial compliance with respect to each domain of the applicable Check-Out Audit Agreements based on the experts' report and other evidence presented by the parties."   Settlement Agreement ¶ 4(B), at 4.   "If the Court requires additional information in order to make his or her recommended findings, the Court will provide guidance to the appropriate expert as to what additional information is required."   Settlement Agreement ¶ 4(B), at 4.   If the Court finds that

Bernalillo County does not comply with a particular domain, "the Court, in consultation with the appropriate expert, will direct Defendants as to what must be accomplished to achieve initial substantial compliance."  Settlement Agreement ¶ 4(B), at 4-5.  When the Court makes "the determination of initial substantial compliance, the Court will also determine the date upon which initial substantial compliance began as to each domain."  Settlement Agreement ¶4(C), at 5.

Once the Court has determined that Bernalillo County has achieved initial substantial compliance, "the Court will set a period of self-monitoring for each domain which the Court determines is a sufficient period to reach sustained substantial compliance based upon the complexity of the domain, the date when initial substantial compliance began as well as any other factors determined by the Court."  Settlement Agreement ¶ 5(A), at 5.  The Settlement Agreement requires that "[t]he Court-appointed experts in each area, in conjunction with Defendants, will develop self-monitoring protocols."  Settlement Agreement ¶ 5(B), at 5.  These protocols must provide for the collection and analysis of data for each subcategory listed in the Check-Out Audits, a preliminary analysis by MDC staff or medical contractor staff, the review and written report by the Court-appointed expert for that domain, and any recommendations the expert makes for corrective action.  See Settlement Agreement ¶¶ 5(B)(1)-(5), at 5-6.

During the period of self-monitoring, the "Defendants will submit quarterly reports to the expert for that domain, and to counsel for Plaintiff and Plaintiff-Intervenors as to Defendants' continued substantial compliance with each particular domain."  Settlement Agreement ¶ 5(C), at 6.  "The quarterly reports will contain sufficient data for the expert for that domain to determine whether County Defendants remain in compliance with each of the subcategories listed under the domain."  Settlement Agreement ¶ 5(C), at 6.  The Settlement Agreement provides that "counsel for Plaintiffs and Plaintiff-Intervenors only will be compensated for," among other things,

"reviewing Defendants' self-monitoring reports and providing feedback to the Defendants and their counsel regarding whether the Defendants are in compliance with the provisions of the self-monitoring agreement."   Settlement Agreement ¶ 5(D), at 6-7.   "[A]t the end of the period established for self-monitoring, the Court's experts will conduct Check-Out Audits as to each domain and make a finding of compliance, partial compliance, or non-compliance with the substantive requirement of the Check-Out Audit Agreements . . . ."   Settlement Agreement ¶ 6, at 7.

Each Check-Out Audit "provides definitive, specific, and measurable tasks to be accomplished in order to achieve substantial compliance," Check-Out Audit #3 ¶ 2, at 1, and Check-Out Audit #3 covers all conditions of confinement not related to the provision of medical and mental health services, see Check-Out Audit #3 ¶ 1, at 1.  Check-Out Audit #3 provides that "[t]he Court's jail operations expert will make findings of fact which address the subcategories listed below . . . ."  Check-Out Audit #3 ¶ 6, at 2.   The Settlement Agreement requires that, following the Check-Out Audit, the Court must determine "whether the record supports a finding of sustained substantial compliance as to each domain," "[b]ased upon the Defendants' self-monitoring reports[9] as well as the experts' proposed findings at the Check-Out Audits . . . ."  Settlement Agreement ¶ 8, at 8.   "If the Court determines there is not sustained substantial compliance, the Court will set an additional period for self-monitoring.  At the conclusion of the additional period of self-monitoring, the expert for that domain will conduct another Check-Out Audit."   Settlement Agreement ¶ 8, at 8-9.   "[A]fter the Court makes a finding of sustained

---

[9]The Court interprets the phrase "Defendants' self-monitoring reports" in Settlement Agreement ¶ 8, at 8, as referring to the same documents as the "quarterly reports" that Settlement Agreement ¶ 5(C) requires the Defendants submit to the Plaintiffs' counsel and to that domain's expert during the self-monitoring period.

substantial compliance as to a particular domain . . . , all provisions of extant orders related to that Domain will be vacated." Settlement Agreement ¶ 10, at 9. The Settlement Agreement also provides that, if "the Defendants have engaged in backsliding[10] as to a domain that was previously vacated, they may move the Court to re-engage oversight over that particular domain," Settlement Agreement ¶ 11, at 10, and the Court will "grant a motion to re-engage oversight over a domain only where Plaintiffs and/or Plaintiff-Intervenors have established by a preponderance of the evidence that Defendants engaged in backsliding," Settlement Agreement ¶ 12, at 10.

In the Motion, Bernalillo County presents Frasier's Domain #3 Report and requests disengagement from Court oversight for Domain #3, which evaluates Jail Operations. See Motion ¶ 1, at 1. Domain #3 provides standards for: "Fire and Life Safety," Check Out Audit #3 ¶ L, at 27-28; "Sanitation and Environmental Conditions," Check Out Audit #3 ¶ 6(M), at 28-30; "Sanitary Laundry Procedures," Check Out Audit #3 ¶ 6(N), at 31; "Food Service," Check Out Audit #3 ¶ 6(O), at 31-32; "U.S. Mail Service," Check Out Audit #3 ¶ 6(R), at 34; "Inmate Access to Telephones," Check Out Audit #3 ¶ 6(S), at 34-35; "Inmate Access to Commissary," Check Out Audit #3 ¶ 6(U), at 35-36; inmate "Access to Community Services," Check Out Audit #3 ¶ 6(V), at 36; and "Competency Evaluations," Check Out Audit #3 ¶ 6(X), at 37.[11] First, the Court concludes that Bernalillo County has not complied fully with the Settlement Agreement's requirement to submit quarterly reports during Domain #3's self-monitoring period. Second, the

---

[10]The Settlement Agreement defines backsliding as "deviations from Defendants' obligations that are sufficiently significant that, had those deviations been found at the time substantial compliance originally was determined as to that domain, the deviations would have prevented a finding of substantial compliance as to that domain." Settlement Agreement ¶ 2(A), at 2.

