# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JIMMY (BILLY) McCLENDON, et al.,

      **Plaintiffs,**

vs.                                    No. CIV 95-24 JB/KBM

CITY OF ALBUQUERQUE, et al.,

      Defendants,

vs.

E.M., R.L. W.A. D.J., P.S., and
N.W. on behalf of themselves and
all other similarly situated,

      Plaintiff-Intervenors.

## STIPULATED SETTLEMENT AGREEMENT TO AVOID LITIGATION REGARDING NONCOMPLIANCE WITH CHECK-OUT-AUDIT NUMBER 2

This matter comes before the Court by agreement of Defendant Bernalillo County and Plaintiff-Intervenors ("the parties") regarding the resolution of a dispute between the parties concerning noncompliance with Check-Out Audit Agreement Number 2 ("COA # 2), Document No. 1222-3. Plaintiff Intervenors assert that compliance with COA #2 precipitously declined after Defendant Bernalillo County ("Bernalillo County" or "County") contracted with YesCare, a corporation formerly known as Corizon ("YesCare"), to provide mental health services at the Bernalillo County Metropolitan Detention Center ("MDC"). Defendant Bernalillo County does not admit these allegations and the Court makes no findings in regard to the substance of the dispute, beyond what is stated herein.

Based on the stipulations of the parties, and the reports of the Court's experts, the Court

1

finds as follows pursuant to 18 U.S.C. § 3626(a)(1):

1.  This Order resolves the current dispute between the parties concerning Intervenors' allegations regarding the decline of Bernalillo County's provision of mental health care at MDC;

2.  Defendant Bernalillo County is not in compliance with some of the requirements of COA # 2;

3.  Defendant Bernalillo County has begun steps to remedy the problems that are the subject of the parties' dispute, and the parties have determined that Corrective Action Plans ("CAPs") and other measures set forth herein should be implemented promptly, without the delay, expense and distraction of litigation of this dispute;

4.  It is in the best interests of Defendant Bernalillo County, the Intervenors, and the public for this settlement agreement to be entered at this time, without the expense and distraction of litigation; and

5.  The settlement agreement is proper and all of the relief described in this settlement agreement:

   a.  is narrowly drawn;

   b.  extends no further than necessary to correct the violations of the federal rights of class and subclass members;

   c.  is the least intrusive means necessary to correct the violations of the federal rights of class and subclass members; and

   d.  will have no adverse impact on public safety or the operation of the criminal justice system.

It is hereby ordered that Defendant Bernalillo County and Plaintiff Intervenors will implement the following Settlement Agreement forthwith.

## SETTLEMENT AGREEMENT BETWEEN
## PLAINTIFF INTERVENORS AND DEFENDANT BERNALILLO COUNTY

On March 18, 2022, counsel for Intervenors wrote to Special Master Alan Torgerson, "seeking [his] assistance with the mediation of the dispute between [Intervenors] and County Defendant ("County") regarding the County's failure to provide mental health services to Intervenors in compliance with COA #2. The parties ultimately decided to attempt to negotiate their dispute, and thereafter met on several occasions to attempt to resolve their dispute.

Counsel for the parties have determined that it is in their mutual interests to resolve their dispute regarding the issues raised in that letter on the following terms. This settlement agreement resolves that dispute. It is not intended to resolve all issues between the parties and it does not preclude future litigation regarding alleged noncompliance with COA # 2.

## A. TERMS

1.     In consideration for this Stipulated Settlement Agreement:

   a.      Intervenors agree not to file their heretofore contemplated Motion For Enforcement Of Check-Out Audit Agreement No. 2 And For Further Remedial Relief; and

   b.      Defendant Bernalillo County will, in return, implement the provisions of this Settlement Agreement, as described herein.

## B. CORRECTIVE ACTION PLANS FOR MENTAL HEALTH

2.     Henry Dlugacz, an expert in the provision of mental health services to people in prisons and jails selected by counsel for Plaintiff Intervenors, and the County's

3

Compliance Monitor regarding medical and mental health care provided to people detained in the

MDC, Natalie Vance (together "drafters"), will collaborate in creating corrective action plans ("CAPs") designed to bring all items in COA # 2 that have declined since YesCare became the vendor for providing mental health care at MDC into compliance with COA #2. Those items to be addressed by the CAPs are listed in Attachment A hereto.

3.       If Natalie Vance is no longer in her position before the CAP is fully drafted, the County will designate a replacement. If counsel for Plaintiffs-Intervenors object to the replacement, the parties will present this dispute to Dr. Jeffrey Metzner to determine whether the proposed replacement possesses the requisite qualifications.

4.       Defendant Bernalillo County will reimburse Henry Dlugacz for his work on developing the corrective action plans at his customary hourly rate for similar work, $335 per hour, up to $ 20,000.00.

5.       The drafters have begun to meet and will determine how they will collaborate in drafting proposed CAPs, including (a) which areas of COA #2 should be prioritized for drafting a CAP based on the respective urgency of the areas and (b) which of the two drafters is best suited to write the first draft for each area, based on their respective areas of experience and expertise. Each drafter will then provide their first draft CAP for each topic to the other drafter, as soon as that draft CAP is completed. These first drafts will simultaneously be made available to counsel for Intervenors and the County. Each drafter will give the other any feedback they have and will then have a conversation during which they either reach agreement on content, or crystalize any area of

disagreement.

