## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JIMMY (BILLY) McCLENDON, et al.,

      **Plaintiff,**

      **v.**                                                     **No. CIV 95-24 JB/KBM**

CITY OF ALBUQUERQUE, et al.,

      **Defendant,**

      **v.**

E.M., R.L., W.A., D.J., P.S., and
N.W. on behalf of themselves and
all other similarly situated,

      **Plaintiff-Intervenors.**

### DEFENDANT CITY OF ALBUQUERQUE'S MOTION TO DISMISS BASED ON COMPLIANCE WITH THE TERMS OF THE 2017 SETTLEMENT AGREEMENT

There is no longer a valid basis for the City of Albuquerque to remain a defendant in this action. The City entered a settlement agreement with the Plaintiffs and Plaintiff-Intervenors eight years ago. That agreement specified that the City would be entitled to dismissal if it adopted revised arrest procedures and established programs that would help individuals avoid incarceration. The City has fulfilled its obligations under that agreement. The City, therefore, is entitled to dismissal. In addition, the City is not engaged in an ongoing constitutional violation that would justify extension of its contractual obligations. The City, therefore, moves for an order dismissing it from this matter.[1]

---

[1] Pursuant to D.N.M. LR-Civ. 7.1(a), Defendant attempted to determine whether this motion was opposed prior to filing by sending a Letter to counsel for Plaintiffs and Plaintiff-Intervenors requesting their position. Counsel have advised they are opposed.

## BACKGROUND

This lawsuit was filed three decades ago as a class action alleging unconstitutional conditions at the Bernalillo County Detention Center (BCDC), then located in downtown Albuquerque. At that time, BCDC was jointly operated by the City and Bernalillo County. The Complaint alleged that the Defendant violated the Eighth and Fourteenth Amendments to the United States Constitution, and analogous provisions of the New Mexico Constitution, by allowing overcrowding at BCDC. *See* Doc. No. 1 at 22-23. In November 1996, Plaintiffs and Plaintiff-Intervenors[2] entered into two Settlement Agreements with both the City and County. The Court adopted these Consent Decrees in two orders: Order Regarding the Prison Litigation Reform Act (Doc. No. 255) (the PLRA Order); and Order (Doc. No. 256) (the 1996 Order).[3] These orders required the City and the County to significantly reduce the average daily population at BCDC.

By June 2003, the City and County completed the transfer of inmates from BCDC to the newly constructed Metropolitan Detention Center (MDC) located in western Bernalillo County. In July 2006, the City transferred full operational control of MDC to the County. Since that time, the County has managed MDC.

In July 2015, Plaintiff-Intervenors asserted that the City Defendants had not consistently complied with prior orders. After mediation, the City and the Plaintiffs and Plaintiff-Intervenors

---

[2] On August 15, 1996, the Court certified "a sub class of all persons with mental and/or developmental disabilities who are, or in the future may be, detained at the [BCDC]," represented by Plaintiff-Intervenors. *See* Order Certifying Sub-Class (Doc. 237). As used in this brief, unless otherwise specified, "Plaintiffs" includes "Plaintiff-Intervenors."

[3] The PLRA Order addressed issues of population management; the 1996 Order (Doc. No. 245) is the Court's approval of the first Consent Decree reached between the Plaintiff-Intervenors and Defendants in October of 1996, which settled Plaintiff-Intervenors' Complaint.

reached a settlement agreement.[4]  The Settlement is divided into fourteen paragraphs, ten of

which contain specific expectations of the City.  The Agreement provides the City must fulfill

the requirements of those 10 paragraphs to end its involvement in this lawsuit:

> This Agreement satisfies all claims made or claims that could have been made by
> the Plaintiff class and the Plaintiff Intervenor sub class against the City
> Defendants in this action and will result in dismissal of City Defendants from this
> action after the City Defendants have substantially complied with the provisions
> set forth herein. City Defendants may file motions with the Court to find
> substantial compliance in whole or in in part with individual paragraphs of this
> Agreement. After publishing the report required by Paragraph 6, City Defendants
> may file a motion for dismissal from the case upon showing of substantial
> compliance with this Agreement.

Exhibit A, ¶ 14.

After the parties reached an agreement, the City began working to comply with the 10

requirements.

Paragraph 1

To comply with Paragraph 1, the City began drafting new policies, and revising existing

policies, to require officers to issue citations, rather than making arrests, in certain

circumstances.  Paragraph 1 provides that:

> The Chief of the Albuquerque Police Department will, within 45 days from the
> signing of this Agreement, (a) issue a special order and a member of the
> command staff will issue a corresponding video, and (b) initiate revision to the
> Arrests, Arrest Warrants and Booking Procedure Standard Operating Procedure,
> specifically 2-80. Both the Special Order and revised SOP 2-80 will include a
> clear written directive to police officers regarding the Court's order in *McClendon*
> with respect to issuing citations whenever appropriate, as established by operative
> policies, including an explanation that persons alleged to have committed non-
> violent misdemeanor offenses (not to include DWIs) will not be arrested when
> there are no circumstances necessitating an arrest. ("Provide direction to law
> enforcement officials under the control of the City and/or the County to issue
> citations where appropriate and to use the 'walk through procedures,' rather than
> incarcerating individuals, where appropriate." (Doc. 319, p. 5)). The written
> directives will explain how to use the window at Metropolitan Court to post a
> bond or pay a fine to resolve or quash a warrant, without being taken to the

---

[4] *See* Order Approving Settlement Agreement (Doc. 1320), attached hereto as Exhibit A.

Prisoner Transport Unit or the jail. The written directives will also specify that whether a person has a permanent address may not be the sole factor in determining whether to arrest rather than issue a citation. The Special Order will remain in effect until the approval of the revised SOP.

Within 10 days of signing the Settlement Agreement, the City initiated revisions to the Arrest, Arrest Warrants and Booking SOP. The City went on to create and publish a Special Order[5] and corresponding video that met each of the criteria required by Paragraph 1.[6] Within 45 days of the parties' signing the Settlement Agreement, Chief Gorden E. Eden, Jr. issued a Special Order intended to address the requirements of Paragraph 1. (Special Order 17-53, entitled "Court Order in *McClendon* and Arrest Procedures,").[7] The Special Order made it mandatory for officers to issue citations in lieu of arrest on non-violent misdemeanor offenses, other than DWIs, when circumstances did not call for an arrest. As Paragraph 1 required, the Special Order also clarified that whether or not a person has a permanent address could not be the sole factor in deciding to arrest rather than issue a citation. Attached to the Special Order was a list of applicable non-violent misdemeanor offenses. This list was also provided to officers in pocket cards for quick reference.

Additionally, the Special Order directed officers not to take people to the Prisoner Transport Unit or the MDC when circumstances made it feasible to instead use the bonding window located at the Bernalillo County Metropolitan Court; for example, to post a bond, pay a fine, or to resolve a warrant. The Special Order directed officers to take people to the bonding window whenever they were arrested for lower-level warrants, such as those issued for traffic or

---

[5] *See* Department Special Order 17-53, attached hereto as Exhibit B.

[6] *See* Email from Debra Moulton to counsel for Plaintiffs and Plaintiff-Intervenors, dated May 15, 2017, attached hereto as Exhibit C. The corresponding video can be viewed at https://www.youtube.com/watch?v=Hcz1DK8LjGc&t=1s, marked as Exhibit D.

[7] *See* Exhibit B.

petty misdemeanor charges, and to explain that fines or bonds could be paid without having to be booked into MDC. The Special Order explained all aspects of the bonding window, including its hours, that the bonding window only accepts cash, and the procedures for cancelling a warrant at the bonding window. The Special Order also directed officers to return the person to their prior location upon completion of the transaction if time or the situation permits. The corresponding video required under Paragraph 1(a) was made available to Albuquerque Police Departments officers on May 11, 2017. The video link was provided to Plaintiffs on May 15, 2017.[8]

As Paragraph 1 required, the City also initiated revisions to the Arrests, Arrest Warrants and Booking Standard Operating Procedure (SOP 2-80), on April 7, 2017. On that date, the City provided several SOPs to Plaintiffs.[9] A more detailed discussion regarding the revisions to SOP 2-80 is discussed below under Paragraph 3.

