## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**JIMMY (BILLY) McCLENDON, et al.,**

        Plaintiffs,

vs.

                                         **CIV 95-24 JAP/KBM**

**CITY OF ALBUQUERQUE, et al.,**

        Defendants,

vs.

**E.M., R.L., W.A., D.J., P.S., and
N.W., on behalf of themselves and all
others similarly situated,**

        Plaintiff-Intervenors.

## PLAINTIFFS' MOTION TO STAY
## DEFENDANT CITY OF ALBUQUERQUE'S MOTION TO DISMISS

The Plaintiff-Intervenor subclass and the Plaintiff class (hereafter "the Plaintiffs"), by

counsel, the Law Office of Ryan J. Villa, by Ryan J. Villa, and Davis Law New Mexico, by

Nicholas Davis, respectfully request that the Court enter an order staying any further action with

respect to Defendant City of Albuquerque's Motion to Dismiss Based on Compliance with the

Terms of the 2017 Settlement Agreement [Doc. 1733] ("MTD") in order to (1) allow the Plaintiffs

to conduct discovery regarding the assertions set forth in the 36-page motion and exhibits, and (2)

allow mediation to occur prior to litigating a dispute regarding compliance, as explicitly required

by the 2017 Settlement Agreement[1] and Court Order [Doc. 1326] approving this Agreement.

---

[1] The settlement agreement provides, "In the event that any dispute arises regarding whether or not the terms of this Agreement are being properly fulfilled, mediation before the Court's Special Master or another mediator . . . is required before any motion can be filed with the Court." Doc. 1320, p. 7 para 12.

## INTRODUCTION

In March 28, 2017, the Defendant City of Albuquerque entered a settlement with Plaintiffs, to resolve their Amended Motion for An Order to Show Cause and For Further Remedial Relief Regarding City Defendants [Doc. 1233] ("Show Cause Motion"). The 2017 Settlement Agreement was accepted by the Court and entered as a court order. *See* Docs. 1320, 1326. The purpose of the Settlement and Order was to remedy ongoing constitutional and statutory violations and reduce the number of individuals, primarily members of the Plaintiff-Intervenor subclass, arrested by the City and incarcerated in the Bernalillo County Metropolitan Detention Center (MDC) solely or primarily because they had a mental illness or experienced homelessness. In short, the City was using arrest and incarceration at MDC as a way to sweep members of the subclass and those experiencing homelessness from the City's streets and to force them into the jail. This is not what MDC is designed to do and not a proper basis to arrest the class and subclass.

As alleged in the Show Cause Motion, the City's arrest practices and other conduct were violating the Constitution, the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act, and stipulated Court orders designed to reduce overcrowding at MDC, including reducing arrests for citable offenses, improving jail diversion programs for those with psychiatric or developmental disabilities and others, and causing the population to exceed the jail's capacity. In the Show Cause Motion, Plaintiffs discussed the constitutional and statutory violations in detail:

> The root cause of many inappropriate detentions and arrests of sub class members is the City Defendants' de facto policy of "sweeping the streets" of people who appear to have a mental disability. . . [Albuquerque Police Department] officers routinely stop and question people who appear to be what law enforcement officials commonly refer to as "homeless mentally ill," and order them to move when they are standing or sitting in public places, particularly downtown Albuquerque and near certain business establishments. Upon information and belief, the Mayor of

Albuquerque has told business owners that he will reduce the numbers of "homeless mentally ill" people in the downtown area.

APD officers commonly stop a person who appears to be "homeless mentally ill" for no lawful reason, then demand identification from him/her and search his/her person and backpack. Those unlawful stops, searches and seizures of members of the sub class, without reasonable suspicion of a crime, frequently lead to resistance by the person and inappropriate arrests and segregation of the person from the community. The City Defendants direct APD employees to approach persons who have, or appear to have, disabilities merely because they are exhibiting non-threatening symptoms of their mental illness or because they had an encounter with law enforcement in the past. APD officers then commonly check whether that sub class member has a warrant, often charge him or her with a crime and, in the absence of an exigent circumstance, arrest them instead of issuing a citation.

