## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JIMMY (BILLY) McCLENDON, et al.,**

    **Plaintiffs,**

    **v.**                         **No. 95-CV-00024 JB/KBM**

**CITY OF ALBUQUERQUE, et al.,**

    **Defendants,**

**v.**

**E.M., R.L., W.A., D.J., P.S., and
N.W. on behalf of themselves and
all others similarly situated,**

    **Plaintiff-Intervenors.**

## DEFENDANT CITY OF ALBUQUERQUE'S
## <u>RESPONSE TO PLAINTIFFS' MOTION TO STAY</u>

The Settlement Agreement ("Agreement") agreed to by the Defendant City of Albuquerque ("City") and Plaintiffs and Plaintiff-Intervenors ("Plaintiffs") provides the procedure for filing a motion to dismiss. The parties are bound by this Agreement, both in requirements and procedure. Plaintiffs now seek to expand the scope of these requirements and procedures by requesting discovery not previously contemplated and attempting to invoke mediation in connection to a dismissal request—a procedure not contemplated in the Agreement. The Court should deny Plaintiffs' Motion to Stay because (1) the parties are bound by the Agreement and the requested discovery and mediation are not contemplated at this stage and, by making these requests, Plaintiffs seek to expand the terms of the contract; (2) the City has provided numerous documents over the years in the course of complying with the terms of the Agreement, reflecting good faith compliance by the City and obviating any need for additional document productions; and (3)

Plaintiffs fail to allege any specific, supported facts of non-compliance by the City with the Agreement and only raised the issue of non-compliance after a motion to dismiss was filed.

Eight years ago, the City reached a Settlement Agreement with Plaintiffs and Plaintiff-Intervenors. In that Agreement [Doc. 1320], the City was tasked with compliance in ten different paragraphs, each requiring specific actions. Compliance with the Agreement is achieved after the accomplishment of the steps outlined in the Agreement. Once the City has completed the steps outlined in each paragraph, the Agreement provides that the City may file a Motion to Dismiss. The City has accomplished each of the ten paragraphs and has properly moved for dismissal based on substantial compliance as set out in Paragraph 14 of the Agreement.

Plaintiffs now ask for a stay so that they may conduct discovery regarding the assertions made by the City in the City's Motion to Dismiss [Doc. 1733] and in order to allow mediation to occur prior to litigating the Motion to Dismiss. Plaintiffs had an opportunity to negotiate for a discovery option or mediation requirement connected to a dismissal request, but that was not done when the Agreement was negotiated. Furthermore, discovery is unnecessary as the City has provided a wealth of documents since 2018, and the specific discovery requests made by Plaintiffs are improper as the requests exceed the bounds of what was contemplated by the Agreement. In the list of potential items Plaintiffs seek, they request discovery never requested before, items already provided, or items well beyond the scope of the Agreement. The terms of the Agreement do not permit a stay for this fishing expedition.

The determination as to whether the City has achieved substantial compliance is left to the trial court once the City has filed a motion with the Court to find substantial compliance in whole or in part. The City filed that motion pursuant to Paragraph 14 and respectfully requests that the Court to proceed to ruling on the motion to dismiss.

## FACTUAL BACKGROUND

On March 28, 2017, the City and the Plaintiffs reached a Settlement Agreement in this matter. [Doc. 1320.]  The Agreement contains fourteen paragraphs, ten of which contain specific requirements of the City.  The Agreement provides the City must fulfill the requirements of those ten paragraphs to end its involvement in this lawsuit:

> This Agreement satisfies all claims made or claims that could have been made by the Plaintiff class and the Plaintiff Intervenor sub class against the City Defendants in this action and will result in dismissal of City Defendants from this action after the City Defendants have substantially complied with the provisions set forth herein. City Defendants may file motions with the Court to find substantial compliance in whole or in part with individual paragraphs of this Agreement. *After publishing the report required by Paragraph 6, City Defendants may file a motion for dismissal* from the case upon showing of substantial compliance with this Agreement.

[Doc. 1320, ¶ 14.] (emphasis added).

*Reports and document production*

As contemplated by the Agreement, the City published its first Paragraph 6 report on July 26, 2018.[1] Thereafter, Plaintiffs' counsel submitted three formal public records requests pursuant to the Inspection of Public Records Act ("IPRA") between 2018 and 2022.[2] As detailed below, these requests were fulfilled.

The first, received on September 18, 2018, submitted by Plaintiffs' attorney Ryan Villa, requested fifteen different types of documents.[3] The City worked over the course of several months to produce the many requested documents. The City took the extra step on September 25, 2018 when Counsel for the City, Lindsay Van Meter, wrote to Mr. Villa and requested the opportunity

---

[1] As detailed in the City's Motion to Dismiss, the City agreed to produce and publish a second report, which was published February 9, 2024.
[2] Upon information and belief, counsel for Plaintiffs have made three public records requests since entering the 2018, requesting information related to the City's compliance with the Agreement. The history of those requests and the City's responses are discussed herein, but if additional requests were made, undersigned counsel is not aware.
[3] The IPRA request dated September 11, 2018 is attached hereto as Exhibit A.

3

to meet with counsel for Plaintiffs and Plaintiff-Intervenors to discuss the September 11, 2018 IPRA request.[4] The City sought to explain how Dr. Peter Winograd, who authored the 2018 report, used APD's database to create his 2018 report and to seek clarification from Counsel regarding which "course of business records" they requested. *See,* letter from Lindsay Van Meter to Ryan Villa, dated September 24, 2018, attached hereto as Exhibit B. Counsel for Plaintiffs and Plaintiffs-Intervenors subsequently met with Counsel for the City on October 3, 2018. Prior to meeting, the City provided 3,228 pages of police reports to Plaintiffs. The parties then met and discussed the procedure for identifying non-violent misdemeanors, the procedure for identifying CIT-Related incidents, calls for service involving domestic violence, and traffic citations. This meeting was memorialized in a letter from Counsel for the City dated October 17, 2018.[5] In the letter, Ms. Van Meter also summarized the documents produced as a result of that meeting.[6] Part of the production included the underlying data used to create the 2018 report pursuant to Paragraph 6.

