**Assessment of Medical Care**

**at**

**Metropolitan Detention Center**

**Albuquerque, New Mexico**

Prepared by

Muthusamy Anandkumar MD, MBA, CHCQM, CCHP

Report Date:

October 2025

This report presents an assessment of the medical care services at the Metropolitan Detention Center (MDC). The assessment included off-site review activities performed both before and after an on-site evaluation conducted on October 14–16, 2025. The assessment included a facility walkthrough, staff interviews, and a review of medical reports and records. Throughout the visit, facility leadership and staff were engaged, cooperative, and responsive to requests for information.

Significant changes since the last visit:

Leadership: The leadership structure at the Metropolitan Detention Center (MDC) remains consistent with the prior assessment, and the core leadership team continues to oversee medical operations. A leader has filled the previously vacant Executive Director position at MDC Healthcare Services. The current Executive Director has extensive experience in healthcare quality. There is an opening for the Director of Nursing position for the Detox/MOUD program. No new leadership roles have been created or restructured. The leadership team maintains a high level of commitment and involvement.

Since the previous assessment, provider staffing has increased. In May 2025, the facility had one full-time physician serving as the Medical Director, with administrative duties, one part-time physician, and one full-time Advanced Practice Provider (APP) serving as the Clinic Director, also with administrative responsibilities. By October 2025, staffing increased to two full-time physicians and two full-time APPs, in addition to the ongoing part-time physician. This reflects an increase in one full-time physician and one full-time APP. The clinic briefly had three APPs in September, but one resigned. They continue to use PRN providers regularly to support clinical needs. Nursing coverage continues to be supplemented through agency staffing.

During the on-site visit, the team presented data on various processes. It was encouraging to see that the team has begun reviewing data to assess performance. Although still in its early stages, this information creates a solid foundation for development and encourages a data-driven culture for tracking performance. The data was collected manually by the operational team. With support from a data analyst, the team should be able to develop more detailed and automated reports to monitor performance and trends over time.

Staffing continues to be a challenge. While the on-site leadership works to coordinate daily staffing coverage, limitations in both medical providers and nursing staff continue to impact the timeliness and quality of patient care. The staffing plan is currently part of the corrective action plan, and the team is developing a project plan to assess staffing needs.

One of the key limiting factors identified by the team is the sustained increase in demand for services associated with population growth. This trend has been acknowledged for some time. While this is a valid contributing factor, there does not yet appear to be a clear set of strategies in place to manage this demand and consistently meet the required level of service. They have taken steps to decentralize clinical services across the housing units in an effort to reduce the need for transporting patients to the

clinic, and the impact of this approach is still being evaluated. As part of the staffing analysis, the team should assess the demand for each service and determine what is needed to meet that demand in alignment with established standards. This may include optimizing workflows, redeploying staff, and identifying additional opportunities for efficiency. The team must determine the staffing levels needed now, as well as those required once the improvement efforts are fully implemented and sustained. The approach to ensuring timeliness and quality of services should include both short-term and long-term strategies. While future improvements are anticipated, current performance standards must still be met. A short-term plan is therefore necessary to maintain service quality and meet demand in the present, while longer-term solutions are developed and implemented.

It was encouraging to see the on-site team engaged in ongoing improvement activities. They are clearly motivated and committed. While their efforts are making a positive contribution, the current level of impact is insufficient to drive the broader improvements needed in the medical program. Several limiting factors are constraining their work and slowing the overall pace of progress. The corrective action plan, which is broadly aligned with previous recommendations and is currently underway, is expected to strengthen the foundation of the medical program and support reliable monitoring and ongoing optimization for long-term sustainability.

To implement effectively, the team will require <u>dedicated</u> support personnel to assist with activities such as staff recruitment, project management, EMR setup, data and reporting, staff education and training, and quality improvement. However, adequate resources have not been assigned since the last on-site visit to support this work, and securing these support resources will be critical to advancing progress.

Based on my recent assessment, the team is currently limited by insufficient support in the following areas:
- HR Support: Adequate and reliable permanent staff cover all shifts and perform the work.
- IT / EMR Support: Optimization of workflows, documentation templates, orders, etc.
- Data & Reporting Support: To develop reliable reporting to monitor demand, performance, and outcomes close to real-time.
- Training & Education: to ensure staff are equipped with the skills they need.
- Supervision: Assigned supervisors for each service area to ensure work is completed as intended and to provide real-time guidance and support to the staff.
- Project Management: To coordinate and track progress of improvement efforts.

The current phase will require a more intensive level of effort to establish the core functions of the medical program quickly. Although the need for these resources has been known for some time, they have not yet been adequately deployed. If the expected resources are not available, alternate approaches to securing the required resources should be considered to prevent further delays. Once these elements are in place and operational stability is achieved, the team can transition to a maintenance phase with optimized support levels.

Clearly identifying the necessary resources and securing and effectively deploying them should be considered a high priority. With adequate clinical staff, dedicated support staff, and systematic implementation of the corrective action plan, the team will be well-positioned to make rapid and meaningful progress.

From the previous reports: (These items are generally reflected in the Corrective Action Plan currently underway.)

*The priority recommendations for consideration:*

- *Evaluate the staffing plan to meet the needs of the growing population and ensure adequate staff to deliver quality and timely care.*
- *Provide adequate technical support to develop templates, streamline workflows, and generate reports, addressing the current heavy demand and ongoing support needs.*
- *Expand the clinical space at Intake to improve the health screening and assessment process. The new space identified is not optimal and is a step down from the existing location. (Since my visit, alternate options are being considered.)*
- *Designate supervisory oversight and implement a daily process to observe clinical operations and review the quality of staff assessments, documentation, and adherence to established procedures. This process should include structured feedback mechanisms to support staff development.*

*List of high-level recommendations (as stated in the previous report):*

1. *Update the documentation templates to standardize practices, detailed assessments, and plans of care and reduce variations. Ensure that the templates are simple, efficient, and easy for staff to use (Intake Screening, Nursing sick call assessment, Provider—chronic care, Initial Health Assessment, etc.).*
2. *Utilize daily reports during daily huddles and shift changes to ensure timely completion of tasks based on priority and address any delays immediately.*
3. *Assign daily oversight responsibilities to each supervisor and manager to ensure timely and appropriate task completion, with the ability to escalate as needed to avoid surprises.*
4. *Form work groups for each workflow to promote ownership and use rapid cycle improvement efforts for quick progress (e.g., detox program, intake, sick call program, chronic care, infectious disease, off-site visits, etc.).*
5. *Establish and implement the Clinical Practice Guidelines and Nursing Protocols.*
6. *Continue building the Continuous Quality Improvement program and track key performance metrics to monitor the healthcare program. This is key to sustainability.*
7. *Provide tactical and emotional support to maintain morale and reduce turnover through frequent communication with current staff. Clear and respectful communication should be maintained through immediate supervisors to prevent confusion and frustration.*
8. *Continue offering adequate training and support to the staff.*
9. *Seek feedback from staff and involve them in recruitment and improvement efforts.*

In this review, I evaluate compliance by assessing whether there is an active, strategic, and well-organized approach supported by documented work and the resources necessary to sustain progress. A finding of partial compliance recognizes that, while a requirement is not yet fully met, there is a credible plan with early structured implementation underway and showing demonstrable progress. Non-compliance is found when there is insufficient substantive activity to make progress, or when efforts are fragmented, unsupported, or improvements have stalled or reversed. Compliance determinations are made independently of the Corrective Action Plan (CAP). The CAP helps establish an essential framework for the medical program and is interrelated with and aligned to the work required to achieve compliance.

*The recommendations listed in the report are intended to guide improvement efforts and reflect what the Monitor believes will be helpful to the program in achieving compliance. While not exhaustive or prescriptive, they are informed by current findings and may evolve as progress is made, or new challenges emerge. The facility may implement these recommendations using any appropriate approach, including the adoption of evidence-based best practices or innovative solutions, as determined by clinical leadership. The purpose is to support effective, reliable, measurable, and sustainable improvements that address the identified findings, promote safe, timely, and quality care, and fulfill the intent of the requirements. The Monitor remains available to provide technical assistance, clarify expectations, and collaborate with the facility to identify practical solutions that support ongoing progress toward compliance. Some recommendations may be repeated across multiple provisions, as similar strategies can impact various workflows and services.*

**<u>Checkout audit provisions of medical services:</u>**

**6A**   **MDC's provision of medical services complies with MDC's medical policies and procedures.**

**Findings:**

The Policy and Procedures Committee continues to make progress in updating policies to align with National Commission on Correctional Health Care (NCCHC) standards, and staff training is ongoing. A reliable tracking system is in place to ensure that policies and procedures are regularly reviewed and updated. The content of these documents should be reviewed again by subject matter experts to confirm alignment with clinical intent and national standards. Once finalized, each policy and procedure should be communicated clearly and consistently to staff.

The Continuous Quality Improvement (CQI) program is being developed to monitor compliance with these policies and should be structured to ensure ongoing accountability. Currently, there is no clear, standardized process for identifying patients with a higher clinical risk who are awaiting clinical services. Each service should utilize a prioritization process based on risk and acuity to ensure that higher-priority needs are addressed promptly, thereby maintaining safety while improvements are underway. Further work will be needed to identify and implement sustainable strategies to meet the current demand for clinical services.

**Assessment:** Partial-Compliance

**Recommendations:**

1. Ensure that each policy and procedure is reviewed again by subject matter experts and the Policy and Procedures Committee for accuracy and alignment with clinical intent and standards.
2. Continue to maintain and monitor the routine annual review schedule for all policies and procedures.
3. Provide staff with comprehensive training to ensure understanding and confidence in applying the established policies and procedures.
4. Ensure the necessary support systems are in place to enable staff to implement the policies and procedures and achieve the intended outcomes.
5. Structure the Continuous Quality Improvement (CQI) program to monitor compliance with each policy and procedure, including both the timeliness of service delivery and the quality of care provided.

