# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JIMMY (BILLY) MCCLENDON; HAROLD LUND; PETER SUMATKAKU; DAVID MICHAEL BAUER; CARL RAY LOPEZ; BRUCE DAVID MORAWE; THOMAS YOUNG; RUTHIE DURAN; DEBORAH LAVERA; JANELLE ROYBAL; DANETTE DIFIORI; MARIA SISNEROS; LARRY GREEN; BARTEL HALEY; MICHAEL COTE; JOE RAY HERRERA; JOSIE KRIENA; DEBBIE LUCERO; DAVID SHAWKIN; MARC A. GILLETTE; GEORGE CHAVEZ; ELISEO BACA; CLINT BARRAS; FRANCISCO MELENDEZ; SAMUAL HERROD; VINCENT PADILLA; CARL DUCKWORTH; JOSEPH W. ANDERSON; PAUL JOHNSON; FRED MALL; HECTOR LOPEZ; RICKY ROSE; HERBERT KING, SR.; JAMES PARKS; MICHAEL A. JOHNSON; JOHNNY VALLEJOS; JOE NEWBERRY; DARRYL CRAFT; ALBERT WILLY; WILLIAM P. JIMMY; AUGUSTINE TAPIA; RICHARD A. SMITH; ROBERT LOVATO; ROY WHATLEY; MARTY BEGAY; MARTIN VALDIVIA; TALLIE THOMAS; AUGUSTINE JACKSON; DONALD HALL; CARL SUR; STEVE ESQUIBEL; LONNIE WHATLEY; JAMES SAIZ; BRYON ZAMORA; ALLEN M. SAWYER; PATRICK BENNY ROMERO; RICHARD C. KOPECKY; PHILLIP SHUMATE; NELSON ROMERO; STEVE JOHNSON; BENNIE F. GARCIA; LOUIE CHAVEZ; BRIAN SALAZAR; RICHARD GALLEGOS; LARRY STROUD; JAMES BURKS; BRAD FISCHER; AMIHON BACA; JEFF DILLOW; PETE MCQUEEN; MANUEL MARTINEZ; ARNOLD ANTHONY MAESTAS, and JOHN HEWATT,

      Plaintiffs,

vs.                                                                 No. CIV 95-0024 JB/KBM

E.M.; R.L.; W.A.; D.J, P.S.; and N.W., on behalf
of themselves and all others similarly situated,
and SHAWNA TANNER,

       Plaintiff-Intervenors,

vs.

CITY OF ALBUQUERQUE; MARTIN
CHAVEZ; COUNTY OF BERNALILLO;
PATRICK BACA; ALBERT VALDEZ;
EUGENE GILBERT; BARBARA SEWARD;
JACQUELINE SCHAEFER; BILL DANTIS;
BERNALILLO COUNTY DETENTION
CENTER; PAUL SANCHEZ; FRANK
LOVATO; ERCELL GRIFFIN; MICHAEL
SMITH; JOHN VAN SICKLER; WILL
BELL; ALFRED CHAVEZ; RICHARD
FUSCO; GEORGE FUENTES; DAVID
BACA; VICTOR HERNANDEZ; KEVIN D.
SEVIR; DR. JIM MASON; BARBARA
COLE; MARIA LUCERO; DAVID
ROYSTON; FELIMON MARTINEZ;
STANLEY LENTS; DOUGLAS
ROBINSON; SEAL BARLEY; LYNN KING;
DAVID SHERMAN; BRIAN MASER;
JOHN DOES, employees of Bernalillo County
Detention Center; MICHAEL SISNEROS,
Director of Bernalillo County Detention
Center, in his official capacity, and
BERNALILLO COUNTY BOARD OF
COMMISSIONERS,

       Defendants,

vs.

LAWRENCE A. JOHNSON; WILLIE
JAMES WASHINGTON; MANUEL R.
BOSWELL, and AFSCME LOCAL 2499,

       Intervenors.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant City of Albuquerque's Motion to Dismiss Based on Compliance with the Terms of the 2017 Settlement Agreement, filed March 28, 2025 (Doc. 1733)("MTD"). The Court holds a hearing on February 3, 2026. See Clerk's Minutes at 1, filed February 3, 2026 (Doc. 1820). The primary issues before the Court are: (i) whether Paragraph 12 of the Settlement Agreement requires the parties to go to mediation before filing the MTD with the Court; and (ii) whether the Defendant City of Albuquerque has substantially complied with all of the Settlement Agreement Between the City Defendants, the Plaintiff Class, and the Plaintiff Intervenor Sub Class, filed September 11, 2017 (Doc. 1320)("2017 Settlement Agreement") ten specific requirements -- (i) the Chief of the Albuquerque Police Department will (a) issue a special order and a member of the command staff will issue a corresponding video, and (b) initiate revision to the Arrests, Arrest Warrants and Booking Procedure Standard Operating Procedure, specifically 2-80; (ii) the APD Chief will, within thirty days after the State issues the revised Uniform Citation form that includes fields for telephone number and email address, issue a Standard Operating Procedures requiring all officers to, whenever possible, obtain and record telephone numbers and email addresses whenever they issue a citation; (iii) the City of Albuquerque will revise the following standard operating procedures: (a) Field Services Standard Operating Procedure 1-14 entitled "Biased Based Policing/Profiling" (b) Field Services Standard Operating Procedure 2-80 entitled "Arrests, Arrest Warrants and Booking Procedures" (c) Field Services Standard Operating Procedure 2-71 entitled "Search and Seizure without a Warrant" and (d) Former Field Services Standard Operating Procedure 3-12 entitled Domestic Violence" and provide training on these revised standard operating procedures; (iv) the City of Albuquerque will revise Field Services Standard Operating Procedure 2-19 entitled "Response to Behavioral Health

Issues"; (v) the City of Albuquerque will implement the special order and standard operating procedures described in paragraphs (i)-(iv); (vi) the City of Albuquerque will create course of business records documenting: (a) the notation of telephone numbers and email addresses on the Uniform Traffic Citation form beginning at the time the City of Albuquerque is in possession of the new form; (b) booking on citable non-violent misdemeanor offenses, not to include DWIs; (c) disposition data for individuals involved in Crisis Intervention Team ("CIT") related incidents; and (d) arrest arising from calls for service involving domestic violence, compile the above referenced documents for a period of one year, and then publicly issue a written report summarizing the above referenced records and any follow-up measures taken; (vii) the City of Albuquerque will continue to collaborate in good faith with Defendant County of Bernalillo to develop jail diversion programs, as well as use current third-party behavioral health response programs and services; (viii) the City of Albuquerque agrees to meet with Bernalillo County at least one time each quarter beginning July 1, 2017, through June 30, 2018, to explore whether it is feasible to establish teams of mental health professionals who are not APD employees, who will provide mental health follow up and case management services; (ix) the City of Albuquerque will continue to collaborate in good faith with Bernalillo County in the development and funding for mobile crisis teams to respond to mental health crisis calls, including alleged threats of suicide, self-harm or welfare check, where appropriate; and (x) the City of Albuquerque will continue to provide approximately 700 supportive housing slots, either transitional supportive housing or permanent housing with wrap-around case management and other behavioral health services, for people, including those with mental illness or mental disability, who have been booked into the Bernalillo County Metropolitan Detention Center ("MDC"), and collaborate in good faith with Bernalillo County regarding opportunities for additional supportive housing slots and the

allocation of resources -- such that the City of Albuquerque should be dismissed from the case. The Court concludes: (i) Paragraph 12 of the Settlement Agreement does require the parties to go to mediation before filing a motion before the Court if there is dispute over the City of Albuquerque's substantial compliance with the terms of the Settlement Agreement; (ii) in accordance with the Court's first conclusion, the Court does not rule on the issue of substantial compliance for disputed portions of the Settlement Agreement, because the parties have not yet undergone mediation, and finds substantial compliance for the undisputed portions of the Settlement Agreement.