[11]The parties state that they have reached a stipulated agreement as to the Competency Evaluations. See Domain #3 Report at 11.

Court concludes that the record does not support a finding of sustained substantial compliance as to all of Domain #3's requirements.

I.   **BERNALILLO COUNTY HAS NOT COMPLIED WITH THE SETTLEMENT AGREEMENT'S REQUIREMENT TO SUBMIT QUARTERLY REPORTS.**

The first issue is whether Bernalillo County complies with the Settlement Agreement's requirement that Bernalillo County submit quarterly reports during Domain #3's self-monitoring period.   The Settlement Agreement provides that, during a period of self-monitoring, the "Defendants will submit quarterly reports to the expert for that domain, and to counsel for Plaintiff and Plaintiff-Intervenors as to Defendants' continued substantial compliance with each particular domain." Settlement Agreement ¶ 5(C), at 6.  Senior Judge Parker concluded that the "Defendants achieved initial substantial compliance with Domain #3 as of July 1, 2019," and set the self-monitoring period to begin on July 1, 2019, and end on August 19, 2021, "eighteen calendar months from the entry of [the Domain #3 Initial Compliance] Order," which was entered on February 19, 2020.  Domain #3 Initial Compliance Order ¶¶ 2-3, at 2.  The Domain #3 Initial Compliance Order does not state explicitly how many quarterly reports Bernalillo County must submit during the eighteen-month period; nevertheless, the Court agrees with the Plaintiffs that, for an eighteen-month self-monitoring period, Bernalillo County must submit six quarterly reports. See Response at 1-2.  Bernalillo County argues that "it is not clear that Defendant was required to submit a Q2 2021 report," because "[t]he next quarterly report would have been due in September 2021," and "the monitoring period ended before the next report was due."  Reply at 2.  While the final quarterly report "would have been due in September 2021," Response at 2, and this deadline had not passed before the end of the self-monitoring period, the Court must give greater weight to the provisions of the parties' agreed-upon contract -- the Settlement Agreement -- than to any

deadlines that conflict with the Settlement Agreement's requirements.   The Settlement Agreement's provision that "[t]he quarterly reports will contain sufficient data for the expert for that domain to determine whether County Defendants remain in compliance with each of the subcategories listed under the domain" would be rendered meaningless if the quarterly reports are optional.  Settlement Agreement ¶ 5(C), at 6.  Because the Court interprets the phrase "Defendants' self-monitoring reports," Settlement Agreement ¶ 8, at 8, as referring to the same documents as the "quarterly reports" that Settlement Agreement ¶ 5(C), at 6, requires the Defendants submit to the Plaintiffs' counsel and to that domain's expert, the quarterly reports are an important source of information for the Court to determine whether "the record supports a finding of sustained substantial compliance as to each domain."   Settlement Agreement ¶ 8, at 8.   Furthermore, "reviewing Defendants' self-monitoring reports and providing feedback to the Defendants and their counsel regarding whether the Defendants are in compliance with the provisions of the self-monitoring agreement" are activities for which the Plaintiffs' counsel are compensated.  Settlement Agreement ¶ 5(D), at 6-7.  The Plaintiffs' counsel are compensated for the most important aspects of their work; allowing Bernalillo County to submit fewer quarterly reports than the entirety of a self-monitoring period requires undermines the Settlement Agreement's provisions regarding the Plaintiffs' counsel's oversight duties and compensation.  Settlement Agreement ¶ 5(D), at 6-7.

Bernalillo County argues that the quarterly reports are not the end goal, but, rather, the goal is to provide the expert with sufficient information that the expert is able to make an informed decision about Bernalillo County's sustained compliance.  See Tr. at 182:13-15 (Rahn).  Bernalillo County argues that Frasier writes in the Domain #3 Report that she has sufficient data to complete the check-out audit.  See Tr. at 182:22-25 (Rahn).  Frasier notes the importance of the quarterly reports during the self-monitoring phase: "[F]or domains in the self-monitoring phase, emphasis

has shifted to evaluation of the quarterly reports as opposed to semi-annual compliance tours." Report #14 of the Court Appointed Jail Operations Expert Regarding Conditions of Confinement at Bernalillo County Metropolitan Detention Center at 4 (dated November 22, 2021),  filed November 22, 2021 (Doc. 1495)("Report #14")).

Regardless whether Frasier decides that she has sufficient data to complete the check-out audit, the Court must make its own determination "whether the record supports a finding of sustained substantial compliance as to each domain," and this determination must be "[b]ased upon the Defendants' self-monitoring reports as well as the experts' proposed findings at the Check-Out Audits . . . ."  Settlement Agreement ¶ 8, at 8.  The Court would abdicate its role under the Settlement Agreement if it made optional one basis of information upon which the Settlement Agreement states the Court must rely to determine Bernalillo County's compliance with a particular domain.  Because Bernalillo County submitted only five quarterly reports, see Tr. at 165:1-4 (Smith), and did not submit a quarterly report for April through June, 2021, the Court agrees with the Plaintiffs that Bernalillo County has not submitted the number of quarterly reports that the Settlement Agreement requires.  Although the Settlement Agreement ¶ 5(C), at 6, only requires Bernalillo County to submit the quarterly reports to the Plaintiffs' counsel and to the expert, the Court reads Settlement Agreement ¶ 8, at 8, as requiring Bernalillo County to make the quarterly reports available to the Court also.  These quarterly reports at least should be filed as attachments to the motion for disengagement, so that the Court can find them easily in the record.

The Settlement Agreement states that, "[i]f the Court determines there is not sustained substantial compliance, the Court will set an additional period of self-monitoring."  Settlement Agreement ¶ 8, at 8.  Because the Settlement Agreement states that, "[d]uring the period of self-monitoring for each domain, Defendants will submit quarterly *reports*" in the plural -- and does

not contemplate the possibility of one quarterly report only -- the Court concludes that a six-month self-monitoring period is the minimum period the Settlement Agreement requires. Settlement Agreement ¶ 5(C), at 6 (emphasis added). Accordingly, the Court will order a further six-month period of self-monitoring as to Domain #3, from October 1, 2022 through March 31, 2023, and order Bernalillo County to provide two quarterly reports for that period, which should be filed on CM/ECF as attachments to the renewed motion for disengagement.