6.        CAPs about which the drafters fully agree will be implemented by the County and its vendor forthwith.

7.        Any disagreement about a provision of a CAP will be submitted for resolution to Dr. Jeffrey Metzner, as the Court's appointed expert. Once finalized by Dr. Metzner, the CAP will be implemented forthwith.

8.        Counsel for either party may object to any provision of a particular CAP, for good cause shown, by presenting a timely objection to the Court for final review and approval.

9.        After each CAP is finalized, any policy changes that the CAP calls for will be included in Metropolitan Detention Center policies.

10.       Natalie Vance, as Compliance Monitor, will oversee the progress of the County's medical/mental health vendor in implementing the CAP. The Compliance Monitor will provide monthly reports on progress to counsel for Intervenors.

11.       The drafters will issue each CAP as soon as practicable and make their best efforts to complete and submit all of their draft CAPs by December 31, 2022. The drafters will give priority to and will act with all due speed with regard to (1) specialty care for inmates with serious mental illness, (2) sick call for inmates with mental health concerns, and (3) intake screening for inmates with mental health concerns.Based on their own judgment, and suggestions from counsel for the parties, the drafters will categorize the other areas as highest priority, average priority and lower priority, and schedule the drafting of the CAPs based on those priorities.

12.       As part of the drafters' creation of a CAP related to specialty care for inmates

with serious mental illness, any proposed CAP must, in addition to any provisions chosen by the drafters, include:

a.     A process for the prompt assessment of inmates with Serious Mental Illness who may be in need of a higher level of specialty care, as described in Item (B)(17) of COA # 2, to include a timeline for assessment of affected inmates by professional level personnel and a timeline for any referral to a higher level care, as deemed necessary by professional level personnel;

b.     MDC and YesCare personnel (or personnel for any future medical vendor), will work with the courts, prosecutors, public defenders, and mental health providers in Bernalillo County, including the University of New Mexico Hospital, or other appropriate stakeholders to establish an ongoing mechanism for ensuring that the County and its vendor coordinate with the appropriate stakeholders to facilitate placements for identified individual class members in need of a higher level of care, as described in (B)(17) of COA #2; and

c.     A Metropolitan Detention Center policy describing the mechanism for identification and referral of inmates to a higher level of care.

## C. MORBIDITY REVIEWS

13.     The County will formalize and adopt Dr. Metzner's proposed definition of serious suicide attempt, to include self-harm by inmates whose intent was lethal, even though their method was not. The need for hospitalization is a factor for inclusion of a self-harm incident as a serious suicide attempt, but the lack of hospitalization and/or the lack of need for an internal emergency medical response is not a basis for exclusion of a particular incident that otherwise demonstrates lethal intent. As soon as the written definition is accepted by Dr. Metzner it must be included in MDC policy.

14.     The County must present evidence to counsel for Intervenors that it is conducting timely morbidity reviews for purposes of mental health issues. This includes providing Intervenors a monthly list and description of all incidents of self-harm at the end of each

month, including a statement whether the Mortality and Morbidity ("M&M") committee has accepted the incident for morbidity review. YesCare will complete all morbidity reviews as they are due, and provide all completed morbidity reports and the lists of incidents of self-harm and of suicide attempts to Plaintiffs and Plaintiff Intervenors at the end of each month. If the reviews are downloaded to the Sharepointfile or otherwise provided in an encrypted message, the County must communicate to Plaintiffs and Plaintiff Intervenors and to Dr. Metzner when morbidity reviews and lists have been downloaded.

15.       Where the County and YesCare adopt a corrective action plan as a result of a mortality or morbidity review, the County must also demonstrate that it is using an effective mechanism to track completion of the CAPs. In complying with the morbidity reviews section of this Settlement Agreement, the County may rely on the drafters to review and assess the present morbidity review process, and to draft any necessary CAPs, incorporating the above-described mandatory provisions.

### D. WATCHES AND ROUNDS

New Electronic Systems for Monitoring

16.   Intervenors have submitted to the County Defendants information regarding two recommended systems for monitoring watches and rounds, as follows:

a.        The Guardian RFID Compliance Monitor, which monitors whether corrections officers or other personnel are performing watches and rounds;

b.        The "Alive Lock," which monitors heart rate and motion for inmates who are subject to watches. The reports are that it detects suicide attempts and vital signs electronically, at a distance. This would be added to, not substituted for, in-

person watches.

17.      By December 31, 2022, the County will review both systems, and, if the County

chooses, other similar electronic monitoring systems.  The County will consult with all

three court appointed experts, and with the County Compliance Monitor, Natalie Vance,

and Henry Dlugacz ("experts").  If a majority of these five persons agree that an

electronic monitoring system will substantially improve MDC's system to implement and

oversee watches, MDC and the County Manager will recommend to the County

Commission that the County purchase and implement one of the electronic monitoring

systems.

<u>Watches and Rounds that Depend on Personnel</u>

18.      The County will direct its medical vendor, as a matter of MDC policy, that the

vendor must conduct monthly audits of whether YesCare safety monitors are performing

adequate watches.  The County will also ensure that all audits include a review of video

evidence to ensure that YesCare safety monitors are accurately reporting their

compliance with monitoring policies.  The methodology of audits performed by the

medical vendor must be consistent with the monitoring performed of watches and rounds

by corrections personnel and must include video monitoring.