Paragraph 2

To comply with Paragraph 2, the City revised its Uniform Citation form to include a field for telephone numbers and email addresses.  Paragraph 2 provides that:

> The City has been informed that the State will soon be issuing a revised Uniform Traffic Citation form that includes fields for telephone number and email address, and has so informed counsel for Plaintiffs and Plaintiff-Intervenors. In reliance on this expectation, Plaintiff and Plaintiff-Intervenors have agreed that the Chief of the Albuquerque Police Department will, within 30 days after the State issues the revised Uniform Citation form that includes fields for telephone number and email address, issue a Standard Operating Procedures requiring all officers to, whenever possible, obtain and record telephone numbers and email addresses whenever they issue a citation.

At the time of the Settlement Agreement, the City already had in place a Special Order

---

[8] *See* Exhibit C.

[9] *See* Email from counsel for City to counsel for Plaintiff dated April 7, 2017, regarding McClendon Consent Decree SOPs, attached hereto as Exhibit E. These included 2-80.

instructing officers to ask the driver/violator their email and phone number when issuing a Uniform Traffic Citation.[10]  That Special Order remained in effect until the incorporation of the procedure into SOPs 2-40 and 2-41. That occurred on April 9, 2019, when APD added the following to SOP 2-40 Misdemeanor Traffic and City Ordinance Enforcement:

> B. Uniform Traffic Citations
>
> 1.  Officers using the New Mexico Uniform Traffic Citation, may charge a person with a moving violation as defined in state statutes or city ordinances as follows:
>     a.  Officers issuing a notice to appear in court citation, penalty assessment citation, or warning citation will:  …
>         ii.  Officers *shall* fill in the email address and telephone number fields for each citation. Officers *shall* inform the person that the purpose of including this information is to provide the information to the court so the court can inform the person of their court date. If the individual declines to provide an email address or telephone number the officer must note that in the narrative of the citation or the drop down menu if possible.

(Emphases added.)[11] Also on April 9, 2019, APD added the following to SOP 2-41 Traffic Stops: "Citation should include driver's phone number and email address."[12]  Plaintiffs approved the additional language.[13] APD published the two Standard Operating Procedures requiring all officers to, whenever possible, obtain and record telephone numbers and email addresses whenever they issue a citation in 2018 and 2019. As such, the City has complied with the requirements of Paragraph 2.

---

[10] *See* Exhibit F, Special Order 15-74, issued August 26, 2015.

[11] SOP 2-40 Misdemeanor Traffic and City Ordinance Enforcement, April 9, 2019, attached hereto as Exhibit G.

[12] *See* SOP 2-41 Traffic Stops, attached hereto as Exhibit H.

[13] *See* Email from counsel for City to counsel for Plaintiffs and Plaintiff-Intervenors on October 30, 2018; and response Email dated October 31, 2018, approving the proposed language, attached hereto as Exhibit I.

In the interest of insuring that APD officers fill in the email address and telephone number fields for each citation pursuant to policy, APD has recently requested that the citation be modified such that those fields are now required fields and must be filled in to finalize the citation.[14]

<u>Paragraph 3</u>

To comply with Paragraph 3, the City made additional policy revisions, and implemented training on those policies, through the course of long negotiations with Plaintiffs.  Paragraph 3 provides that:

The City Defendants will also initiate revisions to the following SOP's:

a. Field Services Standard Operating Procedure 1-14 entitled "Biased Based Policing/Profiling."
b. Field Services Standard Operating Procedure 2-80 entitled "Arrests, Arrest Warrants and Booking Procedures;"
c. Field Services Standard Operating Procedure 2-71 entitled "Search and Seizure without a Warrant;" and
d. Former Field Services Standard Operating Procedure 3-12 entitled "Domestic Violence."

It is the City's position that the above-referenced standard operating procedures in their current form are consistent with the subjects which follow. However, the revised standard operating procedures will include, to the extent that such provisions are not already sufficiently clear, provisions that (a) require officers to have reasonable suspicion before stopping, searching, asking for identification from, frisking, or searching people who appear to have a mental disability, and/or to be homeless; and (b) state that officers may seize or dispose of property or personal identification only when authorized by law to do so. The City will provide the above referenced SOP's in their current forms within 10 days of signing the Agreement to counsel for Plaintiff and Plaintiff Intervenors. Counsel for Plaintiffs and Plaintiff Intervenors will have 30 days to provide suggested revisions. Thereafter, counsel for Plaintiff and Plaintiff Intervenors will have opportunity to present their suggested revisions to the Office of Policy Analysis (OPA); the City will schedule an OPA meeting within 30 days of receiving their suggestions. The policies will then go through the Department's policy development process, within 90 days. Following the Policy Procedure Review Board, counsel for Plaintiff and Plaintiff and Plaintiff Intervenors will be presented with the final revisions. They will have fourteen (14) days to provide

---

[14] *See* Affidavit of D.C. Jon Griego, attached hereto as Exhibit J.

written objection with respect to any of their original suggestions not fully incorporated into the revisions. The Chief will have ultimate authority.

After the Chief issues the SOP regarding the issuance of citations, issues the SOP regarding the collection of phone numbers and email addresses, and gives ultimate approval to the SOP's (specifically SOP's 1-14, 2-19, 2-80, 2-71 and 3-12), APD will ensure that all officers are adequately trained on the revised SOP's.

With regard to training methods on these policy changes for the SOP's referenced (specifically SOP 1-14, 2-19, 2-80, 2-71 and 3-12), APD will develop, following the finalization of the revisions, a training plan within 60 days of the Chief approving the revised policy. Counsel for plaintiff and plaintiff intervenors will be given the opportunity to review the training plan and materials and make comments and recommendations within two weeks of receipt of same. The Chief will make the final determination on training materials and methods.

After the Settlement Agreement was signed, the City provided draft versions of SOP 1-14, 2-80, 2-71, 4-25 and 2-19 to Plaintiffs.[15]  The parties then continued exchanging drafts through March 2018.[16]  On March 12, 2018, Plaintiffs approved SOP 2-71, 2-19, and 4-25, but expressed concerns about SOP 1-14.[17]  After further revisions by the City,[18] Plaintiffs approved SOP 1-14.[19] After a conference call with Chief Geier, Plaintiffs prepared a revised draft of SOP 2-80.[20] On April 26, 2018, a revised SOP 1-14 was published, as was revised SOP 2-80 and revised SOP 2-71. On April 25, 2018 revised SOP 4-25 was published. *See* SOPs (first pages only), attached hereto as Exhibit Y.

---

[15] *See* Exhibit E. Two of the SOP's referenced in the Settlement Agreement had been relabeled as part of a reorganization of APD's SOP's when counsel for the City sent the SOPs to counsel for Plaintiffs and Plaintiff-Intervenors. Specifically, SOP 1-14, Biased Based Policing/Profiling, had been relabeled SOP 1-4. Additionally, SOP 3-12 had been relabeled 4-25. As of this writing, SOP 4-25 is now SOP 2-78.

[16] *See* Correspondence between counsel and pleadings regarding SOP revisions, Exhibits K – T.

[17] *See* Email from counsel for Plaintiffs and Plaintiff-Intervenors regarding SOPs, attached hereto as Exhibit U.

[18] *See* Email from counsel for City to counsel with SOP 1-4 dated March 28, 2018, attached hereto as Exhibit V.

[19] *See* Email from counsel for Plaintiffs and Plaintiff-Intervenors with approval of the newly revised version of SOP 1-4, attached hereto as Exhibit W.

[20] *See* Emails from counsel for Plaintiffs and Plaintiff-Intervenors to counsel for City regarding SOP 2-80 dated March 30, 2018, attached hereto as Exhibit X.