*See* Motion to Show Cause [Doc. 1233] at 14-16.

The City now claims that it has complied with the 2017 Settlement Agreement and Court Order, in proffering affidavits and other documents, claims that practices which are prohibited by the Settlement and Order are not occurring. However, despite Plaintiffs' best efforts in the course of its compliance monitoring in 2019, 2022, 2024, and 2025 to obtain arrest data and other documents that would establish whether the City has implemented the Standard Operating Procedures that are required by the Settlement and Order, the City has withheld the evidence and refused to participate in discovery. At this time, the Plaintiffs have not been able to obtain data that would show whether the Albuquerque Police Department (APD) has stopped their practices of (1) approaching and detaining people who appear to be homeless and/or mentally ill without reasonable suspicion, (2) demanding their identification, (3) running warrant checks, (4) searching the person and their backpacks, and (5) arresting them on charges for which those who are not homeless or mentally ill would receive a citation. Despite numerous document requests under the state Inspection of Public Records Act, the City has never provided the underlying data that would prove or disprove its claim that it has implemented the Court's 2017 Settlement and this Court's Order.

3

To be sure, MDC's population has been rising dramatically since 2022, going from the 1300s into the 1800s some weeks during 2025,[2] approaching the stipulated population limit. This increase coincides with changes in City policies and directives about targeting people who appear to be homeless or mentally ill, in clear violation of the 2017 Settlement and Court Order. Even without access to the City's data regarding arrest practices, publicly available information indicates that the City's noncompliance has worsened considerably in the last two years. The core allegation in the Show Cause Motion that was filed against the City in 2016 was that the City "sweeps the streets" of people APD refers to as "the homeless mentally ill." *See* Doc. 1320 at 14-15. Those "sweeps" have dramatically increased in recent years.

Even without discovery, certain facts are already evident, including:

1. The City's website regarding homelessness reported displacing unhoused people at a rate of 700 displacements per year in 2023 and reported over 1,000 displacements *per month* in 2024. Police commonly demand identification and run warrant checks when they displace people who are camping.[3]

2. City officials, including the chief of police, have publicly stated throughout 2024 and 2025 that they have initiated "tactical plans" for sweeping homeless people from the Central Avenue corridor, and the police chief has acknowledged that, as part of that campaign, APD is arresting people for misdemeanors.

3. In the state case of *Williams et al. v City of Albuquerque,* No. D-202-CV-2022-07562, homeless people and their advocates have provided sworn declarations and video showing that, during 2024 and 2025, APD officers commonly approached people standing together

---

[2] The May 8, 2005 population of the MDC was 1806, according to County's the population dashboard. https://www.bernco.gov/county-manager/bernalillo-county-mdc-population-dashboard/
[3] Article

in the International District of Albuquerque, who might be homeless, and required each person to disclose their identity. Police then run warrant checks on them with no reasonable suspicion.

4. Researchers from the University of New Mexico reported in January 2025 that bookings into the MDC on misdemeanor charges have increased from 300 to 400 per month (a 33% increase) since 2021, and that APD initiates 65% of the bookings into the MDC. **Exhibit 1,** UNM Study: Law Enforcement Booking Patterns at 3.

5. The percentage of people booked into the MDC who are identified as not having an address (categorized as "transient") has dramatically increased. People categorized as "transient" made up 31% of MDC's population in September 2023 and, during several days in 2024, constituted a majority of the MDC population. *See e.g.* **Exhibit 2**, MDC Dashboard Timeline.

Moreover, City officials have made several public statements during the past two years that suggest that its arrest practices have gotten worse and violate the Settlement Agreement and Court Order.