On February 26, 2019, Mr. Villa wrote to the City, explaining that he had reviewed the materials provided and believed he was missing some documents that the City said it produced. Mr. Villa requested that the City resend Dr. Winograd's spreadsheets and the responses to Requests No. 6 and 7. On March 12, 2019, the City responded to this request and provided Dr. Winograd's spreadsheets in both .pdf format and Excel format[7], records for Crisis Intervention Team ("CIT") data[8], and records for domestic violence data.[9] No additional requests were received from Mr. Villa regarding the IPRA request of September 11, 2018. During this process, Plaintiffs received hundreds of pages including contracts with behavioral health providers,

---

[4] September 25, 2018, letter from Counsel for the City to Counsel for Plaintiffs, attached hereto as Exhibit __.
[5] See, October 17, 2018, from Lindsey VanMeter to Ryan Villa, Zach Ives and Kelly Waterfall, regarding September 11, 2018, IPRA request, attached hereto as Exhibit C...
[6] See Exhibit C (Oct. 17, 2018 letter from Van Meter); and Affidavit of City Clerk Ethan Watson, Exhibit D.
[7] *See,* sample of the spreadsheet produced for non-violent misdemeanors, attached hereto as Exhibit E.
[8] *See,* sample of spreadsheet produced for CIT data, attached hereto as Exhibit F..
[9] *See,* sample of spreadsheet for DV data, attached hereto as Exhibit G/.

supportive housing slots, collaboration efforts between the City and the County, and data on non-violent misdemeanors, CIT interactions, and domestic violence arrests.

A second public records request made by Plaintiffs' Counsel was received by the City Clerk's Office on May 30, 2019.[10] On June 20, 2019, the City provided partial production and produced five documents.[11]  The production of additional responsive emails was made available on September 9, 2019 and the request was noted as fulfilled and closed, according to records maintained by the City Clerk's Office.

In February 2021, two different records requests and requests for meetings were made by Counsel for Plaintiff-Intervenors directly to counsel for the City. First, on February 22, 2021, Counsel for Plaintiff-Intervenors, Peter Cubra emailed requesting information regarding an officer-involved shooting and a meeting for the same. The Parties met on March 30, 2021, along with Parties in the *United States of America v. City of Albuquerque* - 1:14-cv-01025-JB-JFR, also known as the Court Approved Settlement Agreement ("CASA"). While this meeting was primarily related to the CASA, the City prepared and subsequently circulated on May 10, 2021, an "initial draft findings from the McClendon report," which was dated April 5, 2021 and labeled a "discussion draft." Said draft report was never published, but its production resulted in additional information being available to Plaintiffs. Additional requested records were produced May 11, 2021, along with an offer to answer further questions or set up a follow up meeting. Based on records in possession of the City, counsel for Plaintiff-Intervenors did not respond.

The second, separate February 2021 records request from counsel for Plaintiff-Intervenors was made on February 25, 2021.[12] Counsel for Plaintiffs sent a letter to the City requesting

---

[10] Attached as Exhibit H.
[11] See Exhibit D.
[12] Attached as Exhibit I.

documents and requesting to meet and discuss the City's compliance with the Agreement. The City met with Plaintiffs' Counsel on March 18, 2021 and provided a link to the Mental Health Response Advisory Committee ("MRAC") reports that same day. The City also produced a thumb drive of body worn camera videos to Plaintiffs which was made available on March 26, 2021 but not picked up by Plaintiffs' Counsel until April 7, 2021. The City scheduled a follow up meeting with Plaintiffs' Counsel on April 5, 2021. After that meeting, there were no further requests related to the February 25, 2021 letter.

The third public records request was received December 29, 2022 by the City Clerk's Office.[13] Like the prior two, this request sought numerous records, to include all records from January 1, 2021 to the date of the request in December 2022, pertaining to the arrests for fifteen different misdemeanor crimes.[14] The City made several partial productions of documents in response to this request through May of 2023, including multiple Crisis Intervention Data Books, various meeting minutes and agendas, and numerous contracts related to supportive housing funding. On February 9, 2024, the City published a second report pursuant to Paragraph 6 to Plaintiffs which covered the period of January 1, 2022 through December 31, 2022. When the report from 2022 was published, Counsel for the City provided data sets to Counsel for Plaintiffs for each of the four areas: non-violent misdemeanors, CIT, domestic violence, and phone and email addresses on Uniform Citations. Counsel for Plaintiffs sent a letter to Counsel for the City on May 15, 2024, seeking information regarding the most recent report and how to read it in light of the two prior reports produced, the 2018 report and the 2021 so-called "discussion draft" report. In response to these questions, the City responded to counsel for Plaintiffs with a letter on June 28,

---

[13] Attached as Exhibit J.
[14] See Exhibit D [Ethan Watson Affidavit].

2024. The City asked counsel for Plaintiffs to reach out with further questions after review of its correspondence. No such further question or request was received.