**6B**   **MDC is in compliance with the advisory standards set forth in the American Correctional Association's Standards for Adult Detention Centers.**

**Findings:**
MDC was previously accredited by the American Correctional Association (ACA) on January 8, 2018, for a three-year term. A subsequent re-accreditation review has not yet been conducted.

In the interim, it is good practice for an internal compliance or quality assurance team to routinely track and monitor adherence to applicable ACA standards as part of an ongoing quality assurance process. This has not been setup yet.

**Assessment:** Non-Compliance

**Recommendations:**

1. Consider scheduling the ACA audit
2. Establishing an internal process to monitor ongoing compliance to maintain readiness for future audits.

**6C**    **MDC has made and is making good faith efforts to comply with the Advisory Guidelines of the National Commission on Correctional Health Care.**

**Findings:**
The National Commission on Correctional Health Care (NCCHC) conducted a review in April 2021, and the facility remains NCCHC certified. Preparations for the upcoming audit are underway, including a mock survey scheduled for January 2026 to check for complaints against the new NCCHC standards, with plans to proceed with the official survey shortly thereafter.

It is commendable that the team is enthusiastic about adopting the newly updated NCCHC standards and is actively preparing for the upcoming mock audit. Their engagement reflects a strong commitment to meeting the standards.

**Assessment:** Compliance

**Recommendations:**

1. Consistently monitor program performance through the CQI program to ensure compliance with NCCHC standards.

**6D**    **MDC is conducting and completing a history and physical exam of each inmate in a timely manner, i.e., within 72 hours for inmates with serious medical needs identified at booking and no later than 14 days otherwise.**

**Findings:**
The timeliness of completing history and physical (H&P) examinations has been variable. Based on the data provided, the percentage of H&Ps completed more than 14 days after intake was 8% in December 2024, increased to 15% in May 2025, and improved to 10% in September 2025. The average number of days to complete an H&P also fluctuated, ranging from 8 days in December 2024 to 16 days in May 2025 and 11 days in September 2025. This may also be related to the population volume. A POD nursing process change was implemented on June 23, 2025, which may be contributing to the improvement observed between May and September 2025.

While improvement is noted, timely completion remains inconsistent, and a prioritization process is necessary to ensure that individuals with higher clinical risk receive earlier evaluations.

The history and physical examination should be detailed, comprehensive, and complete. Each active problem must be identified through a review of the health screening form, past medical history, and patient-reported concerns. Each problem should then be assessed and documented with an appropriate plan of care, using the established clinical guidelines. The problem list should be kept current, and a medication reconciliation must be performed and recorded.

Despite ongoing improvement efforts, there remains insufficient substantive activity to ensure that timely and complete assessments are applied consistently and reliably. To support a reliable process, the team will need to review workload and demand, align staffing to support the work, refine the documentation template to guide comprehensive assessments, and strengthen supervision to ensure the process is followed as intended.

**Assessment:** Non-Compliance

**Recommendations:**

1. Implement and operationalize a prioritization process that identifies patients with higher clinical risk at intake and assigns earlier evaluation timeframes accordingly.
2. Update and standardize the H&P documentation template with the required elements.
3. Establish a tracking report that is reviewed during daily operational huddles to ensure timely completion of assessments based on prioritization criteria.
4. Continuous Quality Improvement (CQI) program, including:
   a. Monthly timeliness reporting stratified by priority level
   b. Monthly chart audits to evaluate the completeness and quality of assessments and care plans
   c. Action plans are developed and followed when performance falls below targets


**6E      MDC inmates who complain orally or in writing of serious acute illness or serious injury are given immediate medical attention.**

**Findings:**
The facility has an excellent Rapid Response Team staffed with well-trained personnel who respond promptly to critical medical emergencies. However, the notification and triage process that triggers medical staff assessment is inconsistent and unreliable, except in situations that are clearly life-threatening. As a result, patients with serious acute illness who may require immediate attention are not consistently identified or assessed by the medical staff.

Delays occur at multiple points in the process, including delays in notifying medical staff, delays in their response to clinical requests, and gaps in the assessment and follow-up of acute medical

conditions. Follow-up care after the initial evaluation is not consistently completed to ensure clinical resolution.

The threshold for activating the Rapid Response Team has recently been lowered, increasing the volume of activations. This currently serves as a safety net, while the primary process remains unreliable and improvement efforts are still underway. The current deficiencies present a significant risk of harm by delaying assessment and treatment of serious acute medical conditions.

To support a reliable process, the team will need to review the workload and demand for services, establish a prioritization system to identify high-risk patients, align staffing to meet service needs, and refine the template to guide comprehensive assessments, plans of care, and follow-up. Strengthening supervision will also be necessary to ensure the process is consistently followed. Establishing a warm handoff at each step will help prevent communication breakdowns and ensure continuity of care. Additionally, implementing a simple and reliable mechanism to track all referrals from initiation through completion will support timely follow-up and accountability.

When patient concerns and medical conditions are not addressed promptly, and necessary treatment, medications, and follow-up are delayed, conditions can worsen and lead to preventable medical emergencies. As the medical program becomes more reliable in providing timely and appropriate care, the number of preventable emergencies is expected to decrease significantly.

**Assessment:** Non-Compliance

**Recommendations:**

1. Continue the current Rapid Response Program and monitor its performance to ensure a timely response to true medical emergencies.
2. Ensure that custody staff and sitters understand the importance of notifying medical staff whenever an inmate appears acutely ill or reports concerning symptoms. Maintaining a lower threshold for requesting medical assistance is essential to protect patient safety. Even if a patient is already being treated for a condition, medical staff should be notified if symptoms continue or worsen. Custody staff and sitters should be encouraged to err on the side of safety and notify medical whenever there is uncertainty.
3. Implement a prioritization process for each clinical service so that inmates with higher medical risk are seen without delay.
4. Use a warm handoff at each step so responsibility for care is clearly transferred and not assumed.
5. Create a simple tracking system to follow all referrals from start to finish to ensure that every patient receives necessary follow-up care.
6. Continuous Quality Improvement (CQI) program to track timeliness and quality of assessments and follow-up.

**6F**    **All inmate requests for medical care are communicated to medical personnel in a timely manner for appropriate treatment.**

**Findings:**

Collaboration between correctional and medical staff has improved; however, these efforts are not yet applied consistently or reliably across staff levels. Custody staff are still not consistently notifying medical personnel when patients exhibit concerning symptoms, and sitters are not reliably completing required checks or reporting signs of medical concern. When medical staff request custody to bring a patient to the clinic, the transport does not always occur, and medical staff do not consistently follow up timely to ensure the patient was brought for evaluation, resulting in delays in care.

Correctional staff have not been adequately trained in recognizing symptoms of concern, determining when medical evaluation is needed, or understanding levels of clinical priority. While training materials are posted in the housing units, they are not consistently used. Given these gaps, maintaining a lower threshold for notifying medical staff is the safer approach. In some instances, custody staff have been instructed to direct patients to submit sick call requests rather than initiating immediate medical assessment, and delays in clinical response have contributed to a loss of confidence in the medical process. As a result, correctional staff are not consistently notifying medical personnel when timely attention may be needed.

There is an opportunity to emphasize expectations and provide focused training to custody staff and sitters on when and how to notify medical staff, supported by a clear and reliable escalation pathway to supervisory staff if a timely response is not received.

While improvement efforts are underway, further review and refinement of the strategy are needed to adequately identify process gaps and develop a structured plan to reduce risk and improve the reliability of the process.

**Assessment:**  Non-Compliance

**Recommendations:**

1. Provide focused training for custody staff and sitters on both the process and expectations, as well as key clinical awareness. Training should include:
   a. Symptoms and conditions that require immediate medical attention.
   b. How and when to notify medical staff.
   c. What to expect from the medical response.
   d. How to escalate concerns if timely care is not provided.
2. Reassess the training that has been provided previously to understand what was covered and why it did not lead to the expected changes. Use this insight to adjust the training so it is practical, clear, and consistently applied in daily practice.
3. Establish a clear escalation pathway when medical response is delayed. If custody does not receive a timely response, they should notify their supervisor, who is responsible for ensuring follow-through.

4. Ensure that medical requests for patient transportation to the clinic are documented and tracked. Medical should verify that the patient arrived and was evaluated. Use a warm handoff at each step to ensure that responsibility for care is clearly transferred and not assumed.

5. Review the various tracking logs currently utilized in the medical clinic, rapid response, etc. and consolidate them as applicable into a single comprehensive tracking tool. The objective is to simplify documentation and ensure that the entire process is monitored from start to finish. The unified log should capture the initial request, triage decisions, follow-up actions, pending requests for transportation to the clinic, and the final disposition. This will enable staff across all shifts to clearly see what has been completed, what is still pending, and who is responsible for the next step. A single, consistently used tracking system will facilitate the timely completion of tasks, clinical assessments, and follow-ups, improve handoffs between shifts, and ensure continuity of care.

6. Continuous Quality Improvement (CQI) program to ensure compliance and track performance.

**6G    MDC has made necessary revisions to existing policies, procedures, and practices for any deficiencies identified by MDC, or the monitors, regarding the provision of timely access to appropriate medical care and is following the revised policies, procedures, and practices.**

**Findings:**
MDC has established policies and procedures, but they require additional review and revision by subject matter experts and the Policy and Procedures Committee to ensure they are aligned with current standards and are feasible within daily operations. Although staff training is underway, consistent application of these practices has not yet been achieved. There is uncertainty about how to meet the expectations of the policies due to the current high demand for services and the pressure on existing workflows. While this is a valid contributing factor, there is currently no clear set of strategies in place to manage this demand and ensure the consistent, timely delivery of services.