**FACTUAL BACKGROUND**

On January 10, 1995, Plaintiff Jimmy (Billy) McClendon, along with "all prisoners who are presently, or will be confined in the Bernalillo County Detention Center"[1] ("the Plaintiffs") filed a class action against the City of Albuquerque, Defendant Mayor of Albuquerque, Bernalillo County, the MDC, the MDC Director, the MDC Deputy Director, and various MDC employees, alleging that MDC operates with inhumane and unconstitutional conditions. See Complaint Class Action ¶¶ 1-2, at 2-3, filed January 10, 1995 (Doc. 1)("Initial Complaint"); Complaint Class Action Part 2 ¶¶ 8.36-23.3 at 1-34, filed January 10, 1995 (Doc. 1-1)("Initial Complaint Part 2"); Complaint Class Action Part 3 ¶¶ 23.4-36.6, at 1-40, filed January 10, 1995 (Doc.1-2)("Initial Complaint Part 3").

In the Initial Complaint, the Plaintiffs seek to enjoin the Defendants from operating MDC until MDC meets State and federal Constitutional standards, see Initial Complaint ¶ 1, at 1-5, and

---

[1]The Bernalillo County Detention Center is now known as the Metropolitan Detention Center.

the Plaintiffs allege that Bernalillo County is violating Articles I, II, and VI of the Constitution of the United States; specifically, the Plaintiffs seek

> to see that federal law is faithfully executed as provided by Article II, Section 3 of the Constitution of the United States; to protect the freedom of persons within the United States to travel and transact business in channels of interstate commerce as established by Article I, Section 8 of the Constitution of the United States; and to protect the rights of persons with the United States to receive the benefits of the supreme law of the land as provided by Article VI of the Constitution of the United States.

Initial Complaint ¶ 3, at 4.  The Plaintiffs bring their claims under 42 U.S.C. § 1983, 18 U.S.C. § 242, and 18 U.S.C. § 245.  See Initial Complaint ¶ 3, at 4.

> The Initial Complaint alleges:

> [T]he totality of the overcrowding and other conditions at BCDC fall beneath standards of human decency, inflict needless suffering on prisoners and create an environment which threatens prisoners' mental and physical well being, and results in the physical and mental deterioration and debilitation of the persons confined therein which is both unnecessary and penologically unjustifiable.

Initial Complaint ¶ 1, at 2-3.  The Plaintiffs allege that this overcrowding makes it nearly impossible to clean the cells, maintain personal hygiene, and provide safety for the inmates.  See Initial Complaint ¶ 4, at 10.  The Plaintiffs also contend that Bernalillo County does not provide sufficient medical care, dental care, or psychological and rehabilitative services to their inmates. See Initial Complaint ¶ 4, at 13.

On September 6, 1995, a group of persons with mental and/or developmental disabilities whom MDC detains or are going to detain, and all others similarly situated, move to intervene in the lawsuit.  See Motion to Intervene, filed September 06, 1995 (Doc. 113)("MTI #1"); Plaintiff Intervenors' Memorandum of Law in Support of Motion to Intervene, filed September 6, 1995 (Doc. 114)("Memo. for Motion to Intervene").  The Plaintiff-Intervenors move to intervene, because "each named Plaintiff has one or more mental or developmental disabilities which require

medical, mental health, habitation and/or educational service.  As a result of their detention, proposed plaintiffs in intervention have interests directly affected by this litigation."  Memo. for Motion to Intervene at 1.

The parties reach the initial Settlement Agreement in this case on September 7, 1995. (Doc. 115)("Initial Settlement Agreement"). The City of Albuquerque, the Plaintiffs, and the Plaintiff-Intervenors enter into the most recent 2017 Settlement Agreement, which sets forth requirements that aim to improve MDC conditions and carve a pathway to the end of litigation for the City of Albuquerque, in 2017.  See Settlement Agreement at 1-8, filed September 11, 2017 (Doc. 1320)("Settlement Agreement"). The Settlement Agreement states that, "[a]fter publishing the report required by Paragraph 6 [of the Settlement Agreement], City Defendants may file a motion for dismissal from the case, upon showing of substantial compliance with this Agreement." Settlement Agreement ¶ 14, at 8.

## ANALYSIS

The City of Albuquerque argues that it substantially complies with the terms of the Settlement Agreement, and, accordingly, the Court should dismiss the City of Albuquerque from the case.  See MTD at 27.  Before the Court reaches the merits of the City of Albuquerque's arguments, the Court must determine whether the City of Albuquerque must mediate the disputes regarding the MTD before filing the MTD.  The Settlement Agreement ¶ 12, at 7, states: "In the event that any dispute arises regarding whether or not the terms of this Agreement are being properly fulfilled, mediation before the Court's Special Master or another mediator agreed to by the parties or selected by the Court is required before any motion can be filed with the Court." Settlement Agreement ¶ 12, at 7.  The Plaintiffs and the Plaintiff-Intervenors rely on ¶ 12, at 7, to argue that mediation must take place before the City of Albuquerque files the MTD.  See Plaintiffs'

Motion to Stay Defendant City of Albuquerque's Motion to Dismiss, at 14-15, filed May 9, 2025 (Doc. 1743)("Given the very nature of the City's Motion to Dismiss, clearly a dispute has arisen over compliance with the Settlement Agreement and thus necessitated mediation prior to filing a motion to dismiss."); Transcript of Hearing at 19:4-9, taken February 3, 2026 (Villa)("Tr.")("That idea encompassed the notion that when the City got to the point so we think we've complied with the Settlement Agreement do you agree we could agree or if there is a dispute then we have to go to mediation first."). [2]

Settlement Agreement ¶ 14, at 8, however, states in relevant part: "City Defendants may file motions with the Court to find substantial compliance in whole or in part with individual paragraphs of this Agreement.    After publishing the report required by Paragraph 6, City Defendants may file a motion for dismissal from the case, upon showing of substantial compliance with this Agreement."  Settlement Agreement ¶ 14, at 8.  The City of Albuquerque argues that ¶ 14, at 8, entitles the City of Albuquerque to file the MTD without attending mediation.  See City of Albuquerque's Reply and Supplemental Brief in Support of Its Motion to Dismiss Based on Compliance (Doc. 1733) at 7, filed March 23, 2026 (Doc. 1845)("Reply")("Paragraph 14 contains no language requiring the City to request mediation before seeking dismissal; it expressly states that the City can file a motion once it has published the report required by Paragraph 6.").  The City of Albuquerque argues that ¶ 12, at 7, is a dispute resolution provision, which the parties use if disputes arise during the period of attempted compliance, and that ¶ 14, at 8, comes into play "once everything has been accomplished." Tr. at 16:2-21 (Grubel).  As an example when the

---

[2] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

dispute resolution provision of ¶ 12, at 7, would be applicable, the City of Albuquerque points to the Settlement Agreement ¶ 2, at 2-3, and to the "timeframes [in which] the City of Albuquerque will issue standard operating procedures and then there is a period to object and file objections and then there is a period for comment and final adoption," arguing that issues with these requirements would be an appropriate time to require mediation under ¶ 12, at 7.  Tr. at 16:9-15 (Grubel).  The City of Albuquerque argues that ¶ 14, at 8, is the more specific paragraph which should govern here.  See Reply at 7.   Further, the City of Albuquerque argues that ¶ 12, at 7, is not applicable at all, because, at the time the City of Albuquerque files the MTD, no dispute had arisen whether the City of Albuquerque is complying with the terms of the Settlement Agreement are being properly fulfilled; the City of Albuquerque states that it does not need to "preemptively invoke Paragraph 12 based on the potential that Plaintiffs would raise disputes."  Reply at 7.  Finally, the City of Albuquerque argues that the MTD "does not seek to resolve a discrete dispute regarding compliance.  Rather, it invokes Paragraph 14 and asks the Court to determine whether the City has substantially complied such that dismissal is warranted."   Reply at 7.