## II.   THE RECORD DOES NOT SUPPORT A FINDING OF SUSTAINED SUBSTANTIAL COMPLIANCE AS TO DOMAIN #3.

The Settlement Agreement requires the Court to determine "whether the record supports a finding of sustained substantial compliance as to each domain." Settlement Agreement ¶ 8, at 8. The Plaintiffs assert that, "even if the Court were to determine that the documentation Defendant provided on August 24, 2021 was sufficient to constitute a Q2 2021 report, Defendant has failed to demonstrate sustained compliance with all provisions of Domain #3 during the review period." Response at 2. The Plaintiffs object to the Motion, because they contend that Bernalillo County does not submit sufficient data to demonstrate sustained substantial compliance with: Checkout Audit #3 ¶¶ 6(L)(3)-(4), at 28; Checkout Audit #3 ¶ 6(M)(1), at 29; Checkout Audit #3 ¶¶ 6(O)(3)-(4), at 32; and Checkout Audit #3 (S)(1)-(3), at 34-35. See Response at 2-6. Overlooking the lack of a final quarterly report, and relying on the data in the Domain #3 Report, the Check Out Request Letter, and the documents attached to the pleadings,[12] the Court concludes that: (i) the record does not support a finding of sustained substantial compliance with the fire and life safety requirements

---

[12]The Court has searched the record and cannot find Bernalillo County's quarterly reports for Domain #3. So that the Court can meet its obligations under Settlement ¶ 8, at 8, Bernalillo County must file these reports on CM/ECF as attachments to their motions for disengagement for each domain, in addition to the expert's check out audit reports.

in Check Out Audit #3 ¶¶ 6(L)(3)-(4), at 28; (ii) the record does not support a finding of sustained substantial compliance with the maintenance staffing plan requirement in Check-Out Audit #3 ¶ 6(M)(1), at 28-29; (iii) the record supports a finding of sustained substantial compliance with the food service requirements in Check-Out Audit #3 ¶¶ 6(O)(3)-(4), at 32; and (iv) the record does not support a finding of sustained substantial compliance with the telephone access requirements in Check-Out Audit #3 ¶ 6(S)(1)-(3), at 34-35.

### A.   THE RECORD DOES NOT SUPPORT A FINDING OF SUSTAINED COMPLIANCE AS TO CHECK OUT AUDIT #3 ¶¶ 6(L)(3)-(4).

The record before the Court does not demonstrate sustained compliance as to Check Out Audit #3 ¶¶ 6(L)(3)-(4), at 28, which evaluates "[w]hether MDC has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas according to applicable fire codes," and "[w]hether MDC properly maintains and routinely inspects all fire and life safety equipment."  Check Out Audit #3 ¶¶ 6(L)(3)-(4), at 28. In the Domain #3 Report, Frasier recommends a finding of sustained compliance:

> Proposed finding of fact: MDC has the necessary fire and life safety equipment to demonstrate that it has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas according to applicable fire codes. MDC's audits demonstrate that there was alignment between policy/procedures and operational practices throughout the self-monitoring period. The issues found to be violations in the January 2021 annual fire inspection were minor and have been corrected.
>
> . . . .
>
> Proposed finding of fact: MDC's documentation demonstrates proper maintenance and routine inspection of all fire and life safety equipment by MDC and a fire and life safety equipment contractor. MDC's audits demonstrate that there was alignment between policy/procedures and operational practices throughout the self-monitoring period. The issues found to be violations in the January 2021 annual fire inspection were minor and have been corrected.

Domain #3 Report ¶¶ L(3)-(4), at 3.  The Plaintiffs argue that the "the Fire Alarm Inspection List and the Fire Sprinkler Test" forms -- which Bernalillo County include with the quarterly report for January through March, 2020 -- "had shown failures of various smoke alarms, horns, strobes and modules, as well as various deficiencies in certain housing and other areas regarding the fire sprinkler system in previous reports."  Response at 2-3.  Bernalillo County responds, however, that it corrected any violations listed in the Fire Inspection Report, and argues that the Plaintiffs do not acknowledge the Fire Inspection Report Violations, which proves that it corrected the violations .  See Reply at 4 (citing Fire Inspection Report Violations ¶ 1, at 1-2).  The Fire Inspection Report Violations, which lists the violations and how they were corrected, is some evidence of substantial compliance; however, the Fire Inspection Report Violations does not list the fourteen areas of compliance.  See Fire Inspection Report Violations at 1-2.  Bernalillo County references a Fire Inspection Report, which it attaches as Exhibit A to the Domain #3 Reply.  See Fire Safety Permit at 1, filed January 21, 2022 (Doc. 1529-1)("Fire Safety Permit").  Bernalillo County describes this document as the Fire Inspection Report and asserts that it shows compliance in fourteen out of eighteen areas.  See Reply at 4.  The attached document is entitled "Fire Safety Permit," however, and is an unsigned and undated permit draft, which contains no reference to the eighteen areas of compliance Bernalillo County describes.  See Fire Safety Permit at 1.  Furthermore, the Fire Safety Permit lists MDC's square footage as "0."  Fire Safety Permit at 1.

Bernalillo County states that Frasier made an on-site visit to MDC on June 29-July 2, 2021, "during which she was able to make personal observations."  Reply at 4 (citing Report #14).  Report #14, however, refers the reader to Report #12 for findings about Domain #3: "Monitor Frasier's review in Report #12 found that Substantial Compliance was being sustained of all provisions rated in Domain #3."  Report #14 at 6.  Report #14 does not mention fire safety, and

there is no indication that Frasier's June 29-July 2, 2021, visit included a fire and life safety inspection. Viewing these discrepancies in the data that Bernalillo County submits in combination with its lack of quarterly report on fire and life safety for 2021's second quarter, the Court concludes that, despite Frasier's recommendations and despite the corrections listed in the Fire Inspection Report Violations, the record does not support a finding of sustained compliance as to Check Out Audit #3 ¶¶ 6(L)(3)-(4), at 28.