19.   YesCare's contract with the County provides that YesCare will have at least seven

positions, to cover watches and rounds.

  a.      Intervenors agree that the County cannot guarantee that all positions are
  filled on every date, because there is always an ebb and flow to personnel.

  b.      By December 31, 2022, the County and YesCare will ensure sufficient
  staffing levels so that all suicide watches are conducted as ordered by the mental
  health provider.

c.      By December 31, 2022, the County will create and provide to Intervenors a plan for monitoring by the County Compliance Monitor of whether 100% of the funds resulting from the County's waiver of the contract penalties for failure to fill existing vacancies are being directed towards recruitment and compensation for new hires.

20.      By December 31, 2022, the County must adopt effective discipline for corrections officers who are assigned to inmate monitoring, but who fail to conduct monitoring as required. YesCare must also conform its discipline of its employees to accord with the discipline assigned to corrections officers, to avoid conflict between the two policies. Accordingly, the policy for discipline of any persons assigned to monitoring must be incorporated into MDC policy, rather than relying on vendor policies.

d.      Corrective action must provide, at a minimum, that all monitors who are documented as having intentionally fabricated the information on the monitoring forms must be terminated from employment and/or barred from entering MDC.

e.      Corrective action must provide, at a minimum, that all monitors who fail to perform 1:1 suicide precautions as required and all monitors who fail to complete at least 90% of their checks as required must be suspended from paid employment for at least one day and/or barred from entering MDC for one day.

21.      The County must document and demonstrate to Intervenors progress in turning around MDC's deficient record. This progress must be explicitly set forth in incremental benchmarks.

f.      The County will enable the drafters to review the available data regarding watches and rounds, and request additional studies if necessary, and then collaborate on producing a draft CAP to improve MDC's deficient record on conducting adequate watches and rounds. This draft should be completed by December 31, 2022, and should be submitted to Plaintiffs and Plaintiff Intervenors, as well as to the three court-appointed experts, for review and comment. The CAP will be implemented on the timelines set forth in that CAP.

g.      The draft CAP must include dates for incremental improvement and the County will achieve at least 80 % compliance with timely and accurate watches

9

and rounds within 90 days of the finalization of the CAP and at least 90% compliance within six months.

h.     The CAP must also include a tracking system so that the County, the drafters, and Plaintiffs and Plaintiff-Intervenors are able to track the County's progress in reaching each benchmark.

i.     Until 90% compliance is met, the benchmarks must be reviewed at least monthly by the Suicide Prevention Committee and MEAC. The assessment by the Suicide Prevention Committee and MEAC must be contained in the minutes of each meeting, and the minutes must be provided to counsel for Intervenors at the end of each month.

## E.  AVAILABILITY OF PSU COUNSELOR ON-SITE, FOR EACH SHIFT

22.     The parties agree that the availability of one or more PSU counselors on-site, each day and for each shift, is critical to providing appropriate care to MDC inmates with mental health issues. Accordingly, the parties agree that there will be at least one PSU counselor working on-site at MDC, available for each shift. The parties agree that there may be occasions when the assigned PSU counselor is absent due to being sick or some other unforeseen event. Nonetheless, a PSU counselor will always be assigned, and will not be asked to move or be moved to cover another gap in personnel.

23.     The parties explicitly agree that a "Med1" nurse may not be regularly or routinely substituted for a PSU counselor.

24.     The County will ensure that MDC will have at least one licensed counselor on site 24 hours a day seven days per week by December 31, 2022, whether via employment, contract or assigning other qualified County personnel.

## F.  MONITORING AND QUALITY CONTROL

25.     The parties have agreed that the County will have a permanent position of contract compliance monitor for MDC, with a medical background,

j.       to serve as a County employee,

k.       to be a permanent member of any quality control committee required by COA#2,

l.       to report directly to the County Commission or the County Manager on a monthly basis, with copies of the report to be provided to Plaintiffs and Plaintiff-Intervenors, and

m.      to be allowed to communicate with Intervenors concerning mental health services at MDC, on a monthly basis.

n.       The job responsibilities of the contract compliance monitor include monitoring of compliance with *McClendon* during any transition between vendors, including but not limited to maintenance of the PSU Matrix and the PSU patient list, as well as the change between the old vendor's EMR system and the new vendor's system.

26.      The County will provide Intervenors with CQI Audits on the last day of each month.

27.      The County will provide Intervenors with all morbidity reports regarding incidents of self-harm or suicide attempts at the end of each month.

## G. OTHER MATTERS

28.      The County and counsel for Intervenors will continue to work with the drafters of the corrective action plans at least until the CAPs are implemented.

29.      In the event that Defendant Bernalillo County and counsel for Plaintiff Intervenors do not agree about how to accomplish any aspect of the above, they will seek assistance from the Court expert, Dr. Metzner, as well as the drafters, to resolve any disagreements regarding how to implement the Corrective Action Plans.

30.      If the County determines that a deadline set forth in the CAP has become unworkable, the County will alert counsel for Plaintiff Intervenors at least a week prior to

the deadline and propose a new deadline.

o.      If Intervenors do not agree to the proposed extension or the parties are unable to come to an agreement, the Court expert, Dr. Metzner, will then determine whether the extension will result in an unreasonable risk of harm;

p.      If the Court expert determines there is no unreasonable risk of harm, the extension will be granted;

q.      If the Court expert does not make a determination within fourteen days of the expiration of the original deadline, Plaintiff Intervenors may file a motion raising the issue with the Court.