After the SOPs were finalized, the parties agreed to a schedule for the review of training materials, including the Training Needs Assessment, Lesson Plan, Lesson Plan Evaluation, training video.[21]  The City provided each by the agreed-upon deadline, and Plaintiffs provided feedback on each.

Paragraph 4

To comply with Paragraph 4, the City revised its Behavioral Health SOP.  Paragraph 4 provides that:

> The City Defendants will also initiate revisions to Field Services Standard Operating Procedure 2-19 entitled "Response to Behavioral Health Issues."  The City will provide the current SOP within 10 days of signing the Agreement to counsel for Plaintiffs and Plaintiff Intervenors. Counsel for Plaintiffs and Plaintiff Intervenors will have 30 days to provide suggested revisions. Plaintiff and Plaintiff Intervenors may also participate in the review of this policy with Mental Health Response Advisory Committee (MHRAC) or Office of Policy Analysis (OPA) if they chose to do so. The City will schedule an OPA meeting within 30 days of receiving Plaintiffs' and Plaintiff Intervenors' suggestions. The policies will then go through the Department's policy development process, within 90 days. Following the Policy Procedure Review Board, counsel for Plaintiff and Plaintiff Intervenors will be presented with the final revisions. They will have fourteen (14) days to provide written objection with respect to any of their original suggestions not fully incorporated into the revisions. The Chief has ultimate approval of SOP contents. After the Department's internal review process is complete, the City will send this SOP to the parties and the Monitor in USA v. City, 1:14-CV-1025-RB-SMV, where it is subject to objection by the parties and approval of the Monitor. City will implement the SOP within 30 days of Monitor approval.

The City provided SOP 2-19, entitled "Response to Behavioral Health Issues," to Plaintiffs on April 7, 2017.[22]  Plaintiffs responded with suggested revisions on May 8, 2017.[23] Pursuant to an agreed-upon extension, the City sent all SOPs under revision to Plaintiffs on

---

[21] *See* Correspondence between counsel regarding Lesson Plans, etc. for revised SOPs, Exhibits Z – EE.

[22]  *See* Exhibit E.

[23]  *See* Exhibit K.

September 26, 2017.[24]  Plaintiffs provided written objections on October 10, 2017.[25]  The

revised SOPs were approved on November 27, 2017 by then-Chief Eden.[26] The City then made

further revisions following a meeting between Plaintiffs and Chief Geier.[27]

On March 12, 2018, Plaintiffs advised that they were "comfortable" with the revisions in

three  of the updated SOPs.[28] The City then submitted the SOPs to the Mental Health Response

Advisory Committee (MHRAC),[29] PPRD, the Office of Policy Analysis, and the Police

Oversight Board for review.[30]  On September 27, 2018, SOP 2-19 was sent to Dr. Ginger, who

expressed concerns.[31] To make the guidance clearer, APD divided SOP 2-19 into two policies:

an operational policy in SOP 2-19, Response to Behavioral Health Issues, and a separate policy

for the Crisis Intervention Division and Program, SOP 1-37. After much collaboration and

discussion, SOPs 2-19 and 1-37 was sent to Dr. Ginger.[32]  Both SOP 2-19 and 1-37 were

published on April 4, 2019.[33]

---

[24]  *See* Exhibit M.

[25] *See* Exhibit N.

[26] *See* Exhibit O.

[27] *See* Exhibit R.

[28] *See* Exhibit U.

[29] MHRAC analyzes and recommends appropriate changes to policies, procedures and training methods regarding police contact with persons experiencing a mental health crisis or may be mentally ill. *See* City of Albuquerque webpage entitled Mental Health Advisory Committee, attached hereto as Exhibit FF. MHRAC was created to provide guidance to the City of Albuquerque Police Department pursuant to the Settlement Agreement between the U.S. Department of Justice and the City of Albuquerque.

[30] *See* Email from counsel for City to counsel for Plaintiffs and Plaintiff-Intervenors dated July 19, 2018, advising of proposed revisions to SOP 2-19, with invitation to attend OPA meeting, attached hereto as Exhibit GG.

[31] *See* Letter March 8, 2019 letter to counsel regarding SOP 2-19, specifically Attachment A, A History of SOP 2-19, attached hereto as Exhibit HH.
[32]  *See* Letter to Dr. Ginger dated March 8, 2019, attached hereto as Exhibit II.

[33]  *See* SOP 2-19 and SOP 1-37, attached hereto as Exhibit JJ.

The City thereafter developed a Lesson Plan for SOP 2-19 and provided it to counsel for Plaintiff and Plaintiff-Intervenors, along with test questions and a PowerPoint.[34]  A revised lesson plan, PowerPoint and policy appendix were sent on August 5, 2019.[35] There were no objections to the proposed changes in the Lesson Plan from counsel for Plaintiffs and Plaintiff-Intervenors.[36]

Paragraph 5

To comply with Paragraph 5, the City implemented trainings on the revised standard operating procedures.  Paragraph 5 provides that:

> The City Defendants will implement the special order and SOPs described above. The obligations with respect to policies and training in this Settlement Agreement apply only to city personnel who are subject to the applicable SOPs as identified herein. Sworn commissioned law enforcement officers are subject to the above SOPs and will receive the above referenced training. Mental Health clinicians employed by APD are also subject to SOP 2-19 and will receive training relevant to that SOP.

As stated above, all listed special orders and SOPs were implemented and lesson plans were created to train affected personnel. APD trained all subject personnel on the revised SOPs, as evidenced by training records maintained by the APD Training Academy. By October 1, 2018, 97.99% of City personnel subject to the applicable SOPs had completed training on SOP 2-80;[37]  98.63% of City personnel subject to the applicable SOPs had completed training on

---

[34]  *See* Letter from counsel for City to counsel for Plaintiffs and Plaintiff-Intervenors dated July 31, 2019, attached hereto as Exhibit KK.

[35]  *See* Email from counsel for City to counsel for Plaintiffs and Plaintiff-Intervenors dated August 5, 2019, attached hereto as Exhibit LL.

[36]  *See Id.*

[37]  *See* Affidavit of Joseph Viers Commander of the APD Training Academy, attached hereto as Exhibit MM.

SOPs 1-4 and 2-71;[38] and 97.89% of City personnel subject to the applicable SOPs had completed training on SOP 4-25.[39]  As of July 31, 2023, 97% of sworn personnel and 100% of mental health clinicians subject to the applicable SOPs had completed training on 2-19.[40] Incoming personnel have been and continue to be trained on these and all SOPs prior to being approved for work.[41]

Paragraph 6

To comply with Paragraph 6, the City collected data and issued formal reports on metrics relating to the diversionary elements of the Settlement Agreement.  Paragraph 6 provides that:

> The City Defendants will create course of business records documenting the following: (a) the notation of phone numbers and email addresses on the Uniform Traffic Citation form beginning at the time the City is in possession of the new form; (b) bookings on citable non-violent misdemeanor offenses, not to include DWIs; (c) disposition data for individuals involved in CIT related incidents and (d) arrest arising from calls for service involving domestic violence. Beginning 30 days from the signing of this Agreement, the City Defendants will compile the above referenced documents for a period of one year. Within three months thereafter, City Defendants will publicly issue a written report summarizing the above referenced records and any follow-up measures taken. The report will identify the period of time the revised Uniform Traffic Citation was available, if any. The City's issuance of this report constitutes compliance with the requirements of this paragraph.

On July 26, 2018, the City published the first written report on its website and provided a copy of the report to Plaintiffs.[42] Compiled by Dr. Peter Winograd, the 2018 report summarized

---

[38]  *See Id.*

[39]  *See Id.*

[40]  *See* Affidavit of Raquel Hernandez regarding SOP 2-19, attached hereto as Exhibit NN.

[41]  *See* Exhibit MM.