Pursuant to the Settlement Agreement and prevailing law, Plaintiffs are entitled to conduct discovery that would enable them to determine whether the City's claims of compliance are supported by substantial evidence and whether the seven affidavits submitted by City officials fully and accurately portray the full picture of the City's current conduct, and then to present evidence to the Court regarding the extent to which the City is currently in violation of the 2017 Agreement and Court Order. Moreover, by its express terms, the Settlement and Order mandate that mediation must occur before any motion addressing compliance or noncompliance can be filed. For those two reasons, this Court should now enter a stay, order the parties to meet and confer to establish a scheduling order to conduct discovery regarding whether or not the City is in

substantial compliance with the purpose and requirements of the 2017 Settlement and Order, order

the parties to engage in mediation as required by the Settlement and Order, and set an evidentiary

hearing, if necessary.

## BACKGROUND

In Plaintiff-Intervenors' Amended Motion that was resolved by the 2017 Settlement

Agreement and Court Order, Plaintiff-Intervenors alleged that the City's practices violated both

the Court's orders and federal disability laws in several ways:

> The City's current practices alleged herein violate *both* this Court's orders and the
> following provisions of the ADA and the Rehabilitation Act alleged in Plaintiff
> Intervenors' complaint in intervention: 1) unnecessarily subjecting Plaintiff
> Intervenors to arrest, incarceration and segregation from the community; 2) failing
> to reasonably accommodate sub class members with respect to the decisions made
> by law enforcement officials whether to issue citations to them or to arrest them
> and incarcerate them; 3) booking sub class members into jail even when it is
> apparent they need hospitalization; and 4) not making reasonable modifications to
> City policies and procedures to avoid discrimination against Plaintiff Intervenors
> on the basis of their disabilities. Specifically, Albuquerque police continue: a)
> targeting people with mental disabilities to be unlawfully stopped, searched, seized,
> and incarcerated in the absence of any reasonable suspicion that they are engaged
> in criminal activity; b) failing to reasonably accommodate the disabilities of sub
> class members in the course of what may be a lawful stop, search or seizure; and c)
> a pattern of discriminatory and unnecessary arrests and incarceration, causing sub
> class members to be institutionalized and segregated from the community due to
> their mental disabilities.

Show Cause Motion at 13 [Doc. 1233]. The Show Cause Motion also described how the City's

conduct continued to violate the constitutional and statutory rights alleged in Plaintiff Intervenors'

Amended Complaint in Intervention [Doc. 150]. including: "Defendants, in the administration of

the Albuquerque Police Department...have violated Plaintiff Intervenors' rights under the ADA

by: ... failing to establish an adequate system for identifying mental, behavioral and developmental

problems of people arrested ... failing to develop for and provide to Plaintiff Intervenors necessary

therapeutic placements and services; ... failing to provide Plaintiff Intervenors with services that

are as effective as those provided to non-handicapped people…denying Plaintiff Intervenors programs, activities and services in the most integrated setting appropriate to their needs." *Id.* at 13-14. The Settlement Agreement and Order sought to rectify these alleged violations with the ultimate goal of reducing the number of individuals brought into MDC by the City who have a mental illness or are experiencing homelessness.

The City now claims that oversight is no longer needed to remedy the constitutional and federal statutory violations that cause overcrowding at the MDC and attendant violations of the Fourteenth Amendment and the consent decrees entered in this case. *See* Motion at 33-36. Over the course of the past year, counsel for Plaintiff, Adam Flores, has periodically reviewed the County's MDC Population Dashboard.[4] *See* **Exhibit 3**, Affidavit of Adam Flores, ¶ 10. According to his review, "MDC's average daily population has increased from approximately 1,500 residents to more than 1,800 residents over the course of the past year, rapidly approaching the MDC's McClendon settlement population cap of 1,950." *Id.* ¶ 10. According to data from Defendant County of Bernalillo, the majority of detainees have been arrested by APD, including more than 800 misdemeanor bookings and an additional 200 detainees booked on misdemeanor warrants. *Id.* The 2017 Settlement Agreement requires APD to issue "citations whenever appropriate" and directs that "persons alleged to have committed non-violent misdemeanor offenses (not to include DWIs) will not be arrested when there are no circumstances necessitating arrest." *See* Settlement [Doc 1320] Agreement, ¶ 1. The available data suggests that the City is likely not complying with the Settlement and Order and that oversight is still needed. *Id.* What is more, in recent public statements to the media, City officials have stated they have been conducting, and will continue to conduct, arrests that Plaintiffs believe violate the Settlement and Order, and may run afoul of the

---

[4]    Available online at https://www.bernco.gov/county-manager/bernalillo-county-mdc-population-dashboard/.