According to records maintained by the City Clerk's Office, Plaintiffs' counsel wrote to the City Clerk's Office on December 3, 2024, seeking the remaining records on the still-open records request from December 29, 2022. Records were provided in the following two months and the Clerk's Office and Plaintiffs' counsel communicated regularly about any remaining requests. On January 28, 2025, City Clerk Ethan Watson wrote to Plaintiffs' counsel, stating that the remaining items pertained to item number 5 in their request, which sought records "pertaining to" a number of items, including arrests for fifteen misdemeanor crimes. Mr. Watson sought clarity on the types of records being requested. Mr. Watson sent another message to Plaintiffs' counsel on February 4, 2025, again seeking clarity on those records being sought related to request number 5, asking that they identity any specific incidents and specific records being sought. On February 7, 2025, a representative for the office of Plaintiffs' counsel said the request could be closed. The request was subsequently closed with no further action by the City Clerk's Office.[15]

Since 2017, when the parties entered into the Agreement, the City has published two reports pursuant to Paragraph 6, provided the underlying data, provided thousands of pages of documents in records requests, provided additional records directly to counsel upon request, and has agreed to meet with Plaintiffs' counsel when requested. Additionally, there were numerous emails and documents exchanged between counsel for City and counsel for Plaintiffs in the City's efforts to comply with the Agreement's requirements mandating Standard Operating Procedure updates and training plans. See Doc. 1733.

---

[15] See Exhibit D.

**LEGAL ARGUMENT**

The Court should deny the Plaintiffs' Motion to Stay because  the Settlement Agreement does not contemplate additional discovery, the Affidavit does not meet the Rule 56 threshold (which the City contends is also inapplicable to this circumstance due to the Agreement controlling), many of the requests exceed the scope of the Agreement, and the City has already disclosed a multitude of documents therefore discovery would be duplicative.  Additionally, a stay is not warranted to conduct mediation because mediation is not contemplated for the dismissal process delineated in Paragraph 14 of the Settlement Agreement.  Finally, Plaintiffs fail to allege any specific, supported facts of non-compliance with the Agreement and only raised the issue after a motion to dismiss was filed.

1. **DISCOVERY IS NOT WARRANTED AT THIS TIME**

   a. **The Settlement Agreement does not contemplate additional discovery**

The plain language of the Settlement Agreement does not permit Plaintiffs to obtain additional discovery at any point including prior to litigating a motion to dismiss. See Doc. 1320, ⁋ 14.

Numerous circuit courts have turned to the Settlement Agreement or consent decree itself to analyze whether discovery is proper. In *P.J. ex rel W.J. v. CT Bd. Of Educ.*, 550 F. App'x 20, 24 (2d Cir. 2013) (unpublished), the Court noted: "While Appellants may have preferred greater access to Appellee's records, they did not bargain for such access in the Agreement. Accordingly, the district court properly denied Appellants' motion to compel discovery."  Similarly, in *Shield Club v. City of Cleveland*, 838 F. 2d 138, 140 (6th Cir. 1987), the Sixth Circuit also turned to the Agreement itself to decide on discovery: "We do not believe that the retained right of plaintiffs to make the examination requested was contingent upon making out a prima facie case in support of

the melanin or any other particular theory, but rather *was warranted by the very language of the consent decree.*" (emphasis added).

Stated simply, "[i]f class counsel believed that formal discovery was imperative to their monitoring duties, they should have negotiated an explicit provision to that effect." *Montez v. Hickenlooper*, No. 92-CV-00870 CMA, 2014 WL 4413221, at *2 (D. Colo. Sept. 8, 2014). The *Montez* court employed principles of contract construction when construing the Plan. *See*, *United States v. ITT Continental Banking Co.*, 420 U.S. 223, 237 (1975) ("since consent decrees . . . have many of the attributes of ordinary contracts, they should be construed basically as contracts…."

In this case, the Court should construe the contractual provisions of the Agreement in determining whether discovery is warranted. Paragraph 14 merely provides that the City may move for dismissal after publishing the report required by Paragraph 6 and seeking a finding of substantial compliance from the Court.

If the Plaintiffs wanted additional discovery or wanted discovery prior to litigating a motion to dismiss, they could have negotiated to include a specific discovery requirement as a part of the Agreement. In Plaintiffs' Motion to Stay, they attach a Declaration by Plaintiffs' Counsel, Adam Flores. Mr. Flores correctly points out in his Declaration that the Agreement includes substantive requirements for revisions to certain Standard Operating Procedures ("SOPs"), a process for drafting the revisions, and training requirements. **Those requirements have been met by the City and it is important to note that Plaintiffs and Plaintiff-Intervenors were involved at each step of the process involving the revisions of SOPs, including providing extensive feedback about the training plan, as set out in some detail in the City's Motion to Dismiss.**

Further, the City's obligations to report on specific data is outlined in Paragraph 6, and the City complied with this requirement when it produced two reports in 2018 and 2024 and the

underlying data to report to Plaintiffs. The Agreement does not authorize additional discovery beyond the report, does not authorize depositions and/or expert evaluation to assess the adequacy of the City's training on any of the SOPs. If Plaintiffs wished to conduct this type of evaluation or depositions, they should have made those provisions a part of the Agreement. In fact, the parties agreed that "[t]his Agreement does not require the engagement of an independent monitor." *See* Doc 1320, ¶ 13.

If Plaintiffs wished to have an expert evaluation to assess the adequacy of the City's training on any of the SOPs, they could have done so when the training plans were circulated; and Plaintiffs could have hired experts to evaluate the City's underlying data to its two reports at the time they were produced.

Likewise, in Paragraph 4 of the Agreement the City was required to follow a certain process for revising and enacting an SOP related to APD's response to behavioral health issues. Plaintiffs and Plaintiff-Intervenors were actively involved in this process and their approval was obtained at each step, including the training plan, the training test, and the training evaluation. Plaintiffs did not include in the Agreement a provision that they were entitled to written discovery and depositions of APD's training personnel on top of being actively involved in the process. This is not contemplated by the contract entered into by the parties.