**Assessment:** Partial Compliance

**Recommendations:**

1. Complete the policy and procedure review process with subject matter experts and the Policy and Procedures Committee to ensure clinical accuracy and operational feasibility before final implementation.

2. Provide targeted training to ensure staff understand how to apply policies in their daily operations effectively.

3. Develop and implement operational strategies (e.g., prioritization criteria, workflow adjustments, and support resources) to help staff manage the current demand for services and consistently meet policy expectations.

4. Assigned supervisors for each service area to ensure work is completed as intended and to provide real-time guidance and support to the staff.

     5.   Utilize the Continuous Quality Improvement (CQI) process to routinely monitor compliance with policies, evaluate the timeliness and quality of care, identify barriers, and provide feedback to staff and leadership.

**6H**     **MDC's Quality Improvement Process** (See below items)

**6H1**     **Quality Improvement**: MDC operates an adequate Quality Assurance/ Improvement system regarding medical care, its medical and health care policies, and procedures, including but not limited to those identified in NCCHC standards and MDC policy, and has implemented appropriate corrective action.

**Findings:**
The Quality Improvement Program is essential for monitoring operations, ensuring compliance with policies and procedures, and identifying and supporting areas that need improvement. However, the program is still in its early stages of development. Frequent turnover in the quality improvement role has delayed progress. The most recently hired staff member has left the position, and a new individual just joined a few days before the onsite visit. This new hire brings strong Continuous Quality Improvement (CQI) experience from a hospital setting, which is a notable strength. However, they are still in the process of orientation and learning the correctional health workflows and the operational needs of the facility.

It is important to assess the CQI needs to ensure adequate staffing and support, including the need for a dedicated data analyst. Core elements such as identifying key performance indicators (KPIs), defining metrics, establishing data sources, conducting routine audits, and developing reliable reports are still in progress.

**Assessment:** Non-Compliance

**Recommendations:**
1. Finalize and implement a QAPI Plan that outlines the structure of the quality program, areas of focus, and reporting.
2. Identify key performance indicators and metrics for each service area, including timeliness of care, quality of care, safety, and outcomes.
3. Create a data dictionary for the metrics.
4. Establish data sources in the EMR to calculate the metrics.
5. Develop standardized audit tools.
6. Establish an audit schedule that includes daily process monitoring and monthly audits until operations are stable, then transition to quarterly review.
7. Develop a structured system to document corrective actions, assign responsibility, track progress, and verify that improvements have been sustained.
8. Assess staffing needs for the CQI program, including dedicated data support.

**6H2**     **Quality Improvement:** MDC has a committee that reviews individual and system data about triggers and thresholds and determines whether the data indicates trends either for individuals or for the adequacy of treatment overall.

**Findings:**

The Quality Improvement Program is essential for monitoring operations, ensuring compliance with policies and procedures, and identifying and supporting areas that need improvement. However, the program is still in its early stages of development. Frequent turnover in the quality improvement role has delayed progress. The most recently hired staff member has left the position, and a new individual just joined a few days before the onsite visit. This new hire brings strong experience in Continuous Quality Improvement (CQI) from a hospital setting, which is a notable strength. However, they are still in the process of orientation and learning the correctional health workflows and the operational needs of the facility.

Core elements such as identifying key performance indicators (KPIs), defining metrics, establishing data sources, conducting routine audits, and developing reliable reports are still in progress. Progress during the review period has stalled, with staffing challenges and leadership changes contributing to delays in progress.

**Assessment:** Non-Compliance

**Recommendations:**
1. Finalize and implement a QAPI Plan that outlines the structure of the quality program, areas of focus, and reporting.
2. Identify key performance indicators and metrics for each service area, including timeliness of care, quality of care, safety, and outcomes.
3. Create a data dictionary for the metrics.
4. Establish data sources in the EMR to calculate the metrics.
5. Update standardized audit tools to make them comprehensive.
6. Establish an audit schedule that includes daily process monitoring and monthly audits until operations are stable, then transition to quarterly review.
7. Develop a structured system to document corrective actions, assign responsibility, track progress, and verify that improvements have been sustained.
8. Assess staffing needs for the CQI program, including dedicated data support.

6H3    **Quality Improvement:** MDC's Quality Improvement Committee conducts analyses of the medical and healthcare processes and makes recommendations on changes and corrective actions.

**Findings:**

Frequent turnover in the quality improvement role has delayed progress. The most recently hired staff member has left the position, and a new individual just joined a few days before the onsite visit.

Core elements such as identifying key performance indicators (KPIs), defining metrics, establishing data sources, conducting routine audits, and developing reliable reports are still in progress.

Progress during the review period has stalled, with staffing challenges and leadership changes contributing to delays in progress.

**Assessment:** Non-Compliance

**Recommendations:**
1. Finalize and implement a QAPI Plan that outlines the structure of the quality program, areas of focus, and reporting.
2. Identify key performance indicators and metrics for each service area, including timeliness of care, quality of care, safety, and outcomes.
3. Create a data dictionary for the metrics.
4. Establish data sources in the EMR to calculate the metrics.
5. Update standardized audit tools to make them comprehensive.
6. Establish an audit schedule that includes daily process monitoring and monthly audits until operations are stable, then transition to quarterly review.
7. Develop a structured system to document corrective actions, assign responsibility, track progress, and verify that improvements have been sustained.
   Assess staffing needs for the CQI program, including dedicated data support.

6H3a    **Quality Improvement:** Provides oversight of the implementation of medical policies, procedures, guidelines, and support plans.

**Findings:**
The Quality improvement program is still under development. They have recently hired a staff member to support this effort.

Progress during the review period has stalled, with staffing challenges and leadership changes contributing to delays in progress.

**Assessment:** Non-Compliance

**Recommendations:**
1. Finalize and implement a QAPI Plan that outlines the structure of the quality program, areas of focus, and reporting.
2. Identify key performance indicators and metrics for each service area, including timeliness of care, quality of care, safety, and outcomes.
3. Create a data dictionary for the metrics.
4. Establish data sources in the EMR to calculate the metrics.
9. Update standardized audit tools to make them comprehensive.
5. Establish an audit schedule that includes daily process monitoring and monthly audits until operations are stable, then transition to quarterly review.
6. Develop a structured system to document corrective actions, assign responsibility, track progress, and verify that improvements have been sustained.
7. Assess staffing needs for the CQI program, including dedicated data support.

**6H3b**    **Quality Improvement:** Reviews policies, training, and staffing levels.

**Findings:**
The policies and procedures require review by subject matter experts to better align with standards and operational feasibility. The training and review of the staffing levels are part of the CAP initiative.  The plan is for the new CQI staff to be engaged in the CAP activities.

Progress during the review period has stalled, with staffing challenges and leadership changes contributing to delays in progress.

**Assessment:** Non-Compliance

**Recommendations:**

1. Establish KPI for each service to track compliance with established policies and procedures.
2. Update standardized audit tools to make them comprehensive.
3. Make progress on CAP – Staffing plan, Staffing level tracking, and Education regarding policies and procedures.

**6H3c**    **Quality Improvement:** Monitors implementation of recommendations and corrective actions.

**Findings:**
The medical team uses a project management tool to track corrective actions and monitor their implementation. The project manager who previously oversaw this process has transitioned into the HSA role, and a new project management resource has not yet been assigned. As part of the CAP staffing analysis, the roles and responsibilities related to tracking and follow-up of corrective actions must also be clearly defined and finalized.

Progress during the review period has stalled, with staffing challenges and leadership changes contributing to delays in progress.

**Assessment:** Partial Compliance

**Recommendations:**
1. Identify and assign a dedicated resource to support project management functions, including tracking and follow-up.
2. Ensure all corrective action plans are tracked through completion with clear ownership and timelines.
3. Streamline and prioritize action plans to avoid duplication of efforts.
4. Re-evaluate and confirm the effectiveness of corrective actions after implementation to ensure improvements are sustained.

**6H3d**    **Quality Improvement:** Reports its findings and recommendations to the appropriate County officials periodically.

**Findings:**

Metrics are in the early phases of development. The data is collected manually, but this is not sustainable. They still have not identified resources to provide data support.

Progress during the review period has stalled, with staffing challenges and leadership changes contributing to delays in progress.

**Assessment:** Partial Compliance

**Recommendations:**

1. Finalize and implement a QAPI Plan that outlines the structure of the quality program, areas of focus, and reporting.
2. Identify key performance indicators and metrics for each service area, including timeliness of care, quality of care, safety, and outcomes.
3. Create a data dictionary for the metrics.
4. Establish data sources in the EMR to calculate the metrics.
5. Update standardized audit tools to ensure they are comprehensive.
6. Establish an audit schedule that includes daily process monitoring and monthly audits until operations are stable, then transition to quarterly review.
7. Develop a structured system to document corrective actions, assign responsibility, track progress, and verify that improvements have been sustained.

6H3e    **Quality Improvement:** Refers appropriate incidents to the Morbidity & Mortality (M&M) Committee for review, as necessary.

**Findings:**

The M&M Committee is reviewing all deaths; however, the reviews need to be more detailed and thorough to clearly identify the root causes of the issues. The recent addition of reviewing CCTV footage is a positive step, but the analysis needs to be deeper. Without identifying the underlying causes, it is challenging to develop corrective actions that address the actual contributing factors. The M&M Committee should also establish clear timelines for each phase of the review process to ensure that reviews are completed in a timely and consistent manner. The criteria for selecting morbidity cases should be reviewed to ensure that high-risk events and serious medical incidents, including near misses that did not result in death, are reviewed. This will help the M&M Committee identify system issues and prevent future harm.

**Assessment:** Partial Compliance

**Recommendations:**
1. Ensure all deaths are reviewed promptly in accordance with policy and with clear timelines for each phase of the review process.
2. Use defined criteria to identify and refer high-risk, complex cases and near-miss events for morbidity review.