The Honorable Judge Parker, Senior United States District Judge for the District Court of the District of New Mexico states about these two provisions:

> If a dispute arises over compliance with the Settlement Agreement, before filing a motion with this Court, the parties must first attempt to mediate the dispute before Special Master Alan C. Torgerson or another agreed-upon mediator.  The City Defendants may file a motion with the Court for a finding of substantial compliance with the Settlement Agreement and upon a showing of substantial compliance, the City Defendants may ask the Court to dismiss them from the case.

Memorandum Opinion and Order Approving Settlement Agreement Between Class and Subclass and the City of Albuquerque, filed October 15, 2017 (Doc. 1326).

Taking into consideration both ¶ 12, at 7, and ¶ 14, at 8, the Court concludes that ¶ 12, at 7, applies here to require that the parties go to mediation before filing the MTD with the Court. Courts interpret and enforce settlement agreements according to ordinary contract-law principles. See Anthony v. United States, 987 F.2d 670, 673 (10th Cir. 1993). Accordingly, the Court must determine the parties' obligations from the agreement's language. Cont'l Potash, Inc. v. Freeport-McMoran, Inc., 1993-NMSC-039 ¶ 54, 115 N.M. 690, 704, 858 P.2d 66, 80. ¶ 12, at 7, requires mediation if "any dispute arises regarding whether or not the terms of this Agreement are being properly fulfilled" before any party files a motion before the Court. There is a dispute whether the City of Albuquerque substantially complies with seven of the ten substantive paragraphs of the Settlement Agreement; this dispute qualifies as "any dispute regarding whether or not the terms of this Agreement are being properly fulfilled." Settlement Agreement ¶ 12, at 7. The Court is reluctant to narrow this provision and allow the parties to sidestep the mediation requirement and come to the Court to resolve disputes between the parties regarding the Settlement Agreement, regardless whether the dispute concerns substantial compliance with the Settlement Agreement.

The City of Albuquerque tries to create a tension between ¶ 12, at 7, and ¶ 14, at 8, that does not exist. There is no inconsistency, they both have a separate purpose, they are not redundant, they are not surplusage, and the parties must comply with both. ¶ 12, at 7, is the mediation provision, and the parties wrote it broadly to cover most, if not all, disputes that arise about the Settlement Agreement: "In the event that any dispute regarding whether or not the terms of this Agreement are being properly fulfilled, mediation before the Court's Special Master or another mediator agreed to by the parties is required before any motion can be filed with the Court." Settlement Agreement ¶ 12, at 7 (emphasis added). Accordingly, the Court determines that the parties must mediate the issue of substantial compliance with the Settlement Agreement

before the City of Albuquerque may refile the MTD before the Court.  It seems odd that the parties would write this sentence and then -- one page later -- talk about motions that are exempt from mediation.  There is no sound reason to think that ¶ 12, at 7, when it talks about "any motion" is not including ¶ 14, at 8, motions.  The City of Albuquerque says that it does not know if there is a "dispute" until it files its motion, but that is not the way motion practice operates in federal court. D.N.M. LR-Civ. 7.1(a) provides: "Movant must determine whether a motion is opposed, and a motion that omits recitation of a good-faith request for concurrence may be summarily denied." The movant must determine in federal court whether there is a dispute before the movant files a motion. The MTD indicates in footnote 1 on p.1 of the MTD that the City of Albuquerque sought the Plaintiffs and Plaintiff-Intervenors' positions before it files its motion, and, because the City of Albuquerque complies with the local rules, it learns that the Plaintiffs and Plaintiff-Intervenors oppose at least portions of the MTD.  See MTD at 1 n.1.  Once the Plaintiffs and Plaintiff-Intervenors state that they oppose the proposed MTD, the duty to mediate is triggered.  At that point -- before the City of Albuquerque files its MTD -- it should have contacted the Special Master Torgerson or Magistrate Judge Molzen, and asked them to mediate the case.

The City of Albuquerque cannot -- and does not -- argue that it is exempt from the D.N.M. LR-Civ rules. The City of Albuquerque does not argue that it or its motions are exempt from the mandated electronic filing requirements (D.N.M. LR-Civ 5.1(a)); the service requirement (D.N.M. LR-Civ 5.1(c)); the timing requirement (D.N.M. LR-Civ 5.1(c)); the writing requirement (D.N.M. LR-Civ 7.1(a)); the certificate of service requirement (D.N.M. LR-Civ 7.1(b)); the forum of motion requirement (D.N.M. LR-Civ 7.3(a)); the evidence requirement (D.N.M. LR-Civ 7.3(b)); the timing requirement (D.N.M. LR-Civ 7.4(a)); notice of completion (D.N.M. LR-Civ 7.3(c)); length of motion (D.N.M. LR-Civ 7.5); oral argument (D.N.M. LR-Civ 7.6(a)); forum of

documents (D.N.M. LR-Civ 10.1); page limit for exhibits (D.N.M. LR-Civ 10.5); and so many more. The meet-and-confer rule is another rule, and applies to all motions. Also, if the movant determines that his motion is unopposed, "an unopposed motion must be accompanied by a proposed order approved by each party . . . . " D.N.M. LR-Civ 7.2. Thus, there cannot be dispute, and there is no dispute, that the ¶ 14 motion remains secondary to D.N.M. LR-Civ 7.1(a) meet-and-confer requirement.

The Court does not understand how the City of Albuquerque can say soundly, given footnote 1 in the MTD, that, at the time the City of Albuquerque files the MTD, no dispute had arisen whether "the terms of the Agreement are being properly fulfilled." Reply at 7 (quoting Settlement Agreement ¶ 12, at 7). Similarly, given footnote 1 in the MTD, the Court does not see how the City of Albuquerque's argument that it "was not required to preemptively invoke Paragraph 12 based on the potential that Plaintiffs would raise disputes" is accurate. The Plaintiffs and the Plaintiff-Intervenors oppose the MTD before the City of Albuquerque files the motion.

In an attempt to avoid ¶ 12, at 7, the City of Albuquerque argues that the MTD "does not seek to resolve a discrete dispute regarding compliance." Reply at 7. The heading of the MTD is "Motion to Dismiss Based on Compliance . . . ." ¶ 14, at 8, talks about "substantially complied" and "substantial compliance." It is not sound for the City of Albuquerque to say that the MTD does not seek to resolve a "discrete dispute regarding compliance." Reply at 7. There is not any daylight between "being properly fulfilled" in ¶ 12, at 7, and "complied" and "compliance" in ¶ 14, at 8.