### B.   THE RECORD DOES NOT SUPPORT A FINDING OF SUSTAINED COMPLIANCE AS TO CHECK-OUT AUDIT #3 ¶ 6(M)(1).

The record does not support a finding of sustained compliance as to Check-Out Audit #3 ¶ 6(M)(1), at 28-29, which evaluates "[w]hether MDC maintains an adequate written staffing plan and sufficient staffing levels to provide for adequate maintenance of the facility." Check-Out Audit #3 ¶ 6(M)(1), at 28-29. In the Domain #3 Report, Frasier determines that

> MDC's documentation and performance demonstrates that MDC maintained an adequate written staffing plan and sufficient staffing levels to provide for adequate maintenance of the facility throughout the self-monitoring period. While MDC has a shortage of security staff, it has sufficient maintenance staff to provide for adequate maintenance of the facility. Adequacy of security staff is covered in another Domain.

Domain #3 Report ¶ M(1), at 4. Since Frasier wrote the Domain #3 Report, the parties entered into a stipulated agreement about security staffing. See Stipulated Order Addressing the Staffing Issues at the Metropolitan Detention Center at 1-7, filed August 11, 2022 (Doc. 1573)("Stipulated Staffing Order"). Despite Frasier's recommendation, the Plaintiffs allege that there is "neither a staffing plan nor documentation showing sufficient staffing levels were provided for Q2 2021." Response ¶ 2, at 3. As discussed above, the Court agrees with the Plaintiffs that the Settlement Agreement requires a quarterly report for every quarter of the self-monitoring period, and, therefore, sets an additional six-month monitoring period. See Analysis § I, supra at 63-66.

Furthermore, the Plaintiffs object that the "Defendant provided only three daily staffing rosters for this time period and a letter dated June 30, 2021 indicating that Defendant had received two bids for a complete staffing analysis and was in the selection and funding process."  Response at 3 (citing Check Out Request Letter).  Because these rosters are not attached to the Response or to the Check Out Request Letter that the Plaintiffs filed, the Court cannot evaluate fully whether the record supports a finding of sustained compliance.  The Plaintiffs state that Frasier, in Report No. 14, "found all five provisions related to staffing to be in only partial compliance as of July 2, 2021," and note that Frasier recommends that Bernalillo County update its staffing plan.  Response at 3.  Frasier's findings in Report No. 14, however, relate to Check-Out Audit #3 ¶ 6(K)(1), which evaluates security, and not maintenance staffing.  The parties have since reached an agreement about security staffing.  See Stipulated Staffing Order at 1-7.

The Plaintiffs also argue that Bernalillo County does not demonstrate that MDC has adequate staff to maintain the facility, see Tr. at 170:18-19 (Smith), and that Check-Out Audit #3 ¶ 6(M)(1), at 28-29, requires MDC to provide "'sufficient staffing levels to provide for adequate maintenance of the facility,'" Tr. at 170:22-25 (Smith)(quoting Check-Out Audit #3 ¶ 6(M)(1)), which includes security staffing, see Tr. at 170:25 (Smith).  The Plaintiffs explain that this lack of staffing leads to insufficient of out-of-cell time for the inmates, because there are not enough staff personnel to let inmates out of their cells, see Tr. at 171:12-16 (Smith); consequently, inmates who are bay orderlies are stuck in their cells for entire weekends, or several days in a row, causing maintenance problems, such as overflowing toilets, see Tr. at 171:12-16 (Smith).  The Plaintiffs note that Bernalillo County received two bids for staffing analysis, and that the staffing analysis would not begin until January, 2022.  See Tr. at 169:7-12 (Smith).

Because the Court orders an additional six-month period of self-monitoring, this time will allow Bernalillo County to complete the staffing analysis that it began in January, 2022, and to provide the updated written maintenance staffing plan that Check Out Audit #3 ¶ 6(M)(1) requires. This period also will give time for Bernalillo County to implement the new security staffing agreement according to the Stipulated Staffing Order and assuage the Plaintiffs' concerns that a lack of security staffing is affecting negatively MDC's maintenance. The Court concludes that the record does not support a finding that Bernalillo County demonstrate sustained substantial compliance with Check Out Audit #3 ¶ 6(M)(1), at 28-29. The Court, therefore, will order Bernalillo County to provide an updated written staffing plan by the end of the new self-monitoring period, as Check Out Audit #3 ¶ 6(M)(1) requires.

### C.   THE RECORD SUPPORTS A FINDING OF SUSTAINED SUBSTANTIAL COMPLIANCE AS TO CHECK-OUT AUDIT #3 ¶¶ 6(O)(3)-(4).

Bernalillo County demonstrates sustained substantial compliance with the food safety requirements in Check Out Audit #3 ¶ 6(O), at 32. See Check Out Audit #3 ¶ 6(O), at 31-32. The Plaintiffs object to a finding of sustained compliance as to Check Out Audit #3 ¶¶ 6(O)(3) and (4), which evaluate "[w]hether MDC ensures that all food service staff, including inmate staff, are adequately trained in food service operations, safe foodhandling procedures, and appropriate sanitation," and "[w]hether MDC ensures that the kitchen is staffed with a sufficient number of appropriately supervised and trained personnel." Check Out Audit #3 ¶¶ 6(O)(3)-(4), at 32. Frasier's reports: "MDC's documentation demonstrates that all food service personnel, including inmates, were adequately trained in food service operations, safe food-handling procedures, and appropriate sanitation. MDC's audits demonstrate that there was alignment between policy/procedures and operational practices throughout the self-monitoring period." Domain #3

Report ¶ O(3), at 8.  She also reports that "MDC's documentation demonstrates that the food service contractor provided a sufficient number of staff and to appropriately supervise and train the personnel throughout the self-monitoring period."  Domain #3 Report ¶ O(4), at 8.  The Plaintiffs assert that "[n]o documentation was provided for the Q2 2021 compliance period and so fail to demonstrate sustained compliance with this provision."  Response at 4.  Bernalillo County counters that it provides sufficient documentation to Frasier for her to make a finding of sustained compliance.  See Reply at 7.

Overlooking the lack of a Q2 2021 quarterly report, the Court agrees with Bernalillo County that Bernalillo County provides sufficient data to demonstrate sustained compliance with these provisions:  Bernalillo County provides the kitchen schedule, the staff serving certifications, and kitchen cleaning instructions.  See Kitchen Schedule Spring 2021, filed January 21, 2022 (Doc. 1529-3); ServSafe Certifications, filed January 21, 2022 (Doc. 1529-4); Cleaning Instructions, filed January 21, 2022 (Doc. 1529-5).  Check Out Audit #3 ¶ 6(O)(3), at 32, requires that the food service staff be "adequately trained." Check Out Audit #3 ¶ 6(O)(3), at 32.  Although Bernalillo County has not submitted a final quarterly report, it submitted sufficient evidence to demonstrate that every food service staff member -- including inmate staff members -- has a food handling certification, and has been trained in equipment safety operation.  See ServSafe Certifications, at 1-7.