31.      In the event the County determines that a task set forth in the CAP has become unworkable, they will alert counsel for Intervenors, the Court expert, and the drafters. If the Court expert, after consulting with the drafters, agrees that there is a better way to accomplish the same purpose, they may either eliminate the provision or substitute a different provision for the original one.

32.      In the event the County does not comply with the timelines or tasks in the CAP, Intervenors' counsel may present the issue(s) directly to the Court by filing a motion seeking to remedy the ongoing noncompliance, without first mediating the issue(s) before the Special Master.

33.      Noncompliance with any provision of the CAP creates a rebuttable presumption of noncompliance with COA # 2. County Defendant may overcome that presumption, but County Defendant bears the burden of proof in any proceeding in which they seek to rebut the presumption using a preponderance of the evidence standard.

34.      Nothing in this Stipulated Settlement Agreement prevents counsel for Plaintiffs or Plaintiff Intervenors from seeking remedial relief from the Court in the event members of the class or subclass are experiencing irreparable harm, irrespective of whether the CAP

is being implemented. This agreement does not otherwise modify the mediation provisions set forth in the parties' Settlement Agreement.

35.      The Compliance Officer will monitor compliance with COA # 2 and the provisions of this Settlement Agreement.

36.      The Parties will conduct quarterly status conferences with the Court to address County Defendant's progress in achieving compliance with COA #2, the CAPs, this Order and any compliance related issues.

37.      The County may not file any Prison Litigation Reform Act (PLRA) motion to terminate prospective relief until eighteen (18) months following the date the Court enters this Order. This order will expire after eighteen (18) months, but Intervenors may request an extension of this order if the provisions of this Settlement Agreement have not been implemented.

**IT IS SO ORDERED.**

_____
JAMES O. BROWNING
United States District Judge

**APPROVED:**

_____
Kenneth Martinez
Attorney for County Defendants

_____
Taylor Rahn
Attorney for County Defendants

_____
for Kelly Waterfall
Attorney for Plaintiff-Intervenors

_____
Nancy L. Simmons
Attorney for Plaintiff-Intervenors

13

## CROSS WALK CENTURION COMPLIANCE VERSUS YESCARE COMPLIANCE

33 of 70 active items have been downgraded.  I have not counted items that Plaintiff Interveners agreed to delete from Check-out Audit.

A.          **Screening and Assessment**

1) Whether MDC has developed and implemented policies and procedures for appropriate screening and assessments of inmates with serious mental health needs.

**July 30, 2021**          **compliance continues**
**July 7, 2022**           **partial compliance**

2) Whether MDC has developed and implemented an appropriate screening instrument that identifies mental health needs and ensures timely access to a mental health professional when inmates present symptoms requiring such care.

**July 30, 2021**          **compliance continues**
**July 7, 2022**           **partial compliance**

3) Whether MDC screens all inmates with Qualified Medical Staff upon booking at MDC, but no later than four (4) hours after booking, to identify the inmate's risk for suicide or self-injurious behavior.

**2021**                   **compliance continues**
**2022**                   **compliance ruling deferred**

4) Whether MDC's Qualified Medical Staff conducting intake screening receive adequate training on identifying and assessing suicide risk, are assigned appropriate tasks and guidance, and properly conduct intake screening.

**2021**                   **partial compliance continues**
**2022**                   **non-compliance**

5) Whether MDC Qualified Medical Staff, based on the screening, develop and implement an acuity system or triage scheme (P1, P2, or P3) to ensure that inmates with immediate mental health needs are prioritized for services.

**2021**                   **compliance continues**
**2022**                   **partial compliance**



PLAINTIFF'S EXHIBIT A — ALL-STATE LEGAL®

Psychiatric Assessment
Re: <u>McClendon, et al. v. The City of Albuquerque, et al.</u>
Page 2 of 17

6) Whether MDC provides "sufficient psychiatric services to assure that a psychiatrist will evaluate no later than the business day after a resident's admission, any resident who: 1) reports being on any psychoactive medication when taken into custody, 2) requests any psychoactive medication or other psychiatric service, or 3) has been identified by any mental health or health professional at the jail as appropriate for a psychiatric assessment." *[Doc. No. 256, IIII(1-3)].*

      a.  Whether MDC provides adequate and timely psychiatric services to assess any inmate who:
          (1) reports being on any psychiatric medication when taken into custody,
          (2) requests any psychiatric medication or other psychiatric service, or
          (3) has been identified by any mental health or health professional at the jail as appropriate for a psychiatric assessment.

| | |
|---|---|
| **2021** | **partial compliance due to backlog** |
| **2022** | **partial compliance due to backlog** |

7) Whether MDC implements policies and procedures, commensurate with the level of risk of suicide or self-harm, that ensure that inmates are protected from identifiable risks for suicide or self-injurious behavior..

| | |
|---|---|
| **2021** | **partial compliance continues** |
| **2022** | **partial compliance; would have found non-compliance if not for June 2022 audit** |

8) Whether MDC's policies and procedures require that a Qualified Mental Health Professional performs a mental health assessment within the prescribed period of time, based on the inmate's risk.

| | |
|---|---|
| **2021** | **partial compliance due to problems with implementation** |
| **2022** | **partial compliance due to staffing** |