[42]*See* Email from City to counsel for Plaintiffs and Plaintiff-Intervenors and attached letter transmitting the July 2018 report, with report, attached hereto as Exhibit OO.

the records outlined in Paragraph 6.[43] While the Settlement Agreement only required that the report document data for a period of one year, the 2018 report analyzed incidents for a period of sixteen months, from January 1, 2017 to April 28, 2018. This period included four months before officers received training on SOP 2-80, including instructions to issue citations in lieu of arrest for non-violent misdemeanors. The data show that the percentage of arrests for all incidents involving non-violent misdemeanors dropped from an average of 20.3% for the four baseline months of January through April 2017 to 10 % for the twelve months after May 11, 2018.[44] In addition, the data showed that:

- 54% of CIT-related calls[45] for service resulted in minimal or no law enforcement action needed;

- 1.8% of individuals involved in a CIT-related call for service were arrested;[46]

- .1% of individuals involved in a CIT-related call for service received a citation;[47]

- .9% of individuals involved in a CIT-related call for service received a summons;[48]

- The percentage of individuals involved in a CIT-related call being transported to a hospital or other services increased from 35% in January 2017 to 55% in April 2018;[49]

---

[43] *See Id.*, pp. 6 and 13.

[44] *See Id.,* pp. 15 and 19.

[45] "CIT-related calls or incidents" is a term used in Paragraph 6 of the Settlement Agreement and both reports produced pursuant to Paragraph 6. A CIT-related incident is one in which a field officer completes a CIT contact sheet, indicating a concern about the subject's mental or behavioral health during the call. *See Id.,* pp. 15 and 19.

[46] *See Id.*

[47] *See Id.*

[48] *See Id.*

[49] *See Id.* at pp. 18 and 19.

- The percentage of arrest for incidents involving domestic violence charges rose from an average of 50.4% for the four baseline months of January to April 2018 to 51.1% for the following twelve months;[50] and

- Officers were noting either a phone number or email address on the citation, on average, 11% of the time.[51]

In subsequent meetings, the City agreed to continue to monitor the requested information. A second report was produced on February 9, 2024 and published on the City's website on February 12, 2024.[52] The 2024 report covered a one-year period, specifically 2022 and showed that:

- The percentage of arrests for non-violent misdemeanors was 7%, down from 10% in May of 2018;[53]

- 29% of CIT-related calls for service resulted in minimal or no law enforcement action needed (specifically "No action required," "Disengagement" and "Non-engagement");[54]

- 2.4% of individuals involved in a CIT-related call for service were arrested;[55]

- .2% of individuals involved in a CIT-related call for service received a citation;[56]

- 2.7% of individuals involved in a CIT-related call for service received a

---

[50] See Id. at pp. 21 and 31.

[51] See Id. at pp. 33 and 34.

[52] See McClendon report dated February 12, 2024, attached hereto as Exhibit PP.

[53] See Id., pp. 2 and 4.

[54] See Id. pp. 16.
[55] See Id.

[56] See Id.

summons;[57]

- 64% of the CIT-related call for service resulted in Voluntary or Involuntary Mental Health Transport;[58]

- The percentage of arrests for all incidents involving domestic violence charges decreased from 51% in April 2018 to 31% in 2022;[59]

- There were 113 cases associated both with Behavioral Health and Domestic Violence: Thirty-eight of those individuals (approximately 34%) were taken into custody, seventy-four were summoned and one was cited;[60]

- Officers were noting either a phone number or email address on the citation, on average, approximately 12.2% of the time.[61]

After receiving the data for this report, APD has made the phone number and email address section of the citation mandatory.[62] Since then, APD is monitoring the phone number and email address entries in citations to determine if this increases the percentage of completion.

Paragraph 7

To comply with Paragraph 7, the City implemented numerous diversionary programs. Paragraph 7 provides that:

The City Defendants will continue to collaborate in good faith with Bernalillo County to develop jail diversion programs and will collaborate in good faith with Bernalillo County and other partners in the establishment of such programs and

---

[57] *See Id.*

[58] *See Id.*

[59] *See Id.,* pp. 3 and 4 and Exhibit OO, pp. 33 and 34.

[60] *See* Exhibit PP, pp. 27.

[61] *See Id.* pp. 30.

[62] *See,* Exhibit J.

the allocation of resources to implement those programs. The City Defendants will utilize current third-party behavioral health response programs and services, including current locations available during a behavioral health crisis and will utilize other appropriate third-party providers as they become available in the community. The details and timing of these programs are fully within the discretion of the City and the County. To the extent appropriations are required, notwithstanding any other provisions in this Agreement, the terms of this paragraph of the Agreement are contingent upon the City Council of the City of Albuquerque making the appropriations necessary for the performance of this Agreement.

In furtherance of this requirement, the City has participated in the establishment of new jail diversion programs, continued to utilize existing diversion programs and undertaken significant revisions to APD policies to encourage diversion from jail where appropriate. The City has also collaborated with Bernalillo County on several jail diversion programs and opportunities. The collaborative, jail diversion programs are listed as follows:

- Mobile Crisis Teams: Beginning in 2017, the City and County worked with ABCGC[63] to create Mobile Crisis Teams through the Crisis Services Subcommittee.[64] Mobile Crisis Teams respond to nonviolent behavioral health crisis calls, with the goal of diverting individuals to treatment and away from jail. Each team is comprised of a trained police officer from the Crisis Intervention Team and a master's level clinician. Mobile Crisis Teams provide immediate behavioral health services once a scene is secure.[65] The MCT Teams were implemented in February of 2018.[66]In 2018, the Mobile Crisis Teams "reported an 80% diversion rate in stabilizing clients within their own environment," alleviating urgent care and emergency visits.[67]

---

[63] ABCGC (Albuquerque Bernalillo County Government Commission) is comprised of Albuquerque City Councilors and Bernalillo County Commissioners and authorized the creation of four sub-committees who would meet on a regular basis to discuss how behavioral health funding would be spend in four areas: Crisis Services, Prevention, Intervention and Harm Reduction, Supportive Housing and Community Supports.  *See,* ABCGC Behavioral Health Subcommittees, attached hereto as Exhibit QQ.

[64] *See*, Mental Health Response Advisory Committee (MHRAC) Meeting Minutes dated Tuesday, May 17, 2017, attached hereto as Exhibit RR.

[65] *See* APD SOP 1-37, attached hereto as Exhibit JJ.

[66] *See* Bernalillo County website, Mobile Crisis Teams, dated 1/22/2024, attached hereto as Exhibit SS.

[67] *See* ABCGC Minutes dated August 23, 2018, attached hereto as Exhibit TT.

- Law Enforcement Assisted Diversion Program[68]: The Law Enforcement Assisted Diversion Program (LEAD) is intended to divert individuals with low-level, non-violent offenses into community-based programs and services.[69]  LEAD trains officers to utilize diversionary options such as a verbal warning, issuing a citation or summons, or transporting a person to a mental health provider, either voluntarily or involuntarily according to NMSA 1978, § 43-1-10 (2013).[70] The City now directs all sworn personnel assigned to APD's Proactive Response Teams (PRT) to be trained in the LEAD program and be able to assist other sworn personnel in their respective area commands regarding the LEAD Program.[71] The PRTs are to use community outreach to attempt to increase non-enforcement community contacts with the people of Albuquerque, as well as Albuquerque businesses. Their outreach is intended to connect community members with services, with the goal of reducing contact with the criminal justice system. During their contact with members of the community, PRT officers may identify and refer individuals to the LEAD program. Additionally, PRT officers can assist other officers in utilizing the LEAD program.[72]

- Assertive Community Treatment: In collaboration with the University of New Mexico, the City has also developed and funded two Assertive Community Treatment (ACT) teams, which primarily provide services, including medication management, in the community. ACT teams deliver comprehensive behavioral health services for clients with severe mental illness and offer support for clients where traditional treatment settings have failed. ACT is operated at UNM and is supported by a contract with the City. Case managers, peer specialists, nurses, therapists and providers provide care throughout the city to meet patients at home and collaborate on working toward recovery goals.[73]

- Forensic Assertive Community Treatment: More recently, the City has

---

[68] The City recently learned that the County intends to terminate this program on July 1, 2025 and that the resources will be distributed to other programs. The City hopes to work with the County to ensure that the resources remain available, and it can either maintain, or hopefully increase, the number of diversions.