Constitution and federal disability rights laws.[5] In order to respond to the City's Motion and make this assessment, Plaintiffs need reasonable discovery. *Id.*

  The City has filed a thirty-six-page Motion to Dismiss seeking to terminate the 2017 Settlement Agreement based on its alleged compliance and to be dismissed from this suit. The Motion contains sixty-eight exhibits totaling approximately 340 pages. The City argues that they are no longer in violation of the Constitution and federal statutes and are in substantial compliance with the Settlement Agreement and Court Order. Plaintiffs dispute that the City is not violating the law and is in substantial compliance. *See* **Ex. 3**, Aff. of Adam Flores, ¶ 4. However, in order to fully address the City's factual allegations, additional discovery is needed. *Id.* For instance, the City claims that it has complied with paragraph 5 of the Settlement Agreement in implementing certain Standard Operating Procedures (SOPs). However, this claim is based on affidavits from APD personnel who reviewed training records and undisclosed spreadsheets and made calculations, based on methodologies not described in the affidavits. *Id.* ¶ 7. Plaintiffs have never been given an opportunity to speak with these witnesses or review the training records, spreadsheets, and other material relied upon by these affiants. *Id.* Nor does training alone satisfy the Settlement Agreement's requirements to "implement" these mandated SOPs. Plaintiffs are thus requesting written discovery and depositions of City personnel to assess aspects of implementation including and beyond training, to include adherence data, supervisors' practices, and any evidence of discipline for violations of the required policies.

---

[5] Jacqlin Aragon, *Albuquerque Police crack down on crime along East Central*, KOB4 NEWS, February 16, 2025, available at https://www.kob.com/news/top-news/albuquerque-police-crack-down-on-crime-along-east-central; Jessica Salinas, *Albuquerque police target fentanyl use on Central Ave.*, KRQE NEWS, October 9, 2024, last updated October 10, 2024, available at https://www.krqe.com/news/crime/albuquerque-police-target-fentanyl-use-on-central-ave/; Matthew Reisen, *Albuquerque Police Plan to Crack Down on Open-Air Fentanyl Use Along Central*, THE ALBUQUERQUE JOURNAL, October 9, 2024, Available at https://www.abqjournal.com/news/article_a47e44b8-867c-11ef-8f0c-f3dd7a2b2e5a.html

Many of the other claims in the City's Motion to Dismiss likewise rely on affidavits and information that Plaintiffs have never had the opportunity to investigate. *Id.* ¶¶ 8, 11. The Plaintiffs have not had an opportunity to depose these affiants and have not seen the data on which they rely. *Id.* Thus, Plaintiffs require time to engage in discovery to make this assessment, including reviewing the data on which these affiants rely and conducting depositions. *Id.*

The City also relies heavily on the Winograd report (Exhibit PP) [Doc. 1733-42]. However, the conclusions reached by Dr. Winograd are based on incomplete and inaccurate data. *Id.* ¶ 12. Plaintiffs' counsel tried to obtain this data in 2020, 2022, 2024, and 2025, but the City refused to produce it. *Id.* ¶ 12. In fact, in response to Plaintiffs' requests, "the City acknowledged that it could not produce its underlying data and acknowledged the report likely relied on incomplete data." *Id.* Accordingly, Plaintiffs require formal discovery to review the City's underlying data; question City personnel about the report, its methodology, and underlying data under oath; and assess the reliability of the report in order to respond to the Motion to Dismiss.