To request depositions with training personnel, supervisors' practices and any evidence of discipline for violations of the required policies is clearly well beyond the terms of the Agreement, which was negotiated in good-faith by all parties. Not only are such requests not authorized by the plain language of the contract, but Plaintiffs only seek these particular requests for the first time eight years into this Agreement and after a motion to dismiss has been filed. As such, the request is improper and not warranted by the Agreement. The Motion to Stay should be denied.

*Plaintiffs' cited cases are inapplicable to the procedural posture of this case.*

Plaintiffs have cited four cases for the proposition that due process requires that the Plaintiffs to have a meaningful opportunity to prove that the City is not in compliance and that the Motion to Dismiss should be stayed to permit Plaintiffs to conduct discovery. These cases are distinguishable because the settlement agreements in those matters were necessarily different that the Settlement Agreement in this matter. Without complete analysis of the provisions of those agreements compared with the Settlement Agreement in this matter, these cases are not instructive. Further, many of the cases are from other jurisdictions and thus are not binding on the Court.

*Joseph A. by Wolfe v. New Mexico Dept. of Human Services*, 69 F. 3d 1081, 1084 (10th Cir. 1995) involved the dissolution of New Mexico's foster care system. The district court dissolved the consent decree based on a Special Master's report. However, because the Special Master's factual findings and conclusions of law did not conform to Fed. R. Civ P. 52(a), the Court of Appeals could not determine if the Special Master correctly applied the substantial compliance standard and remanded it to the district court to outline the essential subsidiary findings and reasoning which lead to the ultimate conclusions for each specific requirements. Additional discovery was not ordered, and the Special Master analysis was specific to the facts of the case and the requirements in the agreement for the foster care system.

The facts in *R.C. ex rel. Alabama Disabilities Advocacy Project v. Walley*, 270 Fed. Appx. 989, 991 (11th Cir. 2008) are also distinguishable in that it appears that no documents had been produced prior to the court's order for discovery. After the Court ordered discovery, more than 50,000 documents were produced. Here, while there has not been formal discovery, there has been a near continuous production of documents through public record requests, direct production from counsel, the production of two reports, and the exchange of documents related to the SOP updates

and training plan approvals. Neither case supports the Plaintiffs' request for a stay to conduct discovery.

The issue in *Hadix v. Johnson*, 228 F.3d 662, 665 (6th Cir. 2000) was not whether discovery was required, but whether an evidentiary hearing was required prior to terminating a consent decree under the Prison Litigation Reform Act ("PLRA"). The "automatic stay" provision of PLRA does not automatically stay the motion to dismiss, but rather stays the prospective relief, in this case, the Agreement. *See* Section 3626(e). While the district courts in *Hadix* and *Loyd v. Alabama Dep't of Corrections,* 176 F/3d 1336, 1342 (11th Cir.) both conclude that the party opposing termination must be given the opportunity to submit additional evidence, they are not required to grant discovery requests in every case. *See, Cagle v. Hutto*, 177 F.3d 253, 258 (4th Cir. 1999) (pre-termination evidentiary hearing is discretionary unless party opposing termination alleges specific facts amounting to current and ongoing constitutional violation). As the Eighth Circuit Court of Appeals discussed in *Watson v. Ray*, 192 F. 3d 1153, (8th Cir. 1999), discovery was not necessary because the district court found in its termination order "…that appellants failed to show present violations of constitutional rights, that most of the problems giving rise to the decree had been solved, and that recent reports suggested that the only areas of current noncompliance with the decree were not of constitutional magnitude." As there were no prior allegations by Plaintiffs of non-compliance, and insufficient evidence of current and ongoing violations, the Court should deny the request for a stay to conduct discovery, even if it were authorized pursuant to the Agreement.

Because the plain language of the Settlement Agreement does not contemplate discovery nor was the type of discovery authorized within the bounds of the Agreement, a stay to conduct discovery is not warranted.

**b.  The City has already provided a multitude of documents to Plaintiffs**

The City has provided thousands of pages of documents to Plaintiffs' Counsel, so additional discovery, even if authorized, would be unnecessary and a stay is not warranted to conduct further discovery.

In *Watkins v. Ray,* 192 F.3d 1153, 1158 (8th Cir. 1999), the Eighth Circuit Court of Appeals found that "[g]iven the wealth of evidence available in the record to support the district court's finding of no current and ongoing violations, we find that the denial of discovery in this case was not an abuse of discretion."  The Eighth Circuit Court of Appeals based this finding upon "the wealth of information available."

As detailed above, the City has provided thousands of pages of documents to Plaintiffs since 2018, including numerous records responsive to public records requests, records in response to direct requests to counsel, produced two reports and the underlying data, and engaged in the required back and forth for approval of SOPs and training plans.

Despite this wealth of information being shared, Plaintiffs state that "despite Plaintiffs' best efforts in the course of its compliance monitoring in 2019, 2022, 2024 and 2025, to obtain arrest data and other documents that would establish whether the City has implemented the Standard Operating Procedures that are required by the Settlement and Order, the City has withheld the evidence and refused to participate in discovery." Plaintiffs also state that: "(n)otably, much of the information Plaintiffs seek, has to date, been information exclusively available to the City." These statements are incorrect. In fact, thousands of pages have been produced to the Plaintiffs, both through public records requests as stated above and when the City produced its first report in 2018 and second report in 2024. As demonstrated in correspondences, Counsel for the City offered to meet or answer further questions after documents were produced. Plaintiffs' Counsel's failure to  avail themselves of the offered meetings and communication at that time should not now result

13

in delaying the Court's consideration of the City's Motion to Dismiss, or result in discovery that is not contemplated in the Agreement. Furthermore, there is no need for formal discovery to review the City's underlying data, as it was produced to the Plaintiffs and is and has been available to them. The suggestion that Plaintiffs need to question City personnel about the report and its methodology is unfounded as Ms. Van Meter provided the report methodology to Mr. Villa in her October 17, 2018 letter.