3. Include the appropriate interdisciplinary team members in each review to support accurate clinical and operational analysis.
4. Conduct reviews at a deeper level of analysis to clearly identify root causes, contributing factors, and system-level issues.
5. Develop targeted corrective actions based on the findings, assign responsibility and timelines, and track each action to completion to ensure improvements are achieved and sustained.

**7    Constitutionally adequate medical care**

**Assessment:** Non-Compliance

*(The key elements of the healthcare program detailed below contribute to the overall evaluation of item #7. Based on feedback from both parties, I have revised the assessment rating to be distinct from the formal compliance rating. This assessment uses the following scale to indicate progress: Unaddressed, Minimal Progress, In Progress (Early Stages), In Progress, In Progress (Approaching Sustainability), and Sustained Progress. This feedback aims to provide the team with clear insights into the current status from my perspective as they progress toward achieving full compliance.)*

**Health Screening:** Perform a detailed medical screening upon arrival at the facility to identify health conditions that need further assessment and treatment.
**Findings:**
The nursing leadership overseeing the intake process remains engaged.
Previously, a designated nurse reviewed about one-third of the intake screening forms using a set of criteria to ensure referrals were completed correctly. Since that staff member was reassigned, the intake nurses have taken on this responsibility and continue to identify and correct issues in real-time.

There are two intake screening rooms in use. Registration staff were assigned from the hospital to help with adding patients into the EMR before nurse intake screening, but were not present on the day of the visit due to staffing constraints. Plans are underway to establish additional space in the intake area, enabling the intake screening process to be divided into pre-screening and full screening; however, this has not yet been implemented. The prior plan to staff a medical provider at intake has been discontinued. The plan to staff the PTC is still being considered.

The intake screening still does not consistently capture key information, including chronic conditions, pharmacy details, current medications, and other relevant medical history. There continue to be challenges in ensuring patients are referred to appropriate services based on their needs. Abnormal vital signs are not consistently rechecked or followed up, and there is no reliable warm handoff when patients are sent to Med One for further evaluation.

The intake operational leader has requested an update to the intake screening form in the EMR to improve the screening accuracy and reduce errors. This is a very high-priority request that has been pending for an extended period due to a lack of adequate support for making changes in the electronic medical record (EMR) system.

Patients are not consistently continued on the medications they were receiving for chronic medical conditions because of delays in being seen by a provider. Medications that are not currently being administered at the facility are still appearing as active in the patient chart and are not being reconciled. Medications listed as active before arriving at the jail remain active in the record even when they are not being administered at the facility. Because all medications must be re-ordered by the facility provider for the patient to receive them, the active medication list must accurately reflect only the medications being continued. The active medication list needs to be reset and reconciled to ensure accuracy. A detailed discussion is needed to determine the safest and most reliable process for completing this reconciliation.

**Assessment:** In Progress

**Recommendations:**
1. Review and update the intake screening form to ensure all required clinical elements are captured and organized in a clear and meaningful way.
2. Ensure the review of prior medical records, problem lists, medication histories, and relevant health information is completed and documented during intake screening.
3. Separate medication history from active medications so that only medications currently being continued at the facility appear as active in the medical record.
4. Continue with the plan to staff the PTC.
5. Conduct regular rounds in the intake area to identify patients who may need medical attention.
6. Ensure high-risk or high-priority patients are transferred to the next level of care without delay through a clear warm handoff process, with ongoing monitoring until responsibility is formally transferred.
7. Ensure abnormal vital signs and screening results are acknowledged and addressed promptly.
8. Consider maintaining commonly needed medications at the intake clinic to reduce unnecessary transport to Med One.
9. If a patient is already taking medications, the intake nurse should contact the provider to determine whether those medications should be continued. A bridge order may be used when appropriate to ensure continuity of treatment until the on-site provider sees the patient.
10. CQI process to identify and fix errors or omissions in real-time quickly.

**Chronic Medical Conditions:** Inmates with chronic medical conditions are treated in a timely manner using evidence-based clinical guidelines.

**Findings:**

The facility has begun tracking chronic care metrics. The data is still preliminary, but it indicates a gradual improvement in wait times. A physician and an advanced practice provider have recently been hired and have helped reduce the backlog. However, delays persist in both initial and follow-up chronic care visits. There is no reliable prioritization process to ensure that high-risk patients are seen sooner. As a result, patients with chronic medical conditions are not consistently continued on their medications upon arrival. There is also no reliable process in place to ensure that these patients receive bridge orders for the continuation of their medications.

Orders placed by the physicians are not being completed in a timely manner, including laboratory orders. Provider assessments are often incomplete and do not address all active clinical conditions. There is no plan of care documented for each identified medical problem. There is no reliable way to ensure that they are following the established clinical practice guidelines. I had the opportunity to meet with the newly hired physician, whose documentation is detailed and whose assessments and plans are thorough. The physician will be a valuable addition to the program. The facility will need to reassess provider staffing levels to determine the number of providers required to meet established timelines.

**Assessment:** Minimal Progress

**Recommendations:**
1. Establish priority levels for provider visits to ensure timely scheduling based on clinical risk.
2. Ensure a reliable process is in place for patients to receive care or continue their existing care while awaiting a provider visit.
3. When clinically appropriate, providers should order medications in quantities sufficient to last until the next scheduled follow-up to prevent gaps in treatment.
4. Reassess provider staffing levels to ensure adequate coverage and the ability to meet current demand.
5. Ensure high-priority patients are seen promptly and without delay.
6. CQI process to evaluate timeliness and quality of care.
7. Improve documentation templates for provider notes.

**Dental Care:** Provide timely and adequate dental care.

**Findings:**
The dental services continue to perform well. The facility has added two additional PRN dentists to support the existing dental staff and help meet the demand for dental care. One dentist is expected to start on November 4th, and the second dentist has accepted an offer and is completing the credentialing process. The lead dental assistant has been with the team since 2022, in addition to the PRN dental assistants. Training for nurses and paramedics on oral screening is ongoing. The annual mandatory training and competency assessments were completed this year in March, April, and July. The performance of the dentists is monitored through a standardized audit process.

The facility has begun offering two Saturday dental clinics each month to further address demand. The current average wait time for dental visits is approximately 14 days, and the average time from referral to dental visit for urgent referrals is approximately two days.

The backlog in nursing sick call assessments continues to contribute to delays in access to dental services.

**Assessment:** In Progress

**Recommendations:**
1. The nurse should triage all dental-related sick call requests and assess them promptly per the sick call policy.
2. Dental pain should be assessed and appropriately managed while the inmate waits for dental appointments.
3. All nursing staff should continue to receive dental training and feedback from the dentist on a routine basis.
4. Track dental referrals by priority level and ensure they meet the established timelines.
5. Quality Assurance and Performance Improvement:
   a. Reports:
      i. Track time from referral (by priority type) to dentist evaluation.
   b. Audits/ Reviews:
      i. Audit Nursing dental assessments and provide feedback to staff on improvement opportunities.

**Care for high-acuity, high-risk, or complex patients:** Provide adequate care for inmates with illnesses or conditions requiring a higher level of monitoring and management. (This pertains to high-acuity, high-risk, or complex patients managed at the facility. The sheltered housing unit (SHU) provides care for patients with serious health care needs at the facility)

**Findings:**
While patients are transferred to the hospital when clinically indicated, this medical area houses patients who are complex, have mobility limitations, or require orthopedic casts. These patients remain at increased risk for falls, making it important to take reasonable, good-faith steps to reduce fall risk. Fall prevention is multifactorial. The beds in this location appear unusually high and narrow, which may increase fall risk. Common practice is to position beds low enough for patients to sit with both feet flat on the floor and to use beds wide enough to allow patients to turn over during sleep without increased risk of rolling off. When beds must be raised for treatment, consider using bed rails or other protective measures to reduce fall risk.

Staff reported that they are exploring options to replace the current tall beds with lower ones. Hospital beds are designed to allow height adjustment as needed for care and should be

considered. For patients with security concerns, alternative bed options should be considered that minimize fall risk as much as possible. There is also limited privacy for patients when using the restroom. There is no plan to address the privacy issue.

**Assessment:** Minimal Progress

**Recommendations:**

1. Review and finalize policy and procedure regarding the care for the high acuity patient population, including the patients housed at the SHU, and provide training for the medical staff.
2. Inmates admitted to SHU should receive a detailed admission assessment by a nurse and provider. In addition, a comprehensive care plan should be developed to manage the inmate's medical condition.
3. House the inmates who are high-acuity, high-risk, or complex patients in a location where a facility staff member can see and hear them so that medical emergencies can be identified and responded to promptly.
4. Quality Assurance and Performance Improvement:
   a. Reports:
      i. Track all high-acuity, high-risk, or complex patients and ensure they are assessed routinely per policy.
   b. Audits:
      i. Audit to ensure that nursing and provider assessments are appropriate and provide staff feedback on improvement opportunities.


**Infectious Disease:** Provide adequate screening, surveillance, treatment, and prevention of infectious diseases.

**Findings:**

The infectious disease program is still in development. Clinical practice guidelines have been established, but they are not yet consistently operationalized. Patients with Hepatitis C are not consistently referred to the Truman Clinic.

There is no process in place to track compliance with preventive care, including vaccinations. There is no reliable process to identify high-risk patients for vaccinations, such as influenza. The facility is not consistently identifying which patients qualify for preventive services, nor tracking who was offered these services and who was not. This limits the ability to monitor performance and ensure recommended care is provided.

The facility previously had fully trained wound care nurses and was actively collaborating with the hospital; however, there has been turnover. The current wound care nurse did not receive specific training in wound care. Provider orders often lack adequate detail regarding wound care instructions. Wounds are not photographed, and detailed written descriptions are not consistently documented, making it difficult to track wound progression over time.