If the City of Albuquerque had only failed to meet-and-confer before it filed the MTD, the Court would proceed to decide the MTD, because the Plaintiffs and Plaintiff-Intervenors oppose the MTD. Mediation is qualitatively different. A skillful mediator, like Judge Torgerson or

Molzen, can work their magic to resolve many disputes and keep the endless disputes in this case off the District Judge's desk. The Court cannot compromise its rulings; a mediator may convince the parties to trade-off demands and wants. The Court does not underestimate a seasoned mediator, and the Court knows that Judge Torgerson and Molzen have kept endless disputes off its desk. The Court has no incentive to read ¶ 12, at 7, narrowly or not to enforce the provision when a party skips it. The Court -- with a busy docket -- must enforce the mediation provision out of self-preservation.

The courts construe consent decrees as contracts. See McClendon v. E.M., No. CIV 95-0024 JB/KBM, 2022 WL 4094519, at *21 (D.N.M. Sept. 6, 2022)(Browning, J.). To achieve substantial compliance, a party must perform the specific steps in the contract to fulfill the essential requirements of the contract as represented by its purpose. See Joseph A. by Wolfe v. New Mexico Dep't of Hum. Servs., 69 F.3d 1081, 1086 (10th Cir. 1995); Jackson v. Los Lunas Ctr., No. CV 87-839 JAP/KBM, 2015 WL 13662981 (D.N.M. April 3, 2015)(Parker, J.)("The substantial compliance inquiry asks whether Defendants took the required specific steps in furtherance of the essential purposes and intent of the consent decree."). "Defendants carry the burden of showing by a preponderance of the evidence 'that they had substantially complied with the requirements of the consent decrees, and that any deviation from literal compliance did not defeat the essential purposes of the decrees." Jackson v. Los Lunas Ctr. for Persons with Developmental Disabilities, No. CV 87-0839 JP/KBM, 2012 WL 13076262, at *9 (D.N.M. Oct. 12, 2012)(Parker, J.)(quoting Jeff D. v. Otter, 643 F.3d 278, 284 (9th Cir. 2011)). "Procedurally, motions to disengage the action items in the S[ettlement] A[greement] are like motions for summary judgment." Jackson v. Los Lunas Ctr. For Persons with Developmental Disabilities, No. CV 87-0839 JAP/KBM, 2020 WL 4220907 at *3 (D.N.M. July 23, 2020)(Parker, J.). The Settlement Agreement sets forth ten

specific requirements that the City of Albuquerque must meet. The Court takes each requirement up in turn to determine if the parties are in dispute regarding substantial compliance such that they are required to mediate the issue before filing with the Court.

Settlement Agreement ¶ 1 states:

The Chief of the Albuquerque Police Department will, within 45 days from the signing of this Agreement, (a) issue a special order and a member of the command staff will issue a corresponding video, and (b) initiate revision to the Arrests, Arrest Warrants and Booking Procedure Standard Operating Procedure ["SOP"], specifically 2-80. Both the Special Order and the revised SOP 2-80 will include a clear written directive to police officers regarding the Court's order in McClendon with respect to issuing citations whenever appropriate, as established by operative policies, including an explanation that persons alleged to have committed non-violent misdemeanor offenses (not to include DWIs) will not be arrested when there are no circumstances necessitating an arrest . . . . The written directives will explain how to use the window at Metropolitan Court to post a bond or pay a fine to resolve or quash a warrant, without being taken to the Prisoner Transport Unit or the jail. The written directives will also specify that whether a person has a permanent address may not be the sole factor in determining whether to arrest rather than issue a citation. The Special Order will remain in effect until the approval of the revised SOP.

Settlement Agreement ¶ 1, at 1-2. The City of Albuquerque argues that it substantially complies with this requirement. See MTD at 4. First, the City of Albuquerque states that, within ten days of signing the Settlement Agreement, the City of Albuquerque initiates revisions to the Arrest, Arrest Warrants, and the Booking SOP. See MTD at 4. The City of Albuquerque maintains that it creates and publishes a Special Order as well as a corresponding video which meets the criteria that ¶ 1 requires. See MTD at 4. The City of Albuquerque alleges that the Special Order: (i) makes it mandatory for officers to issue citations in lieu of arrest on non-violent misdemeanor offenses, other than DWIs, when circumstances do not call for an arrest; (ii) clarifies that whether a person has a permanent address cannot be the sole factor in deciding to arrest rather than issue a citation; (iii) directed officers not to take people to the Prisoner Transport Unit or the MDC when

- 14 -

circumstances make it feasible to instead use the bonding window at the Bernalillo County Metropolitan Court; (iv) explains all aspects of the bonding window, including its hours, that the bonding window only accepts cash, and the procedures for cancelling a warrant at the bonding window; and (v) directs officers to return the person to the prior location upon completion of the transaction if time or the situation permits. See MTD at 4-5. City of Albuquerque provides the corresponding video required under ¶ 1 to the APD officers on May 11, 2017. See MTD at 5. Finally, also as the Settlement Agreement requires, the City of Albuquerque maintains that it initiates revisions to the Arrests, Arrest Warrants and Booking Standard Operating Procedure (SOP 2-80) on April 7, 2017. See MTD at 5.

The Plaintiffs and the Plaintiff-Intervenors argue that the City of Albuquerque does not substantially comply with ¶ 1, because the current SOP 2-80 (effective 2/06/2026) is not compliant with ¶ 1's requirements. See Plaintiffs' Opposition to Defendant City's Motion to Dismiss, at 10, filed March 16, 2026 (Doc. 1838)("Response"). The Plaintiffs and the Plaintiff-Intervenors state that the current SOP 2-80 violates ¶ 1, because it allows officers to both make arrests for non-violent misdemeanor crimes that occur in the officer's presence and, based on probable cause, for non-violent misdemeanor crimes which do not occur in the officer's presence. See Response at 1. This is contrary to ¶ 1's requirement that SOP 2-80 direct officers to issue citations rather than arrest people for non-violent misdemeanor offenses. See Response at 10-11. The Plaintiffs and the Plaintiff-Intervenors maintain that the 2026 version of SOP 2-80 is substantially similar to the 2025 version of SOP 2-80. See Response at 10 n. 13.

Based on the arguments that the parties make above, the parties dispute the City of Albuquerque's substantial compliance with Settlement Agreement ¶ 1, at 1-2. Settlement Agreement ¶ 12, at 7, requires that the parties undergo mediation for any dispute regarding

"whether or not the terms of this Agreement are being properly fulfilled" before "any motion can be filed with the Court." Settlement Agreement ¶ 12, at 7. The Court determines that, in disputing the City of Albuquerque's substantial compliance with the Settlement Agreement ¶ 1, at 1-2, the parties dispute whether the City of Albuquerque substantially complies with the Settlement Agreement ¶ 1, at 1-2. Accordingly, the parties must undergo mediation on this issue before filing a motion with the Court. Because the parties do not go to mediation before the City of Albuquerque files the MTD with the Court, the Court does not entertain at this time the motion on the issue of substantial compliance with Settlement Agreement ¶ 1, at 1-2.

Settlement Agreement ¶ 2 states:

> The City has been informed that the State will soon be issuing a revised Uniform Traffic Citation form that includes fields for telephone number and email address, and has so informed counsel for Plaintiffs and Plaintiff-Interveners. In reliance on this expectation, Plaintiff and Plaintiff Interveners have agreed that the Chief of the Albuquerque Police Department will, within 30 days after the State issues the revised Uniform Traffic Citation form that includes fields for telephone number and email address, issue a Standard Operating Procedure requiring all officers to, whenever possible, obtain and record telephone numbers and email addresses whenever they issue a citation.