Check Out Audit ¶ 6(O)(4), at 32, requires that "the kitchen is staffed with a sufficient number of appropriately supervised and trained personnel."  Check Out Audit ¶ 6(O)(4), at 32. Although the Defendants do not provide their final quarterly report, the documentation Bernalillo provides demonstrates compliance with Check Out Audit ¶ 6(O)(4).  See Kitchen Schedule Spring 2021 at 1.  Although the Court concludes that Bernalillo County has complied adequately with

Check Out Audit ¶¶ 6(O)(3)-(4), at 32, Bernalillo County must produce all quarterly reports for the additional self-monitoring period that the Court sets.

### D.    THE RECORD DOES NOT SUPPORT A FINDING OF SUSTAINED COMPLIANCE AS TO CHECK OUT AUDIT #3 ¶¶ 6(S)(1)-(3).

The record does not support a finding of sustained compliance as to Check Out Audit #3 ¶¶ 6(S)(1)-(3), at 34-35.  Check Out Audit #3 ¶¶ 6(S)(1) evaluates "[w]hether MDC provides its inmates access to telephones which meets the applicable standards stated in the American Correctional Association's Standards for Adult Detention Centers."    Check Out Audit #3 ¶¶ 6(S)(1), at 34.  Frasier recommends that the Court find that:

> MDC's documentation demonstrates that MDC's policies and practices regarding providing inmates access to telephones met the applicable standards of ACA's Standards for Adult Detention Centers for access to telephones throughout the self-monitoring period. MDC contracts with a provider of telecommunication equipment and services to provide the telephones. The Monitor recognizes that physical access to telephones in the housing units was necessarily reduced due to the safety precautions related to the pandemic.  The Monitor also recognizes that lock-downs due to staffing shortages reduced the number of hours inmates have access to telephones. The provision of tablets and the easing of restrictions on inmates being able to access the tablets when they are in their cells helped to offset the reduction of access to telephones in the housing units. MDC has provided documentation of reasonable access to telephones and tablets as required by the applicable standards of ACA's Standards for Adult Detention Centers.  It should be noted that accepted correctional practice does not require a set number of telephone calls by a particular inmate.

Domain #3 Report ¶ S(1), at 10.  Check Out Audit #3 ¶¶ 6(S)(2) evaluates "[w]hether MDC has adequate policies and procedures governing inmate access to telephones and whether it adequately implements those policies."  Check Out Audit #3 ¶¶ 6(S)(2), at 34-35.  Frasier recommends:

> MDC's documentation demonstrates that there were adequate policies and procedures that are adequately implemented governing inmate access to telephones throughout the self-monitoring period.  As noted above, the Monitor recognizes that physical access to telephones in the housing units was necessarily reduced due to the safety precautions related to the pandemic. The Monitor also recognizes that lock-downs due to staffing shortages reduced the number of hours inmates have

access to telephones. The provision of tablets and the easing of restrictions on inmates being able to access the tablets when they are in their cells helped to offset the reduction of access to telephones in the housing units.

Domain #3 Report ¶ S(2), at 10.  Check Out Audit #3 ¶ 6(S)(3), at 35, evaluates "[w]hether MDC has inmate telephones in the booking area and all housing units and whether it provides inmates with adequate access to those telephones."  Check Out Audit #3 ¶¶ 6(S)(3), at 35.  Frasier recommends a finding of sustained compliance:

> MDC's documentation demonstrates that MDC had inmate telephones in the booking area (12 telephones) and all housing areas (ranges from 4-7 telephones) and provided adequate access throughout the self-monitoring period.  The Monitor viewed the telephones in the booking area and observed their usage.  Due to necessary safety precautions, some of the telephones in the booking area were not available for use to provide for social distancing.  However, the number available was adequate for the number of inmates utilizing those telephones.  As noted above, the Monitor recognizes that physical access to telephones in the housing units was necessarily reduced due to the safety precautions related to the pandemic.  The Monitor also recognizes that lock-downs due to staffing shortages reduced the number of hours inmates have access to telephones.  The provision of tablets and the easing of restrictions on inmates being able to access the tablets when they are in their cells helped to offset the reduction of access to telephones in the housing units.  It should be noted that accepted correctional practice does not require a set number of telephone calls by a particular inmate.

Domain #3 Report ¶ S(3), at 10.

The Plaintiffs contest Frasier's recommended finding of sustained compliance as to Check Out Audit #3 ¶¶ 6(S)(1)-(3), at 34-35, noting that Frasier's report specifically acknowledges that inmates' access to telephones was reduced because of the pandemic: "The monitor recognizes that physical access to telephones in the housing units was necessarily reduced due to the safety precautions related to the pandemic.  The monitor also recognizes that lockdowns due to staffing shortages reduce the number of hours inmates have access to telephone."  Tr. at 175:13-19 (Smith).  Bernalillo County responds by stating that tablets were made available in the inmates' cells to make up for this deficiency, and provide Call Statistics demonstrating the number of telephone

calls, video calls and messaging inmates used the tablets.  See Tr. at 157:20 (Rahn); id. at 158:3 (Rahn).

The record demonstrates that inmates completed: 65,816 calls during May, 2021, see Call Statistics at 1; 62,413 calls during June, 2021, see Call Statistics at 2, and 59,324 calls in July, 2021, see Call Statistics at 3.   Bernalillo County argues that the number of calls demonstrates that approximately two calls a day were completed per inmate.  See Tr. at 159:16-23 (Rahn).  The record also demonstrate that, in April, 2021, inmates spent approximately 900,000 minutes on video calls, 400,000 minutes on messaging, and about 12,000 minutes exchanging photographs on the tablets.  See Tr. at 162:1-5 (Rahn)(citing Metropolitan Detention Center Tablet Usage April 2021 Report (May DFMO) at 1, filed January 21, 2022 (Doc. 1529-9)).