9)Whether MDC security staff monitors inmates who are presumed to be of moderate or high risk of suicide or self-harm with constant supervision until the inmate is seen by a Qualified Mental Health Professional for assessment, and thereafter on the schedule chosen by the Mental Health Professional.

| | |
|---|---|
| **2021** | **partial compliance** |
| **2022** | **partial compliance** |

Psychiatric Assessment
Re: McClendon, et al. v. The City of Albuquerque, et al.
Page 3 of 17

10) Whether MDC conducts appropriate mental health assessments within the following periods
    from the initial screen:
    a. 14 days, or sooner, if medically necessary, for inmates classified as low risk (P3);
    b. 8 hours, or sooner, if medically necessary, for inmates classified as moderate risk (P2); and
    c. Immediately, but no later than four hours, for inmates classified as high risk (P1).

| 2021 | compliance continues |
| 2022 | deferred finding |

11) Whether MDC ensures that mental health assessments include the assessment factors described
below:
    a.  Intake screening shall inquire as to the following:
        (1) Current mental health conditions;
        (2) Current psychiatric medications;
        (3) Current suicidal ideation, threat, or plan;
        (4) Past suicidal ideation and/or attempts;
        (5) Prior mental health treatment or hospitalization;
        (6) Recent significant loss – such as the death of a family member or close friend;
        (7) History of suicidal behavior by family members and close friends;
        (8) Any reported observations of the transporting officer, court, transferring agency, or
            similar individuals regarding the inmate's potential suicidal risk.

| 2021 | compliance continues |
| 2022 | partial compliance |

12) Whether MDC Qualified Mental Health Professionals complete all assessments, pursuant
    to generally accepted correctional standards of care.

| 2021 | compliance is now present |
| 2022 | partial compliance |

13) Whether MDC Qualified Mental Health Professionals perform in-person mental health
    assessments no later than one working day following notification of any adverse triggering
    event (i.e., any suicide attempt, any suicide ideation, and any aggression to self-resulting in
    injury).

| 2021 | compliance continues |
| 2022 | deferred finding |

Psychiatric Assessment
Re: <u>McClendon, et al. v. The City of Albuquerque, et al.</u>
Page 4 of 17

14) Whether MDC Mental Health Staff conduct in-person assessments of inmates before placing them on suicide watch, clinical seclusion, or segregation and on regular intervals thereafter, as clinically appropriate and defined by MDC policy.

| | |
|---|---|
| **2021** | **compliance continues** |
| **2022** | **partial compliance** |

15) Deleted from check-out audit.
16) Deleted from check-out audit.
17) Deleted from check-out audit.

**B. Treatment Plan**

1) Whether Defendants provide treatment plans consistent with prevailing professional standards for those inmates requiring a treatment plan.

    a.  Whether treatment plans for inmates in specialized mental health units are designed by an appropriate treatment team; and

    b.  Whether the plans are reviewed periodically, ordinarily at least every 90 days, and at the request of the resident.

| | |
|---|---|
| **2021** | **compliance now present** |
| **2022** | **partial compliance** |

2) Whether MDC's policies and procedures ensure that adequate and timely treatment for inmates are continued and further developed for inmates whose assessments reveal serious mental health needs and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate. *[Doc. No. 256, III(I)].*

| | |
|---|---|
| **2021** | **partial compliance continues** |
| **2022** | **partial compliance** |

Psychiatric Assessment
Re: McClendon, et al. v. The City of Albuquerque, et al.
Page 5 of 17

3) Whether MDC's treatment plans adequately address inmates' serious mental health needs and whether the plans contain interventions specifically tailored to the inmates' diagnoses and problems. *[Doc. No. 256, III(I)].*

| 2021 | **compliance now present** |
|------|----------------------------|
| 2022 | **partial compliance** |

4) Whether MDC makes available appropriate therapy services by a licensed mental health provider where medically necessary for inmates with serious mental health needs as ordered by their attending psychiatrist.

| 2021 | **partial compliance continues** |
|------|----------------------------------|
| 2022 | **non-compliance** |

5) Whether MDC completes mental health evaluations as part of the disciplinary process and can demonstrate that the hearing officer incorporates those recommendations into the disciplinary process for determining whether an inmate's actions should be excused and, if not, for mitigation of sanctions if the inmate's behaviors were a result of a mental or developmental disability. *[Doc. No. 256, IV(A)(1)].*

| 2021 | **compliance is now present** |
|------|-------------------------------|
| 2022 | **non-compliance** |

6) Whether MDC implemented an adequate scheduling system to ensure that mental health professionals assess inmates with mental illness as clinically appropriate, regardless of whether the inmate is prescribed medications. *[Doc. No. 256, III(I)].*

| 2021 | **compliance continues** |
|------|--------------------------|
| 2022 | **non-compliance** |

7) Whether MDC inmates have the opportunity to participate meaningfully in the development of a treatment plan. *[Doc. No. 256, III(I)].*

| 2021 | **compliance continues** |
|------|--------------------------|
| 2022 | **non-compliance** |

Psychiatric Assessment
Re: <u>McClendon, et al. v. The City of Albuquerque, et al.</u>
Page 6 of 17

8) Whether MDC inmates receive appropriate psychotropic medications in a timely manner.

| | |
|---|---|
| **2021** | **partial compliance** |
| **2022** | **partial compliance** |