[69] *See* Letter from counsel for the City to counsel for Plaintiffs and Plaintiff-Intervenors dated May 10, 2019 regarding initiatives by the City and APD, attached hereto as Exhibit UU. In May of 2019, the City advised counsel for Plaintiffs and Plaintiff-Intervenors that the Albuquerque Police Department was adopting and implementing the program, requesting feedback on the SOPs. In a May 10th Letter, the City invited comments and feedback on the proposed LEAD SOP, received by way of a June 3, 2019. *See* Letter from Ryan Villa to Lindsay Van Meter with comments/suggestions on the LEAD SOP, attached hereto as Exhibit VV.

[70] *See* SOP 2-79, attached hereto as Exhibit WW.

[71] *See Id.*

[72] *See* SOP 1-81, Protective Response Teams, attached hereto as Exhibit XX.

[73] *See* Assertive Community Treatment, UNM Health webpage, attached hereto as Exhibit YY and Agreements between the City and Regents of the University of New Mexico for Assertive Community Treatment (ACT) for 2024 and 2025, attached hereto as Exhibit ZZ.

collaborated with Bernalillo County in the implementation of a Forensic Assertive Community Treatment (FACT) team. FACT is a service delivery model intended for individuals with serious mental illness who are involved with the criminal justice system, including individuals with co-occurring substance use and physical health disorders. FACT builds on the evidence-based assertive community treatment (ACT) model by making adaptions based on criminal justice involvement. FACT is specifically designed to reduce reoccurring arrests, incarceration and hospitalizations and increase public safety.[74] It is anticipated that the FACT program will begin operation in late 2024.

- Assisted Outpatient Treatment Program: Since 2020, the City has participated in the Assisted Outpatient Treatment Program (AOT), a court-supervised, community-based treatment program for individuals with severe mental illness funded in part by a grant from Substance Abuse and Mental Health Services Administration (SAMSHA) and administered by the Second Judicial District Court. Assisted outpatient treatment is a form of civil outpatient commitment that authorizes the judicial system to mandate eligible individuals with severe mental illness to intervention and treatment, focusing on those who have demonstrated difficulty engaging with treatment on a voluntary basis. Research has shown that AOT reduces hospitalizations, homelessness, arrests and incarceration.[75] Specifically, of those who received AOT, 87% fewer experienced incarceration and 83% fewer experienced arrest.[76] The City agreed to provide funding for fiscal year 2025 (July 1, 2024 through June 30, 2025) in the amount of $900,000 to Second Judicial District Court for AOT.[77]

- Metro Court Case Management: At Bernalillo County Metropolitan Court, the City funds one case manager position for the Court's Behavioral Health Unit to provide mental health services to defendants and inmates.[78]

- Gateway Receiving Area: The City has collaborated with the University of New Mexico Health Sciences Program to open the First Responder Receiving Area at the Gateway Center, a Pilot Program for providing basic first aid and overnight respite for people with chronic disorders and mental health diagnoses.[79] The First Responder Receiving Area is a safe, low-barrier site for first responders to bring

---

[74] See "Forensic Assertive Community Treatment," attached hereto as Exhibit AAA.

[75] See Assisted Outpatient Treatment information, attached hereto as Exhibit BBB.

[76] See Id.

[77] See Intergovernmental Agreement between the City and Second Judicial District Court, dated July 11, 2024, attached hereto as Exhibit CCC.

[78] See Intergovernmental Agreement between the City and Bernalillo County Metropolitan Court, attached hereto as Exhibit DDD.

[79] See Gateway Center First Responder Receiving Area Referral Instructions, attached hereto as Exhibit EEE.

unhoused persons who need shelter overnight.

In addition to jail diversion programs, the City undertook significant changes to SOP 2-19, Response to Behavioral Health Issues,[80] adopting subsection SOP 2-19-8, entitled "Diversion from Jail." This subsection sets forth the expectation that individuals with behavioral health disorders or in behavioral health crisis who come into contact with law enforcement for misdemeanors, petty misdemeanors, and non-violent felonies may be served by jail diversion, when possible. Five options are provided: (1) issuing a written warning; (2) issuing a citation; (3) giving a summons for misdemeanors or submitting a non-violent felony case to the District Attorney; (4) transporting the person to a mental health provider either voluntarily or involuntarily pursuant to NMSA 43-1-10; or (5) disengagement.

The revised SOP 2-19 encourages officers seek treatment intervention in lieu of criminal charges when the individual's criminal behavior appears to stem from a behavioral health disorder and would be better served in a treatment location rather than a criminal justice setting. SOP 2-19 explains roles and responsibilities of various entities in the Crisis Intervention Unit. Mobile Crisis Teams, for example, are a part of the Crisis Intervention Unit. The SOP goes beyond jail diversion in the initial encounter to reduce the likelihood of future behavioral health crises by encouraging referrals to Crisis Intervention Unit clinicians and the involvement of Mobile Crisis Teams. In fact, the Crisis Intervention Unit publishes an annual report which documents the Mobile Crisis Team's work. In the Crisis Intervention Unit's 2023 semiannual report for the first half of 2023, the Mobile Crisis Team Unit had 1,290 contacts for that six-

---

[80] *See* SOP 2-19, effective 4/4/2019, previously attached as Exhibit JJ.

month period.[81] The Mobile Crisis Teams are discussed in greater detail with respect to Paragraph 9.

The City also participates in state court specialty courts and court programs in an effort to prevent individuals from being unnecessarily incarcerated. As APD's liaison to the Metropolitan Court's Behavioral Health Court, CIU Detective Jeff Jones participates in meetings during which he is able to share historical information and information about the people CIU serves, helping to identify and provide any additional needed services through the Court.[82] Detective Jones apprises the Court when he becomes aware that an individual in the Court's Behavioral Health Court is also on the Crisis Intervention Unit's caseload and recommends the specialty court to individuals on the Crisis Intervention Unit's caseload when appropriate. Detective Jones also, at the Court's request, transports individuals from court to emergency mental health evaluations on Certificates for Evaluation when an individual appears at Court in an active crisis. In order to serve in this role, he underwent the Court's specialty court training. Crisis Intervention Unit Detective Terry Dye has a similar arrangement with the District Court's Behavioral Health Program.[83]

Furthermore, Commander Kyle Hartsock is APD's representative at the Criminal Justice Coordinating Council (CJCC), which brings together stakeholders in the criminal justice community. Through the CJCC, Commander Hartsock advocated to receive the names of individuals graduating from specialty courts in Second Judicial District Court so that he may

---

[81] See Response to Behavioral Health Incidents, attached hereto as Exhibit FFF.

[82] *See* Affidavit of Jeff Jones, attached hereto as Exhibit GGG.

[83] *See* Affidavit of Terry Dye, attached hereto as Exhibit HHH.

inform the arresting officer and they can attend the individual's graduation and witness the important impact of these diversion programs in State court.[84]

The City has also recently engaged in discussions with Bernalillo County Metropolitan Judge Asra Elliott to increase referrals to Outreach Court, which defers prosecution for unhoused individuals who are working with a social service provider or substance abuse counselor.

The City has contributed $1.5 million from the proceeds of settlements with opioid manufacturers and distributors to provide opioid treatment and recovery services at MDC.[85]  The City has also dedicated $5 million of those funds to a recovery housing program that will feature pallet homes.  The City is currently in the process of deciding how to allocate the additional funds – approximately $70 million – that it will receive from the settlements.  The County is participating in the planning process and will be determining how to allocate the nearly equal amount that it receives.

<u>Paragraph 8</u>

To comply with Paragraph 8, the City established case management teams staffed by mental health professionals.  Paragraph 8 provides that:

> City Defendants agree to meet with Bernalillo County through Albuquerque Bernalillo County Government Commission, one of its sub-committees or another collaborative effort at least one time each quarter beginning July 1, 2017 through June 30, 2018 to explore whether it is feasible to establish teams comprised of mental health professionals who are not employees of the police department who will provide mental health follow up and case management services similar to the activities of the COAST team.[86]

---

[84] *See* Affidavit from Kyle Hartsock, attached hereto as Exhibit III.