Lastly, the Settlement Agreement and Court Order specifically call for mediation prior to the filing of a motion regarding compliance or a motion to dismiss. *See* Settlement Agreement, ¶ 12 [Doc. 1320]. The Court's Memorandum Opinion and Order approving and entering the 2017 Settlement Agreement clearly states: "If a dispute arises over compliance with the Settlement Agreement, before filing a motion with this Court, the parties must first attempt to mediate the dispute." [Doc. 1326]. The City failed to satisfy this requirement to attempt mediation prior to filing the Motion to Dismiss.

Prior to filing this Motion for Stay, counsel for Plaintiff-Intervenors, Ryan Villa, and counsel for Plaintiff, Nicholas Davis, met and conferred with counsel for the City, Deb Moulton.

Ms. Moulton indicated that the City opposes the request for a stay, for discovery, for an evidentiary hearing, and to conduct mediation. Counsel for the County, Taylor Rahn, opposes this Motion.

**ARGUMENT**

A decision to stay is within the discretion of the trial court as it "has broad discretion in managing its docket, which includes decisions regarding all or part of a proceeding." *De Baca v. United States*, 403 F. Supp. 3d 1098, 1111 (D.N.M. 2019) (Browning J.).

I.   **The Motion to Dismiss should be stayed to permit Plaintiffs to conduct discovery on the City's claims and to effectively respond to the Motion.**

   A.   **Due Process requires that the plaintiffs must have a meaningful opportunity to prove that the City Defendants are not in compliance.**

Because the Settlement Agreement and Court Order confer upon members of the class and subclass important protections against deprivation of their liberty and also protect them from the resultant harms attendant to being detained in a jail where the conditions are substandard, the Plaintiffs are entitled to procedural due process before the Settlement Agreement can be terminated. Courts addressing motions to terminate prospective injunctive relief in system reform class action lawsuits are obligated to afford the opposing party all the protections afforded to parties facing motions to dismiss a case pre-trial. Courts in similar cases have granted discovery before terminating prospective injunctive relief.

For example, in *Joseph A. by Wolfe v. New Mexico Dept. of Human Services*, the district court required further hearings and additional findings of fact by a special master to address concerns about the termination of a consent decree, indicating the necessity of ongoing discovery to ensure compliance with the decree's spirit and intent. *See* 69 F.3d 1081, 1084 (10th Cir. 1995). Similarly, the Eleventh Circuit has upheld a trial court's order terminating a consent decree, based in part on the trial court's decision to grant plaintiffs an opportunity to complete discovery, leaving

10

no stone unturned, and detailed findings based on that discovery. *R.C. ex rel. Alabama Disabilities Advocacy Project v. Walley, 2*70 Fed. Appx. 989, 991 (11th Cir. 2008) ("The court formally reopened discovery following the motion to terminate, during which time the defendants produced more than 50,000 documents, the plaintiffs took three depositions, and there were two court monitor reports submitted to the court.").

The Sixth Circuit has also addressed the issue in the context of the Prison Litigation Reform Act (PLRA). *See Hadix v. Johnson*, 228 F.3d 662, 665 (6th Cir. 2000). The PLRA speaks to the ability of a party to not only enter but exit litigation before this Court and the "stringent standard" that must be met before prospective injunctive relief can be terminated. *Id.* There is an automatic stay under 18 USC Section 3626(e)(2) of the PLRA for motions to "terminate prospective relief in a civil action with respect to prison conditions." 18 USC § 3626(e)(1). When the motion to terminate is made under "any other law" it shall operate as a stay for 180 days. *See* § 3626(e)(2)(ii). Such a stay is appropriate in this matter, and it is well within the Court's discretion, if it does not take place automatically, both under a PLRA analysis or by operation of the Settlement Agreement itself. Additionally, Section 3626(b)(3) requires that a district court determine based on current conditions whether there is a current and ongoing violation of a federal right. *Id.*