Specifically, in response to the first public records request in 2018, the City produced 3,228 pages of police reports, which included police reports for the requested charges, police reports for arrests identified in the CIT-related incidents, and for behavioral health related arrests involving domestic violence. Along with those reports the City also produced the spreadsheets created by Dr. Winograd which were not specifically responsive to the IPRA request but were produced with the understanding that the spreadsheets may satisfy some aspects of the IPRA requests. The spreadsheet for non-violent misdemeanors, for example, identified the case number, date, criminal charge, name, and whether the person was summonsed, cited, or arrested for 6,181 police reports. The spreadsheet for CIT incidents included the date, the criminal charge, and the call disposition for 11,456 incidents, which included information about whether a mental health transport occurred or was refused. The third spreadsheet included a list of all domestic violence incidents for the relevant time frame and included the date, case number, the charge, and the call status for those incidents. In addition, the City produced various committee meeting minutes or agendas from 2017 and 2018 that illustrate the continuation of good faith collaborative efforts with Bernalillo County to develop jail diversion programs. When it published the 2024 report, the City produced to Plaintiffs three different data sets, which included information on thousands of contacts between police and citizens.

14

It is incorrect to suggest that the City has withheld evidence. The data has been produced, and the Plaintiffs have had ample opportunity over the course of years to request any additional discovery and/or request depositions. A stay is not warranted to accomplish these requests prior to litigating City's Motion to Dismiss, nor is it authorized in the procedures provided in the Agreement.

### c. Rule 56 is not applicable here, and Plaintiffs' Rule 56(d) Affidavit does not satisfy the 10th Circuit threshold requirements

The City's Motion to Dismiss is not a motion for summary judgment and therefore Rule 56(d) does not apply.

As noted above and stated in the City's Motion to Dismiss (Doc. 1733], courts have repeatedly held that contract law applies when interpreting consent decrees such as the instant Agreement. Plaintiffs merely assert, without support, that the City's Motion to Dismiss "can be considered a dispositive motion *akin* to one seeking summary judgment." (Emphasis added). However, the dismissal process in this matter was created by agreement, the Court and parties are bound by the terms of the Agreement, as negotiated. Plaintiffs seek to expand the scope of what is permitted at this procedural posture by comparing the Motion to Dismiss to a motion for summary judgment, while acknowledging that the Motion to Dismiss is not a motion for summary judgment, but attempting to compare it as "akin" to the process. Plaintiffs offer no support for this argument, the City objects to using the summary judgment process as it is not party of the Settlement Agreement, and thus, the argument should be rejected by the Court.

Even if Rule 56(d) did apply, the Plaintiffs have not met the threshold established by the 10th Circuit and the Court should deny the Plaintiff's Motion to Stay.

A Rule 56(d) affidavit may be provided in the course of litigating a motion for summary judgment. Rule 56(d) provides:

(d) When Facts Are Unavailable to the Nonmovant.

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) Defer considering the motion or deny it;
(2) Allow time to obtain affidavits or declarations or to take discovery; or
(3) Issue any other appropriate order.

When a party files an affidavit or declaration, and moves for additional discovery time under rule 56(d), the party invokes the Court's discretion. *See Jensen v. Redev. Agency of Sandy City,* 998 F.2d at 1553-54. To be sufficient, the rule 56(d) affidavit must identify: "(1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable the party to obtain those facts and rebut the motion for summary judgment." *Adams v. C3 Pipeline Constr. Inc.*, 30 F.4th at 968 (quoting *Gutierrez v. Cobos*, 841 F.3d 895, 908 (10th Cir. 2016)). Accordingly, a party filing the affidavit or declaration must state with specificity how the desired time would allow it to meet its burden in opposing summary judgment. *Jensen*, 998 F.2d at 1554. Plaintiffs have not met this burden.

"Rule 56(d) is not a license for a fishing expedition…." *Lewis v. Ft. Collins*, 903 F. 2d 752, 753 (10th Cir. 1990). Rule 56(d) may not be invoked based solely upon the assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable. *Jensen*, 998 F. 2d at 1554. Further, "if the party filing the Rule 56(d) affidavit has been dilatory, or the information sought is either irrelevant to the summary judgment or merely cumulative, no extension will be granted." *Id*. (denying a 56(d) request and stating that "the record reflects that plaintiffs were dilatory in pursuing discovery prior to the filing of their 56[d] affidavit").[16] Courts have previously denied rule 56(d) motions where the information sought does not relate to a

---

[16] Plaintiffs have submitted no discovery since the Settlement Agreement was agreed upon and approved by the Court in September of 2017, nor have Plaintiffs requested discovery. As such, no discovery plan is in place.

relevant legal question. *Martinez v. Lucero*, No. 11-1003, 2012 WL 2155772, at *30 (D.N.M May 31, 2012) (Browning, J.). Similarly, courts have denied 56(d) requests where the party seeks duplicative information. *Todd v. Montoya*, 877 F. Supp. 32d 1048, 1099 (D.N.M. 2012) (Browning, J.).

Here, Mr. Flores has submitted an Affidavit in which he has failed to identify the probable facts not available, why those facts cannot be presented currently, the steps that have been taken to acquire those facts and how additional time will enable the party to obtain those facts and rebut the motion for summary judgment.