**Assessment:** In Progress - Early Stages

**Recommendations:**

1. Consider testing for TB as soon as possible – check CDC and state guidelines. (It's common practice to do it as part of the intake screening process)
2. Conduct routine symptom screening and vital sign checks for individuals in quarantine to support early identification of illness.
3. Track infectious disease cases and trends over time.
4. Continue collaboration with the health department for guidance and support.
5. Ensure consistent adoption of clinical practice guidelines for infectious diseases. Establish a reliable process to identify and refer patients with Hepatitis C to the Truman Clinic.
6. Develop a system to identify patients who qualify for preventive services, including vaccinations, and track who was offered, accepted, pending, or declined these services. Monitor preventive care services.
7. Ensure adequate staffing and coverage so that wound care assessments and treatment are available seven days a week.
8. Provide wound care training for the current wound care nurse and providers.
9. Ensure provider orders for wound care include clear, specific treatment instructions.
10. Implement a process to document wound progression using detailed written descriptions.
11. Ensure wound care is reviewed regularly by nursing staff and healthcare providers, and adjusted based on the clinical response.

**Withdrawal Management:** Screen for drug and alcohol use and monitor for withdrawal symptoms. The inmates with withdrawal symptoms are managed appropriately.

**Findings:**
The facility has a highly capable medical director and a skilled team managing the detox program and MOUD program, which have made significant improvements, including the establishment of Suboxone and Methadone programs. They had a nursing director for this program, but the position is currently vacant.

For the withdrawal program to function safely, every step in the process must be reliable. This includes the early identification of patients at risk of withdrawal, appropriate housing placement, and the consistent and accurate completion of detox assessments exactly as ordered. If patients develop symptoms, they must be evaluated immediately and re-evaluated as needed, and collaborate with the provider. If a patient refuses detoxification assessments, close monitoring is essential, and any concerns must be escalated immediately. Custody staff must be familiar with the signs and symptoms of withdrawal and notify medical staff whenever they observe concerns.

Currently, these steps are not reliable and need to be strengthened to ensure fail-safety. This will require close oversight and real-time monitoring by designated supervisors on every shift to ensure that each step is completed correctly. Reliable data and reporting are also needed to identify issues quickly and correct them without delay.

**Assessment:**  In Progress

**Recommendations:**

1. Process map the withdrawal workflow from initial identification through discharge from the detox program, ensuring each step is clearly defined. Each step in the process should be simple, clear, specific, and fail-safe.
2. Build in a safety net at each step so that if the primary process fails, a secondary step should immediately catch the error or omission, correct it, and provide feedback to improve the primary process (feedback loop).
3. Ensure the intake screening process includes a good patient history, prior medical records, problem list, and any tests that may help identify withdrawal risk; staff should continue to err on the side of caution.
4. Configure EMR screening questions to be easy to use and structured to reduce errors. Ensure all needed orders, referrals, and housing recommendations are done and verified for each patient.
5. Avoid housing high-risk patients in areas without direct supervision.
6. Monitor patients in the Intake area for withdrawal symptoms until they are transferred. Establish a process to closely observe symptomatic patients in the intake area and ensure their monitoring until a warm hand-off to the next clinical staff.
7. Ensure the detox nurse in the housing unit is notified immediately when a new patient arrives and makes early contact with the patient to explain the detox program, expected symptoms, and how to request help.
8. Assign a specific medical provider to support the detox nurses, with daily huddles after detox rounds and direct communication when concerns arise. Evaluate patients with withdrawal symptoms promptly and re-evaluate as needed to ensure symptoms are controlled.
9. Assess patients with acute withdrawal symptoms in an exam room, notify the provider, and ensure the provider evaluates the patient using a lower threshold for patient safety.
10. Continue nursing follow-up for patients with symptoms until the patient is clinically stable or transferred to a higher level of care.
11. Assign supervisors for each shift with specific expectations for oversight, monitoring, and support.
12. Reassess nursing and provider staffing levels based on workflow, program expectations, and patient volume to ensure the program can be carried out consistently and safely.

13. Create a defined list of data elements that need to be tracked for daily and monthly monitoring. Work with the data analyst to establish the reports for tracking.
14. Establish set criteria for discharge from detox. A documented face-to-face assessment should be considered to ensure patient safety.

**Management of Chemical Dependency**

**Findings:**
The Suboxone program and the methadone program have transitioned to UNMH successfully. The clinic remains understaffed, resulting in long MOUD waitlists. A prioritization process should be established for patients on the wait list.  External medication verification procedures should be evaluated to minimize any internal delays and ensure that patients receive their next scheduled dose of medications on time. MOUD medication pass and documentation practices must be strengthened to prevent errors. Processes for initiating or continuing MOUD at intake or following hospitalization should be streamlined. The current vacancy in Nursing leadership is also limiting progress. The hospital's nursing team is providing interim support.

Staffing levels should be assessed based on actual demand, and metrics should be implemented to monitor the timeliness and reliability of services. Progress in tracking data has been limited due to delays in analytics support.

**Assessment:**  In Progress

**Recommendations:**

1. Ensure adequate staffing to minimize impact on daily operations.
2. Consider supervisors/ charge nurses to ensure timeliness and quality.
3. Consider Supervisors for all shifts with clear expectations.
4. Establish metrics and a dashboard to monitor timeliness and quality.
5. Continue communication and collaboration with Custody staff to address challenges.

**Informed Consent:** Inmates should be informed of their rights and provided with adequate information to make informed decisions regarding their medical care.

**Findings:**
During intake, patients are informed of their rights and sign consent forms. A refusal form has been implemented, and its use is improving; however, the patient education materials and consent documents should be reassessed. All medical forms are currently under review to ensure required fields are included.
Patients with cognitive impairment should be evaluated for their capacity to provide informed consent. The refusal process should be reviewed to ensure patients receive clear education on the risks of refusal. Refusals should occur in the presence of medical staff. If security staff reports a refusal, a nurse encounter should follow to verify the refusal and provide education on associated risks.
When a patient is unavailable for scheduled medical care, the specific reason should be accurately documented, and medical staff should attempt to complete the encounter when the

patient becomes available (e.g., upon returning from court, visitation, library, or an off-site location). The reasons for rescheduling or missed medical visits should be clearly captured as a report and studied so that the team can collaborate with the custody staff to reduce them.

**Assessment:** In Progress

**Recommendations:**

1. Ensure that all patient educational materials and consent forms are up-to-date, and maintain a tracking process to review and revise them as needed (like policy review).
2. Provide patients with adequate information regarding medical care and treatment options to support informed decision-making.
3. Establish a process to manage consents for patients with dementia or cognitive impairment.
4. Continue to educate staff regarding inmates' rights.
5. Complete a refusal form for all refusals.
6. Revise refusal forms to include all required fields.
7. Educate patients on the risks associated with refusing care to ensure refusals are informed.
8. Ensure refusals occur in the presence of medical staff, and verify any refusal reported by security through a medical staff encounter.
9. When a patient is unavailable for medical care, document the actual reason and attempt to complete the encounter when the patient becomes available (e.g., after court or other movement).
10. Track refusals where the patient does not sign and only a witness signature is present to identify patterns and trends.


**Sick Call:** Inmates may request and receive timely and adequate healthcare services for illnesses or injuries.

**Findings:**
The sick call requests are not being addressed in a timely manner. There is insufficient staff assigned to handle the sick call assessments, and the current process is unreliable.

The team is currently implementing a decentralized nursing and provider model where the staff go to the housing units to see the patients rather than bring them to the clinic. The purpose is to eliminate the transport as a bottleneck. I want to give the team credit for trying various options to get the patients seen without delay. The impact of this new process is yet to be realized.

Volume of medical requests is seen as a challenge. The team should reevaluate the current volume and identify the staffing needs based on current demand.

The sick call protocols and NETs have been developed to guide the nurses with their assessments. The intention of these documents is to guide staff to perform, at minimum, the required history, exam, and assessment to quickly identify emergent or urgent conditions and refer patients to a provider or a higher level of care without delay; use standing orders appropriately for lower-acuity concerns; and reevaluate and escalate to a provider if the patient's condition is not improving or is worsening. My concern is that, as written, these protocols may negatively impact the current level of assessment and management rather than improve it. I have requested that the medical leadership review them to ensure they are also designed to be detailed and thorough, and help identify emergent and urgent issues early, allowing for early initiation of care and referral to a provider or higher level of care without delay.

Based on the discussion with the team during the on-site visit, I have asked the team to review the sick call policy and procedure to ensure it meets the standards and operational feasibility.

**Assessment:** Minimal Progress (at risk)

**Recommendations:**

1. Review the sick call policy with the subject matter experts and the Policy and Procedures committee.
2. Reevaluate the staffing needed to manage each aspect of the sick call program. (Clerical, RN, Providers, etc.)
3. Ensure that sick call requests are picked up from all housing units daily.
4. Sick call requests should be triaged by a trained nurse or paramedic and assigned a triage level as emergent, urgent, or routine.
5. A clinical staff member should promptly assess the patient in person based on acuity level.
6. All medical assessments should be conducted in a private setting, and all essential medical equipment should be available and used appropriately during the assessments.
7. Standard sick call forms should be used in all housing units. Remove any old versions of the sick call forms.
8. Ensure that the sick call forms are readily available to the inmates in the housing units. Have a process for periodically refilling the forms.
9. Establish a process to ensure that all sick call forms have been picked up from all sick call boxes daily.
10. Create clinical practice guidelines for common medical conditions and encourage the staff to use the established nursing templates.
11. Educate nursing staff on common medical conditions and provide refresher training periodically.
12. Establish a tracker (report) and review it in the daily operational huddle to ensure that the sick call requests are completed promptly based on priority.
13. Quality Assurance and Performance Improvement:
    a. Reports:
        i. Track to ensure the sick call requests are picked up daily
        ii. Track to ensure all sick call requests are triaged in a timely per policy.

iii.  Track to ensure that all sick calls are addressed in a timely manner in order of priority.
   b.  Audits/ Reviews:
      i.  Audit Sick call triage levels to ensure appropriateness.
      ii.  Audit Sick call assessments to ensure appropriateness.