Settlement Agreement ¶ 2, at 2. The City of Albuquerque, in support of its contention that it substantially complies with this requirement, mentions that, at the time that the City of Albuquerque, the Plaintiffs, and the Plaintiff-Intervenors enter into the Settlement Agreement, the City of Albuquerque has in place a Special Order instructing officers to ask the drivers/violators their email and telephone number when issuing a Uniform Traffic Citation. See Special Order 15-74 (issued August 26, 2015), filed March 28, 2025 (Doc. 1733-F). The City of Albuquerque maintains that this Special Order remains in effect until the City of Albuquerque incorporates the required procedure into SOPs 2-40 and 2-41 on April 9, 2019. See SOP 2-40 Misdemeanor Traffic and City Ordinance Enforcement (dated April 9, 2019), filed March 28, 2025 (Doc. 1733-

- 16 -

G)("Officers shall fill in the email address and telephone number fields for each citation."); SOP 2-41 Traffic Stops (dated April 9, 2019), filed March 28, 2025 (Doc. 1733-H)("Citation should include driver's phone number and email address").  Finally, the City of Albuquerque asserts that, "[i]n the interest of insuring that APD officers fill in the email address and telephone number fields for each citation pursuant to policy, APD has recently requested that the citation be modified such that those fields are now required fields and must be filled in to finalize the citation."  MTD at 7.

The Plaintiffs and the Plaintiff-Intervenors acknowledge that the City of Albuquerque substantially complies with ¶ 2 "to the extent that it issued SOP 2-40 requiring officers to obtain and record telephone numbers and email addresses when they issue traffic citations . . ."  Response at 11 (emphasis in original).  The Plaintiffs and the Plaintiff-Intervenors highlight, however, that SOP 2-40 does not contain the same requirement for non-traffic citations for misdemeanors, and maintain that ¶ 2 requires a SOP which requires officers to obtain telephone numbers and email addresses for all citations, and not merely for traffic citations.  See Response at 11.

Based on the arguments that the parties make above, the parties dispute the City of Albuquerque's substantial compliance with Settlement Agreement ¶ 2, at 2.  Settlement Agreement ¶ 12, at 7, requires that the parties undergo mediation for any dispute regarding "whether or not the terms of this Agreement are being properly fulfilled" before "any motion can be filed with the Court."  Settlement Agreement ¶ 12, at 7.  The Court determines that, in disputing the City of Albuquerque's substantial compliance with the Settlement Agreement ¶ 2, at 2, the parties dispute whether the City of Albuquerque substantially complies with the Settlement Agreement ¶ 2, at 2.  Accordingly, the parties must undergo mediation on this issue before filing a motion with the Court.  Because the parties do not go to mediation before the City of Albuquerque files the MTD with the Court, the Court does not entertain at this time the motion on

the issue of substantial compliance with Settlement Agreement ¶ 2, at 2.

Settlement Agreement ¶ 3 states:

The City Defendants will also initiate revisions to the following SOP's: a. Field Services Standard Operating Procedure 1-14 entitled "Biased Based Policing/Profiling;" b. Field Services Standard Operating Procedure 2-80 entitled "Arrests, Arrest Warrants and Booking Procedures;" c. Field Services Standard Operating Procedure 2-71 entitled "Search and Seizure without a Warrant;" and d. Former Field Services Standard Operating Procedure 3-12 entitled "Domestic Violence."

It is the City's position that the above-referenced standard operating procedures in their current form are consistent with the subjects which follow. However, the revised standard operating procedures will include, to the extent that such provisions are not already sufficiently clear, provisions that: (a) require officers to have reasonable suspicion before stopping, searching, asking for identification from, frisking, or searching people who appear to have a mental disability, and/or to be homeless; and (b) state that officers may seize or dispose of property or personal identification only when authorized by law to do so. The City will provide the above referenced SOPs in their current forms within 10 days of signing the Agreement to counsel for Plaintiffs and Plaintiff Intervenors. Counsel for Plaintiffs and Plaintiff Intervenors will have 30 days to provide suggested revisions. Thereafter, counsel for Plaintiffs and Plaintiff Intervenors will have opportunity to present their suggested revisions to the Office of Policy Analysis (OPA); the City will schedule an OPA meeting within 30 days of receiving their suggestions. The policies will then go through the Department's policy development process, within 90 days. Following the Policy Procedure Review board, counsel for Plaintiff and Plaintiff Intervenors will be presented with their final revisions. They will have fourteen (14) days to provide written objection with respect to any of their original suggestions not fully incorporated into the revisions. The Chief will have ultimate approval authority.

After the Chief issues the SOP regarding the issuance of citations, issues the SOP regarding the collection of phone numbers and email addresses, and gives ultimate approval to the SOPs (specifically SOPs 1-14, 2-19, 2-80, 2-71 and 3-12), APD will ensure that all officers are adequately trained on the revised SOPs.

With regard to training methods on these policy changes for the SOPs referenced (specifically SOP 1-14, 2-19, 2-80, 2-71 and 3-12), APD will develop, following the finalization of the revisions, a training plan within 60 days of the Chief approving the revised policy. Counsel for plaintiff and plaintiff intervenors will be given the opportunity to review the training plan and materials and make comments and recommendations within two weeks of receipt of same. The Chief will make the final determination on training materials and methods.

Settlement Agreement ¶ 3, at 2-4.  The City of Albuquerque argues that it substantially complies with the ¶ 3's requirements, because the City of Albuquerque engages in a back and forth drafting process with the Plaintiffs and the Plaintiff-Intervenors regarding revisions to SOP 1-14, 2-80, 2-71, 4-25,[3] and 2-19, which results in either approval by the Plaintiffs and the Plaintiff-Intervenors, publishing of the revised SOP, or both.  See MTD at 8.  Further, the City of Albuquerque mentions that, after the City of Albuquerque finalizes the SOPs, "the parties agreed to a schedule for the review of training materials . . . [, which] the City provided [] by the agreed-upon deadline, and Plaintiffs provided feedback on each."  MTD at 9.

The Plaintiffs and the Plaintiff-Intervenors provide three reasons in support of their argument that the City of Albuquerque does not substantially comply with ¶ 3's requirements. First, the Plaintiffs and the Plaintiff-Intervenors argue that, "since adopting SOP 2-40, the City has provided no evidence that it trained APD officers on that SOP."  Response at 14.  Second, the Plaintiffs and the Plaintiff-Intervenors maintain that ¶ 3's adequate training requiring is an "ongoing obligation not limited to a certain time frame," and that the City of Albuquerque must provide sufficient evidence of continued adequate training for compliance, which the City of Albuquerque does not provide.  Response at 14.  Finally, the Plaintiffs and the Plaintiff-Intervenors argue that "[t]he mere fact that an officer has received some training does not render that training adequate.  Adequate training should result in substantial compliance by officers with the contents of the SOP."  Response at 14.

Based on the arguments that the parties make above, the parties dispute the City of

---

[3] SOP 3-12 is relabeled to SOP 4-24 as part of a reorganization of APD's SOP's when the City of Albuquerque sends the SOPs to Plaintiffs and Plaintiff-Intervenors. See MTD at 8 n.5.

Albuquerque's substantial compliance with Settlement Agreement ¶ 3, at 2-4. Settlement Agreement ¶ 12, at 7, requires that the parties undergo mediation for any dispute regarding "whether or not the terms of this Agreement are being properly fulfilled" before "any motion can be filed with the Court." Settlement Agreement ¶ 12, at 7. The Court determines that, in disputing the City of Albuquerque's substantial compliance with the Settlement Agreement ¶ 3, at 2-4, the parties dispute whether the City of Albuquerque substantially complies with the Settlement Agreement ¶ 3, at 2-4. Accordingly, the parties must undergo mediation on this issue before filing a motion with the Court. Because the parties do not go to mediation before the City of Albuquerque files the MTD with the Court, the Court does not entertain at this time the motion on the issue of substantial compliance with Settlement Agreement ¶ 3, at 2-4.