The Plaintiffs argue that, although Bernalillo County presents extensive reports of thousands of calls being made, Bernalillo County does not provide data to demonstrate what the call rates were before the COVID-19 pandemic.  See Tr. at 175:6-8 (Smith).  In addition, the Plaintiffs argue that there is no consistent plan in place to ensure that each inmate has equal or consistent access to working tablets and assert that some inmates are hoarding tablets, see Tr. at 176:9-12 (Smith), and that using a tablet inside of a cell is very different from getting to leave the cell to make a telephone call, see Tr. at 176:17-20 (Smith); id. at 177:2-11 (Smith).  Bernalillo County asserts, however, that the ACA does not require the facility to provide a specific number of calls per inmate over a specific timeframe and that the Court should defer to Frasier's findings on this issue.  See Tr. at 157:7-10 (Rahn).

In the Supplemental Report, Frasier addresses the Plaintiffs' argument that tablets are not available equally to all inmates by stating that "[a]dditional steps were taken to lessen the likelihood of hoarding occurring including the introduction of additional tables."  Supplemental

Report at 4.   Frasier also addresses the Plaintiffs' argument that tablets are not a sufficient substitute for telephone access:  "Inmates interviewed indicated that tablets are readily available to inmates," and that "they preferred the tablets to the wall mounted telephones as they provided more privacy and were more widely available."   Supplemental Report at 4.   Frasier summarizes the ACA standards against which the Settlement Agreement evaluates compliance, and emphasizes that the ACA standards do "not require a set number of telephones in a housing unit or a set number of calls by a particular inmate."   Supplemental Report at 4.

Although Frasier addresses some of the Plaintiffs' concerns whether inmates' use of tablets is an acceptable substitute for out-of-cell telephone access and whether inmates have equal access to these tablets, the Settlement Agreement and Check Out Audit #3 evaluate inmates' access to telephones and not to tablets.[13]   The Court is reluctant to expand the Settlement Agreement's scope to monitoring tablet usage, when the Settlement Agreement and Check Out Audit #3 require the Court make a finding of sustained substantial compliance as to telephone access only.   See Check-Out Audit #3 ¶¶ 6(S)(1)-(3), at 34-35.   Although Bernalillo County and Frasier imply that the tablets' use is a sufficient substitute for telephone access, Frasier does not make this finding directly in the Domain #3 Report or in the Supplemental Report.   Furthermore, Bernalillo County

---

[13]By their plain terms and common meaning, the words "telephone" and "tablet" refer to different things.   Compare Merriam-Webster, Telephone, https://www.merriam-webster.com/dictionary/telephone (last visited August 29, 2022)("an instrument for reproducing sounds at a distance," "specifically: one in which sound is converted into electrical impulses for transmission (as by wire or radio waves"), with Merriam-Webster, Tablet https://www.merriam-webster.com/dictionary/tablet   (last visited August 29, 2022)("[Tablet computer: a mobile computing device that has a flat, rectangular form like that of a magazine or pad of paper, that is usually controlled by means of a touch screen, and that is typically used for accessing the Internet, watching videos, playing games, reading electronic books, etc.").   Although Bernalillo County validly makes the argument that inmates can place telephone calls on tablets more effectively than on telephones, Check-Out Audit #3 evaluates access to telephones, and not access to telephone calls.

and Frasier do not provide the exact wording of the ACA standards against which Frasier evaluates sustained substantial compliance, and against which the Court must make its determination whether the record supports substantial compliance as to Check-Out Audit #3 ¶¶ 6(S)(1)-(3), at 33-34.  If the parties wish to amend the Settlement Agreement and Check Out Audit #3 to reflect Bernalillo County's and Frasier's argument that tablets are a valid, ACA-compliant alternative to telephone access, they may do so; it is not, however, within the Court's power to amend the Settlement Agreement or Check Out Audits without the parties' motion.  See Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. at 383 ("[A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree.").

Frasier also addresses the Court's concern that Frasier evaluates MDC against different standards based on the pandemic.  See Supplemental Report at 2.  In the context of the Plaintiffs' Force Majeure Motion, the Court states in the March 29, 2022, Order that "Frasier must recommend substantial compliance with Check-Out Audit #3 ¶¶ 6(S)(1)-(3)'s requirements that inmates have sufficient access to telephones without reference to the COVID-19 pandemic before the Court finds sustained compliance as to Domain #3."  March 29, 2022, Order at 21.  Frasier responds:  "It was the intent of Monitor Frasier to provide insight on how the COVID-19 pandemic and/or staff shortage had influenced the manner in which the Metropolitan Detention Center (MDC) complied with the provisions of the Settlement Agreement, not to change the standard to which Monitor Frasier held MDC."  Supplemental Report at 2.

Despite the Supplemental Report's qualitative and quantitative findings which address the Plaintiffs' previous concerns regarding inmates' ability to make telephone calls and the Court's concern that Bernalillo County not invoke the pandemic as an excuse for diminished telephone access, the Court concludes that the record does not support a finding of sustained compliance as

to Check Out Audit #3 ¶¶ 6(S)(1)-(3), at 33-34, because these provisions govern telephone access and not tablet access.  Because the Court requires a further period of six months' self-monitoring, see Analysis § I, supra at 63-66, Frasier must make another finding of sustained substantial compliance as to Check Out Audit #3 ¶¶ 6(S)(1)-(3), at 33-34, at the end of the new self-monitoring period.

### III.   BERNALILLO COUNTY NEED NOT PROVIDE NOTICE TO THE CLASS AND SUBCLASS MEMBERS BEFORE MOVING FOR DISENGAGEMENT.

Bernalillo County need not provide notice to the Class and Subclass Members before moving for disengagement of Domain #3.  The Plaintiffs request that Class and Subclass members be given notice and an opportunity to be heard before the Court makes a finding of sustained compliance as to Domain #3.  See Response at 6-7.  The Plaintiffs adopt the same arguments that they made in response to the Domain #5 Motion and assert that rule 23 of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 23, and the Due Process Clause of the Fifth Amendment to the Constitution of the United States of America, U.S. Const. amend. V., require notice and an opportunity to be heard before the Court finds that Bernalillo County is in sustained compliance as to Domain #3.  See Response at 6-7.  Bernalillo County also adopts the same arguments it made in the Domain #5 Motion: it contends that it is "simply employing the disengagement mechanism specifically contemplated by the Settlement Agreement, which underwent the Rule 23 approval procedure," and that, "by modifying the Settlement Agreement disengagement procedure to be more burdensome than contemplated at the time of drafting, Plaintiffs ask the Court to deprive Defendants of one the key benefits of the Settlement Agreement, which was a clear path towards dismissal."  Reply ¶ 2, at 10.