9) Whether MDC's use of psychotropic medications is reviewed by a Qualified Mental Health Professional on a regular, timely basis.

| | |
|---|---|
| **2021** | **partial compliance continues** |
| **2022** | **partial compliance** |

10) Whether MDC properly monitors and timely adjusts medications.

| | |
|---|---|
| **2021** | **partial compliance continues** |
| **2022** | **partial compliance** |

11) Whether MDC has established standards for the frequency of review and associated charting of psychotropic medication.

| | |
|---|---|
| **2021** | **compliance continues** |
| **2022** | **partial compliance** |

12) Whether a psychiatrist personally assesses every MDC inmate on psychiatric medication at least once every thirty (days. *[Doc. No. 256, III(C)]*.
   a. With what frequency should a psychiatrist personally assess every MDC inmate on psychiatric medication who is not seriously mentally ill.
   b. With what frequency should a psychiatrist personally assess every seriously mentally ill inmate.

| | |
|---|---|
| **2021** | **partial compliance continues** |
| **2022** | **deferred finding** |

13) Whether MDC's treatment of suicidal inmates involves more than segregation and close supervision (*i.e.*, providing psychiatric therapy, regular counseling sessions, and follow-up care).

| | |
|---|---|
| **2021** | **compliance continues** |
| **2022** | **partial compliance** |

Psychiatric Assessment
Re: <u>McClendon, et al. v. The City of Albuquerque, et al.</u>
Page 7 of 17

14) Deleted from check-out audit

15) Deleted from check-out audit

16) Deleted from check-out audit

17) Whether Defendants have developed and implemented adequate formal procedures for seeking psychiatric hospitalization or other appropriate residential mental health care for inmates who need and would benefit from such care, and who are eligible for such placement, consistent with the court imposed conditions of their confinement. *[Doc. No. 256, III(M)].*

    a. Whether MDC has sent an inmate to a psychiatric hospital or other appropriate residential mental health care for inmates who need and would benefit from such care, and who are eligible for such placement, consistent with the court imposed conditions of their confinement.

    b. Whether MDC has the realistic option of sending an inmate to a psychiatric hospital or other appropriate residential mental health care for inmates who need and would benefit from such care, and who are eligible for such placement, consistent with the court imposed conditions of their confinement

**2021**                   **compliance continues**

**2022**                   **partial compliance**

**C. Suicide Precautions**

1) Whether MDC's suicide prevention policies, procedures, and practices include provisions for constant direct supervision of actively suicidal inmates, close supervision of special needs inmates with lower levels of risk (e.g., 15-minute checks), and follow-up assessments after the suicide watch is discontinued.

**2021**                   **compliance continues**
**2022**                   **partial compliance**

2) Whether MDC inmates on suicide watch are monitored by security with constant direct supervision until a Qualified Mental Health Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.

**2021**                   **compliance continues**
**2022**                   **partial compliance**
3) Whether MDC security staff provide the amount of supervision specified by a Qualified Mental

Psychiatric Assessment
Re: McClendon, et al. v. The City of Albuquerque, et al.
Page 8 of 17

Health Professional and accurately document their well-being checks on forms that do not have pre-printed times.

**2021**          partial compliance (?)
**2022**          partial compliance

4) Whether MDC follows its policy of having a psychiatrist or psychologist evaluate all inmates placed on suicide precautions before they are removed from suicide watch, and whether MDC assures that its policies are followed.

**2021**          compliance continues
**2022**          partial compliance

5) Whether MDC conducts all follow-up assessments on all inmates discharged from suicide watch.

**2021**          partial compliance (?)
**2022**          partial compliance

6) Deleted
7) Deleted

8) Whether MDC has developed and implemented appropriate policies for the housing of suicidal inmates.

**2021**          compliance continues
**2022**          partial compliance

9) Whether MDC assures that its policies and procedures in paragraphs 1-8 are followed.

2021          compliance continues
2022          partial compliance

## D. Suicide Prevention Training Program

1) Deleted from check-out audit.

2) Whether all medical and mental health staffs are trained on the suicide screening portion of the mental health intake form and medical intake tool.

**2021**          compliance continues

Psychiatric Assessment
Re: McClendon, et al. v. The City of Albuquerque, et al.
Page 9 of 17

| 2022 | compliance continues |
|------|----------------------|

3) Whether all MDC staff who work directly with inmates have demonstrated competence in identifying and managing suicidal inmates and have shown comprehension of the training objectives via a performance measure tool such as a pre-and post-test.

| 2021 | compliance continues |
|------|----------------------|
| 2022 | compliance continues |

4) Deleted from check-out audit.
5) Deleted from check-out audit.

6) Whether an emergency rescue tool is in close proximity to all housing units.

| 2021 | compliance continues |
|------|----------------------|
| 2022 | compliance continues |

7) Whether all staff coming into regular contact with inmates knows the location of the emergency rescue tool and are trained in its use.

| 2021 | compliance continues |
|------|----------------------|
| 2022 | compliance continues |

**E. Use of Clinical Restraints**

1) Deleted from check-out audit.