[85] *See* Intergovernmental Agreement between the City of Albuquerque and the County of Bernalillo, dated February 15, 2024, attached hereto as Exhibit JJJ.

[86] Paragraph 8's reference to the "COAST" Team refers to the Crisis Outreach and Support Teams. The primary objective of COAST was to safely resolve behavioral health crises by referring individuals in crisis to professional mental health services. COAST workers were non-sworn personnel who worked within law enforcement to help people experiencing homelessness, mental illness, or other behavioral crises. COAST served as a form of jail

In multiple meetings in 2017 and 2018, the City and County explored a tiered response to behavioral health calls by law enforcement, specifically considering the possibility of not having just sworn officers respond when no crime had been committed. As discussed more fully below, this resulted in the creation of the Mobile Crisis Teams.

Mobile Crisis Teams are comprised of licensed mental health professionals with extensive crisis intervention training who partner with APD's Enhanced Crisis Intervention Team (ECIT) officers for safety and support.  Their purpose is to handle high risk behavioral health crises that requires both clinical expertise and law enforcement support.

The City took further action to develop a tiered response when it created the Albuquerque Community Safety Department (ACS), a third branch of the City of Albuquerque's first responder system. ACS is based on a public health model with non-law enforcement-led responses. ACS allows 911 dispatch to send trained mental health professionals who are not employees of the police department to non-violent and non-medical calls.  The goal is to improve access to the broad range of social services from government and community-based organizations.[87]

In its first two years, ACS responded to 46,482 calls for service; of those, 28,322 were calls diverted from APD. [88]

Paragraph 9

---

diversion because it directed individuals in need of professional mental health services to the appropriate community resources. After the formation of Albuquerque Community Safety Department, COAST's functions were subsumed by ACS. *See* Affidavit of Matthew Tinney, attached hereto as Exhibit KKK.

[87] *See* City of Albuquerque website entitled Albuquerque Community Safety, Our Role, attached hereto as Exhibit LLL.

[88] *See* City of Albuquerque website entitled Albuquerque Community Safety, Two Years of Service, attached hereto as Exhibit MMM.

To comply with Paragraph 9, the City worked with the County to establish Mobile Crisis Teams:

> The City Defendants will continue to collaborate in good faith with Bernalillo County in the development and funding for mobile crisis teams to respond to mental health crisis calls, including alleged threats of suicide, self-harm or welfare check, where appropriate. The details and timing of the implementation of these mobile crisis teams are fully within the discretion of the City and the County. Notwithstanding any other provision in this Agreement, the terms of this paragraph of the Agreement are contingent upon the City Council of the City of Albuquerque making the appropriations necessary for the performance of this paragraph of the Agreement.

The Mobile Crisis Teams were implemented in February 2018, less than a year after the Settlement Agreement was negotiated on March 28, 2017.[89] By May 2017, members of the Crisis Services sub-committee of ABCGC had met with MHRAC to discuss the mobile crisis team model. At that time, the City of Albuquerque and Bernalillo County together issued a Request for Proposals for master's level clinicians and determined that the program would consist of four teams with City and County teams functioning together.[90]

The teams provide specialized response to 911 calls involving a behavioral health element. The clinicians are employed by ACS. When someone in a crisis calls 911, the dispatcher now asks questions to ascertain if a Mobile Crisis Team would be appropriate. If so, a Mobile Crisis Team will be dispatched if available. Mobile Crisis Teams can also be requested by officers on scene at a call.[91]  At present there are four mobile crisis teams for APD and two for BCSO. Additionally, Bernalillo County Fire Department has a non-law enforcement mobile

---

[89] *See* Exhibit SS.

[90] *See* MHRAC Meeting Minutes dated May 16, 2017, previously attached hereto as Exhibit RR.

[91] *See* Exhibit SS.

crisis team and pairs a behavioral health clinician with a paramedic. Whether staffed by County or City personnel, the Mobile Crisis Teams are available for both APD and BCSO. Between 2018 and 2021, there were 7,478 dispatches for the Mobile Crisis Teams.[92] More recently, in a six-month period in 2023 the Crisis Intervention Team's Mobile Crisis Team had 1,290 contacts.[93]

Not only have the City and the County collaborated in the development of the Mobile Crisis Teams; they have also collaborated in the allocation of resources to implement the Mobile Crisis Teams. In a December 2022 Bernalillo County publication, it is noted that the County's investment for the Mobile Crisis Teams was $1 million and that the City of Albuquerque contributed $456,000 to the program.[94]

Paragraph 10

To comply with Paragraph 10, the City continued to fund supportive housing slots for individuals booked into the jail. Paragraph 10 provides that:

> City Defendants will continue to provide approximately 700 supportive housing slots for people, including those with mental illness or mental disability, who have been booked into the Metropolitan Detention Center. The housing slots are either transitional supportive housing or permanent housing with wrap-around case management and other behavioral health services. In providing these services, the City will keep, subject to applicable grant funding and appropriations by City Council, the programs that include individuals with mental disabilities who have been booked into the Metropolitan Detention Center, where not prohibited by other funding sources. City Defendants will collaborate in good faith with Bernalillo County regarding opportunities for additional supportive housing slots and the allocation of resources for same. Notwithstanding any other provisions in the Agreement, the terms of this paragraph of the Agreement are contingent upon the City Council of the City of

---

[92] *See* Bernalillo County Jail Diversion December 2022 Update, attached hereto as Exhibit NNN.

[93] *See* Exhibit FFF.

[94] *See* Exhibit NNN.

> Albuquerque making the appropriations necessary for the performance of this paragraph of the Agreement.

In April 2018, there were 764 supportive housing slots funded by the City and federal funds.[95]

Since them, the City has maintained the following number of supportive housing slots:

- 928 by the end of FY 2018

- 870 by the end of FY 2019

- 684 by the end of FY 2020[96]

- 840 by the end of FY 2021

- 970 by the end of FY 2022

- 1365 by the end of 2023

- 1242 by the end of 2024.

These numbers reflect two types of supportive housing: (1) Rapid Rehousing – vouchers that provide up to 24 months (formerly 12 months) of rental assistance and supportive services to households experiencing homelessness and create a plan to retain permanent housing; and (2) Permanent Supportive Housing – vouchers that provide rental assistance and case management, are not time limited, and are intended to target homeless persons with verified disabilities who have not been successful at maintaining permanent housing on their own.

In addition to supportive housing slots, the City contracts with five agencies to provide motel vouchers. Annually, Albuquerque Healthcare for the Homeless and First Nations each administers more than 100 hotel vouchers, First Nations-Bernalillo County administers 160, Barrett Foundation administers 15, and the New Mexico Coalition to End Homelessness

---

[95] *See* Excel spreadsheet for April 2017 – April 2018, attached hereto as Exhibit OOO.

[96] The 2020 numbers reflect the inability to perform Housing Quality Standard Inspections during the Covid-19 pandemic.

administers 35.  The average length of stay for individuals is up to 90 days, dependent on the household's situation.[97]  The City has also provided hotel vouchers when clearing encampments. The City provided more than 100 12-week vouchers to individuals who had set up an encampment at First Street and Indian School.  ACS will also, in some circumstances, provide motel vouchers to its clients.  The City also provides $150,000 in temporary lodging vouchers to Bernalillo County to be available at the Re-Entry Center when an individual is released from MDC. [98]

The City is also increasing the number of beds available for emergency overnight shelter. The City currently has 840 shelter beds available – 660 beds at Gateway West, 65 beds at Gateway Family, 50 beds at Gateway Women's, 50 Medical Respite beds and 15 beds for First Responders Drop Off.[99] Coming soon there will be a total of 1,131 shelter beds available, with the addition of 50 beds for Gateway Sobering, 50 Gateway Recovery beds, 50 beds in Young Adult Navigation Center and 141 beds at Gateway Men's. The Sobering facility is expected to open in the summer of 2025.  Many of the additional beds are expected to be available in the next six to twelve months.[100]  The City also sets up overflow shelter when needed.  During the winter of 2023-24, the City used community centers for overflow shelter.  In February 2025, the City used space the Gateway Center and Gateway West.  The City is also expecting that it will receive funds from the State for housing.