"[B]ecause the existing record at the time the motion for termination is filed will often be inadequate for purposes of this determination, the party opposing termination must be given the opportunity to submit additional evidence in an effort to show current and ongoing constitutional violations." *Hadix.* 228 F.3d at 671. *See also Loyd v. Alabama Dep't of Corrections*, 176 F.3d 1336, 1342 (11th Cir.) (noting "[i]t would read all meaning out of [§ 3626(b)(3) of the PLRA] to force the party opposing termination to show that the consent decree meets the requirements of § 3626(b)(3) and then not provide that party with the opportunity to present evidence on that point"),

*cert. denied*, 528 U.S. 1061 (1999); *Benjamin v. Jacobson*, 172 F.3d 144, 166 (2d Cir. 1999) ("In sum, we interpret §§ 3626(b)(2) and (3), read together, to mean that, when the plaintiffs so request in response to a defendant's motion for termination, the district court must allow the plaintiffs an opportunity to show current and ongoing violations of their federal rights."). To be fully informed on this question, this Court must permit Plaintiffs to present evidence and should do so after Plaintiffs have an opportunity to conduct discovery.

**B. Discovery and a stay are warranted under Rule 56(d) for a dispositive motion**.

Because the City does not cite the PLRA for their relief and instead argue factually they are in compliance with the Settlement Agreement and Court Order, its Motion to Dismiss can be considered a dispositive motion akin to one seeking summary judgment. To be sure, the City seeks to dismiss the claim as a matter of contractual law for compliance with the Settlement Agreement based on affidavits and evidence it provides with its Motion. Therefore, the rules of discovery in that context are reasonable and should apply. Rule 56 Fed. R. Civ. P. states in pertinent part that, when the nonmovant shows by affidavit for specified reasons it cannot present facts to justify opposition, the Court may: (1) defer its consideration of the motion or deny it; (2) "allow time to obtain affidavits or declarations or to take discovery;" or (3) "issue any other appropriate order," such as a stay. *See Gutierrez v. Cobos*, 841 F.3d 895, 908 (10th Cir. 2016). To invoke rule 56(d), the party filing the affidavit or declaration must state with specificity how the desired time would allow it to meet its burden in opposing a dispositive motion. *See Green v. Padilla*, 697 F. Supp. 3d 1115, 1179 (D.N.M. 2023) (Browning J.). In the Tenth Circuit, a non-movant requesting additional discovery under Rule 56(d) "must specify (1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how

additional time will enable [the party] to obtain those facts and rebut the motion for summary judgment." *Gutierrez*, 841 F.3d at 908 (10th Cir. 2016).

It is necessary to allow time to take discovery because there is clearly more to Defendant's motion than what they provide the Court. *See generally*, **Ex. 3**, Affidavit of Adam Flores. In the affidavit, Mr. Flores, counsel for Plaintiffs, specifically outlines the needs and purposes of time to complete discovery as it breaks down each claim of compliance by paragraph. *Id.* That discovery is generally required to "assess the City's exhibits and respond to the MTD." *Id.* ¶ 4. The justifications throughout the affidavit include: requiring written discovery to access the City's training on APD's Stop and Search practices; depositions of APD training personnel to determine whether they are adhering to policies required under the Settlement Agreement and Court Order; discovery to "access aspect of implementation of policies apart from training;" review of affidavits of City personnel who are unknown to Plaintiffs and require examination; discovery to compare to other data that suggests Defendants are not in compliance with the Settlement Agreement and Court Order. *See generally id.* To be sure there are external data points that suggest the City's claim is incorrect, such as news reports from local news KOB, among others, where APD lists "accomplishments," which includes misdemeanor arrests.[6] Additionally, a monthly report from December 2024, published by Bernalillo County, indicates 26.6% increase in MDC population year over year. *See* **Exhibit 4**, Criminal Justice Reforms and the Jail Population Report, at 1. The report states that misdemeanors accounted for a larger portion of the change in bookings than felonies and also notes that there were increases in booking for petty misdemeanors. *Id.* at 7.