Rather, he has submitted an Affidavit that states only, for example, "Plaintiffs require written discovery, depositions and expert evaluation sufficient to assess the adequacy of the City's training on APD's stop and search practices in order to assess and challenge the City's alleged compliance with Paragraph 3."[17]  He provides no identification of the probable facts that are not available. He does not indicate why those facts cannot be presented currently or the steps that have been taken to acquire those facts. The Plaintiffs' only rationale for their discovery request is that they need these documents to challenge what the City has presented, because other than submitting public records requests, they have done nothing beyond what was stated in the Agreement to determine if the City is substantially compliant.

Plaintiff's request for discovery is a quintessential fishing expedition. Plaintiffs are bound by the terms of the Agreement, including the procedures delineated therein. The City further objects to the extent the request goes far beyond the requirements set out in Paragraph 3, which does not discuss in any way the adequacy of the City's training on APD's stop and search practices.

---

[17] Paragraph 3 references the initiation of revisions to four SOP's and the process required and includes time restraints and training on the new SOPs.

In reference to Paragraph 4 of Mr. Flores' declaration, Plaintiffs state that they require written discovery and depositions of APD's training personnel to determine whether city personnel are adhering to the new policies required by Paragraph 4. As with the previous paragraph, this request goes far beyond the requirements of Paragraph 4, which required the City to follow a certain process for revising and training on the SOP related to behavioral health issues. The City did follow the process provided in the Agreement, but Plaintiffs now seek to rewrite the requirements. If the Plaintiffs wanted a follow up procedure to determine whether City personnel were adhering to the new policies required in Paragraph 4 they could have requested that provision be added to Paragraph 4 at the time the Agreement was drafted and negotiated, but they did not. Alternatively, they could have requested additional records to ascertain that which they allegedly seek in the eight years since the Agreement has been in place.  Plaintiffs took neither action, and it is thus improper for them to make these demands after the City has complied with the Agreement and requested dismissal.

Paragraph 7 of the Agreement requires the City to collaborate with the County to develop jail diversion programs, establish such programs and allocate funds to implement the programs. In Mr. Flores' declaration he states, "Plaintiff's require written discovery and depositions to assess and challenge the City's alleged compliance with Paragraph 7." As stated, this is simply a fishing expedition; as such, Plaintiffs' request should be denied. *See, Jensen*, 998 F. 2d at 1554.

Plaintiffs do not state probable facts that are not available; they simply seek to engage in unlimited discovery related to information that has already been provided to them in the exhibits of the City's Motion to Dismiss,  through public records requests, or through voluntary disclosures of information by the City.

Relying on 2019 information in his affidavit, Mr. Flores states in reference to Paragraph 10 that based on his personal review of the County's 2019 Jail Population Management Plan, "as of May 30, 2018, the City of Albuquerque committed only $500,000 in supportive housing funds and that the County was trying to persuade the City to more than double that number in order to provide a mere 150 total housing slots." Plaintiffs did not attach the 2019 Jail Population Management Plan as an exhibit.[18] A review of this document will show that these assertions occurred prior to the Agreement in 2015 and has not been updated to show the collaboration efforts since the Agreement has been in effect. Plaintiffs need only review the numerous housing contracts that were attached to the City's response to Plaintiffs' request for public records in September of 2018 to know the number of supportive housing slots funded by the City at that time.

Mr. Flores' affidavit fails to satisfy the four-part sufficiency requirement as set forth in *Adams v. C3 Pipeline Constr. Inc.*, 30 F.4th at 968 (quoting *Gutierrez v. Cobos*, 841 F.3d 895, 908 (10th Cir. 2016). Furthermore, to engage in discovery as requested in the affidavit would only result in a massive exchange of materials already provided to the Plaintiffs. The Court should deny the Rule 56(d) request for discovery, as Plaintiffs have failed to establish a legal basis to grant the request, and they are requesting duplicative information and information exceeding the scope of the Agreement, which will require the unnecessary repetition of effort and resources.

**d. The requests are outside the scope of the Agreement**

Much of the requested information is irrelevant to the question of whether the City is in compliance with the Agreement as it is outside the bounds of the negotiated terms, and the information being sought has not been requested until after the City filed its Motion to Dismiss.

---

[18] Attached hereto as Exhibit K.

For example, Plaintiffs seek "written discovery and depositions of APD personnel to assess aspects of implementation apart from training, to include rank-and-file adherence data, supervisors' practices, and evidence of discipline for violations of the required policies." Plaintiffs also request to depose personnel at the Academy.

None of this is contemplated by the Agreement. More notably, these specific requests were not made until after the City filed its Motion to Dismiss. Plaintiffs' Motion to Stay should be interpreted as an attempt to expand the bounds of the original Agreement. But as the Agreement "does not require the engagement of an independent monitor," and it "satisfies all claims made or claims that could have been made by the Plaintiff class and the Plaintiff Intervenor sub class against the City," these requests must be denied. The time to request this discovery was when the Agreement was being negotiated.

Thus, Plaintiffs' request for a stay to engage in discovery should be denied.

## 2. A STAY IS NOT WARRANTED BECAUSE MEDIATION IS NOT REQUIRED PRIOR TO FILING A MOTION TO DISMISS PER THE SETTLEMENT AGREEMENT

Plaintiffs argue that Paragraph 12 of the Agreement requires mediation, but a plain reading of the Agreement does not support this contention.

Paragraph 12 of the Agreement outlines what is to occur when a disagreement regarding compliance arises:

> In the event that any dispute arises regarding whether or not the terms of this Agreement are being properly fulfilled, mediation before the Court's Special Master or another mediator agreed to by the parties or selected by the Court is required before any motion can be filed with the Court.