**Medication Management**: Provide timely medications to the inmates in a safe manner.

**Findings:**
*(Previous findings: The Medication administration process continues to improve. The number of staff administering medications has increased, and a new medication administration application has been implemented. The new process is more time-intensive but safer and reduces medication errors. The medication pass is interrupted or delayed due to simultaneous activities at the housing units. The leadership team continues to find ways to reduce interruptions.  Delays in provider visits are also causing delays in patients receiving medication.  Several improvements have been made. Medications used to be dispensed upon discharge from the facility when the medical team was notified with sufficient lead time to prepare the medication. Currently, they are not dispensed at the facility. The UNMT has implemented a process where the medication order is sent to an outside pharmacy for the inmate to pick up after release. The medication order is sent to one pharmacy close to the resource reentry center, and it can be transferred to other pharmacies if the patient requests it. No data is available to see how many medications were picked up upon discharge.)*
**Update:** The Medication administration process continues to improve. There is a continued delay in provider visits, resulting in patients not receiving their medication on time. If the patient reports being on medications at intake, these may not be continued in a timely manner due to a delay in the initial provider visit.

The pharmacy process currently allows providers to renew prescriptions for an extended period without first completing a patient assessment. In practice, providers are allowed to order only short-term or bridge orders to continue medications until the patient can be seen by a provider. Extended prescriptions without evaluating the patient is not safe, as the patient may require labs, monitoring, or dose adjustments. Ideally, the patient should be started on medication after a detailed assessment.

The medication-related data, including the one to track the timeliness, has been in the queue for a very long time to be developed. This has been delayed due to inadequate data support. They have not been given a status update or a probable date when they will be ready.
The facility is not providing medication upon discharge. Prescriptions given upon release are supposed to be picked up at a designated pharmacy, but there is no data to show the effectiveness of this process.  Patients' preferred pharmacies are not always documented in their medical records.

**Assessment:** In Progress

**Recommendations:**

1. Medications should be administered per provider orders within the administration time per policy.
2. A refusal form should be completed for all refusals. In addition, the staff should educate patients regarding the risk of refusal.
3. Multiple refusals for medication should be referred to the provider for review based on the type of medication.
4. The medication administration process should follow safe practices (right patient, right medication, right dose, right route, right time, right documentation, right education, etc.).
5. Document patients preferred pharmacy in the EMR.
6. Track and reduce the need for verbal orders. Consider not allowing extended bridge orders.
7. Establish a process to track patients on medications who need specific labs and make sure they are addressed.
8. Provide medication upon release/ transfer per policy. Track the number of medications that the inmate picked up upon release.
9. Quality Assurance and Performance Improvement:
   a. Reports:
      i. Track to ensure all medications were offered to the inmates in a timely manner as ordered and document the administration status in the electronic medication administration record (eMAR).
      ii. Track the reasons for the non-administration of medication and analyze them for improvement.
   b. Audits/ Reviews:
      i. Observe the medication administration process to ensure that the staff follows the medication administration steps appropriately.


**Medical Orders:** All medical orders should be completed as ordered.


**Findings:**

*(Previous Report: Reports are being developed to check the status of the orders and address any delays. Lab orders are automatically deleted if they are not completed within a specific timeframe. The team has extended this timeframe to allow more time to complete the orders. Additionally, they have created reports to track these orders, ensuring that if any are deleted, there is a method to locate them and complete the necessary tasks.)*

**Update:** There are still delays in completing lab orders. Reports tracking all open orders and tasks by type and priority have not yet been established. This has been in the queue for a long time. This has been delayed due to inadequate data support. They have not been given a status update or a probable date when they will be ready.


I met with the phlebotomy staff. They have the needed equipment and a good process for collecting lab samples.

The team shared the following data on open lab orders:
- 161 in December 2024
- 282 in April 2025
- 264 in September 2025
- 234 in the first week of October 2025

They also shared the average number of days to complete a lab order:
- 7.5 days in August 2025
- 11.2 days in September 2025
- 12.5 days in the first week of October 2025

**Assessment:** In Progress - Early Stages

**Recommendations:**

1. Track all open medical orders and establish a process for the on-site leadership to review daily during the daily huddle.
2. Assign staff for each task to ensure that they are addressed promptly.
3. Review the staffing plan to accommodate the workload.
4. Establish a reliable process to ensure all lab orders are completed on time. Have a safety check process to reconcile the lab orders to ensure that nothing gets missed due to software issues. Work with IT to address the autodeletion issue.
5. Educate and ensure that the staff follows the standard lab draw process. Identify space that the staff can use for the lab draw.
6. Quality Assurance and Performance Improvement:
   a. Reports:
      i. Track the status of medical orders daily and ensure that they are completed in the order of priority.
      ii. Reconcile lab and radiology orders to ensure nothing gets missed.
      iii. Ensure the refusal process is followed.
      iv. Reconcile to ensure that all lab results are received and reviewed by the provider.
      v. Track critical labs to ensure that they are addressed in a timely manner.
   b. Audits/ Reviews:
      i. Audit/ observe the lab draw process to ensure that the staff follows the established process.

**Medical Records:** The inmates' medical records should be complete and contain all relevant medical information. It should help coordinate care between caregivers and ensure patient safety.

**Findings:**

*(Previous Report: The clinical documentation of medical assessments is not comprehensive. UNMH-CH is working with the IT department to update the documentation templates. The Nursing protocols/guidelines and Provider clinical practice guidelines are under development.)* Previous Update: Not much progress has been made. A staff member has been assigned to assist with the development of documentation templates. Additionally, a provider with an IT background has been assigned to help the medical providers improve these documentation templates. Unfortunately, they were not available to meet during this visit.

Update: A physician with an informatics background meets with the medical team on-site to support improvements in clinical documentation. A data architect is also present at MDC to assist the team. Both are valuable resources and provide helpful guidance to the medical staff on how to optimize the EMR. They do not make the actual changes in the EMR or create reports.

MDC lacks sufficient technical staff to make the necessary changes to the electronic medical record. This request has been in place for some time, but a solution has not yet been identified.

**Assessment:** Minimal Progress (at risk)

**Recommendations:**

1. Create templates for each of the encounter types. Templates can be a helpful tool for staff to ensure that they document all the necessary information relevant to the patient's condition and the purpose of the visit. By filling out the templates, the staff can ensure they don't miss any important details and provide accurate and comprehensive patient care.
2. Give clear and descriptive titles for documents to make it easier to find the necessary information during a chart review.
3. Templates must have a standard format for documenting subjective, objective, assessment, and plan of care. Avoid automatically inserting data that hasn't been reviewed and acknowledged by staff responsible for documentation.
4. Complete a refusal form for all refusals and scan it into the medical record.
5. Encourage staff to document a detailed assessment using available templates in the EMR.
6. Collect feedback and provide focused EMR training for the medical staff.
7. Evaluate the workflow in the EMR to make it easy for the staff to navigate.

**Medical Staff:** Assign adequate and qualified staff to provide safe and quality healthcare for the inmates.

**Findings:**

*(Previous Report: UNMH-CH has received approval to hire additional staff and is actively recruiting. They need to reassess their staffing levels based on the increased population and the demand for medical services. Currently, they are using agency staff to fill shifts while seeking to hire full-time employees.)* Previous Update: A sustained surge in population has led to a

continued increase in demand for healthcare services. However, staffing levels have not been reassessed to align with current needs, resulting in ongoing delays in the delivery of care.

Update: Physician staffing levels have improved, with the addition of a new physician and an advanced practice provider. Nursing continues to rely heavily on agency staff. Some agency nurses have transitioned into full-time roles at the facility, indicating that they find the work environment positive.

The team reports a higher volume of healthcare requests and does not anticipate this volume decreasing in the near future. If this is the case, staffing levels will need to be re-evaluated to meet the current demand for care. The Corrective Action Plan includes a staffing analysis, which should assess the current demand for each service area to determine appropriate staffing levels. To complete this analysis effectively, the team will require data support.

**Assessment:** Minimal Progress

**Recommendations:**

1. Conduct a staffing analysis. This should be done periodically and adjusted as needed.
2. Hire staff to fill open positions.
3. Hire educators and provide ongoing training for the new and current staff.
4. Healthcare leaders should be able to work in their leadership roles without frequently being pulled to cover open shifts.
5. Quality Assurance and Performance Improvement

**Specialty Care:** Timely referral and access to specialty care and off-site procedures. Provide adequate and timely care for pregnant inmates.

**Findings:**

The off-site coordinator tracks all the requested appointments. As recommended, they are also tracking all referrals made at the hospital for patients within the facility. This helps ensure that appointments are made as recommended.

They are now tracking referrals in an Excel spreadsheet to monitor the status of each appointment. During the on-site visit, I met with the off-site coordinator team. They were very positive and engaged. I have made some recommendations for the tracking spreadsheet to improve workflow optimization.

I also recommended that they review all the pending, urgent, and routine specialty referrals with the clinic director so that appropriate actions can be taken based on the clinical condition.

The process for having patients seen by a nurse after returning from an offsite visit needs to be improved to ensure proper documentation and timely start of recommended medications after discussion with the provider.

**Assessment:** In Progress (positive)

**Recommendations:**

1. Track timeliness for all specialty appointments.
2. Inform the referring provider regarding any delays so they can escalate if needed.
3. Care should be provided while the inmate waits for their appointment.
4. Provide pregnancy tests for inmates per policy.
5. Provide adequate and timely care for pregnant inmates.
6. Track all pregnant inmates and ensure that they get timely care. (initial and follow-up provider evaluations)
7. Quality Assurance and Performance Improvement:
8. Reports:
    a. Track all referrals – each step from the time of referral.
    b. Track referrals to ensure that the high-priority referrals are not delayed.
    c. Track the time from referral to appointment and notify leadership of any delays for specific specialties.
9. Audits/ Reviews:
    a. Audit patients returning from offsite to ensure that the process is followed.