Settlement Agreement ¶ 4 states:

> The City Defendants will also initiate revisions to Field Services Standard Operating Procedure 2-19 entitled "Response to Behavioral Health Issues." The City will provide the current SOP within 10 days of signing the Agreement to counsel for Plaintiffs and Plaintiffs Intervenors. Counsel for Plaintiffs and Plaintiff Intervenors will have 30 days to provide suggested revisions. Plaintiff and Plaintiff Intervenors may also participate in the review of this policy with Mental Health Response Advisory Committee (MHRAC) or Office of Policy Analysis (OPA) if they choose to do so. The City will schedule an OPA meeting within 30 days of receiving Plaintiffs' and Plaintiff-Intervenors' suggestions. The policies will then go through the Department's policy development process, within 90 days. Following the Policy Procedure Review Board, counsel for Plaintiff and Plaintiff Intervenors will be presented with the final revisions. They will have fourteen (14) days to provide written objection with respect to any of their original suggestions not fully incorporated into the revisions. The Chief has ultimate approval of SOP contents. After the Department's internal review process is complete, the City will send this SOP to the parties and the Monito in Usa v. City, 1:14-CV-1025-RB-SMV, where it is subject to objection by the parties and approval of the Monitor. City will implement the SOP within 30 days of Monitor approval.

Settlement Agreement ¶ 4, at 4-5. The City of Albuquerque maintains that it has substantially complied with ¶ 4's requirements, because it complies with the required revision process to SOP

2-19.  See MTD at 8-9.  The City of Albuquerque also develops a Lesson Plan for SOP 2-19, along with test questions and a PowerPoint.  See MTD at 11.  The Plaintiffs and the Plaintiff-Intervenors argue that the last sentence requires that the City of Albuquerque implement the SOP, and that there is not currently sufficient evidence that SOP 2-19 is implemented as required.  See Tr. at 33:2-5 (Cubra).

Based on the arguments that the parties make above, the parties dispute the City of Albuquerque's substantial compliance with Settlement Agreement ¶ 4, at 4-5.   Settlement Agreement ¶ 12, at 7, requires that the parties undergo mediation for any dispute regarding "whether or not the terms of this Agreement are being properly fulfilled" before "any motion can be filed with the Court."  Settlement Agreement ¶ 12, at 7.  The Court determines that, in disputing the City of Albuquerque's substantial compliance with the Settlement Agreement ¶ 4, at 4-5, the parties dispute whether the City of Albuquerque substantially complies with the Settlement Agreement ¶ 4, at 4-5.  Accordingly, the parties must undergo mediation on this issue before filing a motion with the Court.   Because the parties do not go to mediation before the City of Albuquerque files the MTD with the Court, the Court does not entertain at this time the motion on the issue of substantial compliance with Settlement Agreement ¶ 4, at 4-5.

Settlement Agreement ¶ 5 states:

> The City Defendants will implement the special order and SOPs described above.  The obligation with respect to policies and training in this Settlement Agreement apply only to city personnel who are subject to the applicable SOPs as identified herein.  Sworn commissioned law enforcement officers are subject to the above SOPs and will receive the above referenced training.  Mental health clinicians employed by APD are also subject to SOP 2-19 and will receive training relevant to that SOP.

Settlement Agreement ¶ 5, at 5.  The City of Albuquerque argues that it substantially complies with ¶ 5's requirements, because "all listed special orders and SOPs were implemented and lesson

plans were created to train affected personnel." MTD at 11. The City of Albuquerque states:

> By October 1, 2018, 97.99% of City personnel subject to the applicable SOPs had completed training on SOP 2-80; 98.63% of City personnel subject to the applicable SOPs had completed training on SOPs 1-4 and 2-71; and 97.89% of City personnel subject to the applicable SOPs had completed training on SOP 4-25. As of July 31, 2023, 97% of sworn personnel and 100% of mental health clinicians subject to the applicable SOPs had completed training on 2-19. Incoming personnel have been and continue to be trained on these and all SOPs prior to being approved for work.

MTD at 11-12. The Plaintiffs and the Plaintiff-Intervenors, however, assert a similar objection to ¶ 5, at 5, as their objection to ¶ 4, at 4-5, stating that the City of Albuquerque does not prove that the required SOPs are sufficiently implemented, as well as arguing that the City of Albuquerque has not demonstrated that all mental health clinicians employed by APD have received training on SOP 2-19 (now split into SOP 2-19 and SOP 1-37). See Response at 20; See Tr. at 34:3-9 (Cubra)("I think that the city says some years ago we changed some policies and some years ago we did some training, and they don't want to talk about whether in 2026 those SOPs are being followed and whether they've ever been actually implemented or not.").

Based on the arguments that the parties make above, the parties dispute the City of Albuquerque's substantial compliance with Settlement Agreement ¶ 5, at 5. Settlement Agreement ¶ 12, at 7, requires that the parties undergo mediation for any dispute regarding "whether or not the terms of this Agreement are being properly fulfilled" before "any motion can be filed with the Court." Settlement Agreement ¶ 12, at 7. The Court determines that, in disputing the City of Albuquerque's substantial compliance with the Settlement Agreement ¶ 5, at 5, the parties dispute whether the City of Albuquerque substantially complies with the Settlement Agreement ¶ 5, at 5. Accordingly, the parties must undergo mediation on this issue before filing a motion with the Court. Because the parties do not go to mediation before the City of

Albuquerque files the MTD with the Court, the Court does not entertain at this time the motion on the issue of substantial compliance with Settlement Agreement ¶ 5, at 5.

¶ 6 of the Settlement Agreement states:

The City Defendants will create course of business records documenting the following: (a) the notation of phone numbers and email addresses on the Uniform Traffic Citation form, beginning at the time the City is in possession of the new form (b) bookings on citable non-violent misdemeanor offenses, not to include DWIs; (c) disposition data for individuals involved in CIT related incidents; and (d) arrests arising from calls for service involving domestic violence.  Beginning 30 days from the signing of this Agreement, the City Defendants will compile the above referenced documents for a period of one year.  Within three months thereafter, City Defendants will publicly issue a written report summarizing the above referenced records and any follow-up measures taken.  The report will identify the period of time the revised Uniform Traffic Citation form was available, if any.  The City's issuance of this report constitutes compliance with the requirements of this paragraph.

Settlement Agreement ¶ 6, at 5.  The City of Albuquerque argues that it substantially complies with ¶ 6, at 5, because the City collected data and issues a report complying with ¶ 6's requirements and publishes the report on its website on July 26, 2018.  See 2018 Report at 1.  The report analyzes incidents for a period of sixteen months -- from January 1, 2017, to April 28, 2018.  See MTD at 13.  The report identifies the period of time in which the revised Uniform Traffic Citation form is available, see 2018 Report at 34, and describes the follow-up measures that the City of Albuquerque takes.  See 2018 Report at 35-37.   In addition, the City of Albuquerque publishes a second report covering a one-year period, 2022, on February 12, 2024.  See MTD at 14.  The Plaintiffs and the Plaintiff-Intervenors mainly take issue with the 2022 Report and argue that they have not been provided data on all the arrest practices from 2022, and that they do not "have any data about their current practices or anything that's happened in the last three years."  See Tr. at 37:5-16 (Cubra).  The Plaintiffs and the Plaintiff-Intervenors agree that the City of Albuquerque complies with ¶ 6, at 5.  See Response at 1.  Accordingly, the Court grants the MTD as to ¶ 6.