At the February 11, 2022, hearing, the Plaintiffs asserted that Bernalillo County proceeds at its own peril if does not notify the Class, because, if a Class member discovers that the lawsuit was terminated and they did not receive notice, he or she could petition the Court for reconsideration under rule 60 of the Federal Rules of Civil Procedure.  See Tr. at 57:19-58:3 (Lowry, Court)).  The Plaintiffs cite Irvin v. Harris, 944 F.3d 63, 72 (2d Cir. 2019), in support of their argument, and summarize its holding as "terminating a consent decree concerning jail conditions without input from class members via current class representative violates individual class members' Due process rights and Rule 23."  Response at 7.  As the Court stated at the hearing, the Court will have to address any motion for reconsideration under rule 60 of the Federal Rules of Civil Procedure if and when it is filed.  See Tr. at 58:4-5 (Court).  The Plaintiffs responded that Bernalillo County is on notice that the Plaintiffs object to the lack of notice and opportunity to be heard, and cannot "say they weren't aware of the problem."  Tr. at 58:11-12 (Lowry).

Although persuasive authority, the United States Court of Appeals for the Second Circuit does not bind the Court.  In Irvin v. Harris, 944 F.3d at 71, upon which the Plaintiffs rely, the Second Circuit states that, "[f]or named class representatives to be 'adequate' under Rule 23, '[t]wo factors generally inform [the inquiry]: (1) absence of conflict and (2) assurance of vigorous prosecution,'"  944 F.3d at 71 (quoting Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 170 (2d Cir. 2001)), and "'[t]he named plaintiffs in a class action cannot represent a class of whom they are not a part, and can represent a class of whom they are a part only to the extent of the interests they possess in common with members of the class,'" 944 F.3d at 71 (quoting Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch., 660 F.2d 9, 17 (2d Cir. 1981)).  The Second Circuit concludes that a class of inmates "was inadequately represented during the termination proceedings," because

the class was defined as "all persons who are or will be confined at the Green Haven Correctional Facility" . . . .  But none of the named class representatives remained incarcerated at Green Haven during any time period relevant to the termination proceedings, and no new representatives were substituted after the original representatives were released.  There is no record evidence that any of the named plaintiffs retained "interests . . . in common" with the class, *Nat'l Super Spuds*, 660 F.2d at 17, which would provide "assurance of vigorous prosecution," *Robinson*, 267 F.3d at 170; *cf. Sosna v. Iowa*, 419 U.S. 393, 395-97, 403 . . . (1975).  In short, named representatives of a Green Haven inmate class certified 35 years before the relevant proceedings do not adequately represent the class when they are no longer Green Haven inmates and have not continued to pursue the litigation.

Irvin v. Harris, 944 F.3d at 71-72.  The Second Circuit seems to be an outlier, however: the United States Court of Appeals for the First Circuit notes that other Courts of Appeals -- including the Tenth Circuit -- "have concluded that class members whose claims are no longer live may adequately represent the class on a going-forward basis."  Cohen v. Brown Univ., 16 F.4th 935, 947 (1st Cir. 2021)(citing J.D. v. Azar, 925 F.3d 1291, 1313  (D.C. Cir. 2019)(per curiam)("Mootness alone . . . does not establish [the named plaintiffs'] inadequacy as representatives."); Binta B. ex rel. S.A. v. Gordon, 710 F.3d 608, 619 (6th Cir. 2013)(explaining that class representative with moot claim is adequate "at least until such time that there is a determination that the representative is no longer adequate"); Reed v. Bowen, 849 F.2d 1307, 1312 (10th Cir. 1988)(holding that district court "determine[s] whether mooted named plaintiffs will remain adequate class representatives"); Harris v. Peabody, 611 F.2d 543, 544 (5th Cir. 1980)(per curiam)("Whether [plaintiff with moot claims] may continue to represent a class depends upon the facts of the given case."); Ahrens v. Thomas, 570 F.2d 286, 288-89 (8th Cir. 1978)(holding that plaintiff, no longer a pretrial detainee, adequately represented class of "all present and future pretrial detainees" at jail)).  The First Circuit concurs with the majority of Courts of Appeals that have considered this issue, and explains that

an inquiring court should not invoke any presumption against allowing a plaintiff whose own claim has become moot to continue in place as a class representative but, rather, should consider the adequacy-of-representation issue on the facts of the particular case. . . .   [W]e must ask whether the representatives' interests meaningfully conflict with those of the class and whether the representatives are competent champions of the cause.

Cohen v. Brown Univ., 16 F.4th at 947.

In Reed v. Bowen, the Tenth Circuit affirmed a district court's denial of a class certification where the plaintiffs' claims were moot.  See 849 F.2d at 1309.  The Tenth Circuit explains:

In making such a determination the district court may consider "the stature and interest of the named parties themselves."  7A C. Wright & A. Miller, Federal Practice and Procedure § 1766 at 297-98 (2d ed. 1986).  Specifically, when the named plaintiffs' claims are moot the district court may consider "the stage at which the individual resolution occurs and the extent of the resolution."  *Harris*, 611 F.2d at 545; *see also Glidden v. Chromalloy Am. Corp.*, 808 F.2d 621, 626 (7th Cir. 1986)("If the claim of the class representative becomes moot in advance of a certification, the case may come to a halt even if a properly certified class action would survive the mootness of the representative's claims.").

Reed v. Bowen, 849 F.2d at 1313.  Unlike the stage of the district court's case in Reed v. Bowen -- where the class had not yet been certified -- the Class and Subclass in this case were certified decades ago in 1995.  See Order at 1, filed August 23, 1996 (Doc. 106); Order at 1, filed September 7, 1995 (Doc. 116); Settlement Agreement at 1-3, filed September 7, 1995 (Doc. 115). Considering the stage at which this case is -- nearly thirty years after the class was certified and the first Settlement Agreement was approved, and six years after the current Settlement Agreement was approved, see MOO Approving Settlement at 1-2 -- the Plaintiffs do not argue, and the Court does not conclude, that the Class and Subclass representatives are inadequate.