2) Whether the MDC policy requires restrained inmates with mental health needs are monitored at least every 15 minutes by security staff to assess their physical condition. *[Doc. No. 256, III (N)&(I)].*

| 2021 | compliance continues |
|------|----------------------|
| 2022 | compliance continues |

3) Deleted from check-out audit.
4) Whether MDC follows its clinical restraint policies. *[Doc. No. 256, III (N)&(I)].*

| 2021 | compliance continues |
|------|----------------------|
| 2022 | compliance continues |

Psychiatric Assessment
Re: <u>McClendon, et al. v. The City of Albuquerque, et al.</u>
Page 10 of 17

**F. Use of Security Four Point Restraints**

1) Whether MDC ensures that, in the event an emergency results in a four-point restraint of an individual identified as having a psychiatric, neuropsychological or developmental disorder, a Qualified Mental Health professional is notified immediately and personally assesses the appropriateness of the restraint and designs a plan to safely end the restraint as soon as possible.

| | |
|---|---|
| **2021** | **compliance continues** |
| **2022** | **compliance continues** |

**G. Basic Mental Health Training**

1) Deleted from check-out audit.

2) Whether MDC provides adequate specialized training for all security staff working on specialized mental health units.

| | |
|---|---|
| **2021** | **compliance continues** |
| **2022** | **compliance continues** |

**H. Mental Health Staffing**

1) Whether the caseload for psychiatrists treating MDC inmates exceeds 100 residents per FTE. *[Doc. No. 256, III(C)].*

    a. What caseload allows psychiatrists treating MDC inmates to provide for adequate access to psychiatric care for inmates in need of such treatment.

    b. Whether the current caseload for psychiatrists treating inmates provides for adequate access to psychiatric care for inmates in need of such treatment.

| | |
|---|---|
| **2021** | **partial compliance** |
| **2022** | **partial compliance** |

2) Whether MDC's mental health staffing is sufficient to provide all safety precautions (referencing suicide prevention and planned use of force), treatment, and services required by the Court's orders.

Psychiatric Assessment
Re: McClendon, et al. v. The City of Albuquerque, et al.
Page 11 of 17

| | |
|---|---|
| **2021** | **partial compliance** |
| **2022** | **partial compliance** |

3) Whether MDC provides adequate care for inmates' serious mental health needs.

| | |
|---|---|
| **2021** | **partial compliance** |
| **2022** | **partial compliance** |

4) Whether MDC's mental health staffing is sufficient to provide adequate care for inmates' serious mental health needs, consistent with generally accepted correctional mental health standards of care.

| | |
|---|---|
| **2021** | **partial compliance continues** |
| **2022** | **partial compliance** |

5) Whether MDC annually reviews staffing patterns based on data of time frames in which staff have completed necessary functions such as response to sick call requests, initial assessments, follow up contacts, and other essential clinical processes during the past year.

| | |
|---|---|
| **2021** | **non-compliance due to no staffing analysis** |
| **2022** | **deferred compliance rating** |

6) Whether there is evidence that MDC addressed staffing needs whenever new programming was initiated.

| | |
|---|---|
| **2021** | **compliance continues** |
| **2022** | **compliance rating deferred** |

**I. Quality Assurance/Improvement *[Doc. No. 256, III(K)]*.**

1) Whether MDC developed and implemented policies and procedures that create an adequate quality management system to review suicide and self-injurious behaviors, morbidity and mortality and implementation of its mental health policies and procedures and implemented appropriate corrective action to prevent or minimize future harm to inmates.

| | |
|---|---|
| **2021** | **partial compliance remains** |
| **2022** | **partial compliance** |

2) Whether MDC developed and implemented a Suicide Prevention Committee that reviews individual and system data about triggers and thresholds and determines whether these data indicate trends either for individuals or for the adequacy of treatment and suicide prevention

Psychiatric Assessment
Re: McClendon, et al. v. The City of Albuquerque, et al.
Page 12 of 17

overall.

| 2021 | partial compliance |
| 2022 | partial compliance |

3) Whether MDC's Quality Improvement Committee:

a. Includes the Medical Director, the Psychiatric and Behavioral Health Directors, related clinical disciplines, Jail Director or the Assistant Chief of Operations, and the Health Services Administrator;
b. Conducts analyses of the mental health processes and makes recommendations on changes and corrective actions;
c. Provides oversight of the implementation of mental health policies, procedures, guidelines and support plans;
d. Reviews policies, training, and staffing levels;
e. Monitors implementation of recommendations and corrective actions;
f. Reports its findings and recommendations to appropriate County officials periodically; and
g. Refers appropriate incidents to the Morbidity/Mortality Committee for review, as necessary.

| 2021 | compliance continues |
| 2022 | partial compliance |

4) Whether MDC's Morbidity/Mortality Committee reviews suicides, serious suicide attempts, all other deaths of people committed to the custody of the MDC, and other sentinel events occurring at MDC in order to improve care on a jail-wide basis.

a. Whether MDC's Morbidity and Mortality Review Committee conducts an interdisciplinary review, consisting of members of the correctional, medical, and mental health staffs, of all deaths of people housed at MDC, serious suicide attempts and other sentinel events;
b. Whether MDC's Morbidity and Mortality Review Committee's inquiry includes:
  i.   circumstances surrounding the incident;
  ii.  facility procedures relevant to the incident;
c. All relevant training received by involved staff;
d. Pertinent medical and mental health services/reports involving the victim;
e. Possible precipitating factors leading to the event;
f. Recommendations, if any, for changes to policy, training, physical plant, medical or mental health services, and operational procedures; and
g. Tracking of whether MDC implements recommendations and, if so, when.

| 2021 | partial compliance |

Psychiatric Assessment
Re: McClendon, et al. v. The City of Albuquerque, et al.
Page 13 of 17

**2022**                     **partial compliance**

5) Whether the review team, when appropriate, develops a written plan (and timetable) to address areas that require corrective action.