---

[97] *See* City of Albuquerque Supportive Housing summaries, attached hereto as Exhibit PPP.

[98] *See* Inter-Governmental Agreement Between City of Albuquerque and Bernalillo County, attached hereto as Exhibit JJJ.

[99] *See* CABQ Shelter Beds Available, Exhibit PPP.

[100] *See* Exhibit PPP.

Plaintiffs have not filed any motion, since the required policies were implemented, that the City was not complying with the settlement agreement.

## ARGUMENT

The City has met all terms of the 2017 Settlement Agreement. Thus, under the clear terms of the agreement, the City should be dismissed. Dismissal is also appropriate as a matter of policy. Courts should not continue oversight of public entities and deprive local communities of the ability to make their own choices, when there is no longer a need to do so. Here, continuing jurisdiction over the City is not necessary to remedy a continuing violation of federal law. The Court, therefore, should dismiss the City from this action and return control to the City.

**A.    The City Has Substantially Complied with the Settlement Agreement.**

Dismissal is warranted because the City has substantially complied with the terms of the agreement.

The Settlement Agreement provides that the "Agreement satisfies all claims made or claims that could have been made by the Plaintiff class and the Plaintiff Intervenor sub class against the City Defendants in this action and will result in dismissal of City Defendants from this action after the City Defendants have substantially complied with the provisions set forth herein." Exhibit A, Paragraph 14. When determining a party's obligations under a contract, "[t]he court's duty is confined to interpretation of the contract which the parties made for themselves and may not alter or make a new agreement for the parties." *Davies v. Boyd*, 1963-NMSC-164, ¶ 4, 385 P.2d 950. Thus, so long as the City has achieved substantial compliance with the Settlement Agreement, it is entitled to dismissal.

To achieve substantial compliance, a party must perform the specific steps set forth under the contract and fulfill the essential requirements of the contract as represented by its purpose.

*See Joseph A. by Wolfe v. New Mexico Dep't of Hum. Servs.*, 69 F.3d 1081, 1086 (10th Cir. 1995).; *see also Jackson v. Los Lunas Center, et al. Defendants, and The Arc of New Mexico, Intervenor and Mary Terrazas, et al. Intervenors, pro se*, 2015 WL 13662981, *5 (D.N.M. 2015) (April 3, 2015) ("The substantial compliance inquiry asks whether Defendants took the required specific steps in furtherance of the essential purposes and intent of the consent decree"). Here, the City has done both.

        **1.**    <u>The City has performed the specific steps required under the Settlement Agreement</u>.

First, the City has performed the specific steps required under the 2017 Settlement Agreement.

To start, the City has fully complied with the specific steps required in Paragraph 1 of the 2017 Settlement Agreement. Under Paragraph 1, the City was required to: (1) issue a special order requiring compliance with the prior orders issued in this case; (2) issue a corresponding video; (3) initiate revision to SOP 2-80 to include a clear written directive requiring compliance with the prior orders issued in this case; (4) direct officers to use the booking window at the Metropolitan Court; (5) direct officers to issue citations in lieu of arrest for nonviolent misdemeanors; and (6) direct officers not to arrest people for not having a permanent address. As shown above, the City has performed each of these steps, and thus has fully complied with Paragraph 1 of the 2017 Settlement Agreement.

The City has also fully complied with the specific steps required in Paragraph 2 of the 2017 Settlement Agreement. Under Paragraph 2, the City was required to, after a revised Uniform Traffic Citation was received from the State that included phone numbers and email addresses, issue an SOP requiring officers to obtain and record telephone numbers and emails

addresses whenever possible.  The City fully complied with the requirements of Paragraph 2 and has also taken additional steps to ensure compliance with the SOP more recently.

The City has also fully complied with the specific steps required in Paragraph 3 of the 2017 Settlement Agreement.  Under Paragraph 3, the City was required to (a) initiate revisions of SOPs 1-14 (relabeled 1-4), 2-80, 2-71, and 3-12 (relabeled 4-25) to incorporate specific provisions related to reasonable suspicion and seizure of property, and (b) finalize a training plan on the revisions. The City has performed these steps.  The revised SOPs include the agreed-upon language to clarify that officers must have reasonable suspicion to engage with individuals who appear to be homeless or have a mental disability and legal authorization before seizing or disposing of property. The City timely created and implemented a training program reflecting the revisions. The City went to great lengths, through a year-long negotiation process, to incorporate the suggestions of Plaintiffs. As a result, the parties reached an agreement as to the substance of the revisions, which went beyond the express requirements of the Settlement Agreement. Thus, the City fully complied with the requirements of Paragraph 3 of the 2017 Settlement Agreement.

The City has also fully complied with the specific steps required in Paragraph 4 of the 2017 Settlement Agreement. Under Paragraph 4, regarding officer response to behavioral health issues, the City was required to initiate revisions of SOP 2-19.  The City complied with this requirement by (1) preparing a revised draft of SOP 2-19 (Response to Behavioral Health Issues); (2) timely providing the draft to Plaintiffs; (3) scheduling a meeting with Plaintiffs within 30 days of receiving proposed revisions; (4) incorporating revisions to the SOP based on Plaintiffs' feedback, to the extent that Plaintiffs felt "comfortable" with the revisions; (5) sending the SOP to Dr. Ginger for review; and (6) timely implementing the changes by way of the

previously cited Lesson Plan. Thus, the City fully complied with the requirements of Paragraph 4 of the 2017 Settlement Agreement.

The City has also fully complied with the specific steps required in Paragraph 5 of the 2017 Settlement Agreement. Paragraph 5 required the City to implement training on SOP 2-19, as revised, for both sworn commissioned law enforcement officers and mental health clinicians. The City has implemented that training, such that upwards of 97% of current personnel and all incoming personnel have received the required training. Thus, the City fully complied with the requirements of Paragraph 5 of the 2017 Settlement Agreement.

The City has also fully complied with the specific steps required in Paragraph 6 of the 2017 Settlement Agreement. This paragraph included the Settlement Agreement's only reporting requirement. Specifically, Paragraph 6 required that the City collect data by way of creating course of business records and use the records to issue a written report on diversionary measures (specifically, nonviolent misdemeanor offenses, CIT-related incidents, and domestic violence arrests). The Agreement expressly provides that "The City's issuance of this report constitutes compliance with the requirements of this paragraph." The City compiled the required data for the period of January 1, 2017 to April 28, 2018 and issued the required report in 2018. This alone was sufficient to establish compliance with Paragraph 6 of the 2017 Settlement Agreement.  The City, however, produced an additional report analyzing data for 2022.  Thus, the City fully complied with the requirements of Paragraph 6 of the 2017 Settlement Agreement.

The City has also fully complied with the specific steps required in Paragraph 7 of the 2017 Settlement Agreement. Paragraph 7 required the City to continue to collaborate in good faith with the County to develop jail diversion programs, as well as to utilize third-party behavioral health response programs and services. The City met, and exceeded, this requirement

by collaborating with partners to implement (1) Mobile Crisis Teams, (2) LEAD, (3) ACT, (4) FACT and (5) AOT. In addition, the City has taken additional steps which will help divert individuals from jail. The City developed the Gateway Receiving Area, and has continued to engage with third-party behavioral health response programs and services. While this program was not developed with jail diversion as its primary function, given the source of the referrals (law enforcement, fire services and Albuquerque Community Safety (ACS), discussed below), it is likely that it will fulfill that function. The City also helps fund opioid treatment at MDC. The City sends a liaison to the Metropolitan Court's Behavioral Health Court and to the CJCC. The City has engaged in outreach to increase diversion opportunities. Through these steps, the City has not only met, but exceeded, the requirements of Paragraph 7 of the 2017 Settlement Agreement.