Notably, much of the information Plaintiffs seek, has to date, been information exclusively available to the City. "The movant's exclusive control of such information is a factor weighing

---

[6] *Supra*, FN 2.

heavily in favor of relief." *Price ex rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000). The City relies on its own data to claim compliance relying on the Winograd report, but when this data was requested by Plaintiffs, to date, the City has been unable to produce it or assure that it is reliable. *See* **Ex. 3**, Aff. of Flores, ¶ 12. In May 2024, Plaintiff's counsel requested to meet regarding the underlying data and requested the supporting data to the report on which it now relies in part. *See* **Exhibit 5**, Letter from Plaintiff's Counsel Regarding Winograd Report Data, at 7. In a letter from 2024, the City discusses the major change in 2021 that allowed the City to collect data they struggled to collect with the old system that the 2018 Winograd report relied upon. *See* **Exhibit 6**, Response Letter from City to Plaintiff's Counsel. The City explains in the first paragraph that it migrated its data from one system to another in 2021, noting this improved APD's data collection *after* the 2018 Winograd report as well as *after* the 2021 draft report was circulated. *Id.* However, Plaintiffs have never been able to access this data and confirm the conclusions of the 2024 Winograd report. **Ex. 3**, Aff. of Flores, ¶ 12.

With this in mind, the Court should use its discretion to provide additional time under Rule 56(d) for discovery.

**II.    The Motion to Dismiss should be stayed until the parties have completed mediation.**

According to Paragraph 12 of the Settlement Agreement with the City, mediation is required "before the Court's Special Master or another mediator agreed to by all the parties or selected by the Court." *See* Settlement Agreement [Doc. 1320]. This must take place "before any motion can be filed with the Court." *Id*. The Court's Memorandum Opinion and Order approving the Settlement Agreement also ordered that, "[i]f a dispute arises over compliance with the Settlement Agreement, before filing a motion with this Court, the parties must first attempt to mediate the dispute." *See* Order [Doc. 1326]. Given the very nature of the City's Motion to

14

Dismiss, clearly a dispute has arisen over compliance with the Settlement Agreement and thus necessitated mediation prior to filing a motion to dismiss. While the City is clearly in violation of the mediation requirements of the Settlement Agreement and Court Order, the Court can remedy this violation either by denying the City's Motion to Dismiss, with leave to refile following mediation, or by staying the proceedings until the Parties complete good-faith mediation. Plaintiffs submit that mediation done after discovery will be significantly more fruitful than prior to discovery.

**CONCLUSION**

The City's Motion to Dismiss should be stayed to allow for discovery and an evidentiary hearing under the controlling authority of the PLRA and Rule 56(d), and to allow for mediation as required under the Settlement Agreement itself and this Court's Order.

**WHEREFORE,** the parties hereby respectfully request this Court enter an Order staying the City's MTD [Doc. 1733] to allow for discovery and mediation.

Respectfully submitted,

By: /s/ *Ryan J. Villa*

THE LAW OFFICE OF RYAN J. VILLA
Ryan J. Villa
Kelly K. Waterfall
Katherine M. Loewe
5501 Eagle Rock Ave., Suite C2
Albuquerque, New Mexico 87113
ryan@rjvlawfirm.com
kelly@rjvlawfirm.com
kate@rjvlawfirm.com
*Attorneys for Plaintiff Intervenors*

By: /s/ *Nicholas T. Davis*
NICHOLAS T. DAVIS
*Counsel for Plaintiffs*
1000 Lomas Blvd. NW
Albuquerque NM, 87102

(505) 242-1904
(505) 242-1864 (fax)
nick@davislawnm.com

By: */s/ Adam C. Flores*
Adam C. Flores
Henry A. Jones
*Attorneys for Plaintiffs*
925 Luna Cir. NW
Albuquerque, NM 87102
(505) 364-3858
adam@nmcivilrights.com
henry@nmcivilrights.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2025, I filed the Notice of Change of Address electronically through the CM/ECF system, which caused all parties or counsel entitled to notice to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

/s/  *Ryan J. Villa*

RYAN J. VILLA