Doc. 1320, ⁋ 12.

Read in context, the mediation contemplated in Paragraph 12 was intended as a remedy during the City's performance pursuant to the Settlement Agreement, not as a response to a Motion

20

to Dismiss. It was available to the Plaintiffs during the eight years during which the City made good faith efforts to comply with the Settlement Agreement. However, Plaintiffs never requested mediation for the purpose of discussing non-compliance.

In a separate paragraph and separately outlined procedure, Paragraph 14 of the Agreement provides the procedure for when and how the City may move for dismissal. Specifically, it states:

> This Agreement satisfies all claims made or claims that could have been made by the Plaintiffs and Plaintiff-Intervenor sub class against the City Defendants in this action and will result in dismissal of City Defendants from this action after the City Defendants have substantially complied with the provisions set forth herein. City Defendants may file motions with the Court to find substantial compliance in whole or in part with individual paragraphs of this Agreement. After publishing the report required by Paragraph 6, City Defendants may file a motion for dismissal from the case, upon showing of substantial compliance with this Agreement.

Mediation is not mentioned as a required step in obtaining dismissal from this case. Thus, it would be improper for the Court to order mediation at this time. If Plaintiffs and Plaintiff-Intervenors intended to permit mediation prior to litigating a motion to dismiss the case, that language should have been included in Paragraph 14 during the negotiations of the Agreement. Plaintiffs and Plaintiff-Intervenors at no point in the last eight years have requested a mediation as to any discovery issues or compliance issues.

Due to the fact that Paragraph 14 of the Agreement does not include mediation as a precursor to a motion to dismiss, nor part of the process for a motion to dismiss, a stay is not warranted to conduct said mediation.

### 3.  PLAINTIFF'S EXHIBITS DO NOT DEMONSTRATE THE CITY'S NON-COMPLIANCE WITH THE SETTLEMENT AGREEMENT

Plaintiffs make general assertions that the City is not in compliance with the Agreement, and thus, require discovery to support this allegation. Plaintiffs' allegations are not specific, nor do they support non-compliance. Furthermore, Plaintiffs make this allegation before the Court for

the first time in eight years only after the City has filed its Motion to Dismiss. Thus, the Court should reject this claim and deny the request to stay.

a. **Plaintiff's exhibits are too general to draw conclusions and do not paint a complete picture**

Pursuant to the Agreement, APD's SOPs are to direct officers to issue "citations whenever appropriate…including…persons alleged to have committed non-violent misdemeanor offenses (not to include DWIs) will not be arrested when there are no circumstances necessitating an arrest." See Doc 1320, ¶ 1. The Plaintiffs' exhibits do not show the complete picture of APD's arrest practices and do not demonstrate non-compliance with the Agreement.

Plaintiffs first introduce the Bernalillo County MDC Population Dashboard, erroneously marked as Exhibit 1.[19] The MDC Dashboard provides a great deal of general information about the number of bookings, the type of bookings, the arresting agency, as well as sex, age, race, and housing status of the individuals arrested. It does not provide any specific information about non-violent misdemeanors. Plaintiffs make many conclusions based on this general information that they provided. They assume that the detainees that have been marked as transient have been arrested due to the fact that they are unhoused. There is no evidence to support this assumption, which the City asserts is not correct.

According to Plaintiffs' exhibit, the majority of transient detainees are booked on felony offenses.. Plaintiffs also assume that more than 800 misdemeanor bookings are (1) made by APD, and (2) in violation of the Agreement. However, the bookings included in the report are from multiple agencies, not solely APD. Additionally, this data fails to sort misdemeanor bookings by specific charge, and thus, this data fails to identify what types of misdemeanor crimes these

---

[19] In their Motion Plaintiffs identify Exhibit 1 as the UNM Study: Law Enforcement Booking Patterns and Exhibit 2 is identified as the MDC Dashboard, whereas Exhibit 1 is marked as the MCD Dashboard and the UNM Study is labeled as Exhibit 2.

individuals are detained on—whether they are detained on DWIs or domestic violence charges, or whether they have been detained on non-violent misdemeanors. Even if the dashboard showed a number of non-violent misdemeanor arrests, it does not show whether the arrest was necessary or which law enforcement agency made the arrest. Arresting for misdemeanors is not, by itself, a violation of the Agreement. Arresting for misdemeanors warrants is also not a violation of the Agreement, nor is arresting for felonies is not a violation of the Agreement.[20] Arresting for a non-violent misdemeanor may also be compliant with the Agreement if arrest is necessitated under the circumstances.

According to the testimony of Mr. Flores, Plaintiffs conclude that APD is not adhering to the requirements of the Settlement Agreement, based on very general and incomplete information. *See*, Exhibit 3 to Plaintiffs' Motion for Stay. Mr. Flores alleges that oversight is still needed to ensure that jail population levels remain below the County's settlement cap. While the City recognizes the utmost importance in keeping jail population levels below the County's settlement cap, it is imperative to remember that the Agreement only requires that persons alleged to have committed non-violent misdemeanors (not to include DWIs) will not be arrested when there are no circumstances necessitating an arrest. Plaintiffs' exhibits do not demonstrate that APD is in violation of the Settlement Agreement.