**Privacy:** Adequate privacy should be provided while exchanging healthcare information and during healthcare visits.

**Findings:**
The exam rooms in the housing units are well-equipped for patient assessments, offering both privacy and the necessary medical equipment. Staff have begun using these spaces. The newly implemented decentralized nursing and provider model can also benefit from utilizing these exam rooms. Privacy concerns identified in the dental clinic have been addressed. Continue to review the medical housing units and find a way to provide adequate privacy. Ensure that detox assessments for symptomatic patients and other sick call assessments are done in a private setting.

**Assessment:** In Progress

**Recommendations:**

1. Perform healthcare assessments in a private clinical setting where the staff can access medical records and equipment needed for the assessment.
2. Quality Assurance and Performance Improvement:
    a. Audits/ Reviews:
        i. Conduct reviews and observations to ensure that staff follow the established process.

**7A**    **The medical care provided by MDC to its inmate's evidence repeated examples of negligent acts, which disclose a pattern of conduct by MDC medical staff.**

**Findings:**
The leadership team continues to diligently construct the foundation for an effective healthcare program. There are inconsistencies in following the established processes. Significant efforts are still needed to ensure timely and safe healthcare services, but progress is slowing.

I've noticed that a significant bottleneck lies in clinical staffing and support staff. With sufficient clinical staff (especially Nurses and Providers), dedicated support staff, and a systematic approach to implementing the corrective action plan, the team will be well-equipped to achieve rapid and meaningful progress.

**Assessment:** Non-Compliance

**Recommendations:**

1. Evaluate staffing for each clinical service.
2. Implement the CAP to establish the fundamental framework for the medical program.
3. Assign supervisors to all clinical areas for every shift.
4. Establish a strong Quality assurance program.

**7B**    **The examples of negligent acts disclose a pattern of conduct by MDC medical staff that effectively denies inmates access to adequate medical care.**

**Findings:**
The leadership team continues to diligently construct the foundation for an effective healthcare program. There are inconsistencies in following the established processes. Significant efforts are still needed to ensure timely and safe healthcare services, but progress is slowing.

I've noticed that a significant bottleneck lies in clinical staffing and support staff. With sufficient clinical staff (especially Nurses and Providers), dedicated support staff, and a systematic approach to implementing the corrective action plan, the team will be well-equipped to achieve rapid and meaningful progress.

**Assessment:** Non-Compliance

**Recommendations:**

1. Evaluate staffing for each clinical service.
2. Review and finalize the policies and procedures and communicate them to the staff.
3. Implement the CAP to establish the fundamental framework for the medical program.
4. Assign supervisors to all clinical areas for every shift.
5. Establish a strong Quality assurance program.

**7C**      **There are systematic and gross deficiencies in staffing, facilities, equipment, or procedures.**

**Findings:**
The leadership team is actively working to build a solid foundation for an effective healthcare program. Clinical spaces are well-equipped, and additional exam rooms have been identified in the housing units, allowing decentralized nursing and provider teams to deliver care closer to patients. An exam room is also being set up at intake, though progress has been slower. The beds in the medical unit are currently being evaluated to ensure patient safety, and privacy considerations are also under review.

Significant progress has been made in establishing the Policy and Procedures Committee. The initial review of policies and procedures has been completed; however, each policy still requires a detailed review to ensure alignment with standards and operational feasibility.

**Assessment:** Partial Compliance

**Recommendations:**

1. Evaluate staffing for each clinical service.
2. Review and finalize the policies and procedures and communicate them to the staff.
3. Implement the CAP to establish the fundamental framework for the medical program.
4. Assign supervisors to all clinical areas for every shift.
5. Establish a strong Quality assurance program.

**7D**      **The systematic and gross deficiencies effectively deny the inmate population access to adequate medical care.**

**Findings:**
*(Previous Report: The leadership team has recently hired several experienced and knowledgeable new leaders. They are currently reviewing their programs to identify any issues and are developing a strategic plan to address them systematically. Several improvements are already being implemented. Some of these initiatives have shown immediate results, while others will take more time to demonstrate their effectiveness. All process improvement efforts are tracked and managed using standard project management methodologies.)*

**Update:** Significant efforts are still needed to ensure timely and safe healthcare services, but progress is slowing. Adequate support staff have not been assigned to support the effort. The bottlenecks continue to exist and hinder the team from making progress.

With sufficient clinical staff (especially Nurses and Providers), dedicated support staff, and a systematic approach to implementing the corrective action plan, the team will be well-equipped to achieve rapid and meaningful progress.

**Assessment:** Partial Compliance (At risk of regression)

**Recommendations:**

1. Develop a priority list of improvement efforts.
2. Implement the action plan based on the priority.
3. Develop a robust quality improvement program to track performance for continuous improvement.

**8A**    **Adequate communication occurs between MDC administration and treating healthcare professionals regarding an inmate's significant health needs that must be considered in classification decisions in order to preserve the health and safety of that inmate, other inmates, or staff.**

**Findings:**
*(Previous Report: The daily multidisciplinary huddle helps improve communication and address issues collaboratively. Additionally, there are multidisciplinary administrative meetings to discuss and address significant issues. The culture of collaboration takes time to be fully effective and seen at all levels of the facility. There continues to be good progress.)*

**Update:** The MDC administration is supportive of the clinical team, and communication continues to improve. The medical team needs access to accurate data to guide staffing assignments, clinical care decisions, and custody-related coordination. I met with the warden and medical leadership and recommended establishing standing agenda items for their weekly meetings. Tracking action items and reviewing progress in subsequent meetings will help ensure issues are addressed in a timely manner.

**Assessment:**  Partial Compliance

**Recommendations:**

1. The Medical Director, Health Service Administrator, and Director of Nursing should meet weekly to review the healthcare operations activities using a standard agenda.
2. Medical leaders should continue to meet with MDC administrative leaders weekly using a standard agenda to collaborate on operational activities and troubleshoot issues.
3. Track all action items and discuss them in these meetings. Escalate delays as needed.

**8A1**    **MDC security staff is advised of inmates' special medical needs that may affect housing, work, program assignments, disciplinary measures, and admissions to and transfers from institutions.**
**Findings:**
Medical alerts must be readily accessible to custody staff responsible for inmate supervision to ensure safety. The process for creating alerts and notifying security staff should be standardized, and all information communicated must be documented in the medical record. The current workflow requires further standardization to ensure consistency and reliability. The IT team should work with the medical and custody team to establish optimal workflows.

Currently, there is no CQI process to ensure that the special medical needs are followed.

**Assessment:** Partial Compliance

**Recommendations:**

1. Establish a process to identify patients with special needs and document their information in the medical record in a clear and easily noticeable manner for care continuity.
2. Establish a standard communication process with security staff to communicate special medical needs. This information should be readily available to any security staff managing the inmate.
3. Periodically assess the communication processes from medical to security and revise them to ensure reliability.
4. Establish a process for the medical team to ensure that the special needs are followed as ordered.
5. It is essential to have a standing agenda for review in the weekly Medical/MDC administrative meetings to identify and address any concerns quickly.

**8A2**    **Health care and security staff communicate about inmates with special needs conditions.**

**Findings:**

The current workflow requires further standardization to ensure consistency and reliability.

A process improvement effort is needed to review the full workflow, from screening and identification of special needs through provider assessment, development of the plan of care, ordering of necessary accommodations and supplies (including DME), follow-up planning, and communication of these needs and orders to responsible parties, including security and classification staff. Streamlining this end-to-end process is necessary to ensure timely and consistent implementation. A monitoring process should also be established to verify that required information is communicated to all responsible parties, that orders are executed as written, and that accommodations continue to be provided as intended. In addition, a tracking report should be created to follow each order from entry through dispensation, flag orders approaching expiration, and support timely decisions regarding renewal or discontinuation. When an order is not renewed or is discontinued, the rationale should be documented.

Currently, there is no CQI process to ensure that the special medical needs are followed. The IT team should work with the medical and custody team to establish optimal workflows.

**Assessment:**  Partial Compliance

**Recommendations:**

1. Establish a standard communication process with security staff to communicate special medical needs. This information should be readily available to any security staff managing the inmate.
2. There should be a standing agenda for review in the weekly Medical/MDC administrative meetings to quickly identify and address any concerns.

**8B**    **MDC follows a proactive program which provides care for special needs patients who require close medical supervision or multidisciplinary care.** (See below items)

**Assessment:** Partial Compliance

**8B1**    **Individual treatment plans are developed by a physician or another qualified clinician at the time the condition is identified and updated when warranted.**

**Findings:**
There is a delay in the initial and follow-up provider assessments.  The recently hired medical providers can help reduce the delay.  The team must assess the current demand for services and determine the necessary staffing level.

The assessments do not consistently include a detailed plan of care.   The physician informatics person is helping them design the new documentation templates, but they don't have adequate resources to make those changes in the EMR.

**Assessment:** Non-Compliance

**Recommendations:**

1. Track licensure, credentials, and certifications for all medical staff.
2. Ensure that their information is current and working within their scope of practice.
3. Use templates to help standardize documentation. During their encounters, the medical staff should document a detailed treatment plan to address all active medical conditions.
4. Also see the recommendation under high-acuity, high-risk, or complex patients and Chronic Medical Conditions.
5. Quality Assurance and Performance Improvement:
   a. Audits/ Reviews:
      i. Conduct reviews to evaluate the quality of assessments and adherence to clinical practice guidelines. Provide feedback to providers regarding improvement opportunities.