¶ 7 of the Settlement Agreement states:

> The City Defendants will continue to collaborate in good faith with Bernalillo County to develop jail diversion programs and will collaborate in good faith with Bernalillo County and other partners in the establishment of such programs and the allocation of resources to implement those programs. The City Defendants will utilize current third-party behavioral health response programs and services, including current locations available during a behavioral health crisis and will utilize other appropriate third-party providers as they become available in the community. The details and timing of these programs are fully within the discretion of the City and the County. To the extent appropriations are required, notwithstanding any other provisions in this Agreement, the terms of this paragraph of the Agreement are contingent upon the City Council of the City of Albuquerque making the appropriations necessary for the performance of this Agreement.

Settlement Agreement ¶ 7, at 6. The City of Albuquerque contends that it substantially complies with ¶ 7, at 6, because it has "participated in the establishment of new jail diversion programs, continued to utilize existing diversion programs and undertaken significant revisions to APD policies to encourage diversion from jail where appropriate." MTD at 16. The City of Albuquerque also states that it collaborates with Bernalillo County on several jail diversion programs and opportunities: (i) Mobile Crisis Teams ("Mobile Crisis Teams respond to nonviolent behavioral health crisis calls, with the goal of diverting individuals to treatment and away from jail . . . . The MCT teams were implemented in February of 2018"); (ii) Forensic Assertive Community Treatment ("[T]he City has collaborated with Bernalillo County in the implementation of a Forensic Assertive Community Treatment (FACT) team. FACT is a service delivery model intended for individuals with serious mental illness who are involved with the criminal justice system, including individuals with co-occurring substance use and physical health disorders."); and (iv) Metro Court Case Management ("At Bernalillo County Metropolitan Court, the City funds one case manager position for the Court's Behavioral Health Unit to provide mental health services to defendants and inmates "). MTD 16-18 (brackets added). Other jail diversion programs that

the City of Albuquerque lists includes: (i) Assertive Community Treatment ("In collaboration with the University of New Mexico, the City has also developed and funded two Assertive Community Treatment (ACT) teams, which primarily provide services, including medication management, in the community"); (ii) Assisted Outpatient Treatment Program ("Since 2020, the City has participated in the Assisted Outpatient Treatment Program (AOT), a court-supervised, community-based treatment program for individuals with severe mental illness funded in part by a grant from Substance Abuse and Mental Health Services Administration (SAMSHA) and administered by the Second Judicial District Court"); and (iii) Gateway Receiving Area ("The City has collaborated with the University of New Mexico Health Services Program to open the First Responder Receiving Area at the Gateway Center, a Pilot Program for providing basic first aid and overnight respite for people with chronic disorders and mental health diagnoses"). MTD at 17-18. The City of Albuquerque also participates in "state court specialty courts and court programs in an effort to prevent individuals from being unnecessarily incarcerated," and "has also recently engaged in discussions with Bernalillo County Metropolitan Judge Asra Elliott to increase referrals to Outreach Court, which defers prosecution for unhoused individuals who are working with a social service provider or substance abuse counselor." MTD at 20-21. Finally, the City of Albuquerque contends that it is working with Bernalillo County to decide how to allocate the remaining approximately seventy-million dollars that it will receive from settlements with opioid manufacturers and distributors, after already contributing one-point-five-million dollars to opioid treatment and recovery services at MDC and five million dollars to a recovery housing program. See MTD at 21.

In response, the Plaintiffs and the Plaintiff-Intervenors state that the subparts with which they take issue is whether the City of Albuquerque continues to collaborate in good faith with

Bernalillo County to develop jail diversion programs, and to collaborate with other third-party partners in the establishment of such programs and the allocation of resources. See Tr. at 41:13-19 (Cubra). The Plaintiffs and the Plaintiff-Intervenors assert that the City of Albuquerque drops or suspends a few of the programs to which the City of Albuquerque points in its MTD, and that the Plaintiffs and the Plaintiff-Intervenors explicitly want to discover to what extent the current City of Albuquerque administration is requesting resources for these dropped programs. See Tr. at 41:22-42:25 (Cubra); Response at 24. Finally, the Plaintiffs and the Plaintiff-Intervenors state that they do not know whether the City of Albuquerque is using other appropriate third party services as they become available in the community, as ¶ 7, at 6, requires. See Tr. at 42:8-14 (Cubra).

Based on the arguments that the parties make above, the parties dispute the City of Albuquerque's substantial compliance with Settlement Agreement ¶ 7, at 6. Settlement Agreement ¶ 12, at 7, requires that the parties undergo mediation for any dispute regarding "whether or not the terms of this Agreement are being properly fulfilled" before "any motion can be filed with the Court." Settlement Agreement ¶ 12, at 7. The Court determines that, in disputing the City of Albuquerque's substantial compliance with the Settlement Agreement ¶ 7, at 6, the parties dispute whether the City of Albuquerque substantially complies with the Settlement Agreement ¶ 7, at 6. Accordingly, the parties must undergo mediation on this issue before filing a motion with the Court. Because the parties do not go to mediation before the City of Albuquerque files the MTD with the Court, the Court does not entertain at this time the motion on the issue of substantial compliance with Settlement Agreement ¶ 7, at 6.

¶ 8 of the Settlement Agreement states:

City Defendants agree to meet with Bernalillo County through Albuquerque

> Bernalillo County Government Commission, one of its sub-committees or another collaborative effort at least one time each quarter beginning July 1, 2017 through June 30, 2018 to explore whether it is feasible to establish teams comprised of mental health professionals who are not employees of the police department who will provide mental health follow up and case management services similar to the activities of the COAST team.

Settlement Agreement ¶ 8, at 6.  The City of Albuquerque argues that it has substantially complied with ¶ 8, at 6, because it "established case management teams staffed by mental health professionals."  MTD at 21.  The Plaintiffs and the Plaintiff-Intervenors agree that the City of Albuquerque has complied with ¶ 8, at 6.  See Tr. at 45:15-16 (Cubra).  Accordingly, the Court grants the MTD as to ¶ 8, at 6.

> ¶ Nine of the Settlement Agreement states:

> > The City Defendants will continue to collaborate in good faith with Bernalillo County in the development of and funding for mobile crisis teams to respond to mental health crisis calls, including alleged threats of suicide, self-harm or welfare checks, where appropriate.  The details and timing of the implementation of these mobile crisis teams are fully within the discretion of the City and the County.  Notwithstanding any other provisions in this Agreement, the terms of this paragraph of the Agreement are contingent upon the City Council of the City of Albuquerque making the appropriations necessary for the performance of this paragraph of the Agreement.