The Court addressed briefly the Plaintiffs' arguments in the March 29, 2022, Order, when it ruled on the Domain #5 Motion:

First, it is the responsibility of the Plaintiffs' counsel to keep Class and Subclass representatives informed of the progress of the lawsuit, as 16-104 NMRA

requires.[14]  Second, the Court agrees with Bernalillo County that Rule 23's notice requirements were satisfied when the Honorable James Parker, Senior United States District Judge for the United States District Court of New Mexico, approved the Settlement Agreement in 2016. . . .  As Judge Parker noted in his Memorandum Opinion and Order, "[t]he notice requirements of Rule 23 are designed to satisfy due process by providing class members the right to notice of settlement and a right to be heard."  McClendon v. City of Albuquerque, No. CIV 95-0024 JAP/ACT, 2016 U.S. Dist. LEXIS 202938, at *26 (D.N.M. June 27, 2016)(Parker, J.)(citing Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173-74 (1974)).  Third, "'the stage at which the individual resolution occurs and the extent of the resolution'" is an important factor in determining the adequacy of a class member's representation, where that class member's claims are moot.  Reed v. Bowen, 849 F.2d 1307, 1313 (10th Cir. 1988)(quoting Harris v. Peabody, 611 F.2d 543, 545 (5th Cir. 1980)).  Here, the Class and Subclass members are no longer incarcerated; however, six years have passed since Judge Parker approved the Settlement Agreement resolving the case.  Consequently, the Court does not conclude that the Class and Subclass members are inadequate for this stage of the proceedings.

March 29, 2022, Order at 18-19.  The Court sees no reason to depart from its reasoning in the

March 29, 2022, Order.  If the parties think that the current class representative are inadequate,

---

[14]Rule 16-104 NMRA provides that a lawyer shall

    (1)    promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Paragraph E of Terminology of the Rules of Professional Conduct, is required by these rules;

    (2)    reasonably consult with the client about the means by which the client's objectives are to be accomplished;

    (3)    keep the client reasonably informed about the status of the matter;

    (4)    promptly comply with reasonable requests for information; and

    (5)    consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law.

16-104 NMRA.  "The Rules of Professional Conduct adopted by the Supreme Court of the State of New Mexico apply" in the United States District Court for the District of New Mexico. D.N.M.LR-Civ. 83.9.

they need to raise that issue directly by separate motion, so that the Court and the parties enjoy full briefing and argument on the issues, and not raise it in response to a motion to find sustained compliance when requiring notice to the class.  The Court also will not raise this issue sua sponte. Because the parties do not argue -- and provide no evidence that -- the current Class and Subclass members are inadequate for this stage of the litigation, the Court will deny the Plaintiffs' request for notice and an opportunity to be heard before it makes a finding of sustained substantial compliance as to Domain #3.

     **IT IS ORDERED** that: (i) Defendant Bernalillo County Board of Commissioners' Motion for Finding of Sustained Compliance and for Disengagement of Domain #3, filed (Doc. 1480), is denied; (ii) the Plaintiff's request that Bernalillo County give notice and  an opportunity to be heard to Class and Subclass members before the Court finds a Domain in sustained compliance as stated in the Plaintiff and Plaintiff Intervenors' Joint Response Opposing Defendant Bernalillo County Board of Commissioners' Motion for Finding of Sustained Compliance and for Disengagement of Domain #3 at 1-9, filed December 10, 2021 (Doc. 1497), is denied; (iii) Bernalillo County must undergo another six-month period of self-monitoring, as Settlement Agreement ¶ 8, at 8, requires, to begin October 1, 2022, and end March 31, 2023; (iv) Bernalillo County must attach its two quarterly reports to the renewed motion for disengagement of Domain #3.

 

UNITED STATES DISTRICT JUDGE

*Parties and counsel*:

Adam C. Flores
Ives & Flores, PA
Albuquerque, New Mexico

-- and --

Alexandra Freedman Smith
Doreen McKnight
Law Office of Alexandra Freedman Smith
Albuquerque, New Mexico

-- and --

Mary E. Schmidt-Nowara
Freedman, Boyd, Hollander & Goldberg, P.A.
Albuquerque, New Mexico

-- and --

Philip B. Davis
Philip B. Davis, Attorney at Law
Albuquerque, New Mexico

-- and --

Mark H. Donatelli
Peter Schoenburg
Marc M. Lowry
Kate S. Thompson
Rothstein Donatelli LLP
Albuquerque, New Mexico

   *Attorneys for the Plaintiffs*

Mary E. Schmidt-Nowara
Freedman, Boyd, Hollander & Goldberg, P.A.
Albuquerque, New Mexico

-- and --

Philip B. Davis
Davis Law
Albuquerque, New Mexico

-- and --

Claire Dickson
Albuquerque, New Mexico

-- and --

Nancy L. Simmons
David Meilleur
Law Offices of Nancy L. Simmons
Albuquerque, New Mexico

-- and --

Peter Cubra
Law Office of Peter Cubra
Albuquerque, New Mexico

-- and--

Ryan J. Villa
Kelly K. Waterfall
The Law Office of Ryan J. Villa
Albuquerque, New Mexico

       *Attorneys for the Plaintiff-Intervenors*

Jeffrey L. Baker
The Baker Law Firm
Albuquerque, New Mexico

-- and --

Debra J. Moulton
Kennedy, Moulton & Wells, P.C.
Albuquerque, New Mexico

-- and --

Kathryn Levy
Carlos F. Pacheco
Trevor Adam Rigler
City Attorney's Office
City of Albuquerque

Albuquerque, New Mexico

>  *Attorneys for Defendant City of Albuquerque*

Luis E. Robles
Taylor S. Rahn
Marcus J. Rael, Jr.
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

>  *Attorneys for Defendants County of Bernalillo and Bernalillo County Board of Commissioners*

Shane C. Youtz
Stephen Curtice
Youtz & Valdez, PC
Albuquerque, New Mexico

>  *Attorneys for Intervenor AFSCME Local 2499*

Michael Sisneros
Director of Bernalillo County Detention Center
Albuquerque, New Mexico

>  *Defendant pro se*