**2021**                     **partial compliance**
**2022**                     **partial compliance**

6) Whether MDC's Mortality Committee or Suicide Prevention Committee (for review of morbidity only) conducts a preliminary mortality or morbidity review within 30 days of each suicide or serious suicide attempt (e.g., those incidents requiring hospitalization for medical treatment).

**2021**                     **partial compliance**
**2022**                     **partial compliance**

7) Whether Mortality Committee or Suicide Prevention Committee's preliminary report of any mortality review is completed within 30 days of each suicide or serious suicide attempt.

**2021**                     **partial compliance**
**2022**                     **partial compliance**

8) Whether MDC completes a final mortality review report within 30 days after the pathological examinations are complete.

**2021**                     **deferred finding**
**2022**                     **deferred finding**

**J. Other Matters**

1) Whether any individual who has been identified as having a psychiatric, neuropsychological or developmental disorder who was subjected to a Taser, pepper gas, mace or other chemical agent is assessed by a mental health professional and the circumstances of the event is included in the resident's mental health file.

**2021**                     **continued compliance**
**2022**                     **partial compliance**

2) Whether Defendants have developed an adequate plan to implement an effective jail diversion program for persons with psychiatric or developmental disabilities. *[Doc. No. 319 at 6 ¶ 4]*

**2021**                     **continued compliance**
**2022**                     **continued compliance**

Psychiatric Assessment
Re: <u>McClendon, et al. v. The City of Albuquerque, et al.</u>
Page 14 of 17

3)  Whether Defendants developed, in consultation with the Court's Mental Health Expert, a plan
    for the provision of specialized mental health treatment for both female and male residents
    who are segregated. May 22, 2013 "Order Resolving Order to Show Cause," *[Doc. No. 1004].*

| | |
|---|---|
| **2021** | **partial compliance** |
| **2022** | **partial compliance** |

### K. Constitutionally adequate mental health care

1) Whether the mental health care provided by MDC to its inmates evidences repeated examples
   of negligent acts.

| | |
|---|---|
| **2021** | **compliance continues** |
| **2022** | **"I found no evidence of repeated negligent acts based on this limited virtual site assessment."** |

2) Whether the conduct of MDC mental health staff effectively denies inmates access to adequate
   mental health care;

| | |
|---|---|
| **2021** | **compliance continues** |
| **2022** | **"The conduct of MDC mental health staff does not deny inmates access to adequate mental health care."** |

3) Whether there are systematic deficiencies in staffing, facilities, equipment, or procedures.

| | |
|---|---|
| **2021** | **compliance continues** |
| **2022** | "There are not systematic deficiencies in staffing [allocations], facilities, equipment, or procedures although there have clearly been issues related to staffing vacancies as summarized in various sections of this report." |

4) Whether the inmate population is effectively denied access to adequate mental health care.

| | |
|---|---|
| **2021** | **compliance continues** |
| **2022** | "The inmate population is not denied access to adequate mental health care although access issues are present related to staffing vacancies as previously summarized." |

Psychiatric Assessment
Re: <u>McClendon, et al. v. The City of Albuquerque, et al.</u>
Page 15 of 17

## L. Americans with Disabilities Act

1) Whether the Defendants have made the modifications to their policies, procedures and practices that are necessary to provide to sub class members mental health care which is adequate.

**2021**            **compliance continues**
**2022**            **partial compliance**

2) Whether sufficient communication occurs between MDC administration and treating mental health care professionals regarding an inmate's significant mental health needs that must be considered in classification and housing decisions in order to preserve the health and safety of that inmate, other inmates, or staff.

**2021**            **compliance continues**
**2022**            **compliance continues**

3) Whether MDC security staff is adequately advised of inmates' special mental health needs that may affect housing, work, program assignments, disciplinary measures, and admissions to and transfers from institutions.

**2021**            **see Frasier report**
**2022**            **see Frasier report**

4) Whether mental health care and security staff communicate sufficiently about inmates with special needs conditions.

**2021**            **compliance continues**
**2022**            **compliance continues**

5) Whether MDC follows a proactive program which provides care for special needs patients who require close mental health supervision or multidisciplinary care.

**2021**            **compliance continues**
**2022**            **compliance continues**

6) Whether individual mental health treatment plans are developed by a psychiatrist or other qualified clinician at the time the condition is identified and updated when warranted.

**2021**            **compliance now present**

Psychiatric Assessment
Re: <u>McClendon, et al. v. The City of Albuquerque, et al.</u>
Page 16 of 17

**2021**                    **partial compliance**

7)Whether the mental health treatment plan includes, at a minimum:

   a.  The frequency of follow-up for mental health evaluation and adjustment of treatment
       modality;
   b.  The type and frequency of diagnostic testing and therapeutic regimens; and
   c.  When appropriate, instructions about diet, exercise.

**2021**                    **compliance continues**
**2022**                    **partial compliance**

Psychiatric Assessment
Re: <u>McClendon, et al. v. The City of Albuquerque, et al.</u>
Page 17 of 17

**Attachment 2**