The City has also fully complied with the specific steps required in Paragraph 8 of the 2017 Settlement Agreement. Paragraph 8 required the City to meet with Bernalillo County to explore the possibility of establishing case management teams staffed by mental health professionals. In furtherance of these requirements, the City met at least quarterly with Bernalillo County or sub-committees. These meetings resulted in the generation of Mobile Crisis Teams. Later, the City created ACS, which functionally implemented what the Settlement Agreement merely directed the City to explore. Like Paragraph 7, the City exceeded what was required by Paragraph 8 of the 2017 Settlement Agreement.

The City has also fully complied with the specific steps required in Paragraph 9 of the 2017 Settlement Agreement. Under Paragraph 9, the City was required to (1) collaborate with Bernalillo County and (2) participate in funding and developing of Mobile Crisis Teams to

respond to mental health crisis calls, where appropriate.  The City did both.  Thus, the City fully complied with the requirements of Paragraph 9 of the 2017 Settlement Agreement.

The City has also fully complied with the specific steps required in Paragraph 10 of the 2017 Settlement Agreement. Under Paragraph 10, the City was required to maintain at least 700 supporting housing slots.  The City has far exceeded that, and currently maintains more than 1,200 permanent supportive housing slots, while also providing motel vouchers.[101]  The number of City shelter beds will also exceed 1,000 within the next 12 months.  The City has also eliminated some restrictions on the development of multi-family housing and worked to attract affordable housing projects. The City complied with Paragraph 10 regarding supportive housing by: (1) continuing to provide supportive housing slots; (2) collaborating with Bernalillo County regarding the implementation of additional housing resources by way of the Reentry center; and (3) increasing the number of housing slots available. Thus, the City has not only met, but exceeded, the requirements of Paragraph 10 of the 2017 Settlement Agreement.

In sum, the City fulfilled the specific steps required in each paragraph of the Settlement Agreement, and in many instances greatly exceeded those requirements.

> **2.**    The City has satisfied the essential purpose of the Settlement Agreement.

The City also fulfilled the essential purpose of the Settlement Agreement.

The Settlement Agreement required the City to initiate revisions of its procedures for handling certain non-violent misdemeanors and to make efforts toward implementing programs that would help certain populations avoid incarceration.  As discussed above, the City has fulfilled this essential purpose.  The City has implemented policies for walk-through procedures at MDC and required the issuance of citations, rather than arrest, in many circumstances.  In

---

[101] The City is concerned that federal funding for these housing slots will be reduced.

addition, the City has created or funded multiple programs designed to provide assistance to individuals, rather than arresting them. The City has also created, funded or participated in diversion programs designed to provide an alternative to incarceration. Indeed, the City's diversionary efforts with respect to the affected population have *rewritten* how APD engages the affected populations. Required simply to initiate revision of the relevant standard operating procedures, continue to collaborate with third-party behavioral health response providers, implement case management teams with mental health professionals, and collaborate to implement mobile crisis teams, the City's subsequent creation of ACS, CIU, and the Mobile Crisis Teams reflects a cultural shift and commitment to the litigation's overarching purpose. These changes further the general goal of connecting individuals who may have been otherwise arrested to professional mental health services, and by extension reducing jail population, while changing the institutional fabric to guarantee lasting change. Moreover, the City has implemented multiple programs designed to provide housing for individuals. The City has gone above and beyond the specific terms of the Settlement Agreement and has fulfilled its essential purpose. The City, therefore, should now be dismissed from this litigation.

### B.    Oversight of The City Is No Longer Needed to Remedy A Constitutional Violation.

Dismissal is also warranted as a matter of public policy.

Consent decrees should not last forever. To the contrary, "federal consent decrees are temporary solutions that may be kept in place only so long as necessary to cure an unlawful condition." *Jackson*, 880 F.3d at 1192; *see also John B. v. Emkes*, 710 F.3d 394, 398 (6th Cir. 2013) (a consent decree "may remain in force only so long as it continues to remedy a violation of federal law"); *Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (federal courts should not "continue their oversight … for long periods of time … absent an ongoing violation of federal law.").

Accordingly, a federal court must exercise its equitable powers to ensure that "when the objects of the decree have been attained," responsibility for discharging government obligations is returned to the local government.  *See Frew,* 540 U.S. at 442.  This approach "seeks to return control to state and local officials as soon as a violation of federal law has been remedied." *Horne v. Flores*, 557 U.S. 433, 451 (2009).  "Keeping a consent decree in place any longer than necessary to assure compliance with federal law risks violating principles of federalism and 'improperly depriving future officials of their designated legislative and executive powers.'" *Jackson*, 880 F.3d 1176.  Indeed,

> Where, as here, a consent decree remains in effect for decades, enforcement of the decree necessarily interjects a federal court into local affairs and binds local governmental officials who were not parties to the consent decree. The federal court, thereby, effectively limits the democratic process by restricting the array of resources available to the governmental officials for the enactment of other policies.

*Jackson*, 880 F.3d at 1199.  When there is no longer an ongoing violation of federal law, enforcement of additional requirements within an agreement may no longer be equitable.  *See Jackson*, 880 F.3d at 1206 (district court erred by refusing to dismiss because Defendants had not complied with the "numerous, detailed obligations" provided in the consent decree when there was no ongoing violation of federal law).

The 2017 Settlement Agreement's provisions related to the handling of misdemeanor offenses do not serve to remedy a constitutional violation.  Those provisions are not directed to an ongoing constitutional violation by the City: the City does not operate MDC and is not responsible for the conditions at that facility.  Moreover, the provisions limiting arrests are not, in themselves, directed toward a violation of federal law.  The Constitution does not prohibit the

arrest of individuals for non-violent misdemeanors,[102] does not limit the number of arrests that can be made for non-violent misdemeanors and does not create a preference for citations over arrests.  The Court had equitable power to proscribe the manner in which the City made arrests while the City was operating the jail and could be deemed responsible for overcrowding.  But in the absence of ongoing unconstitutional conduct by the City, the Court should return the power to make law enforcement decisions to the City.

The Settlement Agreement's remaining provisions, similarly, do not serve to remedy a constitutional violation.  The Constitution does not require the notation of phone numbers and email addresses on citations.  The Constitution does not require reporting on misdemeanor arrests.  The Constitution does not require jail diversion programs. The Constitution does not require programs like the Mobile Crisis Teams or ACS.   The Constitution does not require government entities to provide permanent supportive housing.  While the City intends to continue its programs designed to prevent unnecessary incarceration – most of which it adopted voluntarily and has expanded well beyond the expectations of the Settlement Agreement – it should be permitted to do so without judicial oversight, without remaining a defendant in a decades-long lawsuit, without the duty to pay attorney fees whenever Plaintiffs believe they have grounds to complain about the City's actions, and without the threat of sanction based on Plaintiffs' views of the Agreements' terms.  Principles of equity, therefore, support the dismissal of the City from this action.

---

[102] Indeed, the United States Constitution permits *warrantless* misdemeanor arrests in some circumstances, so long as there is probable cause.  *See, e.g.*, *United States v. Gonzalez*, 107 F.4th 1304, 1310 (11th Cir. 2024) ("Today, we join our sister circuits and hold that the Fourth Amendment does not require a misdemeanor to occur in an officer's presence to conduct a warrantless arrest.").  It cannot be said, therefore, that arrests for non-violent misdemeanors are unconstitutional.

## CONCLUSION

For the foregoing reasons, the City of Albuquerque respectfully requests that the Court

dismiss it from this action.

KENNEDY, MOULTON & WELLS, P.C.

*/s/ Debra J. Moulton*
DEBRA J. MOULTON
Attorney for Defendant City of Albuquerque
2201 San Pedro N.E., Bldg. 3, Suite 200
Albuquerque, NM 87110
(505) 884-7887

I HEREBY CERTIFY that a true and correct
copy of the foregoing was filed through the
CM/ECF filing system which caused a copy
of the pleading to be served on all counsel of
record on this 28th day of March 2025.

*/s/ Debra J. Moulton*
Debra J. Moulton