Plaintiff's Exhibit 2, the UNM Study, illustrates that APD has a significantly larger proportion of felony arrests compared to misdemeanor arrests, actually indicating compliance with the Agreement. The study also shows that the New Mexico State Police ("NMSP") has a larger proportion of misdemeanor arrests. It is important to keep in mind, however, that this data shows

---

[20] According to the UNM Study, hereinafter referred to as Exhibit 2, between January 2021 and December of 2024, overall, there was a "substantial upward trend in felony bookings, which increased from approximately 400 to 700 bookings" while misdemeanor bookings showed only a moderate increase from about 300 to 400 bookings.

no information about non-violent misdemeanors and while the information is helpful in that it shows a significant increase in the City's felony arrests, it provides no helpful information about non-violent misdemeanor arrests or their circumstances. To conclude that the increase in the jail population is because APD is not compliant with the terms of the Agreement is unsubstantiated given the data Plaintiffs provided shows an increase in APD's felony arrests.

Plaintiffs' exhibits are missing key information about police contact that does not end in arrest.  None of Plaintiffs' exhibits which are provided to show an alleged violation of the agreement include data specifically on non-violent misdemeanor arrests, data on law enforcement diversion in lieu of arrest, data on citations or summonses in lieu of arrest, or data on sources such as the City's use of Albuquerque Community Safety ("ACS") or CIT in lieu of arrest, all of which has been provided to Plaintiffs.  Because Plaintiffs' exhibits show incomplete data, the Court should not rely on these exhibits in determining substantial compliance, nor should the Court entertain this as a reason to Stay the City's Motion to Dismiss.

**b.  Plaintiff's assertions regarding non-compliance are incorrect**

Plaintiff's assertions regarding the City's non-compliance with the Agreement are incorrect and unsubstantiated.

On page 4 of Plaintiff's Motion to Stay, Plaintiffs make a number of unsubstantiated and irrelevant statements. For example, Plaintiffs use language from the Show Cause Motion [Doc. 1233] that was filed against the City in 2016 to attempt to establish that the City is non-compliant, such as stating that the City "sweeps the streets" of people APD refers to as "the homeless mentally ill."  To be clear, those comments were made in the past and prior to the City entering into the Agreement. After the City mediated with Plaintiffs and Plaintiff-Intervenors in good faith, reached an Agreement, and complied with every paragraph in the Agreement, APD is not "sweeping the streets" of unhoused people from the Central Avenue corridor. The articles that Plaintiffs' have

relied on in their Motion to stay reference APD's tactical plans which combat felony open air drug use, specifically possession of fentanyl, and targeting violent felony offenders. To state that these "sweeps" that were happening prior to the Agreement have dramatically increased in recent years is inaccurate.

The changes made through this Agreement have changed the culture of APD, through the modification of the SOPs, training on both SOPs and behavioral health, the resources available to officers, such as ACS, and jail diversion efforts. In 2022, for example, the percentage of arrests for non-violent misdemeanors was down from 10% in May of 2018 to 7% in 2022. *See*, McClendon report dated February 12, 2024, attached hereto as Exhibit E. Individuals with behavioral health issues are not being arrested but are being transported to a hospital or provided other services. *Id.* Only 2.4% of individuals involved in a CIT-related call for service were arrested. There is no "sweeping the streets" of those with behavioral health issues.

Plaintiffs continue to equate arresting for misdemeanors, which is not prohibited by the Agreement, with arresting for non-violent misdemeanors, which is limited by the Agreement to not arrest if there are "no circumstances necessitating an arrest." Plaintiffs' assertions are not supported by their own exhibits and do not demonstrate a need for further discovery or mediation to ensure compliance.

### 4. THE CITY NO LONGER REQUIRES FEDERAL OVERSIGHT AND SHOULD REGAIN CONTROL OF ITS LAW ENFORCEMENT

The City no longer requires federal oversight now that it has demonstrated substantial compliance with the Settlement Agreement.

As stated in the City's Motion to Dismiss, consent decrees should not last forever. To the contrary, "federal consent decrees are temporary solutions that may be kept in place only so long as necessary to cure an unlawful condition." *Jackson*, 880 F.3d at 1192; *see also John B. v. Emkes*,

710 F.3d 394, 398 (6th Cir. 2013) (a consent decree "may remain in force only so long as it continues to remedy a violation of federal law"); *Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (federal courts should not "continue their oversight … for long periods of time … absent an ongoing violation of federal law.").   Accordingly, a federal court must exercise its equitable powers to ensure that "when the objects of the decree have been attained," responsibility for discharging government obligations is returned to the local government.  *See Frew,* 540 U.S. at 442.  This approach "seeks to return control to state and local officials as soon as a violation of federal law has been remedied." *Horne v. Flores*, 557 U.S. 433, 451 (2009).  "Keeping a consent decree in place any longer than necessary to assure compliance with federal law risks violating principles of federalism and 'improperly depriving future officials of their designated legislative and executive powers.'" *Jackson*, 880 F.3d 1176.

The City has complied with the Agreement and is entitled to dismissal.  The City and APD have implemented SOPs and a culture shift that are stable and long-lasting. The results of the changes created through the City's compliance with the Settlement Agreement reflect that the Agreement's objectives have been met. The Court, therefore, should return the power to control its law enforcement to the City.

## CONCLUSION

Defendant requests that the Court deny Plaintiff's Motion to Stay and proceed with ruling on the Motion to Dismiss.

KENNEDY, MOULTON & WELLS, P.C.

*/s/ Debra J. Moulton*
DEBRA J. MOULTON
Attorney for Defendant City of Albuquerque
2201 San Pedro N.E., Bldg. 3, Suite 200
Albuquerque, NM 87110
(505) 884-7887
dmoulton@kmwpc.com

I HEREBY CERTIFY that a true and correct
copy of the foregoing was filed through the
CM/ECF filing system which caused a copy
of the pleading to be served on all counsel of
record on this 13th day of June 2025

*/s/ Debra J. Moulton*
Debra J. Moulton