**8B2**    **Whether the treatment plan includes, at a minimum,** (see below)

**8B2a**    **The frequency of follow-up for medical evaluation and adjustment of treatment modality.**

**Findings:**

There is a delay in the initial and follow-up provider assessments.  There is no reliable prioritization of the provider referrals. The recently hired medical providers can help reduce the delay.  The team must assess the current demand for services and determine the necessary staffing level.

The assessments do not consistently include a detailed plan of care.   The physician informatics person is helping them design the new documentation templates, but they don't have adequate resources to make those changes in the EMR.

**Assessment:** Non-Compliance

**Recommendations:**

1. Medical evaluation should be comprehensive and address all active medical conditions.
2. The medical staff should develop a detailed plan of care, including frequency of follow-ups, and educate the inmate on the plan.
3. Quality Assurance and Performance Improvement:
   a. Audits/ Reviews:
      i. Conduct reviews to evaluate the quality of assessments and adherence to clinical practice guidelines. Provide feedback to providers regarding improvement opportunities.
      ii. Ensure that the monthly chart audit looks at the follow-up documentation needed for the inmate per the clinical practice guidelines.


**8B2b    The type and frequency of diagnostic testing and therapeutic regimens.**

**Findings:**
*(Previous finding - The lab and radiology processes are not standardized and reliable. The software auto-deletes lab orders after a week if they are not completed, and there is no process to ensure that lab orders are not missed. -* This lab issue has a temporary fix while IT works on identifying a solution to stop the auto-delete of orders.) Past Update: The building of the provider documentation templates to match the clinical practice guidelines, naming of the diagnostic test orders, and the building of the order sets in the electronic medical record are currently pending. There are inconsistencies in ordering the tests and a delay in the completion of the orders. Additionally, there is insufficient supervision of the process to ensure timely completion of the orders and review of the test results. There is no reliable data to monitor the outstanding orders.

Clinical practice guidelines are being established. The electronic medical record (EMR) must be optimized to align with these guidelines and include the necessary order sets to ensure that recommended diagnostic testing and therapeutic regimens are consistently followed. The team will need support from the IT department to build these order sets and the documentation templates within the EMR.  The physician should be informed of the clinical practice guidelines and asked to document their reasoning if they deviate from the guidelines.

**Assessment:** Partial Compliance

**Recommendations:**
1. Medical evaluation should be comprehensive and address all active medical conditions.
2. Order diagnostic tests and medications as appropriate.
3. Ensure that the monthly chart audit looks at the treatment plan documentation, including diagnostics and medications for the inmate, per the clinical practice guidelines.

**8B2c    When appropriate, instructions about diet, exercise, adaptation to the correctional environment, and medication.**

**Findings:**
The instructions for diet, exercise, adoption of correctional environment and medications is not clearly and consistently documented in the plan of care. The clinical practice guidelines, order sets, and documentation templates are still under development with minimal progress due to inadequate IT resources.

Additionally, the current workflow requires standardization to ensure consistency and reliability. The IT team should work with medical and custody to establish optimal workflows.

**Assessment:** Partial Compliance (At risk of regression)

**Recommendations:**

1. Medical evaluation should be comprehensive and address all active medical conditions.
2. Provide education regarding diet, exercise, medications, and care plans.
3. Quality Assurance and Performance Improvement:
   a. Audits/ Reviews:
      i. Conduct reviews to evaluate the quality of assessments and adherence to clinical practice guidelines. Provide feedback to providers regarding improvement opportunities.
      ii. Ensure that documentation includes patient education on diet, exercise, environmental adaptation, medications, and adherence to clinical practice guidelines.

**8C    Medical and dental orthoses, prostheses, and other aids to impairment are supplied in a timely manner when the health of the inmate would otherwise be adversely affected, as determined by the responsible physician or dentist.**

**Findings:**
*(Previously reported: Medical and dental equipment and supplies are provided to the inmates. Still, there is a need to optimize and standardize the process of identifying individuals who require medical supplies and ensure timely delivery. The medical record has no standard and*

*reliable location to document this information for easy access and review.) Past* Update: This process is still under development with minimal progress.

The current workflow is unreliable and requires standardization to ensure consistency. The IT team should work with medical and custody to establish optimal workflows.

**Assessment:** Partial Compliance (At risk of regression)

**Recommendations:**

1. Ensure that the patients who need dental or medical equipment/supplies are correctly identified during the intake screening and are provided with such medical equipment/supplies in a timely manner when indicated.
2. Establish a standard communication process with security staff to communicate special medical needs. This information should be readily available to any security staff managing the inmate.
3. Conduct a periodic audit to ensure that the equipment provided is still available to the inmate and is in working condition.

**8C1    Health records confirm that patients receive prescribed aids to impairment.**

**Findings:**
*(Previously reported: Inmates are provided their prescribed aid for impairment per the medical staff. A tracking process needs to be put in place. The medical record has no standard and reliable location to document this information for easy access and review. – Past Update: The EJUS has a flag for inmates with disabilities or other accommodation needs. It is important to establish a reliable process for identifying and communicating this information, ensuring that all disciplines have accurate and timely access to it and are using it appropriately.)*

There needs to be a system in place to track all prescribed aid orders to ensure that patients receive them, including obtaining the patient's signature to confirm receipt. Furthermore, it is important to periodically verify that these aids are consistently available for use and that orders are renewed promptly when necessary. There is no reliable process. The IT team should work with medical and custody to establish optimal workflows.

**Assessment:**  Partial Compliance (At risk of regression)

**Recommendations:**

1. Track all prescribed aids to impairment and ensure that they are provided in a timely manner.
2. Ensure a standard process to identify, document in the medical record, and communicate special medical needs with security staff. This information should accurate and be readily available to any security staff managing the inmate.

3.  Establish a standard communication process with security staff to communicate special medical needs. This information should be readily available to any security staff managing the inmate.
4.  Quality Assurance and Performance Improvement:
    a.  Reports:
        i.  Track all patients with prescribed aid to impairment.
    b.  Audits/ Reviews:
        i.  Conduct regular audits to confirm the patient received prescribed aid to impairment and periodically verify the availability and working condition of the provided aid.

**8C2     (If) The use of specific aids to impairment is contraindicated for security reasons, whether alternatives are considered so the health needs of the inmate are met.**

**Findings:**
*(Previously reported: The medical provider is consulted when specific aids to impairment are contraindicated for security reasons. There is no standard documentation process in the EMR, making continuity of care difficult. Past Update: Identifying the prescribed aid for patients with impairments and ensuring they receive it is not standardized. The EJUS has a flag for inmates with disabilities or other accommodation needs. The medical team has to streamline the process.)* Past Update: This process is still being standardized, but progress has not been significant.

There is no reliable process. The IT team should work with medical and custody to establish optimal workflows.

**Assessment:**  Partial Compliance (At risk of regression)

**Recommendations:**

5.  Ensure a standard process to identify, document in the medical record, and communicate special medical needs with security staff. This information should be accurate and readily available to any security staff managing the inmate.
1.  Track all prescribed aids to impairment and ensure that they are provided in a timely manner.
2.  Educate the medical staff on items contraindicated for security reasons and the policy and procedures regarding review for alternative options.
3.  Establish a standard communication process with security staff to communicate special medical needs. This information should be readily available to any security staff managing the inmate.
4.  Discuss special situations during the weekly standard meeting between MDC and the medical team.

**8D**    **The medical care provided to subclass members is adequate and whether the medical care provided to subclass members is at least equivalent in quality to the medical care provided to others.**

**Findings:**

*(Previously reported: The timely delivery and quality of healthcare remain a challenge. The new healthcare team is well-equipped to address these issues and establish a dependable healthcare program. They are taking a systematic approach to implementing improvements. Past Update: The care is delayed, inconsistent, and inadequate. There is tracking of patients with special needs and this process is being optimized. Multiple improvement activities are in progress. The UNMH-CH team is focusing on building the fundamental aspects of the program, such as policies and procedures, staffing, etc., which are critical to developing a strong healthcare program. A significant amount of effort is being invested, and the results of these improvements should be evident soon.)* Past Update: The care provided is delayed, inconsistent, and inadequate. The team is working very hard, but the progress being made is slowing down.

The team needs to develop a reliable process to identify different groups of patients, including the sick patients, high-risk patients, and vulnerable patients, to track them, and ensure that they get adequate, timely care. The current process is not standardized. The groups have to be established a report has to be created to track them.

**Assessment:** Partial Compliance (At risk of regression)

**Recommendations:**

1. Identify and track each group of patients, including high-risk inmates and inmates with disabilities or special needs within the EMR and ensure they receive timely and adequate care.
2. The medical team should continue comprehensive case discussions to develop a treatment plan for inmates with complex medical conditions and dual diagnoses.

**8E**    **Regarding inmates who are qualified individuals with disabilities under the ADA, whether the Defendants have made modifications to their policies, procedures, and practices that are necessary to provide inmates with disabilities with medical care, which is equivalent in quality to the care provided to inmates without disabilities.**

**Findings:**

The EJUS has a flag for inmates with disabilities or other accommodation needs. The medical team has to streamline the process. There is no reliable process to ensure that individuals with disabilities are receiving adequate care and equipment as ordered by the provider. The IT team should work with medical and custody to establish optimal workflows.

There is no review by CQI to ensure that the disabilities or other accommodation needs are followed.

**Assessment:** Partial Compliance (At risk of regression)

**Recommendations:**

1. Ensure that the policies and procedures are adequate and provide timely care for individuals with disabilities and special needs.
2. Establish a process to track all inmates with special needs within the EMR and ensure that it is accurate and complete.
3. Quality Assurance and Performance Improvement:
   a. Reports:
      i. Track to ensure the patients with disabilities are receiving care per policy.
   b. Audits/ Reviews:
      i. I. Audit charts to ensure that the patient's special needs and disabilities are addressed, and an appropriate care plan is developed.


……………………………………………………………. End of Report…………………………………………………………………