Settlement Agreement ¶ 9, at 6-7.  The City of Albuquerque contends that it substantially complies with ¶ 9, at 6-7, because the City of Albuquerque works with Bernalillo County to establish Mobile Crisis Teams, which the City of Albuquerque first implements in February, 2018.  See MTD at 23 ("By May 2017, members of the Crisis Services sub-committee had met with MHRAC to discuss the mobile crisis team model.  At that time, the City of Albuquerque and Bernalillo County together issued a Request for Proposals for master's level clinicians and determined that the program would consist of four teams with City and County teams functioning together.").  The Mobile Crisis Teams provide specialized responses to 911 calls involving a behavioral health element, and can

either be dispatched by 911 operators if appropriate, or officers on scene may request a Mobile Crisis Team.  See MTD at 23.  "Whether staffed by County or City personnel, the Mobile Crisis Teams are available for both APD and BCSO."  MTD at 24.  Between 2018 and 2021, there are 7,478 dispatches for the Mobile Crisis Teams, and, in a six-month period in 2023 the Crisis Intervention Team's Mobile Crisis Team has 1,290 contacts.  See MTD at 24.  The City of Albuquerque also asserts that, beyond collaborating with Bernalillo County in the development of the Mobile Crisis Teams, they also collaborate with Bernalillo County with the allocation of resources to implement the Mobile Crisis Teams.  See MTD at 24 ("In a December 2022 Bernalillo County publication, it is noted that the County's investment for the Mobile Crisis Teams was $ 1 million and that the City of Albuquerque contributed $456,000 to the program.").  The Plaintiffs and the Plaintiff-Intervenors agree that the City of Albuquerque complies with ¶ 9, at 6-7.  See Response at 1.  Accordingly, the Court grants the MTD as to ¶ 9, at 6-7.

¶ 10 of the Settlement Agreement states:

City Defendants will continue to provide approximately 700 supportive housing slots for people, including those with mental illness or mental disability, who have been booked into the Metropolitan Detention Center.  The housing slots are either transitional supportive housing or permanent housing with wrap-around case management and other behavioral health services.  In providing these services, the City will keep, subject to applicable grant funding and appropriations by City Council, the programs that include individuals with mental disabilities who have been booked into the Metropolitan Detention Center, where not prohibited by other funding resources.  City Defendants will collaborate in good faith with Bernalillo County regarding opportunities for additional supportive housing slots and the allocation of resources for the same.  Notwithstanding any other provisions in the Agreement, the terms of this paragraph of the Agreement are contingent upon the City Council of the City of Albuquerque making the appropriations necessary for the performance of this paragraph of the Agreement.

Settlement Agreement ¶ 10, at 7.  The City of Albuquerque argues that it substantially complies with ¶ 10's requirements, because it continues to fund supportive housing slots for individuals

booked into the jail.  See MTD at 24.  The City of Albuquerque maintains that it has kept more than 700 supportive housing slots open since the end of 2018 and that it additionally contracts with five different agencies to provide motel vouchers.  See MTD at 25.  Further, the City of Albuquerque maintains that it also provides hotel vouchers when clearing encampments and that it provides $150,000.00 in temporary lodging vouchers to Bernalillo County to be available at the Re-Entry Center when an individual is released from MDC.  See MTD at 26.  Finally, the City of Albuquerque also mentions that it is increasing the number of beds available for emergency overnight shelter and that it sets up overflow shelter when needed.  See MTD at 26.

In response, the Plaintiffs and the Plaintiff-Intervenors emphasize that ¶ 10, at 7, requires that the City of Albuquerque provide approximately 700 supportive housing spots for people who have been booked into the MDC.  See Tr. at 48:24-49:2 (Cubra).  The Plaintiffs and the Plaintiff-Intervenors argue that despite all of the other things which the City of Albuquerque has done, the City of Albuquerque:

> has never given us any indication they've ever made any effort to even know who those people are, and they have never claimed that they have done anything for people who are subclass members that they don't do for other people, and we have the clear impression from our work at the jail and with the University of New Mexico that there is nothing anywhere close to 700 supportive housing slots for people who are leaving the jail, or who have been booked into Metropolitan Detention Center.

Tr. at 49:6-16 (Cubra).  See Response at 26.  Additionally, the Plaintiffs and the Plaintiff-Intervenors argue that the City of Albuquerque does not comply, because "it has not provided 700 supportive housing slots," casting doubt on the evidence that the City of Albuquerque provides as support for its contention that the housing slots are supportive, and because it does not make good-faith efforts to keep the existing programs for people booked into the MDC, or collaborate in good faith with Bernalillo County regarding opportunities for additional supportive housing slots.

- 29 -

Response at 26.

Based on the arguments that the parties make above, the parties dispute the City of Albuquerque's substantial compliance with Settlement Agreement ¶ 10, at 7. Settlement Agreement ¶ 12, at 7, requires that the parties undergo mediation for any dispute regarding "whether or not the terms of this Agreement are being properly fulfilled" before "any motion can be filed with the Court." Settlement Agreement ¶ 12, at 7. The Court determines that, in disputing the City of Albuquerque's substantial compliance with the Settlement Agreement ¶ 10, at 7, the parties dispute whether the City of Albuquerque substantially complies with the Settlement Agreement ¶ 10, at 7. Accordingly, the parties must undergo mediation on this issue before filing a motion with the Court. Because the parties do not go to mediation before the City of Albuquerque files the MTD with the Court, the Court does not entertain at this time the motion on the issue of substantial compliance with Settlement Agreement ¶ 10, at 7.

**IT IS ORDERED** that: (i) the Defendant City of Albuquerque's Motion to Dismiss Based on Compliance with the Terms of the 2017 Settlement Agreement, filed March 28, 2025 (Doc. 1733), is granted in part and denied in part; (ii) the MTD is granted as to Settlement Agreement ¶¶ 6, 8, and 9; and (iii) the MTD is denied as to Settlement Agreement ¶¶ 1, 2, 3, 4, 5, 7, and 10.

_____
UNITED STATES DISTRICT JUDGE

*Counsel and parties*:

Mary E. Schmidt-Nowara
Freedman, Boyd, Hollander & Goldberg, P.A.
Albuquerque, New Mexico

- 31 -

-- and --

Philip B. Davis
Philip B. Davis, Attorney at Law
Albuquerque, New Mexico

-- and --

Adam C. Flores
Ives & Flores, PA
Albuquerque, New Mexico

-- and --

Mark H. Donatelli
Peter Schoenburg
Marc M. Lowry
Kate S. Thompson
Rothstein Donatelli LLP
Albuquerque, New Mexico

-- and --

Alexandra Freedman Smith
Doreen McKnight
Law Office of Alexandra Freedman Smith
Albuquerque, New Mexico

*Attorney for the Plaintiffs*

Mary E. Schmidt-Nowara
Freedman, Boyd, Hollander & Goldberg, P.A.
Albuquerque, New Mexico

-- and --

Philip B. Davis
Davis Law
Albuquerque, New Mexico

-- and --

Claire Dickson
Albuquerque, New Mexico

-- and --

Nancy L. Simmons
David Meilleur
Law Offices of Nancy L. Simmons
Albuquerque, New Mexico

-- and --

Peter Cubra
Law Office of Peter Cubra
Albuquerque, New Mexico

-- and--

Ryan J. Villa
Kelly K. Waterfall
The Law Office of Ryan J. Villa
Albuquerque, New Mexico

> *Attorneys for the Plaintiff-Intervenors*

Jeffrey L. Baker
The Baker Law Firm
Albuquerque, New Mexico

-- and --

Kathryn Levy
Carlos F. Pacheco
Trevor Adam Rigler
City Attorney's Office
City of Albuquerque
Albuquerque, New Mexico

-- and --

Debra J. Moulton
Kennedy, Moulton & Wells, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendant City of Albuquerque*

Luis E. Robles
Marcus J. Rael, Jr.

- 33 -

Taylor Sauer Rahn
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

  *Attorneys for Defendants County of Bernalillo and Bernalillo County Board of*
   *Commissioners*

Shane C. Youtz
Stephen Curtice
Youtz & Valdez, PC
Albuquerque, New Mexico

  *Attorneys for Intervenor AFSCME Local 2499*

Michael Sisneros
Director of Bernalillo County Detention Center

  *Defendant Pro Se*